**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **v.** ) | |
| ) | **Crim. No. 17-cr-213 (CRC)** |
| **MUSTAFA MUHAMMAD MUFTA** ) | |
| **AL-IMAM,** ) | |
| ) | |
| **Defendant.** ) | |

### MOTION TO DISMISS ALL COUNTS

Defendant Mustafa Muhammad Mufta Al-Imam, through undersigned counsel,

respectfully moves this Court to dismiss:  (1) Counts Four through Seventeen, and parts of

Counts One and Two, because they are based on laws that do not apply extraterritorially; (2)

Counts One, Two, Three, and Ten through Seventeen, because Al-Imam's seizure violated the

terms of the two treaties governing the prosecution and extradition of the alleged crimes; and (3)

Counts Ten through Fifteen, because they are based on laws that only apply to legally operated

federal facilities.

### BACKGROUND

On October 30, 2017, Defendant Mustafa Al-Imam was captured by U.S. special forces

in Misrata, Libya.  He was transported on a naval vessel to the Washington, D.C. area and

transferred to this Court for arraignment on charges stemming from the September 11-12, 2012,

attack on the U.S. Special Mission and CIA Annex in Benghazi, Libya.  On October 25, 2018,

Al-Imam was charged in a seventeen-count indictment. Dkt. # 43. The charges, which mirrored

charges filed in a superseding indictment in the case of *United States v. Ahmed Abu Khatallah*,

14-cr-141 (CRC), were:  conspiracy to provide material support and resources to terrorists

resulting in death, in violation of 18 U.S.C. § 2339A (Count One); providing material support

1

and resources to terrorists resulting in death, in violation of 18 U.S.C. § 2339A (Count Two);

murder of an internationally protected person, in violation of 18 U.S.C. §§ 1116 and 1111 (Count

Three); murder of an officer and employee of the United States, while such officer and employee

was engaged in and on account of the performance of official duties, in violation of 18 U.S.C. §§

1114 and 1111 (Counts Four, Five and Six); attempted murder of an officer and employee of the

United States, while such officer and employee was engaged in and on account of the

performance of official duties, in violation of 18 U.S.C. §§ 1114 and 1113 (Counts Seven, Eight

and Nine); killing a person in the course of an attack on a federal facility involving the use of a

firearm and dangerous weapon, in violation of 18 U.S.C. §§ 930(c) and 1111 (Counts Ten,

Eleven, Twelve and Thirteen); malicious damaging and destroying U.S. property by means of

fire and an explosive causing death, in violation of 18 U.S.C. § 844(f)(1) & (3) (Counts Fourteen

and Fifteen); and maliciously destroying and injuring dwellings and property and placing lives in

jeopardy within the special maritime and territorial jurisdiction of the United States, in violation

of 18 U.S.C. §§ 1363 and 7 (Counts Sixteen and Seventeen).  He now moves to dismiss all

charges in the Indictment.

## ARGUMENT

### I.    Counts Four Through Seventeen (and Parts of Counts One and Two) Are Based on Laws That Do Not Apply Extraterritorially

#### A.  The presumption against extraterritoriality is only overcome by textual evidence of an international focus, or naturally probable international effect, at least with regard to foreign nationals

Al-Imam acknowledges that this Court recently analyzed the extraterritorial application

of criminal statutes generally, and these statutes in particular, in great detail.  *See United States v.*

*Abu Khatallah*, 151 F. Supp. 3d 116, 123–38 (D.D.C. 2015).  In that opinion, the Court described

how the "Supreme Court has repeatedly—and quite recently—insisted that '[w]hen a statute

2

gives no clear indication of an extraterritorial application, it has none.'" *Id*. at 123. (quoting

*Kiobel v. Royal Dutch Petroleum Co.*, ⎯ U.S. ⎯, 133 S.Ct. 1659, 1664 (2013) (citing

*Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010)).  Under this rule, "'congressional

silence" on extraterritoriality therefore 'means no extraterritorial application,' *Morrison*, 130

S.Ct. at 2881, as does a merely 'plausible' showing of intended extraterritorial application,

*EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 250." *Id*.  And the Court noted that

"[i]mportantly, the Supreme Court has instructed courts to 'apply the presumption *in all cases*' in

which an extraterritorial offense is alleged." *Id*. at 124 (quoting *Morrison*, 130 S.Ct. at 2881)

(emphasis added by this court).

Nevertheless, the Court felt bound to apply "a nearly century-old chestnut of

extraterritoriality doctrine"—the case of *United States v. Bowman*, 260 U.S. 94 (1922)—even

though it "sits uneasily with *Aramco*, *Morrison*, and *Kiobel*." *Abu Khatallah*, 151 F. Supp. 3d at

125.  As the Court explained, *Bowman* divided criminal statutes into two broad categories:

> First were "[c]rimes against private individuals or their property, like assaults,
> murder, burglary, larceny, robbery, arson, embezzlement and frauds of all kinds."
> These offenses principally "affect the peace and good order of the community,"
> and so must seemingly be committed within the political community that they
> disturb. If Congress intends to punish such crimes extraterritorially, "it is natural
> for [it] to say so in the statute, and failure to do so will negative the purpose of
> Congress in this regard."

> But a different rule of construction applies to "criminal statutes which are, as a
> class, not logically dependent on their locality for the Government's jurisdiction,
> but are enacted because of the right of the Government to defend itself against
> obstruction, or fraud wherever perpetrated." For these offenses, "to limit their
> locus to the strictly territorial jurisdiction would be greatly to curtail the scope and
> usefulness of the statute and leave open a large immunity for frauds as easily
> committed by citizens on the high seas and in foreign countries as at home."
> Congress "has not thought it necessary" to explicitly enable their overseas
> application, instead "allow[ing] it to be inferred from the nature of the offense."

*Abu Khatallah*, 151 F. Supp. 3d at 126 (quoting *Bowman*, 260 U.S. at 98).  "Because *Bowman* remains binding on the lower courts," according to the Court, "satisfying *Bowman* is one way of 'clear[ly] indicati[ng]' a federal statute's extraterritorial reach—even if *Bowman* itself requires no 'affirmative' evidence of a deliberate congressional decision to permit overseas applications." *Id*. at 125 (quoting *Kiobel*, 133 S.Ct. at 1664).

The Court was then faced with how to interpret and apply the *Bowman* test itself.  As the Court noted, the *Bowman* Court included dicta concerning six other federal statutes that it believed applied extraterritorially.  *Id*. at 126–27 (citing 260 U.S. at 98–99).  For two of these statutes, *Bowman*'s analysis suggested that "the number of expected extraterritorial offenses must outweigh domestic ones—that the former must be 'probable' or 'most likely.'"  *Abu Khatallah*, 151 F. Supp. 3d at 127.  "But *Bowman*'s fifth example pointed toward a looser 'locus' test for extraterritoriality—that the crime 'would naturally often occur' abroad."  *Id*.  The Court then considered the D.C. Circuit case of *United States v. Delgado-Garcia*, 374 F.3d 1337, 1339 (D.C. Cir. 2004), which the Court interpreted as a "resolution of this issue in favor of the latter [looser] formulation" of the test for extraterritoriality.  151 F. Supp. 3d at 127.

