**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No.: 17-CR-213 (CRC)** |
| | : | |
| **MUSTAFA MUHAMMAD MUFTAH** | : | |
| **AL-IMAM,** | : | |
| | : | |
| **Defendant.** | : | |

GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO DISMISS ALL COUNTS

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby files its opposition to the Defendant Mustafa Muhammad Mufta Al-Imam's Motion to Dismiss all Counts. Specifically, the Defendant moves to dismiss counts One and Two in part, and counts Four through Seventeen, because they do not apply extraterritorially; Counts One, Two, Three and Ten through Seventeen, because the defendant's seizure violated multinational extradition treaties; and Counts Ten through Fifteen, because the United States Mission and Annex in Benghazi, Libya were not federal facilities. As discussed below, and in this Court's opinion in *United States v. Khatallah,* 151 F. Supp. 3d 116 (D.D.C. 2015), and its supplemental Memorandum Opinion and Order in *Khatallah* [No. 14-cr- 141 (CRC) ECF No. 149] there is no basis to dismiss any counts of the Indictment against Defendant Al-Imam.

As the defendant acknowledges in his motion (at 11 and 28), Sections I(B) and III of the defendant's motion repeat arguments made by the defense in *Khatallah* in order to preserve those issues on appeal. Accordingly, in Sections I and II of this opposition, the government will respond

to the defendant's new arguments that: 1) this Court's opinion in *Khatallah* was flawed because the Supreme Court's opinion in *United States v. Bowman*, 260 U.S. 94 (1922) does not apply to foreign nationals, and because *Bowman* and *United States v. Delgado-Garcia*, 374 F.3d 1337 (D.C. Cir. 2004) did not establish a test for analyzing extraterritorial jurisdiction; and 2) defendant's argument that the defendant's extradition to the United States was improper under the *Ker-Frisbie* doctrine. In Sections III and IV of this opposition, in light of the defense's repetition of arguments made in *Khatallah,* the government responds in kind with the arguments it made before this Court in *Khatallah*.

## <u>BACKGROUND</u>

The defendant, Mustafa Muhammad Muftah Al-Imam, a Libyan national, has been charged by federal indictment for his participation in the September 11-12, 2012, terrorist attack on United States Special Mission and Annex in Benghazi, Libya ("Attack"), which resulted in the deaths of four Americans. The Attack was carried out by Libyan-based Islamist extremists, including members of Ubaydah Ibn Al Jarrah ("UBJ") and Ansar Al-Sharia ("AAS"). The defendant was a close associate of Ahmed Salim Faraj Abu Khatallah, the commander of UBJ, an extremist brigade. UBJ and AAS are armed militias that hold anti-Western views and advocate the establishment of Sharia law in Libya. The United States Department of State ("DOS") designated AAS in Benghazi a Foreign Terrorist Organization on January 10, 2014. The DOS noted in its designation that AAS Benghazi has been involved in terrorist attacks against civilian targets, frequent assassinations, and attempted assassinations of security officials and political actors in eastern Libya, as well as the Attack. Khatallah was also designated by the U.S. government as a Specially Designated Global Terrorist.

2

In the days leading up to the Attack, Khatallah voiced concerns about and opposition to the presence of an American facility in Benghazi. On September 11, 2012, at approximately 9:45 p.m., a group of twenty or more armed men assembled outside the Special Mission and then violently breached the Mission gate. Several Benghazi-based UBJ members have been identified among this group, many of whom are known associates of the defendant and or of Khatallah. The initial attackers were armed with AK-47-type rifles, handguns, and rocket-propelled grenade launchers. After the initial breach, the attackers stole a Mission vehicle, forcibly entered and damaged Mission buildings, and stole Mission property. During this initial attack, buildings within the Mission were set on fire. The fires that were set during the attack led to the deaths of Ambassador J. Christopher Stevens and DOS Information Management ("IMO") Officer Sean Patrick Smith. The remaining DOS personnel were able to escape to a nearby U.S. facility, known as the Annex. It also soon came under attack, which continued throughout the early morning hours of September 12, 2012, culminating in a precision mortar attack that resulted in the deaths of Security Officers Tyrone Snowden Woods and Glen Anthony Doherty.

Shortly after the U.S personnel evacuated from the Mission, the defendant entered the compound with Khatallah and other UBJ members who participated in the Attack. At the direction of Khatallah, Defendant Al-Imam removed sensitive material form the Mission's Office. This material identified the Annex by location and as the evacuation point for DOS personnel. Following the attack on the Mission, the defendant returned to an AAS camp in Benghazi along with Khatallah and other attackers, where a large group of armed extremists began assembling for the attack on the Annex.

The defendant was captured in Libya on or about October 29, 2017, during an operation conducted by U.S. personnel. The defendant was transported to the United States to be presented in U.S. District Court for the District of Columbia to stand trial on charges arising from his involvement in the Attack.

A federal grand jury subsequently returned a superseding indictment charging the defendant with the following offenses: *Count One* – Conspiracy to Provide Material Support and Resources to Terrorists Resulting in Death, in violation of 18 U.S.C. § 2339A; *Count Two* – Providing Material Support and Resources to Terrorists Resulting in Death, in violation of 18 U.S.C. §§ 2339A and 2; *Count Three* – Killing of an Internationally Protected Person (Ambassador Christopher Stevens), in violation of 18 U.S.C. §§ 1116, 1111 and 2; *Counts Four through Six* – three counts of Killing Officers and Employees of the United States (IMO Sean Smith, Security Officer Tyrone Woods, and Security Officer Glen Doherty), in violation of 18 U.S.C. §§ 1114, 1111 and 2; *Counts Seven through Nine* – two counts of Attempting to Kill Officers and Employees of the United States (DSS Special Agents Scott Wickland and David Ubben and Security Officer Mark Geist), in violation of 18 U.S.C. §§ 1114, 1113 and 2; Counts *Ten through Thirteen* – four counts (one for each victim) of Killing a Person in the Course of an Attack on a Federal Facility Involving the Use of a Firearm or a Dangerous Weapon, in violation of 18 U.S.C. §§ 930(c), 1111 and 2; *Counts Fourteen and Fifteen* – two counts (one for each facility attacked) of Maliciously Damaging and Destroying U.S. Property by Means of Fire and an Explosive Causing Death, in violation of 18 U.S.C. §§ 844(f)(1) & (3) and 2; and *Counts Sixteen and Seventeen* – two counts (one for each facility attacked) of Willfully and Maliciously Destroying Property within the

Special Maritime and Territorial Jurisdiction of the United States and Placing Lives in Jeopardy, in violation of 18 U.S.C. §§ 1363, 7 and 2.

## ARGUMENT

**I.      This Court's Opinion in *Khatallah* did not Err in Following *Bowman* and *Delgado-Garcia* to Find that the Charged Offenses Applied Extraterritorially.**

     **A.      The Court Properly Relied on *Bowman* Even Though the Defendant was not a United States Citizen.**

In *Khattallah*, this Court endeavored to "reconcile and synthesize . . . increasingly divergent strands of case law," 151 F. Supp. 3d at 123, regarding the extraterritorial reach of criminal statutes that did not expressly provide for extraterritorial application. In framing the issue, this Court noted that while recent Supreme Court pronouncements regarding civil cases included "restrictive expressions" regarding the extraterritorial reach of such statutes, the Supreme Court's decision in *Bowman*, "appears to leave significantly more room for the extraterritorial application of criminal statutes, even though recent decisions explicitly say that the same presumption against extraterritorial application applies to *all* cases." *Id.*

The core doctrine at issue is the oft-stated principle that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none." *Kiobel v. Royal Dutch Petroleum Co.,* 569 U.S. 108, 115 (2013). However, a "clear indication" of intent to authorize extraterritorial application is not limited to a specific statement within the text of the statute. Rather, the Supreme Court has made it clear that courts should "stand ready" to rebut the presumption against extraterritorial application if a statute's "statutory language, context, history, or purpose" demonstrates an extraterritorial purpose. *Small v. United States,* 544 U.S. 385, 391 (2005). In

*Khatallah,* this Court found that "[b]ecause *Bowman* remains binding on the lower courts, this Court must assume that satisfying *Bowman* is one way of clearly indicating a federal statute's extraterritorial reach." 151 F. Supp. 3d at 125 (internal quotations and citations omitted). Such an approach is consistent with the Supreme Court's opinion in *Small* because *Bowman* itself focused on the subject statute's language, context, and purpose in finding that it had an extraterritorial purpose.

Defendant (at 5-7) argues that this Court's view, as stated in *Khatallah,* that *Bowman* was binding precedent was erroneous because the defendant in *Khatallah* was not a United States citizen. While *Bowman* did not have occasion to rule on this issue because the defendants before it were all United States citizens, there is nothing in *Bowman* to suggest that the Court intended its reach to extend only to United States citizens. Further, the defense's argument ignores this circuit's ruling in *Delgado-Garcia*, which is binding on this Court, which specifically found that a defendant's citizenship was irrelevant to a determination that a statute has extraterritorial application. Indeed, in *Khatallah¸* this Court stated that it was this circuit's interpretation of *Bowman* in *Delgado-Garcia* that was guiding its analysis. 151 F. Supp. 3d at 127.

