**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| **v.** ) | |
| ) | **Crim. No. 17-cr-213 (CRC)** |
| **MUSTAFA MUHAMMAD MUFTA** ) | |
| **AL-IMAM,** ) | |
| ) | |
| **Defendant.** ) | |

**DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS ALL COUNTS**

Defendant Mustafa Muhammad Mufta Al-Imam, through undersigned counsel,

respectfully submits this Reply in support of his motion to dismiss all counts of the Indictment.

**ARGUMENT**

I.    **Counts Four Through Fifteen (and Parts of Counts One and Two) Do Not Apply
        Extraterritorially**

   A. **Rebutting the Presumption Against Extraterritoriality Requires a Natural or
        Probable Connection to Overseas Activity**

Al-Imam's Motion began with a discussion of this Court's opinion in <u>Abu Khatallah</u>, 151

F. Supp. 3d 116 (D.D.C. 2015), and its fashioning of an analytical "<u>Bowman</u> test" from <u>Bowman</u>

<u>v. United States</u>, 260 U.S. 94 (1922) and <u>Delgado-Garcia v. United States</u>, 374 F.3d 1337 (D.C.

Cir. 2004).  The thesis of that discussion is two-fold:  that these cases must be read as a whole in

light of the facts before them, rather than parsed for specific language into a "test" the cases did

not formulate themselves; and to the extent that any binding "test" applicable to foreign nationals

can be divined from these cases, it requires textual or contextual evidence of a "natural" or

"probable" extraterritorial focus or effect, in the form of language suggesting acts that will

"naturally" or "probably" occur abroad, especially in light of the Supreme Court's continued

strengthening of the presumption against extraterritoriality in the years since <u>Delgado-Garcia</u>.

To be sure, as acknowledged in the Motion, Delgado-Garcia repeatedly quoted Bowman's use of the word "many" when discussing the overseas occurrence of statutory violations as a means of determining its extraterritorial scope. See Abu Khatallah, 151 F. Supp. 3d 129 n.3. However, it never implied that it was formulating a test to be used beyond the discussion of the clearly-extraterritorial statute before it. In any event, implicit in this language is the question, "many" compared to what? The whole thrust of the Bowman and Delgado-Garcia decisions is that contextual evidence indicates that the purpose of the statutes at issue would have been significantly frustrated by a territorial limitation. Nothing in this formulation suggests that the tail of extraterritorial occurrences can wag the dog of territorial occurrences, even if it is a big dog with a big tail. In other words, if overseas facilities represent a tiny fraction of federal facilities, and overseas officers represent a tiny fraction of federal officers, the fact that there are "many" of them is no indication of a Congressional intent to override the presumption against extraterritoriality. Because including that small percentage of qualifying facilities or officers will bring an entirely different set of foreign policy considerations into play that are extraneous to the overwhelming majority of cases covered by the statutes, and therefore do not indicate that Congress, in legislating over the broad body of the dog, contemplated the specific effects of bringing in the tail.

That is why Bowman's discussion of citizenship is not irrelevant to its application in other contexts, even if, as the D.C. Circuit stated, "Bowman's *logic* did not depend on this fact." Delgado-Garcia, 374 F.3d at 1346 (emphasis added). What the government misses is that Bowman *applied* its logic only to U.S. citizens. Contrary to the statement by the government that "Bowman did not, on its face, limit itself to actions by United States citizens," Opp. at 7, that is precisely what Bowman did. And it did so because, as it expressly stated, there are no

significant foreign policy implications to applying its logic to U.S. citizens that Congress would

have needed to consider.  It stated:

> The three defendants who were found in New York were citizens of the United
> States, and were certainly subject to such laws as it might pass to protect itself and
> its property. Clearly it is no offense to the dignity or right of sovereignty of Brazil
> to hold them for this crime against the government to which they owe allegiance.
> The other defendant is a subject of Great Britain. He has never been apprehended,
> and it will be time enough to consider what, if any, jurisdiction the District Court
> below has to punish him when he is brought to trial.

260 U.S. at 102–03.

Perhaps more important than Bowman's own reservations about citizenship is language

subsequently used by the Supreme Court when discussing the Bowman test.  In Skiriotes v.

Florida, 313 U.S. 69 (1941), the Court explained:

> [T]he United States is not debarred by any rule of international law from
> governing the conduct of its own citizens upon the high seas or even in foreign
> countries when the rights of other nations or their nationals are not infringed.
> With respect to such an exercise of authority there is no question of international
> law, but solely of the purport of the municipal law which establishes the duty of
> the citizen in relation to his own government….United States v. Bowman, 260
> U.S. 94….Thus, a criminal statute dealing with acts that are directly injurious to
> the government, and are capable of perpetration without regard to particular
> locality is to be construed as applicable *to citizens of the United States* upon the
> high seas or in a foreign country, though there be no express declaration to that
> effect. United States v. Bowman, supra.

313 U.S. at 73–74 (emphasis added).[1]

---

[1] The Skiriotes court provided other examples emphasizing the importance of citizenship:

> The Bowman case arose under Section 35 of the Criminal Code. 18 U.S.C., Sec. 80. Another
> illustration is found in the statute relating to criminal correspondence with foreign governments.
> 18 U.S.C., Sec. 5. In Cook v. Tait, supra, we held that Congress could impose a tax upon income
> received by a citizen of the United States who was domiciled in a foreign country although the
> income was derived from property there located. In Blackmer v. United States, supra, the validity
> of an Act of Congress requiring a citizen of the United States residing in France to return to this
> country for the purpose of giving testimony and the servide of a subpoena upon him personally by
> an American consul were sustained.  For the same reason, none of the treaties which appellant
> cites are applicable to his case. He is not in a position to invoke the rights of other governments or
> of the nationals of other countries.

