**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Crim. No. 17-cr-213 (CRC)** |
| **MUSTAFA AL-IMAM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MOTION TO SUPPRESS STATEMENTS**

Pursuant to Federal Rules of Criminal Procedure 5(a) and 12(b)(3) and the Fifth and

Sixth Amendments to the United States Constitution, Defendant Mustafa Al-Imam moves to

suppress any and all statements allegedly made by him to law enforcement agents in the course

of a custodial interrogation, as well as any evidence gathered as a result of those statements.

Defendant requests an evidentiary hearing on this motion.

**FACTUAL BACKGROUND**

Defendant Mustafa Al-Imam is a lifelong resident of Benghazi, Libya.  He attended

school until the ninth grade, and later worked as a shopkeeper.  For his entire life, until 2011, he

lived under a brutal police state that imprisoned citizens without evidence, afforded no due

process, and tortured inmates.  Al-Imam was imprisoned twice by this regime.

Late in the evening of October 29, 2017, Al-Imam was captured by U.S. special forces in

Misrata, Libya, where he had been visiting relatives with his pregnant wife.  He was handcuffed,

gagged, and fitted with goggles and earmuffs.  He was driven to a secure location where his

verbal restraint was removed.  He was changed into a long sleeve fleece pullover, raincoat, life

preserver, and eye and ear protection.  He was walked into the water to board a waiting skiff

boat.  A wave hit the boat as he was boarding, crashing it into his back.

1

Al-Imam was then transported to a second boat.  He vomited while onboard.  The second boat took him to a third ship, where he was raised onboard in a basket.  The time period from his capture to his lifting onto the third boat was approximately two hours and fifteen minutes.  Once onboard, Al-Imam was given a medical screening requiring him to disrobe and be photographed. He was then blindfolded, handcuffed, and fitted with noise-cancelling earmuffs.

Al-Imam's first interrogation session began at 1:25 GMT, about two hours after his arrival on the ship.  According to an FBI-302, Al-Imam was informed of his rights under Miranda v. Arizona, 384 U.S. 436 (1966), and was provided an "Advice of Rights" form in Standard Arabic.  The session was terminated after an hour and a half, when Al-Imam vomited into a trash can.  He was seen by a doctor, given medicine, and taken back to his cell.  Five hours later, he was given additional medicine, a medical check, and a meal.

Al-Imam's interrogation resumed three hours later, at 10:45 GMT.  According to the FBI-302, Al-Imam was informed of his Miranda rights and provided with the same "Advice of Rights" form for his signature.  Al-Imam was questioned for another two hours.

Al-Imam's third interrogation session began about eight hours later, at 20:48 GMT.  This time, Al-Imam was not advised of his Miranda rights and was not provided with an "Advice of Rights" form.  This third session lasted two hours.

Ten hours later, at 9:10 GMT, Al-Imam was taken back to the interrogation for a fourth time.  According to his FBI-302, he was again advised of his rights.  Upon hearing the rights, he allegedly stated, "I think I might want to have a lawyer here while we speak."  Agents ceased any further questioning.  Al-Imam then told the interviewing agents that if they were not going to beat him, he would like to go back to his living area.  The agents advised Al-Imam that while he was in U.S. custody he would not be mistreated or treated inhumanly.

**ARGUMENT**

"An individual swept from familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion…cannot be otherwise than under compulsion to speak."  Miranda, 384 U.S. at 461.  Because of the psychological coercion inherent in custodial interrogation, the Supreme Court has held that an individual must be warned before questioning "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."  Miranda, 384 U.S. at 479.  Before it can use any statements produced through custodial interrogation, the government has the burden show that "the defendant 'voluntarily, knowingly and intelligently' waived [these] rights."  J.D.B. v. North Carolina, 564 U.S. 261, 269–70 (2011).

A waiver is knowing and intelligent if it was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."  Moran v. Burbine, 475 U.S. 412, 421 (1986).  "Voluntariness turns on whether the defendant's will was overborne when he gave his statement, and the test for this is whether the statement was a product of an essentially free and unconstrained choice by its maker."  United States v. Murdock, 667 F.3d 1302, 1305–06 (D.C. Cir. 2012) (citations and quotations omitted).  Assessing voluntariness "requires a careful evaluation of all the circumstances of the interrogation, including but not limited to the defendant's age and education, the length of detention, whether the defendant was advised of his rights, and the nature of the questioning."  Id. (citations and quotations omitted).  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly

conclude that the <u>Miranda</u> rights have been waived.  <u>Moran v. Burbine</u>, 475 U.S. 412, 421

(1986).

