**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **Criminal No.: 17-CR-213 (CRC)** |
| | : | |
| **MUSTAFA MUHAMMAD MUFTAH** | : | |
| **AL-IMAM,** | : | |
| | : | |
| Defendant. | : | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S MOTION TO SUPPRESS STATEMENTS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, hereby files its opposition to the defendant's Motion to Suppress Statements.

## I.    Factual Background

Defendant Mustafa Muhammad Muftah Al-Imam, a Libyan national, has been charged by superseding indictment for his participation in the attack on September 11-12, 2012, on the United States Special Mission and Annex in Benghazi, Libya, which resulted in the deaths of four Americans. The attack was carried out by Libyan-based Islamist extremists, including members of Ansar Al-Sharia ("AAS") and Ubaydah Ibn Al Jarrah ("UBJ"). At the time of the attack, AAS and UBJ were armed militias that held anti-Western views and advocated the establishment of Sharia law in Libya. The government hereby incorporates by reference the discussion of the defendant's role in the attack that is contained in the government's Opposition to the Defendant's Motion to Dismiss Counts [ECF No. 53].

## II.      Procedural History

On May 19, 2015, the defendant was charged for his participation in the attack by a sealed criminal complaint. At that time, a warrant was issued for his arrest. The defendant was arrested in Libya on October 29, 2017. On November 8, 2017, a federal grand jury returned a one-count indictment charging the defendant with conspiring to provide material support to a terrorist organization, resulting in death. On October 25, 2018, a federal grand jury returned a superseding indictment charging the defendant with a total of seventeen counts related to his participation in the attack.

## III.      Capture and Transfer of the Defendant

On October 29, 2017, at approximately 2116 hours Zulu time,[1] members of the Department of Defense (DOD) and the Federal Bureau of Investigation (FBI) participated in the capture of the defendant, Mustafa Al-Imam. The capture team included, among others, a medic to evaluate and monitor the defendant's physical condition, and an FBI Agent who had mastered certain phrases in Arabic. The capture took place in Misrata, Libya, at a location the defendant was known to frequent. The selection of this location, and the steps described below to immediately secure the defendant, were designed to minimize the risk of an armed confrontation for the safety of both the defendant and the members of the capture team.

Members of the capture team exited a vehicle and placed a gloved hand over the defendant's mouth so that he could not yell and draw attention to the capture team. Other members of the team simultaneously secured the defendant's arms and legs and pulled him into the vehicle. The members of the capture team did not use or display any weapons during the capture. The

---

1. "Zulu time" is equivalent to Greenwich Mean Time. Misrata Libya's local time is two hours later than Zulu time. Unless otherwise noted, all times in this motion are given in Zulu time.

defendant did not resist and the capture was completed within seconds. Once in the vehicle, members of the capture team handcuffed the defendant's hands in front of his body, attached the handcuffs to a belt using a carabineer, placed goggles with duct tape over the defendant's eyes, and placed a gag in the defendant's mouth.

Before placing ear coverings over the defendant's ears, an FBI agent informed the defendant, in Arabic, that he had been detained by the United States government. The defendant immediately appeared to relax after he was notified that he was in the custody of the United States. After the defendant's capture, the medic monitored the defendant's pulse and blood pressure, and did not note any medical distress; the medic continued to monitor the defendant while he was in the vehicle. The defendant was entirely compliant as the capture team drove him to a transfer site.

At the transfer site, members of the capture team removed the defendant's gag. Members of the capture team then provided the defendant with water. At this second location, an Arabic-speaking FBI Agent asked the defendant for his name, and the defendant positively identified himself as Mustafa Al-Imam. Members of the capture team provided the defendant with a fleece pullover jacket, a raincoat, a life preserver, and the same eye and ear protection.[2] The defendant's hands remained handcuffed in front of his body, but agents did not reattach the handcuffs to the belt. The Arabic-speaking agent explained to the defendant that these steps were being taken for his safety and that he was going to be placed on a boat. The defendant acknowledged that he understood these instructions. The agent also asked the defendant how he was doing, and the defendant stated that he was fine.

---

2.  The eye and ear protection served the dual purpose of protecting the integrity of the second site and the movement of the capture team, as well as protecting the defendant from sea spray and engine noise during his sea transfer.

The capture team placed the defendant in a second car and drove him to an area where he was to be transferred to a small watercraft. The medic remained with the defendant and continued to monitor the defendant's physical condition. Throughout these movements, members of the capture team told the defendant what they were doing and explained to the defendant the steps that the capture team was taking to protect his safety. Each time, the defendant acknowledged these commands and repeatedly stated that he was fine.

When they arrived at the water, an agent stood on each side of the defendant to help guide him into the watercraft. As a result of heavy surf, as they approached the rear of the watercraft, a wave knocked the watercraft backwards into the defendant and the agents, causing the watercraft's transom to strike the defendant's back. Despite being hit by the wave and the transom of the watercraft, agents were able to maintain control of the defendant and to keep his head above the water.  Once they boarded the watercraft, agents asked the defendant how he was doing. Although he indicated that he had some back pain, he stated that he was okay. The medic continued to monitor the defendant.

