UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **MUSTAFA MUHAMMAD MUFTA AL-IMAM**, <br><br> Defendant. | Case No. 17-cr-213 (CRC) |

<u>**MEMORANDUM OPINION**</u>

On September 11 and 12, 2012, a group of Libyan militants attacked U.S. diplomatic and intelligence facilities in Benghazi, Libya.  Four Americans died in the attacks, including then-United States Ambassador to Libya J. Christopher Stevens.  The United States alleges, in a seventeen-count superseding indictment, that Defendant Mustafa Muhammad Mufta Al-Imam participated in the attacks.  Al-Imam has moved to dismiss all but one of the counts.  He contends that most of the statutes under which he is charged do not apply to conduct undertaken outside of the United States; that he cannot be prosecuted for eleven of the counts because his capture violated international law; and that six counts must be dismissed because the offenses charged apply only to legally operated federal facilities, which he says excludes the facilities here.

Save for the illegal capture argument, the Court has previously considered and rejected each of Al-Imam's challenges in ruling on a motion to dismiss brought by one of his purported co-conspirators, Ahmed Abu Khatallah, who was convicted in November 2017 of three of the offenses with which Al-Imam is also charged.  <u>See</u> Judgment, <u>United States v. Ahmed Abu Khatallah</u>, 14-cr-141, ECF No. 547.  Recognizing this obstacle to dismissal, Al-Imam urges the Court to reconsider its prior analysis, particularly with respect to his extraterritorial challenge.

But the Court finds no reason to depart from its conclusion in <u>Abu Khatallah</u>.  It also finds Al-Imam's capture argument unavailing.  Accordingly, and for the reasons that follow, the Court will deny Al-Imam's motion to dismiss with respect to all counts.

## I.   Background

Muammar Gaddafi seized power in Libya in 1969 and remained its leader until 2011, when a civil war broke out.  Indictment ¶ 2.  The war erupted in the Libyan coastal city of Benghazi, which was controlled by rebels and served as the base of operations for the rebel-led Transitional National Council ("TNC").  <u>Id.</u>  On February 25, 2011, the U.S. Department of State evacuated American personnel from Libya and suspended its operations at the U.S. Embassy in Tripoli.  <u>Id.</u> ¶ 3.  Less than two months later, in April 2011, the State Department reestablished its presence in the country with the arrival in Benghazi of U.S. Special Envoy J. Christopher Stevens.  <u>Id.</u> ¶ 4.

On July 15, 2011, the United States officially recognized the TNC as Libya's governing authority.  <u>Id.</u>  One month later, Gaddafi was ousted from power and killed.  <u>Id.</u>  In November 2011, the United States established a diplomatic outpost in Benghazi, known as the U.S. Special Mission ("Mission"), where a contingent of State Department personnel were stationed.  <u>Id.</u> ¶ 5.  The United States established a second Benghazi facility, this one known as the Annex, where additional U.S. personnel were based.  <u>Id.</u> ¶ 6.

In May 2012, the United States dispatched Stevens, now the U.S. Ambassador to Libya, to the Libyan capital of Tripoli.  <u>Id.</u> ¶ 7.  Ambassador Stevens traveled to Benghazi to visit the Mission compound on September 10, 2012.  <u>Id.</u>  Stationed at the compound and present during the Ambassador's visit were Information Management Officer Sean Patrick Smith; Assistant

Regional Security Officers Scott Wickland and David Ubben; and Security Officers Tyrone
Snowden Woods, Glen Anthony Doherty, and Mark Geist.  See id. ¶¶ 13-18.

Around 9:45 p.m. on September 11, 2012, approximately twenty men—armed with
assault rifles, handguns, and rocket-propelled grenade launchers—attacked the Mission.  Id. ¶ 22.
After breaching the facility, the attackers set fire to several buildings, causing the deaths of
Ambassador Stevens and Sean Smith.  Id.  The remaining State Department personnel escaped to
the Annex, which soon also came under attack, ending in mortar fire that killed Tyrone Woods
and Glen Doherty.  Id.

Al-Imam was captured in Libya on or about October 29, 2017, during an operation by
U.S. armed forces personnel.  He was thereafter transported to the District of Columbia to stand
trial.  A federal grand jury on October 25, 2018 returned a seventeen-count superseding
indictment.  According to the indictment, the Mission and Annex attacks were carried out, at
least in part, by members of the extremist group Ubaydah Ibn Al Jarrah ("UBJ"), whose
commander was Abu Khatallah.  Indictment ¶ 9.  The government alleges that Al-Imam was a
close associate of Abu Khatallah and was present for, helped orchestrate, and participated in the
attacks.  Id. ¶¶ 9-11.  According to the indictment, Al-Imam entered the Mission at the direction
of Abu Khatallah and took sensitive material, including material that identified the Annex by
location and as the evacuation point for Department of State personnel.  Id. ¶ 22; Opposition
Mot. Dismiss ("Opp.") at 3.  Al-Imam then assembled with Abu Khatallah and others to
coordinate the attack on the Annex.  Id.

The specific charges against Al-Imam are as follows:  *Count One* – Conspiracy to
Provide Material Support and Resources to Terrorists Resulting in Death, in violation of 18
U.S.C. § 2339A; *Count Two* – Providing Material Support and Resources to Terrorists Resulting

in Death, in violation of 18 U.S.C. §§ 2339A and 2; *Count Three* – Killing of an Internationally

Protected Person (Ambassador Stevens), in violation of 18 U.S.C. §§ 1116, 1111 and 2; *Counts*

*Four through Six* – three counts of Killing Officers and Employees of the United States (Smith,

Woods, and Doherty), in violation of 18 U.S.C. §§ 1114, 1111 and 2; *Counts Seven through Nine*

– two counts of Attempting to Kill Officers and Employees of the United States (Wickland,

Ubben, and Geist), in violation of 18 U.S.C. §§ 1114, 1113 and 2; Counts *Ten through Thirteen*

– four counts (one for each victim) of Killing a Person in the Course of an Attack on a Federal

Facility Involving the Use of a Firearm or a Dangerous Weapon, in violation of 18 U.S.C.

§§ 930(c), 1111 and 2; *Counts Fourteen and Fifteen* – two counts (one for each facility attacked)

of Maliciously Damaging and Destroying U.S. Property by Means of Fire and an Explosive

Causing Death, in violation of 18 U.S.C. §§ 844(f)(1) and (3) and 2; and *Counts Sixteen and*

*Seventeen* – two counts (one for each facility attacked) of Willfully and Maliciously Destroying

Property within the Special Maritime and Territorial Jurisdiction of the United States and Placing

Lives in Jeopardy, in violation of 18 U.S.C. §§ 1363, 7 and 2.

Al-Imam moves to dismiss all but one count, arguing that most of the statutes under

which he is charged do not apply extraterritorially, that his capture violated international law

such that prosecution on some of the counts is precluded, and that the Mission and Annex

facilities were not legally-operated federal facilities and thus fall outside the protection of federal

law.  The government opposes Al-Imam's motion.  The Court held a hearing on the motion on

February 15, 2019, and the issues are now ripe for the Court's resolution.

## II.   Legal Standard

A criminal defendant "may raise by pretrial motion any defense, objection, or request that

the court can determine without a trial on the merits."  Fed. R. Crim. P. 12(b)(1).  Pretrial

motions may challenge "a defect in the indictment or information," as long as "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  Fed. R. Crim. P. 12(b)(3)(B).  "'Because a court's use[] [of] its supervisory power to dismiss an indictment . . . directly encroaches upon the fundamental role of the grand jury,' dismissal is granted only in unusual circumstances."  United States v. Ballestas, 795 F.3d 138, 148 (D.C. Cir. 2015) (quoting Whitehouse v. U.S. Dist. Court, 53 F.3d 1349, 1360 (1st Cir. 1995)).  An indictment "only need contain 'a plain, concise, and definite written statement of the essential facts constituting the offense charged,'" id. at 149, in order "to inform the defendant of the nature of the accusation against him," id. at 148–49 (quoting United States v. Hitt, 249 F.3d 1010, 1016 (D.C. Cir. 2001)) (internal quotation marks omitted).  "When considering a motion to dismiss an indictment, a court assumes the truth of those factual allegations."  Id. at 149.

## III.  Analysis

The Court begins with Al-Imam's contention that the federal laws he stands charged with violating do not apply extraterritorially, first recounting its analysis of the arguments in Abu Khatallah, which the parties repeat here, before moving to Al-Imam's critique that the Court's prior reasoning went astray.  The Court will then tackle Al-Imam's arguments that his capture precludes the prosecution of certain counts, and that the purportedly unlawful operation of the Benghazi facilities bars the prosecution of other counts.

A.  The Extraterritoriality of the Offenses Charged in Counts 1-2 and 4-17[1]

Al-Imam advances extraterritoriality arguments identical to those considered and rejected by this Court in Abu Khatallah.  Compare MTD at 11-25 with Mot. Dismiss for Lack of Extraterritorial Jurisdiction (ECF No. 91) at 4-21, United States v. Abu Khatallah, 14-cr-141. The government, for its part, responds just as it did in Abu Khatallah.  Compare Opp. at 20-34 with Opp. Mot. Dismiss for Lack of Extraterritorial Jurisdiction, ECF No. 101, at 7-24, United States v. Abu Khatallah, 14-cr-141.  Indeed, as both parties acknowledge, their submissions on these Counts are near-verbatim reproductions of the submissions in Abu Khatallah.[2]  Therefore, the Court reproduces its Abu Khatallah analysis here, though modified to address Al-Imam rather than Abu Khatallah and to exclude arguments appearing in Abu Khatallah's reply memorandum that Al-Imam does not advance here.  151 F. Supp. 3d at 123-38; United States v. Abu Khatallah, 168 F. Supp. 3d 210, 214 (D.D.C. 2016) (addressing § 1363 counts after supplemental briefing).

1.  *Generally Applicable Principles of Extraterritoriality*

The Supreme Court has repeatedly—and quite recently—insisted that "[w]hen a statute gives no clear indication of an extraterritorial application, it has none."  Kiobel v. Royal Dutch Petroleum Co., 133 S. Ct. 1659, 1664 (2013) (quoting Morrison v. Nat'l Australia Bank Ltd., 130 S. Ct. 2869, 2878 (2010)).  Phrased slightly differently, "there must be present the

---

[1] Al-Imam also replicates Abu Khatallah's argument against a "Count 18," in violation of 18 U.S.C. § 924(c), but only Abu Khatallah—not Al-Imam—was charged with a violation of § 924(c).  There is no Count 18 in the indictment in this case.

[2] Some of the arguments in Al-Imam's reply vary from Abu Khatallah's, but they are contingent on the Court answering his call to revise the extraterritoriality standard set forth in Abu Khatallah.  Because the Court rejects Al-Imam's invitation to do so, it need not reach his arguments respecting each individual statute under his favored rubric.

affirmative intention of the Congress clearly expressed." Id. (quoting Benz v. Compania

Naviera Hidalgo, 353 U.S. 138, 147 (1957)).  "[C]ongressional silence" on extraterritoriality

therefore "means no extraterritorial application," Morrison, 130 S. Ct. at 2881, as does a merely

"plausible" showing of intended extraterritorial application, EEOC v. Arabian American Oil Co.,

499 U.S. 244, 250 (1991) ("Aramco").  Phrases like "clear indication" and "convincing

indication," Small v. United States, 544 U.S. 385, 391 (2005), suggest that the required quantum

of proof is significantly more than a preponderance.  And the burden of making the necessary

affirmative showing is on the party seeking to apply a statute extraterritorially.  Aramco, 499

U.S. at 250.  Importantly, the Supreme Court has instructed courts to "apply the presumption *in

all cases*" in which an extraterritorial offense is alleged.  Morrison, 130 S. Ct. at 2881 (emphasis

added).

        The presumption against extraterritoriality is a "canon of construction . . . rather than a

limit upon Congress's power to legislate." Morrison, 130 S. Ct. at 2877.  The canon rests on a

defeasible assumption about congressional intent—that "Congress ordinarily legislates with

respect to domestic, not foreign matters." Id.  This assumption may or may not be factually

correct in individual cases.  But the presumption is meant to relieve judges from having to

"guess anew in each case" by "divining what Congress would have wanted if it had thought of

the situation before the court." Id. at 2881.  Congress is on notice that courts apply the

presumption across the board, which ensures a "stable background against which Congress can

legislate with predictable effects." Id.  Regardless of what Congress actually intends, the

predictable effect of not clearly authorizing extraterritorial application will be no extraterritorial

application.  Of course, Congress remains free to modify statutes that courts have construed not

to apply abroad (as it has done before). Id. at 2883 n.8.

Aside from administrability and predictability concerns, the presumption against extraterritoriality is also rooted in ideas of institutional competence and the separation of powers. Its robust application "protect[s] against unintended clashes between our laws and those of other nations which could result in international discord." Kiobel, 133 S. Ct. at 1664 (quoting Aramco, 499 U.S. at 248).  Displacement of the presumption means that aliens can be sued (or prosecuted) and tried in American courts for acts committed in their home countries, even if their acts were perfectly lawful there.  The political branches alone are equipped to make "such an important policy decision where the possibilities of international discord are so evident." Id. (quoting Benz, 353 U.S. at 147).  The presumption against extraterritoriality therefore precludes judges from inferentially triggering such "significant foreign policy implications" in the absence of deliberate congressional choice. Id. at 1665.  But whether this concern permeates any individual case is irrelevant:  The "presumption applies regardless of whether there is a risk of conflict between the American statute and a foreign law." Morrison, 130 S. Ct. at 2877–78.

