# **EXHIBIT A**

```
 1               IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - x
 3     THE UNITED STATES OF AMERICA,
                                       Criminal Action
 4                 Plaintiff,          No: 1:14-cr-00141-CRC-1
                                       Thursday, September 14, 2016
 5     vs.                             10:59 a.m.

 6     AHMED SALIM FARAJ ABU KHATTALAH,

 7                 Defendant.
       - - - - - - - - - - - - - - - x
 8


 9     _____

                    TRANSCRIPT OF          HEARING
10        HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
                    UNITED STATES DISTRICT JUDGE
11     _____

       APPEARANCES:
12
       For the United States:   MICHAEL C. DiLORENZO, ESQ.
13                              JOHN CRABB, JR., ESQ.
                                JULIEANNE HIMELSTEIN, ESQ.
14                              OPHER SHWEIKI, ESQ.
                                U.S. ATTORNEY'S OFFICE
15                              FOR THE DISTRICT OF COLUMBIA
                                555 Fourth Street, NW
16                              Washington, D.C. 20530
                                (202) 252-7938
17
       For the Defendant:       MICHELLE M. PETERSON, ESQ.
18                              MARY MANNING PETRAS, ESQ.
                                FEDERAL PUBLIC DEFENDER FOR D.C.
19                              625 Indiana Avenue, NW, Suite 550
                                Washington, DC 20004
20                              (202) 208-7500

21                              ERIC LESLIE LEWIS, ESQ.
                                LEWIS BAACH PLLC
22                              1899 Pennsylvania Avenue, NW
                                Suite 600
23                              Washington, D.C.  20006
                                (202)833-8900
24     (CONTINUED ON NEXT PAGE)

25     Proceedings recorded by mechanical stenography; transcript
       produced by computer-aided transcription
```

```
1        A P P E A R A N C E S  (CONTINUED):

2       *Interpreters:                Samir Kaibni, Sworn
                                      Sara Kamel, Sworn
3
        Court Reporter:               Lisa A. Moreira, RDR, CRR
4                                     Official Court Reporter
                                      U.S. Courthouse, Room 6718
5                                     333 Constitution Avenue, NW
                                      Washington, DC  20001
6                                     202-354-3187

7
        *Only present for the open portion of the hearing
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2    WITNESS                                                    PAGE

3

4

5

6    JUSTIN O'DONNELL

         (By Mr. DiLorenzo).................................. 68
7        (By Ms. Petras).................................... 91
         (By Mr. DiLorenzo.................................124

8

9

10

11

12

13

14

15

16

17.

18

19

20

21

22

23

24

25

```
 1                  A F T E R N O O N   S E S S I O N
 2              THE COURTROOM DEPUTY:  Your Honor, we're back on
 3      the record for Criminal Case 14-141, United States of
 4      America vs. Ahmed Salim Faraj Abu Khatallah.
 5              THE COURT:  Okay.  We're back in open session.  Is
 6      our witness ready?
 7              MR. DiLORENZO:  Yes, Your Honor.  We're going to
 8      call Special Agent Justin O'Donnell.  I believe he'll be
 9      here any second.
10              THE COURT:  Tag-teaming today, huh?
11              MR. DiLORENZO:  Yes.  There's a lot of
12      responsibilities to spread around.
13              THE COURT:  I wish I could do that.
14              MR. DiLORENZO:  You do have a number of able
15      clerks.
16                       JUSTIN O'DONNELL, Sworn
17                          DIRECT EXAMINATION
18      BY MR. DiLORENZO:
19      Q.   Good afternoon.
20      A.   Good afternoon.
21      Q.   Could you please introduce yourself to the Court and
22      spell your last name.
23      A.   Justin O'Donnell, O-'-D-o-n-n-e-l-l.
24      Q.   And by whom are you employed?
25      A.   The FBI.
```

Q.   And how long have you been employed by the FBI?

A.   Seven years.

Q.   What's your current assignment with the FBI?

A.   I'm currently assigned to the New York field office on an extraterritorial squad.

Q.   And could you generally tell us what does the extraterritorial squad do?

A.   We investigate acts of terrorism overseas.

Q.   And prior to working on the extraterritorial squad, in what capacity did you work for the FBI?

A.   I was assigned to another investigative squad but still working in counterterrorism matters.

Q.   And if you could briefly tell the Court what you did prior to joining the FBI.

A.   I was a state corrections officer for two years, and I was in the Army for nine years, including a year deployment to Iraq.

Q.   And what is your educational background?

     THE COURT:   Sir, could you move just a little bit closer to the microphone.   Thank you.

A.   I have a master's degree.

Q.   And what is that in?

A.   Middle Eastern studies.

Q.   Now, are you familiar with the investigation into the attack on the U.S. Special Mission and Annex in Benghazi

```
 1   back in September of 2012?
 2   A.  Yes.
 3   Q.  And what I'd like to do is show you Government's Exhibit
 4   1100.
 5            MR. DiLORENZO:  May I approach, Your Honor?
 6            THE COURT:  You may.
 7   Q.  Could you please take a look at that.
 8   A.  (Witness reviews document)
 9   Q.  Do you recognize Government's Exhibit 1100?
10   A.  Yes.
11   Q.  What is it?
12   A.  Call data records.
13   Q.  And where did you or the FBI obtain those call data
14   records?
15   A.  I obtained them from Government Agency A.
16   Q.  And could you describe what these call data records are?
17   A.  They're phone records for the telephone number used by
18   Ahmed Abu Khatallah.
19   Q.  And what number are the records for specifically?
20   A.  The last four are 0532.  Do you want me to read the full
21   phone number?
22   Q.  Yes, please.
23   A.  218-926-390532.
24   Q.  And what is the date range of those records?
25   A.  August 1, 2012, to October 21, 2012.
```

1    Q.   And do you know who the service provider is for those

2    phone numbers?

3    A.   Yes.

4    Q.   And who is the service provider?

5    A.   Libyana.

6    Q.   And does Libyana have a more corporate name?

7    A.   Libyana Telecommunications.

8    Q.   And what is Libyana Telecommunications?

9    A.   They're one of two telephone service providers for

10   Libya.

11   Q.   And where is it based?

12   A.   Tripoli, Libya.

13   Q.   And do you know the name of the other telephone service

14   provider in Libya?

15   A.   Yes, AL Madar.

16   Q.   What, if anything, did you do to confirm the

17   authenticity of the records, Government's Exhibit 1100?

18   A.   I met with the CEO of Libyana Telecommunications.

19   Q.   And who is that?

20   A.   Mohamed Ben Ayad.

21   Q.   And how is it that you were able to meet with the CEO of

22   Libyana?

23   A.   We were introduced to Mr. Ayad through a mutual

24   acquaintance.

25   Q.   And did you actually meet with the CEO?

1    A.   Yes.

2    Q.   And was is outside of the United States?

3    A.   Yes, it was.

4    Q.   And when was that meeting?

5    A.   January 27, 2017.

6    Q.   And when you met with the CEO, what, if any, other

7    positions did he have within Libyana?

8    A.   Besides the CEO, he was also project manager, and he

9    previously served on the executive committee.

10   Q.   And were you able in any way to confirm his position

11   with Libyana?

12   A.   Yes.

13   Q.   And how were you able to do that?

14   A.   Through open sources, publicly available information.

15   Q.   And that information confirmed that this individual held

16   that position at Libyana?

17   A.   Yes.

18   Q.   And could you please tell the Court how the meeting

19   began.

20   A.   We were introduced to -- myself and Co-Case Agent Mike

21   Clarke, we were introduced to Mr. Ayad through the mutual

22   acquaintance.  We exchanged greetings, introduced ourselves

23   as FBI agents responsible for investigating the attack on

24   the U.S. Mission and Annex in Benghazi, Libya.

25   Q.   Now, do you speak Arabic?

```
 1    A.   Yes.

