**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Crim. No. 17-cr-213 (CRC) |
| MUSTAFA AL-IMAM, | |
| *Defendant*. | |

**DEFENDANT'S MOTION TO PROHIBIT USE OF CERTAIN LANGUAGE AND
EVIDENCE AT TRIAL ON THE GROUNDS OF PREJUDICE, CONFUSION, AND
DENIAL OF HIS RIGHT TO A FAIR TRIAL**

Defendant Mustafa Al-Imam, through undersigned counsel, moves this Honorable Court

for an Order prohibiting the use of certain language evidence during the upcoming trial that would

be unfairly prejudicial, confusing, and deny his right to a fair trial.

**ARGUMENT**

A federal district court has both the inherent authority and the duty to ensure that trials are

conducted in a manner that protects a defendant's right to a fair trial. See United States v. Marks,

530 F.3d 799, 807 (9th Cir. 2008) ("District courts have broad power to ensure that a trial proceeds

in a proper manner."). That authority includes preventing the use of language that casts the

defendant, or others, in a negative light—particularly when it is irrelevant to the proceeding. See

20 Am. Jur. Trials 441 § 20 ("Expressions, names, nicknames, and the like, which are so sensitive

that their use would be likely to stir up antagonistic feelings on the part of the jurors, ought to be

removed from the case at the earliest opportunity. The damage they can inflict on a party's legal

position may be irreversible even if they are used but once in front of the jury"). Similarly, a

prosecutor is prohibited from making "comments designed to inflame the passions or prejudices

of the jury," United States v. Johnson, 231 F.3d 43, 47 (D.C. Cir. 2000) (citing United States v.

Childress, 58 F.3d 693, 715 (D.C. Cir. 1995)), or to "ask jurors to find a defendant guilty as a means of promoting community values [or] maintaining order." Id. (citing United States v. Monaghan, 741 F.2d 1434, 1441 (D.C. Cir. 1984)). The court's authority also extends to insuring that the jury is not confused by the testimony and arguments because it uses terms that are ambiguous and incomplete. See United States v. DiVarco, 484 F.2d 670, 675 (7th Cir. 1973) ("The district judge has a duty to see that the trial does not become confusing or repetitious.").

**A.    The Court should limit the government's use of the words "terrorist," "terrorism," and "extremist," and exclude testimony drawing hearsay conclusions about the political beliefs of others as "terrorist" or "extremist."**

In Khatallah, the Court denied Mr. Khatallah's motion to prohibit the government from using the word "terrorist" or "terrorism" at trial, holding:

> Among the charges leveled against the Defendant is providing material support to terrorists resulting in death under 18 U.S.C. § 2339A. While this Court has held that § 2339A does not "include terrorist conduct as an element of liability," Memorandum Opinion (ECF No. 140), the heart of the charges against the Defendant is that he participated in the terrorist attack against U.S. facilities in Benghazi. As a result, describing the Defendant's alleged conduct to the jury without using the terms "terrorism" or "terrorist" would be artificial and divorced from the charges in the case. The Court will, however, instruct the Government to avoid gratuitous or unnecessary uses of the terms.

United States v. Khatallah, No. 14-cr-00141 (CRC), ECF No. 372 at 1–2 (filed Sept. 28, 2017). Mr. Al-Imam reiterates and incorporates Khatallah's request that the two words be completely prohibited because they are unnecessary and inherently prejudicial. See United States v. Steinkoetter, 633 F.2d 719, 720–21 (6th Cir. 1980) (prosecutor's comments comparing defendant to Pontius Pilate and Judas Iscariat reversible error); Mathis v. United States, 513 A.2d 1344, 1348 (D.C. Ct. App. 1986) (prosecutor's description of defendant as "the Godfather" required reversal); cf. United States v. Crooks, 766 F.2d 7, 12 (1st Cir. 1985) (district court properly excluded testimony that associated defendant with word "Mafia").

While the conduct alleged in this case may meet the statutory definition of "terrorism" as well as the government's claimed dictionary understanding of the word—"the use of violent acts to frighten people in an area as a way of trying to achieve a political goal," Khatallah, ECF No. 243, at 2 (citing Merriam-Webster's Dictionary, Electronic Ed. (2017)—there are very real differences that make the comparison to those other terrorist acts particularly prejudicial. Even under the government's theory, the charged crime involved an attack by members of a brigade that had taken part in the legitimate overthrow of dictator, and during that post-revolutionary period, attempting to counteract what it perceived as illegitimate foreign intervention and intelligence-gathering in their newly freed state (which the United States admits it was doing, just not at that facility). This kind of political violence is a far cry from the murderous intentional targeting of innocent civilians going about their daily lives in America or other non-combative zones that Americans usually associate with the word "terrorism," most forcefully on 9/11. And yet, Mr. Al-Imam has no ability to mitigate the prejudicial effect of the comparison, because elucidating the distinction to the jury would likely have the opposite effect.