According to the Court, the D.C. Circuit formulated the *Bowman*-test as one concerned only with whether a statute has (numerically) "many foreseeable extraterritorial applications," 151 F. Supp. 3d at 133, not whether it was "fundamentally international…in focus and effect'" *id*. (quoting *Delgado-Garcia*, 374 F.3d at 1345).  This Court reasoned:

> *Delgado–Garcia* could have interpreted *Bowman* to mean that an offense is not logically dependent on its locality when it will likely be committed overseas more often than not, just as the court believed that § 1324(a) crimes would be. Yet the D.C. Circuit articulated a more permissive standard for satisfying *Bowman's* "locus" element: whether a criminal statute "ha[s] many obvious extraterritorial applications." *Id.* at 1347. A prohibition can have many obvious extraterritorial applications even if it is most readily and naturally deployed domestically.

*Abu Khatallah*, 151 F. Supp. 3d at 134.  In a footnote, the Court culled multiple instances in which the *Delgado-Garcia* court described the *Bowman* test in terms of frequency of occurrence. *Id*. at 129 n.3 (citing 374 F.3d at 1346 ("[M]uch of the conduct that § 1324(a) criminalizes occurs beyond the borders of the United States."); *id*. at 1347 (concluding that § 1324(a) "applies to much extraterritorial conduct"); *id*. (observing that "many" proscribed attempts would occur overseas); *id*. at 1347–48 (finding that the charged conspiracy offense "has many natural extraterritorial applications"); *id*. at 1348 (noting that § 1324(a) "has a great many international applications")).

Based on these statements in *Delgado-Garcia*, this Court concluded that "[i]n this Circuit, then, *Bowman* is satisfied when (1) a federal criminal offense directly harms the U.S. Government, and (2) enough foreseeable overseas applications existed at the time of a statute's enactment (or most recent amendment) to warrant the inference that Congress both contemplated and authorized prosecutions for extraterritorial acts."  *Id*. at 129.  Satisfying this two-part test, according to the Court, qualifies as "'clear[ly] indicati[ng]' a federal statute's extraterritorial reach" under Supreme Court precedent.  *Id*. at 125 (quoting *Kiobel*, 133 S.Ct. at 1664).

Respectfully, there are two problems with the Court's reasoning that *Bowman* is so easily satisfied, and that satisfying *Bowman* suffices to overcome the presumption against extraterritoriality.  First, *Bowman* expressly reserved the question of whether the statute at issue would apply to a foreign national.  260 U.S. at 102–03.  Thus, *Bowman*'s holding is *not* binding on this Court in this case.  *See Brecht v. Abrahamson*, 507 U.S. 619, 631 (1993) (explaining an opinion is not binding precedent on an issue "never squarely addressed" even if the opinion "assumed" one resolution of the issue).  Rather, at most, all that can be said is that satisfying *Bowman* is one way of clearly-indicating a statute's extraterritorial reach over *U.S. citizens*.

Modern jurists do not always appreciate how important the issue of citizenship was to the extraterritorial application of statutes in "elderly" cases. *Delgado-Garcia*, 374 F.3d at 1350. But in early decisions, the Supreme Court often considered respect for the feelings of foreign nations to be a guiding principal in statutory construction, and interpreted even extraterritorial statutes to avoid reaching foreign nationals. In *United States v. Palmer*, 16 U.S. 610, 626–27 (1818), for example, the Court interpreted a statute that applied on its face to "any person or persons" who commits a murder or robbery "upon the high seas" as limited to U.S. citizens or foreigners on U.S. ships. Similarly, in *United States v. Furlong*, 18 U.S. 184 (1820), the Court expressed a rationale for selectively applying criminal statutes to U.S. citizens:

> As to our own citizens, I see no reason why they should be exempted from the operation of the laws of the country, even though in foreign service. Their subjection to those laws follows them every where; in our own Courts they are secured by the constitution from being twice put in jeopardy of life or member, and if they are also made amenable to the laws of another State, it is the result of their own act in subjecting themselves to those laws.

*Id*. at 197–98.

It makes sense then that, having reserved the question of the applicability of government-protecting statutes to foreign nationals for overseas conduct, the Supreme Court in *Bowman* would be less than strident in articulating a clear and consistent rationale for when a statute would apply extraterritorially: the stakes were not as high, because the duties of citizens not to harm their government "follow them anywhere." *Id*. Indeed, the *Bowman* court even referred to a government's right to defend itself "especially from its own *citizens*, officers, or agents" when defining its second class of crimes. 260 U.S. at 98 (emphasis added). And while it could be argued that the court's use of "especially" indicates that it did not envision a limitation to citizens in this second class of crimes—which seems true enough—it seems equally true that the government's especially strong prerogative to apply its law to its own citizens anywhere in the

6

world can help explain the *Bowman* court's unselfconsciously "looser 'locus' test" in those examples where the international focus of the statute was less strong.  In short, there is no way to separate out a "test" from *Bowman* apart from its intuition that the federal government, in assigning rules for its own citizens with regard to itself, would not necessarily need to expressly state that its rules apply wherever its own citizens roam.

That is not to say that *Bowman* necessarily would have been decided differently had the defendants been foreign:  as the D.C. Circuit observed, "*Bowman*'s logic did not depend on" the citizenship of the defendants, 374 F.3d at 1346, and "the fact that *Bowman* involved a U.S. citizen [did not] lessen[] its force" as "persuasive authority" for interpreting the clearly-internationally-focused statute at issue in *Delgado-Garcia*.  But it does mean that (1) *Bowman* is not binding precedent here; and (2) attempting to divine a test from *Bowman* with the rigor necessary to apply it to *non-citizens* is a perilous endeavor that should not be done by focusing on the most expansive language or examples used in the case.

This leads to the second problem with the Court's approach to *Delgado-Garcia* and *Bowman*:  in striving for analytical purity, the Court fashioned a test out of words such as "much," "many," or "often" that were not meant to be expressions of a test, and which reflected what was necessary, but not sufficient, to establish the extraterritoriality of statutes.  As noted above, the Court held that "the D.C. Circuit articulated a more permissive standard for satisfying *Bowman's* 'locus' element: whether a criminal statute 'ha[s] many obvious extraterritorial applications.'"  *Abu Khatallah*, 151 F. Supp. 3d at 134 (quoting *Delgado-Garcia*, 347 F.3d. at 1347).  It is true, as the Court noted, that the opinion in *Delgado-Garcia* commented that the statute before it, like the statutes discussed in *Bowman*, had "many obvious extraterritorial applications," or words to that effect.  347 F.3d at 1347.  But the court never

characterized these descriptions as a "test."  Nor would it have made sense for it to do so:  the court in Delgado-Garcia was not applying Bowman as a precedential framework, it was simply using a case with a less-internationally-focused statute as "persuasive authority" to argue against the dissent's opinion that the more-internationally-focused statute before it did not apply extraterritorially.