As this Court noted in *Khatallah,* the Supreme Court in *Bowman* drew a distinction between statutes with the primary purpose of protecting individuals and their property, which had a primarily domestic purpose, and "'criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction, but are enacted because of the right of the Government to defend itself against obstruction, or fraud wherever perpetrated.'" *Khatallah,* 151 F. Supp. 3d at 126 (quoting *Bowman,* 260 U.S. at 98). The Supreme Court in *Bowman* went on to state that the government's right to defend itself against certain crimes "wherever perpetrated"

applied "especially if committed by its own citizens." 260 U.S. at 98. The defendant rightfully acknowledges (at 6-7) that this language does not appear to limit the logic of *Bowman* exclusively to United States citizens. Indeed, during *Bowman's* subsequent analysis of the fraud statute at issue in that case, the Supreme Court found that the fraud statute: "is directed generally against *whoever* presents a false claim against the United States, . . . *whoever* connives at the same . . . or *whoever* enters a conspiracy to do these things. *Id.* at 100-101 (emphasis added). Thus, *Bowman* did not, on its face, limit itself to actions by United States citizens.

Any question regarding the applicability of the Court's ruling in *Bowman* to cases involving foreign nationals has been addressed in this Circuit as well as other federal courts. These courts have uniformly held that *Bowman's* extraterritorial analysis is not limited to cases involving United States citizens. In *Delgado-Garcia,* the District of Columbia Court of Appeals examined whether 8 U.S.C. § 1324(a), which prohibits conspiracies to encourage or induce aliens to enter the United States illegally, and attempting to bring aliens into the United States illegally, applied extraterritorially. 374 F.3d at 1344-45. *Delgado-Garcia* relied on *Bowman*'s contextual analysis in concluding that § 1324(a) did apply extraterritorially. In discussing *Bowman*, the *Delgado-Garcia* court recognized that *Bowman* was "not directly on point" in part because the defendants in *Bowman* were United States citizens. The court held, however, that this difference did "not lessen *Bowman*'s force . . . the citizenship of the defendant is irrelevant" because "*Bowman's* logic did not depend" on the citizenship of the defendants. *Id.* at 1345-46. Other federal courts have reached similar conclusions. *See, e.g., United States v. Benitez*, 741 F.2d 1312, 1316 (11th Cir. 1984); *United States v. Ayesh*, 762 F. Supp. 2d 832, 840 (E.D. Va. 2011); *United States v. Campbell*, 798 F. Supp. 2d 293, 306 (D.D.C. 2011); *United States v. Hijazi,* 845 F. Supp. 2d 874,

887 (C.D. Ill. 2011); *United States v. Bin Laden,* 92 F. Supp. 2d 189, 195 (S.D.N.Y. 2000) ("no court, to date, has refused to apply the *Bowman* rule on the ground that the defendant was a foreign national").

Indeed as the *Bin Laden* court noted, limiting *Bowman* to United States citizens would defeat its purpose:

> *Bowman* rests on two factors: (1) the right of the United States to protect itself from harmful conduct—irrespective of the locus of this conduct, and (2) the presumption that Congress would not both (a) enact a statute designed to serve this protective function, and—where the statute proscribes acts that could just as readily be performed outside the United States as within it—(b) undermine this protective intention by limiting the statute's application to United States territory. Given that foreign nationals are in at least as good a position to perform extraterritorial conduct as are United States nationals, it would make little sense to restrict such statutes to United States nationals.

*Bin Laden,* 92 F. Supp. 2d at 194.

Accordingly, in *Khatallah,* this Court properly applied the reasoning of *Bowman* and *Delgado-Garcia* to conclude that 18 U.S.C. §§ 1114, 930(c), and 844(f)(1) & (3) applied extraterritorially, and there is no reason to reach a different conclusion with respect to the defendant here because he, like Khatallah, is not a United States citizen.[1]

## B.    This Court Properly Applied *Bowman* and *Delgado-Garcia.*

Defendant argues (at 7-10) that in *Khatallah,* this Court misinterpreted *Delgado-Garcia* and in so doing diluted *Bowman*'s requirements for the application of extraterritorial

---

1.    The defendant does not advance an independent argument regarding *Bowman's* application to 18 U.S.C. § 1363, and it does not appear that in *Khatallah* this Court relied on *Bowman* when it denied Khatallah's motion to dismiss the counts related to § 1363. Rather, this Court relied on the special maritime and territorial jurisdiction of the United States under § 1363 when it denied Khatallah's motion to dismiss. Defendant repeats Khatallah's arguments regarding § 1363 in Section I (B) of his motion, and the government will rely on its arguments made in its original and supplemental filings in the *Khatallah* case in Section III of this opposition.

jurisdiction. The heart of the defendant's argument appears to be that *Delgado-Garcia*'s reliance, and in turn this Court's reliance, on terms such as "many obvious extraterritorial applications" and "much extraterritorial conduct," 374 F.3d at 1347, improperly expanded *Bowman*'s focus on the "probable place" where an offense might occur. *Bowman*, 260 U.S. at 99. While the Court in *Bowman* did use the term "probable place," it did so while analyzing one of several federal statutes and the potential locations where the violation of these statutes could have occurred. *Id.* ("The natural inference from the character of the offense is that the sea would be a probable place for its commission").

However, in another example regarding "property captured as prize," the Court did not rely on probability, but noted that such offenses "would *naturally often* occur at sea, and Congress could not have meant to confine [a violation] to the land of the United States." *Id.* (emphasis added). Two other examples provided by *Bowman* also did not rely on probability, but on the *possibility* that a government official who was the subject of a bribe was stationed overseas, or that one who stole military property did so overseas. *Id.* at 99-100. Importantly, when the Supreme Court in *Bowman* turned away from its analysis of other federal statutes, and focused on the Congressional intent of the statute before it, the Supreme Court did not focus on probability, rather it stated:

> We cannot suppose that when Congress enacted the statute or amended it, it did not have in mind that *a wide field* for such frauds upon the government was in private and public vessels of the United States on the high seas and in foreign ports and beyond the land of jurisdiction of the United States, and therefore intended to include them in the section.

*Id.* at 102 (emphasis added).

The defendant's argument that *Bowman* sought to establish a quantifiable formula based on mathematical probability is belied not only by the Supreme Court's analysis described above, but also by *Bowman*'s observation that criminal provisions "are to be fairly construed according to the legislative intent as expressed in the enactment. They are not to be strained either way." *Id.* at 102. Thus, *Bowman* fairly stands for the proposition that *Bowman* created, as this Court noted in *Khatallah,* a "looser locus" test that included not only statutes where the offense would "most likely" or probably occur overseas, but also statutes where the offense would "naturally often occur" overseas, where there was a "wide field" for extraterritorial commission of an offense, or where there was the potential for a government official or government property protected by statute to be located overseas.

This Court properly viewed *Delgado-Garcia* as an endorsement of a more flexible view of *Bowman.* The defense argues (at 8) that *Delgado-Garcia* intentionally departed from *Bowman* when it cited with approval the Second Circuit's statement that "'all statutes, without exception, [should] be construed to apply within the United States only, unless a contrary intent appears.'" *Delgado-Garcia,* 374 F. 3d at 1344 (quoting *Kollias v. D & G Marine Maintenance,* 29 F.3d 67 (2nd Cir. 1994)). But, the Circuit went on to explain that "[o]ur point is that contextual factors show that Congress had a contrary intent in this case." *Id.* The defense appears to view *Delgado-Garcia*'s use of "contextual factors" as substantively different than *Bowman*'s focus on "criminal statutes which are, as a class, not logically dependent on their locality for the government's jurisdiction." *Bowman,* 260 U.S. at 98. However, the Court in *Bowman* identified a class of statutes that had an extraterritorial application by examining the context, purpose, and application of each statute. In this regard, there appears to be little, if any daylight, between *Delgado-Garcia* and

10

*Bowman*, as in each case the court sought to examine the language, context, and purpose of the statutes at issue in an attempt to determine Congress' intent. As the defense acknowledges (at 9), these are valid considerations to consider to rebut the presumption against extraterritoriality under *Small.*

Whether *Delgado-Garcia* relied on *Bowman* as a core basis for its holding, or simply a response to the dissent, is of no moment, as the Circuit's discussion of *Bowman* supports the "looser locus" test described by this Court in *Khatallah*. *Delgado-Garcia*'s description of § 1324(a) as concerning "much more than merely domestic conditions," that "much of the conduct that § 1324(a) criminalizes occurs beyond the borders of the United States," and that § 1324(a) had "many obvious extraterritorial applications," 374 F.3d at 1345-1347, dovetails with *Bowman*'s analysis of federal offenses that "naturally often occur" overseas or where there was a "wide field" for the commission of the offense overseas. Thus, both *Bowman* and *Delgado-Garcia* endorsed the same fact-intensive analysis to determine whether a particular statute contains evidence of Congressional intent to apply the statute extraterritorially. That test was not based on mathematical equations to determine whether a statute was more likely than not to apply extraterritorially, as *Bowman* required no such analysis.