313 U.S. at 74.

Ignoring <u>Skiriotes</u>, the government cites <u>United States v. Bin Laden</u>, 92 F. Supp. 2d 189, 195 (S.D.N.Y. 2000), for the proposition that "limiting <u>Bowman</u> to United States citizens would defeat its purpose." Opp. at 8. The <u>Bin Laden</u> court's reasoning begins innocuously, stating that

> <u>Bowman</u> rests on two factors: (1) the right of the United States to protect itself from harmful conduct—irrespective of the locus of this conduct, and (2) the presumption that Congress would not both (a) enact a statute designed to serve this protective function, and—where the statute proscribes acts that could just as readily be performed outside the United States as within it—(b) undermine this protective intention by limiting the statute's application to United States territory.

92 F. Supp. 2d at 194. But the court veers off target when it follows this with the claim that "[g]iven that foreign nationals are in at least as good a position to perform extraterritorial conduct as are United States nationals, it would make little sense to restrict such statutes to United States nationals." <u>Id</u>. The "sense" it makes is the very complex set of foreign policy considerations underlying the presumption against extraterritoriality. As <u>Bowman</u> noted, those considerations are largely absent in prosecutions of U.S. citizens by their own government, wherever their conduct occurred, providing a basis for applying a statute regardless of the locus of the defendant's conduct. 260 U.S. at 102–03.

Ignoring the Supreme Court's formulation of <u>Bowman</u>'s holding in <u>Skiriotes</u>, the <u>Bin Laden</u> court, like the government, misses the fact that citizenship plays a role in defining "the right of the United States to protect itself from harmful conduct—irrespective of the locus of this conduct," 92 F. Supp. 2d at 194, because of the power nations have over their own citizens wherever they may roam. <u>See</u> <u>Skiriotes</u>, 313 U.S. at 73–74; <u>Bowman</u>, 260 U.S. at 102–03; <u>United States v. Furlong</u>, 18 U.S. 184 (1820) ("As to our own citizens, [there is] no reason why they should be exempted from the operation of the laws of the country, even though in foreign service. Their subjection to those laws follows them every where.") Citizenship creates a "class"

4

relationship—one mentioned in the definition of the "class" of offenses in <u>Bowman</u>—that provides a basis for jurisdiction other than territoriality.

This discussion does not mean that <u>Bowman</u> has no importance to cases involving foreign nationals, as <u>Delgado-Garcia</u> makes clear.  The point is that <u>Bowman</u> decided a case, not a rule of law.  And there is no way to separate out a "test" from *Bowman* apart from its intuition that the federal government, in assigning rules for its own citizens with regard to itself, would not necessarily need to expressly state that its rules apply wherever its own citizens roam. Likewise, <u>Delgado-Garcia</u> also decided a case, not a rule of law.  And its use of <u>Bowman</u> as "persuasive authority" cannot be stretched beyond the facts of the case, which involved a prohibition on importing immigrants that is patently concerned with foreign conduct. Attempting to divine a test from <u>Bowman</u> and <u>Delgado-Garcia</u> with the rigor necessary to apply it to *non-citizens* and statutes having less of an extraterritorial focus is a perilous endeavor that should not be done by focusing on the most expansive language or examples used in these cases.

In trying to apply <u>Bowman</u> and <u>Delgado-Garcia</u> outside their facts, the fact that other, more stringent formulations were used must be taken into account.  And the best way to synthesize these cases with subsequent Supreme Court decisions would be to affirm that Congress will be presumed not to apply a law to foreign nationals for acts done extraterritorially unless there is a natural or probable connection in the statute to extraterritorial conduct, even if a looser test is applicable to citizens.  Anything less would fail to honor the Supreme Court's concern in the post-<u>Delgado-Garcia</u> case of <u>Morrison v. Nat'l Australia Bank Ltd.</u>, 561 U.S. 247 (2010), that "disregard of the presumption against extraterritoriality has occurred over many decades in many courts of appeals and has produced a collection of tests for divining

congressional intent that are complex in formulation and unpredictable in application.  561 U.S. at 248.

To avoid this confusion, this Circuit demanded, in another post-Delgado-Garcia case, that "courts must find clear and independent textual support—rather than relying on mere inference—to justify the nature and extent of each statutory application abroad."  Validus Reinsurance, Ltd. v. United States, 786 F.3d 1039, 1047 (D.C. Cir. 2015).  Outside the context of citizens, this requires, at least, that the text and context of a statute provide "evidence that, as the Supreme Court observed in United States v. Bowman, 'the natural inference from the character of the offense[s]' is that an extraterritorial location 'would be a probable place for [their] commission.'"  Delgado-Garcia, 374 F.3d at 1345 (quoting Bowman, 260 U.S. at 99).  Only this "natural" or "probable" test provides enough rigor to faithfully discern when Congress intended to wade into the complex foreign policy considerations inherent in applying statutes extraterritorially, at least in cases involving foreign nationals.  It is not enough that a statute just has "many" extraterritorial applications, regardless of how small a percentage they are, because some of those applications may be problematic when applied to non-citizens.  As the Court noted in Abu Khatallah, this test was suggested in Bowman, whose "treatment of two statutory examples suggested that the number of expected extraterritorial offenses must outweigh domestic ones—that the former must be 'probable' or 'most likely.'"  151 F. Supp. 3d 116 (quoting Bowman, 260 U.S. at 99).  Since both Bowman and Delgado-Garcia's use of "looser" language is not binding, for the reasons stated above, the Court should adhere to this language as the only permissible way to faithfully apply the strictures of the post-Bowman and post-Delgado-Garcia Supreme Court cases, especially to a foreign national.

**B. All counts except Count Three (and Counts One and Two insofar as they are based on Count Three) must be dismissed**

    i.   <u>Section 1114 Does Not Apply Extraterritorially</u>

Applying the proper test, nothing in § 1114's text or context supports the conclusion that "an extraterritorial location 'would be a probable place for [its] commission.'" <u>Delgado-Garcia</u>, 374 F.3 at 1347 (quoting <u>Bowman</u>, 260 U.S. at 99). It simply prohibits the murder of federal employees generally, approximately 97% of of whom work in the territorial United States.[2] None of the statutory examples discussed in <u>Bowman</u> reflect such a great disparity of possible applications, except insofar as they apply to federal employees *in addition* to clearly extraterritorial actors, such as the naval service or Emergency Fleet Corporation.