The government cannot meet its burden of demonstrating that Al-Imam's purported

waiver was knowing and voluntary under the totality of the circumstances.  The government

began questioning Al-Imam in the middle of the night less than two hours after he was hoisted

onto a ship after a traumatic abduction by U.S. military personnel.  He was extremely seasick,

having vomited on the way to the ship and again during the interrogation, and would have been

extremely psychologically distressed from the nature of his capture.  While courts have permitted

the introduction of statements obtained after traumatic arrests, <u>see</u>, <u>e.g.</u>, <u>Watson v. DeTella</u>, 122

F.3d 450, 452 (7th Cir. 1997) (head injury and bleeding during arrest), there has been a dramatic

shift in the scientific understanding of the effects of trauma on the brain that preclude reliance on

these older authorities.  According to researchers David Alexander and Susan Klein, the process

of being abducted has the following typical effects on adults:

> *Cognitive*: impaired memory and concentration; confusion and disorientation;
> intrusive thoughts ('flashbacks') and memories; denial (i.e. that the event has
> happened); hypervigilance and hyperarousal (a state of feeling too aroused, with a
> profound fear of another incident);
>
> *Emotional*: shock and numbness; fear and anxiety (but panic is not common);
> helplessness and hopelessness; dissociation (feeling numb and 'switched off'
> emotionally); anger (at anybody – perpetrators, themselves and the authorities);
> anhedonia (loss of pleasure in doing that which was previously pleasurable);
> depression (a reaction to loss)….

Alexander & Klein, *Kidnapping and hostage-taking: a review of effects, coping and resilience*, J.

ROY. SOC. MED. 2009 Jan 1; 102(1): 16–21.  The government did not wait for these symptoms to

subside, but exploited them by having Al-Imam quickly sign an "Advice of Rights" form and

then interrogating him in the middle of the night, until the interrogation was interrupted by

vomiting.  As soon as he had *one day* to process the brain effects of his sudden abduction from

his home, homeland, and pregnant wife, Al-Imam responded to the "Advice of Rights" recitation

by asking for a lawyer and expressing concern for his family.

In addition, there are problems with the process by which the government purportedly

obtained Al-Imam's waiver.  First, the form was not expressed "in simple terms," United States

v. Zaitar, 858 F. Supp. 2d 103, 115 (D.D.C. 2012), but in technical language that did not have

resonance in the Libyan context.  For example, the text said that Al-Imam had the "right to

remain silent," which encompasses notions of legal rights non-existent in Libya, instead of

saying, "you do not have to talk to us."  As will be shown at an evidentiary hearing, Al-Imam did

not have the background, education, or cultural context to understand this form or his rights,

even if it were read to him.

Moreover, the form did not give Al-Imam the option *not* to waive his rights.  This was

problematic for two reasons.  First, it was psychologically coercive, as Al-Imam was

undoubtedly instructed to "sign here," and there was no option to sign in a way to indicate his

objection to questioning.  Second, it created an evidentiary problem, as the government cannot

plausibly show that it did not simply instruct Al-Imam to quickly sign "court paperwork" without

explaining its import.  That evidentiary problem would not exist had the government simply

offered Al-Imam both choices—to invoke his right to silence or waive it—and let him choose

which one to sign.  Since the government created the form in this way, *and* chose not to record

its recitation of rights to Al-Imam, the court should infer that the government did so to create the

appearance of a waiver without adequately ensuring that Al-Imam understood what he was

signing.  See United States v. Yunis, 859 F.2d 953, 961 (D.C. Cir. 1988) (noting that "the failure

by the FBI to use equipment at its disposal might support a larger inference that the agents'

testimony did not accurately portray the circumstances surrounding [a] confession").

Third, the record reflects that through the very end of the interrogation process, Al-Imam believed that he would be beaten by the agents if he stopped talking.  This strongly indicates his statements were not voluntary and that any compliance with instructions to "sign here" reflected fear rather than an actual understanding and waiver of his rights.

Finally, there are additional facts Al-Imam anticipates developing at an evidentiary hearing that he does not wish to preview for the government.  In light of these facts, the government will be unable to establish by a preponderance of the evidence that he intelligently and voluntarily waived his Miranda rights, or that his statements were provided voluntarily under the totality of the circumstances.

## CONCLUSION

For the foregoing reasons, Defendant Al-Imam respectfully requests that the Court hold an evidentiary hearing and suppress all statements allegedly made by him to law enforcement agents in the course of a custodial interrogation, as well as any evidence gathered as a result of those statements.

February 15, 2019                                                         Respectfully submitted,

/s/ Matthew J. Peed
Matthew J. Peed (D.C. Bar No. 503328)
CLINTON & PEED
777 Sixth St., NW, 11th Floor
Washington, DC 20001
(202) 621-1828 (tel)
(202) 204-6320 (fax)

*Counsel for Defendant Mustafa Al-Imam*