The capture team then transferred the defendant to a second, larger watercraft. The capture team raised the defendant's goggles so that he could see as they transferred him to the second watercraft. Initially, the capture team left the defendant's goggles up, however they lowered the goggles again when sea spray started to strike the defendant's face. While in the second watercraft, the defendant started to have motion sickness, so the agents lifted the goggles again to try to relieve the defendant's discomfort. While in the second watercraft, the defendant vomited as a result of motion sickness. At approximately 2330 hours, two-and-a-quarter hours after he was first captured,

the defendant was loaded onto a large United States naval vessel.[3] When the capture team and the defendant arrived at the naval vessel, members of the capture team and the medic assisted in securing the defendant in a Stokes basket.[4] Members of the naval vessel's crew hoisted the defendant onto the vessel's deck without incident. DOD guard force members carried the defendant, still in the Stokes basket, for approximately 20 yards to the initial detention area.

## IV.   Initial Processing of the Defendant

In the detention area aboard the vessel, members of the guard force removed the defendant's safety equipment, including the goggles and ear covering and helped the defendant come to a standing position. With the assistance of an FBI linguist,[5] the defendant was searched and photographed. The defendant was provided with privacy and clean underwear to change into before his medical examination. The defendant then underwent a comprehensive medical examination by a physician.

Outside of motion sickness, the defendant did not present any acute medical issues. The physical examination revealed that the defendant had five small abrasions on his facial area,

---

3. An FBI team in conjunction with DOD personnel had prepared for the defendant's arrival. These preparations included establishing a "detention pod" where the defendant would be held, a latrine pod, and an interview room where any voluntary interviews would take place; and repeated drilling to make sure the defendant was lifted safely onto the naval vessel using a boom, winch, and a "Stokes" basket. The detention pod was approximately 2.22 x 1.95 meters, was equipped with air conditioning, and included a bed, blanket, a prayer rug, and a Koran. Also, as a sign of respect, the Koran was placed on top of a small box, rather than on the floor of the detention pod. The latrine was located several yards away from the detention pod. The Interview room was also separated from the detention pod, and measured approximately 4.6 x 5.75 meters.

4. A Stokes basket, also called a Stokes stretcher or Stokes litter, is a metal wire or plastic litter widely used in search and rescue.

5. The FBI linguist in this case is a native Arabic speaker who is familiar with multiple Arabic dialects. The linguist had no difficulty communicating with the defendant.

bruising on each of his biceps, and some abrasions on each shoulder (*see* Attachment 1-001 to 1-009). The physician provided the defendant with Meclizine[6] to treat his motion sickness. The physician did not observe any evidence of physical abuse, and the defendant did not indicate that he had been abused in any way.[7] Throughout the examination, the defendant appeared to understand all the questions and directions posed to him through the linguist and the defendant responded appropriately. The physician completed the medical examination at approximately 0032 hours on October 30, 2017. After examining the defendant, the physician medically cleared the defendant for detention.

With the assistance of the linguist, an FBI agent took additional photographs of the defendant and gathered biometric data and a DNA swab from the defendant. The defendant was also advised of his rights pursuant to Article 3 of the Geneva Convention, additional rules he would need to follow while on the naval vessel, and religious accommodations. Article 3 of the Geneva Convention[8] and the rules were printed in Arabic and posted on the wall so that the defendant could follow along. These "rules" included:

- Notification that the defendant would receive fresh clothing;

- Notification that the defendant would be searched;

- Notification that the defendant would be examined by a doctor;

---

6.  Meclizine is an antihistamine that is used to prevent and treat nausea, vomiting, and dizziness caused by motion sickness.

7.  The defendant did have scars in his leg area related to an old shrapnel injury.

8.  Article 3 of the Geneva Convention provides basic protections to individuals who are no longer engaged in hostilities. These protections include prohibitions against mutilation, cruel treatment and torture; outrages upon personal dignity, in particular, humiliating and degrading treatment; and the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court.

- Instructions on requesting water or bathroom breaks;

- Notification that the defendant would be photographed; and

- Instructions to notify the staff if he was abused.

This additional processing and notification process was completed at approximately 0107 hours.

V.    **Statements**

As described below, the defendant provided three post-*Miranda* statements before he invoked his right to counsel. In each of these interviews the defendant was treated with respect, there were no military personnel present, no weapons were displayed, and the defendant was granted numerous breaks. An Arabic linguist was present throughout the interviews, and at no time did the defendant have any difficulty communicating through the linguist. Further, the interviewing agents did not threaten or harass the defendant, or make any promises. The interviews were all conducted in a conversational tone, and often included idle conversation regarding sports, family and politics.

### A.  First Statement - October 30, 2017, 0125 Hours

On October 30, 2017, at approximately 0120 hours, members of the guard force moved the defendant to the interview room to meet with FBI agents.[9] Members of the guard force escorted the defendant into the interview room and removed the defendant's handcuffs, blindfold and ear covering. Members of the guard force then exited the interview room. Present in the interview room at this time were FBI Special Agent Larkin and FBI Task Force Officer Marcano. Neither one of these agents had participated in either the capture or initial processing of the defendant. The agents wore civilian clothing and were not armed. The agents were assisted by the same FBI

---

9.  Before moving the defendant, members of the guard force handcuffed the defendant's hands behind his back, covered his eyes with a blindfold and applied ear coverings. This same procedure was followed whenever the guard force moved the defendant.

linguist who had accompanied the defendant since the defendant was first brought aboard the naval vessel.