So strong is the presumption, the Supreme Court has said, that geographically unbounded terms like "every" and "any" fail to rebut it. Kiobel, 133 S. Ct. at 1665; Small, 544 U.S. at 388; Foley Bros. v. Filardo, 336 U.S. 281, 287 (1949).  Even statutory definitions of commerce that specifically refer to "foreign commerce" do not "definitely disclose an intention to give . . . extraterritorial effect." Aramco, 499 U.S. at 251.  Perhaps most strikingly, Kiobel very recently held that the Alien Tort Statute ("ATS") "does not imply extraterritorial reach" even though it permits actions by "alien[s]" for "violation[s] of the law of nations." Kiobel, 133 S. Ct. at 1663, 1665.  That was true even though one such violation (piracy) "typically occurs . . . beyond the territorial jurisdiction of the United States." Id. at 1667.   The two other paradigmatic law-of-nations violations contemplated by the ATS—"violation of safe conducts" and "infringement of

the rights of ambassadors," id. at 1666—could easily occur abroad and are creatures of international relations. Yet they, too, fail to displace the presumption against extraterritoriality. Id.

The Supreme Court has slightly diluted the presumption's potency by conceding that it is "not . . . a 'clear statement rule.'" Morrison, 130 S. Ct. at 2883. A statute need not say "this law applies abroad"; "[a]ssuredly context can be consulted as well." Id.; see also Small, 544 U.S. at 391 (recognizing "statutory language, context, history, or purpose" as proper tools for rebutting the presumption); Foley, 336 U.S. at 286 (concluding that a statute's legislative history revealed a "concern with domestic labor conditions"). Any indication of congressional intent is very likely material, regardless of its source. Yet context, purpose, legislative history, and statutory structure are unavailing unless they amount to a "clear indication" of intended extraterritoriality. Kiobel, 133 S. Ct. at 1664. According to the Supreme Court, this sometimes-multifaceted inquiry is neither "complex" nor "unpredictable in application." Morrison, 130 S. Ct. at 2878. And the D.C. Circuit very recently explained that contextual evidence tending to displace the presumption must be traceable to the statutory text. See Validus Reinsurance, Ltd. v. United States, 786 F.3d 1039, 1047 (D.C. Cir. 2015) ("[C]ourts must find clear and independent textual support—rather than relying on mere inference—to justify the nature and extent of each statutory application abroad.") (quoting Keller Found./Case Found. v. Tracy, 696 F.3d 835, 845 (9th Cir. 2012)).

### 2. Harmonizing the Apparent Civil/Criminal Divide

As detailed above, the modern Supreme Court has instructed lower courts to apply the presumption "in all cases." Morrison, 130 S. Ct. at 2881. Such insistence on across-the-board uniformity seems to foreclose doctrinal tests that would allow the presumption to be more easily

rebutted in certain kinds of cases.  Nonetheless, a nearly century-old chestnut of

extraterritoriality doctrine—United States v. Bowman, 260 U.S. 94 (1922)—sits uneasily with

Aramco, Morrison, and Kiobel.  In practice, Bowman requires a lesser evidentiary showing of

congressional intent to permit the extraterritorial application of certain kinds of federal criminal

statutes.  Its application may well require judges to "guess anew in each case," Morrison, 130 S.

Ct. at 2881, often under a shroud of empirical uncertainty.  Yet the Supreme Court has not yet

attempted to reconcile the stability-serving values undergirding recent civil decisions like

Morrison and Kiobel with the reality that Bowman is "not easy to administer."  Id. at 2879.

Because Bowman remains binding on the lower courts, this Court must assume that satisfying

Bowman is one way of "clear[ly] indicati[ng]" a federal statute's extraterritorial reach, id. at

2878—even if Bowman itself requires no "affirmative" evidence of a deliberate congressional

decision to permit overseas applications.  Kiobel, 133 S. Ct. at 1664.

### a.  The Facts and Holding of *United States v. Bowman*

The defendants in Bowman had allegedly conspired to defraud the Emergency Fleet

Corporation—all of whose stock was owned by the United States—on board a ship approaching

Brazil.  Bowman, 260 U.S. at 95.  The crux of the indictment was that the defendants had made

(and conspired to make) a "false or fraudulent claim" against a "corporation in which the United

States of America is a stockholder."  Id. at 96, 100 n.1.  Neither party disputed that all relevant

actions had occurred outside American soil.  If Bowman had never been decided, faithful

application of recent Supreme Court precedents might well dictate a finding of no

extraterritoriality on these facts alone.  For the mere statutory reference to "*any* corporation in

which the United States of America is a stockholder," id. at 100 n.6, would not rebut the

presumption any more than statutory language encompassing "every contract," "any court," "any

person," or "any civil action."  Foley Bros., 336 U.S. at 287; Small, 544 U.S. at 387; Morrison,

130 S. Ct. at 2881; Kiobel, 133 S. Ct. at 1665.

The Bowman Court took a starkly different approach, however.  It began its analysis by

observing that "the necessary *locus* [of proscribed activity], when not specially defined, depends

upon the purpose of Congress as evinced by the description and nature of the crime."  Id. at 97.

Bowman postulated two broad types of crimes for these purposes.  First were "[c]rimes against

private individuals or their property, like assaults, murder, burglary, larceny, robbery, arson,

embezzlement and frauds of all kinds."  Id. at 98.  These offenses principally "affect the peace

and good order of the community," and so must seemingly be committed within the political

community that they disturb.  Id.  If Congress intends to punish such crimes extraterritorially, "it

is natural for [it] to say so in the statute, and failure to do so will negative the purpose of

Congress in this regard."  Id.

But a different rule of construction applies to "criminal statutes which are, as a class, not

logically dependent on their locality for the Government's jurisdiction, but are enacted because

of the right of the Government to defend itself against obstruction, or fraud wherever

perpetrated."  Id.  For these offenses, "to limit their *locus* to the strictly territorial jurisdiction

would be greatly to curtail the scope and usefulness of the statute and leave open a large

immunity for frauds as easily committed by citizens on the high seas and in foreign countries as

at home."  Id.  Congress "has not thought it necessary" to explicitly enable their overseas

application, instead "allow[ing] it to be inferred from the nature of the offense."  Id.

The Bowman Court held that the charged crime fell comfortably within this second

category.  The statute had been amended in 1918 to encompass false claims harmful to

corporations in which the United States owned stock.  Id. at 101.  The Court found that this

11

provision "was evidently intended to protect the Emergency Fleet Corporation," which was "expected to engage in, and did engage in, a most extensive ocean transportation business" that serviced "every great port of the world open during [World War I]."  Id. at 101–02.  Two key factors informed the Court's decision: that Congress had sought to stifle "frauds upon the Government," and—because of background assumptions about the Emergency Fleet Corporation's worldwide business—that those frauds were likely to occur "on the high seas and in foreign ports and beyond the land jurisdiction of the United States."  Id.

Bowman also supplemented its holding (if only in dictum) with a list of six other federal crimes whose nature commanded an inference of extraterritorial application.  Because Bowman has been entirely absent from the Supreme Court's modern extraterritoriality decisions, these six crimes are important data points for understanding Bowman's underlying rationale.  The Court noted that all six appeared in a chapter of the U.S. Code entitled "Offenses against the operations of the Government," id. at 98–99; each crime had evidently been designed to forestall some tangible or intangible harm to the U.S. Government.  In asserting that each of the following offenses would apply extraterritoriality, the Court also commented on the statutes' anticipated geographic reach:

(1) *A consul's knowingly certifying a false invoice*.  "Clearly the *locus* of this crime as intended by Congress is in a foreign country . . . ."  Id. at 99.

(2) *Forging or altering a ship's papers*.  "The natural inference from the character of the offense is that the sea would be a probable place for its commission."  Id.

(3) *Enticing desertions from the naval service*.  Congress must have "intend[ed] by this to include such enticing done aboard ship on the high seas or in a foreign port, where it would be most likely to be done."  Id.

(4) *Bribing an officer of the U.S. civil, military, or naval service to violate his duty or to aid in committing a fraud on the United States*.  The Court concluded that it would "hardly [be] reasonable to construe this not to include offenses" directed at

consuls, ambassadors, and military officers "in a foreign country or on the high seas." Id.

(5) *Defrauding the United States in the disposition of property captured as prize*. "This would naturally often occur at sea, and Congress could not have meant to confine it to the land of the United States." Id.

(6) *Stealing or embezzling property of the United States furnished or intended to be used for military or naval service*. "It would hardly be reasonable to hold that" Congress did not intend to punish offenses against U.S. military property located "in foreign countries, in foreign ports or on the high seas." Id. at 100.

In sum, for statutes whose geographic reach is ambiguous, satisfying Bowman first requires proof that a criminal offense directly harms the U.S. Government. Bowman also suggested that the presumption against extraterritoriality cannot be rebutted inferentially unless the enacting Congress very likely envisioned, and can be assumed to have authorized, a considerable number of extraterritorial applications. Yet whether Bowman's preconditions are satisfied is hardly a mechanical inquiry. Bowman left open the key question of how many foreseeable extraterritorial applications are necessary to warrant the inference that Congress "clearly" intended to allow prosecutions for acts occurring overseas. Its treatment of two statutory examples suggested that the number of expected extraterritorial offenses must outweigh domestic ones—that the former must be "probable" or "most likely." Id. at 99. But Bowman's fifth example pointed toward a looser "locus" test for extraterritoriality—that the crime "would naturally often occur" abroad. Id. The D.C. Circuit's resolution of this issue in favor of the latter formulation must guide this Court's analysis of Al-Imam's extraterritoriality challenges.

> b. The D.C. Circuit's Application of *Bowman*: *United States v. Delgado-Garcia*

Along with other lower courts, the D.C. Circuit has sought to reconcile modern extraterritoriality doctrine's across-the-board, rule-like rigor with the more flexible and individualized inquiry required in criminal cases by Bowman. Its reading of Bowman precludes

two possible approaches to this case: (1) to proceed as if the Supreme Court has overruled

Bowman *sub silentio* and apply only the restrictive test outlined in Aramco, Morrison, and

Kiobel; or (2) to assume that federal crimes designed to prevent harm to the U.S. Government

necessarily satisfy Bowman (and so apply extraterritorially) absent a clear indication to the

contrary.

  The defendants in United States v. Delgado-Garcia, 374 F.3d 1337, 1339 (D.C. Cir.

2004), were charged with (in the court's words) "conspiring to induce aliens illegally to enter the

United States" and "attempting to bring illegal aliens into the United States," in violation of 8

U.S.C. § 1324(a).  All relevant conduct occurred outside the United States.  Id.  The defendants

moved to dismiss the indictment, claiming that § 1324(a) does not apply extraterritorially

because the statute is silent on its geographic reach.  The Delgado-Garcia court disagreed, citing

"specific textual evidence" and "contextual factors" as affirmative evidence that Congress

intended for § 1324(a) offenses to be prosecutable regardless of where they might occur.  Id. at

1344–45.  The court situated its analysis firmly within the framework established by Bowman,

deeming it a "persuasive precedent" for the Government's position.  See id. at 1346.

  According to Delgado-Garcia, the generally worded statute at issue in Bowman applied

abroad *because* the Emergency Fleet Corporation . . . 'was expected to engage in, and did

engage in, a most extensive ocean transportation business.'"  Delgado-Garcia, 374 F.3d at 1346

(emphasis added); see also id. ("Because of this expectation, the Court reasoned, many persons

who commit the crime of defrauding a U.S. corporation would do so overseas, and *therefore* the

statute had extraterritorial application." (emphasis added)).

  The Government's reading of Bowman echoes Judge Rogers's dissenting opinion in

Delgado-Garcia.  She understood Bowman to mean that when Congress "protect[s] the United

States government from harm," it generally must be assumed to have done so "irrespective of [the harm's] origin." Id. at 1355 (Rogers, J., dissenting). For such crimes, in other words, "it is obvious that in declaring them to be crimes Congress intends to prohibit them everywhere." Id. at 1354. The majority rejected this line of reasoning, concluding that it "is for Congress, not this Court," to decide whether particular acts would "harm the United States government even if [they were] completed abroad." Id. at 1346 (majority opinion) (alteration in original) (quoting id. at 1355 (Rogers, J., dissenting)).[3] The Delgado-Garcia majority offered a different explanation of what it means for federal criminal offenses to be "not logically dependent on their locality"—that they "have many obvious extraterritorial applications." Id. at 1346–47.

Delgado-Garcia held that both § 1324(a) crimes charged in the indictment met this standard (and thus applied extraterritorially). After explaining that the statute satisfied Bowman's "harm" prong because it sought to protect the integrity of U.S. borders, id. at 1345,[4] the court shifted to a lengthy discussion of Bowman's "locus" element. Reasoning purely from the text and structure of § 1324(a), the court found that the crimes of attempting to bring an unauthorized alien into the United States and conspiring to encourage or induce illegal immigration both "applie[d] to much extraterritorial conduct." Id. at 1347. First, because "[b]ringing' someone suggests . . . physical proximity" to the person sought to be brought,

---

[3] The Court thus rejects the Government's gloss on Bowman—that a federal criminal law applies abroad whenever "the statute's purpose would be undermined were its scope confined to the United States' territorial boundaries." Opp. Mot. Dismiss ("Opp."), ECF No. 53, at 18.

[4] The Court found that the very nature of the harm tended to undermine the presumption against extraterritoriality: Because border-protection statutes are "fundamentally international, not simply domestic, in focus and effect," it "makes no sense to presume that such a statute applies only domestically." Id.