 2    Q.   How long have you been speaking Arabic?

 3    A.   Approximately 13 years.

 4    Q.   Would you consider yourself proficient in Arabic?

 5    A.   Proficient, yes.

 6    Q.   Did this meeting take place in Arabic?

 7    A.   No.

 8    Q.   What language was this meeting in?

 9    A.   English.

10    Q.   And was there any difficulty communicating with the CEO?

11    A.   No.

12    Q.   And after identifying yourself as an FBI agent, and --

13    did you indicate what you were interested in?

14    A.   Yes.  We explained to the CEO that we were responsible

15    for investigating the attack on the U.S. Mission and Annex,

16    and we were asking his assistance with a particular matter.

17    Q.   And did he agree to assist you?

18    A.   Yes.

19    Q.   In your conversation with him, did you learn his history

20    with Libyana?

21    A.   Yes.  Mr. Ayad explained that he was with the company

22    since 2004.  He was one of the individuals who helped found

23    the company.

24    Q.   What about any familiarity he had with the business

25    practice or the business records?
```

1    A.   Yes.   He was knowledgeable and familiar with the

2    structure of the business, the company, the internal

3    processes, and related documents.

4    Q.   After explaining to the CEO what it is that you wanted,

5    what did you do?

6    A.   We presented phone records to him, documents in hard

7    copy.

8    Q.   Which records?   The records that are --

9    A.   Yes.   These records.   We presented the records to

10   Mr. Ayad and asked him to review them.

11   Q.   And what did he do?

12   A.   He took several minutes to thumb through the pages

13   looking at the information in the records, the profile page.

14   He explained that they were Libyana CDRs, call data records.

15   Q.   And so when you say he indicated that those were Libyana

16   CDRs, what do you mean?

17   A.   He explained that the format of the records and the core

18   CDRs, call data records, and the profile page was subscriber

19   information that is unique to Libyana.

20   Q.   And is that one of the reasons he based his opinion that

21   these were, in fact, Libyana records?

22   A.   Yes.

23   Q.   Was there anything else in terms of the substance that

24   was noted by the CEO during this conversation?

25   A.   Yes.   The specific phone number that the records are for

1    that was used by Khatallah is unique to Libyana.

2    Q.   And when you talk about the number, what is it about the

3    number that's unique?

4    A.   The prefix.   There are two prefixes that are unique to

5    Libyana.

6    Q.   And do you recall what those prefixes are?

7    A.   Yes, 092 and 094.

8    Q.   And just so we're clear, can you explain to the Court

9    the CEO's statements about these two phone prefixes being

10   unique to only Libyana?   What did he mean by that?

11   A.   Well, phone numbers beginning with those two prefixes,

12   092 or 094, are only subscribed to and service provided by

13   Libyana.

14   Q.   And they wouldn't -- okay.

15            And what prefix did the number that you presented

16   to the CEO have?

17   A.   092.

18   Q.   When you had discussions about the authenticity of these

19   records, did the CEO seem confident?   What was his level of

20   confidence with respect to whether or not these were Libyana

21   records?

22   A.   After reviewing the records, he determined that they

23   were Libyana CDRs.

24   Q.   And during the conversation at all, did he indicate what

25   his role was in the creation of any of the formatting?

1   A.   Yes.   He said specifically the format, the profile page

2   and the core CDRs, he was one of the individuals who helped

3   create that format.

4   Q.   After reviewing the records and telling you that they

5   appeared to be authentic Libyana records, what, if anything,

6   did he do?

7   A.   We presented him with a certificate of authenticity

8   and -- in English and Arabic.   We read it through line by

9   line, word for word, with him in English, asked him if he

10   had any questions, and presented him a copy in English and

11   Arabic for him to review as well.

12   Q.   And if I could show you Government's Exhibit 1102, and

13   what I'll do --

14            MR. DiLORENZO:   Your Honor, if I could approach?

15            THE COURT:   You may.

16   Q.   And I actually have a book in front of you that has

17   Government's Exhibit 1102.   If you can't find it, I can

18   produce another copy, but if you can turn to Government's

19   Exhibit 1102.

20   A.   (Witness reviews document)

21   Q.   Have you located the document?

22   A.   Yes.

23   Q.   And what is Government's Exhibit 1102?

24   A.   This is the certificate of authenticity of business

25   records that we presented to Mr. Ayad on January 27, 2017.

1    Q.  And you indicated there's an English and an Arabic

2    version?

3    A.  Yes, there is.

4    Q.  And was there a discussion with him prior to him filling

5    this out?

6    A.  Yes.  We read it through line by line, word by word,

7    with him in English, presented him a copy so he could read

8    along, and we asked him if he understood it.

9    Q.  And so when you read through it, did you read through

10   the fact that he was attesting that these records would have

11   been made at or near the time of the occurrence of the

12   matters set forth therein?

13   A.  Yes.  We read that, that he declares that the documents

14   that are attached hereto are original records or true copies

15   of records which were made at or near the time of occurrence

16   of the matter set forth therein by or from information

17   transmitted by a person with knowledge of those matters or

18   kept in the course of regularly conducted business activity

19   or made by the said business activity as a regular practice

20   and, if not original records, are duplicates of the original

21   records.

22   Q.  And did he affirm to you orally that these records, to

23   the best of his knowledge, met those conditions?

24   A.  Yes.

25   Q.  And upon doing that, what did he do?

1    A.  He signed the certificate of authenticity business

2    records.

3    Q.  In looking at Government's Exhibit 1102, there is a name

4    at the top where it says "I, the undersigned," and there's a

5    name.

6    A.  Yes.

7    Q.  Who filled that out?

8    A.  Mr. Ayad filled that out.

9    Q.  And that was done in your presence?

10    A.  Yes.

11    Q.  And there is a signature at the bottom.  Do you see

12    that?

13    A.  Yes.

14    Q.  Whose signature is that?

15    A.  Mr. Ayad's.

16    Q.  And that was signed in your presence as well?

17    A.  Yes.

18    Q.  And there is also an Arabic version?

19    A.  There is, yes.

20    Q.  And when he reviewed the certificate of authenticity

21    prior to signing it, did he review both the English and the

22    Arabic?

23    A.  He did.  We gave him both copies.

24    Q.  And did he have any questions or comments or hesitations

25    after your conversation?

1    A.   No.

2    Q.   And how did the meeting conclude?

3    A.   Excuse me?

4    Q.   After he had signed the Government's Exhibit 1102, was

5    there any other conversation?

6    A.   Yes.   We expressed our gratitude for him coming to meet

7    with us, and we asked him if he would be willing and able to

8    reproduce the records from Libyana databases when he

9    returned to Tripoli.

10   Q.   And what did he say?

11   A.   He said yes, he'll look into it and let us know.

12   Q.   And did you have further communication with him?

13   A.   I did, yes.

14   Q.   And when was that?

15   A.   Approximately a week and a half later I received an

16   email from him providing records that were currently

17   available in Libyana databases.

18   Q.   And what I'll do is I could just direct your attention

19   to Government's Exhibit 1104, and that's also in that book.

20   If you could please take a look at Government's Exhibit

21   1104.

22   A.   (Witness reviews document)

23   Q.   Do you recognize Government's Exhibit 1104?

24   A.   Yes.

25   Q.   And what is that?

1    A.   These are the call data records that Mr. Ayad provided

2    to me on February 7, 2017.

3    Q.   Okay.  And the records, do those records include records

4    for the number ending in 0532?

5    A.   Yes, they do.

6    Q.   And is that the same number that you -- of the phone of

7    the records you presented to him back on January 27th of

8    2017?

9    A.   Yes.

10   Q.   Now, did he provide anything else along with the records

11   for the number ending in 0532?

12   A.   There are additional records for two other phone numbers

13   serviced by Libyana.

14   Q.   And what, if any, significance do those numbers have?

15   A.   The two additional phone numbers that Mr. Ayad provided

16   records for on February 7th are also subscribed to the same

17   individual as the 0532 number.

18   Q.   Okay.  So I just want to ask you a couple of questions

19   about the subscriber information.  In the initial records

20   that you presented to the CEO on January 27, 2017, you

21   indicated they were records.  Was there also, like, a

22   subscriber page?

23   A.   Yes, a profile page with subscriber information.

24   Q.   And that was one of the items that the CEO and the

25   format that he indicated were unique to Libyana?

1    A.   Yes.

2    Q.   And could you please turn to the subscriber profile

3    page.

4              MS. PETRAS:   Can I have the exhibit and page

5    number?

6              MR. DiLORENZO:   It's the second-to-last page.

7              THE COURT:   Just for the record, Bates No. 3474;

8    is that correct?

9              MR. DiLORENZO:   That's correct.

10   A.   Yes.

11   Q.   And can you just explain to the Court what that page is.

12   A.   This is the subscriber information for the phone number

13   ending in 0532 in addition to two other phone numbers

14   subscribed to the same individual with service by Libyana.

15   Q.   And the subscriber information, do you know the name

16   that appears on that, or do you know the individual who is a

17   subscriber?

18   A.   Yes.

19   Q.   And who is that?

20   A.   It is Ahmed Abu Khatallah's brother.

21   Q.   And you were requesting phone records for the number you

22   believe to be the defendant's, which is 0532?

23   A.   Yes.

24   Q.   And when the CEO provided these records in February, he

25   provided the records with 0532?

1    A.   He provided records for 0532 as well as 9394 and 6852,

2    all records that were currently available in their

3    databases.

4    Q.   And associated with that subscriber?

5    A.   Yes.

6    Q.   And what was the date range for the records that the CEO

7    was able to provide to you in February of 2017?  And maybe

8    if we could just look at the date range of the records for

9    the number ending in 0532.

10   A.   (Witness reviews document) For 0532, it's -- the date

11   range is February 21, 2014, to April 28, 2014.

12   Q.   Did you have any subsequent discussion with the CEO

13   regarding these records or the date range?

14   A.   Yes.

15   Q.   And can you please tell the Court what that was.

16   A.   I thanked him for sending the records.  I told him that

17   the format looked consistent with the previous records we

18   showed him in January, but the date range was not the date

19   range that we were interested in.

20   Q.   And what was the date range you were interested in?

21   A.   A few months before the attack in September 2012 to a

22   few months after.  I believe I asked him for July to

23   December 2012.

24   Q.   And did he indicate whether there were any issues with

25   respect to retrieving the information in 2017?

1   A.   He stated that the records from 2012 were archived and

2   corrupted, and they were unable to recover them, but their

3   technical officers were working on that.

4   Q.   And what, if any other, further contact did you have

5   with the CEO?

6   A.   In approximately July I provided records to him.

7   Specifically July 12th I sent an electronic copy of the

8   records we showed him in hard copy form in our January

9   meeting.  I sent him an electronic copy of those records,

10   and I asked him to analyze the records and compare them to

11   existing phone records maintained in Libyana databases.

12   Q.   And did he agree to do that?

13   A.   Yes.

14   Q.   And what, if anything, resulted from that?

15   A.   He responded that the records were Libyana CDRs, and he

16   provided a signed certificate of authenticity of business

17   records.

18   Q.   And then if I could direct your attention to

19   Government's Exhibit 103 [sic], which you have.  Do you see

20   that?

21   A.   Yes.

22   Q.   And prior to him sending you -- looking at Government's

23   Exhibit 103, what is it?

24   A.   This is a certificate of authenticity of business

25   records signed by Mr. Ayad.

1 Q. And do you see the date of Government's Exhibit 1103?

2 A. Yes.

3 Q. And what is that?

4 A. July 18, 2017.

5 Q. Okay.  And then -- and this was sent to you?  You

6 indicated that Government's Exhibit 1102 was signed in your

7 presence during the January 27th meeting.  How did you

8 receive Government's Exhibit 1103?

9 A. Mr. Ayad sent it to me via email.

10 Q. And you indicated that the CEO indicated that he

11 compared the records?

12 A. Yes.

13 Q. Can you drill down on some of the details about what the

14 CEO was able to compare the records to that you had sent

15 him?

16 A. He compared the records to other phone records for other

17 phone numbers maintained in Libyana databases.

18 Q. And was he able to compare them specifically to the

19 phone records with the number ending in 0532 during the time

20 period of August 2012 through October 2012?

21 A. No.  As he indicated before, those historical records

22 were corrupted, and they were trying to recover them.

23 Q. So what, if any, other comparison was he able to do to

24 satisfy him that these records were authentic?

25 A. He was able to compare the format to existing records