While using the term is highly prejudicial, its evidentiary or descriptive value is marginal, at best. For example, no element of any charged offense requires the jury to conclude whether the label "terrorist" or "terrorism" applies to any person, group, or conduct at issue in this case. And if the government truly means to use the term in its ordinary dictionary sense (violence for a political goal), it has no descriptive value. In Khatallah, the government argued that it intended to prove at trial that the defendant "attempted to use violence (burning down the Special Mission) to achieve a political goal (coercing America into leaving Benghazi)." Id. There is no need to invoke the highly inflammatory association by labeling that act "terrorism."

The same logic applies to the term "extremism." It is a label that invokes highly prejudicial comparisons that convey a meaning far beyond the dictionary sense of "extreme."[1]

The use of these terms are problematic for another reason: there is a substantial risk that government witnesses will employ them as a way to offer improper characterizations of the motives or beliefs of others without an admissible foundation. "Federal Evidence Rule 701 permits lay testimony in the form of an opinion when it meets the following criteria: it must be rationally based on the witness's perception and helpful to the jury in understanding the witness's testimony or the determination of a 'fact in issue,' and may not be based on the kind of specialized knowledge possessed by experts within the scope of Rule 702." United States v. Hampton, 718 F.3d 978, 981 (D.C. Cir. 2013) (quoting Fed. R. Evid. 701). Lay opinion is inadmissible in every instance "[w]hen a witness has not identified the objective bases for his opinion . . . , first because there is no way for the court to assess whether it is rationally based on the witness's perceptions, and second because the opinion does not help the jury but only tells it in conclusory fashion what it should find." Id. (citing United States v. Rea, 958 F.2d 1206, 1216 (2d Cir. 1992)). But if a witness does give admissible testimony demonstrating an objective basis to label something terrorist or extremist, i.e., admissible non-hearsay evidence about the specific political or ideological beliefs of another, there would be no reason to add the inflammatory label on top of it. The task for the jury will be to sort through the wide variance of religious and ideological beliefs (or nonbeliefs) among the various persons allegedly involved, to draw inferences about shared intent and common beliefs sufficient to find the existence of a conspiracy. Broadly labeling such

---

[1] Mr. Al-Imam has no objection to use of the adjective "extreme," provided context, so long as they avoid the label of "extremism" or "extremists."

beliefs "terrorist" or "extremist" is unhelpful and confusing in that regard; not all "terrorists" or "extremist beliefs" are the same, or even similar.

In addition, as the trial transcript in <u>Khatallah</u> shows, use of the term "extremists" can be especially confusing. For example, in one exchange, a witness described Ubaydah Bin Jarrah as "a group, a brigade, of takfiris," but the interpreter added, "extremists, Islamists who do not believe other Muslims are following the true path of Islam." Trial Tr. 2404:8–12. After the Court struck the interpreter's own multi-step definition of "takfiri" ("takfiri"→"extremists"→"Islamists who do not believe other Muslims are following the true path"), the witness—through the interpreter—explained that the term "takfiri" meant something else: people who believe that Islam permits (and even rewards) Muslims to kill people who work with the Army and the police. Trial Tr. 2404:13–23. It would be fair to describe that particular belief as "extreme," but it is unhelpful, confusing, and prejudicial to apply the label "extremist" as a way to avoid describing the belief itself.

Finally, to the extent the Court denies Mr. Al-Imam's primary request regarding these words, he respectfully respectfully requests that the Court at least reaffirm its prior order instructing the Government to "avoid gratuitous or unnecessary uses of the terms," including the words "extremist" and "extremism." <u>Id</u>.