The Court did not seem to appreciate this distinction.  According to the Court, the *Delgado-Garcia* "court situated its analysis firmly within the framework established by *Bowman*, deeming it a 'persuasive precedent' for the Government's position."  *Abu Khatallah*, 151 F. Supp. 3d at 128 (quoting *Delgado-Garcia*, 374 F.3d at 1346).  But a close reading of *Delgado-Garcia* shows that it does not endorse *Bowman*'s two-tiered approach to statutes.  Instead, the court stated early in its analysis that it "agree[s] with the Second Circuit's statement…that 'all statutes, *without exception*, [should] be construed to apply within the United States only, unless a contrary intent appears….'"  374 F.3d at 1344 (quoting *Kollias v. D & G Marine Maintenance*, 29 F.3d 67, 71 (2d Cir. 1994)) (alteration in original) (emphasis added).  This contrasts directly with *Bowman*'s holding that "the same rule of interpretation [i.e., the presumption against extraterritoriality] should not be applied to criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction, but are enacted because of the right of the government to defend itself…."  260 U.S. at 98.

Rather than apply a *Bowman*-like two-tiered framework, the *Delgado-Garcia* court stated that its "point is that contextual factors show that Congress had a contrary intent in this case."  374 F.3d at 1344.  *See also id.* at 1345 ("[I]n examining the statute for congressional intention of extraterritorial application, we consider both contextual and textual evidence. That is what our analysis below represents."); *id.* ("Read in context, § 1324(a) applies extraterritorially.").  In that

sense, the *Delgado-Garcia* court simply anticipated *Morrison*'s diluting instruction that a statute need not say "this law applies abroad," because "context can be consulted as well." *Morrison*, 130 S.Ct. at 2883.  *See also Small v. United States*, 544 U.S. 385, 391 (2005) (recognizing "statutory language, context, history, or purpose" as proper tools for rebutting the presumption).

Only after applying this modern approach to the presumption against extraterritoriality did the *Delgado-Garcia* court turn to the "old chestnut" of *Bowman*.  Since the statute in *Bowman* had a far less obvious international focus than the immigration-related statute in *Delgado-Garcia*, the D.C. Circuit was happy to cite it as support for its ultimate conclusion that the statute at issue applied extraterritorially.  347 F.3d at 1345–46 ("The second main difference between this case and *Bowman* – that this case involves immigration offenses rather than frauds against the United States – shows that *Bowman* applies with even greater force to § 1324(a).").  But in so doing, the Court had no reason to formulate a Bowman "test," or even pay close attention to the distinction in its language between "probable" applications abroad and "many" such applications.

Thus, *Delgado-Garcia*, whatever it stands for, is not a binding endorsement of one side of the tension between *Bowman*'s own descriptions of what makes a statute apply extraterritorially.  A more faithful approach to *Bowman* would be to read it holistically, including its reservation with regard to citizenship.  Doing so reveals that it speaks more prevalently about Congress affirmatively *intending* the locus of a crime as a foreign country, or a foreign location being the "probable place for [a crime's] commission," than it does about the mere possibility of high number of occurrences abroad for an otherwise domestically-focused statute.  260 U.S. at 99.

And such a test makes far more sense:  It could hardly be the case that mere numerical frequency of possible overseas applications is enough to overcome the presumption against extraterritoriality, when the overseas application of a statute may raise complications Congress may have wanted to avoid in some, but not all, instances.  For example, Congress may not have wanted the killing of any U.S. soldier by a foreign national in a conflict zone to be treated as a crime, as opposed to an instance of lawful armed conflict.  Yet that is what the strict text of § 1114 requires if it is applied extraterritorially without regard for its natural focus and effect.  Similarly, Congress may not have wanted to empower prosecutors to prosecute every instance of a foreign official overseas who makes a false statement to a federal officers, even if the statement would otherwise fall under 18 U.S.C. § 1001.  While the sheer number of federal officers abroad makes a high frequency of such statements possible, one can envision instances Congress may not have wanted to criminalize, which is not encompassed by any frequency-based test.  Thus, again, the better approach, and the one more faithful to a holistic reading of Bowman, is to apply the actual test from Delgado-Garcia:  a statute applies extraterritorially when there is "specific textual evidence that, as the Supreme Court observed in *United States v. Bowman,* 'the natural inference from the character of the offense[s]' is that an extraterritorial location 'would be a probable place for [their] commission.'"  374 F.3d at 1345 (quoting *Bowman*, 260 U.S. at 99).

**B. All counts except Count Three (and Counts One and Two insofar as they are based on Count Three) must be dismissed[1]**

    i.  Section 1114 Does Not Apply Extraterritorially

Counts Four, Five and Six charge Al-Imam with murder in violation of 18 U.S.C. § 1114, and Counts Seven, Eight and Nine charge him with attempted murder in violation of § 1114, which provides:

> Whoever kills or attempts to kill any officer or employee of the United States or of any agency in any branch of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties, or any person assisting such an officer or employee in the performance of such duties or on account of that assistance, shall be punished--
>
> (1) in the case of murder, as provided under section 1111;
> (2) in the case of manslaughter, as provided under section 1112; or
> (3) in the case of attempted murder or manslaughter, as provided in section 1113.

This statute contains no reference to extraterritorial application, and there is no clear indication that Congress intended this provision to be applied abroad.

    Although the statute applies to "any" officer or employee, as the Supreme Court has recognized, "it is well established that generic terms like "any" or "every" do not rebut the presumption against extraterritoriality." *Kiobel,* 133 S. Ct. at 1665 (2013) (language in Alien Tort Statute providing jurisdiction over "any" civil action did not rebut presumption against or evince clear indication of extraterritorial reach); *Small*, 544 U.S. at 388 ("In law, a legislature that uses the statutory phrase 'any person' may or may not mean to include 'persons' outside 'the jurisdiction of the state.'" (internal quotations omitted)).   More specific language is necessary to indicate that a federal law may apply extraterritorially, for example when a statute provides for

---

[1] In light of the identical nature of the charged offenses between this case and *Abu Khatallah*, 14-cr-141 (CRC), Defendant Al-Imam is repeating the arguments raised in that case in this section, in order to preserve all of them.

application "regardless of where the offense is committed." *Kiobel*, 133 S. Ct. at 1665 (citing 18 U.S.C. § 1091(e)).

A comparison between § 1114 and § 1116 demonstrates that Congress did not intend for § 1114 to apply extraterritorially. As noted above, § 1116 prohibits the killing of any internationally protected person. Section 1116 was amended in 1996 to broaden "the jurisdictional reach of the statute[] to also provide extraterritorial jurisdiction if the victim is a representative, officer, employee or agent of the United States." *United States v. Sepulveda*, 57 F. Supp. 3d 610, 617 (E.D. Va. 2014). Significantly, at the same time, Congress also amended § 1114, prohibiting the killing of any officer or employee of the United States, rather than specific categories of officers and employees. Unlike § 1116, however, § 1114 was not amended to include extraterritorial application. The amendment to § 1116 would have been unnecessary if Congress had intended § 1114 to apply to the extraterritorial killing of all officers and employees of the United States. Moreover, the amendment to § 1116 demonstrates that when Congress intended a homicide statute to apply extraterritorially, it specifically stated so. *See also* 18 U.S.C. § 2332 (prohibiting killing of "a national of the United States, while such national is outside the United States"). Absent any "clear indication" Congress intended the extraterritorial application of § 1114, "it has none." *Morrison*, 561 U.S. at 255. Here, the failure to include extraterritorial application in § 1114, while specifically including such a provision in § 1116, is a clear indication that Congress did *not* intend the extraterritorial application of § 1114.