Further, contrary to the defendant's argument (at 8), *Bowman* did not establish a "two-tiered" framework involving statutes that were "more likely" to apply extraterritorially, and those that "naturally often occur" extraterritorially. Rather *Bowman* outlined a permissible range of extraterritorial statutory applications that courts could rely upon to determine Congress's intent. So viewed, this Court's holding in *Khatallah* that *Delgado-Garcia* approved of a "looser locus" test, 151 F. Supp. 3d at 127, was not a statement that the Circuit had sided with one of two

competing *Bowman* tests, but rather that the Circuit acknowledged that *Bowman* could be satisfied without establishing that a statute was "more likely" than not to have an extraterritorial purpose.

## II.    The Seizure of the Defendant from Libya does not bar his Prosecution in the United States.

The defendant's argument that his prosecution in the United States is barred because of the government's violation of various treaties that establish a "prosecute or extradite" regime fails to identify an exception to the general rule that the forcible abduction of a defendant abroad does not bar his prosecution in the United States. As the defense acknowledges (at 25), the only recognized exceptions to this general rule are the violation of an extradition treaty or the abduction involves torture, brutality, or other outrageous conduct. Defendant does not argue that his seizure in Libya involved torture, brutality, or outrageous conduct, leaving the violation of an extradition treaty as his sole basis for relief. That claim fails because there is no extradition treaty between the United States and Libya. Further, even assuming the multinational treaties cited by Defendant create an "extradite or prosecute" regime, the Supreme Court has previously determined that such regimes, without more, do not bar the forcible removal of a foreign national and their subsequent prosecution in the United States.

As a general matter, in *Ker v. Illinois,* 119 U.S. 436 (1886), the Supreme Court rejected a claim that the due process clause of the Fourteenth Amendment was violated by the claimed kidnaping of *Ker* in Peru by an emissary of the President of the United States. Ker alleged that he had been arrested "forcibly and with violence," in Peru, kept a "close prisoner" on a ship that transported him to Honolulu, and then transferred "in the same forcible manner" to another ship that brought him to San Francisco. From San Francisco, he claimed he was transferred as a prisoner

to Illinois, where he was tried and convicted in the criminal court of Cook County. *Id.* at 437-39. Ker also claimed that from the time of his arrest in Peru until he was delivered to the authorities in Cook County, he was refused any opportunity to communicate with anyone or seek any advice or assistance. *Id.* at 439. The Supreme Court held that the apprehension and detention of Ker did not violate the due process clause, which "is complied with when the party is regularly indicted by the proper grand jury in the state court, has a trial according to the forms and modes prescribed for such trials, and when, in that trial and proceedings, he is deprived of no rights to which he is lawfully entitled." *Id.* at 440.

> [F]or mere irregularities in the manner in which [a prisoner] may be brought into custody of the law, we do not think he is entitled to say that he should not be tried at all for the crime with which he is charged in a regular indictment.
>
> *       *       *
>
> There are authorities of the highest respectability which hold that . . . forcible abduction is no sufficient reason why the party should not answer when brought within the jurisdiction of the court which has the right to try him for such an offense, and presents no valid objection to his trial in such court.

*Id.* at 440, 444.

During the next 66 years, the Supreme Court "never departed from the rule announced in *Ker*, that the power of a court to try a person for the commission of a crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.'" *Frisbie v. Collins*, 342 U.S. 519, 522 (1952) (footnote omitted). Then, echoing *Ker*, the Supreme Court in *Frisbie* explained "due process of law is satisfied when one present in court is convicted of a crime after having been fairly apprised of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that

requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will." *Id*. at 522.

This Circuit has recognized two exceptions to this broad rule: "an extradition treaty may provide that it is the only way by which one country may gain custody of a national of the other country for the purposes of prosecution . . . and we have also suggested that there may be a very limited exception for certain cases of torture, brutality, and similar outrageous conduct. *United States v. Rezaq,* 134 F.3d 1121, 1130 (D.C. Cir. 1998) (citing *United States v. Alvarez–Machain*, 504 U.S. 655, 664 (1992) and *United States v. Yunis*, 924 F.2d 1086, 1092–93 (D.C. Cir. 1991) (internal quotations omitted)). Only the former exception warrants discussion in this case.

Defendant's claim that he falls under one of the exceptions to this doctrine, i.e. that the abduction violates a treaty, is foreclosed by the Supreme Court's opinion in *Alvarez-Machain.* First, there is no extradition treaty between Libya and the United States on which Defendant can rely. Second, Defendant's reliance on multinational treaties is misplaced. The defendant argues (at 26-27) that three multinational treaties, The Charter of the United Nations, The Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents ("IPP Convention"), and the International Convention for the Suppression of Terrorist Bombings ("Terrorism Convention"), establish a "prosecute or extradite" regime and that as a result "the United States and other nations may not forcibly abduct individuals for trial on crimes that are the subject of the conventions." However, the defendant does not cite any specific language in any of these treaties that would expressly bar the abduction of the defendant. This is a fatal flaw under *Alvarez-Machain*.

14

In *Alvarez-Machain,* individuals acting at the behest of the DEA forcibly abducted a Mexican citizen who assisted in the kidnapping and murder of a DEA agent in Mexico, and brought the defendant into the United States to face trial. 504 U.S. at 657. The defendant challenged the court's jurisdiction over his person, arguing that he had been abducted from Mexico in violation of the existing extradition treaty between the United States and Mexico. *Id.* at 658. A lower court found that the extradition treaty had been violated because "[a]lthough the Treaty does not expressly prohibit such abductions . . . the 'purpose' of the Treaty was violated by the abduction." *Id.* The Supreme Court reversed.

After outlining the *Ker-Frisbie* doctrine, the Court in *Alvarez-Machain* held that their "first inquiry must be whether the abduction violated the Extradition Treaty between the United States and Mexico. If we conclude that the Treaty *does not prohibit* respondent's abduction, the rule in *Ker* applies, and the court need not inquire as to how respondent came before it." *Id.* at 662 (emphasis added). The Court found that although the treaty between the United States and Mexico established a formalized mechanism to conduct extraditions, the "Treaty says nothing about the obligations of the United States and Mexico to refrain from forcible abductions." *Id.* Accordingly, the Court found that Alvarez-Machain's abduction did not violate the extradition treaty between Mexico and the United States.

In reaching this conclusion, the Court rejected the very arguments that the defendant makes here. Specifically, the defendant in *Alvarez-Machain* argued that the provision of the treaty that provided "if extradition is not granted . . . the requested Party shall submit the case to its competent authorities for the purpose of prosecution," left only two options, extradite or prosecute. *Id.* at 663-664. The defense argued that the intent of this extradite or prosecute regime "would be frustrated

15

if either nation were free to abduct nationals of the other nation for the purpose of prosecution." *Id.* at 664. The Court rejected this argument, stating that the treaty "does not purport to specify the only way in which one country may gain custody of a national of the other country for purposes of prosecution." *Id.* Similarly, the Court rejected the argument that international laws, including the United Nations Charter, negated the need for the United States and Mexico to expressly bar abductions. *Id.* at 666. As the Court pointed out, *Ker* was decided long before Mexico and the United States executed their extradition treaty in 1978, and the parties made no attempt to curtail abductions. *Id.* at 665. Thus, pursuant to *Ker, Frisbie* and *Alvarez-Machain,* unless an extradition treaty affirmatively bars abductions, the trial court need not determine how the defendant came before it.

There is no bilateral extradition treaty between the United States and Libya, let alone one that bars abductions. Thus, the defense relies on three multinational agreements in an attempt to create a bar against abductions for prosecution. The defense does not cite any language from these multinational treaties that that expressly bars abductions for the purpose of prosecution. Indeed the language in two of the treaties cited by the defendant is nearly identical to the treaty language at issue in *Alvarez-Machain* that the Court found did not bar abductions. *See Terrorism Convention*, Art. 8, Sec. 1 ("if it does not extradite that person, [the State is] obliged . . . to submit the case without undue delay to its competent authorities for the purpose of prosecution"); *IPP Convention,* Art. 7 ("The State Party in whose territory the alleged offender is present shall, if it does not extradite him, submit . . . the case to its competent authorities for the purpose of prosecution . . ."). As was the case in *Alvarez-Machain, Ker* was settled doctrine long before the treaties cited by

Defendant were drafted and ratified. Had those treaties intended to bar abductions for prosecution, they had the opportunity to expressly do so.

Pursuant to *Alvarez-Machain*, there is no bar to prosecution here because there is no evidence that the defendant's abduction violated an extradition treaty between the United States and Libya**.**

### III.   Counts One, Two, and Four Through Seventeen Apply Extraterritorially.[2]

In Section I(B) of his motion to dismiss, Defendant Al-Imam has adopted the defendant's arguments in *United States v. Khatallah*, 14-cr-141 (CRC) claiming that all but Count Three of the Indictment (and Counts One and Two of the Indictment to the extent they rely on Count Three) must be dismissed. As the government argued in *Khatallah,* each of the statutes at issue applies extraterritorially.