Although the government cites the legislative history of § 1114, that history supports this conclusion. What became § 1114 was originally passed in 1934 at the request of Attorney General Homer Cummings. <u>United States v. Feola</u>, 420 U.S. 671, 681 (1975) (citing 48 Stat. 781 (1934)). In a letter to Congress, AG Cummings urged that "'[t]he Federal Government should not be compelled to rely upon the courts of the States, however respectable and well disposed, for the protection of its investigative and law-enforcement personnel,'" <u>Id</u>. at 781, n.2, because "'In these cases resort must usually be had to the local police court, which affords but little relief to us, under the circumstances, in our effort to further the legitimate purposes of the Federal Government,'" <u>id</u>. This federal-state concern clearly had nothing to do with applying federal law in other countries where a tiny percentage of federal employees were located overseas.

---

[2] In 2009, there were 89,204 federal employees working overseas, out of 2,838,491 total employees. Office of Personnel Management, at https://www.opm.gov/policy-data-oversight/data-analysis-documentation/federal-employment-reports/employment-trends-data/2009/september-2009/table-1/.

Between 1934 and 1996, Congress repeatedly expanded the enumerated federal employees covered by the statute, resulting in a list of '[l]iterally dozens of types of personnel…tak[ing] up a full page in *United States Code Annotated* (West 1984)." United States v. Fenton, 10 F. Supp. 2d 501, 504 (W.D. Pa. 1998).  Then, in 1996, "Congress streamlined § 1114 by providing simply that it applies to 'any officer or employee of the United States....'" *Id.* (quoting Pub.L. 104–132 § 727(a), H.R. Conf. Rep. No. 518, 104th Cong., 2d Sess., 1996 U.S.C.C.A.N. 944, 1996 WL 183509).  There is no indication that this "streamlining" was meant to convert the previous version—which by its terms was virtually entirely focused on domestic federal agencies—into an extraterritorial statute.

Arguing otherwise, the government points to portions of the Comprehensive Antiterrorism Act of 1995, Pub. L. No. 104-132, that describe the need to combat "terrorist acts that transcend national boundaries."  But they appear to be plainly referring to the part of the statute entitled "Acts of terrorism transcending national boundaries," to be codified at 18 U.S.C. § 2332. Significantly, that statute contains a specific provision stating "[t]here is extraterritorial Federal jurisdiction." H.R. REP. NO. 104-383, at 5 (1995). Conversely, § 1114 does not.  Nor did the general purpose of the legislation point to a broad intent to legislate activities abroad. Rather, the report made it clear that the focus of the legislation was domestic: "Title I of H.R. 1710 establishes new federal criminal offenses directed at terrorist activities inside the United States." *Id.* at 38.  For that reason, where Congress intended to authorize extraterritorial application of a law, as with § 1116 and § 2332, it explicitly said so.  Thus, this history offers the government no support for the conclusion that the "streamlining" of § 1114, which was created to address federal-state concerns, and had previously enumerated domestic agencies, somehow greatly expanded its territorial reach.

8

ii.  <u>Section 930(c) Does Not Apply Extraterritorially</u>

Counts Ten through Thirteen charge Al-Imam with violations of 18 U.S.C. § 930(c).  The government argues that it is "a natural inference that a violation of § 930(c) would occur in an extraterritorial location," because there are "hundreds of Federal facilities outside the United States, many of which are in more dangerous areas than Federal facilities within the United States."  Opp. at 25.  But as argued above, a number in the "hundreds" has little meaning standing alone.  According to U.S. General Services Administration, in 1997, the government operated 334 installations abroad, compared to 27,484 in the United States; these installations consisted of 3,869 buildings abroad, versus 430,652 buildings in the United States.  General Services Administration, Office of Real Property, *Summary Report of Real Property Owned by the United States Throughout the World as of September 30, 1997*, *at* https://www.gsa.gov/cdnstatic/owned_inv_97.pdf.  Thus, approximately 99% of federal installations and buildings were in the United States.  In light of this disparity, it is not at all a natural inference that violations of § 930(c) will "naturally" or "probably" occur abroad, or that Congress specifically intended to make any foreign policy considerations that might ensue from adding those few "hundreds" to the 99.7% of other federal buildings.   Again, relative importance is the issue, since otherwise there is no reason to conclude that Congress had the complications of foreign locations in mind.

The government does not even attempt to rely on legislative history, which rebut any argument that Congress intended to make § 930(c) apply abroad. The amendment to § 930(c) was passed as part of a series of laws targeting murder committed by escaped prisoners, murder of state or local officials assisting federal law enforcement officials, the protection of court officers and jurors, and the retaliatory killings of witnesses, victims, and informants. H.R. REP.

NO. 103-711, at 184-187 (1994) (Conf. Rep.). Not only is the legislative history silent on the extraterritorial application of § 930(c), any such "natural inference" (Opp. at 25) based on context would lead a reasonable person to conclude that the section was intended to be exclusively domestic.

      iii.  <u>Section 844(f) Does Not Apply Extraterritorially</u>

Without attempting to offer estimates, the government contends that there is "an enormous quantity of personal and real property of the United States outside the United States." Opp. at 26. But like § 930(c), the mere fact that some property owned or leased by the United States may be beyond the territorial United States is not sufficient to establish Congressional intent to apply this provision extraterritorially to foreign nationals. While a statute may, upon reflection, and as an absolute number, have "many obvious extraterritorial applications," <u>Abu Khatallah</u>, 151 F.Supp. 3d at 134, that does not mean that the extraterritorial applications are so prominent or prevalent that Congress *must* have contemplated and formed a judgment as to the foreign policy considerations of including them. Where overseas applications represent a tiny percentage of possible scenarios—perhaps as tiny as a tenth of a percent—the presumption that Congress was not legislating over foreign nationals in foreign countries is not overcome. Thus, the Court should presume that § 844(f)—a statute indisputably passed to expand federal authority over bombings of domestic properties during the Vietnam War, <u>id</u>.—does not apply extraterritorially.