Agents asked the defendant how he was feeling. The defendant stated that although he was feeling all right, he was a bit nauseous. The agents explained to the defendant who they were, that the defendant was on a United States naval vessel, and that he was under arrest. The defendant acknowledged that he understood what the agents were saying through the linguist.

At 0140 hours, the agents orally advised the defendant of his *Miranda* rights using a form that was written in Arabic, with an English translation on the back of the form. The agent advising the defendant of his rights spoke slowly, allowing the linguist sufficient time to translate. The defendant, using his finger, followed along on the Arabic advice of rights form as his rights were being read and translated. After being advised of his rights, the defendant acknowledged that he understood his rights, and stated that he was willing waive those rights and to speak with the agents. The defendant confirmed that he was able to read and speak Arabic, at which time agents gave the defendant a copy of the advice of rights form. The defendant then reviewed and signed the Arabic version of the acknowledgement and waiver of rights (Attachment 2). Thus, the defendant agreed to waive his rights and to speak with agents both orally and in writing.

At approximately 0215 hours, at the defendant's request, the guard force moved him from the interview room to go to the bathroom. The defendant returned to the interview room approximately 15 minutes later. At this time, the guard force also provided the defendant with a pair of reading glasses.[10]

---

10.  During his initial medical evaluation, the defendant stated that he wore glasses "a long time ago," and that he had trouble reading up close.

The interview resumed at approximately 0230 hours, however, at 0238 hours, the defendant vomited. The physician was contacted and after examining the defendant, the physician provided the defendant with a dose of Zofran[11] to treat the defendant's motion sickness. Given the defendant's motion sickness, Agents Larkin and Marcano elected to end the interview for the evening. At approximately 0258 hours, members of the guard force returned the defendant to his detention pod.

### B.  Second Statement - October 30, 2017, 1045 Hours

At 0755 hours, the physician and linguist entered the detention pod to check on the defendant's welfare. The defendant was still nauseous, so the physician provided the defendant with another dose of Meclizine. The defendant ate some of the food provided to him that morning.

At approximately 1045 hours, the guard force moved the defendant to the interview room, and again removed his handcuffs, blindfold and ear coverings. Agent Larkin and TFO Marcano, through the FBI linguist, asked the defendant how he was feeling, and whether he had eaten and prayed. The defendant stated that he had eaten and prayed that morning, that he was not nauseous, and that he was feeling much better.

At 1055 hours, Agent Larkin and TFO Marcano advised the defendant of his rights. Using the same process that they had used during the first advice of rights, the defendant orally and in writing waived his rights and agreed to speak with the agents (Attachment 3).

At 1155 hours, the defendant took a 15-minute break to use the bathroom. The defendant continued to speak with agents after he returned. At approximately 1255 hours, the interview was suspended so that the defendant could pray, shower, and have a wellness check with the physician.

---

11.  Zofran (ondansetron) blocks the actions of chemicals in the body that can trigger nausea and vomiting.

After he was returned to the detention pod, the guard force provided the defendant with a bucket of water so that he could prepare himself for prayer. The defendant then took a shower and returned to his detention pod. At approximately 1900 hours, the physician checked on the defendant and gave him an additional dose of Meclizine. At 1956 hours, the defendant received a meal.

### C.  Third Statement - October 30, 2017, 2048 Hours

The guard force returned the defendant to the interview room at approximately 2048 hours the same day, removing his handcuffs, blindfold, and ear coverings. Agent Larkin and TFO Marcano asked the defendant whether he had the opportunity to pray, eat, and to use the restroom. The defendant stated that he had an opportunity to pray and that he had been eating and sleeping well, and that he felt fine. Although they did not re-advise the defendant of his rights, they reminded the defendant of the nature of the interview, and instructed him that they were continuing the conversation they had started earlier in the day.

At approximately 2145 hours, the defendant took a 15-minute break to use the bathroom. When the defendant retuned, Agent Larkin and TFO Marcano asked the defendant if he was feeling okay. The defendant indicated that he was feeling fine and that he did not need anything else.

At approximately 2217 hours, as the interview with the agents ended for the day, the defendant asked if the interviewers could provide him with coffee, rice, olives or chicken. The guard force then returned the defendant to his detention pod.

### D.  Fourth Statement - October 31, 2017, 2048 Hours

On October 31, 2017, at approximately 0700 hours, the physician and linguist entered the detention pod to check on the defendant's welfare. The defendant was still nauseous, so the physician provided the defendant with another dose of Meclizine. After he was examined by the

physician, the guard force provided the defendant with a bucket of water to prepare for prayers. At approximately 0800 hours, the guard force provided the defendant with a meal.

Shortly after 0900, the guard force moved the defendant from the detention pod to the interview room. Once there, the guard force removed the defendant's handcuffs, blindfold and ear covering.

Agent Larkin and TFO Marcano asked the defendant how he was feeling and whether or not he had eaten and had time to pray. The defendant stated that he had not slept well the night before. Consistent with his request from the previous evening, the agents provided the defendant with coffee and olives. Agents also provided the defendant with a Pop-Tart.

At approximately 0920 hours, Agent Larkin and TFO Marcano advised the defendant of his rights, using the same process that they had used during the first two advice of rights. However, this time the defendant stated, "I think I might want to have a lawyer here while we speak." The defendant volunteered that he had been thinking about his family, and that his wife did not know where he was so she would be worried. The defendant then told agents that if they were not going to beat him, he would like to go back to his living area. Agent Larkin and TFO Marcano stressed that the defendant would not be mistreated while he was in the custody of the United States. The defendant stated that he would talk to the agents about soccer or other issues unrelated to the case but that he did not want to answer any additional questions. The defendant began to drink his coffee, and he and the agents engaged in casual conversation.