"many [failed] attempts to bring someone into the United States will occur outside the United States." Id.  And second, the court reasoned that it would be "much easier" to conspire to encourage or induce illegal immigration "outside the United States, in proximity to those who carry out the plot." Id. at 1348.  The conspiracy provision therefore "contemplates application to much extraterritorial conduct."  Id.

In this Circuit, then, Bowman is satisfied when (1) a federal criminal offense directly harms the U.S. Government, and (2) enough foreseeable overseas applications existed at the time of a statute's enactment (or most recent amendment) to warrant the inference that Congress both contemplated and authorized prosecutions for extraterritorial acts.  Delgado-Garcia's "locus" inquiry specifically asks whether a statute "ha[s] many obvious extraterritorial applications," id. at 1347, or whether offenders "will often be outside the United States," id.[5]  As long as such a likelihood existed when the statute was passed—whether because of the nature of the offense (as in Delgado-Garcia), contingent facts about the United States's presence abroad, or some combination thereof—courts may properly infer a congressional intent to permit extraterritorial uses.  This process yields the necessary "clear indication of an extraterritorial application." Morrison, 130 S. Ct. at 2878.  It is not enough, as the Government suggests, that a statute seek to protect U.S. interests that "lie, or may very well lie, outside the United States."  Opp. Mot. Dismiss ("Opp."), ECF No. 53, at 20.  Nor may judges attempt to divine "what Congress would

---

[5] Delgado-Garcia offered several virtually identical formulations of this standard.  See, e.g., id. at 1346 ("[M]uch of the conduct that § 1324(a) criminalizes occurs beyond the borders of the United States."); id. at 1347 (concluding that § 1324(a) "applies to much extraterritorial conduct"); id. (observing that "many" proscribed attempts would occur overseas); id. at 1347–48 (finding that the charged conspiracy offense "has many natural extraterritorial applications"); id. at 1348 (noting that § 1324(a) "has a great many international applications").

have wanted if it had thought of the situation before the court." Morrison, 130 S. Ct. at 2881.

With these principles in mind, the Court now turns to Al-Imam's individual statutory challenges.

       *3.  Al-Imam's Statutory Challenges*

Al-Imam contends that five of the statutes under which he is charged do not apply

extraterritorially.

       a.  <u>18 U.S.C. § 1114: Murder and Attempted Murder of Officers
           and Employees of the United States</u>

Counts Four through Six charge Al-Imam with murder in violation of 18 U.S.C. § 1114;

counts Seven through Nine charge him with attempted murder in violation of § 1114.  That

statute reads, in full:

> Whoever kills or attempts to kill any officer or employee of the United States or of
> any agency in any branch of the United States Government (including any member
> of the uniformed services) while such officer or employee is engaged in or on
> account of the performance of official duties, or any person assisting such an officer
> or employee in the performance of such duties or on account of that assistance, shall
> be punished—
>
> (1) in the case of murder, as provided under section 1111;
>
> (2) in the case of manslaughter, as provided under section 1112; or
>
> (3) in the case of attempted murder or manslaughter, as provided in section 1113.

Section 1114 does not explicitly reference extraterritorial application, so such prosecutions must

be justified by Bowman, if at all.  The Court does not doubt—nor does Al-Imam contest—that

§ 1114 targets a form of harm suffered directly by the U.S. Government.  Under Delgado-Garcia,

then, just one question remains:  Did § 1114 "have many obvious extraterritorial applications"

when it was enacted (or most recently amended)?

       Cautious of its institutional limitations in resolving an issue of this nature, the Court

answers affirmatively.  The parties have not informed the Court as to when § 1114 was either

originally enacted or last amended.  That law appears to have remained in its current form since

being amended as part of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No.

104-132, § 727(a), 110 Stat. 1214.  Nor have the parties provided concrete information on the

number of U.S. officers and employees working and residing abroad, either in 1996 or today.

The Government asserts (though without substantiation) that "[t]he United States government

has over one hundred thousand officers and employees stationed abroad."  Opp. at 21.  Al-Imam

has not questioned this estimate.  Because a purely territorial statute cannot become

extraterritorial as a result of changing conditions—only a deliberate congressional choice can

rebut the presumption—present-day figures matter only insofar as they indirectly reflect what

conditions either obtained when a statute was passed or were understood to be likely to exist in

the future.

Here, the Court is satisfied that § 1114 "ha[d] many obvious extraterritorial

applications" when the law was last amended in 1996—enough to have put Congress on notice

of the issue of extraterritoriality and to permit an inference under Bowman that the law was

intended to reach conduct undertaken outside the United States.  It is widely known that then, as

now, large numbers of U.S. diplomats and Foreign Service Officers, military servicemembers,

members of the intelligence community, and other government personnel served the United

States's interests abroad.  Executive and legislative officials (and their staff) also frequently

traveled—and obviously still do—outside the United States in the course of performing their

official duties.  See also United States v. Al Kassar, 660 F.3d 108, 118 (2d Cir. 2011) ("[A]

significant number of [U.S.] employees perform their duties outside U.S. territory.").  Such U.S.

employees and officials could obviously be killed while engaging in or on account of performing

their official duties.  Under Delgado-Garcia, this is enough to conclude that Congress authorized

extraterritorial prosecutions under § 1114.  Al-Imam may well be correct that "nothing in the statute suggests an international focus," MTD at 13, whereas the <u>Delgado-Garcia</u> court found the relevant statute to be "fundamentally international . . . in focus and effect," 374 F.3d at 1345. Yet <u>Bowman</u> still allows an inference that Congress intended to authorize overseas prosecutions for crimes enacted in the wake of purely domestic incidents.  Under <u>Delgado-Garcia</u>, a criminal offense whose most natural or obvious applications are domestic can still be prosecuted abroad if the law had "many obvious extraterritorial applications" at the time of enactment.  <u>Id.</u> at 1346–47.

Al-Imam nonetheless argues that a comparison between § 1114 and § 1116, which criminalizes the murder of internationally protected persons, reveals that Congress did not intend for § 1114 to apply extraterritorially.  MTD at 12-13.  Both statutes were amended in 1996; whereas § 1116 broadened the "internationally protected person" category to reach "any other representative, officer, employee, or agent of the United States Government," § 1114 remained generally worded and geographically ambiguous.  <u>Id.</u> at 12.  As a result, Al-Imam claims, § 1116's amendment "would have been unnecessary if Congress had intended § 1114 to apply to the extraterritorial killing of all [U.S.] officers and employees."  <u>Id.</u> at 5-6.  The Court is not persuaded.  To qualify as an internationally protected person, one must be, "at the time and place concerned[,] . . . entitled pursuant to international law to special protection against attack."  18 U.S.C. § 1116(b)(4)(B).  Such an element is missing from § 1114.  Section 1116 "appl[ies] to a relatively small subset of the broad class of United States employees and officers covered by Section 1114."  <u>United States v. Bin Laden</u>, 92 F. Supp. 2d 189, 203 (S.D.N.Y. 2000).  Such modest overlap between the two statutes is not enough to upend the method of analysis called for by <u>Delgado-Garcia</u>.

Other statutes not cited by Al-Imam lend some credence to his position that "when Congress intend[s] a homicide statute to apply extraterritorially, it specifically state[s] so."  MTD at 12.  One of them, 18 U.S.C. § 1751, criminalizes (among other things) assassinating the President, Vice President, or President-elect.  This statute would seem to satisfy <u>Bowman</u> rather easily.  Yet it specifically clarifies that "[t]here is extraterritorial jurisdiction over the conduct prohibited by this section."  <u>Id.</u> § 1751(k).  A similar law prohibiting the killing of members of Congress, cabinet heads, Supreme Court Justices, and directors of specified intelligence agencies also explicitly permits prosecutions for extraterritorial conduct.  18 U.S.C. § 351(i).  On the other hand, a number of federal criminal statutes designed to prevent harm to the Government that would frequently occur abroad are expressly limited to domestic offenses.  Congress apparently understood that <u>Bowman</u> would otherwise apply in these instances, but for some reason chose to limit its operation.  Such criminal offenses include discriminating against persons wearing the uniform of the armed forces, 18 U.S.C. § 244; commencing or facilitating an expedition against a friendly nation, 18 U.S.C. § 960; and enlisting "to serve in armed hostility against the United States," 18 U.S.C. § 2390.  The Court therefore declines to demand clear statements of extraterritorial application in this case—essentially, to render <u>Bowman</u> toothless—merely because some criminal statutes have not relied on <u>Bowman</u> to signal their geographic reach.

The D.C. Circuit's recent refusal to permit a <u>Bivens</u> cause of action to remedy harm inflicted extraterritorially does not change the Court's analysis.  In <u>Meshal v. Higginbotham</u>, 804 F.3d 417 (D.C. Cir. 2015), the D.C. Circuit offered the following hypothetical in declining to recognize the asserted implied private right of action:  "If Congress had enacted a general tort cause of action applicable to Fourth Amendment violations committed by federal officers (a statutory <u>Bivens</u>, so to speak), that cause of action would not apply to torts committed by federal

officers abroad absent sufficient indication that Congress meant the statute to apply extraterritorially." Id. at 425 (citing Morrison, 130 S. Ct. at 2877).  That statement fully coheres with this Court's analysis.  Bowman and Delgado-Garcia continue to govern whether the presumption has been rebutted for *criminal* statutes.  Under current law, satisfying Bowman furnishes a "sufficient indication that Congress meant the statute to apply extraterritorially."  Id. Nor is this Court the first to hold that § 1114 reaches abroad under Bowman.  See Al Kassar, 660 F.3d at 118; Bin Laden, 92 F. Supp. 2d at 202; United States v. Benitez, 741 F.2d 1312, 1317 (11th Cir. 1984).

For the foregoing reasons, the Court will deny Al-Imam's motion as to Counts Four through Nine, which charge him with violating 18 U.S.C. § 1114.

> b. 18 U.S.C. § 930(c): Killing a Person in the Court of an Attack on a Federal Facility Involving the Use of a Firearm or Other Dangerous Weapon

Counts Ten through Thirteen charge Al-Imam with violating 18 U.S.C. § 930(c).  Section 930 provides, in relevant part:

> (c) A person who kills any person . . . in the course of an attack on a Federal facility involving the use of a firearm or other dangerous weapon, or attempts or conspires to do such an act, shall be punished as provided [elsewhere].
>
> * * *
>
> (g) As used in this section:
>
> (1) The term "Federal facility" means a building or part thereof owned or leased by the Federal Government, where Federal employees are regularly present for the purpose of performing their official duties.

Because § 930 is silent on its geographic reach, Bowman must again guide the Court's extraterritoriality analysis.  Bowman's "harm" test is clearly satisfied here—the act of killing someone in the course of an attack on a federal facility directly harms the U.S. Government.

The remaining question is whether § 930(c) offenses are "not logically dependent on their locality," meaning that the provision had "many obvious extraterritorial applications" when it was enacted (or most recently amended).  Delgado-Garcia, 374 F.3d at 1346–47.

Al-Imam points out that § 930(c) was added to 18 U.S.C. § 930 as part of the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 60014, 108 Stat. 1796. He argues that because some other provisions of this omnibus legislation expressly permitted prosecutions for conduct abroad, Congress cannot be said to have clearly authorized the extraterritorial use of § 930(c).  MTD at 15.  Al-Imam further claims that the "obvious focus" of this statute is "Federal facilities within U.S. territory," id. at 16, for "§ 930(c) was passed as part of a series of laws targeting murder committed by escaped prisoners, murder of state or local officials assisting federal law enforcement officials, the protection of court officers and jurors, and the retaliatory killings of witnesses, victims, and informants."  Reply in Support of Mot. Dismiss ("Reply"), ECF No. 54, at 9.

Yet a criminal statute whose legislative history and neighboring provisions are bereft of foreign references may still apply extraterritorially if Bowman's "harm" and "locus" elements (as understood by Delgado-Garcia) are both satisfied.  Again, the Government has not provided a concrete figure for or independently substantiated how many federal facilities exist outside the United States.  But it has assured the Court that they number in the "hundreds."  Opp. at 25.  Al-Imam does not contest this approximation.  Cf. Bin Laden, 92 F. Supp. 2d at 201–02 (observing that "a significant number of Federal facilities are located outside the United States").  The Court notes that embassies, consulates, and other diplomatic missions would seem to be fairly encompassed within § 930(g)(1)'s definition of "Federal facility," as would the component structures of military bases.  Such structures were no doubt similarly prevalent when § 930(c)

was enacted in 1994.  The Government also asserts that "many [Federal facilities abroad] are in more dangerous areas than Federal facilities within the United States," which presumably alerted Congress to the likelihood of attacks on overseas facilities for reasons apart from those facilities' sheer numerosity.  Opp. at 25.  The Court hesitates to impute an ignorance of these conditions to the enacting Congress.  Accordingly, the Court joins the Southern District of New York in concluding that § 930(c) applies extraterritorially under Bowman, because that law had many foreseeable extraterritorial applications at the time of enactment.  See Bin Laden, 92 F. Supp. 2d at 201–02.  The Court will therefore not dismiss Counts Ten through Thirteen for lack of extraterritoriality.

> c.   18 U.S.C. § 844(f)(1) & (3): Maliciously Damaging and Destroying U.S. Property by Means of Fire and an Explosive Causing Death

Counts Fourteen and Fifteen charge Al-Imam with violating 18 U.S.C. §§ 844(f)(1) & (3).  Sections 844(f)(1) and (3) provide:

> (f)(1) Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof, or any institution or organization receiving Federal financial assistance, shall be imprisoned for not less than 5 years and not more than 20 years, fined under this title, or both.