```
 1      for other phone numbers.
 2      Q.   And what did he conclude?
 3      A.   He concluded that they were, in fact, Libyana CDRs.
 4      Q.   And then he sent you Government's Exhibit 1103, which is
 5      a second certificate of service --
 6      A.   Yes.
 7      Q.   -- completed by him.
 8                And, again, this document appears to have two
 9      pages, an English and an Arabic.
10      A.   Yes.   I sent him English and Arabic versions.
11      Q.   And both versions appear to have the same signature?
12      A.   Yes.
13      Q.   Now, did you have any discussions with the CEO regarding
14      the general business practice of Libyana?
15      A.   Yes, during our January 27, 2017, meeting.
16      Q.   And what did that consist of?
17      A.   He explained that Libyana maintains call data records
18      and other business records as a matter of general practice.
19      Q.   And did you, either through your conversation with him
20      or through your experience as an FBI agent, have any
21      knowledge of whether or not these records -- the accuracy
22      and accountability have any importance?
23      A.   Yes, they do.
24      Q.   And why is that?
25      A.   For accountability of business transactions, billing, et
```

1    cetera.

2    Q.  After receiving this information, what, if anything, did

3    you or the FBI do to confirm that the phone records,

4    Government's Exhibit 1100, were authentic?

5    A.  I analyzed the phone records in conjunction with the

6    rest of the investigation.

7    Q.  And generally what was your conclusion?

8    A.  The records were accurate.

9    Q.  And could you please give us some specific examples.

10   A.  Yes.  During our interviews of Abu Khatallah in June

11   2014, we asked him about a specific phone number, and

12   Khatallah stated that the phone number was used by an

13   associate named Salah Al-Amari.

14   Q.  Do you recall what that number ended in?

15   A.  Yes.  The last four digits are 8891.

16            THE COURT REPORTER:  Can you spell that name,

17   please?

18            THE WITNESS:  S-a-l-a-h, A-l, A-m-a-r-i

19   Q.  And what, if anything, did you learn about whether --

20   what, if anything, did the investigation reveal about any

21   contacts the defendant may have had with that individual?

22   A.  Again, during our interviews of Khatallah in June 2014,

23   he also stated that during the evening of the attack,

24   September 11, 2012, shortly after 8:30 p.m., he was leaving

25   the house of another individual and that he thought he may

1    have called Salah Al-Amari.

2    Q.   And did you have occasion to look at the phone records

3    to see if that phone call took place?

4    A.   Yes.   I analyzed the phone records, and I found a call

5    between the phone number used by Khatallah and the phone

6    number used by Amari at approximately 8:39 p.m.

7    Q.   And if I could just direct your attention to the phone

8    records, could you point that out in the phone record.   And

9    I believe it's on Page 3433.

10            MS. PETRAS:   I'm sorry, I didn't hear the page

11   number.

12            MR. DiLORENZO:   3433.

13   A.   Yes.

14   Q.   And do you see an entry there for a phone call

15   confirming that information?

16   A.   Yes.   The entry number is 1577.

17   Q.   And when you say that, that's the number that appears on

18   the right-hand side of Page 3433?

19   A.   Yes, the first column on the right between phone number

20   0532 used by Khatallah and phone number 8891 used by Amari

21   on September 11, 2012, at approximately 8:39 p.m.

22   Q.   Now, the number you indicated, 8891, was connected to

23   Al-Amari.   How do you know that that number was connected to

24   Al-Amari?

25   A.   During our June 2014 interviews of Khatallah, we asked

1    him about the user of this specific phone number, and he

2    stated that it was used by an associate named Salah Al-

3    Amari.

4    Q.   Now, could you share with the Court any other examples

5    of the investigation confirming the authenticity of the

6    records?

7    A.   Yes.   I interviewed another -- a witness to the attack

8    who explained that he had a phone conversation with

9    Khatallah during the attack.   The witness provided the phone

10   number that he used, and he provided the phone number that

11   Khatallah used, and he provided the approximate time that

12   the phone call took place.

13   Q.   And do you recall the number -- the last four digits of

14   the number that the witness said that he had used?

15   A.   Yes.

16   Q.   And what is that?

17   A.   1530.

18   Q.   And do you recall the last four digits of the number

19   that he said that the defendant was using that evening?

20   A.   Yes, 0532.

21   Q.   Now, in your investigation, specifically your interview

22   of the defendant, did he provide any statements concerning

23   this phone call?

24   A.   Yes.   During our June 2014 interviews Khatallah stated

25   that he had a phone conversation with that witness.