**B.    The Court should instruct the Government to avoid gratuitous and unnecessary uses of the phrases "September 11" and "9/11."**

In <u>Khatallah</u>, the Court also denied Mr. Khatallah's motion to prohibit the Government from using the phrases "September 11" or "9/11" without the qualifier "2012." <u>Id</u>. In so doing, the Court noted: "the date is both relevant and unavoidable given that the Benghazi attack took place on that date in 2012. The Government may therefore refer to the date in referencing the attack, but obviously may not suggest that the Defendant was involved in the attacks of September 11, 2001 in the United States." <u>Id</u>. Mr. Al-Imam respectfully requests that the Court specifically prohibit

the Government from suggesting that Mr. Al-Imam was involved in the attacks of September 11,

2001, but also to prohibit gratuitous or unnecessary uses of the phrases "September 11" or "9/11,"

especially without the qualifier "2012." While use of the date will be relevant and unavoidable to

establish the chronology in this case, gratuitous and unnecessary use of the phrase—especially

when used in close proximity with the word "terrorism"—runs the substantial risk of invoking

highly prejudicial and grossly improper associations between the Benghazi attacks at issue in this

case, and the traumatic events of September 11, 2001.

> **C.    The Court should prohibit the Government from using first-person plural pronouns (e.g., "our Mission," "our ambassador," or "our American sons") when referring to the people and places at issue in the trial.**

In Khatallah, the Government repeatedly referred used the pronoun "our" in connection

with the United States embassy in Libya, the American ambassador, the consulate, the mission,

and other persons, places, and things that appeared as evidence in the trial. See generally Khatallah,

ECF No. 500, at 6–8 (filed Jan. 26, 2018) (listing twenty-eight trial uses of "our" by the

government). The government continued to use the pronoun (eight times) even after the Court

sustained Khatallah's objection to its use as "designed to bias." Id. There is no legitimate reason

for the Government to use the pronoun, and a profoundly biasing one: "us" invokes a sense of

shared experience between the jury, the Government, and the American people, places, and things

in Libya, which excludes and alienates Mr. Al-Imam and his defense team. Accordingly, Mr. Al-

Imam respectfully requests that the Court do now what it eventually did in Khatallah, and prohibit

the government from using the pronoun "our" or any other first-person plural pronouns in this

way.

**D.    The Court should exclude evidence about a burned American flag spotted on the Special Mission grounds.**

In <u>Khatallah</u>, the government elicited detailed testimony regarding the considerable time and effort spent searching for and collecting the remnants of a burned American flag spotted on the Special Mission grounds, and then displayed those remnants to the jury:

> Q. Do you recall during the course of your search if there was an American flag that was being investigated?
>
> A. I remember that very vividly.
>
> Q. Do you recall at what particular time of the day that was done?
>
> A. I know we noticed it early on. What time we finished collecting, I'm not sure.
>
> Q. Could you please describe the general nature of your work with regard to that?
>
> A. I, Special Agent Clarke, and whoever else was available, once we noticed that there was a burned American flag on the premises, we decided that that was definitely a priority, and we needed to make sure that we collected every bit of the flag.
>
> Q. How many team members were actually involved in that particular search?
>
> A. Anywhere from three to five at different times. Again, we're doing a lot of different things at the same time, but we did prioritize this throughout the Mission to make sure that we did collect everything. So it wasn't all of us at once, but there were times when there could be two to four of us at the same time. And in fact, at one point, we had people stop so we could go out there, and we conducted a line search where we all lined up next to each other and searched the premises and – to the point where we were even on our hands and knees because some of the pieces were so small, you know, and they would get blown around maybe within the grass and things like that. So that took a little bit of time. But we would switch people on and off so we could continue the other jobs as well.
>
> . . .
>
> Q. Looking at the particular item in your hands, can you please describe its condition in any further detail?
>
> A. It's remnants of part of a flag, very badly burned, very fragile. There seem to be some smaller fragments in there as well. One fragment is completely destroyed and burned on one side, yet on the other still -- you can still observe the stars and stripes.
>
> Q. When you say the stars and stripes, you can still observe the colors of it, the red and white and blue?

7

A. That's correct

<u>Khatallah</u>, ECF No. 413, at Tr. 2023:14–24:17, 2027:13–22 (Oct. 11, 2017 (PM Session)).

Such testimony is irrelevant to any of the charges in this case, and appears designed to play to the jurors' emotions and sense of patriotism. For these reasons, it should be excluded.