With little analysis, two other Circuits have upheld the extraterritorial application of § 1114. *See United States v. Siddiqui,* 699 F.3d 690, 700 (2d Cir. 2012*); United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011); *United States v. Benitez*, 741 F.2d 1312, 1316-17 (11th Cir. 1984). As discussed above, a fair reading of the law of this Circuit does not permit

such a finding. *See Delgado-Garcia,* 374 F.3d at 1344-50.  In *Benitez*, the Eleventh Circuit

found that "Congress must have intended" the statute to apply extraterritorially, *Benitez,* 741

F.2d at 1317, but pointed only to the status of the victims and cited nothing demonstrating such

an intent.  The Second Circuit in *Al Kassar* and *Siddiqui* did the same, relying on *Benitez* and

finding that the nature of the offense alone was sufficient to imply intent to apply the statute

extraterritorially.  *Al Kassar*, 660 F.3d at 118;  *Siddiqui*, 699 F.3d at 701.  In *Siddiqui*, the court

made this finding after noting that, in the Second Circuit, "[t]he ordinary presumption that laws

do not apply extraterritorially has no application to criminal statutes."  699 F.3d at 700.

In contrast, the law of this Circuit requires the Court to apply the presumption to criminal

as well as civil statutes, and more is necessary to find a Congressional intent to apply a statute

beyond U.S. borders, absent a specific indication in the text of the statute.  *Delgado-Garcia,* 374

F.3d at 1344-50 (finding presumption overcome and extraterritorial application of criminal

statute implied for statute with international focus designed to protect borders, where natural

inference was that offenses would likely occur outside U.S. borders).   Section 1114 protects

U.S. officers and employees, and while some of these individuals work outside of the territorial

United States, nothing in the statute suggests an international focus.  Moreover, as noted above,

other homicide statutes specifically provide for extraterritorial application in limited

circumstances when the victim is within a specific category of officers or employees of the

United States or is a U.S. national—negating any suggestion of Congressional intent for

extraterritorial application for all U.S. officers and employees.  *See* 18 U.S.C. §§ 1116, 2332.

 ii. Section 930(c) Does Not Apply Extraterritorially

Counts Ten through Thirteen charge Mr. Abu Khatallah with violations of 18 U.S.C.

§ 930(c). Section 930 provides:

(a) Except as provided in subsection (d), whoever knowingly possesses or causes to be present a firearm or other dangerous weapon in a Federal facility (other than a Federal court facility), or attempts to do so, shall be fined under this title or imprisoned not more than 1 year, or both.

(b) Whoever, with intent that a firearm or other dangerous weapon be used in the commission of a crime, knowingly possesses or causes to be present such firearm or dangerous weapon in a Federal facility, or attempts to do so, shall be fined under this title or imprisoned not more than 5 years, or both.

(c) A person who kills any person in the course of a violation of subsection (a) or (b), or in the course of an attack on a Federal facility involving the use of a firearm or other dangerous weapon, or attempts or conspires to do such an act, shall be punished as provided in sections 1111, 1112, 1113, and 1117.

* * *

(g) As used in this section:

(1) The term "Federal facility" means a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties.

Like § 1114, this statute contains no reference to extraterritorial application, and there is no clear indication that Congress intended this provision to be applied abroad.  This statute also lacks a connection to international activities that would evidence some intent to apply it beyond U.S. borders.  Although some "Federal facilities" may be located outside of the United States, this fact alone does not demonstrate a Congressional intent to apply the statute extraterritorially.

Only one reported case addresses the extraterritorial application of § 930(c).  *See United States v. Bin Laden,* 92 F. Supp. 2d 189 (S.D.N.Y. 2000) (finding §§ 844(f), 924(c), and 930(c) apply extraterritorially).  The court found that § 930(c) could be applied extraterritorially to foreign nationals "[g]iven (i) that this provision is explicitly intended to protect vital United States interests, (ii) that a significant number of Federal facilities are located outside the United States, and (iii) that, accordingly, foreign nationals are in at least as good a position as are United States nationals to attack Federal facilities." *Bin Laden* at 198, 201-02.  The court rejected the

defendant's argument that "(i) because Section 930(c) was added to Section 930 by Title VI, Section 60014 of the Violent Crime Control and Enforcement Act of 1994, Pub.L. 103-322, 108 Stat. 1796, 1973, and (ii) because Title VI 'contained several statutory provisions that expressly provided for extraterritorial jurisdiction,' it follows that 'Congress's failure to provide for extraterritorial jurisdiction in' Section 930(c) means that Congress did not intend that it apply extraterritorially." *Id.* at 202 (citation omitted). The court rejected this argument based on its reading of *Bowman,* 260 U.S. at 98, but that reading conflicts with the D.C. Circuit's application of the presumption against extraterritorial application absent a clear indication of Congressional intent.

The court in *Bin Laden* found that *Bowman* established an exception to the presumption against extraterritorial application when a statute is enacted based on the government's right to defend itself against obstruction or fraud and the requisite intent may be inferred merely from the nature of the statute. *Bin Laden,* 92 F. Supp. 2d at 193. As noted above, the law of this Circuit requires the Court to apply the presumption to all statutes, and a clear indication of Congressional intent is necessary. *Delgado-Garcia,* 374 F.3d at 1344-50. Although the court in *Delgado-Garcia*, like the court in *Bin Laden*, found that *Bowman* supported the extraterritorial application of the statute at issue, the court affirmed its commitment to the presumption against extraterritorial application and did not read *Bowman* as broadly as the court in *Bin Laden*. *Id.* The *Delgado-Garcia* court found that the § 1324(a)—which criminalizes the unlawful bringing of, or attempts to bring, aliens into the United States—had an international focus. *Id.* at 520. This international focus was the contextual feature of the statute that supported extraterritorial application. *Id.* The *Delgado-Garcia* court found that *Bowman* supported this finding because, as in *Bowman*, the natural inference was that this immigration offense would probably be

committed in extraterritorial locations.  *Id.* The court did not find that this inference regarding

"probable locations," or a U.S. interest, was sufficient by itself to infer Congressional intent.

Here, the Court should not infer extraterritorial application from the mere fact that some

"Federal facilities" are outside the territorial United States.  Section 930(c) has no international

focus.  Rather, the obvious focus is Federal facilities within U.S. territory, and the court is

required to presume that Congress intended to apply the statute within the territorial United

States given the absence of any clear indication that Congress intended otherwise.