#### A.   General Principles of Extraterritorial Jurisdiction.

It is well-established that "Congress has the authority to 'enforce its laws beyond the territorial boundaries of the United States.'" *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991). However, "all statutes, without exception,' [should] be construed to apply within the United States only, unless a contrary intent appears." *United States v. Delgado-Garcia*, 374 F.3d 1337, 1344 (D.C. Cir. 2004); *see also United States Ballestas*, 2015 WL 4528161 (D.C. Cir. July 28, 2015) ("notwithstanding the presumption against extraterritoriality, a statute will be construed

---

2.      The defendant also included an argument regarding the reach of 18 U.S.C. § 924(c), however, Defendant Al-Imam was not charged with a violation of § 924(c).

to apply extraterritorially if Congress gives a 'clear indication' of that intention" (citation omitted)).

"[I]n examining [a] statute for congressional intention of extraterritorial application, [this Court] should consider both contextual and textual evidence." *Delgado-Garcia*, 374 F.3d at 1345. Of particular relevance here, "specific textual evidence" of the requisite congressional intent is present if the "'natural inference from the character of the offense'" indicates that the statute's purpose would be undermined were its scope confined to the United States' territorial boundaries. *Id.* at 1344 (quoting *Bowman*, 260 U.S. at 99). For example, *Bowman* explained, "[c]rimes against *private individuals or their property*, like assaults, murder, burglary, larceny, robbery, assault, embezzlement, and frauds of all kinds, which affect the peace and good order of the community must, of course, be committed within the territorial jurisdiction of the government where it may properly exercise it." 260 U.S. at 98 (emphasis added). However, *Bowman* further explained, criminal statutes "enacted because of *the right of the government to defend itself* against obstruction, or fraud wherever perpetrated," should not be construed as "logically dependent on their locality for the government's jurisdiction." *Id.* (emphasis added). "[L]imit[ing] th[e] locus" of such crimes against the government "to the strictly territorial jurisdiction would be greatly to curtail the scope and usefulness of the statute[s]," because such crimes could "as easily" be "committed by citizens on the high seas and in foreign countries as at home." *Id.*[3]

_____

3.    The defendant maintains that *Delgado-Garcia* requires a particularly stringent demonstration of congressional intent to overcome the presumption against extraterritoriality, a showing that is more burdensome than that mandated by other federal courts, such as the Second Circuit. He is mistaken. This Circuit's test—like the Second Circuit's—hews to *Bowman*, which simply holds that, in certain instances, the very nature of a criminal offense will reflect the requisite congressional intent. Thus, for example, citing *Bowman* and *United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003), the Second Circuit in *United States v. Al Kassar*, 660 F.3d 108 (2d Cir. 2011), explained that, if a

One federal court has distilled the *Bowman* principle as follows:

> *Bowman* rests on two factors: (1) the right of the United States to protect itself from harmful conduct – irrespective of the locus of this conduct, and (2) the presumption that Congress would not both (a) enact a statute designed to serve this protective function, and – where the statute proscribes acts that could just as readily be performed outside the United States as within it – (b) undermine this protective intention by limiting the statutes application to United States territory.

*United States v. Bin Laden*, 92 F.Supp.2d 189, 194 (S.D.N.Y. 2000).[4] It therefore follows that

---

"criminal statute is silent," the requisite congressional intent to apply the statute extraterritorially must be "'inferred from the nature of the offense.'" *Id.* at 118 (quoting *Bowman*). Indeed, in response to the *Delgado-Garcia* dissent's contention that the majority's holding conflicted with the Second Circuit's extraterritorial test, the *Delgado-Garcia* majority cited *Kollias v. D & G Marine Maintenance*, 29 F.3d 67 (2d Cir. 1994), a Second Circuit decision which, consistent with *Bowman*, declares that "*all statutes, without exception,* [should] be construed to apply within the United States only, unless a contrary intent appears." *Id.* at 71 (emphasis added). And, while the Second Circuit in *United States v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012), broadly declared that the "ordinary presumption that laws do not apply extraterritorially has no application to criminal statutes," the remainder of *Siddiqui*'s analysis makes clear that—consistent with *Bowman*, *Delgado-Garcia*, *Al Kassar*, *Yousef*, and *Kollias*—the presumption applies to criminal statutes, but it will be overcome if the "'nature of the offense'" implies a congressional intent that [the statute] apply outside of the United States." 699 F.3d at 701 (quoting *Bowman*, *Al Kassar*). Thus, contrary to defendant's assertion (at 6-7), there is no difference between the D.C. and Second Circuit tests. Each Circuit adheres to *Bowman* and asks whether the very nature of the criminal offense reveals a congressional intent to apply the statute extraterritorially. *Compare Delgado-Garcia*, 374 F.3d at 1344 ("we presume statutes not to apply extraterritorially, unless there are contextual reasons for reading the text otherwise" and such reasons can be found in the "'character of the offense itself'" (quoting *Bowman*) *with Yousef*, 327 F.3d at 86 ("the presumption against extraterritorial application does not apply to those 'criminal statutes which are, as a class, not logically dependent on their locality for the Government's jurisdiction'" (quoting *Bowman*)).

Defendant additionally contends that *Delgado-Garcia* requires "more" to "find a Congressional intent to apply a statute beyond U.S. borders" where there is no "specific indication in the text of the statute" of an extraterritorial application. And, defendant additionally maintains, the requisite "more" in *Delgado-Garcia* was that 8 U.S.C. § 1324 had an "international focus designed to protect borders." But *Delgado-Garcia* did not hold that such an "international focus" was a necessary prerequisite to a finding of extraterritoriality. Indeed, had *Delgado-Garcia* so held, it would conflict with *Bowman*'s conclusion that the requisite congressional intent can, in certain circumstances, be found in the very nature of the offense itself. *Delgado-Garcia* simply cited to § 1324's "international" focus as *additional* evidence of Congress's intent: "But more than simply the fact that this statute is international in focus shows that it applies extraterritorially. There is also specific textual evidence that, as the Supreme Court observed in *United States v. Bowman*, 'the natural inference from the character of the offense[s]' is that an extraterritorial application 'would be a probable place for [their] commission.'" 374 F.3d at 1345.

4.      *Bowman* has been widely invoked and applied by the courts throughout the years to conclude that various criminal statutes apply extraterritorially. *Bin Laden*, 92 F.Supp.2d at 194-95 (collecting cases in which courts relied on *Bowman* in applying various criminal statutes, including some of those charged here, to foreign nationals on foreign soil); *see also, e.g., United States v. Vasquez-Velasco*, 15 F.3d 833, 839 (9th Cir. 1994) (racketeering associated with drug smuggling); *United States v. Benitez*, 741 F.2d 1312, 1317 (11th Cir. 1984) (assault and attempted murder of a DEA agent); *United States v. Cotten*, 471 F.2d 744, 749-50 (9th Cir. 1973) (theft of government property); *Brulay v.*

where a criminal statute protects vital interests of the United States and those interests lie, or may

very well lie, outside the United States, it has extraterritorial effect.[5]

**B.      The Specific Charges in the Indictment Apply Extraterritorially.**

**1.      Section 1114 applies extraterritorially.**

The defendant argues that Counts Four through Nine should be dismissed because 18

U.S.C. § 1114 cannot be applied extraterritorially. He specifically states that the statute contains

no clear indication that Congress intended that it be applied extraterritorially. The defendant relies

on the presumption against extraterritorial application of federal statutes discussed in *Delgado-*

*Garcia*. This argument is without merit.

Section 1114 states that:

> Whoever kills or attempts to kill any officer or employee of the United States or
> any agency in any branch of the United States Government (including members of
> the uniformed services) while such officer or employee is engaged in or on
> account of the performance of official duties, . . . shall be punished –
>
> > (1) in the case of murder, as provided under section 1111;
> > (2) in the case of manslaughter, as provided under section 1112; or
> > (3) in the case of attempted murder or manslaughter, as provided in section 1113.

---

*United States*, 383 F.2d 345, 350 (9th Cir. 1967) (drug smuggling); *United States v. Layton*, 509 F.Supp. 212 (N.D. Cal. 1981) (extraterritorial application of 18 U.S.C. §§ 351, 1116, 1117 in murder of member of Congress), *appeal dismissed*, 645 F.2d 681 (9th Cir. 1981).

5.      Furthermore, the underlying rationale for extraterritorial application of a criminal statute is not dependent on the nationality of the offender. Courts have rejected such an argument. *Bin Laden,* 92 F.Supp. 2d at 194; *see also Delgado-Garcia,* 374 F.3d at 1345-46. "[F]oreign nationals are in at least as good a position to perform extraterritorial conduct as are United States nationals." 92 F.Supp. 2d at 194. In paraphrasing *Bowman*, the *Bin Laden* court reasoned that "to limit [a statute's coverage to United States nationals] would be greatly to curtail the scope and usefulness of the statute and leave open a large immunity for frauds as easily committed [by foreign nationals] as [by United States nationals]." *Id.* Judge Sand went on to note that no court has refused to apply the *Bowman* rule on the ground that the defendant was a foreign national. *Id.* at 195.