      iv.  <u>Section 2339A Applies Extraterritorially Only to the Extent the Underlying Offense Applies Extraterritorially</u>

The government argues that Congress's removal of an extraterritorial *restriction* on § 2339A means that it now applies extraterritorially in all cases. Opp. at 27–28. But removing that restriction simply placed § 2339A in the same category as other ancillary offenses, whose

extraterritorial reach is "coterminous with that of the underlying criminal statute."  United States v. Ali, 718 F.3d 929, 939 (D.C. Cir. 2013).  As recognized in Abu Khatallah, the government concedes that § 2339A is an ancillary offense.  151 F.Supp.3d. at 138.  Thus, for the reasons stated above, it does not apply extraterritorially to Al-Imam, a foreign national accused of no crimes in the United States.

## II.     Al-Imam's Seizure Violated Treaties Governing the Prosecution and Extradition of the Alleged Crimes

As explained in Al-Imam's Motion, the government cannot prosecute Al-Imam for crimes covered by extradition conventions that the government violated through his capture.  The government mistakenly relies on United States v. Alvarez-Machain, 504 U.S. 655 (1992), asserting that it rejected the argument advanced here.  It did not.  In Alvarez-Machain, the Supreme Court held that a bilateral treaty between Mexico and the United States did not bar the prosecution of a defendant forcibly removed from Mexico, because the treaty was silent as to forcible abductions.  In light of this silence, the Court declined to infer a ban on forcible abductions from the treaty's "prosecute or extradite" requirement alone.  Id. at 664.  It likewise declined read an implied ban into the treaty based on the argument that "international abductions are 'so clearly prohibited in international law' that there was no reason to include such a clause in the Treaty itself."  Id. at 668 (quoting Respondent Brief).  According to the Court, reading such an implied term into the treaty would "require[] a ... large[] inferential leap, with only the most general of international law principles to support it."  Id. at 669.

Unlike the U.S.-Mexico treaty at issue in Alvarez-Machain, however, the conventions cited by Al-Imam expressly refer to the U.N. Charter as a premise for their respective agreements.  The Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents ("IPP Convention") begins with

the statement:  "The State Parties to this Convention, *having in mind* the purposes and principles

of the Charter of the United Nations concerning the maintenance of international peace and the

promotion of friendly relations and cooperation among States…, *have agreed* as follows…."

Preamble, IPP Convention.  Moreover, the Convention was adopted along with General

Assembly Resolution 3166, which states that its "provisions are related to the annexed

Convention, [and] shall always be published together with it."  U.N. Res. 3166, at

https://bit.ly/2Duj8jv (last visited Feb. 9, 2019).  That "related provision" is an important

interpretative statement necessary to secure the convention's adoption, which affirms "the

exercise of the legitimate right to self-determination and independence, in accordance with the

purposes and principles of the Charter of the United Nations and the Declaration on Principles of

International Law concerning Friendly Relations and Cooperation among States in accordance

with the Charter of the United Nations, by peoples struggling against colonialism, alien

domination, foreign occupation, racial discrimination and apartheid."  Id.; see also Michael C.

Wood, *The Convention on the Prevention and Punishment of Crimes against Internationally

Protected Persons, including Diplomatic Agents*, INTERNATIONAL & COMPARATIVE LAW

QUARTERLY, Vol. 23, No. 4 (1974), at 791-817 (describing role of Resolution 3166 and the U.N.

Charter in the adoption of the IPP Convention).

 While the IPP Convention's incorporation of territorial sovereignty through this language

is admittedly opaque, the International Convention for the Suppression of Terrorist Bombings

("Terrorism Convention), *available at* https://bit.ly/2TLjMzS (last visited Feb. 9, 2019), is not.

Like the IPP Convention, it begins with the statement that its signatories had in mind the

principles of the U.N. Charter when forming the agreement.  Preamble, Terrorism Convention.

But it goes further, enshrining the principle of territorial sovereignty into three different articles:

- Article 17:  The States Parties shall carry out their obligations under this Convention in a manner consistent with the principles of sovereign equality and territorial integrity of States and that of non-intervention in the domestic affairs of other States.

- Article 18:  Nothing in this Convention entitles a State Party to undertake in the territory of another State Party the exercise of jurisdiction and performance of functions which are exclusively reserved for the authorities of that other State Party by its domestic law.

- Article 19.1:  Nothing in this Convention shall affect other rights, obligations and responsibilities of States and individuals under international law, in particular the purposes and principles of the Charter of the United Nations and international humanitarian law.

Id.[3]  Thus, absolutely no "inferential leap" is required to establish that the principle of territorial

sovereignty reflected in the U.N. Charter is part of and reflected in the "prosecute or extradite"

---

[3] In addition, the requirement of respecting the U.N. Charter in the agreement generally, and territorial sovereignty in particular, was referenced by several nations participating in the drafting of the convention. For example:

- China stated that its "Government was totally opposed to any terrorist or violent acts carried out by States, groups or individuals in violation of international law," but "[i]t also opposed any infringement sovereignty or territorial integrity and interference in the internal affairs of other countries in the name of combating international terrorism…." Official Records of the U.N. General Assembly, A/C.6/52/SR.28 ¶ 16, at https://bit.ly/2Dw7EMn.

- Saudi Arabia stated it was signing the convention "with a view to implementing the principles contained in the Charter of the United Nations and of the norms of international law." Official Records of the U.N. General Assembly, A/C.6/52/SR.27 ¶ 27, at https://bit.ly/2SHs7aF.