At approximately 1005 hours, the guard force returned the defendant to his detention pod. There were no additional interviews of the defendant.

## VI.     Argument

### A.  The Defendant's Miranda Waiver was Valid.

As set forth below, the defendant validity waived his *Miranda* rights. The defendant was carefully and repeatedly advised of his *Miranda* rights in his native language. He knowingly and voluntarily waived those rights, and provided three statements to interviewing agents before invoking his right to counsel.

In *Miranda*, the Supreme Court stated that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." 384 U.S. at 475. Subsequently, the Supreme Court has explained that "this 'heavy burden' is not more than the burden to establish waiver by a preponderance of the evidence." *Berghuis v. Thompkins*, 560 U.S. 370, 384 (2010). "Thus, the government must show it is more probable than not that [defendant's] waiver of rights reflected 'an uncoerced choice and the requisite level of comprehension.'" *United States v. Yunis*, 859 F.2d 953, 962 (D.C. Cir. 1988).

This Court has previously found that a captured defendant's *Miranda* waiver was knowing and voluntary under circumstances similar to those in this case. Relying on the well-established principles discussed below, in *United States v. Khatallah,* 275 F.3d 32, 66-70 (D.D.C. 2017), this Court found that Khatallah's waiver and subsequent statement were knowing and voluntary where: Khatallah had been captured by United States forces in Libya; he suffered a gash to his head as he resisted his capture; he was transported to a naval vessel; he was held in a detention pod; he was blindfolded and handcuffed as he was moved about the vessel; and he claimed that based on his prior experiences in Libya he felt compelled to provide a statement. As in *Khatallah,* the totality

of the circumstances in this case demonstrates that the defendant's statements were voluntary and the result of a voluntary and knowing waiver.

### 1.   The Defendant's Miranda Waiver was Voluntary and Knowing.

The decision to waive one's Fifth Amendment rights must be the product of "a deliberate choice to relinquish the protection those rights afford." *Berghuis*, 560 U.S. at 385. The Court should inquire first, whether "the relinquishment of the right [was] voluntary in the sense that it was the product of a free and deliberate choice," and second, whether the waiver was made "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). To determine whether a *Miranda* waiver was "voluntary, knowing and intelligent," *id.* at 421, the Court must look at the totality of the circumstances surrounding the case, "including the background, experience and conduct of the accused." *Oregon v. Bradshaw*, 462 U.S. 1039, 1046 (1983) (citations and internal quotation marks omitted). Here, as set forth below, the defendant's waivers were made voluntarily, knowingly and intelligently and "with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421. The evidence to be adduced at the hearing will demonstrate (1) that the defendant's decision to waive his *Miranda* rights was voluntary and free from coercion and (2) that he understood exactly what he was doing when he executed those waivers.

### 2.   The defendant's *Miranda* waiver was voluntary.

The voluntariness of a *Miranda* waiver is analyzed using the same guidelines as those used in determining the voluntariness of statements. *See Colorado v. Connelly*, 479 U.S. 157 (1986); *North Carolina v. Butler*, 441 U.S. 369 (1979). As discussed *infra,* consequently, the test is whether the waiver was voluntary based on the totality of the circumstances. The mere presence

of some potentially coercive factors does not necessarily render a *Miranda* waiver involuntary.

For example, a *Miranda* waiver was deemed voluntary where,

> Prior to his arrest, Shi spent four days in a storage compartment where he had been kept by the crew. Still, the district court found that upon his release from the compartment, Shi appeared coherent and alert. Indeed, the district court credited the agents' description of Shi's demeanor as "cocky" and "not timid at all." In addition, Shi was allowed access to a bathroom before the agents escorted him to the dining area to read him the warnings.

*United States v. Shi*, 525 F.3d 709, 728 (9th Cir. 2008).[12]

### 3. The defendant's Miranda waiver was knowing and intelligent.

The evidence amply demonstrates that the defendant's *Miranda* waiver was knowing and intelligent. The sole focus of this analysis is whether the defendant understood that any statements he made could be used against him, and this understanding is presumed upon the giving of *Miranda* warnings to a suspect. *Colorado v. Spring*, 479 U.S. 564, 574-76 (1987) ("Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled."). Here, the fact that the defendant understood his rights is buttressed by defendant's background and from his conduct during the interviews.

First, the defendant was advised of and waived his *Miranda* on multiple occasions, and in each instance he expressed that he understood those rights. *See, e.g., Yunis*, 859 F.2d at 959 (Agents "repeatedly asked Yunis, as each warning was read to him, whether Yunis understood the

---

12. *See also Berghuis*, 560 U.S. at 386 (three hour interrogation while seated in straight back chair); *United States v. Medunjanin*, 752 F.3d 576, 588 (2d Cir. 2014) (comments regarding expense of the defendant's attorney); *United States v. Vallar*, 635 F.3d 271, 284 (7th Cir. 2011) ("arrest[] at [defendant's] home at 6:30 a.m. by officers with weapons drawn, [defendant] handcuffed for about an hour while agents searched his home, and [defendant] taken to the police station and forced to listen to audio tapes implicating him in the alleged conspiracy before he received and waived his *Miranda* rights and provided the post-arrest statement"); *United States v. Gaddy*, 532 F.3d 783, 788 (8th Cir. 2008) (intoxication and fatigue); *United States v. Burson*, 531 F.3d 1254, 1258 (10th Cir. 2008) (defendant exhausted and high on methamphetamine).