> * * *

> (3) Whoever engages in conduct prohibited by this subsection, and as a result of such conduct directly or proximately causes the death of any person, including any public safety officer performing [his] duties, shall be subject to the death penalty, or imprisoned for not less than 20 years or for life, fined under this title, or both.

As with § 1114 and § 930(c), § 844(f) contains no provision explicitly authorizing extraterritorial use.  The Court will therefore analyze § 844(f)'s geographic reach under the Bowman framework.  Damaging or destroying U.S. property unquestionably harms the U.S. Government.  So again, the remaining issue is whether § 844(f) had "many obvious extraterritorial

applications" at the time of its enactment or most recent amendment.  <u>Delgado-Garcia</u>, 374 F.3d

at 1347.

The Court answers in the affirmative.  Statutory "Federal facilities"—buildings owned or

leased by the U.S. Government, where federal employees are regularly present for the purpose of

performing their official duties—are but a subset of "personal or real property in whole or in part

owned or possessed by, or leased to, the United States, or any department or agency thereof."  18

U.S.C. § 844(f)(1).  The enacting Congress[6] cannot have envisioned considerably fewer overseas

applications of a more expansive category of crimes.  Because the Court has already concluded

that <u>Bowman</u> permits extraterritorial prosecutions under § 930(c), the Government may

necessarily proceed under § 844(f), as well.  Again, the Southern District of New York has held

likewise.  <u>See</u> <u>Bin Laden</u>, 92 F. Supp. 2d at 198.

Al-Imam insists that § 844(f) "does not have an international focus."  MTD at 16.  For

all the Court can tell, he is correct.  Al-Imam explains that § 844(f) was "indisputably passed to

expand federal authority over bombings of domestic properties during the Vietnam War."  Reply

at 10.  The Government offers no reason to doubt this account of the historical forces driving

§ 844's passage.  But Al-Imam misunderstands the import of <u>Delgado-Garcia</u>'s application of

<u>Bowman</u>.  To be sure, <u>Delgado-Garcia</u> characterized § 1324(a)'s border-control provisions as

"fundamentally international . . . in focus and effect."  <u>Delgado-Garcia</u>, 374 F.3d at 1345.

<u>Delgado-Garcia</u> could have interpreted <u>Bowman</u> to mean that an offense is not logically

dependent on its locality when it will likely be committed overseas more often than not, just as

---

[6] Section 844(f) was originally passed as part of the Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 1102, 84 Stat. 956, and was last substantively modified in the Homeland Security Act of 2002, Pub. L. No. 107-296, § 1125, 116 Stat. 2135.

the court believed that § 1324(a) crimes would be. Yet the D.C. Circuit articulated a more permissive standard for satisfying <u>Bowman</u>'s "locus" element: whether a criminal statute "ha[s] many obvious extraterritorial applications." <u>Id.</u> at 1347. A prohibition can have many obvious extraterritorial applications even if it is most readily and naturally deployed domestically.

Nor is it material that § 844(f) prohibits the damaging or destruction of "any institution or organization receiving Federal financial assistance," the great majority of which are presumably located domestically. Section 844 clearly targets a vast range of destructive behavior undertaken within the territorial United States. But its independently operative provisions that protect U.S. property could foreseeably be applied abroad in a great number of situations; this must have been known when the statute was modified in 2002, as well. As a result, the Court will deny Al-Imam's motion as to Counts Fourteen and Fifteen.

### d. 18 U.S.C. § 2339A: Providing Material Support and Resources to Terrorists Resulting in Death (and Conspiring to Do the Same)

Count One charges Al-Imam with conspiring to violate 18 U.S.C. § 2339A ("the material-support statute"), and Count Two charges him with a substantive violation of that statute. As with each of the offenses discussed above, § 2339A does not explicitly authorize extraterritorial prosecutions. Section 2339A provides, in relevant part (with only potentially applicable predicate offenses listed below):

> (a) Offense.  Whoever provides material support or resources or conceals or disguises the nature, location, source, or ownership of material support or resources, knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section . . . 844(f) . . . , 930(c), . . . 1114, 1116, . . . [or] 1363, . . . or in preparation for, or in carrying out, the concealment of an escape from the commission of any such violation, or attempts or conspires to do such an act, shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life.

Section 1116 (corresponding to Count Three) explicitly authorizes extraterritorial prosecutions; the other four offenses (corresponding to Counts Four through Seventeen) do not. Al-Imam therefore moves to dismiss Counts One and Two insofar as they charge him with providing (or conspiring to provide) material support for violations of §§ 844(f), 930(c), 1114, and 1363.

Al-Imam and the Government agree that § 2339A is an ancillary crime that applies extraterritorially to the extent that an associated substantive offense does. Deciding whether to dismiss an ancillary offense for lack of extraterritoriality requires no new analysis when the geographic reach of any predicate crimes has already been determined. The Court therefore incorporates by reference its earlier holdings and denies Al-Imam's motion as to Counts One and Two. The Government may continue to proceed under § 2339A insofar as it charges Al-Imam with providing (or conspiring to provide) material support for a violation of §§ 844(f), 930(c), 1114, or 1116.

> e. <u>18 U.S.C. § 1363: Maliciously Destroying or Injuring Property Within the Special Maritime and Territorial Jurisdiction of the United States</u>

In the Court's initial motion-to-dismiss ruling in <u>Abu Khatallah</u>, the Court reserved judgment on the extraterritorial application of § 1363 issue and ordered supplemental briefing. After reviewing the parties' submissions, the Court concluded that the alleged conduct, if proved, occurred within the special maritime and territorial jurisdiction of the United States ("SMTJ") as defined in 18 U.S.C. § 7(9) and therefore found that it had jurisdiction over the § 1363 charges. The following analysis is cribbed, with slight modifications to address Al-Imam's reply arguments, from the Court's opinion in <u>Abu Khatallah</u>. 168 F. Supp. 3d at 211.

Congress defined two distinct crimes in 18 U.S.C. § 1363. The first entails "willfully and maliciously destroy[ing] or injur[ing] any structure, conveyance, or other real or personal property, or attempt[ing] or conspir[ing] to do such an act" within the SMTJ. A person who

commits that crime may be imprisoned for up to five years.  The second involves the same

conduct where the targeted "building [is] a dwelling" or where the act results in "the life of any

person be[ing] placed in jeopardy."  A person who commits that crime may be imprisoned for up

to twenty years.

Al-Imam disagrees with this analysis of the statute.  As he sees it, "the enhanced form of

§ 1363 involves 'jeopardy' to the life of a person, without thereby being transformed into a crime

*against* a person."  Reply at 19.  Rather, Al-Imam contends that § 1363 defines a single property

crime concerned with buildings or property within special maritime and territorial jurisdiction.

This position is untenable, however, in light of the Supreme Court's decision in Apprendi v. New

Jersey, 530 U.S. 466 (2000).  There, the Court held that any fact that "expose[s] the defendant to

a greater punishment than that authorized by the jury's guilty verdict" is an "element" that must

be submitted to a jury and proved beyond a reasonable doubt.  Id. at 494.  The endangerment of a

person's life is a "fact that, by law, increases the penalty" under § 1363, and is therefore "an

'element' [of a crime] that must be submitted to the jury and found beyond a reasonable doubt."

Alleyne v. United States, 133 S. Ct. 2151, 2155 (2013).  The government recognizes as much.

The crime with which Al-Imam is charged, therefore, has the following elements: (1) willfully

and maliciously destroying or injuring any structure, conveyance, or other real or personal

property, or attempting or conspiring to do such an act, (2) within the SMTJ, (3) where the

destroyed or injured building is a dwelling or where the act results in the life of any person being

placed in jeopardy.

As a threshold matter, the Court finds that the government is not legally precluded from

presenting evidence under 18 U.S.C. § 7(9) in support of the second element.  In other words, to

demonstrate that the conduct at issue occurred within the SMTJ, the government may show that,

"[w]ith respect to offenses committed by or against a national of the United States," 18 U.S.C.

§ 7(9), the Special Mission and Annex constituted "the premises of United States diplomatic,

consular, military or other United States Government missions or entities in foreign states," id.

§ 9(A), or that they were "residences in foreign States," id. § 9(B).[7]

To prove that the offense was "committed . . . against a national of the United States"

under § 7(9), the government seeks to show, *inter alia*, that Al-Imam "placed the lives of United

States nationals in danger" as a result of his conduct.  Indictment Count Sixteen ¶ 2; id. Count

Seventeen ¶ 2.  The question for the Court, then, is whether the crimes charged in Counts Sixteen

and Seventeen constitute offenses "committed . . . against a national of the United States."  18

U.S.C. § 7(9).  The Court concludes that they do.  Where the government seeks to satisfy its

burden as to an element of a crime by showing that a person's life was endangered,[8] and that

person is a U.S. national, the offense is necessarily one "committed . . . against a national of the

United States."  18 U.S.C. § 7(9).  Prosecution under § 1363—for an offense "committed . . .

against a national of the United States"—is therefore appropriate where the government alleges

---

[7] To the extent that the Court might be inclined to follow the approach to interpreting
§ 7(9) outlined in United States v. Passaro, 577 F.3d 207 (4th Cir. 2009), that case hardly
justifies precluding the government from proceeding under § 7(9).  The sorts of factors Passaro
deemed relevant—including "the length of United States control over th[e] premises, the
substantiality of its improvements, [and] actual use of the premises," id. at 214—plainly call for
fact-specific inquiries.  Passaro even deemed the testimony of "trial witnesses" relevant in
determining whether a particular military installation qualified as a "military . . . mission[]"
under § 7(9).  Id. at 215.  The Court also notes that Al-Imam did not respond to the government's
assertion that the Special Mission and Annex constituted "other United States . . . *entities* in
foreign States."  18 U.S.C. § 7(9)(A) (emphasis added).

[8] Although the offense at issue concerns risk of physical harm, the Court does not express
an opinion as to whether a crime involving financial or other harm to a U.S. national might also
constitute an offense "committed . . . against a national of the United States."  18 U.S.C. § 7(9).

and seeks to prove that, in the course of maliciously destroying and injuring dwellings and property within the SMTJ, a defendant placed the lives of U.S. nationals in danger.

Al-Imam's objections on this point are unavailing.[9]  In his view, he has not been charged with committing a crime against a U.S. national—or any person, for that matter—because § 1363 simply defines a property crime that can be committed only . . . , if there has been damage, or the intent to damage, a building," and which has the "unambiguous statutory purpose" of protecting "[b]uildings or property within special maritime and territorial jurisdiction."  Def's Suppl. Br., Abu Khatallah, 14-cr-141 ("Abu Khatallah's Suppl. Br."), ECF No. 141, at 10.  Yet the government has charged Al-Imam with a crime that includes as one of its elements the endangerment of human life and that carries a maximum penalty fifteen years greater than when no life is placed in jeopardy.  That crime is most assuredly concerned with protecting people, not just buildings or property.

In addition, Al-Imam claims, "[p]lacing a life in jeopardy is not an offense against a person under federal law.  The word 'offense' necessarily means a chargeable offense under U.S. federal law; if an 'offense' against a U.S. national could be any conceivable offense—criminal or otherwise—§ 7(9) would be rendered meaningless."  Id. at 11.  Al-Imam is surely correct that the word "offense" refers to a chargeable offense under U.S. federal law, and that an "offense against a national of the United States" cannot mean any conceivable offense.  But this argument

---

[9] It is unclear whether Al-Imam intended to incorporate the arguments Abu Khatallah made in his supplemental briefing on the § 1363 issue, or rather only the arguments Abu Khatallah made in his initial motion to dismiss (which is what he reproduces in this case).  The Court will respond to Al-Imam as if he intended to incorporate the supplemental arguments, since the Court's § 1363 decision ultimately came after considering those arguments.  The citations to the Al-Imam's "arguments," however, will be to Abu Khatallah's supplemental brief. The government, for its part, reproduces its supplemental briefing arguments in its opposition, so the Court will cite to its opposition in this case when addressing its arguments.

misses the mark.  The government does not contend—and this Court does not hold—that "[p]lacing a life in jeopardy is," on its own, "an offense against a person under federal law."  Id. Nor does the Court hold that any criminal act that results in harm or the risk of harm to a U.S. national constitutes an "offense against a national of the United States."  Rather, the Court concludes that when placing a life in jeopardy satisfies an element of a crime with which a person is charged, the charged offense is necessarily one "committed . . . against a national of the United States."  18 U.S.C. § 7(9).

Lastly, Al-Imam argues that when Congress placed within the SMTJ "offenses committed . . . against a national of the United States," id., it meant to import the common-law meaning of the term "crimes against the person," which "include only those offenses that, by their nature, are likely to involve the *intentional* use or threat of physical force against another person," Abu Khatallah's Suppl. Br. at 11-12 (emphasis added) (citing United States v. Trejo-Galvan, 304 F.3d 406 (5th Cir. 2002) (holding that the misdemeanor of driving under the influence of alcohol did not constitute a "crime against the person" under the common-law definition of that term)).  Although Congress may "intend[] to incorporate the well-settled meaning of the common-law terms it uses," United States v. Castleman, 134 S. Ct. 1405, 1410 (2014) (quoting Sekhar v. United States, 133 S. Ct. 2720, 2724 (2013)), Congress has not used such a term here.  Instead, it spoke of "offenses committed by or against a national of the United States," 18 U.S.C. § 7(9)—broad language that encompasses crimes involving U.S. nationals, either as perpetrators or victims.