```
 1    Q.   And did he say that occurred during the attack?
 2    A.   Yes, during the attack.
 3    Q.   And that would be on September 11th of 2012?
 4    A.   2012, yes.
 5    Q.   And did you have occasion to look at the records to see
 6    if that record appeared on Government's Exhibit 11 --
 7    A.   Yes.  I analyzed the phone records, and I found a phone
 8    call between Khatallah and the witness during the evening of
 9    September 11, 2012, at approximately 10:20 p.m.
10    Q.   And do you see that -- and could I direct your attention
11    to Page 3434?
12    A.   Yes.
13    Q.   And do you see a record of that call on these records
14    confirming that that call took place?
15    A.   Yes.  It's Row 1608 between phone number ending in 0532
16    and phone number ending in 1530 at 10:20 p.m. on September
17    11, 2012.
18    Q.   In general, were there other examples confirming the
19    authenticity of these records?
20    A.   Excuse me?
21    Q.   Were there other examples generally of --
22    A.   Generally, yes.
23    Q.   And, I mean, what -- to you, as an investigator, what is
24    the significance of these calls matching with the evidence?
25    A.   It confirms the authenticity of the records, and that
```

```
 1    they're accurate.
 2              MR. DiLORENZO:  Your Honor, I have nothing further
 3    at this time.
 4              THE COURT:  Okay.  Could you all approach for one
 5    minute.
 6              (The following is a conference held at the
 7              bench outside the hearing of the gallery)
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12                    (This is the end of the bench conference)
13    BY MR. DiLORENZO:
14    Q.   Just very briefly, you had referenced the FBI had
15    obtained these records from the Government Agency A, without
16    naming the agency.  Do you know when or approximately when
17    the FBI obtained these records from that agency?
18    A.   Approximately October 2012.
19    Q.   Okay.
20              MR. DiLORENZO:  Great.  Thank you, Your Honor.  I
21    have nothing further for the witness.
22                         CROSS-EXAMINATION
23    BY MS. PETRAS:
24    Q.   Good afternoon, Agent O'Donnell.
25    A.   Good afternoon.
```

1  Q.  I have three 302s that you wrote in relation to this

2  case.  One in January -- one that reports the January 27th

3  interview of Mr. Ayad, one that reports July 12th

4  interaction, and one that reports a February 7, 2017.  Did

5  you write any other 302s about any -- in relation to these

6  telephone records?

7  A.  No.

8  Q.  When you talked to Mr. Ayad in January, it was in

9  Tunisia, correct?

10 A.  Yes.

11 Q.  Did you take notes of that conversation?

12 A.  Yes.

13 Q.  And those notes are two pages, correct?

14 A.  Yes.

15 Q.  And when you talked to him over -- other than that, did

16 you ever meet him in person?

17 A.  No.

18 Q.  You've only met him in person that one time?

19 A.  Yes.

20 Q.  Okay.  Did you ever talk to him over the phone?

21 A.  Yes.

22 Q.  Did you take any notes during any of those phone calls?

23 A.  No.

24 Q.  Were any of the phone calls recorded?

25 A.  No.

1    Q.   Okay.   The email exchanges that you had with him, you

2    provided some of that to government counsel, correct?

3    A.   Yes.

4    Q.   And other than the three pages that you provided to

5    government counsel with regard to email exchanges, did you

6    have any other email exchanges at all with Mr. Ayad?

7    A.   No.

8    Q.   Did you testify in the grand jury in this case?

9    A.   No.

10   Q.   Have you ever testified in relation to this case?

11   A.   No.

12   Q.   So have you ever testified in relation to these phone

13   records at all?

14   A.   No.

15   Q.   Did you send any emails to the U.S. Attorney's Office

16   about the emails?

17   A.   Yes.

18   Q.   And the certifications?

19   A.   Yes.

20   Q.   And what was going on with trying to get the information

21   from Mr. Ayad?

22   A.   No.   I sent them the 302s and the accompanying

23   certification and the phone records that he provided.

24   Q.   And you sent all that by emails?

25   A.   Yes.

1    Q.  Did you say anything in the emails other than sending

2    the documents?

3    A.  No.

4    Q.  Okay.  When you originally got the records from the

5    agency you referred to as Government Agency A, did you

6    personally go to Government Agency A and get those records?

7    A.  No.

8    Q.  Was it Agent Clarke who got the records?

9    A.  No.

10   Q.  Was it somebody else in the FBI?

11   A.  No.  They're shared with the community.

12   Q.  Okay.  So you got the records off of a joint database?

13   A.  Yes.

14   Q.  Okay.  And from -- do you know what date they were

15   first -- what date did you first access them on that

16   database?

17   A.  I don't remember that.

18   Q.  You don't remember.

19   A.  No.

20   Q.  Do you remember the first time somebody in the FBI

21   accessed them?

22   A.  I don't know that.

23   Q.  Who has access to the records in that database?

24   A.  I can't answer that question.  I have access to it, but

25   I don't know everyone in the government who has access to

1    it.

2    Q.   But a lot of people in the FBI have access to it,

3    correct?

4    A.   Sure.

5    Q.   It's a joint intelligence database, correct?

6    A.   Yes.

7    Q.   And so people in the other government agency have it,

8    correct?   Does Agency A have access?

9    A.   I don't know that.

10   Q.   You don't know -- okay.

11   A.   I don't work for that government agency.

12   Q.   Okay.   But it's fair to say that a lot of people in the

13   government have access to that database?

14   A.   Yes.

15   Q.   Okay.   Now you've got two certificates of authorization

16   from Mr. Ayad, correct?

17   A.   Yes.

18   Q.   And you got the first one in January, right?

19   A.   Yes.

20   Q.   And then you realized that that one wasn't going to be

21   sufficient so you had to get another one, correct?

22   A.   No.   I asked him to -- if he was willing and able to

23   reproduce the records organically from Libyana databases --

24   Q.   I remember.   I'm asking --

25   A.   -- as a result of our January meeting.

1    Q.   I'm asking you why -- you already had a certificate of

2    authenticity from January though, correct?

3    A.   Uh-huh, yes.

4    Q.   But you felt the need to get another one in July,

5    correct?

6    A.   That was when I provided the records to him

7    electronically.

8    Q.   Okay.

9    A.   In January I presented him a hard copy, and when we left

10   the meeting, he did not take it with him.

11   Q.   Okay.  So what he did in January and then signed the

12   certificate you knew was not sufficient to authenticate the

13   records, correct?  So that's why you did what you did in

14   July?

15   A.   I didn't know that.

16   Q.   So did somebody tell you to go and get a different

17   certificate of authorization?

18   A.   Consulting with the U.S. Attorney's Office.

19   Q.   Okay.  So you gave the first certificate of

20   authorization that you got in January, you gave it to the

21   U.S. Attorney's Office?

22   A.   Certificate of authenticity.

23   Q.   I'm sorry, yes.  Correct?

24   A.   Yes.

25   Q.   And you explained to them how you got it and gave them

1    the 302 as well, correct?

2    A.  Yes.

3    Q.  Okay.  So then one of these attorneys sitting here today

4    then came to you and said, "That's not good enough.  You

5    need to do more."  Correct?

6    A.  They again asked if he was able to provide us the same

7    records from 2012.

8    Q.  And authenticate them, correct?

9    A.  If he was able to provide them, he would authenticate

10   them, yes.

11   Q.  Okay.

12   A.  That was our February interaction.

13   Q.  Okay.  And that was back in February.  So as soon as you

14   got this -- let me just back up for a minute.

15         When you first accessed the records, it wasn't

16   getting them from Mr. -- from Libyana.  It was getting them

17   from the electronic database, correct?

18   A.  Yes.

19   Q.  And at that point the only thing you knew about where

20   the records came from was on that database, correct?

21   A.  Yes.

22   Q.  So if there was a report that went along with the

23   records, that's what you knew about how the records came to

24   be on the database, correct?

25   A.  Yes.

1   Q.   All right.  And the next thing that you did was contact

2   through someone else Mr. Ayad?

3   A.   Excuse me?

4   Q.   The next thing you did in order to authenticate the

5   records was contact Mr. Ayad?

6   A.   Yes.  We were introduced to him through a mutual

7   contact.

8   Q.   Okay.  And at that first meeting in January of 2017 you

9   said -- Mr. Ayad speaks English, right?

10  A.   Yes.

11  Q.   And so you talked to him about the Libyana company,

12  correct?

13  A.   Yes.

14  Q.   And your understanding was that he was currently the

15  CEO?

16  A.   He was currently the CEO and the project manager.

17  Q.   Okay.  And you said that one of the ways that you looked

18  into who he was was through open source materials, correct?

19  A.   Yes.

20  Q.   And you looked at his LinkedIn page, correct?

21  A.   I don't remember exactly, but there were several

22  articles about him.

23  Q.   But you testified in response to Mr. DiLorenzo that you

24  looked at his LinkedIn page, correct?

25  A.   I never said "LinkedIn," no.