**E.    The Court should require the government and witnesses to use proper names for entities operating in the post-Gaddafi period rather than referring to the "Libyan government" or "the government" of Libya.**

During the Libyan revolution, many different brigades, militias, and individuals fought alongside each other with the common goal of overthrowing the Gaddafi regime. During this period, most of the international community, including the United States, came to recognize the Transitional National Council (TNC) as the legitimate political representative of the Libyan people. As a result, the TNC received billions in formerly-frozen funds of the Gaddafi regime, and used that money to fund some of the existing militias in the post-Gaddafi era. Others did not receive this funding, and either disbanded or continued without TNC funding.

On August 8, 2012, the TNC dissolved and formally transferred power to the General National Congress (GNC), a body consisting of representatives chosen through national elections on July 7, 2012. On August 4, 2014, the GNC's mandate expired without a new constitution, and it was forced organize elections to a new House of Representatives. An un-reelected minority of former GNC members, supported armed groups loyal to GNC president Nouri Abusahmain, met on August 25, 2014 and declared a National Salvation Government. On April 1, 2016, the GNC announced its own dissolution and was been replaced by the High Council of State. The High Council of State was formed under the terms of the Libyan Political Agreement signed on December 17, 2015. The agreement resulted from peace talks supported by the United Nations, and has been unanimously endorsed by the Security Council. The High Council of State is able to advise the interim Government of National Accord (GNA) and the House of Representatives

(HoR) and can express a binding opinion on these bodies under certain circumstances. Meanwhile, Field Marshal Khalifa Haftar, who represents the HoR, has been waging a war for control of Benghazi and eastern areas, with spirited resistance.

In short, the history of post-Gaddafi Libya is one of political chaos. There is generally no dispute that in the aftermath of the fall of Gaddafi, there were widespread political disagreements between individuals and militias that had striven together to overthrow the regime during the Libyan revolution. Even when acting under the authority of the TNC, militias often had a stronger loyalty to individual leaders and group identity. In this post-revolution context, it would be improper for the government or witnesses to refer to "the government of Libya" to refer to the TNC or GNC, rather than refer to the TNC, GNC, or other political or military actors by their individual names. While foreign states recognized the TNC during the revolution, it is Libyans, not international actors, must decide who will ultimately be the legitimate government of the Libyan people after Gaddafi—and that question has to this day not yet been settled. In this context, allowing the government to refer to individual groups as "the government of Libya" would be prejudicial in two ways: (1) it would falsely imply that there was a level of security, stability, and legitimacy in post-war Libya that did not exist at the time; and (2) it would imply that anyone opposed to the political program of the TNC or GNC is an outlaw or a criminal. There is no reason to permit this prejudice, since there is no downside for the government in its presentation of the facts if it refers to post-war groups in Libya by their actual names, instead of by terms such as "the government."

### F.   The Court should prohibit the government from eliciting testimony about the character of the victims.

With limited exceptions not applicable here, evidence about the character of the victim is generally irrelevant, Fed. R. Evid. 404(a)(1) & (2), and certainly may not be introduced to

enhance jury sympathy for a victim. See <u>United States v. Williams</u>, 836 F.3d 1, 18 (D.C. Cir. 2016) (noting that evidence of a woman's pregnancy could improperly enhance jury sympathy if her husband were the victim of the relevant crime). For that reason, the Court should prohibit the introduction of character evidence relating to any of the victims of the charged crimes.

### G.    Denigrating the evidentiary stipulations regarding classified information as merely "words on pieces of paper."

In <u>Khatallah</u>, the government referred to CIPA stipulations as merely "words on pieces of paper" to urge the jury to ignore stipulations that were used as substitutes for classified evidence. <u>Khatallah</u>, ECF No. 476, at 6 (citing trial transcript). The Court should specifically instruct the government to avoid any statement that implies that such stipulated CIPA evidence is of less value than testimonial evidence. Allowing the government to criticize the form of such evidence by language such as "words on pieces of paper" is grossly unfair to a criminal defendant who is forced to proceed by stipulation to protect government secrets.

### CONCLUSION

For the foregoing reasons, Defendant Mustafa Al-Imam respectfully requests an order prohibiting or limiting the evidence and language as described above.

March 15, 2019                                          Respectfully submitted,

                                                       /s/ Timothy R. Clinton
                                                       Matthew J. Peed (D.C. Bar No. 503328)
                                                       Timothy R. Clinton (D.C. Bar No. 497901)
                                                       CLINTON & PEED
                                                       777 Sixth Street NW, 11th Floor
                                                       Washington, DC 20001
                                                       (202) 621-1828
                                                       (202) 204-6320 (fax)

                                                       *Counsel for Defendant Mustafa Al-Imam*