### iii.  Section 844(f) Does Not Apply Extraterritorially

Counts Fourteen and Fifteen charge Al-Imam with violations of 18 U.S.C. § 844(f)(1) &

(3), which provide:

> (f)(1) Whoever maliciously damages or destroys, or attempts to damage or
> destroy, by means of fire or an explosive, any building, vehicle, or other personal
> or real property in whole or in part owned or possessed by, or leased to, the
> United States, or any department or agency thereof, or any institution or
> organization receiving Federal financial assistance, shall be imprisoned for not
> less than 5 years and not more than 20 years, fined under this title, or both.
>
> * * *
> (3) Whoever engages in conduct prohibited by this subsection, and as a result of
> such conduct directly or proximately causes the death of any person, including
> any public safety officer performing duties, shall be subject to the death penalty,
> or imprisoned for not less than 20 years or for life, fined under this title, or both.

Like § 930(c), the mere fact that some property owned or leased by the United States may

be beyond the territorial United States is not sufficient to establish Congressional intent to apply

this provision extraterritorially.  This statute contains no reference to extraterritorial application

and there is not contextual basis to support Congressional intent for such application because the

statute does not have an international focus and logically applies to property within the territorial

United States.  For the same reason that the Court should reject the analysis in *Bin Laden* with

regard to § 930(c) -- because the law of this Circuit requires  a clear indication of Congressional

intent -- the court should reject the *Bin Laden* court's finding with regard to § 844(f).

    iv.  <u>Section 924(c) Does Not Apply Extraterritorially as Charged</u>

Count Eighteen charges Al-Imam with a violation of 18 U.S.C. § 924(c), which provides:

(c)(1)(A) Except to the extent that a greater minimum sentence is otherwise
provided by this subsection or by any other provision of law, any person who,
during and in relation to any crime of violence or drug trafficking crime
(including a crime of violence or drug trafficking crime that provides for an
enhanced punishment if committed by the use of a deadly or dangerous weapon or
device) for which the person may be prosecuted in a court of the United States,
uses or carries a firearm, or who, in furtherance of any such crime, possesses a
firearm, shall, in addition to the punishment provided for such crime of violence
or drug trafficking crime –

(i) be sentenced to a term of imprisonment of not less than 5 years;

(ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less
than 7 years; and

(iii) if the firearm is discharged, be sentenced to a term of imprisonment of not
less than 10 years.

The Court has found that § 924(c) is an ancillary statute.  Thus, § 924(c) does not apply

extraterritorially, because, as argued elsewhere herein, the predicate substantive offenses do not

apply extraterritorially.

Section 924(c) is set within a comprehensive statutory scheme regulating the domestic

licensing, trade and use of guns and other firearms.  Congress's evident goal in § 924(c) was to

address one aspect of the gun violence problem within the United States, by attempting to deter

criminals from using firearms during the commission of other crimes.  *See generally United*

*States v. Washington*, 106 F.3d 983, 1010 n. 41 (D.C. Cir. 1997).  Section 924(c) does refer to

"any" crime of violence or drug trafficking crime, but as noted above, such generic terms do not

rebut the presumption against extraterritoriality.  *See Kiobel,* 133 S.Ct. at  1665; *see also Small,*

544 U.S. at 388-89 (use of phrase "convicted in *any* court" in 18 U.S.C. § 922(g) has no

particular significance as to the issue of whether Congress intended law to apply to foreign

convictions).

Although the Supreme Court has not directly addressed the extraterritorial application of

§ 924(c), the Court's decision in *Small,* with regard to § 922(g), strongly supports Al-Imam's

position that Congress did not intend § 924(c) to have extraterritorial effect.  Section 924

contains several subsections defining different firearms offenses.  Section 922(g), enacted at the

same time as § 924(c), makes it a crime for an individual previously convicted of a felony to

possess a firearm.  The issue in *Small* was whether § 922(g) applies to an individual who was

previously convicted of a felony in a foreign court or whether the statute is limited only to prior

domestic convictions.  Relying on the presumption against extraterritorial application of

Congressional statutes and its reading of the statutory language and legislative history, the Court

held that § 922(g) does not prohibit the possession of firearms by individuals who have been

convicted in foreign courts.  The presumption against extraterritoriality did not directly dictate

the result in *Small* -- because the defendant who possessed the firearm was in the United States --

but the presumption was accorded significant weight in the analysis.  The Court began its

analysis with its line of cases recognizing the "legal presumption that Congress ordinarily

intends its statutes to have domestic, not extraterritorial, application."  *Small*, 544 U.S. at 388-89.

Applying the reasoning underlying this presumption, the Court found "no convincing indication"

in the statutory language or the contextual or legislative history that would overcome the

presumption.

The decision in *Small* confirms that the presumption against extraterritoriality applies to

possession of a firearm abroad:  "That presumption would apply, for example, were we to

consider whether this statute prohibits unlawful gun possession abroad as well as domestically."
544 U.S. at 389.  Moreover , like § 922(g), the subject matter of § 924(c) is a domestic issue --
possession of firearms.  There is no more indication in the text or the contextual or legislative
history of § 924(c) that Congress intended it to apply extraterritorially, than there is in the text or
contextual or legislative history of § 922(g).  Indeed, both statutes were initially part of the same
Omnibus Crime Control and Safe Streets Act of 1968.

      The Court in *Small* found that application of § 922(g) to foreign convictions would be
inconsistent with the principles which underlie the presumption against extraterritorial
application of statutes.  *Id*. at 389-90.  The extraterritorial application of § 924(c) similarly is
inconsistent with these principles.  Section 924(c) regulates the possession of firearms, and the
circumstances under which an individual may carry a firearm is quintessentially a matter of the
law of the sovereign where the individual is located.  Congress may set whatever limitations it
deems appropriate for the possession of firearms in the United States.  And while it may or may
not have the power to set limitations on such possession in foreign countries, it should not be
inferred that Congress intended to exercise such power in the absence of unambiguous evidence
of such intent.  *See Arabian Am. Oil Co.,* 499 U.S. at 248 (presumption against extraterritorial
application "serves to protect against unintended clashes between our laws and those of other
nations which could result in international discord.").

      The legislative history of § 924(c) confirms the absence of any extraterritorial intention.
Section 924(c) was enacted as part of the Omnibus Crime Control and Safe Streets Act of 1968,
Pub. L. 90-351, Title IV, § 902, June 19, 1968, 82 Stat. 233.  Its history suggests that the "safe
streets" referred to in the Act's title were those of the United States alone.  The Act was a
compendium of provisions ranging from technical and financial assistance to state and local law

enforcement agencies (Title I), major changes to the rules relating to the admissibility of confessions and other evidence in the courts of the United States (Title II), authorization of wiretapping and electronic surveillance by domestic law enforcement agencies (Title III), and new licensing, transfer, transportation, and use and possession laws relating to firearms, with associated criminal penalties (Title IV).  *See generally Id.,* S. Rep. No. 1097 *available in* 1968 U.S.C.C.A.N 2112, 2113.  As explained in the Senate Report, the goal of the Title IV provisions, which included the enactment of the new 18 U.S.C. § 924(c), was to "keep firearms out of the hands of those not legally entitled to possess them" and to "assist law enforcement authorities *in the States and their subdivisions* in combating the increasing prevalence of crime in the United States."  *Id.* at 2113-14 (emphasis added); *see also id.,* at 2163-66, 2164 (describing and documenting the aim of Title IV of the Act as "curbing the problem of gun abuse that exists in the United States").