A plain reading of § 1114 suggests that it should be applied extraterritorially. It specifically applies to "*any* officer or employee" in "*any* branch of government" (emphasis added). The statute also includes members of the armed services. The United States government has over one hundred thousand officers and employees stationed abroad, particularly members of the uniformed services. The focus of the statute is on the protection of employees of the United States and not the location of the offense. Thus, "given (i) that this provision is explicitly intended to protect vital United States interests; (ii) that a significant number of United States officers and employees perform their official duties in places outside the United States, and (iii) that, accordingly, foreign nationals are in at least as good a position as are United States nationals to kill or attempt to kill United States officers or employees," it is clear that Congress intended that § 1114 be applied extraterritorially irrespective of the nationality of the offender. *Bin Laden*, 92 F.Supp.2d at 202.

Notably, in 1996, as part of the Comprehensive Antiterrorism Act of 1995, Congress expanded § 1114 to include the protection of members of the uniformed services. Pub. L. No. 104-132. Examining the legislative history of the Act, particularly in the context of the amendment to § 1114, it is clear that Congress intended § 1114 to have extraterritorial effect. Congress recognized the need to update criminal statutes to respond to the serious and growing threat of terrorism. H.R. Rep. No. 104-383, at 37 (1995). The Act, which was the legislative response to this need, among other things, "outlaws the murder of federal employees and prohibits terrorist acts that transcend national boundaries." *Id.* at 38. In noting that there was a need for this legislation because "[t]errorism potentially affects all Americans, both at home and abroad," Congress cited numerous "tragic examples of terrorism" occurring outside the United States, including two attacks

on military personnel.[6] *Id.* at 41. The defendant's claim that § 1114 does not apply extraterritorially is refuted by this legislative history.

The case law further supports the government's position that § 1114 applies extraterritorially. Indeed, there is no contrary authority. For example, the Eleventh Circuit held that § 1114 is "exactly the type of crime that Congress must have intended to apply extraterritorially." *United States v. Benitez*, 741 F.2d 1312, 1316-17 (11th Cir. 1984). The Second Circuit has similarly reasoned that "the nature of the offense – protecting U.S. personnel from harm when acting in their official capacity – implies an intent that [the statute] apply outside the United States." *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011); *see also Siddiqui*, 699 F.3d at 700 (in prosecution for shooting of U.S. personnel in Afghanistan, no basis for expecting that Congress intended to limit the protections of § 1114 to U.S. personnel acting within the United States only).[7]

The defendant makes two additional arguments against § 1114's extraterritorial application – citing a recent Supreme Court case and then making a comparative analysis. Both of these arguments are without merit. First, the defendant's reliance (at 5) on *Kiobel v. Royal Dutch*

---

[6]    The two attacks against military personnel cited by Congress were the bombing of a discotheque in Germany, which resulted in the killing of American military personnel, and the torture and murder of U.S. Marine Colonel William Higgins in the Middle East. H.R. Rep. 104-383, at 41.

[7].    The defendant tries to distinguish these precedents, contending (at 6) that they rely "only" on the "status of the victims" and asserting that "more" is required in this Circuit. As demonstrated in note 4, *supra*, this Circuit – like all Circuits – follows *Bowman* and assesses whether congressional intent of extraterritorial application can be gleaned from the nature of the offense itself. This is precisely the analysis reflected in *Benitez, Al Kassar,* and *Siddiqui*.

*Petroleum Co.*, 133 S. Ct. 1659 (2013), is misplaced. *Kiobel* held that the Alien Tort Statute ("ATS") does not have extraterritorial effect. *Id.* at 1669. In reaching this conclusion, the Court examined both the text and context of the ATS. *Id.* at 1665-69. While *Kiobel* stated that generic terms like "any" or "every" do not rebut the presumption against extraterritoriality, *Kiobel* reaffirmed that context should also be consulted in determining whether a cause of action applies abroad. *Id.* at 1665-66. Following an in-depth analysis of the historical background of the ATS and its context, *Kiobel* concluded that this too did not suggest the statute be given extraterritorial effect. *Id.* at 1666-69. Section 1114 is distinguishable from the ATS. As noted above, the historical background and context of § 1114 evidence a congressional intent to give it extraterritorial effect. The text of § 1114 – "any officer or employee of the United States" – is further evidence of such intent, particularly given the large number of employees of the United States stationed overseas.

The defendant also points to 18 U.S.C. § 1116, arguing that Congressional intent concerning the lack of extraterritorial jurisdiction for § 1114 can be inferred from the language of § 1116, which charges murder of an internationally protected person. The defendant argues that since § 1116 has a provision specifically authorizing its extraterritorial application,[8] it follows that § 1114 cannot be applied extraterritorially because it does not have such a provision. This argument is also without merit.

---

[8]     Section 1116(c) provides that "[i]f the victim of an offense under subsection (a) is an internationally protected person outside the United States, the United States may exercise jurisdiction over the offense if (1) the victim is a representative, officer, employee, or agent of the United States, (2) an offender is a national of the United States, or (3) an offender is afterwards found in the United States." 18 U.S.C. § 1116(c).

In rejecting this same argument, the court in *Bin Laden* stated that "the conclusion of this argument is merely that Section 1114 does not apply to a narrow category of extraterritorially located employees, viz, embassy employees." 92 F.Supp.2d at 203. The court recognized that the statutes overlap, but noted that § 1116 applies to a relatively small subset of the broad class of United States employees and officers covered by § 1114. *Id.* The court correctly held that such overlap has no bearing on the extraterritorial application of § 1114. *Id.*

### 2.        Section 930(c) applies extraterritorially.

The defendant also argues that Counts Ten through Thirteen should be dismissed because 18 U.S.C. § 930(c) cannot be applied extraterritorially. The defendant reasons that the statute contains no clear indication that Congress intended that there be extraterritorial jurisdiction. This argument, too, is without merit.

Section 930(c) states that:

> A person who kills any person in the course of a violation of subsection (a) or (b), or in the course of an attack on a Federal facility involving the use of a firearm or other dangerous weapon, or attempts or conspires to do such an act, shall be punished as provided in sections 1111, 1112, 1113, and 1117.

A Federal facility is defined as "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." 18 U.S.C. § 930(g)(1).

In applying the *Bowman* principle, the court in *Bin Laden* specifically upheld the extraterritorial application of § 930(c). 92 F.Supp.2d at 201-02. It stated: "Given (i) that this provision is explicitly intended to protect vital United States interests; (ii) that a significant number of Federal facilities are located outside the United States, and (iii) that, accordingly, foreign

24

nationals are in at least as good a position as are United States nationals to attack Federal facilities," it was the intent of Congress that Section 844(f)(1) apply extraterritorially irrespective of the perpetrator's nationality. *Id.*

The defendant erroneously argues that the reasoning in *Bin Laden* is in direct conflict with the D.C. Circuit's application of the presumption against extraterritorial application. The defendant once again relies on *Delgado-Garcia*, in which the D.C. Circuit, invoking *Bowman*, held that the natural inference of the charged offenses – immigration offenses – was that "an extraterritorial location would be a probable place for [their] commission." 374 F.3d at 1345. The same logic applies to the hundreds of Federal facilities outside the United States, many of which are in more dangerous areas than Federal facilities within the United States. It is unimaginable that Congress sought to exclude these facilities from federal protection, simply because they are located outside the United States. It is therefore a natural inference that a violation of § 930(c) would occur in an extraterritorial location. The court in *Bin Laden*, in adherence to *Bowman*, correctly focused on the nature of the offense in holding that § 930(c) applies extraterritorially. 92 F.Supp.2d at 203.

### 3.      Section 844(f) applies extraterritorially.

The defendant makes a similar argument with respect to Counts Fourteen and Fifteen, that is, that they should be dismissed because 18 U.S.C. § 844(f) cannot be applied extraterritorially. The defendant again argues that the statute contains no clear indication that Congress intended that it be applied extraterritorially. This argument is without merit.

Section 844(f) provides that:

(1) Whoever maliciously damages or destroys, or attempts to damage of destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States,

or any department or agency thereof, or any institution or organization receiving Federal financial assistance, shall be imprisoned for not less than 5 years, and not more than 20 years, fined under this title, or both.

*   *   *

(3) Whoever engages in conduct prohibited by this subsection, and as a result of such conduct directly or proximately causes the death of any person, including any public safety officer performing duties, shall be subject to the death penalty, or imprisoned for not less than 20 years or for life, fined under this title, or both.

The same logic supporting the extraterritorial application of § 930(c) applies to § 844(f). The purpose of the statute is to protect personal or real property of the United States. There exists an enormous quantity of personal and real property of the United States outside the United States. Again, much of this property is in locations outside the United States that are at a greater risk of danger than such property that is located within the United States. Again, it inconceivable that Congress sought to exclude this property from federal protection, simply because it is located outside the country. *Bin Laden* thus properly upheld the extraterritorial application of § 844(f), stating that "[g]iven (i) that this provision is explicitly intended to protect United States property, (ii) that a significant amount of United States property is located outside the United States, and (iii) that, accordingly, foreign nationals are in at least as good a position as are United States nationals to damage such property," it was the intent of Congress that Section 844(f)(1) apply extraterritorially irrespective of the perpetrator's nationality. 92 F.Supp.2d at 198.[9]

---

9       *Bin Laden* ruled that both § 844(f)(1) and (3) apply extraterritorially, holding that § 844(f)(3) is dependent on § 844(f)(1), and thus the same logic supports its extraterritorial application. 92 F. Supp. 2d at 198.