- Columbia stated that "Developing countries…valued international assistance and cooperation to prevent, combat and eradicate international terrorism, within a framework of respect for international law, the sovereignty of States, the principle of non-intervention and human rights." Official Records of the U.N. General Assembly, A/C.6/52/SR.28 ¶ 32, at https://bit.ly/2Dw7EMn.

- Canada stated that "all the provisions of the draft convention were subject to the applicable provisions of international law, including those relating to human rights." Official Records of the U.N. General Assembly, A/C.6/52/SR.27 ¶ 3, at https://bit.ly/2SHs7aF.

- Iran, after describing the convention as forming "the basis for the prosecution and punishment of perpetrators of such criminal acts," immediately stated, "the obligation to refrain from the threat or use of force in international relations was enshrined in the Charter and was binding on all Member States." Official Records of the U.N. General Assembly, A/C.6/52/SR.33 ¶¶ 52–53, at https://bit.ly/2TRs4WU.

- Pakistan requested a paragraph in the preamble "reaffirming the inalienable right to self-determination and independence of all peoples under colonial and racist regimes and other forms of alien domination and foreign occupation, and upholding the legitimacy of their struggle, in particular the struggle of national liberation movements, in accordance with the purposes and principles of the Charter and Declaration on Principles of International Law concerning Friendly Relations and Cooperation among States in accordance with the Charter of the United Nations." Official Records of the U.N. General Assembly, A/C.6/52/L.19, at https://bit.ly/2USKqqQ.

regime established by the IPP and Terrorism Conventions.  That is significant, because in

Alvarez-Machain, there was no dispute that the U.N. Charter prohibits forcible abductions

involving violations of territorial sovereignty.  The Supreme Court simply recognized that the

U.S.-Mexico treaty did not endorse that prohibition one way or the other, despite the

longstanding existence of the Ker-Frisbie doctrine.  And it felt that general background

principles of international law could not provide the basis for inferring additional terms to an

extradition treaty.

Here, by contrast, the conventions identify themselves as extradition treaties and

expressly connect the principles of the U.N. Charter to the "prosecute of extradite" regime they

establish—something wholly absent from the U.S.-Mexico treaty at issue in Alvarez-Machain.

Thus, far from rejecting Al-Imam's argument, the opinion in Alvarez-Machain supports the

conclusion that the Ker-Frisbie doctrine does not apply here, where the United States and other

nations have contracted together to endorse a single document that (1) affirms the principles of

the U.N. Charter; (2) requires a prosecute or extradite regime; (3) declares itself to be a self-

executing extradition treaty insofar as any signatory nation requires extradition treaties; and

(4) provides for individual rights for accused under the terms of the convention.

Although this conclusion requires the dismissal of several counts, it is important to note

that it does not reflect any limitation imposed by the Court on the government.  Rather, it simply

---

- Paraguay, speaking on behalf of the Rio Group, stated that the Rio Group countries believed the fight against terrorism must be part of "a joint future on the basis of cooperation, respect for sovereignty, self-determination and the legal equality of States." Official Records of the U.N. General Assembly, A/C.6/52/SR.27 ¶ 14, at https://bit.ly/2SHs7aF.

- And Libya stated that while it agreed to the draft convention "on the basis of its principled opposition to terrorism in all its forms and manifestations,….[a]t the same time, nothing in the draft Convention should be interpreted as prejudicial to those who were struggling against foreign occupation.  Such people had the right to take legitimate action in order to exercise their right to self-determination in accordance with the Charter of the United Nations and international law."  Official Records of the U.N. General Assembly, A/C.6/52/SR.33 ¶ 69, at https://bit.ly/2TRs4WU.

adheres to the bargain struck by the President and Congress to obtain the cooperation of the vast majority of nations in the world in the fight against terrorism. *See* Ex. Rept. 107-2 ("The Convention is the result of an initiative by the United States following such incidents as the 1996 bombing attack on U.S. military personnel in Saudi Arabia and bombing attacks by HAMAS in Tel Aviv and Jerusalem."). Those nations, including Libya, committed themselves to prosecuting or extraditing their own citizens regardless of the domestic political cost, and to assist in the investigation of such crimes. Given the extreme sensitivity to issues of national and territorial sovereignty felt in most post-colonial nations, such as Libya, this commitment cannot be separated from the express textual references to the U.N. Charter in the conventions.

That, too, was made abundantly clear in statements surrounding the adoption of the Terrorism Convention. The United States described the convention as a "milestone" that would "make a real contribution on behalf of the international community in its response to terrorism." Official Records of the U.N. General Assembly, A/C.6/52/SR.33 ¶ 18, https://bit.ly/2TRs4WU. It stated that "all delegations, including his own, had had to make compromises," but the "language of the compromise text was evidence of the good faith shown by all parties in refusing to pursue selfish goals," and that "failure to act would mean losing an opportunity to act promptly, effectively and impressively in the response to terrorism." Id. Various other nations acknowledged both the great step forward the convention represented in creating a legal regime for the prosecution of terrorists, and the delicate compromise reflected in the convention's balance between territorial and military sovereignty and a robust "prosecute or extradite" regime. For example:

- Canada described the convention as "the most progressive and the broadest of all the anti-terrorism instruments adopted within the United Nations system," Official Records of the U.N. General Assembly, A/C.6/52/SR.27 ¶ 14, *at* https://bit.ly/2SHs7aF, noting that "States parties could not refuse extradition

or assistance solely on the grounds that the offence had been politically motivated."  Id. ¶ 3.  It further noted that "The removal of the 'political offence' exception had been balanced with detailed safeguards contained in article 9 ter."  Id.

- South Korea stated:  "The draft contained some innovative measures that would contribute to the progressive development of international criminal law, including the depoliticization clause, the extradition waiver in the case of discriminatory prosecution or punishment, conditional extradition and the transfer of detained persons for investigation or prosecution purposes….The Republic of Korea firmly believed that the adoption of the convention would help fill the gaps in the current legal regime, which had provided terrorists with escapes and safe havens."  Id. ¶¶ 38–39.