warning. According to both agents, Yunis consistently answered that he did understand."). The rights were presented to the defendant in his native Arabic both verbally and in writing, and the meaning of the rights was discussed with him. *See, e.g.*, *Id.* (waiver valid where "the entire form was read to Yunis aloud, in Arabic"); *United States v. Elfgeeh,* 515 F.3d 100, 124-25 (2d Cir. 2008) (valid waiver by Arabic-speaking defendant where *Miranda* form written in Arabic was used and reviewed line-by-line); *United States v. Yousef*, 327 F.3d 56, 123 (2d Cir. 2003) (waiver valid, where defendant "was also read his *Miranda* rights in Arabic"). *United States v. Hasan*, 747 F. Supp. 2d 642, 670 (E.D. Va. 2010), *aff'd sub nom. United States v. Dire*, 680 F.3d 446 (4th Cir. 2012) ("The *Miranda* rights were recited to Defendants, through Ismail, the interpreter, in their native language.").

Second, a brief review of the defendant's background demonstrates that he is neither unsophisticated nor ignorant. He, therefore, was not susceptible to misunderstanding either his rights or his legal predicament. At the time of his arrest, the defendant was 45 years old, he had completed nine years of formal schooling, and during the interview the defendant demonstrated his ability to read and write Arabic. The defendant reported that he previously owned his own grocery store, and that prior to his capture he was employed by the Libyan government to verify addresses and residency in support of the government's housing authority.

Equally strong evidence that the defendant's waivers were knowing and intelligent can be found in his conduct during the interviews. *See Butler*, 441 U.S. at 373 (the police may infer a knowledgeable and intelligent waiver "from the actions and words of the person interrogated"). As an initial matter, the defendant's intelligence was quite evident throughout his time with the agents. *Compare Young v. Walls*, 311 F.3d 846 (7th Cir. 2002) (IQ 56; intelligence "sufficient if the suspect has enough mental capacity to make decisions in daily life"); *Moore v. Dugger*, 856

F.2d 129, 134-35 (11th Cir. 1988) (valid waiver by mentally handicapped defendant with IQ of 62 and functional intellectual capacity of 11-year-old when defendant appeared calm, responsive, and able to understand questions and acknowledged at trial that informed of right to counsel). The defendant appeared to be alert and appropriately responded to questions, and engaged in relevant conversations regarding a wide range of issues including his personal history, criminal history, sports, and his opinions regarding the complex political situation in Libya. The defendant never exhibited any inability to understand the meaning of the *Miranda* warnings. Importantly, his understanding of those warnings was amply demonstrated when, after three voluntary interviews, he elected to request an attorney before he continued to answer additional questions. *See, e.g.*, *United States v. Andaverde*, 64 F.3d 1305, 1314 (9th Cir. 1995) (defendant demonstrated clear understanding of *Miranda* rights by later asserting them); *United States v. Toro-Pelaez*, 107 F.3d 819, 826 (10th Cir. 1997) (same).

The defendant's unfamiliarity with our legal system does not undermine the factors set forth above, which established that he intelligently waived his rights. *See Yunis*, 859 F.2d at 964–66 (noting that, due to the lack of applicable precedent, "[i]t is unclear what weight should be given to an alien's unfamiliarity with our legal culture in evaluating the validity of that alien's waiver" but ultimately concluding that, under the circumstances of that case, the defendant's "unfamiliarity with American law did not prevent him from understanding the *Miranda* rights as they were presented to him"); *United States v. Labrada–Bustamante*, 428 F.3d 1252, 1259 (9th Cir. 2005) (explaining that agent "was not required to explain to [the defendant] what the *Miranda* rights meant" and that "[t]he fact that [the defendant] might not be familiar with the United States' form of justice is merely one factor to be considered"). In *Hasan*, the defendants made a similar argument:

> Defendants argued that, as non-English speaking and illiterate Somali nationals, without any connection to the United States, they would have lacked any understanding of the existence and nature of the rights available to them under the Fifth Amendment even after having the rights recited to them in their own language. Defendants argue that Somalia's government is barely functional, attorneys are uncommon there, and individual freedoms protecting persons who wish to refuse to answer questions from authorities are foreign and incomprehensible concepts.

747 F. Supp. 2d at 669. Nevertheless, "the Court [found] that the totality of the circumstances in this case demonstrates that Defendants did, in fact, knowingly and intelligently waive their rights. *Id.* In sum, the fact that the defendant may have been unfamiliar with the American justice system is of no moment. *See, e.g.*, *Yunis*, 859 F.2d at 966 (finding *Miranda* waiver valid despite fact that the defendant "'did not grow up watching Hawaii Five-O or Matlock'"). *Accord Khatallah,* 275 F. Supp. 3d at 68.