Al-Imam counters that this interpretation leads to "the absurd conclusion that . . . the government would have jurisdiction to prosecute . . . even when the perpetrator was not aware that a U.S. person was present and a life could be endangered."  Abu Khatallah's Suppl. Br. at

12.  How can it be, Al-Imam asks, that "[w]hether a building is within special territorial jurisdiction" is "wholly contingent upon the arbitrary presence of a U.S. person and the degree of risk posed to that person at the time of the injury to the building"?  Id.  But such a result is far from absurd.  The federal Hostage Taking Act, for example, prohibits (in part) seizing or detaining a person anywhere in the world for the purpose of compelling a governmental organization to take or not take some action.  The Act "authoriz[es] assertion of U.S. jurisdiction where 'the offender or the person seized or detained is a national of the United States.'"  United States v. Yunis, 924 F.2d 1086, 1090 (D.C. Cir. 1991) (quoting 18 U.S.C. § 1203(b)(1)(A)); see also id. (finding it sufficient that "two of the passengers on Flight 402 were U.S. citizens") (emphasis added).  In such an instance, the victim's U.S. "citizenship [or status as a U.S. national] is an element of the offense that the government ha[s] to prove beyond a reasonable doubt."  United States v. Clarke, 767 F. Supp. 2d 12, 64 (D.D.C. 2011), aff'd sub nom. United States v. Straker, 800 F.3d 570 (D.C. Cir. 2015).  The offender's knowledge of the victim's nationality is irrelevant.  See Yunis, 924 F.2d at 1096.  Similarly, federal law prohibiting destruction of aircraft expressly provides for jurisdiction when, inter alia, "a national of the United States was on board, or would have been on board, the aircraft."  18 U.S.C. § 32(b).  Federal jurisdiction in that scenario may indeed be "wholly contingent upon the arbitrary presence of a U.S. person," Abu Khatallah's Suppl. Br. at 12, a reflection of Congress's intent to "confer[] jurisdiction based on the characteristics of the victim regardless of the offender's knowledge thereof," Opp. at 33.

This understanding is consistent with the well-established principle that courts need not infer an unwritten mens rea element with respect to factual circumstances that are "sufficient to confer jurisdiction on the federal courts."  United States v. Feola, 420 U.S. 671, 676 n.9 (1975).

In <u>Feola</u>, for example, the Supreme Court refused to construe a federal statute "as embodying an unexpressed requirement that an assailant be aware that his victim is a federal officer," for "[a]ll the statute requires is an intent to assault, not an intent to assault a federal officer." <u>Id.</u> at 684. And in <u>United States v. Yermian</u>, 468 U.S. 63 (1984), the Court held that a defendant charged with making a false statement within the jurisdiction of a federal agency could be prosecuted without "proof of actual knowledge of federal agency jurisdiction," <u>id.</u> at 75. So it is not categorically absurd to permit prosecutions based on the "arbitrary presence" of certain factual circumstances—including victim characteristics—that coincide with otherwise-proscribed behavior. A person need not have known that the victim of his crime was a U.S. national for jurisdiction to lie under 18 U.S.C. § 7(9).

B. <u>Al-Imam's Critique of the Court's Extraterritoriality Analysis in *Abu Khatallah*</u>

As the foregoing demonstrates, this Court's conclusion that the federal laws at issue, save for 18 U.S.C. § 1363, applied extraterritorially relied heavily on the Supreme Court's decision in <u>Bowman</u> and the D.C. Circuit's decision in <u>Delgado-Garcia</u>. Al-Imam contends that the Court made two mistakes in applying <u>Bowman</u> and <u>Delgado-Garcia</u>, and that if it corrects those errors, his favored conclusion will follow: that the federal laws Al-Imam stands charged of violating do not apply extraterritorially. Although his arguments are well-made and not without some force, they are ultimately unconvincing.

*1. The Importance of the Defendant's Citizenship*

The Court's first misstep, according to Al-Imam, was failing to appreciate the centrality of the defendant's citizenship to the Supreme Court's decision in <u>Bowman</u>. MTD at 5. Al-Imam explains that, because the defendants in that case, unlike here, were American citizens, <u>Bowman</u> does not control this case. Instead, he insists all <u>Bowman</u> can teach is that "satisfying [its

standard] is one way of clearly-indicating a statute's extraterritorial reach over *U.S. citizens*." Id. To support his point that the American citizenship of the defendants was pivotal to the analysis in Bowman, Al-Imam highlights that the Court reserved judgment on the question whether an alleged British co-conspirator could be prosecuted for violation of the same laws. MTD at 5; see Bowman, 260 U.S. at 102-03 ("[I]t will be time enough to consider what, if any, jurisdiction the District Court below has to punish [the British offender] when he is brought to trial."). Al-Imam also points to passages in Bowman where the Court said its reasoning applied with *special* force to fraud committed by American citizens. See 260 U.S. at 98 ("especially if committed by its own citizens "); id. at 100 ("certainly if a citizen of the United States"). Given those clues, Al-Imam says "there is no way to separate out a 'test' from Bowman apart from its intuition that the federal government, in assigning rules for its own citizens with regard to itself, would not necessarily need to expressly state that its rules apply where its own citizens roam." MTD at 7.

Al-Imam reads too much into the citizenship distinction. While the distinction means Bowman does not by itself dictate the extraterritoriality of the statutes under which Al-Imam is charged—which it never could in any event, given that the statutes at issue are also different—it does not seriously diminish Bowman's application to this case. Any argument to the contrary appears foreclosed by the D.C. Circuit's decision in Delgado-Garcia. There, the court acknowledged the "differences" between the case before it and Bowman, including the nationality of the defendants, but concluded that they "do not lessen Bowman's force as applied to this case." 374 F.3d at 1345. The court made this point in the plainest of terms. "The first difference, the citizenship of the defendants, is *irrelevant*. While Bowman did qualify its holding by noting that no aliens were before the Court, Bowman's logic did *not* depend on this

fact."  Id. at 1345-46 (emphases added).  Because the citizenship distinction did not lessen

Bowman's utility in Delgado-Garcia, it should make no difference in this case, either.

Al-Imam's attempt to avoid this conclusion is unavailing.  Al-Imam seems to suggest that

it was permissible for Delgado-Garcia to use Bowman as persuasive authority despite the

citizenship distinction because Delgado-Garcia "involved a prohibition on importing immigrants

that is patently concerned with foreign conduct," but that it would be improper for the Court to

rely on Bowman here because the statutes at issue are not so obviously focused on foreign

conduct.  Reply at 5; see MTD at 9 (contending the citizenship issue mattered less because the

court was "interpreting [a] clearly-internationally-focused statute").  But whether Bowman's

reasoning can be applied to cases involving different types of harm is a separate question from

whether it can be applied to cases involving foreign nationals.  Delgado-Garcia made this

abundantly clear.  There, the court identified *two separate* distinctions from Bowman: that it

involved (1) "aliens" (as opposed to American citizens) and (2) "immigration offenses" (as

opposed to fraud offenses).  Delgado-Garcia, 374 F.3d at 1345.  And it discussed each

distinction—separately—at length.  See id. ("The first difference, the citizenship of the

defendants, is irrelevant."); id. at 1346 ("The second main difference . . . that this case involves

immigration offenses rather than frauds against the United States . . . shows that Bowman applies

with even greater force . . . .").  Delgado-Garcia's discrete treatment of these distinctions

demonstrates that they are not in some sort of hydraulic relationship, *i.e.* that the citizenship

distinction precludes Bowman's application when a statute is not "patently concerned with

foreign conduct," and vice versa.  Reply at 5.   The Court therefore concludes, consistently with

the D.C. Circuit in Delgado-Garcia, that the citizenship distinction does little to lessen

Bowman's applicability to this case.

To the extent Al-Imam contends that <u>Delgado-Garcia</u> misapplied <u>Bowman</u> by giving too little weight to the defendant's citizenship, that is an argument for the Circuit, not this Court. Nevertheless, his critique strikes the Court as misguided.  As Al-Imam admits, the <u>Bowman</u> Court's use of the word "especially" with regard to the American defendants does not necessarily indicate an intent to limit its extraterritoriality reasoning to American citizens.  MTD at 6; <u>see</u> <u>also</u> <u>id.</u> at 7 ("That is not to say that <u>Bowman</u> necessarily would have been decided differently had the defendants been foreign[.]").  Indeed, there can be no argument that the Court in <u>Bowman</u> *expressly* limited its reasoning to cases involving American citizens.  <u>United States v.</u> <u>Ayesh</u>, 762 F. Supp. 2d 832, 840 (E.D. Va. 2011), <u>aff'd</u>, 702 F.3d 162 (4th Cir. 2012) ("As the use of the word 'especially' suggests, a defendant's United States citizenship strengthens the justification for extraterritoriality, but is not required for such a finding.").[10]

Moreover, as the government notes, there are clues in <u>Bowman</u> that suggest the Court would have reached the same conclusion regardless of the defendants' citizenship.  Opp. at 6-7. First, even as the <u>Bowman</u> Court said it was "especially" confident of its ruling as applied to American defendants, 260 U.S. at 98, it also highlighted that the fraud statute at issue in the case was "directed generally against *whoever* presents a false claim," "*whoever* connives at the same," or "*whoever* enters a conspiracy to do these things," with no mention of any limitation based on citizenship, <u>id.</u> at 101 (emphases added).   Second, there is the Court's statement that, as a general matter, laws should be deemed to apply extraterritorially where the offenses

_____

[10] To be sure, it also cannot be said that the <u>Bowman</u> Court expressly *applied* its reasoning to foreign nationals, since it was careful to reserve on the question whether the analysis would be the same if the British defendant were involved in the case.  All the Court is making clear, however, is that <u>Bowman</u> never affirmatively said it would reach a different conclusion if the defendants in the case were foreign nationals, even while it said it was *more certain* of its conclusion given that the defendants were American citizens.

proscribed are "not logically dependent on their locality." Id. at 98. This suggests the

touchstone for extraterritoriality analysis is *where* the offense might be committed, not by *whom*,

exactly as Delgado-Garcia concluded. Further evidence that the locus of the crime, rather than

the identity of offenders, mattered most in Bowman can be found in the Court's discussion of the

fraud statute's amendment, which revealed an intent to protect a particular corporation that "was

expected to engage in, and did engage in, a most extensive ocean transportation business." Id. at

101. The Delgado-Garcia court reasoned that this passage in Bowman made clear that, as far as

the Supreme Court was concerned, the surest indication of whether Congress intends for a law to

apply extraterritorially is whether it could frequently be expected to protect against

extraterritorial misconduct, regardless whether that misconduct is committed by an American

citizen or foreign national. Delgado-Garcia, 374 F.3d at 1346 ("Because of this expectation, the

Court reasoned, many persons who commit the crime of defrauding a U.S. corporation would do

so overseas, and therefore the statute had extraterritorial application."); see also Ayesh, 762 F.

Supp. 2d at 840 ("[T]he Bowman opinion focused on the nature of the harms . . . and not the

characteristics or nationalities of the perpetrators."). The Court finds Delgado-Garcia's reading

of Bowman persuasive; even if this Court had the authority to disregard it, it sees no reason to do

so.[11]

---

[11] It is worth noting that Al-Imam has identified no decision in which a court has concluded that the application of Bowman depends on the citizenship of the defendant, and the Court is not aware of any such case. Instead, the opposite appears true. See United States v. Bin Laden, 92 F. Supp. 2d 189, 195 (S.D.N.Y. 2000) ("[N]o court, to date, has refused to apply the Bowman rule on the ground that the defendant was a foreign national.").

2.   *What is Required by the* Bowman *"Locus" Inquiry*

That brings us to Al-Imam's second criticism of the Court's Abu Khatallah decision:

misapplying Bowman and Delgado-Garcia by adopting a too-permissive locus test.  Recall that

in Bowman, the Supreme Court explained that if Congress wanted a statute to apply

extraterritorially, "it is natural for Congress to say so in the statute," and that courts should not

imply such an intent when Congress does not.  260 U.S. at 98.  The Court carved out an

exception to that rule, however, for "criminal statutes which are, as a class, not logically

dependent on their locality for the government's jurisdiction."  Id.  One such class of statutes, the

Court said, might be those where the "probable place" for an offense's commission is abroad.

Id. at 99.  This is Bowman's "locus test" or "locus inquiry."  The D.C. Circuit in Delgado-Garcia

appeared to conclude that criminal statutes are "not logically dependent on their locality"—and

that Bowman's locus inquiry is therefore satisfied—when "they have many obvious

extraterritorial applications."  374 F.3d at 1346-47 ("The border-control statutes at issue here are

'not logically dependent on their locality' in the same sense that the fraud offense against the

United States was not in Bowman: they have many obvious extraterritorial applications.").

Based on that passage (and other similar ones) in Delgado-Garcia, this Court reasoned in Abu

Khatallah that "the Delgado-Garcia majority offered a different explanation of what it means for

federal criminal offenses to be 'not logically dependent on their locality'—that they 'have many

obvious extraterritorial applications.'"  151 F. Supp. 3d at 128-29.[12]

---

[12] This Court continued:

Bowman is satisfied when (1) a federal criminal offense directly harms the U.S.
Government, and (2) enough foreseeable overseas applications existed at the time
of a statute's enactment (or most recent amendment) to warrant the inference that
Congress both contemplated and authorized prosecutions for extraterritorial acts.

Al-Imam identifies two problems with the Court's explanation of the <u>Bowman</u> locus inquiry.  First, he says <u>Delgado-Garcia</u> never intended the "many obvious extraterritorial applications" standard to supplant or even modify <u>Bowman</u>'s "probable place" standard; and second, regardless whether <u>Delgado-Garcia</u>'s "many applications" formulation was intended as a gloss on <u>Bowman</u>, Al-Imam stresses that <u>Delgado-Garcia</u> never said that a statute having many obvious extraterritorial applications would satisfy the locus prong in every case, only that it was necessary to the result in that specific case.  <u>See</u> MTD at 7-10.