```
 1    Q.  Oh, I'm sorry.  Did you look at the LinkedIn page?

 2    A.  No.  I don't know that he has a LinkedIn page.

 3    Q.  Did you look at his resume?

 4    A.  I don't remember seeing a resume either.

 5    Q.  Are you aware that his LinkedIn page indicates that

 6    his -- since October of 2011 he's been the CEO of a

 7    company called -- I'm going to butcher it so I'm going to

 8    spell it -- E-t-i-s-a-l-a-t 09 ICT LTD Libya?

 9    A.  No.

10    Q.  But your understanding when you met with him in January

11    of 2007 was that he was the CEO of Libyana at that time?

12    A.  January 2017?

13    Q.  Uh-huh.

14    A.  Yes.

15    Q.  Okay.  And did you know -- and you said you tried to

16    confirm some information about him, correct?

17    A.  Yes.

18    Q.  So you knew that Mr. Ayad has a particularly strong

19    incentive to curry favor with the United States, right?

20    A.  No.

21    Q.  Well, he's the CEO of Libyana, right?

22    A.  How does that have to do with currying favor with the

23    United States?

24    Q.  Well, at the time in 2011 he was particularly opposed to

25    the NATO air strikes, correct?
```

1    A.   I wasn't aware of that information.

2    Q.   Were you aware that he was very outspoken about them?

3    A.   No.

4    Q.   That he was a Gaddafi loyalist?

5    A.   No.

6    Q.   Were you aware that he would do anything to protect

7    Libyana?

8    A.   No.

9    Q.   Were you aware that he indicated that he would use human

10   shields to protect Libyana?

11   A.   No.

12   Q.   Were you aware that he gave a press conference with a

13   PowerPoint and explained that they had 20 -- while another

14   official was explaining that they had 20,000 employees that

15   they were going to put by the Libyana facilities to protect

16   them?

17   A.   When another -- what was explained?

18   Q.   That he gave a PowerPoint presentation where he

19   explained that Libyana was prepared to protect their

20   facilities from NATO air strikes with human shields?

21   A.   No, I wasn't aware of that.

22   Q.   Are you aware that he has -- you're aware from your

23   investigation that if Mr. Ayad is a Gaddafi loyalist, he

24   would be particularly opposed to someone like Mr. Abu

25   Khatallah who participated in the revolution, correct?

1    A.   No.   I'm not aware if he's a Gaddafi loyalist.

2    Q.   Okay.   But you do know that Gaddafi loyalists are

3    particularly opposed to individuals who participated in the

4    revolution?

5    A.   No.   That's not true.

6    Q.   Well, the revolution was the loyalists against the

7    revolutionaries, correct?

8              MR. DiLORENZO:   Objection, Your Honor.

9    A.   We didn't discuss politics.

10             THE COURT:   You can answer.

11   A.   We didn't discuss politics in our January 2017 meeting.

12   Q.   So you don't know if he had any particular bias against

13   Mr. Abu Khatallah?

14   A.   No.

15   Q.   At that first meeting in Tunisia, was anyone other than

16   you and Agent Clarke and Mr. Ayad present?

17   A.   Anyone other than myself and Agent Clarke present?

18   Q.   And Mr. Ayad.

19   A.   Yes, the individual who brokered the meeting.

20   Q.   Okay.   And that person does not work for Libyana,

21   correct?

22   A.   No.

23   Q.   All right.   So at that point you showed him the records

24   that you pulled off the government's website or database,

25   correct?

1    A.   Yes, hard copy form.

2    Q.   All right.  And he indicated to you that he thought that

3    that was how Libyana keeps their records, correct?

4    A.   He indicated that Libyana maintains call data records or

5    documents as a matter of general business practice, yes.

6    Q.   And you said that he recognized the profile page.  Can

7    you explain what you mean by that?

8    A.   Do you want me to point it out from the government

9    exhibit?

10   Q.   Yes, please.  What you showed to him is what's marked as

11   Government's Exhibit 1100, correct?

12   A.   Yes.

13   Q.   So on Exhibit 1100 can you, by Bates-stamp number,

14   identify what you mean by a profile page?

15   A.   3474.  That's how he described that page, 3474, as the

16   profile page.

17   Q.   So when he recognized the profile page, he just

18   recognized the subscriber -- the format in which the

19   subscriber information was provided, correct?

20   A.   Yes, the appearance, the format.

21   Q.   Okay.  Did he say that he recognized the format that's

22   in pages Bates-stamped 3400 to 3474?

23   A.   Yes.

24   Q.   That that's the format that they keep their records in,

25   according to him?

1    A.   Yes.

2    Q.   Okay.   Then based just on looking at the records,

3    without comparing them to anything, he was willing to sign

4    the certificate that's been marked as Government's Exhibit

5    1102, correct?

6    A.   Yes, his visual review of the records, the format, the

7    subscriber information.

8    Q.   But there was no way at that point -- because he was in

9    Tunisia and Libyana is in Libya, he had no way of verifying

10   whether or not the data that's in this spreadsheet is

11   correct, correct?

12   A.   The actual call events?

13   Q.   Yes.

14   A.   Yes, he did not.

15   Q.   He did not and could not at that point?

16   A.   Not at the January meeting, no.

17   Q.   Okay.   And then in February you decide to seek the

18   actual records from him, correct?

19   A.   That was a result of the January meeting.   When we left

20   the January meeting, we asked him if he would be willing and

21   able to reproduce the records from 2012.

22   Q.   Okay.   So do you call him?   Do you send him an email?

23   What do you do?

24   A.   No.   He sent me an email on February 7th providing the

25   records that were currently available at that time in

1   Libyana databases for that phone number of interest to us.

2   Q.  Okay.  And so the first time you heard from him after

3   January was February 7th?

4   A.  Yes, about a week and a half later.

5   Q.  Okay.  And then what he said to you on February 7th is

6   what's marked as Government's Exhibit 1104, correct?

7   A.  Yes.

8           THE COURT:  I'm sorry, sir.  Just to be clear, did

9   you request at the January meeting that he go back and find

10  the original records?

11          THE WITNESS:  Yes, sir.

12          THE COURT:  He responded to that request in

13  February?

14          THE WITNESS:  About ten days later.

15          THE COURT:  Okay.

16          THE WITNESS:  From the January meeting, I

17  requested that he provide the records from 2012.

18          THE COURT:  Okay.

19  Q.  And then he sends them to you.  He sends you records on

20  February 7th, and you, a couple of hours later, respond and

21  say, "Well, that's not quite what we need.  We need July to

22  December of 2012."  Correct?

23  A.  Yes.

24  Q.  All right.  So then he sends back -- and this is marked

25  as Government's Exhibit --