1 The legislative history of subsequent amendments to § 924 demonstrate the continued focus on the "safe streets" of "the States and their subdivisions."  In the floor debate on the 1998 amendments, for example, a leading proponent explained the aim of the bill: "Mr. Speaker, today we take an important step in the battle against firearm violence in America.  . . .  We need it because dedicated law enforcement officers across the country are being gunned down for the mere thrill of the kill."  144 Cong. Rec. H531 (Feb. 24th, 1998) (comments of Rep. McCollum); *see also id.* H532 ("Throughout North Carolina and the Nation, citizens routinely claim that crime is one of their greatest fears and concerns.  Nothing is scarier or more dangerous than a criminal possessing or brandishing a gun during the commission of a crime.  We do not have to put up with it and we will not.") (comments of Rep. Myrick).

Given the text and contextual and legislative history of § 924(c), this Court should not follow the decisions of the Second and Eleventh Circuits, permitting the extraterritorial application of 924(c).  *See United States v. Belfast*, 611 F.3d 783, 815 (11th Cir. 2010); *United States v. Siddiqui*, 699 F.3d 690, 701 (2d Cir. 2012).  The court in *Belfast* found that "there is simply no limitation in the language of the statute concerning its application to crimes committed outside of the United States," and the Second Circuit merely adopted the reasoning in *Belfast* without discussion.  *Belfast,* 611 F.3d at 814; *Siddiqui*, 699 F.3d at 701.  That reasoning, however, turns the presumption against extraterritorial application on its head -- Congress must express an intent for extraterritorial application of a statute, not merely fail to specifically limit the application to domestic offenses.  The law in this Circuit requires the court to find -- either in the text of the statute or the context in which it was enacted – an affirmative expression of intent to apply the statute extraterritorially.  *See Delgado-Garcia,* 374 F.3d at 1344  (affirmative evidence of intent required).

The court in *Belfast* also found that because "[t]here can be no violation of  § 924(c) without a predicate offense, . . . it follows that the statute's reach is determined by the breath of the predicate offense."  *Belfast*, 611 F.3d at 815.  Although the D.C. Circuit has recognized that "[g]enerally, the extraterritorial reach of an ancillary offense like aiding and abetting or conspiracy is coterminous with that of the underlying criminal statute," *Ali*, 718 F.3d at 939,  § 924(c) is not a generic ancillary offense like aiding or abetting or conspiracy, which regulates the manner in which an individual participates in an underlying offense.  Rather, § 924(c) regulates a specific category of additional offenses -- those committed with a firearms.   Absent any indication that Congress intended to regulate the possession of firearms within the territory of a foreign state, such ancillary application of extraterritoriality is not appropriate, particularly where

21

ancillary application could cause "unintended clashes between our laws and those of other nations which could result in international discord." *Arabian Am. Oil Co.,* 499 U.S. at 248.

> v.  Section 1363 Does Not Apply Extraterritorially as Charged

Counts Sixteen and Seventeen charge Al-Imam violations of 18 U.S.C. §§ 1363 and 7. Section 1363 provides:

> Whoever, within the special maritime and territorial jurisdiction of the United States, willfully and maliciously destroys or injures any structure, conveyance, or other real or personal property, or attempts or conspires to do such an act, shall be fined under this title or imprisoned not more than five years, or both, and if the building be a dwelling, or the life of any person be placed in jeopardy, shall be fined under this title or imprisoned not more than twenty years, or both.

Because the statute relies on the special maritime and territorial jurisdiction of the United States, it may be applied extraterritorially only to the extent foreign locations are included within this special maritime and territorial jurisdiction.

Section 7 defines the "special maritime and territorial jurisdiction of the United States." Here, only subsection 7(9) is possibly applicable:

> With respect to offenses committed by or against a national of the United States as that term is used in section 101 of the Immigration and Nationality Act--
>
> (A) the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership; and
>
> (B) residences in foreign States and the land appurtenant or ancillary thereto, irrespective of ownership, used for purposes of those missions or entities or used by United States personnel assigned to those missions or entities.
>
> Nothing in this paragraph shall be deemed to supersede any treaty or international agreement with which this paragraph conflicts. This paragraph does not apply with respect to an offense committed by a person described in section 3261(a) of this title.

The Special Mission and Annex in Benghazi were not such premises or residences. These outposts were established in violation of the Vienna Convention on Consular Relations and Optional Protocol on Disputes art. 2, Apr. 24, 1963, 21 U.S.T. 77, and the Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes art. 2, 12, Apr. 18, 1961, 23 U.S.T. 3227 ("Vienna Conventions").  These treaties require mutual consent between States for the establishment of missions, and the Vienna Convention on Diplomatic Relations provides that "[t]he sending State may not, without the prior express consent of the receiving State, establish offices forming part of the mission in localities other than those in which the mission itself is established."  Art. 12, 23 U.S.T. 3227.  Section 7(9) cannot be applied in conflict with "any treaty or international agreement."  The United States established the Special Mission and Annex without the express consent of the government of Libya, and therefore, they were not premises or residences as defined by § 7(9).  *See* Defendant's Motion to Dismiss Counts Ten Through Fifteen [Dkt. # 90] (citing Accountability Review Bd., U.S. Dep't of State, Benghazi Attack Report (Unclassified), 14-15 (2012) , *available at*

Even if the status of the Special Mission could support application of § 7(9) jurisdiction as a diplomatic mission despite the failure of the United States to comply with the Vienna Conventions when establishing the Mission, the CIA Annex did not constitute such a premises or residence under § 7(9), and Count Seventeen must be dismissed.  *See Passaro*, 577 F.3d at 213-16 ("[W]e doubt that § 7(9) reaches so broadly as to encompass any area that U.S. soldiers occupy, no matter how temporary or mobile their presence.").  In *Passaro*, the court considered whether the Asadabad Firebase, a United States Army outpost in Afghanistan, "constituted a United States 'military mission' so as to render it within the criminal jurisdiction of a federal district court."  *Id.* at 214.  Noting that while "long-established and permanent U.S. military

bases abroad" would constitute "the straightforward 'military' analogue to embassies, the 'diplomatic' and 'consular' missions plainly within § 7(9)'s scope," the statute "would not reach any piece of Afghan soil on which a soldier 'pitches his pup tent.'" *Id.* The court found:

> In cases that fall between these two extremes, courts must consider a number of common-sense, objective factors to determine whether a particular location qualifies as the "premises" of a United States "military mission" for purposes of § 7(9). Relevant factors include the size of a given military mission's premises, the length of United States control over those premises, the substantiality of its improvements, actual use of the premises, the occupation of the premises by a significant number of United States personnel, and the host nation's consent (whether formal or informal) to the presence of the United States. This list surely does not exhaust every factor relevant to determining § 7(9)'s reach; nor is any factor a prerequisite for jurisdiction. But these factors do bring to bear relevant, objective considerations in resolving this question.