26

### 4.      Section 2339A applies extraterritorially.

Finally, the defendant argues that Counts One and Two should be dismissed, in part, because 18 U.S.C. § 2339A does not, on its own, apply extraterritorially. The defendant concedes (at 19) that § 2339A can be applied extraterritorially if the underlying offense or offenses can be so applied. He therefore moves to dismiss Counts One and Two, in part, that is, as they relate to Counts Four through Seventeen, but not Count Three. Section 2339A provides:

> (a) Offense – Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . 844(f) . . , 930(c), 1114, 1116, . . . [or] 1363 . . . of this title, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B), or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and if the death of any person results, shall be imprisoned for any term of years or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal district as provided by law.

It is clear from a plain reading of the statute that Congress has placed no jurisdictional limitations on the statute. Congress enacted the statute to prevent the provision of material support to those preparing to carry out a litany of violent offenses of the type that terrorists typically commit, a significant number of which have indeed been committed by terrorists outside the United States in the past two decades. It is unthinkable that Congress would have intended that such acts are not subject to prosecution simply because they occur outside the United States. Thus, in applying the *Bowman* principle to § 2339A, the extraterritorial effect of the statute can be "inferred from the nature of the offense." 260 U.S. at 98.

The legislative history sheds additional light on the purpose of the statute. As originally enacted, § 2339A prohibited a person "within the United States" from providing material support or resources, knowing that it would be used for the commission of one of the listed offenses. *See* Pub. L. No. 103-3222 § 120005, 108 Stat. 2022 (1994). Thus, in its original form, this statute did not create an extraterritorial offense. Jurisdiction over the offender was predicated upon a defendant's presence in the United States at the time of the crime. On October 26, 2001, however, the statute was amended as part of the USA PATRIOT Act and the jurisdictional limitation, "within the United States," was deleted. Pub. L. No. 107-56, § 805, 115 Stat. 377 (2001). The plain implication of that amendment was that Congress intended to eliminate § 2339A's territorial restriction and to expand the jurisdictional scope to cover any act of providing material support or resources without regard to the locus of the offense. *United States v. Mostafa*, 965 F. Supp. 2d 451, 469 (S.D.N.Y. 2013) ("[I]n October 2001 . . . Congress removed a specific limitation of 18 U.S.C. § 2339A to U.S. conduct. This specific and careful removal of a required occurrence within the United States indicates a congressional intent for extraterritorial application."); *see also,* e.g., *Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have a real and substantial effect."); *accord Morrison v. Nat'l Australia Bank Ltd*, 561 U.S. 247, 255 (2010) (the presumption against extraterritoriality "represents a canon of construction, or a presumption about a statute's meaning, rather than a limit upon Congress's power to legislate"). The D.C. Circuit, which has not yet specifically addressed the extraterritorial application of § 2339A, has observed "that § 2339A . . . was not made extraterritorial until October 26, 2001." *Al Bahlul v. United States*, 767 F.3d 1, 30 n.23 (D.C. Cir. 2014).

Even if the Court were to find that § 2339A did not, on its own, have extraterritorial effect, the defendant's motion should be denied because, as conceded by the defendant, § 2339A is ancillary in nature. Thus, its jurisdictional scope corresponds to that of the crime that the "material support or resources" is intended to facilitate. Accordingly, after October 26, 2001, where the predicate offense permits the exercise of extraterritorial jurisdiction, there would be extraterritorial jurisdiction for a § 2339A violation intended to facilitate that crime. It follows therefore that since the predicate offenses in Counts Four through Nine (*i.e.,* § 1114), Counts Ten through Thirteen (*i.e.,* § 930(c)), Counts Fourteen and Fifteen (*i.e.,* § 844(f)), and Counts Sixteen and Seventeen (*i.e.*, § 1363) all apply extraterritorially, so too do the § 2339A violations alleged in Counts One and Two. The Court should deny the portion of the defendant's motion seeking to dismiss Counts One and Two.

### 5.      Additional argument regarding Counts Sixteen and Seventeen.

In this Court's opinion in *Khatallah,* this Court did not resolve the defendant's motion to dismiss Counts Sixteen and Seventeen based on its analysis of *Bowman.* Rather, this Court sought additional briefing regarding the applicability of the special maritime and territorial jurisdiction of the United States to Counts Sixteen and Seventeen.[10] The government offered the following additional arguments, which the government adopts as part of this opposition.

The offenses alleged in Counts 16 and 17 of the Superseding Indictment fall within the Special Maritime and Territorial Jurisdiction of the United States ("SMTJ"). Jurisdiction for these

---

10.      Because this Court did not resolve this issue based on *Bowman,* the government does not repeat its arguments here, but hereby adopts the arguments that it made in Section III(B)(5) of the Government Opposition to Defendant's Motion to Dismiss for Lack of Extraterritorial Jurisdiction in *Khattalah,* No. 14-CR-00141 (CRC) [ECF. No 101].

offenses is based on 18 U.S.C. §§ 7(3) & (9). First, § 7(3) applies to lands reserved or acquired for the use of the United States abroad that are under the concurrent jurisdiction of the United States, such as the Mission and the Annex. Second, § 7(9) applies because the violations of 18 U.S.C. § 1363, as charged in Counts 16 and 17 of the Superseding Indictment, are both offenses "against a national of the United States."[11]

A two-step analysis demonstrates that § 7(9) confers jurisdiction to prosecute violations of § 1363, as charged here. First, Counts 16 and 17 allege offenses committed against United States nationals. And second, § 7(9) provides that the SMTJ includes premises of the United States located abroad with respect to offenses committed by or against a national of the United States.

First, § 1363 proscribes the following:

> Whoever, within the special maritime and territorial jurisdiction of the United States, willfully and maliciously destroys or injures any structure, conveyance, or other real or personal property, or attempts or conspires to do such an act, shall be fined under this title or imprisoned not more than five years, or both, and *if the building be a dwelling, or the life of any person be placed in jeopardy, shall be fined under this title or imprisoned not more than twenty years, or both.*

18 U.S.C. § 1363 (emphasis added). Section 1363 contains a two-tiered punishment scheme: (1) up to five years for destruction of property and (2) up to 20 years if the destruction of property involved a "dwelling" or placed the life of any person in jeopardy. *Id.* Since § 1363 provides for an increased penalty when the offense involves a dwelling or placing a life in jeopardy, pursuant

---

11.      In its Memorandum Opinion and Order in *Khatallah,* No. 14-CR-00141 (CRC) [ECF No. 149], this Court did not resolve whether 18 U.S.C. § 7(3) provided a basis for jurisdiction, because it found that § 7(9) provided such jurisdiction. Accordingly, while the government adopts the arguments it made regarding §7(3) in *Khatallah*, it does not repeat those arguments in the text of this opposition.

to *Apprendi v. New Jersey*, 530 U.S. 466 (2000), § 1363 proscribes two separate crimes. *Id.* at 490 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *see also Alleyne v. United States*, 133 S.Ct. 2151, 2155 (2013). ("Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt."); *Ring v. Arizona*, 536 U.S. 584, 589 (2002) (same).[12]

Accordingly, the higher tier of the two offenses set forth in § 1363, addressing offenses which involve a dwelling[13] or jeopardy to a person's life, necessarily proscribes an offense against a person. This conclusion is buttressed by the fact that the Sentencing Guidelines provide for an increase in the offense level for a violation of § 1363 if it involves "the conscious or reckless risk of death or serious bodily injury . . . ." U.S.S.G. § 2B1.1(b)(15).[14]

Second, the Special Maritime and Territorial Jurisdiction of the United States includes, among other things, the following premises:

---

12.    The cases cited by the defendant are inapposite, as they involve the merger of offenses for sentencing purposes. The cases also predate *Apprendi*. Accordingly, to the extent those cases suggest that the phrase "the life of any person be placed in jeopardy" (18 U.S.C. § 1363) is a sentencing factor, as opposed to an element of the crime that must be presented to the jury and proved beyond a reasonable doubt, they have been overruled by *Apprendi* and its progeny. As the Supreme Court in *Apprendi* noted, "[a]ny possible distinction between an 'element' of a felony offense and a 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding." 530 U.S. at 478.

13.    A "dwelling" is not defined in the statute or elsewhere in the federal criminal code, but is generally defined as "[t]he house or other structure in which a person or persons live . . . ." *Black's Law Dictionary*, 454 (5th ed. 1979).

14.    Similarly, the federal arson statute, which at first blush may seem to be a purely property crime, also contains an increased penalty if the offense involved "a dwelling or if the life of any person [was] placed in jeopardy . . . ." 18 U.S.C. § 81. And the applicable Sentencing Guideline likewise provides for an enhancement if a person was endangered. *See* U.S.S.G. § 2K1.4(a)(1) & (2).