- Algeria described the convention as "a comprehensive and binding international convention that would encompass, strengthen and upgrade all the conventions regulating specific aspects of terrorism."  Official Records of the U.N. General Assembly, A/C.6/52/SR.28 ¶ 11, at https://bit.ly/2Dw7EMn.

- Tunisia noted that "[n]otwithstanding the imperfections and gaps in the content of the draft convention, it was the product of lengthy negotiations, and represented a delicate balance that must not be jeopardized."  Id. ¶ 14.

- Ukraine described the convention as "a reasonable compromise between the views expressed by delegations during the deliberations."  Id. ¶ 29.

- The Czech Republic stated that "the draft Convention was a compromise based on a fragile balance achieved after difficult negotiations," and expressed the "fear[] that attempts to modify one part of the draft would open the entire draft for renegotiation."  Official Records of the U.N. General Assembly, A/C.6/52/SR.33 ¶ 17, at https://bit.ly/2TRs4WU.

- The United Kingdom stated that the convention reflected "a compromise arrived at after lengthy discussions," that "the text was delicately balanced," and that further discussion would run the risk of unravelling that hard-won compromise."  Id. ¶ 15.

- Finland stated that its "delegation, like others, had had to make concessions, but in accordance with the general spirit of cooperation it had participated in the negotiation of a carefully balanced compromise text."  Id. ¶ 23.

Finally, it is worth noting that unlike the U.S.-Mexico extradition treaty, the IPP and Terrorism Conventions provide a mechanism for handling disputes between signatories regarding their adherence to the treaty.  That further supports the conclusion that the signatories

intended the "prosecute or extradite" regime to function as the exclusive means to obtain custody of offenders within the framework of territorial sovereignty as reflected in the U.N. Charter. Obviously, it would make no sense for two parties to contract to a binding arbitration process, but permit that process to be subverted by the simple expedient of allowing one party to invade the other and capture the subjects of the arbitration. Courts, and arbitrators, cannot permit such offenses to their dignity. By contrast, the U.S.-Mexico treaty not only fails to provide for any mechanism for handling disputes, it permits a party receiving an extradition request to decide for itself if a crime is "political," and thus exempted from the treaty. The fact that the potential for unresolvable disputes is built into the U.S.-Mexico treaty further supports the conclusion that it did not implicitly eschew the Ker-Frisbie doctrine, while the clear expressions of territorial sovereignty adopted in the Terrorism Convention did.

In sum, despite the government's superficial invocation of Alvarez-Machain, that case supports, rather than forecloses, Al-Imam's argument here. The abduction of Al-Imam from Libya by U.S. government actors violated the delicately-negotiated "prosecute or extradite" regime the United States and numerous other nations established through multilateral conventions designed to greatly advance the fight against international terrorism. As a result of these treaties, the United States and other nations may not forcibly abduct individuals for trial on crimes that are the subject of the conventions. If they do so, they violate the bargain that requires all signatory states to cooperate in the suppression of these crimes and to "prosecute or extradite" offenders found in their territory. This treaty regime, which the United States voluntarily entered for its benefit, overrides the Ker-Frisbie doctrine. Accordingly, the Court must dismiss all counts encompassed by the crimes defined under each convention. These include Count Three

(IPP Convention), Ten through Seventeen (IPP and Terrorism Convention), and the parts of

Counts One and Two that depend upon Counts Three and Ten through Seventeen.

### III.    Counts Sixteen and Seventeen Must Be Dismissed Because § 1363 Is Not a Crime Against a Person as Required by § 7(9)

In United States v. Abu Khatallah, 168 F. Supp. 3d 210, 213–14 (D.D.C. 2016), this

Court held that placing a life in jeopardy is an "element" of § 1363 under the reasoning of

Apprendi v. New Jersey, 530 U.S. 466 (2000).  Building on this conclusion, the Court stated that:

> Where the government seeks to satisfy its burden as to an element of a crime by showing that a person's life was endangered, and that person is a U.S. national, the offense is necessarily one "committed ... against a national of the United States." 18 U.S.C. § 7(9).  Prosecution under § 1363—for an offense "committed ... against a national of the United States"—is therefore appropriate where the government alleges and seeks to prove that, in the course of maliciously destroying and injuring dwellings and property within the SMTJ, a defendant placed the lives of U.S. nationals in danger.

Abu Khatallah, 168 F. Supp. 3d at 213–14.

The government has repeated the arguments it made in Abu Khatallah in support of this

opinion.  Opp. at 29–34.  Respectfully, the government and the Court have overlooked the

importance of the passive nature of the element used to enhance the sentence in § 1363.

Although it requires that the lives of U.S. nationals be placed in danger as a result of the

defendant's conduct, § 1363, it does not require any targeting of U.S. nationals—or any person

in general—and thus cannot transform § 1363 from a property crime into a crime "against" a

U.S. national.

This can be seen by analogy to other federal statutes with similar language.  For example,

the enhancing penalties of 18 U.S.C. §§ 924(c)(3) and (e)(2)(B) illustrate the distinction built

into the federal code between crimes *against* persons and crimes that create the *risk* of injury to

persons.  Section 924(c)(3) defines a "crime of violence" as an "offense" that "(A) has as an

element the use…of physical force against the person or property of another, or (B) that by its

nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  And § 924(e)(2)(B) defines a "violent felony" as any crime that "(i) has as an element the use…of physical force against the person of another; or (ii) is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."

As these definitions show, there is a difference between a crime "against the person of another," one the one hand, and crimes like arson that "present[] a serious potential risk of physical injury to another."  Id.  The same is true here:  § 1363 defines a property crime akin to arson, and enhances that crime when it places the life of person "in jeopardy."  But just as arson involves "conduct that presents a serious potential risk of physical injury to another," without becoming a crime "against the person of another," § 924(e)(2)(B), the enhanced form of § 1363 involves "jeopardy" to the life of a person, without thereby being transformed into a crime *against* a person.