### B.  The Defendant's Statements Were Voluntary.

Likewise, the defendant's decision to talk to the agents was voluntary. The sole focus of the "voluntariness" inquiry is whether the government coerced the statement. *Connelly*, 479 U.S. at 169-70. In this case, there is simply no evidence that the defendant's "will [was] overborne and his capacity for self-determination critically impaired because of coercive police conduct." *Spring*, 479 U.S. at 574 (citation and internal quotation marks omitted). Indeed, as discussed in more detail below, the atmosphere in which the defendant spoke was far from hostile. During the interviews, the defendant was not restrained; he was provided food, drink, bathroom breaks, and the opportunity to pray; and the officers did not force him to talk, coerce him, or promise him anything in exchange for his statements. Moreover, the defendant repeatedly acknowledged and waived his rights, and, perhaps most importantly, he ultimately invoked them and refused to answer additional questions without a lawyer.

Under these clearly non-coercive conditions, the defendant's statements should not be suppressed. "[F]ar from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable." *United States v. Washington*, 431 U.S. 181, 187 (1977); *see also Michigan v. Tucker*, 417 U.S. 433, 459 n.23 (1974) ("completely voluntary confessions may, in many cases, advance the cause of justice and rehabilitation").

### 1.   Standard

The burden of proof is on the government by a preponderance of the evidence. *Connelly*, 479 U.S. at 168; *United States v. Hallford*, 816 F.3d 850, 859 (D.C. Cir. 2016) ("the government carried its burden of proving by aa preponderance of the evidence that Hallford's statements were voluntary"); *see also Bobby v. Dixon*, __ U.S. __, 132 S.Ct. 26, 32 n.4 (2011) (rejecting a suggestion that, because the state court noted a lack of evidence of coercion, that somehow this was an unlawful shifting of the burden of voluntariness).

### 2.   The Defendant was not Coerced into Giving a Statement.

When determining whether a defendant's custodial statements were involuntarily elicited, courts look to the totality of the circumstances to determine whether the will of the defendant was overborne in such a way as to render his confession the product of coercion. A statement is involuntary, in violation of due process, if a defendant's will was overborne based on the totality of the circumstances. *See, e.g.*, *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (collecting cases); *Arizona v. Fulminante*, 499 U.S. 279, 285-89 (1991); *United States v. Murdock*, 667 F.3d 1302, 1305 (D.C. Cir. 2012) (voluntariness evaluation "'requires [a] careful evaluation of all the circumstances of the interrogation'").[13] "If his will has been overborne and his capacity for self-

---

13.  Recently, the Court of Appeals criticized the "totality of the circumstances" standard and attempted to refine it:

determination critically impaired, the use of his confession offends due process." *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961). The focus is on whether the confession was obtained by using means "so offensive to a civilized system of justice that they must be condemned." *Miller v. Fenton*, 474 U.S. 104, 109 (1985).

Significantly, the Supreme Court has explained that "coercive police activity is a necessary predicate to the finding that a confession is not voluntary," *Connelly*, 479 U.S. at 167, and that due process is not violated unless the coercion is "causally related to the confession." *Id.* at 163-64; *see also Hallford*, 816 F.3d at 857 ("The ultimate question is whether Hallford's 'will' was 'overborne and his capacity for self-determination critically impaired' as a result of the agents' conduct.").

Factors to consider in assessing the totality of the circumstances include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; whether the police or the accused initiated the dialogue; and the use of physical punishment, such as the deprivation of food or sleep. *See, e.g.,* 18 U.S.C. § 3501(b); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). No one factor is dispositive. Here, the totality of the circumstances leaves no

---

We hesitate to put this in terms of the "totality of the circumstances," a phrase that appears in some opinions dealing with the sort of issues confronting us in this case. Sometimes these opinions treat the "totality" phrase as if it were a "test," which it is not. The phrase itself is "non-descriptive." [citation omitted] It tells us nothing about which circumstances are even relevant (surely, not all circumstances matter), and it reveals nothing about the probative value of any particular circumstance.

*Hallford*, 816 F.3d at 857 n.9.

doubt that the defendant's statements were not the product of police coercion and that they were completely voluntary.

There is no evidence that the defendant was ever subjected to the slightest coercion by the agents. Besides the absence of any circumstances to suggest that the statements were coerced, there is an abundance of circumstances that indicate they were totally voluntary. First, the agents treated the defendant humanely and respectfully throughout the interview process.[14] Second, the defendant was reminded of his *Miranda* rights repeatedly throughout the interviews. *See, e.g., Yunis*, 859 at 961 (D.C. Cir. 1988) ("The administration of proper *Miranda* warnings followed by a written waiver of the rights described in those warnings, will usually go far toward demonstrating that a decision to speak is not compelled."); *Spring*, 479 U.S. at 576 ("Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled."). Third, prior to what would have been his fourth interview, the defendant elected to stop answering questions, and invoked his right to counsel. *Hallford*, 816 F.3d at 859 ("And there is strong evidence that Hallford's will was not "overborne." [citation omitted] As the interview concluded, Hallford refused the agents' request that he consent to a search of the car and he refused to permit the agents to examine his medical records.). Fourth, the defendant was not under the influence of alcohol or any drugs that would have rendered him unable to comprehend his rights. Fifth, during his first three interviews, the defendant never requested the presence of an attorney, even though the agents advised him of his right to have a lawyer with him on numerous occasions. *See, e.g., Ledbetter v. Edwards*, 35 F.3d 1062, 1069-70 (6th Cir. 1994)

---

14.  For example, the agents were dressed in casual civilian clothes; they were unarmed; they spoke in normal conversational tones; they frequently inquired of the defendant's well-being; they afforded the defendant regular breaks to eat, rest, use the facilities, and pray; and provided the defendant with reading glasses.