Start with Al-Imam's first point—that this Court misunderstood <u>Delgado-Garcia</u> as offering a clarification on what <u>Bowman</u> requires.  His basic contention is that <u>Delgado-Garcia</u>'s discussion of <u>Bowman</u> must be viewed in light of how the former treated the latter, which was as additional support for its conclusion, rather than as its decisional framework.  <u>Id.</u> at 8 ("[T]he court in <u>Delgado-Garcia</u> was not applying <u>Bowman</u> as a precedential framework. . . ."); <u>see</u> <u>Delgado-Garcia</u>, 374 F.3d at 1345 (concluding that "both contextual and textual evidence" show that statute "applies extraterritorially" before reaching <u>Bowman</u>, which "supports the validity of this inference").  Because the D.C. Circuit merely "cite[d] <u>Bowman</u> as support for its ultimate conclusion that the statute at issue applied extraterritorially," Al-Imam contends it "had no reason to formulate a <u>Bowman</u> 'test,' or even pay close attention to the distinction in its language

―――――――――――――――

<u>Delgado-Garcia</u>'s "locus" inquiry specifically asks whether a statute "ha[s] many obvious extraterritorial applications," <u>id.</u> at 1347, or whether offenders "will often be outside the United States," <u>id.</u>  As long as such a likelihood existed when the statute was passed—whether because of the nature of the offense (as in <u>Delgado-Garcia</u>), contingent facts about the United States's presence abroad, or some combination thereof—courts may properly infer a congressional intent to permit extraterritorial uses."

<u>Abu Khatallah</u>, 151 F. Supp. 3d at 129 (footnote omitted)

38

between 'probable' applications abroad and 'many' such applications."  MTD at 9.  As a consequence, Al-Imam says the Court in Abu Khatallah mistakenly substituted Delgado-Garcia's "many obvious extraterritorial applications" (and similarly worded variations) for Bowman's "probable place" in the locus inquiry.  See Reply at 1 ("[T]o the extent any binding 'test' . . . can be divined from these cases, it requires textual or contextual evidence of a 'natural' or 'probable' extraterritorial focus or effect. . . .").  In his view, that was never the D.C. Circuit's intention, and if it did so incidentally, that was only because Bowman was being used as additional, not indispensable, authority.

Al-Imam's argument is creative but ultimately unpersuasive.  To start, his attempt to downplay Bowman's significance to the decision in Delgado-Garcia does not withstand closer inspection.  At the conclusion of the majority's opinion in Delgado-Garcia, it singled out "the same textual evidence used by the Supreme Court in Bowman and § 1324(a)'s international focus" as the "two reasons" supporting its decision that the statute applied extraterritorially.  374 F.3d at 1351.  In addition, Bowman is mentioned nearly 40 times in the opinion, occupying several pages of analysis.  It is also telling that Delgado-Garcia went to great lengths to explain why the factual distinctions between the case and Bowman did not preclude Bowman's application.  See id. at 1345-47.  That the D.C. Circuit took pains to explain away those distinctions suggests that the court understood Bowman was critical to its decision.  This sharply undermines Al-Imam's contention that the court treated Bowman haphazardly because it played an ancillary role in its reasoning.

But regardless of the role Bowman played in the Delgado-Garcia decision, Al-Imam fails to convince the Court that the latter's various "many" formulations should not guide the Bowman locus inquiry.  As an initial matter, the D.C. Circuit offered these formulations in

discussing what was necessary to satisfy <u>Bowman</u>.  Most tellingly, when the dissent tried to distinguish <u>Bowman</u> on the basis that the cases involved different types of harm, the majority responded that "[t]he border-control statutes at issue here are 'not logically dependent on their locality' in the same sense that the fraud offense against the United States was not in <u>Bowman</u>: they have many obvious extraterritorial applications."  <u>Delgado-Garcia</u>, 374 F.3d at 1346-47.  That is a clear indication that the D.C. Circuit *equates* statutes having "many obvious extraterritorial applications" with their being "not logically dependent on their locality."  The sheer number of times the D.C. Circuit reiterated the standard, albeit in slightly different ways, only fortifies the conclusion that such language should figure prominently into the <u>Bowman</u> analysis.  <u>See, e.g.</u>, <u>id.</u> at 1346 ("[M]uch of the conduct that § 1324(a) criminalizes occurs beyond the borders of the United States."); <u>id.</u> at 1347 (concluding that § 1324(a) "applies to much extraterritorial conduct"); <u>id.</u> (observing that "many" proscribed attempts would occur overseas); <u>id.</u> (noting that "offenders will often be outside the United States"); <u>id.</u> at 1347–48 (finding that the charged conspiracy offense "has many natural extraterritorial applications"); <u>id.</u> at 1348 (noting that § 1324(a) "has a great many international applications").  To overlook these formulations and fixate on <u>Bowman</u>'s single use of the phrase "probable place" would therefore ignore the mode of analysis employed in binding Circuit precedent.  <u>See Abu Khatallah</u>, 151 F. Supp. 3d at 134 (concluding that <u>Delgado-Garcia</u> "articulated a more permissive standard for satisfying <u>Bowman</u>'s 'locus' element").

To be sure, if Al-Imam could show that these formulations were somehow inconsistent with <u>Bowman</u>, then the Court might conclude it was mistaken to make use of them.  But he cannot show as much, and does not seriously attempt to, beyond his (unpersuasive) suggestion that the D.C. Circuit may not have "pa[id] close attention to the distinction in its language

between 'probable' applications abroad and 'many' such applications."  MTD at 9.  In any event, far from being inconsistent with <u>Bowman</u>, <u>Delgado-Garcia</u>'s "many obvious extraterritorial applications" and related "much" and "often" phrasings seem largely in keeping with the Supreme Court's decision.  While <u>Bowman</u> did use "probable place" in discussing one particular offense (forging a ship's papers) and "most likely" in discussing another (enticing desertions), it said that another offense "would naturally often occur at sea," which was enough to show that Congress did not want "to confine it to the land of the United States."  260 U.S. at 99.  And in discussing two other examples of laws that would apply extraterritorially, the Court focused on whether the offenses *could* be committed outside the country, not on whether it was more likely than not that they would be.  <u>Id.</u> at 99-100 (explaining that bribe of government official and theft of military property could occur "in a foreign country or on the high seas").  Finally, and crucially, when the Court turned to the fraud statute directly at issue in <u>Bowman</u>, it said the following:

> We cannot suppose that when Congress enacted the statute or amended it, it did not have in mind that *a wide field* for such frauds upon the government was in private and public vessels of the United States on the high seas and in foreign ports and beyond the land jurisdiction of the United States, and therefore intended to include them in the section.

260 U.S. at 102 (emphasis added).  There again, the Court did not replicate its "probable place" language, instead choosing a phrase the focused on numerosity, not probability.

Al-Imam counters that <u>Bowman</u>'s use of "wide field" must be understood in context.  He says that the Court used that phrase "in a sentence that specifically was about frauds against the Emergency Fleet Corporation," Hr'g Tr. (Rough) 38:20-21, which the Court noted would "engage in [ ] a most extensive ocean transportation business," and which Congress's 1918 amendment seemed designed to protect, <u>Bowman</u>, 260 U.S. at 102.  Thus, according to Al-

Imam, while the Court may have said it was sufficient that a "wide field" of offenses would be committed abroad, that was only because it was otherwise obvious that the 1918 amendment was calibrated to apply to a corporation doing business abroad.  Not so.  Although the Court in Bowman did emphasize that the 1918 *amendment* to the statute suggested extraterritorial intent, it also said the statute reflected the same intent when Congress *enacted* the statute.  Id. ("We cannot suppose that when Congress *enacted the statute* or amended it, it did not have in mind that a wide field for such frauds" would occur "beyond the land jurisdiction of the United States." (emphasis added)).  This undercuts Al-Imam's contention that Bowman would have come out differently absent the statute's 1918 amendment.  See Hr'g Tr. (Rough) 8:20-9:3.

The long and short of this discussion?  It would misread Bowman to give priority to its "probable place" statement, as Al-Imam urges, and Delgado-Garcia's "many obvious extraterritorial applications" standard is in fact fully consistent with Bowman.  See Opp. at 12 (arguing that Delgado-Garcia's "many" and "much" phrasings "dovetail[ ] with Bowman's analysis of federal offenses that 'naturally often occur' overseas or where there was a 'wide field' for the commission of the offense overseas").

Even so, this particular dispute may be a tempest in a teapot, especially in light of Al-Imam's representations at the hearing.  While the Court grants there could be a substantive difference between a "probable place" standard and a "many applications" standard, that would be true only if the word "probable" is read to mean "more likely than not," which is at least one reasonable interpretation of the term.  But defense counsel at the hearing disclaimed any argument to that effect.  Analogizing to the standard courts apply to 28 U.S.C. § 2255 motions, counsel said the government's burden should not be "to prove that it's more likely than not," but only that there is a "probable likelihood" the offense could be committed extraterritorially.  Hr'g

Tr. (rough) 5:16-20; <u>id.</u> at 5:21-22 (likening standard to a "rough probability").  When the Court

inquired what made this formulation meaningfully different from the D.C. Circuit's in <u>Delgado-</u>

<u>Garcia</u> and this Court's in <u>Abu Khatallah</u>, counsel pivoted to explaining why the use of "many"

in <u>Delgado-Garcia</u> must be read in light of the statute it was considering and cannot be imported

as a standard to be applied to other statutes.  <u>Id.</u> at 6:6-8:10:14; <u>see</u> 9:25-10:2 (explaining that

<u>Delgado-Garcia</u> said "many" "in the context of a naturally occurring many, because of the nature

of the crime").  If a statute has "many obvious extraterritorial applications," however, it strikes

the Court that it would satisfy Al-Imam's favored "probable likelihood" standard,

notwithstanding the Court's confusion on what exactly the latter requires.

    That leaves Al-Imam's second criticism of the Court's analysis of <u>Bowman</u>'s locus test.

Aside from the issue of how <u>Delgado-Garcia</u> employed <u>Bowman</u> in its analysis, and regardless

whether <u>Delgado-Garcia</u> intended its "many" formulations to guide the application of <u>Bowman</u>

in this Circuit, Al-Imam contends this Court erred by making the "many obvious extraterritorial

applications" a sufficient rather than necessary condition for satisfying the <u>Bowman</u> locus

inquiry.  MTD at 7 (arguing that the <u>Delgado-Garcia</u> "many" formulations "reflected what was

necessary, but not sufficient, to establish the extraterritoriality of statutes.").  Or, as Al-Imam

puts it in his reply: "these cases must be read as a whole in light of the facts before them, rather

than parsed for specific language into a 'test' the cases did not formulate themselves."  Reply at

1.  This argument parallels the one Al-Imam made in regard to the citizenship distinction: just as

he argued that the citizenship distinction did not matter in <u>Delgado-Garcia</u> because the statute

was so clearly focused on international conduct, he argues that a statute having "many"

extraterritorial applications was sufficient in <u>Delgado-Garcia</u> only because other contextual

factors also made clear that the statute was intended to guard against international misconduct.

Al-Imam is correct that <u>Delgado-Garcia</u>'s determination that the immigration statute at issue applied extraterritorially did not turn *only* on the fact that the statute would have many extraterritorial applications.  Rather, the court noted other "contextual feature[s]" of § 1324(a), including that the statute protected U.S. borders and was "international in focus."  374 F.3d at 1345.  But those considerations are not as distinct as Al-Imam suggests.  To the contrary, the fact that § 1324 had "a great many international applications" was key to the D.C. Circuit's conclusion that the statute was "not fundamentally domestic in focus."  <u>Id.</u> at 1348.  It is thus difficult to divorce <u>Delgado-Garcia</u>'s observation that the border-control statute had an international focus from its observation that it would have many natural extraterritorial applications.  And at the end of the day, that the immigration statute would have many extraterritorial applications appeared the decisive factor in <u>Delgado-Garcia</u>'s analysis—at least with respect to the <u>Bowman</u> locus question.  The opinion all but said as much: "The border-control statutes at issue here are 'not logically dependent on their locality' in the same sense that the fraud offense against the United States was not in <u>Bowman</u>: they have many obvious extraterritorial applications."  <u>Id.</u> at 1346-47.

A closer look at <u>Delgado-Garcia</u>'s explication of <u>Bowman</u>, and at <u>Bowman</u> itself, confirms that this Court was correct to center the locus inquiry on a statute's extraterritorial applications, not on whether it had a domestic or international "focus."  Discussing <u>Bowman</u>, <u>Delgado-Garcia</u> noted that "[f]raud against the United States does not necessarily concern the national security and foreign affairs of the United States" and that "there is no obvious reason why frauds against the United States, simpliciter, would occur overseas."  <u>Id.</u> at 1346.  Indeed, a close look at the statute the Supreme Court considered in <u>Bowman</u> shows, if anything, there would be more opportunities to violate the statute domestically than abroad.  That law made it a

crime to make a fraudulent claim "for payment or approval [ ] to or by any person or officer in

the civil, military, or naval service of the United States[.]"  Bowman, 260 U.S. at 101 n.1

(quoting the statute).  While it is true that the statute's application to military and navy personnel

provides some indication that Congress foresaw extraterritorial applications—and while the 1918

amendment provided a further clue to its extraterritorial reach—it is doubtless the case that more

civil service and armed forces personnel are stationed domestically than abroad.  Nevertheless, it

sufficed in Bowman that a "wide field" of such frauds could occur extraterritorially.  260 U.S. at

102.  Delgado-Garcia also emphasized that Bowman "recited several other statutes, not expressly

territorial," unlike the immigration statute before it, and explained that those statutes "by the very

nature of the crime outlawed [could] be supposed to apply extraterritorially."  374 F.3d at 1346.