```
 1    A.   He told me in that exchange that the records from 2012
 2    were archived, and they were attempting to recover them.
 3    Q.   Okay.
 4    A.   That was all that was available, what he provided on
 5    February 7th.  That's all that was available.
 6    Q.   Those email exchanges are marked as part of Government's
 7    Exhibit 1105 Bates-stamped No. 3722, correct?
 8              So in response --
 9    A.   Can you repeat your question, please?
10    Q.   Can you look at Exhibit 1105, Bates-stamp No. 3722.
11    A.   Yes, I'm looking at that.
12    Q.   Okay.  And in response to you, he says -- in response to
13    you asking for the 2012, he says, "It's archived data, need
14    recovery.  You know I'm not dreading Libyana since 2015
15    until end of -- 2011 until end of 2015."  Do you know what
16    he meant by that?
17    A.   I don't, no.  He followed with so many problems and data
18    was lost as well, many casual system problems happened.
19    Q.   Correct.  He was indicating to you that it was quite
20    possible that the information didn't exist at all, correct?
21    A.   Yes.
22    Q.   Okay.  Then the next thing that happened -- or do you
23    have any contact with him at all between February 7th, that
24    email of him telling you that the data -- that they have
25    many problems?  And to be clear, he said they had problems
```

1    and data was lost as well as many causal system problems,

2    correct?

3    A.  Yes.

4    Q.  So some information could have been lost, and some could

5    have been corrupted, correct?

6    A.  I don't know that.

7    Q.  But --

8    A.  He said that they were working on it, their technical

9    officers.

10   Q.  Okay.  But he indicated the problems began in September

11   of 2011, correct?

12   A.  He didn't indicate that they began in 2011.

13   Q.  You don't -- his reference to dreading Libyana since

14   September 2011 until end of 2015, correct?

15   A.  No.  The records from that time period are corrupted,

16   missing, et cetera, as he indicated.

17   Q.  Right.

18   A.  Not that it began in 2011, but the records from that

19   time period.

20   Q.  Okay.  So whenever it began, at that point the records

21   could have been corrupted, correct?

22   A.  I don't know when it began.

23   Q.  Okay.  The next contact you had with him was in July of

24   2017, correct?

25   A.  Yes.

1    Q.  And in July of 2017, it's -- let me ask you this:

2    Between February and July 12th of 2017, when you had -- did

3    you have any contact with him?

4    A.  No.  We left our February email exchange in that he

5    indicated his technical officers were working on recovering

6    the historical files from 2012 that we were interested in.

7    Q.  Okay.  So the next thing that happens is on -- did you

8    talk to him by phone before you send him an email on July

9    12th?

10    A.  Yes.

11    Q.  Okay.  And what's that phone conversation?

12    A.  I called him.  I explained that I was going to send him

13    an email with an electronic version of the phone records we

14    presented to him in hard copy form in our January meeting,

15    and that I asked him to analyze the records, compare them to

16    phone records that were maintained in Libyana databases.

17    Q.  Okay.  And you asked him to compare that so that he

18    could verify that they were Libyana records, correct?

19    A.  Yes.

20    Q.  Okay.  And then you also sent him another certificate to

21    sign, correct?

22    A.  Yes.

23    Q.  And the idea was he would compare the records and be

24    able to verify them and sign the certificate?

25    A.  If he were able to verify them, yes.

```
 1    Q.   Okay.  So then you send him -- after he sends that, you
 2    send it -- and this is the following page of Exhibit 1105,
 3    3723.  You send him the certificate, and he writes back that
 4    he'll send it.  He'll sign it and send it back to you when
 5    he gets back from wherever he is, correct?
 6    A.   Yes.
 7    Q.   Okay.  So apparently he's away from the office, but in
 8    response to your sending the certificate, he says he'll sign
 9    it, correct?
10    A.   Yes.  I sent him the phone records first.  In a
11    subsequent email I sent him a blank certification to sign if
12    he was able to verify that the records were Libyana CDRs.
13    Q.   Okay.  So you sent him the phone records, and he takes a
14    look at them, right?
15    A.   Yes.
16    Q.   Those pages in the exhibit are backwards, correct?
17    3724, those email exchanges come before 3724 -- '23, I'm
18    sorry.
19    A.   They do, yes.
20    Q.   Okay.  So first you sent him the records to look at, and
21    he looks at it and again says, just by looking at them, that
22    yes, it's Libyana CDRs, right?
23    A.   Yes, approximately two days later.
24    Q.   Approximately two days later.  But he also says, "It's
25    strange.  Most of them lost Cell LAC and display null?," and
```

1    then indicating there's something strange about them,

2    correct?

3    A.   Yes.

4    Q.   And then he also says, "The file you send created in

5    June 2017," correct?

6    A.   Yes.

7    Q.   So he's noticing that the records you sent him, the file

8    looks like it's created in June 2017, so he's a little

9    confused about that, right?

10   A.   Yes.

11   Q.   And you send him the certification?

12   A.   Yes.

13   Q.   And he says he'll sign it?

14   A.   Yes.

15   Q.   And then he sends it back to you, correct?

16   A.   He replied back after confirming that they were Libyana

17   CDRs.  He replied to the second email saying once he

18   returns, he will sign the certification and return it to me.

19   Q.   Okay.  And so you get the certification, and then you

20   give it to the U.S. Attorney's Office, and everything seems

21   fine, correct?

22   A.   Yes.

23   Q.   Because he told you that he had compared the phone

24   records to phone records that existed in Libyana?

25   A.   Yes.

1    Q.   But, in fact, he had not compared them, correct?

2    A.   He did compare them.  Not for phone records for 0532

3    during 2012; he compared them to other phone records

4    maintained in Libyana databases currently.

5    Q.   All right.  So at that time we agree, right, he could

6    not have compared them to the records that are in

7    Government's Exhibit 1100 because they don't exist anymore,

8    correct?

9    A.   Compared specific call events?

10   Q.   Correct.

11   A.   That's correct, yes.  He could not.

12   Q.   All right.  And so when you say he compared them, that's

13   no different than what he did in January, right?  Because in

14   January he knows what his records look like.  He started the

15   company, right?

16   A.   No.  It's different.

17             In the January meeting we presented him hard copy

18   form of the records.  On July 12th I sent him an electronic

19   version.

20   Q.   And the electronic version was the same thing as that

21   hard copy version, correct?

22   A.   But he did not take the hard copy with him at the

23   conclusion of the January meeting.

24   Q.   Okay.  But when you talked to him in January, he was

25   able to look at those records and certify it and didn't need

1    to do anything else, right?

2    A.   That's correct.

3.   Q.   And then when you talked to him in July, you sent them

4    to him and asked him to compare them to the actual records

5    of the calls that are reflected on Government's Exhibit

6    1100, correct?

7    A.   No.  He said he wasn't able to.  He wasn't able to view

8    the records.  They're corrupt.  I asked him to --

9    Q.   When did he say that to you?

10   A.   On the telephone.  I asked him to compare the records to

11   existing records in Libyana.

12   Q.   When on the telephone did you ask him to compare them to

13   the actual records and he tell you that they didn't have

14   them anymore?

15   A.   Before.

16   Q.   Before when?

17   A.   Before I sent him the email.

18   Q.   Okay.  So before July 12th.  The July 12th email that is

19   on FBI Bates-stamp 03724 where you're sending the phone

20   records to him, before that --

21   A.   Can you point me to the correct email, please.

22   Q.   1105, the last page of the exhibit.

23   A.   And what's the Bates stamp?

24   Q.   3724.  It's the last page.

25   A.   Okay.

1    Q.   So then you said to him -- you sent him the records, but

2    before that you're saying you had a phone call with him.

3    A.   I called him before I sent him the records to explain

4    what I was asking of him, yes.

5    Q.   Okay.  And in that phone call he told you that the phone

6    records that are in Government's Exhibit 1100 from the year

7    2012 no longer exist, correct?

8    A.   Yes.  He confirmed, as he indicated in his February 7th

9    email to me, that the records from 2012 were corrupt, and

10   he's unable to view them.

11   Q.   Okay.  So you --

12   A.   So I asked him to compare them to existing records

13   currently maintained in their database.

14   Q.   Okay.  So you knew as of February 2017 that the records

15   that are in Government's Exhibit 1100 are no longer

16   maintained by Libyana.  They don't exist.

17   A.   Yes.  He indicated that in his February email.

18   Q.   Okay.  And in January, when he signed that certification

19   that these were Libyana business records, those records were

20   not, in fact, maintained by Libyana at that time, correct?

21   A.   I'm sorry, could you ask that question again?

22   Q.   In January when he signed the certification, the first

23   certification, the records were not actually maintained by

24   Libyana at that time?

25   A.   He didn't state that during our January meeting.

1   Q.   Okay.   Moving up to July, the July certification, at the

2   time that he signed that, you know that the records did not

3   exist in the Libyana database?

4   A.   Yes.   He indicated that initially in February, when he

5   sent that email.   Then when I called him in July before I

6   sent him the electronic version of the records, and I asked

7   him on the phone to compare the records I am sending him to

8   the records in their database, he said, "We still have not

9   been able to recover them."

10   Q.   Okay.

11   A.   "I can't compare them to the exact records from 2012."

12   Q.   Okay.   So you knew then that there was no way -- where

13   on those records it says that a particular phone number

14   called another phone number at a particular date and time,

15   there was no way for him to verify that, correct?

16   A.   He said he couldn't compare them to the exact records

17   that I'm providing him.

18   Q.   Right, okay.

19   A.   The call may exist in another call data record for

20   another phone number possibly.   I don't know that.

21   Q.   All right.   And all of this information that you had

22   that they no longer -- the phone records no longer existed

23   but he was signing off on it based on just some general

24   comparison, all that information you gave to the U.S.

25   Attorney's Office, correct?

1   A.   Yes.

2   Q.   Okay.  And the general comparison that you were asking

3   him to do was looking at the headers?

4   A.   What do you mean by "headers"?

5   Q.   What were you asking him to look at?  If he can't

6   compare that this number called this number at this time,

7   what's he comparing it to?

8   A.   The format, all the phone numbers in there.

9   Q.   Okay.

10  A.   Confirm as he did in his January certification.

11  Q.   Okay.  And so he confirmed for you that the format was

12  the same as the Libyana records, correct?

13  A.   Yes.

14  Q.   Now, the records that he had sent to you in February

15  were clearly Libyana records, right?

16  A.   Yes.

17  Q.   Okay.  Because he got those from the Libyana database.

18  A.   He did.

19  Q.   Let me ask you to look at -- you speak Arabic, correct?

20  A.   Yes.

21  Q.   Okay.  I'm going to ask you to look at Government's

22  Exhibit No. 1104.  Those are the records we know are Libyana

23  records, correct?  That are the way that Libyana maintains

24  their records, correct?

25  A.   For the records he provided, February, for that date