*Id.* The court found that § 7(9) extended to Asadabad because "the United States had retained control for nearly a year and a half over this significant, discrete tract of land, maintaining a meaningful permanent presence to conduct significant military operations, which the Afghan government sanctioned." *Id.* at 216. In contrast, the Annex in Benghazi was not an area controlled by the U.S. or where the U.S. maintained a significant permanent presence, rather it was Libyan property covertly and illegally used by an unknown number of CIA agents for an unknown period of time, without the sanction or knowledge of the Libyan government. This is not a diplomatic or military mission within the scope of § 7(9).

  vi. <u>Section 2339A Applies Extraterritorially Only to the Extent the Underlying Offense Applies Extraterritorially</u>

Count One charges conspiracy in violation of 18 U.S.C. § 2339A, and Count Two charges a substantive violation of § 2339A, which provides:

> (a) Offense. --Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this

title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B) or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

As an "ancillary statute," § 2339A applies extraterritorially only insofar as the substantive crimes it references.  As argued above, only Count Three applies extraterritorially, so that is the only basis with which to sustain Counts One and Two.  Because §§ 1114, 930(c), 844(f), and 1363 cannot be applied extraterritorially, these offenses cannot form the basis for the extraterritorial application of § 2339A as charged in Counts One and Two.  The Court, therefore, should dismiss the portions of Count One and Two that are not based on a violation of § 1116 (Count Three), the only charged offense that contains a clear indication that it may be applied extraterritorially.

## II.   Al-Imam's Seizure Violated Treaties Governing the Prosecution and Extradition of the Alleged Crimes

Under Supreme Court precedent, the fact that the government forcibly abducts a defendant to hale him into court provides no bar to a criminal prosecution in U.S. courts, unless (1) the abduction violates the terms of an extradition treaty, or (2) involves torture, brutality, or other outrageous conduct.  *United States v. Rezaq*, 134 F.3d 1121, 1130 (D.C. Cir. 1998) (citing *United States v. Alvarez-Machain*, 504 U.S. 655, 664 (1992); *United States v. Yunis*, 924 F.2d 1086, 1092–93 (D.C. Cir. 1991)).  This rule is known as the *Ker-Frisbie* doctrine after its announcement in *Ker v. Illinois*, 119 U.S. 436, 444 (1886), and affirmation in *Frisbie v. Collins*, 342 U.S. 519, 522 (1952).  Notably, in *Alvarez-Machain*, the Supreme Court held that the

existence of an extradition treaty does not override the doctrine unless the treaty expressly

prohibits forcible abductions.  504 U.S. at 664.

Here, the abduction of Al-Imam from Libya by U.S. government actors violated the

"prosecute or extradite" regime established by three interrelated multilateral conventions:  the

Charter of the United Nations, *available at* https://treaties.un.org/doc/publication/ctc/uncharter.

pdf (last visited Jan. 11, 2019); the Convention on the Prevention and Punishment of Crimes

Against Internationally Protected Persons, Including Diplomatic Agents ("IPP Convention"),

*available at* http://legal.un.org/ilc/texts/instruments/english/conventions/9_4_1973.pdf (last

visited Jan. 11, 2019); and the International Convention for the Suppression of Terrorist

Bombings ("Terrorism Convention), *available at* https://treaties.un.org/doc/Treaties/1997/12/

19971215%2007-07%20AM/ch_XVIII _9p.pdf (last visited Jan. 11, 2019).  By entering the

U.N. Charter, signatory nations agreed in principle to give up their power to violate the territorial

integrity of another nation except under certain conditions.  And by entering into the "extradite

or prosecute" conventions—both of which begin with express references to the U.N. Charter, and

both of which state that they may form the legal basis for an extradition request—the United

States extracted promises from signatory nations to "expedite or prosecute" persons found in

their territory suspected of crimes of terrorism or against internationally-protected persons, in

exchange for adherence to and promotion of the values found in the U.N. Charter.

As a result of these treaties, the United States and other nations may not forcibly abduct

individuals for trial on crimes that are the subject of the conventions.  If they do so, they violate

the bargain that requires all signatory states to cooperate in the suppression of these crimes and

to "prosecute or extradite" offenders found in their territory.  Thus, this treaty regime, which the

United States voluntarily entered for its benefit, overrides the *Ker-Frisbie* doctrine for

defendants forcibly abducted by the United States government for prosecution of crimes covered

by the conventions.  For such defendants, dismissal of the charges is required just as assuredly as

if a bilateral extradition treaty expressly forbid forcible abductions, because they are prohibited

by the U.N. Charter as incorporated and reflected in the IPP and Terrorism Conventions.

Importantly, this conclusion is not contingent on a determination that the U.N. Charter is

"self-executing" or create privately enforceable rights.  Al-Imam is not asking the Court to

dismiss any charges based on a violation of the U.N. Charter *per se*; he is simply invoking the

rule in *Alvarez-Machain*, 504 U.S. at 662, which stated that "our first inquiry must be whether

the abduction of respondent from Mexico violated the Extradition Treaty between the United

States and Mexico."  While parts of the IPP Convention require signatories to take further action

in their domestic laws, its "extradite or prosecute" requirement is self-executing, and the United

States has invoked the IPP Convention to obtain the extradition of defendants before.  *See United

States v. Murillo*, 826 F.3d 152, 155 (4th Cir. 2016) (noting U.S. request for extradition of

defendant from Columbia and Columbia's compliance "pursuant to Colombia's obligations

under the IPP Convention"); *see also Terlinden v. Ames*, 184 U.S. 270, 288 (1902) ("Treaties of

extradition are executory in their character [.]"); *United States v. Balsys*, 119 F.3d 122, 138 n. 13

(2d Cir.1997) (noting that extradition treaties are self-executing), *rev'd on other grounds*, 524

U.S. 666 (1998).[2]

---

[2] The D.C. Circuit provided a long discussion of the difference between self-executing and non-self-executing forms of international law in *Al-Bihani v. Obama*, 619 F.3d 1 (D.C. Cir. 2010).  In that case, the court noted that while "bilateral extradition treaties are ordinarily considered self-executing….[c]ourts have been somewhat more reluctant to find *multilateral* treaties self-executing."  *Id.* at 16 (emphasis added).  However, it noted that "multilateral treaties also have been regarded as self-executing, such as the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, the General Inter-American Convention for Trade Mark and Commercial Protection, and the Vienna Convention on Consular Relations."  *Id.*  In its discussion, the court described the Convention Against Torture and Other Cruel, Inhuman or

As such, the IPP and Terrorism Conventions function as extradition treaties with an additional requirement of respecting the territorial integrity of all signatories—precisely the restriction the bilateral U.S.-Mexico treaty in *Alvarez-Machain* lacked.  Since it would violate these treaties to invade a signatory country and override the "extradite or prosecute" bargain struck by the parties in reliance on "the purposes and principles of the Charter of the United Nations"—which both the IPP and Terrorism Conventions invoke—the Court must dismiss all counts encompassed by the crimes defined under the each convention.  These include Count Three (IPP Convention), Ten through Seventeen (IPP and Terrorism Convention), and the parts of Counts One and Two that depend upon Counts Three and Ten through Seventeen.