>With respect to offenses committed by or against a national of the United States as that term is used in section 101 of the Immigration and Nationality Act—
>
>    (A)  the premises of United States diplomatic, consular, military or other United States Government missions or entities in foreign States, including the buildings, parts of buildings, and land appurtenant or ancillary thereto or used for purposes of those missions or entities, irrespective of ownership . . . .

18 U.S.C. § 7(9). In short, offenses committed on United States premises abroad fall within the SMTJ if they are committed "by or against[15] a national of the United States." As set forth above, the higher tier of § 1363 involves an offense against a person, and the Superseding Indictment alleges that the victims of that offense were United States nationals (*see* Superseding Indictment, Counts 16 and 17). Accordingly, the offenses alleged in Counts 16 and 17 of the Superseding Indictment fall within the SMTJ pursuant to § 7(9).[16] This result is consistent with Congress's intent when it enacted § 7(9) to "expand[] jurisdiction to include terrorism against U.S. facilities abroad." 147 Cong. Rec. S10990-02, 147 Cong. Rec. S10990-02 (daily ed. Oct. 25, 2001).

The defendant's other arguments that § 7(9) does not provide jurisdiction for a violation of § 1363, because that section prescribes a purely property crime, are unavailing. First, the

---

15.     It seems that the phrase "*by or against* a national of the United States" (emphasis added) was used in § 7(9) in order to be consistent with applicable international law jurisdictional principles. Two of the bases for exercising jurisdiction recognized under international law are the "nationality principle" (where the offender is a citizen of the prosecuting state) and the "passive personality principle" (where the victim is a citizen of the prosecuting state). *See United States v. Yousef*, 327 F.3d 56, 91 (2d Cir. 2003) (*citing* Introductory Comment to Research on International Law, Part II, Draft Convention on Jurisdiction with Respect to Crime, 29 AM. J. INT'L. L. 435, 445 (supp. 1935)). Accordingly, "by" refers to the former principle and "against" refers to the latter.

16.     The lesser included offense (*i.e.*, a violation of § 1363 that involves neither a dwelling nor endangering life), however, would not fall within the SMTJ because the offender is not a national of the United States. Notably, if the offender in question were a national of the United States, the lesser included offense – a pure property crime – would still fall within the SMTJ. This fact further demonstrates that Congress did not intend to exclude all property crimes, or all violations of § 1363, from the parameters of § 7(9).

caption of the statute (at 10) does not control the interpretation of the statute: "But headings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis." *Brotherhood of Railroad Trainmen v. Baltimore & O.R. Co.*, 331 U.S. 519, 528 (1947). Accordingly, "the title of a statute and the heading of a section cannot limit the plain meaning of the text." *Id.* at 528-29; *see also Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (same).

Second, the defendant argues that it would be "absurd" to confer jurisdiction when a national of the United States is endangered "even when the perpetrator was not aware . . . .". Conferring jurisdiction in such situations is not absurd; in fact, conferring jurisdiction based on characteristics of the victim regardless of the offender's knowledge thereof is quite common. *See, e.g.*, *United States v. Feola*, 420 U.S. 671, 684 (1975) ("in order to effectuate the congressional purpose of according maximum protection to federal officers by making prosecution for assaults upon them cognizable in the federal courts, [18 U.S.C. § 111] *cannot be construed as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer*.") (emphasis added); *id.* at 694 (holding that offender need not be aware of a fact that establishes jurisdiction: "we again conclude that imposition of a requirement of knowledge of those facts that serve only to establish federal jurisdiction would render it more difficult to serve the policy behind the law of conspiracy without serving any other apparent social policy."); *United States v. Arrington*, 309 F.3d 40, 46 (D.C. Cir. 2002) (citing *Feola* in a § 111 case); *United States v. Yunis*, 924 F.2d 1086, 1096 (D.C. Cir. 1991) (Hostage Taking in violation of 18 U.S.C. § 1203 does not require that the offender knew the victims were nationals of the United States; the statute has "no intent requirement other than that the offender must act

33

with the purpose of influencing some third person or government through the hostage taking."); 18 U.S.C. § 32(b) (providing jurisdiction for destruction of an aircraft, "if a national of the United States was on board, or would have been on board, the aircraft"); 49 U.S.C. § 46502(b)(2)(A) (providing jurisdiction for aircraft piracy if "a national of the United States was aboard"); *cf. United States v. Yermian*, 468 U.S. 63 (1984) (under 18 U.S.C. § 1001, proof of actual knowledge of federal agency jurisdiction is not required to obtain a conviction for making a false statement within the jurisdiction of a federal agency).[17]

## IV. The United States Special Mission and Annex Were Lawfully Operated Federal Facilities.

In Section III of his motion to dismiss, Defendant Al-Imam has adopted the defendant's arguments in *United States v. Khatallah*, No. 14-CR-00141 (CRC), claiming that all counts pursuant to 18 U.S.C. §§ 930(g)(1) and 844(f) must be dismissed because the U.S. Mission and Annex were not federal facilities or lawfully leased to the United States as required by the respective statutes.

As the government argued in *United States v. Khatallah*, citing the Vienna Conventions on Consular and Diplomatic Relations, the defendant contends that dismissal is mandated because the Mission and the Annex in Benghazi were not lawfully established, were not legally owned or leased by the Federal Government, and thus, were not 'Federal Facilities' as defined by 18 U.S.C.

---

17.      *But cf. United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998). In *McVeigh*, the defendant had unsuccessfully argued in the district court that 18 U.S.C. § 2332(a) required the government to prove an "intent to kill." *Id.* at 1192. In upholding the district court's ruling that there was no "intent to kill" element in the statute, the appellate court concluded that the correct intent requirement for each element of the statute was "knowingly." *Id.* at 1194. In so doing, the court indicated that the government needed to prove that the defendant knowingly used a weapon of mass destruction and knowingly did so against persons in the United States or against property of the United States. *Id.* The McVeigh court, however, did not address the Supreme Court's holding in *Feola*, 420 U.S. 671

§ 930(g)(1), or United States property, as defined by 18 U.S.C. § 844(f). First, even assuming the propriety of the defendant's effort to import treaty-based standards into these statutory definitions and that his treaty interpretation is correct, which we do not concede, the defendant's motion is premature. This is so because the government is entitled to present evidence at trial to prove each of the elements of these offenses, including those related to the physical locations. The defendant's present claims are based on predictions about the evidence likely to be presented at trial, rather than the question germane to a pretrial motion such as this – whether the indictment's four corners adequately allege the charged offenses. Second, the defendant's claims are predicated upon elements that are simply not contained in the statutes. For these reasons, the defendant's motion should be denied.

Counts Ten, Eleven, Twelve, and Thirteen charge the defendant with killing persons (J. Christopher Stevens, Sean Patrick Smith, Tyrone Snowden Woods, and Glen Anthony Doherty) in the course of an attack on a federal facility involving the use of a firearm and a dangerous weapon, in violation of 18 U.S.C. §§ 930(c), 1111 and 2. Counts Fourteen and Fifteen charge the defendant with maliciously damaging and destroying U.S. property (i.e., the Mission and Annex) by means of fire and an explosive, in violation of 18 U.S.C. §§ 844(f)(1)&(3) and 2. These statutes include explicit definitions of a federal facility and U.S. property. Section 930(g)(1) defines a federal facility as "a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties." Section 844(f) defines U.S. property subject to its provisions as "any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States,

or any department or agency thereof, or any institution or organization receiving Federal financial assistance."

### A.  Because the Superseding Indictment is Legally Sufficient, the Court Should not Dismiss it Where the Parties Dispute Material Facts Supporting the Charges.

Even if the government agreed that §§ 930(g)(1) and 844(f)'s statutory definitions somehow incorporated the Vienna Conventions' provisions, which we do not, "it is an unusual circumstance for the district court to resolve the sufficiency of the evidence before trial because the government is usually entitled to present its evidence at trial and have its sufficiency tested by a motion for acquittal under Rule 29 of the Federal Rules of Criminal Procedure." *United States v. Yakou*, 428 F.3d 241, 246 (D.C. Cir. 2005). Because the defendant's motion is based upon assertions that the government will be unable to satisfy the elements of Counts Ten through Fifteen at trial, his motion runs afoul of *Yakou*'s general bar on the pretrial resolution of sufficiency-based claims.

*Yakou*'s prohibition is reflective of long-standing principles prohibiting pretrial litigation of claims relating to the insufficiency of evidence in advance of the presentation of such evidence. "An indictment returned by a legally constituted and unbiased grand jury, like an information drawn by the prosecutor, if valid on its face, is enough to call for trial on the merits." *Costello v. United States,* 350 U.S. 359, 363 (1956) (footnote omitted). *Costello* therefore declined the petitioner's suggestion that, under the aegis of the court's supervisory power, it establish a procedure "permitting defendants to challenge indictments on the ground that they are not supported by adequate or competent evidence." *Costello* explained that such a procedure – which

36

is indistinguishable from that suggested by the defendant here – "would run counter to the whole history of the grand jury institution." *Id*. at 364.