To be sure, crimes like arson are "assuredly" punished severely because of concerns with "protecting people, not just buildings or property."  Abu Khatallah, 168 F. Supp. 3d at 214.  But where that concern arises from the "risk" or "jeopardy" to people, not the intent to harm them, the crime remains one that is not, in any linguistically sensible way, a crime *against* a person.[4]

---

[4] Other statutes illustrate this principle even when the sentencing enhancement involves *actual* harm to persons.  For example, 28 U.S.C. 841(a) prohibits the manufacture or distribution of a controlled substance, and its punishment varies depending on the identity of the substance, its quantity, and whether "death or serious bodily injury results from the use of such substance." § 841(b)(1)(A).  Without question, drug distribution is prohibited because of its horrible effects on society; but it makes no sense to describe drug manufacturing as a crime against a person, just because a sentencing factor is based on the effect of the crime on persons the defendant may have never met or even know existed. Of course, if § 841(b) required a defendant to *know* or *intend* that a batch of drugs would cause death or serious bodily injury, it could sensibly be described as an offense against such a purchaser.  Similarly, if the willfulness requirement in § 1363 extended to the element of placing a life "in jeopardy," then such willful endangerment of a life would also reflect an offense against a person.  Without such an intent requirement, however, § 1363 reflects the same distinction reflected in § 924 between crimes *against* persons and crimes, like arson or drug distribution, that increase the *risk* of injury to persons.

Applying this logic, the Court must depart from its ruling in <u>Abu Khatallah</u> and dismiss Counts

16 and 17, because they were not committed by or against any U.S. nationals, and thus do not

fall "within the special maritime and territorial jurisdiction of the United States" as defined in

§ 7(9).

## IV.     Counts Ten through Fifteen must be dismissed because the Special Mission and CIA Annex were not lawfully operated by the United States. [5]

Notwithstanding the government's opposition, Counts Ten through Fifteen must be

dismissed because they only apply to crimes against lawfully-operated "Federal facilities" as

defined by 18 U.S.C. § 930(g)(1), or to lawfully-leased United States property as defined by 18

U.S.C. § 844(f), of which the Special Mission and the Annex were neither.

First, the government states that resolution of this issue is "premature" because it requires

resolution of disputed facts, Opp. 35, but does not point to any facts suggesting that either the

Special Mission or the Annex were lawfully established or were legally owned or leased by the

Federal government. Thus, the government's argument relies on a miscomprehension of Federal

Rule of Criminal Procedure 12, which allows the Court to resolve matters such as this where

there are no factual disputes.

Second, the government misses the mark completely when it asserts that the defendant is

attempting to "import treaty-based standards into these statutory definitions." Opp. 35. The

defendant is doing no such thing. The defendant's contention is that the statutes in question

presume the legality of the facility and, in the absence of that legality—regardless of whether a

treaty or other law creates the illegality—the statutes do not apply.

### A.  Defendant's Motion is not premature.

---

[5] This sections, consistent with the opening brief, largely repeat the arguments raised in <u>Abu Khatallah</u> for preservation purposes.

The government's assertion that the Motion is "premature . . . because the government is entitled to present evidence at trial to prove each of the elements of these offenses, including those related to the physical locations," Opp. 35, ignores the import of Rule 12(b) which provides that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." The Supreme Court has interpreted the language of Rule 12 to permit pretrial resolution of a motion to dismiss the indictment when "trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." United States v. Covington, 395 U.S. 57, 60 (1969).[6] While the defense both acknowledges and respects the jury's role as a fact-finder, on this issue, there are simply no facts in dispute and thus no facts for a jury to find. United States v. Yakou, 428 F.3d 241, 247 (D.C. Cir. 2005) (recognizing that "the existence of undisputed facts obviated the need for the district court to make factual determinations properly reserved for a jury"). While the government has asserted that it disputes that it violated the Vienna Conventions, the government does not dispute any facts noted by the defendant. As such, the issues raised in the defendant's motion are ripe. See, e.g., United States v. Nitschke, 843 F. Supp. 2d 4, 8–9 (D.D.C. 2011).

According to the indictment, the Special Mission was a "diplomatic outpost" staffed by "[a] contingent of U.S. State Department personnel." Indictment ¶ 5. According to the State Department's Foreign Affairs Manual ("FAM"), a special mission is a type of Foreign Service post "designated as an embassy or a legation," and "established to achieve a diplomatic purpose

---

[6] Rule 12 has been amended several times since Covington was decided. As of 1969, the authorizing language of Rule 12 was found in subsection (b)(1), which read: "Any defense or objection which is capable of determination without the trial of the general issue may be raised before trial by motion." See Covington, 395 U.S. at 60. The Advisory Committee Notes to the 1974 and 2002 amendments make clear that the change in wording was stylistic only and no change in practice was intended.

of a special character not identified with the normal continuing diplomatic functions." 2 FAM 111.2, *available at* https://fam.state.gov/FAM/02FAM/02FAM0110.html. See also id. (a "post" is "[a]ny Foreign Service establishment maintained by the United States abroad"). It specifically provides that "[w]hen a decision to open a post has been reached, the acceptance of the foreign government is necessary and must precede any public disclosure of the proposed action." 2 FAM 422.1-1, *available at* https://fam.state.gov/FAM/02FAM/02FAM0420.html. Similarly, "[w]hen the rank of an established post is to be changed . . . the regional bureau instructs the supervisory post to obtain the agreement of the foreign government to the change." See 2 FAM 441(a), *available at* https://fam.state.gov/FAM/02FAM/02FAM0440.html. Thus, State Department regulations recognize that the Vienna Conventions require mutual consent for the establishment of any diplomatic post (not just permanent ones), and the State Department's interpretation of treaties should be accorded "substantial deference." See United States v. Li, 206 F.3d 56, 63 (1st Cir. 2000).