(fact that defendant was advised three times and never chose to request attorney alleviate concern that attorney necessary to make confession voluntary).

### C. Defendant's Arguments do not Demonstrate That the Defendant's Statements Should be Suppressed

The defendant argues (at 4-5) that the defendant's waiver was not voluntarily because the defendant was questioned following a "traumatic abduction," was still suffering the psychological effects of being "abducted," was "extremely seasick," lacked the "cultural context" to understand the waiver form or his rights, and was told by agents to "sign here." These arguments lack merit as similar arguments have been rejected by this Court and others, the defendant's reliance on studies regarding the victims of violent criminal kidnappings and hostage takings is entirely misplaced, and there is no evidence that agents coerced the defendant to "sign here."

First, the defendant's capture was not a "traumatic abduction." Rather, the capture team conducted a carefully controlled arrest of the defendant to maximize the defendant's safety as well as their own. In addition, to minimize any psychological stress, the capture team immediately identified themselves, and regularly updated the defendant on their movements, and the steps they were taking to ensure his safety. The result is that the defendant did not suffer any significant injuries during his arrest, did not offer any resistance during his arrest, and was cooperative throughout his transfer from land to a naval vessel. To the extent the defendant suffered any trauma, such minimal trauma does not vitiate the voluntariness of the defendant's waiver. Indeed, as this Court noted in *Khatallah,* 275 F. Supp. 3d at 67, "courts have generally upheld the validity of *Miranda* waivers even in circumstances where defendants were injured during arrest." (citing *Yunis,* 859 F.2d at 960 (fractured wrists); *United States v. Havlik,* 710 F.3d 818, 822-23 (8th Cir.

2013) (chest injury during arrest); *Watson v. Detalla,* 122 F.3d 450, 452 (7th Cir. 1997) (head injury and bleeding during arrest).[15]

Second, the defendant asks this Court to reject the reasoning of *Watson* (and presumably *Yunis* and *Havlik*) because of a "dramatic shift in the scientific understanding of the effects of trauma on the brain." In support of this claim, the defendant points to the work of David Alexander and Susan Klein and states that, according to their work, "the process of being abducted" has several side effects including cognitive and emotional side effects. To be clear, there is no evidence of "trauma on the brain" as that term is commonly understood. The defendant was never struck in the head, and during his medical exam, the defendant did not indicate any loss of consciousness or other head trauma either as part of his arrest and transfer, or as part of his self-reported medical history.

To the extent that the defendant is equating "trauma on the brain" with the psychological impacts discussed by Alexander and Klein, the cognitive and emotional effects they described are entirely distinguishable. Contrary to the defendant's argument that Alexander and Klein were discussing "abductions," the article cited by the defendant focused on the effects of violent criminal kidnappings and prolonged periods of detention as a hostage. Examples Alexander and Klein cited include the Lindberg kidnapping (and subsequent murder of the child victim); the hostage taking in Munich of members of the Israeli Olympic team (ending in the murder of several

---

15. *See also United States v. Marrero,* 651 F.3d 453, 470 (6th Cir. 2011) (waiver valid: defendant "had been stunned with a taser multiple times during his struggle with police officers"); *United States v. Duvall*, 537 F.2d 15, 23 (2d Cir. 1976) (waiver valid: defendant advised of rights an hour after "arrest at gunpoint, the roughing-up of [defendant's] companion, and [defendant] being punched in the shoulder, and also of the strip search"); *United States v. Michaeloski*, 2013 WL 139192 at *3 (E.D. Tenn. Jan. 10, 2013) (waiver valid: "Although Defendant was arrested by officers with guns drawn and in a forceful takedown, his initial questioning was not performed until approximately fifteen minutes after his arrest, his handcuffs were removed, and he was allowed to smoke a cigarette.").

hostages); the kidnapping and beheading of Nick Berg and Ronald Schultz by Islamic extremists; and the growing problem of kidnappings for ransoms in Nigeria and Columbia. Alexander & Klein, *Kidnapping and hostage-taking" a review of effects, coping and resilience,* ROY. SOC. MED. 2009 Jan 1; 102(1): 16-17. The physiological effects described in the article relate to individuals who have been kidnapped and held hostage, not individuals who have been arrested. *Id.* at 17-18. As noted, *supra.*, in this case the capture team immediately informed the defendant that he was being taken into United States custody in part to mitigate the fear that he was being taken as part of a criminal kidnapping. Indeed, members of the capture team noted that the defendant appeared to relax once he was informed that he was in the custody of the United States.

Third, the defendant's motion sickness did not render his waiver involuntary. The defendant did vomit while he was in the second watercraft, and vomited a second time on the naval vessel after his first waiver. However, the physician on the naval vessel provided the defendant with medication to treat his motion sickness before his first waiver, the defendant ate meals in between his interviews, and the defendant did not vomit as a result of motion sickness after the first interview. Further, both before his second waiver, and before his third interview, the defendant stated that he was feeling fine. In *Yunis*, the court found that a far worse case of motion sickness did not render a defendant's waiver involuntary. In *Yunis,* the defendant suffered from repeated bouts of vomiting, dizziness, and dry heaves, and he did not initially receive any medication. *Yunis*, 859 F.2d at 956. Nonetheless, the court found that Yunis's waiver was voluntary because he was "alert and attentive" when he executed his waiver. *Id.* at 963. As was the case with the defendant in *Yunis,* the defendant here was not asked to execute a waiver shortly after vomiting. Further, before reviewing the defendant's rights with him, the interviewing agents asked the defendant how he was feeling, and the defendant responded that he was all right, although he was a bit nauseous.