Bowman and Delgado-Garcia therefore make clear that a statute by its terms need not reflect an

international focus to infer that Congress intended it to apply extraterritorially; instead, the key

inquiry is whether, at the time a statute was enacted or amended, it had "many obvious

extraterritorial applications."  Accordingly, this Court disagrees that Abu Khatallah erred by

formulating a test that made the primary "locus" consideration whether the statute would have

many likely extraterritorial applications.

    At any rate, the "test" this Court allegedly set forth in Abu Khatallah—which the Court

believes was commanded by Delgado-Garcia and Bowman—did not exclude the other

"contextual features" that Delgado-Garcia highlighted in its extraterritoriality analysis.  To the

contrary, it incorporated them.  After outlining the two-part extraterritoriality analysis, the Court

continued:

> Delgado-Garcia's "locus" inquiry specifically asks whether a statute "ha[s] many
> obvious extraterritorial applications," id. at 1347, or whether offenders "will often
> be outside the United States," id.  As long as such a likelihood existed when the
> statute was passed—whether because of the nature of the offense (as in Delgado-

> Garcia), contingent facts about the United States's presence abroad, or some
> combination thereof—courts may properly infer a congressional intent to permit
> extraterritorial uses.

Abu Khatallah, 151 F. Supp. 3d at 129 (footnote omitted); see supra 16-17.  The Court's

reference to the "nature of the offense" indicates that a court could and should consider whether

a given offense, like the one at issue in Delgado-Garcia, is "international in focus," 374 F.3d at

1345, or is "expressly territorial," id. at 1346.  The Court, however, did not read Delgado-Garcia

and Bowman to suggest such an international focus was a *prerequisite* for extraterritoriality.

And again, that was for good reason: while the international focus of the border-control statute

before the D.C. Circuit supported its extraterritoriality, there was no such focus evident from the

face of the fraud statute at issue in Bowman, nor was it true of several other statutes that

Bowman opined would apply extraterritorially.  What was true in *both* cases, however, was that

the statutes would naturally have many extraterritorial applications.  Delgado-Garcia, 374 F.3d at

1346-47 ("The border-control statutes at issue here are 'not logically dependent on their locality'

in the same sense that the fraud offense against the United States was not in Bowman: they have

many obvious extraterritorial applications.").  Hence, in Abu Khatallah the Court made clear

that, for a statute to apply extraterritorially, a statute *need not* evince an international "focus,"

even if such a focus would provide an additional indication that a statute was intended to apply

extraterritorially.  Abu Khatallah, 151 F. Supp. 3d at 131 ("Under Delgado-Garcia, a criminal

offense whose most natural or obvious applications are domestic can still be prosecuted abroad if

the law had many obvious extraterritorial applications at the time of enactment." (internal

quotation marks omitted)).

  In sum, then, the Court rejects Al-Imam's request for the Court to reconsider its

extraterritoriality analysis in Abu Khatallah.  And because Al-Imam's extraterritoriality

arguments, beyond the additional ones the Court has just rejected, mirror Abu Khatallah's, the Court reaches the same result: each of the statutes under which Al-Imam is charged apply to extraterritorial conduct.  His motion to dismiss those charges for lack of jurisdiction is therefore denied.

> C.  <u>Capture and International Law</u>

Al-Imam presses one other argument for dismissal that his alleged co-conspirator, Abu Khatallah, did not: that the government cannot prosecute him for certain offenses—namely Counts Three, Ten through Seventeen, and parts of Counts One and Two—covered by extradition treaties that the government violated through his capture.  MTD at 25-28.  Two Supreme Court cases, <u>Ker v. Illinois</u>, 119 U.S. 436, 444 (1886) and <u>Frisbie v. Collins</u>, 342 U.S. 519, 522 (1952), provide the relevant legal backdrop for Al-Imam's argument.  "Under a rule known as the <u>Ker-Frisbie</u> doctrine, the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a forcible abduction."  <u>United States v. Rezaq</u>, 134 F.3d 1121, 1130 (D.C. Cir. 1998) (internal quotation marks omitted).  One exception to this rule, however, is when "an extradition treaty . . . provide[s] that it is 'the only way by which one country may gain custody of a national of the other country for the purposes of prosecution.'"  <u>Id.</u> (quoting <u>United States v. Alvarez-Machain</u>, 504 U.S. 655, 664 (1992)).  So if Al-Imam's abduction here violated the terms of an extradition treaty, he could not be prosecuted for crimes covered by that treaty.

The United States does not have a bilateral extradition treaty with Libya.  Al-Imam nevertheless contends that his abduction in Libya violated the "prosecute or extradite" regime established by three multilateral conventions—the Charter of the United Nations ("U.N. Charter"), the Convention on the Prevention and Punishment of Crimes Against Internationally

Protected Persons, Including Diplomatic Agents ("IPP Convention"), and the International

Convention for the Suppression of Terrorist Bombings ("Terrorism Convention")—that together

require signatories to either extradite defendants like Al-Imam or prosecute them domestically.

MTD at 26.  Forcible abduction, Al-Imam says, is not an option.  Id.  The government's response

is two-fold.  First, it says that none of these treaties are relevant, since none of them are between

the United States and Libya.  Opp. at 12.  And second, it argues that even assuming that the

multilateral treaties identified by Al-Imam create a presumption in favor of "extradite or

prosecute," the Supreme Court has already effectively determined that they do not bar an

American prosecution of a foreign national who was forcibly removed from another country.  Id.

 The Court first will try to explain Al-Imam's theory.  Seemingly admitting that the IPP

Convention and Terrorism Convention do not by their own express terms bar extraterritorial

forcible abductions, Al-Imam argues instead that the relationship between the conventions and

the U.N. Charter accomplishes as much.  In his words:

> By entering the U.N. Charter, signatory nations agreed in principle to give up
> their power to violate the territorial integrity of another nation except under
> certain conditions.  And by entering into the "extradite or prosecute"
> conventions—both of which begin with express references to the U.N. Charter,
> and both of which state that they may form the legal basis for an extradition
> request—the United States extracted promises from signatory nations to
> "extradite or prosecute" persons found in their territory suspected of crimes of
> terrorism or against internationally-protected persons, in exchange for adherence
> to and promotion of the values found in the U.N. Charter.

MTD at 26.  Put simply: the conventions require signatories to either extradite international

terrorists or to prosecute them themselves, and the U.N. Charter, which signatories to the

conventions effectively adopted, prohibits forcible abductions.  This functions, according to Al-

Imam, just like a "bilateral extradition treaty [that] expressly forbid[s] forcible abductions,

because they are prohibited by the U.N. Charter as incorporated and reflected in the IPP and Terrorism Conventions." Id. at 27.

Al-Imam clarifies that he is not asking the Court to conclude that the U.N. Charter is self-executing or creates privately enforceable rights. He stresses that he is "not asking the Court to dismiss any charges based on a violation of the U.N. Charter *per se*," but rather "is simply invoking the rule in Alvarez-Machain, 504 U.S. at 662, which stated that 'our first inquiry must be whether the abduction of respondent from Mexico violated the Extradition Treaty between the United States and Mexico.'" Id. And because the IPP and Terrorism Conventions mandate compliance with the U.N. Charter's respect for territorial sovereignty, at least as Al-Imam sees things, his abduction violates those conventions and precludes his prosecution on the offenses covered by the conventions.

The government responds that Alvarez-Machain compels a result in its favor. In that case, the U.S. government orchestrated the abduction of a Mexican citizen who participated in a kidnapping and murder of a DEA agent in Mexico. Alvarez-Machain, 504 U.S. at 657. When forced to face trial, the Mexican citizen claimed that his abduction violated a U.S.-Mexico extradition treaty. Id. at 658. Although the treaty did not expressly prohibit abductions, the defendant argued, and a lower court agreed, that the treaty "would be frustrated if either nation were free to abduct nationals of the other nation for the purposes of prosecution." Id. at 664. The Supreme Court reversed. The Court explained that, although the treaty "provides a mechanism which would not otherwise exist"—namely, a systematic extradition process—the treaty did not "purport to specify the *only* way in which one country may gain custody of a national of the other country for the purposes of prosecution." Id. at 665 (emphasis added).

The Court also rejected the defendant's argument that, even if the treaty lacked an express prohibition on forcible abductions, the Court should imply a term to that effect.  Similar to Al-Imam's argument here, he argued that the treaty should be "interpreted against the backdrop of customary international law," including reference to the U.N. Charter, which "so clearly prohibit[s]" forcible abductions "that there was no reason to include such a clause in the treaty itself."  Id. at 666 (internal quotation marks omitted).  The Supreme Court was unconvinced.  The defendant's argument was undermined in particular by the fact that the "support [he] garner[ed] from international law [did not] relate[ ] to the practice of nations in relation to extradition treaties."  Id. at 667.  "Respondent would have us find that the Treaty acts as a prohibition against a violation of the general principle of international law that one government may not exercise its police power in the territory of another state."  Id. (internal quotation marks omitted).  Although "[t]here are many actions which would be taken by a nation that would violate this principle, including waging war," the Court said "it cannot seriously be contended that an invasion of the United States by Mexico would violate the terms" of the bilateral extradition treaty.  Id.  Yet Al-Imam appears to contend that very point.  Without identifying a specific provision in the U.N. Charter, he asserts that the Charter's signatories "agreed in principle to give up their power to violate the territorial integrity of another nation except under certain conditions."  MTD at 26.  And because the conventions cited the U.N. Charter as the "premise" for their agreements, those agreements now effectively contain the Charter's prohibition on territorial violations.  Reply at 11.  It seems the same conclusion the Supreme Court reached in Alvarez-Machain should follow: the fact that many actions might violate the territorial integrity principle embodied in the U.N. Charter does not mean that those actions automatically violate an extradition treaty.

Al-Imam nevertheless insists that one key distinction wriggles this case free from Alvarez-Machain's grasp.  There, the defendant asked the Court to imply a no-abduction term into the U.S.-Mexico treaty by reading the treaty "against the backdrop of customary international law," as reflected by, among other things, the U.N. Charter.  504 U.S. at 666.  Here, by contrast, the conventions themselves make explicit reference to the U.N. Charter, which Al-Imam contends effectively incorporated the U.N. Charter into the conventions.  Reply at 11 ("Unlike the U.S.-Mexico treaty . . . the conventions cited by Al-Imam *expressly* refer to the U.N. Charter as a *premise* for their respective agreements."); id. at 14 ("[T]he conventions identify themselves as extradition treaties and expressly connect the principles of the U.N. Charter to the 'prosecute or extradite' regime they establish[.]").  What is more, according to Al-Imam, the Terrorism Convention "enshrine[s] the principle of territorial sovereignty into three different articles," Reply at 12, including one that provides that the parties will "carry out their obligations under the Convention" consistently "with the principles of sovereign equality and territorial integrity," Terrorism Convention, Article 17.[13]  By his reading, then, the conventions' incorporation of the U.N. Charter and the Terrorism Convention's explicit reference to territorial integrity supply what was missing in Alvarez-Machain: the "additional requirement" that parties to the conventions "respect[ ] the territorial integrity of all signatories."  MTD at 28.

The Court disagrees.  To start, it is unclear whether the conventions' references to the U.N. Charter suffice to "incorporate" the Charter, such that violations of the Charter *ipso facto* constitute violations of the conventions.  See id.; see also Reply at 12 (discussing conventions' use of phrases like "having in mind the purposes and principles of the Charter of the United

---

[13] *Available at* https://www.state.gov/documents/organization/282340.pdf

States").  Although Al-Imam admits that the IPP's "incorporation of territorial sovereignty" is "opaque," id., he contends that the Terrorism Convention is perfectly explicit on this point, noting one provision discussing the "territorial integrity of States" and another assuring that the Convention's dictates do not conflict with "the Charter of the United Nations and international humanitarian law."  Id. at 13.  Even so, the Court seriously doubts the proposition that these statements are enough to make a violation of the U.N. Charter, or specific provisions of it, a violation of the Conventions.

But the Court need not resolve that doubt.  For even if the Charter were incorporated into the IPP and Terrorism Conventions, that distinction does not remove this case from Alvarez-Machain's orbit.  The Court in Alvarez-Machain did not, as Al-Imam seems to suggest, reject the defendant's argument about "customary international law" and the U.N. Charter simply because it was not explicitly incorporated into the bilateral extradition treaty.  To the contrary, it rejected that argument for the reason highlighted above: the "general principle of international law that one government may not exercise its police power in the territory of another state" did not "relate[ ] to the practice of nations in relation to extradition treaties."  Alvarez-Machain, 504 U.S. at 667.  Nothing in the Court's analysis suggests that its reasoning would have been any different had the U.S.-Mexico treaty, like the IPP and Terrorism Conventions, included a statement that it "had in mind" the principles enshrined in the U.N. Charter or that it was not disturbing any of those principles.  The Alvarez-Machain Court considered customary international law principles, including those codified in the U.N. Charter; it just found nothing in them to suggest that a forcible abduction must be considered a violation of an extradition treaty.  Al-Imam responds that, however general the principle of respect for territorial integrity may be in a vacuum, it should be understood as a bar to forcible abductions when it is included in an

extradition treaty.  Reply at 14 ("[T]he conventions identify themselves as extradition treaties and expressly connect the principles of the U.N. Charter to the 'prosecute or extradite' regime they establish[.]").  But the Court is not convinced that the U.N. Charter's general respect for territorial integrity transforms into a specific prohibition on abductions any time it is alluded to in an extradition treaty.  Nor does the Terrorism Convention's promise that signatories will act consistently with "the principles of sovereign equality and territorial integrity" function as such a prohibition.