```
 1    range, yes.
 2    Q.  Okay.  And do you see the headers across the top in
 3    Arabic?
 4    A.  I do.
 5    Q.  All right.  And the first column across the top reads I
 6    guess literally -- I can't read my own writing, I'm sorry --
 7    "Timing of the beginning" -- "Timing of the beginning of the
 8    call," correct?
 9    A.  Could you please provide a Bates stamp, please.
10    Q.  2438, Government's Exhibit 1104.  These are the records
11    that you received from Mr. Ayad in February, correct?
12    A.  Yes.
13    Q.  Okay.  Across the top, the header reads -- I'm doing it
14    backwards.
15              MS. PETRAS:  May I ask the Court's indulgence?
16              (Pause)
17    Q.  Okay.  The header across the top, the first column, the
18    header at the top says "Number," correct?
19    A.  Starting from the left?
20    Q.  I'm going to start from the left, yes.
21    A.  Okay.
22    Q.  Yes?
23    A.  Yes.
24    Q.  The second column reads "Caller," correct?
25    A.  Yes.
```

1   Q.  Or literally translated, "The one that calls"?

2   A.  Yes, the caller who initiated the phone call.

3   Q.  Okay.  The next column reads "Receiver," correct?

4   A.  Yes.

5   Q.  Or "The one that receives," correct?

6   A.  Yes, the person who received the phone call.

7   Q.  And the next column reads "Duration," correct?

8   A.  Yes.

9   Q.  And the next column reads "Date"?

10  A.  Yes.

11  Q.  And that's the translation of the Arabic across the top,

12  right?

13          Now, if you could turn to Government's Exhibit

14  1100, on the first page marked 3400, the headers on that

15  where it says "Cell B LAC B, Cell A LAC A," those columns

16  are not on the records that you received in February of 2017

17  from Mr. Ayad, correct?

18  A.  Correct.  They're different.

19  Q.  Okay.  And then the column headings are different as

20  well, correct?  The Arabic is different.  They might mean

21  the same, but the Arabic wording is different, correct?

22          Let's do it this way.

23  A.  Yes.

24  Q.  The first column in Arabic reads --

25  A.  I know what you mean.  They're different, yes.

1    Q.   They're different.

2    A.   Yes.

3    Q.   And just so that the Court knows what we mean, the first

4    column in Arabic says "Time of beginning of call," correct?

5    A.   What government exhibit are you talking about?

6    Q.   I'm looking at Government's Exhibit 1100.

7    A.   Okay.

8    Q.   Bates-stamped No. 3400.

9    A.   Okay.

10   Q.   The top of the page.  The first column.

11   A.   From the left?

12   Q.   From the left.

13          THE COURT:   The first one in Arabic, what does

14   that say?

15          THE WITNESS:   Yes.

16   Q.   "Time of beginning of call," correct?

17   A.   Yes.

18   Q.   The second one reads "Duration of call," correct?

19   A.   Yes.  Yes.

20   Q.   And just to compare them, that says "Duration of call"

21   whereas the column that corresponds to duration on

22   Government's Exhibit 1104 just says "Duration," correct?

23   A.   Yes.

24   Q.   And then the next column on Government's Exhibit 1100,

25   third Arabic column, says "Receiving number," correct?

1    A.   Yes.

2    Q.   And so that Arabic is different than the receiver column

3    in -- which is the third column in Government's Exhibit

4    1104, the records that you received in February, correct?

5    A.   Slightly different.

6    Q.   Slightly different.

7         And then the next column says "Calling number,"

8    correct?

9    A.   Yes.

10   Q.   As opposed to just "Caller," which is on Government's

11   Exhibit 1104, so slightly different as well?

12   A.   Slightly different, yes.

13   Q.   So all of the headers there are slightly different, the

14   Arabic?

15   A.   Yes.

16        MS. PETRAS:   May I have the Court's indulgence?   I

17   may be done.

18   Q.   Oh, you said that you were able to verify some of these

19   records based on what you say other people said, so whether

20   hearsay, correct?

21   A.   Excuse me?

22   Q.   Other people said things that you say verify these

23   records, correct?

24   A.   Yes, the defendant and a witness.

25   Q.   Okay.   First of all, that last page of -- second-to-last

1    page of Government's Exhibit 1100 that's Bates-stamped 3474,

2    what you call the profile page.

3    A.  Yes, the CEO called it the profile page.

4    Q.  What does it say -- who does it say the subscriber is?

5    A.  Bubakr Salim Faraj.

6    Q.  Can you spell that, please.

7    A.  B-u-b-a-k-r, S-a-l-i-m, F-a-r-a-j.

8    Q.  And that same subscriber information is for -- is on all

9    of the phone records that you got from -- for the three

10    numbers in February of 2017, correct?  The same subscriber

11    information?

12    A.  Could you ask that question again?  If you're referring

13    to a specific document, could you provide the Bates stamp.

14    Q.  In February of 2017 you got records for three different

15    phone numbers, correct?

16    A.  Yes, all associated with the same subscriber.

17    Q.  The subscriber information for all three of them was the

18    same?

19    A.  Yes.

20    Q.  When you said that Mr. Ayad compared the records in 2017

21    to some other records that were there, you don't know what

22    specifically he compared them to, correct?

23    A.  No.

24    Q.  He never sent you anything to say, "This is what I

25    compared it to"?

1    A.   No.

2    Q.   Okay.  Those records that are marked as Government's

3    Exhibit No. 1100, you never asked Mr. Abu Khatallah about

4    anything in those records, correct?

5    A.   Asked the defendant?

6    Q.   Correct.

7    A.   No.

8    Q.   And you said then that you verified it through what you

9    say his statements were and what you say another witness

10   said, and you pointed to two calls on Exhibit No. 1100.  The

11   one at Line 1155 -- I'm sorry, 1177 on Bates-stamp 3425.

12   A.   Could you repeat the number, the tab number.

13   Q.   On Government's Exhibit 1100 you identified two calls in

14   particular, correct --

15   A.   Yes.

16   Q.   -- when you were speaking to Mr. DiLorenzo?

17   A.   Yes.

18   Q.   Do you remember the line numbers?

19   A.   Do you want me to identify them for you?

20   Q.   Pardon me?

21   A.   Do you want me to identify the two phone calls for you?

22   Q.   Yes.  Give me the line number of the first one you

23   talked about.  I think you said it was 1577.

24   A.   Yes, the digit in the right column is 1577.

25   Q.   Okay.

1    A.   The phone call is --

2    Q.   The numbers down along the side go to 3435, correct,

3    that column, that last column?  So that the records

4    reflect --

5    A.   I'm confused.  What are you speaking about?

6              THE COURT:   3433, Counsel.

7    Q.   Looking at the last column, that denotes the number of

8    the call from beginning to end, so these records number the

9    calls from 1 to 3435, correct?

10   A.   Are you referring to the digits 1577?

11   Q.   No.  The last column on the spreadsheet refers to the

12   number of the call on the spreadsheet.  That's all that

13   refers to, correct?

14   A.   Yes.  You're talking about the number --

15   Q.   1577.

16   A.   Yes.  It seems like it's a sequential order of the phone

17   calls.

18   Q.   Because if you look at the first page, 3400, it begins

19   with 1.

20   A.   Yes.

21   Q.   I mean, you identified the line number for

22   Mr. DiLorenzo.  You know what --

23             THE COURT:   I think we're on the same page.

24   A.   Yes, for ease of identifying it.

25             THE COURT:   It's sequential.  We're on Line No.

1    1577, so ask him about that call.

2    Q.   Okay.  Other than those two calls that you identified at

3    Line 1577 and Line 1608, did you verify any other calls on

4    here in any other way?

5    A.   1577, and what was the second number?

6    Q.   I believe you testified to Line No. 1608.

7    A.   Yes.

8    Q.   Other than those two calls, of those 3425 calls that are

9    reflected in this spreadsheet, did you verify any of the

10   other calls?

11   A.   Generally, yes.

12   Q.   What do you mean, generally?

13   A.   I don't know right now exactly the phone calls, but yes,

14   there are other phone calls there that were corroborated

15   through other evidence in the investigation.

16   Q.   Well, can you give us any specific examples?

17   A.   Additional phone calls, yes.

18   Q.   What phone calls?

19   A.   I don't remember at this time.

20   Q.   You don't remember any other phone calls on there that

21   have been verified in any other way?

22   A.   No, not right now.

23   Q.   Okay.  And it's fair to say that that numbering system,

24   1 through 3435, numbering the calls is not done on the

25   records that you received in February of 2017 that are

1   marked as Government's Exhibit 1104, correct?

2   A.   (Witness reviews document) It doesn't appear so.

3   Q.   Those are numbered sequentially because the phone

4   company isn't going to number calls sequentially because

5   they're continuingly recording them, correct?

6   A.   I don't know that.  I don't work for the phone company.

7   Q.   Do you know who put that last column on Government's

8   Exhibit No. 1100?

9   A.   No.  I didn't obtain those records.

10  Q.   You don't know who put any of those -- that information

11  in there, correct?

12  A.   Excuse me?

13  Q.   You do not know who put any of the information in those

14  records, correct?

15  A.   I didn't obtain these records, Government Exhibit 1100,

16  no.

17  Q.   So no, okay.

18              MS. PETRAS:  May I have the Court's indulgence?

19              No further questions.

20              Oh, wait.

21              (Pause)

22              MS. PETRAS:  No further questions.

23              THE COURT:  Thank you.

24              Mr. DiLorenzo.

25              MR. DiLORENZO:  Briefly.