### III.   Counts Ten through Fifteen must be dismissed because the Special Mission and CIA Annex were not lawfully operated by the United States. [3]

Counts Ten through Fifteen (and aspects of Count I based upon conspiracy to commit those counts) must be dismissed because they only apply to crimes against lawfully-operated "Federal facilities" as defined by 18 U.S.C. § 930(g)(1), or to lawfully-leased United States property as defined by 18 U.S.C. § 844(f).

---

Degrading Treatment or Punishment, adopted Dec. 10, 1984, S. TREATY DOC. NO.. 100–20 ("Torture Convention"), a multilateral convention similar to the IPP Convention, as "a non-self-executing treaty."  *Id*. But this description appears to have been simply a recognition of the need for Congress to implement anti-torture domestic legislation under the treaty.  Like bilateral extradition treaties, the extradition component of multilateral treaties such as the Torture Convention and IPP Convention contain provisions that are clearly self-executing.  For example, Article 8 of the IPP Convention states that the relevant crimes "shall be deemed to be included" in any pre-existing extradition treaties signed by the parties, without requiring any further action.  Thus, it is more precise to refer to these treaties as partially self-executing, or as non-self-executing treaties with self-executing extradition provisions, as reflected in the United States' reliance on the IPP Convention in *Murillo*.

[3] In light of the identical nature of the charged offenses between this case and *Abu Khatallah*, 14-cr-141 (CRC), Defendant Al-Imam is repeating the arguments raised in that case in this section, in order to preserve them.

### A.  The Special Mission and CIA Annex were not lawful federal facilities.

The Vienna Convention on Consular Relations and the Vienna Convention on Diplomatic Relations ("Vienna Conventions"), which were ratified and became law in 1972 and 1969, respectively, require mutual consent between States to establish diplomatic relations and missions. *See* Vienna Convention on Consular Relations and Optional Protocol on Disputes art. 2, apr. 24, 1963, 21 U.S.T. 77; Vienna Convention on Diplomatic Relations and Optional Protocol on Disputes art. 2, Apr. 18, 1961, 23 U.S.T. 3227.  The Vienna Convention on Diplomatic Relations further provides that "[t]he sending State may not, without the prior express consent of the receiving State, establish offices forming part of the mission in localities other than those in which the mission itself is established." Art. 12, 23 U.S.T. 3227.

State Department regulations also recognize the requirement that a foreign post cannot be established without authorization from a foreign government. *See United States v. Li*, 206 F.3d 56, 63 (1st Cir. 2000) ("substantial deference" accorded to State Department's interpretation of treaties). The State Department's Foreign Affairs Manual ("FAM") specifically provides: "When a decision to open a post has been reached, the acceptance of the foreign government is necessary and must precede any public disclosure of the proposed action." *See* 2 FAM 422.1-1, *available at* http://www.state.gov/documents/organization/210051.pdf.  Similarly, "[w]hen the rank of an established post is to be changed . . . the regional bureau instructs the supervisory post to obtain the agreement of the foreign government to the change." *See* 2 FAM 441(a), *available at* http://www.state.gov/documents/organization/84413. Thus, State Department regulations recognize that the Vienna Conventions require mutual consent for the establishment of a diplomatic post.

Here, the Special Mission operated without the consent of the officially recognized Libyan government. Accountability Review Bd., U.S. Dep't of State, *Benghazi Attack Report*

(Unclassified), 14–15 (2012), *available at* http://www.state.gov/documents/organization/
202446.pdf (hereinafter "ARB") (stating that the U.S. Mission in Benghazi "was never a
consulate and never formally notified to the Libyan government").  The Libyan government
apparently was also unaware of the CIA Annex in Benghazi. *See* Margaret Coker, Adam Entous,
Jay Solomon & Siobhan Gorman, *Miscues Before Libya Assault: Limited Security in Benghazi,
Secrecy Over Safe House, Contributed to Tragedy*, The Wall Street Journal, Sept. 21, 2012
(Libyan Deputy Prime Minister Mustafa Abushagour told the Wall Street Journal that, as the
Americans were evacuating during the early morning hours of September 12, 2012, "We were
surprised at the numbers of Americans [approximately 30] who were at the airport . . . We have
no problem with intelligence sharing or gathering, but our sovereignty is also key.").  Without
such consent and authorization, the operation of neither facility was lawfully owned, leased, or
possessed by the United States.

    **B.  Sections 930(c) and 844(f) apply only to lawful federal facilities.**

    The offenses charged in Counts Ten through Fifteen prohibit activities relating to property
lawfully owned, leased or possessed by the United States. Counts Ten through Thirteen charge
violations of § 930(c), which prohibits the killing of any person in the course of a violation of
§ 930(a) or (b). Sections 930(a) and (b), respectively, prohibit possession of a firearm or dangerous
weapon in a "Federal facility," with or without the intent that it be used in a crime. A "Federal
facility" is "a building or part thereof owned or leased by the Federal Government, where Federal
employees are regularly present for the purpose of performing their official duties." 18 U.S.C.
§ 930(g)(1). Counts Fourteen and Fifteen charge violations of § 844(f), which prohibits certain
acts directed at any building or real property "in whole or in part owned or possessed by, or leased
to, the United States, or any department or agency thereof . . . ."

The United States is a nation of laws, not of men or women.  For the United States to "lease" a building, it is not sufficient for a federal officer to purport to sign a lease; the lease must be legal within the framework of U.S. law, including treaties, which are the law of the land. Since Congress legislates against a backdrop of legal order when it uses terms such as "owned" or "leased," those terms cannot be applied to situations outside any lawful framework for ownership or possession.  Thus, the court should narrowly construe these statutes to include only premises lawfully possessed, owned or leased by the United States. Just as the court rejected the government's argument that § 930 applied to enclosed parking lot of a Postal Service building, *United States v. Rodriguez*, 460 F. Supp. 2d 902, 908, 914 (S.D. Ind. 2006), so too the court should reject efforts to read these statutes expansively to include buildings the United States did not legally occupy. Such a reading would impugn Congress' authority to enact treaties and establish the legal framework under which Federal agencies operate.

Applying §§ 930(c) and 844(f) expansively to include unlawfully occupied or possessed property would violate the constitutional requirement of fair notice. *See United States v. Lanier*, 520 U.S. 259, 265–66 (1997) (Fifth Amendment requires statutes to provide fair warning of scope of proscribed conduct). If the court reads the scope of these statutes expansively to apply beyond property lawfully possessed by the United States, any location could be subjected to heightened scrutiny and criminal sanctions, regardless of statutory and constitutional protections in place to regulate government conduct.

## CONCLUSION

Wherefore, Defendant Al-Imam respectfully requests that all charges in the Indictment be dismissed.

January 11, 2019

Respectfully submitted,

/s/ Matthew J. Peed
Matthew J. Peed (D.C. Bar No. 503328)
CLINTON BROOK & PEED
1455 Pennsylvania Ave. N.W., Suite 400
Washington, DC 20004
(202) 621-1828 (tel)
(202) 204-6320 (fax)

*Counsel for Defendant Mustafa Muhammad
Muftah Al-Imam*