Thus, at this juncture, the proper inquiry for this Court is only to determine whether the superseding indictment is legally sufficient, which it is. Under the Fifth and Sixth Amendments of the Constitution:

> an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense. . . . It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words themselves, fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished.

*Hamling v. United States*, 418 U.S. 87, 117 (1974); *see also United States v. Thomas,* 348 F.3d 78, 82 (5th Cir. 2003) (same). To satisfy the *Hamling* standard, "an indictment need do little more than track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (quoting *United States v. Tramunti*, 513 F. 2d 1087, 1113 (2d Cir. 1975)); *see also United States v. Haldeman*, 559 F.2d 31, 123 (D.C. Cir. 1976) ("[t]he validity of alleging the elements of the offense in the language of the statute is, of course, well established"); *United States v. Safavian*, 429 F. Supp. 2d 156, 158 (D.D.C. 2006) (same); Fed. R. Crim. P. 7(c)(1) ( "[t]he indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged"). Counts Ten through Fifteen of the government's superseding indictment meet the standards of *Hamling* and Rule 7(c) and, indeed, the defendant does not contend otherwise.

And, while it might be true that "a district court can properly adjudge the sufficiency of the evidence before trial where the government has made a full proffer of the evidence or where there is a stipulated record," *Yakou*, 428 F.3d at 247, neither of these conditions is satisfied here. Although defendant asserts that the United States never obtained the consent of the officially recognized Libyan government the Mission and Annex, even assuming such factual proof is necessary or relevant, these are "factual determinations properly reserved for a jury." *Yakou*, 428 F.3d at 427. Accordingly, because the government objects and the relevant facts are in dispute, this Court must deny defendant's pretrial motion on these grounds alone. *See, e.g., United States v. Alfonso,* 143 F.3d 772, 776 (2d Cir. 1998) ("to the extent that the district court looked beyond the face of the indictment and drew inferences as to the proof that would be introduced by the government at trial to satisfy the Hobbs Act's jurisdictional element, we hold that, in the circumstances presented, such an inquiry into the sufficiency of the evidence was premature"); *United States v. Todd,* 446 F.3d 1062, 1068 (10th Cir. 2006) (validity of the indictment not affected by the alleged insufficiency of the evidence because the indictment contained the allegations necessary to set out the offense); *United States v. Harms*, 442 F.3d 367, 373 (5th Cir. 2006) ("so long as the indictment contains a facially sufficient allegation of materiality, federal criminal procedure does not provide for a pretrial determination of the sufficiency of the evidence"); *United States v. Salman,* 378 F.3d 1266, 1268 (11th Cir. 2004) (validity of the indictment not affected by the alleged insufficiency of the evidence; factual questions are for determination at trial); *United States v. Hickey,* 367 F.3d 888, 984 (9th Cir. 2004) (validity of the indictment not affected by alleged insufficiency of the evidence).

**B.     This Court Should Reject the Defendant's Effort to add Elements to the Detailed Statutory Definitions of §§ 930(g)(1) and 844(f).**

As demonstrated above, regardless of the correct legal definitions of the terms "Federal Facility" in § 930(g)(1) and of United States' "property" in § 844(f), it would be improper for this Court to dismiss Counts Ten through Fifteen without giving the government the opportunity to adduce sufficient evidence to satisfy those definitions at trial. In any event, the defendant's proposed definitions are incorrect. Relying upon international conventions, the defendant asks this Court to amend the statutory definitions to additionally require that overseas federal facilities be authorized by foreign states. Faced with the clear and unambiguous statutory definition of a federal facility set forth in § 930(g) and the equally clear definition of U.S. property covered by § 844(f), the defendant argues that the Vienna Convention on Consular Relations and the Vienna Convention on Diplomatic Relations ('Vienna Conventions') require mutual consent between States to establish diplomatic relations and missions; (b) the meaning of the language of §§ 930(g)(1) and 844(f) presumes that the government acts within the larger legal framework established by Congress, abiding by treaties it has enacted; and (c) this Court must thus interpret the reach of §§ 930(g)(1) and 844(f) to include only premises lawfully possessed, owned or leased by the United States. The defendant cites no authority for the proposition that this Court should import the terms of an international treaty to amend clearly worded statutory definitions in U.S. criminal statutes. He also fails to identify any individual right under the Vienna Conventions which he could conceivably claim.

The defendant additionally asserts that supposedly because the Mission and Annex operated without the consent of the officially recognized Libyan government they were not lawfully owned, leased, or possesed – thus violating the terms of §§ 930(g)(1) and 844(f

In construing a statute, the starting point for its interpretation "is the language of the statute itself." *Consumer Prod. Safety Com'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108 (1980). In the context of criminal statutes, "[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes which are solely the creatures of statute." *Staples v. United States,* 511 U.S. 600, 604 (1994) (citation omitted). Thus, in determining what facts must be proved beyond a reasonable doubt, "the legislature's definition of the elements of the offense is usually dispositive." *McMillan v. Pennsylvania,* 477 U.S. 79, 85 (1986). Consequently, the primary and generally exclusive source for identifying the elements of a criminal offense is the statutory text, and the Supreme Court "ordinarily resist[s] reading words or elements into a statute that do not appear on [the statute's] face." *Bates v. United States*, 522 U.S. 23, 29 (1997). Moreover, if, as here, "a statute includes an explicit definition, this Court must follow that definition." *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000); *see also Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949) ("[s]tatutory definitions control the meaning of statutory words"). Most critically for present purposes, "[a]s a rule, [a] definition which declares what a term 'means' . . . excludes any meaning that is not stated." *Colautti v. Franklin*, 439 U.S. 379, 392 n.10 (1979) (alterations in original), overruled in part on other grounds by *Webster v. Reproductive Health Servs.*, 492 U.S. 490 (1989).

In contravention of these bedrock principles of statutory construction, the defendant contends that the otherwise detailed statutory definitions of §§ 930(g)(1) and 844(f) silently incorporate the requirements of the Vienna Conventions which pertain to only a small subset of federal facilities – those which a government seeks to have treated as diplomatic or consular facilities. The requirements of the Vienna Conventions are not relevant here. In the case of Section 930(g)(1), Congress chose to premise its statutory definition of a "federal facility" on two things: federal ownership and federal use. Section 930(g)(1) thus defines a federal facility as a building "owned or leased by the Federal Government" and as a place where "Federal employees are regularly present for the purpose of performing their official duties." It is plainly designed to protect federal employees engaged in federal work, a goal that could be unilaterally defeated by a foreign government if the defendant's definition were adopted by this Court. Similarly, § 844(f) broadly defines U.S. property as "any building, vehicle, or other personal or real property . . . owned or possessed by, or leased to, the United States, or any department or agency" receiving federal financial assistance. Again, Congress's obvious purpose to protect federal property would be vanquished by the defendant's proposed addition, i.e., any overseas federal property must be authorized by the foreign state. The plain terms of §§ 930(g)(1) and 844(f) do not mandate proof of such additional elements, and this Court should reject the defendant's proposed amendments.

## V.     The Court Should Deny Defendant Al-Imam's Motion to Dismiss for the Same Reasons this Court articulated in *Khatallah*.

In addition to the arguments made in Sections I and II of this opposition, this Court should deny Defendant Al-Imam's motion to dismiss based on its previous rulings in the Khattallah case.

41

As discussed in Section I of this opposition, the government maintains that this Court properly interpreted *Bowman*, *Delgado-Garcia* and other federal precedent when it held that the statutes at issue in Counts One, Two, and Four through Fifteen of the Indictment contained sufficient evidence of Congress's intent to apply each of these statutes extraterritorially. Defendant Al-Imam's arguments discussed in Sections I and II of this opposition do not cast doubt on this Court's ruling in *Khattalah,* and the government asks that this Court adopt its reasoning from *Khatallah* in this case and to deny the defendant's motion to dismiss Counts One, Two, and Four through Fifteen. Similarly, this Court should deny Defendant Al-Imam's motion to dismiss Counts 16 and 17 based on this Court's Memorandum Opinion and Order in *Khatallah,* 14-CR-00141 (CRC) [ECF No. 149]. There, this Court found that the counts that charged Khattalah with violations of 18 U.S.C. § 1363 fell within the special maritime and territorial jurisdiction of the United States pursuant to 18 U.S.C. § 7(9), and denied Khattalah's motion to dismiss. Counts Sixteen and Seventeen on the Indictment against Defendant Al-Imam mirror the charges at issue in Khatallah. Accordingly, the government asks that this Court adopt its reasoning from the Khatallah case outlined in its Memorandum Opinion and Order and deny Defendant Al-Imama's motion to dismiss Counts Sixteen and Seventeen.

**CONCLUSION**

For the foregoing reasons, the government respectfully opposes the defendant's motion to dismiss and requests that the motion be denied.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar Number 472845

By:_____/s/_____
Michael C. DiLorenzo
MD Bar No. 931214 0189
John Cummings
DC Bar No. 986573
Karen Seifert
Assistant United States Attorneys
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7809
Michael.Dilorenzo@usdoj.gov
John.Cummings@usdoj.gov
Karen.Seifert@usdoj.gov