The Government does not appear to dispute that neither the Special Mission nor the Annex had any official status or was authorized by the Libyan government. The Special Mission held a only special "non-status" as a temporary, residential facility.[7] Accountability Review Bd., U.S. Dep't of State, Benghazi Attack Report (Unclassified), 5 (2012) ("ARB"), *available at* http://www.state.gov/documents/organization/202446.pdf. And the Annex was a secret operation not even known by the Libyan government let alone authorized. See also Margaret Coker, Adam Entous, Jay Solomon & Siobhan Gorman, *Miscues Before Libya Assault: Limited*

---

[7] While baldly asserting that "the relevant facts are in dispute," Opp. 38, the government does not claim, nor could it, that the United States government complied with the requirements of the Vienna Convention on Consular Relations and the Vienna Convention on Diplomatic Relations ("Vienna Conventions") to obtain the permission of the Libyan government to establish diplomatic relations and missions. See ARB at 13–17. The Mission "was never a consulate and never formally notified to the Libyan government." Id. at 14–15.

*Security in Benghazi, Secrecy Over Safe House, Contributed to Tragedy*, THE WALL STREET JOURNAL, Sept. 21, 2012 (Libyan Deputy Prime Minister Mustafa Abushagour told the Wall Street Journal that, as the Americans were evacuating during the early morning hours of September 12, 2012, "We were surprised at the numbers of Americans [approximately 30] who were at the airport . . . We have no problem with intelligence sharing or gathering, but our sovereignty is also key.").  As such, neither was a lawful Federal Facility, as defined by 18 U.S.C. § 930(g)(1), or United States Property, as defined by 19 U.S.C. § 844(f).  Thus, Counts Ten through Fifteen must be dismissed.

### B.   The facilities must be *lawful* federal facilities to be subject to the charged statutes.

The government misconstrues the defendant's argument that the facilities had to be "lawful" as an attempt to enforce the Vienna Conventions.  While the Supreme Court has yet to resolve "whether the Vienna Convention [on Consular Relations] grants individuals enforceable rights," Sanchez-Llamas v. Oregon, 548 U.S. 331, 343 (2006), the defendant is not seeking to enforce any individual right established by the Vienna Conventions, but instead is making statutory challenges regarding the proper scope of the application of §§ 930(c) and 844(f), based on the language of the statutes.  The Special Mission and Annex in Benghazi were not lawfully "owned or leased by the Federal Government," or lawfully possessed by the United States.  Because these facilities were not lawfully operated by the United States, §§ 930(c) and 844(f) are not applicable to the charged conduct.

The Vienna Convention on Diplomatic Relations was ratified and became U.S. law in 1969.  See U.S. Const., art. VI (treaties made under authority of the United State are "supreme Law of the Land").  Having recognized the Transitional National Council ("TNC") as the legitimate government of Libya, the United States was obligated to seek its consent for the

establishment of the Special Mission in Benghazi (as it did for the Embassy in Tripoli) and for

the operation of the Annex as an intelligence gathering operation.  Both facilities operated

without the consent of the officially recognized Libyan government and thus were not lawfully

possessed by the United States.  The offenses charged in Counts Ten through Fifteen prohibit

activities relating to property owned, leased or possessed by the United States.  Implicit in those

statutes is a presumption that the government acts within the larger legal framework established

by Congress, abiding by treaties it has enacted.  Thus, the court should narrowly interpret the

reach of §§ 930(c) and 844(f) to include only premises lawfully possessed, owned or leased by

the United States.[8]  To do otherwise would expand the reach to buildings that the United States

did not legally occupy.[9]  Such an expansive reading would impugn Congress' authority to enact

treaties and establish the legal framework under which Federal agencies operate.  It would

require the Court to assume that Congress intended to either override the Vienna Conventions or

permit the Executive branch to flout its authority at will.

Applying §§ 930(c) and 844(f) statutes to property unlawfully occupied or possessed by

the United States also would violate the constitutional requirement of providing fair notice of

conduct that is prohibited.  See United States v. Lanier, 520 U.S. 259, 265-66 (1997) (Fifth

Amendment requires statutes to provide fair warning of scope of proscribed conduct).  Without

limiting the application of the statutes to property lawfully possessed by the United States, any

---

[8] See United States v. Rodriguez, 460 F. Supp. 2d 902, 908, 914 (S. D. Ind. 2006) (Court rejected argument that § 930 should be construed "broadly and consistent with its purpose, i.e., to protect federal facilities and employees from violence" holding instead that "[w]e cannot depart from the plain and ordinary meaning of the enacted text based on a general, broad, amorphous—and obvious—motivation by Congress to provide protection to federal employees" as interpreting the statute more broadly would raise "a significant Constitutional issue" regarding whether the statute gave "fair warning" as to when an offense would occur).

[9] With regard to the Special Mission, it would make no difference if the United States had the authority to own or lease property in Benghazi for some purpose other than diplomatic or consular relations; the Indictment specifically alleges that it was a "diplomatic outpost," ¶ 5, and therefore its legality is unquestionably implicated by the Vienna Conventions.

location could be subjected to heightened scrutiny and criminal sanctions, regardless of statutory and constitutional protections in place to regulate government conduct.

## CONCLUSION

Wherefore, Defendant Al-Imam respectfully requests that all charges in the Indictment be dismissed.

February 11, 2019                                 Respectfully submitted,

                                                 /s/ Matthew J. Peed
                                                 Matthew J. Peed (D.C. Bar No. 503328)
                                                 CLINTON & PEED
                                                 777 Sixth St. N.W., 11th Floor
                                                 Washington, DC 20001
                                                 (202) 621-1828 (tel)
                                                 (202) 204-6320 (fax)

                                                 *Counsel for Defendant Mustafa Muhammad*
                                                 *Muftah Al-Imam*