*Cf. id.* at 964 (more than one hour between last incidence of nausea and waiver, and defendant stated that he was not in pain). The defendant's nausea, following the passage of at least two hours since he had last vomited (and his receipt of medication to treat his motion sickness) does not evidence that his "will was overborne and his confession was not the product of a rational intellect and a free will," *id.* (internal quotations and citations omitted), because of his motion sickness.

Fourth, the defendant's claim that he lacked the "cultural context" that prevented him from understanding his rights or the waiver form, is similar to claims that have been rejected by this court and others. *See, e.g., Khatallah,* 275 F. Supp. 3d at 68 (citing *Yunis*, 859 F.2d at 964–66 (valid waiver despite defendant's ninth-grade education and "unfamiliarity with [U.S.] legal culture"); *United States v. Labrada–Bustamante*, 428 F.3d 1252, 1259 (9th Cir. 2005) (valid waiver even though the defendant "might not be familiar with the United States' form of justice"); *United States v. Hasan*, 747 F.Supp.2d 642, 669 (E.D. Va. 2010) (valid waiver by "non-English speaking and illiterate Somali nationals, without any connection to the United States"), *aff'd sub nom. United States v. Dire,* 680 F.3d 446 (4th Cir. 2012)). As discussed *supra.,* the defendant had at least a ninth-grade education, had owned his own business, and was employed prior to his capture.

Fifth, the defendant claims that the waiver form used by the agents was defective because it did not give the defendant the option not to waive his rights, and that the defendant "was undoubtedly instructed to 'sign here.'" The former claim ignores the plain language and structure of the waiver form, while the latter claim is baseless. The waiver form (*see* Attachments 2 and 3) begins by identifying the role of the interviewing agents and then, in a series of sentences, separated by a return, and using clear and simple language, advises the defendant of his rights, beginning with "[y]ou have the right to remain silent." The advice of rights continues with

additional rights, and concludes by asking, "[d]o you have any questions about what I have just explained to you?" Following this question, a centered and underlined caption states: "Acknowledgment of Rights Waiver of Rights to an Attorney and to Remain Silent." Thereafter, there are blank spaces for the defendant's initials next to each of the four separately listed rights that the defendant can waive. This is followed by a line for the defendant's full signature. Thus, the structure and language of the form clearly separated the announcement of the defendant's rights, from any decision to waive those rights.

Further, there is no evidence whatsoever that the defendant was told to "sign here" or was told to quickly sign "court paperwork." Such a claim is belied by the waiver form itself, where the defendant initialed the waiver form four separate times before signing his name. Further, each time before the defendant signed the waiver, there was a passage of sufficient time for the defendant to review and consider his rights (approximately 15 minutes before signing the first waiver, and approximately 10 minutes before signing the waiver the second time).[16] Finally, even assuming some error in the form itself, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel . . . is not inevitably either necessary or sufficient to establish waiver. The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the *Miranda* case. *Butler,* 441 U.S. at 373. The

---

16. The defendant also argues that his spontaneous post-invocation statement to the interviewing agents that if they were not going to beat him he would like to return to his living area demonstrates that his compliance with an instruction to "sign here" was the result of fear. The defendant made this statement after he invoked his right to an attorney after being advised of his rights for a third time. The defendant did not make a simultaneous claim that he had been beaten, and there was no evidence of physical abuse. Further, in his motion, the defendant does not claim that he was physically abused, or threatened with physical abuse, by the government. The failure to do so is dispositive. *Connelly*, 479 U.S. at 167 (police activity is a necessary predicate to the finding that a confession is not "voluntary").

defendant clearly appeared to understand his rights, as indicated by his decision to invoke his right

to counsel after his third interview.[17]

## VII.    Conclusion

The defendant's motion to suppress his statements should be denied because the defendant

voluntarily, knowingly, and intelligently waived his *Miranda* rights before voluntarily making

statements to the interviewing agents.[18]

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY

By: _____/s/_____
     Michael C. DiLorenzo
     MD Bar No. 931214 0189
     John Cummings
     DC Bar No. 986573
     Karen Seifert
     New York Bar Number 4742342
     Assistant United States Attorneys
     National Security Section
     United States Attorney's Office
     555 4th Street, N.W.
     Washington, D.C. 20530
     (202) 252-7809
     Michael.Dilorenzo@usdoj.gov
     John.Cummings@usdoj.gov
     Karen.Seifert@usdoj.gov

---

17.  The defendant also argues that because the government did not record the advisement of rights, this Court should infer that the government did so to create the false impression that the defendant understood his rights. As this Court found in *Khatallah,* there is no requirement to record interrogations, 275 F. Supp. 3d at 66, and as such there is no basis for an adverse inference based on the government's failure to do so here. *Accord Yunis*, 859 F.2d at 961.

18.  The defendant also claims that there are additional facts that he does not want to preview in his motion to suppress. While the defendant may elicit additional facts to support his current arguments that his waiver and statements were involuntary, he cannot advance new legal theories to seek suppression of his statements. Fed. Rule Crim. P. 12(b)(3)(C).