Al-Imam in reply offers one other distinction between this case and Alvarez-Machain. He notes that the IPP and Terrorism Conventions, unlike the U.S.-Mexico treaty, contain arbitration provisions binding signatories to handle disputes that arise under the conventions. Reply at 16-17 ("Obviously, it would make no sense for two parties to contract to a binding arbitration process, but permit that process to be subverted by the simple expedient of allowing one party to invade the other and capture the subjects of the arbitration.").  But this is little more than a variant of the argument, rejected by the Court in Alvarez-Machain, that an extradition treaty's purpose would be frustrated if a signatory to the treaty could use means other than extradition to subject a foreign national to trial.  See 504 U.S. at 664.  The arbitration provisions in the conventions may well still serve a purpose; if a party believes the conventions require extradition, and for various reasons that party thinks that extradition is either its best or its only option to bring a suspected terrorist to justice, they may compel the other nation to arbitrate their claim.  In any event, as in Alvarez-Machain, the creation of one legal mechanism for achieving a signatory's end goal does not necessarily imply the illegality of all others.  See 504 U.S. at 665.

For all these reasons, the Court concludes that <u>Alvarez-Machain</u> controls and forecloses Al-Imam's <u>Ker-Frisbie</u> argument.  Accordingly, the Court will deny his motion to dismiss Counts Three, Ten through Seventeen, and parts of Counts One and Two on that basis.

D.  <u>Federal Facilities</u>

Al-Imam's final argument is identical to one considered and rejected by the Court in <u>Abu Khatallah</u>—that Counts Ten through Fifteen must be dismissed because the Mission and Annex were not lawfully operated federal facilities.  <u>Compare</u> MTD at 28-31 <u>with</u> Mot. Dismiss Counts Ten Through Fifteen, ECF No. 90, <u>Abu Khatallah</u>, 14-cr-141.  Given no reason to revise its reasoning in <u>Abu Khatallah</u>, the Court adopts it here in slightly modified form.

Al-Imam argues that the Mission and Annex were neither "federal facilities" nor "U.S. Property" for purposes of those statutes because they were not lawfully owned or leased under certain treaties requiring consent of the host State to establish diplomatic posts.  The Government counters that it is entitled to present evidence at trial as to each element of the offenses charged—and therefore that Al-Imam's argument is premature and unsuited to a motion to dismiss an indictment—and that it would be inappropriate to "import the terms of an international treaty to amend clearly worded statutory definitions in U.S. criminal statutes." Opp. at 39.  Because the treaties Al-Imam cites do not apply to the Mission or Annex, the Court will deny his motion to dismiss these counts.

*1.  Statutory Background*

Section 930(c) prohibits "kill[ing] any person . . . in the course of an attack on a Federal facility involving the use of a firearm or other dangerous weapon [and] attempt[ing] or conspir[ing] to do such an act."   18 U.S.C. § 930(c).  Section 930(g)(1) defines "Federal facility" as "a building or part thereof owned or leased by the Federal Government, where

Federal employees are regularly present for the purpose of performing their official duties." 18

U.S.C. § 930(g)(1).

Section 844(f) prohibits "maliciously damag[ing] or destroy[ing], or attempt[ing] [to do

so], by means of fire or an explosive, any building, vehicle, or other personal or real property in

whole or in part owned or possessed by, or leased to, the United States, or any department or

agency thereof." 18 U.S.C. § 844(f)(1). Subsection (f)(3) provides for the death penalty or a

sentence of twenty years to life for any person who "directly or proximately causes the death of

any person" while engaging in conduct prohibited by subsection (f).

### 2. *The Parties' Arguments*

Al-Imam begins his argument with the observation that "[i]mplicit in [the] statutes is a

presumption that the government acts within the larger legal framework established by Congress,

abiding by treaties it has enacted." MTD at 24. The governing treaties here, he contends, are the

Vienna Convention on Consular Relations and Optional Protocol on Disputes and the Vienna

Convention on Diplomatic Relations and Optional Protocol on Disputes (the "Vienna

Conventions"), which "require mutual consent for the establishment of any diplomatic post (not

just permanent ones)," id. at 22 (citing Vienna Convention on Consular Relations and Optional

Protocol on Disputes art. 2, Apr. 24, 1963, 21 U.S.T. 77; Vienna Convention on Diplomatic

Relations and Optional Protocol on Disputes art. 2, Apr. 18, 1961, 23 U.S.T. 3227).[14] Al-Imam

maintains that because the United States never sought such consent from the TNC to establish

------------------------------------------------

[14] Al-Imam finds support for his reading of the Vienna Conventions in the State
Department's Foreign Affairs Manual. See MTD at 29 ("When a decision to open a post has
been reached, the acceptance of the foreign government is necessary and must precede any
public disclosure of the proposed action." (quoting 2 Foreign Affairs Manual § 422.1-1,
http://www.state.gov/documents/organization/210051.pdf)).

the Mission or Annex, the Mission and Annex were not lawfully possessed, leased, or owned by the United States, and therefore did not constitute federal facilities or U.S. property under § 930(g) and § 844(f).

The Government counters that these statutes should not be read to incorporate treaty requirements found nowhere in the statutory text because "federal crimes . . . are solely the creatures of statute," and Congress is entrusted with designating elements of federal criminal offenses.  Opp. at 40 (quoting <u>Staples v. United States</u>, 511 U.S. 600, 604 (1994)).  The Government also makes two alternative arguments: first, that even if treaties can inform interpretation of the statutes, the Vienna Conventions are not in play here because they pertain only to facilities the Government seeks to have recognized as permanent diplomatic or consular facilities, and second, that Al-Imam's argument is an inappropriate basis for a motion to dismiss because the indictment is legally sufficient and the Government is entitled to an opportunity to prove all elements of the offenses charged at trial.

### 3.  *Applicability of the Vienna Conventions*

As multilateral treaties, the Vienna Conventions "are contracts between sovereigns, [which] should be construed to give effect to the intent of the signatories."  <u>Gonzalez Paredes v. Vila</u>, 479 F. Supp. 2d 187, 191 (D.D.C. 2007) (quoting <u>Tabion v. Mufti</u>, 73 F.3d 535, 537 (4th Cir. 1996)) (internal quotation mark omitted).  Courts discern signatories' intent "in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in light of [the treaty's] object and purpose."  <u>Id.</u> (quoting <u>Logan v. Dupuis</u>, 990 F. Supp. 26, 29 (D.D.C. 1997)) (citing Vienna Convention on the Law of Treaties art. 31(1), May 23, 1969, 1155 U.N.T.S. 331).

The Court need not delve into the Government's contention that criminal laws are "creatures of statute" that should never be read in light of international law. See Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 62 (1804) ("[A]n act of Congress ought never to be construed to violate the law of nations if any other possible construction remains."). That is so because the Court sees no tension between the two in this case. Application of the statutes at issue to the Mission and Annex does not violate the Vienna Conventions because those conventions do not bear on what constitutes a federal facility under § 930(g)(1) or U.S. property under § 844(f)(1).

The treaties require mutual consent for the "establishment of consular *relations*," Vienna Convention on Consular Relations and Optional Protocol on Disputes art. 2, Apr. 24, 1963, 21 U.S.T. 77 (emphasis added), and the "establishment of diplomatic *relations . . . and of permanent diplomatic missions*," Vienna Convention on Diplomatic Relations and Optional Protocol Disputes art. 2, Apr. 18, 1961, 23 U.S.T. 3227 (emphases added). The establishment of consular or diplomatic relations with a foreign state is distinct from the U.S. Government's owning or leasing "a building or part thereof . . . where Federal employees are regularly present for the purpose of performing their official duties," 18 U.S.C. § 930(g)(1), or owning, possessing, or leasing, "in whole or in part," "any building, vehicle, or other personal or real property," 18 U.S.C. § 844(f)(1).[15] The U.S. Government could establish a federal facility or own, possess, or

---

[15] Articles 12 and 23 of the Vienna Convention on Diplomatic Relations, which Al-Imam also cites, see MTD at 29, are not to the contrary. Article 12 provides that "[t]he sending State may not, without the prior express consent of the receiving State, establish offices forming part of the [diplomatic] mission in localities other than those in which the mission itself is established." Vienna Convention on Diplomatic Relations and Optional Protocol Disputes art. 12, Apr. 18, 1961, 23 U.S.T. 3227. To the extent this article applies to the Mission and Annex, the most it could do would be to call into question their status as parts of the United States's diplomatic mission in Libya. It would not affect their status as federal facilities or U.S. property

lease U.S. property recognized as such by these statutes irrespective of whether it used the facility or property in furtherance of diplomatic or consular relations.

Furthermore, the establishment of permanent diplomatic or consular relations is distinct from the use of nonpermanent locations for temporary diplomatic purposes.  See Tachiona ex rel. Tachiona v. Mugabe, 186 F. Supp. 2d 383, 387 (S.D.N.Y. 2002) ("The genesis and negotiating history of the Vienna Convention [on Diplomatic Relations] make clear that the purpose the treaty intended to address was the codification of rules governing diplomatic relations between sovereign states and the organization and functioning of permanent diplomatic missions in states with established relations.").  And the indictment and Al-Imam's motion to dismiss make clear that neither the Mission nor the Annex was intended to be a "permanent diplomatic mission." The U.S. Embassy in Libya was located in Tripoli until the State Department suspended operations and evacuated personnel in February 2011.  When the United States sought to reestablish an American presence in Libya a few months later in April 2011, it sent Special Envoy Stevens to Benghazi, and then set up a "U.S. Special Mission" and an annex building there in late 2011.  Indictment ¶¶ 5–6.  Within six months, Stevens had returned to Tripoli as the U.S. Ambassador to Libya, though he was present, and was killed, in Benghazi during the attack. Id.

Al-Imam appears not to dispute that the Special Mission in Benghazi was established as a temporary concern.  The State Department report that he cites for support, MTD at 29-30, describes the Mission's staffing as "short-term" and "transitory," Accountability Review Bd.,

_____

under U.S. law.  Article 23 is even less applicable to the question before the Court as it concerns diplomatic missions' exemption from local taxes.  See id. art. 23.

U.S. Dep't of State, Benghazi Attack Report 14 (Unclassified) (2012),[16] noting that the Mission "was never a consulate and never formally notified to the Libyan government," id. at 14-15.

The bipartisan Senate intelligence report on the attacks, issued in January 2014, likewise characterizes the Mission as nonpermanent, using the term "U.S. Temporary Mission Facility." U.S. Senate Select Comm. Intelligence, Review of the Terrorist Attacks on U.S. Facilities in Benghazi, Libya, September 11-12, 2012, at 4 (2014), http://www.intelligence.senate.gov /sites/default/files/press/benghazi.pdf.  And commentators have hypothesized that part of the reason the attack was so devastating was the mission's "confusing legal status":  "It wasn't an embassy or even an official consulate; it was so off-book that the Libyan government was never officially notified of its existence.  This put the mission outside the normal State Department procedures used to allocate security funding and personnel."  Zack Beauchamp, 9 Questions About Benghazi You Were Too Embarrassed to Ask, Vox (Oct. 12, 2015, 9:00 AM), http://www.vox.com/2015/10/12/9489389/benghazi-explained.  While this account may bolster Al-Imam's argument that the United State never obtained consent from the TNC to establish the Mission or Annex, it demonstrates that such consent was not required under the Vienna Conventions given the transitory nature of the posts.

Moreover, as the Government points out, it would make little sense for a foreign state to have veto power over the protections these statutes afford federal employees working in federal facilities.  While requiring the host state's consent to establish diplomatic or consular relations or permanent diplomatic facilities is consistent with the purposes of diplomacy and international cooperation, limiting the scope of a U.S. criminal statute designed to protect federal workers,

---

[16] *Available at* http://www.state.gov/documents/organization/202446.pdf

whether within U.S. boundaries or abroad, subverts Americans' safety to the decision of a foreign state.

The Government also urges the Court to reject Al-Imam's Vienna Convention argument because it presents a challenge to the sufficiency of the evidence, which the Government is entitled to establish at trial. The Government does not explicitly concede that it did not seek or obtain consent from the TNC to set up or operate the posts, but it also does not directly refute Al-Imam's claim that it never made the recognized Libyan Government aware of the locations. It focuses instead on the inapplicability of the treaties.

As discussed above, however, resolution of the questions before the Court does not turn on the Mission's or Annex's status under the Vienna Conventions. Rather, the Court is able to determine as a matter of law that, whether or not the United States obtained consent from the TNC to set up the Mission and Annex, the Vienna Conventions do not bear on those entities' status as federal facilities or U.S. property. The Court may therefore address Al-Imam's argument at this stage. See United States v. Yakou, 428 F.3d 241, 247 (D.C. Cir. 2005) (noting that the D.C. Circuit "has upheld a pretrial dismissal of counts of an indictment based on a question of law") (citing United States v. Espy, 145 F.3d 1369, 1370 (D.C. Cir. 1998)).

**IV.  Conclusion**

For the foregoing reasons, the Court will deny [51] Defendant's Motion to Dismiss Counts One Through Seventeen. A separate Order shall accompany this memorandum opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: March 14, 2019