```
 1                         REDIRECT EXAMINATION

 2    BY MR. DiLORENZO:

 3    Q.  Good afternoon.  You were able to learn what was meant

 4    by the "Cell LAC" entries on Government's Exhibit 1100; is

 5    that right?

 6    A.  Can you repeat the question?

 7    Q.  On Government's Exhibit 1100, the entries for -- and if

 8    you could look at it, where it says Cell B, LAC B, Cell A,

 9    LAC A.

10    A.  Yes.

11    Q.  Were you able to learn what that meant, the significance

12    of that?

13    A.  Yes.  I consulted with an analyst at the FBI who

14    explained that that dealt with cell tower information.

15    Q.  And in your experience, the phone's service providers

16    maintain records for various reasons; is that right?

17    A.  Yes.

18    Q.  And would that include usage and billing?

19    A.  Yes.

20    Q.  And what, if any, significance would location have with

21    respect to business practice?

22              MS. PETRAS:  I object to his basis of knowledge.

23              THE COURT:  Overruled.

24    A.  Can you repeat the question, please?

25    Q.  What, if any, significance would location information
```

1   have to business practice?

2   A.   Possibly their network.   Maybe they know who's using

3   more cell towers more frequently, cell tower upgrades, et

4   cetera.

5          MS. PETRAS:   Again, I would object to the basis of

6   knowledge.

7          THE COURT:   Well, overruled.

8   Q.   And defense counsel had pointed out a point where there

9   was a response that something was strange about the document

10  being created on -- phone records being created in June of

11  2017.   What do you know about that?

12  A.   Yes.   The reason for that creation date was before I was

13  sending the electronic file to Mr. Ayad on July 12th, I had

14  to save the electronic file, the spreadsheet, with a new

15  name in order to protect the original source of the

16  information, and that resulted in a creation date of June

17  2017 shortly before I sent it to him on July 12th.

18  Q.   So that accounts for the fact that it was created on

19  June --

20  A.   Yes, or modified.

21  Q.   Appeared to be created?

22  A.   Saved as with a new file name in order to send to him.

23  Q.   Which, again, suggests that the CEO looked not just at

24  the substance of the records, but looked into the creation

25  date as well?

1    A.  Yes.

2    Q.  What, if any, significance did it have to you that the

3    CEO was able to obtain the 2014 records with respect to his

4    access?

5    A.  To me, it meant that he had access to Libyana call data

6    records and other records in their company and willingly

7    provided them to us.  However, as he indicated in his email,

8    the records that were of interest to us for 2012 were

9    corrupted and archived, and they were working on recovering

10   them.

11   Q.  Defense counsel kept saying that the records no longer

12   exist in a number of her questions.  When you spoke to the

13   CEO, what, if anything, did he say about the status of those

14   2012 records and any efforts that they were -- he was taking

15   to try to recover them?

16   A.  He indicated that their technical officers were

17   attempting to recover them.

18   Q.  So he never indicated that they were destroyed?

19   A.  He never indicated that, no.

20   Q.  Now, you cited for the Court two examples that suggested

21   to you that these records were authentic.  Were there other

22   examples as well?

23   A.  Yes, generally.

24   Q.  And you indicated you couldn't recall the specifics of

25   those right now?

1    A.   Not right now, no.

2    Q.   After reviewing the case file, will you be able to come

3    up with other examples, if necessary?

4    A.   Certainly.

5              MR. DiLORENZO:   And the Court's indulgence.

6              I have nothing further.

7              THE COURT:   Okay.   Thank you very much.

8              Okay.   You're dismissed.   Thank you very much for

9    your testimony.   Have a good day.

10

11

12

13

14

15              (Recess taken)

16

17

18

19

20

21

22

23

24

25