**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br> v. <br><br> **MUSTAFA MUHAMMAD MUFTA AL-IMAM**, <br><br> Defendant. | Case No. 17-cr-213 (CRC) |

<u>**MEMORANDUM OPINION**</u>

On September 11 and 12, 2012, a group of Libyan militants attacked U.S. diplomatic and

intelligence facilities in Benghazi, Libya.  Four Americans died in the attacks, including then-

United States Ambassador to Libya J. Christopher Stevens.  Roughly two years after the attacks,

the United States captured in Libya one of the men the government believed was responsible for

the attacks, Ahmed Abu Khatallah, and brought him to trial in this Court.  Then, in 2017, the

United States captured a man who they believed was one of Abu Khatallah's co-conspirators,

Mustafa Mufta Al-Imam, the defendant in this case.  Like Abu Khatallah before him, Al-Imam

was interrogated en route to the United States while aboard an American naval vessel.  Also like

Abu Khatallah, he argues that the statements he offered during those interrogations were

obtained in violation of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), which safeguards detainees'

Fifth Amendment right against self-incrimination.

Al-Imam thus moves to suppress those statements.  He says that he gave his statements

while suffering from mental trauma induced by his recent abduction and seasickness, that he

lacked the wherewithal and familiarity with American legal norms to understand he did not have

to talk with his interrogators, and that he feared he would be beaten if he did not talk with them.

Those factors, Al-Imam suggests, render his two <u>Miranda</u> waivers both involuntary and unknowing and require suppression of his statements.

The Court held an evidentiary hearing at which it received testimony from the personnel involved in Al-Imam's capture and transport; individuals responsible for his processing and detention on the naval vessel where the interrogations took place; a doctor who several times examined Al-Imam on board the vessel; one of the FBI agents who conducted the interrogations; and the Arabic-language interpreter who facilitated all communications aboard the vessel. Based on that testimony and the entire evidentiary record, and for the reasons that follow, the Court will deny Al-Imam's motion.

## I.    Factual Findings

### A.    <u>Attack on the U.S. Special Mission Compound in Benghazi, Libya</u>

Muammar Gaddafi seized power in Libya in 1969 and remained its leader until 2011, when a civil war broke out. Indictment ¶ 2. The war originated in the Libyan coastal city of Benghazi, which was controlled by rebels and served as the base of operations for the rebel-led Transitional National Council ("TNC"). <u>Id.</u> On February 25, 2011, the U.S. Department of State evacuated American personnel from Libya and suspended its operations at the U.S. Embassy in Tripoli. <u>Id.</u> ¶ 3. Less than two months later, in April 2011, the State Department reestablished its presence in the country with the arrival in Benghazi of U.S. Special Envoy J. Christopher Stevens. <u>Id.</u> ¶ 4.

On July 15, 2011, the United States officially recognized the TNC as Libya's governing authority. <u>Id.</u> One month later, Gaddafi was ousted from power and killed. <u>Id.</u> In November 2011, the United States established a diplomatic outpost in Benghazi, known as the U.S. Special Mission ("Mission"), where a contingent of State Department personnel was stationed. <u>Id.</u> ¶ 5.

The United States established a second Benghazi facility, this one known as the Annex, where additional U.S. personnel were based.  Id. ¶ 6.

In May 2012, the United States dispatched Stevens, now the U.S. Ambassador to Libya, to the Libyan capital of Tripoli.  Id. ¶ 7.  Ambassador Stevens traveled to Benghazi to visit the Mission compound on September 10, 2012.  Id.  Stationed at the compound and present during the Ambassador's visit were Information Management Officer Sean Patrick Smith; Assistant Regional Security Officers Scott Wickland and David Ubben; and Security Officers Tyrone Snowden Woods, Glen Anthony Doherty, and Mark Geist.  See id. ¶¶ 13-18.

Around 9:45 P.M. on September 11, 2012, approximately twenty men—armed with assault rifles, handguns, and rocket-propelled grenade launchers—attacked the Mission.  Id. ¶ 22. After breaching the facility, the attackers set fire to several buildings, causing the deaths of Ambassador Stevens and Sean Smith.  Id.  The remaining State Department personnel escaped to the Annex, which soon also came under attack, ending in mortar fire that killed Tyrone Woods and Glen Doherty.  Id.  The government believes that Al-Imam was a close associate of Abu Khatallah, the leader of the extremist group that carried out the attacks.  Id. ¶ 9.  It alleges that Al-Imam was present for, helped orchestrate, and participated in the attacks.  Id. ¶¶ 9-11. According to the indictment, Al-Imam entered the Mission at the direction of Abu Khatallah and took sensitive material, including material that identified the Annex by location and as the evacuation point for State Department personnel.  Id. ¶ 22.  The indictment also alleges that Al-Imam then assembled with Abu Khatallah and others to coordinate the attack on the Annex.  Id.

B.  Al-Imam's Capture and Initial Transport

FBI Special Agent Brandon Goad described Al-Imam's capture at the evidentiary

hearing.  On October 29, 2017, at about 9:15 P.M.,[1] U.S. special forces abducted Al-Imam in

Misrata, Libya.  Testimony of FBI Special Agent Brandon Goad ("Goad Testimony"), Hr'g Tr.

at 11:1-7.[2]  The capture team waited in a vehicle outside Al-Imam's apartment and took him into

custody after Al-Imam exited his car and walked toward his apartment.  Id. at 11:10-13.  Some

members of the team "grabbed his arms" while one "covered his mouth."  Id. at 11:16-18.  The

capture team loaded Al-Imam into the vehicle and left the scene.  Id. at 11:18-20.  Special Agent

Goad estimated that this initial capture took only ten seconds, and he did not recall any members

of the capture team pointing weapons at Al-Imam or that Al-Imam resisted in any way.  Id. at

11:24-12:10.

Inside the vehicle, Al-Imam was handcuffed and fitted with goggles, ear coverings, and a

verbal restraint.  Id. at 12:24-13:8; see Ex 2.  These measures were taken, according to Special

Agent Goad, for Al-Imam's and the capture team's safety, because they were traveling in an area

that presented the risk of armed conflict had they been discovered.  Id. at 13:23-14:6.  Prior to

applying the ear coverings, Special Agent Goad—who had memorized "a handful" of Arabic

phrases "to be able to communicate with [Al-Imam] after he was captured,"  Id. at 9:6-10—told

Al-Imam that he had been detained by the American government, id. at 14:19-20.  Al-Imam,

_____

[1] Most witnesses testified using "Zulu Time," which is two hours behind the local time in
Benghazi, Libya.  All times in this opinion are reported in Zulu time, but they have been
converted from the 24-hour military clock to the standard 12-hour clock.

[2] All evidence was introduced through testimony and exhibits on the first day of the
evidentiary hearing, March 19, 2019, but legal argument was offered on March 20, 2019.  Unless
explicitly indicated (by "Day 2"), any citation to the hearing transcript refers to the first day.

who initially had "seemed excited" and "was breathing heavy," "seemed to completely calm

down, and . . . appeared relaxed from that point on." Id. at 14:14-17.  A member of the capture

team trained as a medic also monitored Al-Imam's pulse and blood pressure during this initial

transport, but Special Agent Goad said he was not concerned "because it seemed like he had

calmed down, and he was compliant." Id. at 15:22-23.

The capture team then arrived at a second location, where they met with additional

American personnel. Id. at 16:3-12.  The capture team outfitted Al-Imam with a fleece pullover,

an "all-weather trench coat," and a lifejacket, before replacing his handcuffs and eye and ear

protection. Id. at 16:15-22.  The verbal restraint was not replaced, because Special Agent Goad

"didn't feel there was a need to," as Al-Imam "was being compliant, and he was following all the

instructions and seemed calm." Id. at 17:4-6.

While at the second location, Al-Imam communicated with FBI Special Agent Jonathan

Kath, who had a "limited working proficiency in Modern Standard Arabic," which he said

enabled him to "give commands and understand the responses back" and "engage in basic

conversation."  Testimony of FBI Special Agent Jonathan Kath ("Kath Testimony"), Hr'g Tr. at

27:5-13.  Special Agent Kath asked whether Al-Imam "was thirsty and how he felt generally, if

he was fine," and Al-Imam indicated that he was fine and accepted some water. Id. at 31:4-10.

Special Agent Kath said his overarching responsibility was to "ensur[e]" and "assess[ ]" Al-

Imam's "status" and "to kind of give him the next steps of . . . what to expect in the arrest

process." Id. at 27:18-20.  He explained that he spoke to Al-Imam in a "conversational tone" and

avoided anything close to "drill-instructor-style orders." Id. at 27:2-12.

The capture team then escorted Al-Imam to "a staging area to get [Al-Imam] on the

[water]craft that was coming in."  Goad Testimony, Hr'g Tr. at 18:3-4.  Special Agents Goad and

Kath "hooked underneath both of [Al-Imam's] arms and took him to the craft when it arrived," with Al-Imam's back facing forward. Id. at 18:11-16. Once they were "about waist deep" in the water, a "wave knocked the craft back into all of [them], and the back of the craft impacted [Al-Imam's] back." Id. at 19:4-5. After Al-Imam had been lifted onto the boat, Special Agent Kath again asked him how he was feeling. Kath Testimony, Hr'g Tr. at 33:25-34:1. Al-Imam responded that his back hurt, but that he was otherwise fine, id. at 34:3-4, and Special Agent Kath said Al-Imam "appeared entirely fine," id. at 34:5.

The first boat took Al-Imam to a second boat. Using the same under-arm lifting technique they had used earlier, Special Agents Goad and Kath moved Al-Imam to the second boat. Goad Testimony, Hr'g Tr. at 20:25-21:2. When it became clear to the capture team that Al-Imam was suffering from seasickness, they removed his eye and ear protection in the hope that it might alleviate his symptoms. Id. at 21:11-14; Kath Testimony, Hr'g Tr. at 35:2-4. It didn't help, or at least not enough: at some point on the second boat trip, Al-Imam vomited. Goad Testimony, Hr'g Tr. at 21:17.

The second boat arrived at a third, this one a large naval vessel, around 11:15 P.M. Id. at 22:6-8. Once Al-Imam was lifted aboard the third vessel, Special Agents Goad and Kath had no further contact with Al-Imam. Id. at 22:3-5; Kath Testimony, Hr'g Tr. at 35:21. Goad Testimony, Hr'g Tr. at 22:8. Both Special Agents Goad and Kath described Al-Imam as calm and compliant on the journey. Id. at 22:24-25 (stating that Al-Imam was "calm and compliant for the entire transit"); Kath Testimony, Hr'g Tr. at 35:24-25 (describing Al-Iman's demeanor during the second boat trip as "very pleasant" and "at no point . . . confrontational at all").

C.  Initial Processing Aboard the Naval Vessel

FBI Special Agent Joshua Kolarcik testified at the evidentiary hearing regarding Al-

Imam's transfer to the third vessel and his initial processing aboard the ship.  Because the third

vessel was significantly larger than the one on which Al-Imam had arrived, he had to be hoisted

aboard using a lift.  Testimony of FBI Special Agent Joshua Kolarcik ("Kolarcik Testimony"),

Hr'g Tr. at 46:16.  This was done by strapping Al-Imam to a "Stokes basket" that had been

lowered to the smaller boat, and then raising the basket, using a pulley system operated by a

"four- to five-man crew," to one of the larger vessel's decks.  Id. at 46:22-47:7; id. at 47:18-24.

According to Kolarcik, this "couldn't have gone any better" and Al-Imam was brought "on board

without any incident safely."  Id. at 46:17-19.

Still handcuffed and with his eye and ear coverings on, Al-Imam was escorted to his

"detention pod."[3]  Id. at 48:5-6.  A "pod" is "basically just a container" with a distinct purpose.

Id. at 44:1-4.  The detention pod is where Al-Imam was housed when he was not being

interrogated.  Id. at 42:8-9; see Exs. 4-5 (depicting outside and inside of detention pod).  It was a

small room, approximately 2.22 meters by 1.95 meters.  Id. at 45:10.  Posted on the wall inside

the detention pod were rules provided by the "guard force," the Department of Defense unit

responsible for Al-Imam's detention aboard the vessel, and certain Geneva Convention articles,

in both English and Arabic.  Id. at 43:1-23; see Exs. 6-8.  The Air Force Captain[4] responsible for

---

[3] Al-Imam was handcuffed behind his back and eye and ear coverings were applied any
time he was moved between rooms on the ship.  Testimony of Air Force Captain ("Captain
Testimony"), Hr'g Tr. at 109:20-21.

[4] For security reasons, this individual was identified only as "Captain" at the evidentiary
hearing.

the guard force provided further details on the detention pod. It contained a "sleeping mat," a blanket, a water bottle, a prayer rug, and a Quran, placed on top of a box (rather than the floor) as a sign of respect. Testimony of Air Force Captain ("Captain Testimony"), Hr'g Tr. at 108:23-109:3.

Once inside the detention pod, Special Agent Kolarcik and his team began Al-Imam's "inprocessing," or initial processing. Id. at 48:12-14. Id. at 48:19-20. First came photographs of Al-Imam as he had arrived on the vessel, fully clothed and with scattered "white flecks on his shoes and pants," remants of his earlier seasickness.[5] Id. at 49:6-10; see Ex. 10.

Next came the "primary objective" of the inprocessing—a medical screening to ensure that there were no immediate health concerns. Id. at 53:5-6. Al-Imam was given privacy to strip down to his underwear for the screening, id. at 49:22-23, which was performed by an Air Force Doctor,[6] Testimony of Air Force Doctor ("Doctor Testimony"), Hr'g Tr. at 67:21. Assisted by an interpreter, the Doctor began with a subjective examination, asking Al-Imam a series of questions regarding the history of any present illnesses before conducting a more general "review of systems." Id. at 65:9-12. Al-Imam reported that he vomited prior to arriving on the vessel and that he had experienced a "productive cough with a sore throat and nasal congestion for the past ten days." Id. at 69:7-8. He indicated that he occasionally took medicine for rheumatism and that he had last eaten approximately four hours earlier. Id. at 69:16-19.

_____

[5] It is unclear from Special Agent Kolarcik and the Doctor's testimony whether all of the photographs occurred before the medical screening began in earnest, or whether some were taken during or after the screening. But it does not make a difference to the analysis of Al-Imam's suppression motion.

[6] For security reasons, this individual was identified only as "Doctor" at the evidentiary hearing.

Relevant to Al-Imam's arguments in this motion, he also said he wore glasses "a long time ago" and "had trouble reading up close," but he did not complain of any loss of consciousness or head trauma and did not report any mental health issues.  Id. at 71:3-14.

Moving to the physical examination, the Doctor observed "some minor abrasions and what appeared to be some well-healed scars[.]"  Id. at 72:8-9.  A series of photographs taken during the medical screening document each of these: a few small abrasions on the face and shoulders, and some minor bruising near his biceps, likely close to where he was held by Special Agents Goad and Kath.  See Exs. 11-16.  Each of these were noted in the Doctor's intake form.  See Ex. 18.  None of them was sufficiently serious to warrant any treatment.  See, e.g., Doctor Testimony, Hr'g Tr. at 72:19-20.   The Doctor chose not to conduct a genital-rectal examination, because when he indicated he would do so, he said Al-Imam "became visibly upset, tearful, [and] kind of backed up a little bit from [him][.]"  Id. at 72: 1-2.

The only condition that Al-Imam presented requiring immediate attention was the motion sickness.  Id. at 73:4-9.  The Doctor "reviewed the potential effects of a medicine," an over-the-counter drug called meclizine, and Al-Imam indicated that he wanted to take it.  Id. at 74:11-75:1.  The Doctor gave him a dose and, finding no other "acute medical issues," cleared him for detention.  Id. at 75:14-19.  The Doctor continued to see Al-Imam twice each day throughout his detention and continued providing him with motion-sickness medication.  Id. at 80:21-81:24 (discussing follow-up visits); see Exs. 20-23.

Throughout these check-ups, the Doctor testified that Al-Imam responded appropriately to his questions, that he did not seem confused by the questions, that he did not appear disoriented, and that he otherwise showed no signs of "acute mental distress."  Id. at 87:14-88:2. When pressed on cross-examination whether Al-Imam appeared to be "psychologically shut

down," the Doctor answered in the negative and explained that "he was appropriate and cooperative with me, answering questions appropriately." Id. at 93:9-22.

Special Agent Kolarcik, who was present for much of Al-Imam's initial processing, including some of the medical screening, was also asked about Al-Imam's treatment and condition during this time. Kolarcik said that Al-Imam "was treated very gently and humanely," that no force was ever required, that "[e]verything was explained to him through the translator," that Al-Imam acknowledged he understood what he was being told, that no one "used raised voices," and that the entire affair was "very calm and organized and orderly." Id. at 54:8-12. He said that he and his team "did [their] best to ensure that [Al-Imam] was comfortable and warm and to try to limit any emotional stress he may experience during the inprocessing." Id. at 55:25-56:5. Finally, while Kolarcik said that Al-Imam appeared "very calm" throughout inprocessing, he added that Al-Imam also seemed "slightly emotionally distraught, as could be understood given his situation and following capture and being transported to a Navy vessel[.]" Id. at 55:25-56:2.

Following the medical screening, the guard force, through the interpreter, explained to Al-Imam the rules of detention and Article 3 of the Geneva Convention, the same materials posted in English and Arabic on the detention pod's walls. See Exs. 5-8. The Air Force Captain in charge of the guard force testified concerning this portion of Al-Imam's processing. The rules of detention included "the [physical] position that he need[ed] to take" before the guard force entered the pod and "how he could communicate with the guard force" when he needed something. Captain Testimony, Hr'g Tr. at 105:8-15. Next came the recitation of Article 3, "which speaks to protection against mistreatment, inhumane care, as well as any humiliation." Id. at 106:9-10. Article 3 forbids, inter alia, "[a]ny form of violence, mutilation, cruel treatment,

or torture" and "humiliating or degrading treatment."  <u>See</u> Ex. 25 (English version).  For both the

rules and Article 3, a member of the guard force read one line in English, and the interpreter then

translated that line into Arabic.  <u>Id.</u> at 106:16-20.  Al-Imam indicated that he understood and did

not have any questions.  <u>Id.</u> at 106:18-24.

    D.  <u>FBI Interrogations</u>

The first interrogation was slated to begin soon after Al-Imam's initial processing.  The

guard force handcuffed Al-Imam, blindfolded him, applied ear coverings and escorted him to the

interview room.  <u>Id.</u> at 108:12-16.  Once inside the interview room, the handcuffs and eye and

ear coverings were removed, and all members of the guard force exited.  <u>Id.</u> at 109:4-19.

Waiting for Al-Imam in the room for the first and all later interviews were FBI Special Agent

Ryan Larkin, Task Force Officer Anthony Marcano ("TFO Marcano"), and FBI interpreter

Samuel Babisha (who had been handling all translation since Al-Imam boarded the third vessel).

Larkin and Babisha provided testimony regarding the interrogations.

The first interview began at approximately 1:25 A.M. on the morning of October 30—

just over four hours after Al-Imam's initial capture.  Testimony of FBI Special Agent Ryan

Larkin ("Larkin Testimony"), Hr'g Tr. at 188:12-13.  Dressed in civilian attire, Hr'g Tr. at

213:6-7, the agents "introduced themselves and asked Al-Imam how he was feeling, <u>id.</u> at

189:20-190:3.  Al-Imam responded that he was "a little bit nauseous but overall felt okay," and

Special Agent Larkin said he appeared "attentive."  <u>Id.</u> at 190:19-21.  The agents informed Al-

Imam that he would be permitted to take a break to use the restroom or to pray, <u>id.</u> at 190:8-13,

and they offered him tea and Pop-Tarts, <u>id.</u> at 191:1-5.

Then the agents administered the <u>Miranda</u> warnings.  The rights were read by Babisha in

Arabic from a form titled "Advice of Rights," which was also provided in written Arabic to Al-

Imam.  Testimony of FBI Interpreter Samuel Babisha ("Babisha Testimony"), Hr'g Tr. at

165:21-166:5.  The "Advice of Rights" stated as follows:

## ADVICE OF RIGHTS

We are American law-enforcement agents.  You have been arrested for violations of United States criminal law related to the attack on the American mission in Benghazi, Libya, on September 11, 2012.  Because you are under arrest, United States law provides you with certain rights in your dealings with us.

Before we ask you any questions, we want to make sure you understand your rights.

You have the right to remain silent.

If you decide to speak with us today, you should know that anything you say can be used against you in a United States court.

You have the right to talk to a lawyer for advice before we ask you any questions.

If you cannot afford a lawyer, one will be appointed to you before any questioning if you wish.

Before you decide whether you want to speak with us today, we also want to explain to you that, because you have been arrested on United States criminal charges, we are bringing you without unnecessary delay to a courtroom in the United States.  When you arrive in court, a judge will advise you of the charges against you; give you an opportunity to hire an attorney of your choice, or, if you cannot afford to hire your own attorney, appoint an attorney to represent you; and determine whether you should be released on bail pending indictment and/or trial against you.

Do you have any questions about what I have just explained to you?

<u>Acknowledgement of Rights Waiver of Rights to an Attorney and to Remain Silent</u>

I am willing to make a statement and answer questions. ____
I do not want a lawyer at this time. ____
I understand my rights and my decision is a knowing and voluntary one. ____
No promises or threats have been made to me and no pressure or coercion of any kind has been used against me. ____

Name: _____

Signature:_____

Translator Signature: _____

Witness Name:_____

Witness Signature:_____

Date/Time:_____

Ex. 29.  Babisha "read [the Advice of Rights] to [Al-Imam] verbatim, word for word."  Babisha

Testimony, Hr'g Tr. at 151:11.  As Babisha read aloud, Al-Imam "was following [his copy] with

his fingers and with his eyes also."  Id. at Hr'g Tr. 151:13-14.  When Babisha reached the

conclusion of the top part of the form—up to the underlined "Acknowledgement" section—Al-

Imam indicated that he understood the rights that had been read to him.  Larkin Testimony, Hr'g

Tr. at 193:2-4.  And when asked whether he had any questions about what had just been

explained to him, he responded that he did not.  Babisha Testimony, Hr'g Tr. at 151:21-152:1.

After Al-Imam indicated he wished to continue, Babisha read aloud the entirety of the

second part of the form.  Larkin Testimony, Hr'g Tr. at 193:2-12.  When he finished, he

"directed [Al-Imam] where to sign," including his initials next to each right he was waiving and

a signature at the end.  Id. at 193:15-16.  Exactly when and how Babisha did this was the subject

of extensive questioning at the evidentiary hearing.  One exchange between Al-Imam's counsel

and Babisha suggested Babisha played a more directive part in the initialing:

> Q.     So when—I just want to make sure I understand your answer.  Generally
> you were saying, "This is where you should initial"; "This is where you
> should sign your full name"?
>
> A.     So we would read, for example, "I'm prepared to give testimony, to
> answer questions," and I would ask him, "Would you please initial next to
> that," and he would.  And I would go to the next one, and so on, so forth.

Babisha Testimony, Hr'g Tr. at 166:21-167:4.  Another exchange—this one between Al-Imam's

counsel and Special Agent Larkin—left it unclear how, or if, Babisha prompted Al-Imam to sign

the form:

> Q.      Did he know what to do with it?  I mean, did someone have to say, you
> know, "Take a pen and write your name"?
>
> A.      Yes.  We told him that there were some portions on there for a signature,
> yes.
>
> Q.      What was said in the interchange?
>
> A.      I can't remember exactly.

Larkin Testimony, Hr'g Tr. at 208:15-20.  A third exchange—on redirect, between government

counsel and Babisha—established that before anyone directed Al-Imam where to initial or sign,

he indicated his intent to continue speaking with the agents:

> Q.      And after you read the top portion of the warning where you talked about
> the defendant's rights under <u>Miranda</u>, was the defendant asked whether he
> wanted to speak with the FBI?
>
> A.      Yes, he was.
>
> Q.      Okay.  So before the defendant answered the questions and initialed, had
> the defendant already told you that he was willing to speak with you?
>
> A.      Yes.  We specifically asked him, "Would you like to speak with us after
> the reading of it?"  And he said, "Yes, I do."

Babisha Testimony, Hr'g Tr. at 174:11-20.  In any event, Al-Imam initialed next to each

statement.  <u>Id.</u> at 152:9-11; <u>see</u> Ex. 29.  He then signed his full name on the form, after

which Babisha and Special Agent Larkin signed the form.  <u>Id.</u> at 170:13-18.

Another issue probed at the evidentiary hearing was whether Al-Imam was able to read

along as his rights were being recited to him during the first interview.  At some point while his

rights were being read to him, Al-Imam asked for reading glasses.  Larkin Testimony, Hr'g Tr. at

194:7.  Special Agent Larkin testified that the agents briefly stopped administering the warnings

to ask the guard force to find glasses for Al-Imam, id. at 194:12-15, but that they resumed

without glasses "[b]ecause he was acknowledging that he was understanding what we were

reading."  Id. at 194:19-20.  And despite Al-Imam not having his glasses, both Babisha and

Special Agent Larkin testified that Al-Imam appeared able to read without them.  Id. at 194:1-2

("He was just—he was going—like his eyes were moving from right to left."); Babisha

Testimony, Hr'g Tr. at 147 ("He was following with his eyes the words.").  Eventually, however,

the guard force was able to obtain reading glasses for Al-Imam, and he had them for all

subsequent interviews, including the second one at which he again waived his Miranda rights.

Larkin Testimony, Hr'g Tr. at 195:8-10.

    The agents then began to question Al-Imam at about 1:40 A.M., 15 minutes after he

entered the interview room.  Id. at 192:1-3; see Ex. 29 (indicating time waiver was signed).  At

2:10 A.M., Al-Imam requested to use the restroom.  Ex. 26 at 1, Item No. 9.  He was secured

with handcuffs and outfitted with eye and ear coverings for the walk to and from the latrine, and

returned to the interview room about 15 minutes later.  Id., Item Nos. 10-11.  The interview

resumed, but lasted only a few more minutes before Al-Imam vomited.  Larkin Testimony, Hr'g

Tr. at 195:14-19.  The guard force summoned the Doctor, who consulted with Al-Imam

regarding Zofran, a different motion-sickness medication, and administered a dose at Al-Imam's

request.  Doctor Testimony, Hr'g Tr. at 79:21-25.  The agents ended the interview.  Larkin

Testimony, Hr'g Tr. at 195:24-196:1.  Special Agent Larkin characterized the tone of the first

interview as "conversational" and said that Al-Imam was "attentive" throughout.  Larkin

Testimony, Hr'g Tr. at 190:14-19.

The guard force escorted Al-Imam to his detention pod at 3:00 A.M., where he remained until he was escorted to the restroom at 6:35 A.M.  Ex. 26 at 2, Item No. 2.  At 7:55 A.M., the Doctor and Babisha visited Al-Imam in the detention pod for a medical screening.  Id., Item No. 4.[7]  Al-Imam reported that he was "no longer nauseated and that he felt much better since the last exam."  Doctor Testimony, Hr'g Tr. at 81:3-6.  The Doctor did not note any other changes from the previous exam, and he provided Al-Imam with another does of meclizine to stave off a recurrence of the motion sickness.  Id. at 81:9-18.  The guard force provided Al-Imam with a meal about twenty minutes later; Al-Imam ate about a third of it.  Ex. 26 at 2, Item Nos. 5, 7.

The second interview began at approximately 10:45 A.M., about eight hours after the first interview had concluded.  Id. at 196:12.  The agents replicated their process from the first interview.  They began by asking how Al-Imam was, whether he needed anything, and offered him tea or water.  Id. at 197:4-9.  Al-Imam said "he was feeling significantly better," which Special Agent Larkin testified appeared to be the case.  Id. at 197:10-16.  Babisha then administered the Miranda warnings and obtained Al-Imam's waiver of his rights using the same Advice of Rights form.  Id. at 198:18-19 ("[I]n terms of how we discussed it with him, it was exactly the same."); Babisha Testimony, Hr'g Tr. at 155:15-22 ("Yes, verbatim, word for word, each time.").  As with Al-Imam's first waiver, Babisha asked Al-Imam whether he wished to continue speaking with the agents prior to indicating where he should initial and sign to reflect that intent.  Babisha Testimony, Hr'g Tr. at 174:15-175:4.

---

[7] The Doctor's records indicate that this screening occurred at 10:00 A.M., some two hours after the guard force's log indicates the Doctor and Babisha entered Al-Imam's detention pod.  See Ex. 20.  That could be due to the time lag between the exam and the completion of the report, but the Court finds the guard force's time record more reliable in any event.

Al-Imam initialed next to each individual right he agreed to waive and signed the form, and Babisha and Special Agent Larkin followed with their signatures. See Ex. 30. The agents then questioned Al-Imam for about an hour, before Al-Imam requested, and was given, a restroom break. Larkin Testimony, Hr'g Tr. at 199:17-20. The interview concluded less than an hour later, at approximately 12:55 P.M. Ex. 26 at 2, Item No. 16. Special Agent Larkin again described the tone of the interview as "very conversational" and Al-Imam as "attentive, answering our questions appropriately, and so on." Larkin Testimony, Hr'g Tr. at 201:19-23 (describing second and third interviews).

After the guard force escorted Al-Imam back to the detention pod, they provided him with a bucket of water to wash for prayer. Ex. 26 at 2, Item No. 17. He was also taken to a shower and given soap, shampoo, and a toothbrush and toothpaste. Id., Item No. 18. The Doctor and Babisha paid Al-Imam a third visit later that evening, at 7:32 P.M. Doctor Testimony, Hr'g Tr. at 81:19-21; see Ex. 21. The Doctor reported no significant changes in Al-Imam's physical condition, but he did report that Al-Imam was "feeling sad because he didn't know what time to pray." Id. at 82:1-2. The guard force apparently told Al-Imam that he was free to pray "whenever he desired." Id. at 82:9. The Doctor followed up on Al-Imam's reported sadness, asking whether he had "any suicidal ideation or want[ed] to hurt himself." Id. at 83:1-2. Al-Imam answered that he did not, and the Doctor administered another dose of meclizine to guard against motion sickness. Id. at 83:3-14. The guard force provided Al-Imam with another meal and an opportunity to wash and pray before another interview scheduled to begin shortly thereafter. Ex. 26 at 3, Item Nos. 7, 9.

The third interview occurred later that same day, October 30, around 8:50 P.M. Ex. 26 at 3, Item No. 10. The agents began, as they had in the prior two interviews, by asking Al-Imam

"all the same questions about how he was feeling."  Larkin Testimony, Hr'g Tr. at 201:4-5.  Al-Imam reported that "he was feeling good" and "wasn't feeling nauseous."  Id. at 201:6-7.  He did not indicate that he was feeling sad or scared.  Id. at 201:8-12.  Al-Imam was also asked whether he had the opportunity to pray between interviews, and he answered that he had.  Id. at 201:13-18.

But then the agents veered from the course taken in the first two interviews; they did not administer Miranda warnings or otherwise seek a waiver of his rights.  Id. at 201:24-202:6.  When asked why, Special Agent Larkin testified that, after consultation with "lawyers back at the FBI and the team," they had determined that one set of warnings per day would be sufficient.[8]  Roughly eight hours had elapsed between the end of the second interview and the beginning of the third, while about ten hours separated the last issuance of Miranda warnings from the start of the third interview.

The agents commenced questioning.  Al-Imam was reportedly "very conversational," "attentive," and answered the agents' questions "appropriately."  Id. at 201:22-23 (using same language to describe interviews two and three).  He again requested, and was given, a restroom break in the middle of the interview.  Ex. 26 at 3, Item No. 11.  At one point during the interview, Al-Imam asked the agents if they "could get him some different types of food, like olives and rice and coffee."  Larkin Testimony, Hr'g Tr. at 202:9-12.  The interview concluded at approximately 10:20 P.M., less than two hours after it had begun.  Ex. 26 at 3, Item No. 13.  Al-

---

[8] As a technical matter, the agents actually administered two sets of warnings on the day of October 30.  But because the first came before Al-Imam retired to sleep for the night, they considered that a distinct day for purposes of the warnings.

Imam returned to his detention pod, where he remained undisturbed for the next eight-plus hours. Id. at 3-4, Item Nos. 13-2.

At 7:00 A.M. the following morning, October 31, the Doctor conducted a fourth medical screening to verify that Al-Imam remained fit for detention. Doctor Testimony, Hr'g Tr. at 84:4-7. Al-Imam reported that he had slept well and that he "was feeling much better" but that "his hips were a little sore." Id. at 84:10-14. Although not discussed at the evidentiary hearing, the Doctor's record of that visit also indicates that Al-Imam had "increased water and food intake." Ex. 22. The Doctor concluded his visit by administering another dose of meclizine for motion sickness at Al-Imam's request. Doctor Testimony, Hr'g Tr. at 84:15-17.

Al-Imam then used the restroom and returned to the detention pod, where the guard force had left a fresh bucket of water for his morning prayer. Ex. 26 at 4, Item No. 5. He was also given a meal, and this time the log provides details: pound cake, veggie crackers, turkey nuggets, and chili mac-n-cheese. Id., Item No. 6. Al-Imam ate some portion of it. Id., Item No. 6.

The fourth interview began at approximately 9:10 A.M. on October 31. Larkin Testimony, Hr'g Tr. at 202:23. The agents "exchanged our normal pleasantries, offered him some things and asked him . . . if he had slept well, if he was feeling okay." Id. at 203:6-8. Al-Imam responded that "he hadn't slept well, and that he had been thinking about his family, and that they would be worried about him." Id. at 203:8-10. Special Agent Larkin testified that Al-Imam "seemed a little bit more down that day" than at their previous sessions together. Id. at 203:13.

Babisha then proceeded to read the Advice of Rights form, while Al-Imam followed along, consistent with the previous two <u>Miranda</u> administrations. <u>Id.</u> at 203:21-24. This time, however, Al-Imam said "something to the effect of 'I think I might want to have a lawyer here with me.'" <u>Id.</u> at 203:24-25. Many questions at the evidentiary hearing focused on exactly what words Al-Imam used to invoke his right to counsel and his demeanor when he did so. Babisha testified on direct that Al-Imam said "'You told us I have the right for an attorney,' and he said, 'I would like that.'" Babisha Testimony, Hr'g Tr. at 156:14-16. Pressed on cross, Babisha testified that "The way he phrased it was, 'You said something about I have a right to an attorney. I would like to have an attorney.'" <u>Id.</u> at 167:13-15. While Babisha acknowledged he did not recall the exact words, he said it was "pretty close" to his formulation; he also clarified that the "you" in Al-Imam's statement referred to Babisha, who had just read aloud that particular right. <u>Id.</u> at 167:16-168:3. Special Agent Larkin was asked on cross whether it seemed Al-Imam "was having a mental realization at [the] moment" he invoked his right to counsel, and Larkin answered, "I couldn't say." Larkin Testimony, Hr'g Tr. at 212:15-18. He was similarly unsure of how to answer the question whether it seemed that what Al-Imam "was reading . . . was novel to him." <u>Id.</u> at 212:19-23.

In any case, the agents heeded his request. <u>Id.</u> at 204:2-5. They "told him that was his right and that . . . [they] couldn't provide him a lawyer on the boat so that [they] wouldn't continue to talk to him until he had the opportunity to have a lawyer." <u>Id.</u> After the agents told Al-Imam that they would not ask him any further questions, Al-Imam "said something to the effect of, 'If you guys aren't going to beat me, I would like to just go back to my cell and sleep a little bit.'" <u>Id.</u> at 204:6-10. Babisha testified that Al-

20

Imam "became emotional" and "[s]ad" around this time.  Babisha Testimony, Hr'g Tr. at 171:20-21.  The agents were "taken aback that he thought anybody was going to beat him" and "immediately told him . . . '[t]hat's never going to happen while you're in the custody of the U.S." and that he "won't be harmed in any way."  Larkin Testimony, Hr'g Tr. at 204:12-16.

Al-Imam did not, however, choose to immediately return to his detention pod.  Id. at 205:1-2.  He had just gotten the coffee and olives he requested in the prior interview, so he engaged in "small talk . . . about soccer and other things" while he finished them. Id. at 205:1-7.  About 20 minutes later, the guard force returned Al-Imam to his detention pod, and the FBI conducted no further interviews with Al-Imam while aboard the vessel. Id. at 205:15-23; Babisha Testimony, Hr'g Tr. at 159:11 (stating that agents "never again" tried to speak with Al-Imam on the vessel).

E.   Other Relevant Facts

Several other issues were explored at the evidentiary hearing that the Court finds relevant to the disposition of  Al-Imam's motion.  One was whether Al-Imam ever indicated that he was abused during the capture operation or while on board the vessel, or whether it appeared that he had been.  Special Agent Goad testified that no member of the capture team had ever physically abused Al-Imam and that Al-Imam had not reported any such abuse.  Goad Testimony, Hr'g Tr. at 22:13-23.  Special Agent Kath, who communicated with Al-Imam during the transport, said the same.  Kath Testimony, Hr'g Tr. at 36:4-13.  Special Agent Kolarcik testified that Al-Imam was treated "very gently and humanely" throughout his initial processing aboard the third vessel.  Kolarcik Testimony, Hr'g Tr. at 54:1-12.  The Doctor who examined Al-Imam throughout his

detention on the vessel testified that Al-Imam neither showed signs of physical abuse nor reported any abuse.  Doctor Testimony, Hr'g Tr. at 72:21-25.  Babisha—who was with Al-Imam throughout the initial processing, the several medical screenings, and the interviews—was asked whether, as "the only Arab[ic] speaker on the ship," Al-Imam ever told him that "he had been abused or maltreated," and Babisha answered that he never did.  Babisha Testimony, Hr'g Tr. at 159:14-18.  Counsel for Al-Imam did not elicit any testimony contradicting these representations, nor has he made any argument suggesting the contrary.  Day 2 Hr'g Tr. at 3:22-25 (conceding that "politeness of the officers is clear" and "not accusing them of mistreatment of Al-Imam in this motion").

Babisha's aptitude as an interpreter was also the subject of extensive questioning at the hearing.  See Babisha Testimony, Hr'g Tr. at 120-135.  Babisha joined the State Department after the terrorist attacks of September 11, 2001, id. at 120:21, and he remained there until joining the FBI in 2008, id. at 121:18.  In his nearly twenty-year career as an interpreter, Babisha has translated thousands of documents and interpreted several hundred in-person interviews.  Id. at 122:13-24.  While at the State Department, Babisha was promoted to the highest level of interpreter, known as "conference-level," id. at 127:2-128:2, earning the opportunity to interpret for high-ranking State Department officials, including then-Secretary of State Condoleezza Rice, id. at 128:11-13.

Babisha has continued to distinguish himself at the FBI.  There, he has been regularly subjected to a "quality review process," and he has never once received an unsatisfactory review for either his written or oral translations.  Id. at 125:2-18.  He has interpreted for former Director Robert Mueller and "other very high-ranking officials."  Id. at 128:18-24.  What's more, soon after joining the FBI, he began creating his own "glossary" of terms, catered to the "specialties"

of his work, which he shares with his "fellow linguists."  Id. at 129:9-14.  More informally, Babisha hones his Arabic by speaking Arabic at home with his wife, watching Arabic-language movies, listening to Arabic music, attending places of worship that conduct services in Arabic, and spending time with Arabic-speaking friends.  Id. at 129:25-130:4.

Babisha testified that there are four dominant dialects of Arabic, and that he has extensive experience translating "Maghreb," the dialect commonly spoken in Libya.  See id. at 131:1-25. But according to Babisha, even where he encounters a dialect with which he is somewhat unfamiliar, the speakers can "very quickly . . . adjust our conversations to that effect."  Id. at 133:18-20.  And if the speakers are still speaking past one another, Babisha said it is his practice to "ask the speaker . . . if there's a word I wasn't sure I understood him correctly.  I would use another word, for example, to say, 'Did you mean this word?' and he would tell me yes."  Id. at 134:2-5.

Throughout his time with Al-Imam, Babisha testified that he had no trouble understanding Al-Imam and that Al-Imam had no difficulty understanding him.  See, e.g., id. at 146:1-5 (Al-Imam had no issues understanding Babisha during his initial processing); id. at 146:12-14 (no problems communicating with the Doctor); id. at 146:15-147:16 (no difficulty understanding the guard force's rules or Article 3 of Geneva Convention); id. at 153:16-20 ("He understood, and he answered exactly what was being asked of him" during the first interview.); id. at 154:13-18 (no concerns about whether Al-Imam was sufficiently educated to understand him).  Special Agent Larkin echoed that.  Larkin Testimony, Hr'g Tr. at 200:3-8 (answering "No, not at all" to question of whether they had a "hard time understanding each other through the interpreter").

## II.   Discussion

Al-Imam's sole argument for suppression is that his statements were obtained in violation

of <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).  In <u>Miranda</u>, the Supreme Court announced that

"the prosecution may not use statements, whether exculpatory or inculpatory, stemming from

custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards

effective to secure the privilege against self-incrimination."  384 U.S. at 444.  Chief among these

safeguards are the now-familiar <u>Miranda</u> warnings: a defendant "must be warned prior to any

questioning that he has the right to remain silent, that anything he says can be used against him

in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford

an attorney one will be appointed for him prior to any questioning if he so desires."  <u>Id.</u> at 479.

A defendant can "knowingly and intelligently waive these rights and agree to answer questions

or make a statement," but the prosecution bears the burden of proving (by a preponderance of the

evidence) that the warnings were given and that the defendant waived his right before any

"evidence obtained as a result of interrogation can be used against him."  <u>Id.</u>

Whether a defendant's waiver of his <u>Miranda</u> rights is valid turns on an "inquiry [with]

two distinct dimensions."  <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986).  "First, the

relinquishment of the right must have been voluntary in the sense that it was the product of a free

and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must

have been made with a full awareness of both the nature of the right being abandoned and the

consequences of the decision to abandon it."  <u>Id.</u>  "Only if the totality of the circumstances

surrounding the interrogation" shows that both criteria are satisfied can a <u>Miranda</u> waiver be

valid.  <u>Id.</u> (internal quotation marks omitted).  In making this determination, courts should

examine "the particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused." Oregon v. Bradshaw, 462 U.S. 1039, 1046 (1983).

There is no dispute that Al-Imam was given Miranda warnings. The propriety of suppression therefore hinges on whether his waiver of those rights was effective. Al-Imam contends that the government cannot meet its burden to prove that his waiver was voluntary, knowing, and intelligent. He suggests that three facets of the interrogations undermine the validity of his waiver: first, the fact that he was abducted meant that he remained in a particularly vulnerable state of mind during the interrogations, especially the first interview that began in the early morning hours of October 30, Mot. Suppress at 4; second, the manner in which his rights were communicated to him was coercive and confusing, id. at 5; and third, his "if you won't beat me" statement shows that, throughout the interrogations, he was under the impression that he would be harmed if he was uncooperative, id. at 6. The government responds that Al-Imam appeared calm and composed, not rattled, in the interrogation sessions; that Al-Imam was capable of understanding the spoken and written translation of his rights and that the waiver form was not otherwise confusing; and that throughout his time aboard the ship—whether before, during, or in between interrogations—he was treated humanely and courteously.

So, to the first question in Burbine: was Al-Imam's waiver "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception[?]" 475 U.S. at 421. At the outset, the Court notes that it rejected a similar voluntariness challenge in the Abu Khatallah case. Many of Al-Imam's arguments track Abu Khatallah's and largely present as weaker versions of his alleged co-conspirator's. For instance, Abu Khatallah endured a seemingly more traumatic (and certainly more violent) capture than did Al-Imam, and he was subjected to five days of interrogation by American intelligence officials,

without ever being advised of his <u>Miranda</u> rights, *before* the FBI interrogations related to his

criminal prosecution began.  <u>United States v. Abu Khatallah</u>, 275 F. Supp. 3d 32, 67 (D.D.C.

2017).  Indeed, what the Court said in <u>Abu Khatallah</u> could almost apply verbatim here:

> Considering the totality of the circumstances, the Court finds that Abu
> Khatallah's <u>Miranda</u> waivers were "made voluntarily, knowingly and
> intelligently."  <u>Burbine</u>, 475 U.S. at 421.  The waivers were voluntary because the
> conditions Abu Khatallah experienced prior to waiving his rights were not
> coercive, and did not in any way prevent his waivers from being "the product of a
> free and deliberate choice."  <u>Id.</u>  No threats or promises were made to induce the
> waivers, and Abu Khatallah was physically unrestrained before, during, and after
> each waiver was made.  The waivers were elicited by an unarmed team of FBI
> personnel—an Arabic interpreter, and two agents dressed in civilian clothes—
> with no DOD guards present.  They were in every instance preceded by a health
> and welfare check, which ensured that Abu Khatallah was well-rested, engaged,
> and alert.  And Abu Khatallah was treated humanely and courteously: He was
> given breaks every hour or two, and offered snacks and refreshments.  The sheer
> number of times Abu Khatallah waived his <u>Miranda</u> rights—once in writing and
> twice verbally on each typical interview day—is further evidence of the waivers'
> voluntariness.

<u>Abu Khatallah</u>, 275 F. Supp. 3d at 66-67 (citations to the hearing transcript omitted).

All those same facts are present here.  Special Agent Larkin and TFO Marcano

always treated Al-Imam with respect and neither appeared threatening nor acted

aggressively towards him.  <u>See, e.g.</u>, Babisha Testimony, Hr'g Tr. at 159:14-18.  Counsel

for Al-Imam conceded as much at the evidentiary hearing.  Day 2 Hr'g Tr. at 3:22-25

(stating that the "politeness of the officers is clear" and that he is "not accusing them of

mistreatment of Al-Imam in this motion").  The agents and the interpreter wore civilian

clothes and were unarmed; they spoke in normal conversational tones; and they

frequently checked on Al-Imam's well-being.  Larkin Testimony, Hr'g Tr. at 190:14-19.

The interrogations were not extensive and were punctuated by regular breaks, sometimes

to use the bathroom, other times to eat, rest, and pray.  <u>See, e.g.</u>, Ex. 26 at 3, Item No. 13

(ending interview after less than 90 minutes of actual questioning).  In addition, Al-Imam

was Mirandized twice and twice he waived his rights, orally and in writing.  See Colorado v. Spring, 479 U.S. 564, 576 (1987) ("Indeed, it seems self-evident that one who is told he is free to refuse to answer questions is in a curious posture to later complain that his answers were compelled."); United States v. Yunis, 859 F.2d 953, 961 (D.C. Cir. 1988) ("The administration of proper Miranda warnings, followed by a written waiver of the rights described in those warnings, will usually go far toward demonstrating that a decision to speak is not compelled.").  Last but no less significant, Al-Imam actually invoked his right to counsel and effectively terminated a fourth interrogation. Babisha Testimony, Hr'g Tr. at 156:14-16.  Given that the warnings administered prior to that interrogation were identical to those administered the first two times he waived his rights, it seems clear that he understood all along that he could not be compelled to speak without counsel present.[9]

In spite of this, Al-Imam argues his waiver was involuntary for three reasons: the FBI agents exploited his fragility in the immediate aftermath of his capture; they used a "psychologically coercive" waiver form to elicit his waiver; and they caused Al-Imam to fear that he would be beaten if he did not waive his rights.  None of these arguments are persuasive.

Al-Imam first asserts that his waiver was involuntary because it was a byproduct of the government exploiting the psychological trauma caused by his abduction.  This Court, and many others, have already rejected variants of this argument.  See, e.g., Abu Khatallah, 275 F. Supp.

_____

[9] Counsel for Al-Imam attempted to elicit testimony from Babisha and Special Agent Larkin that suggested this was the first time Al-Imam actually understood his right to counsel, see Larkin Testimony, Hr'g Tr. at 212:15-18, but the Court finds that Al-Imam likely understood his right to counsel the first two times he was administered Miranda warnings, even if he chose not to invoke his right to counsel at those times.

3d at 67; <u>United States v. Havlik</u>, 710 F.3d 818, 822-23 (8th Cir. 2013) (physical altercation during arrest did not render invalid a waiver given after the defendant had calmed down).  Al-Imam acknowledges the tide of authority contrary to his position but contends "there has been a dramatic shift in the scientific understanding of the effects of trauma on the brain that preclude reliance on these older authorities."  Mot. Suppress. at 4.  He points to research by David Alexander and Susan Klein on the psychological effects of kidnapping and hostage-taking.  <u>See</u> Alexander & Klein, *Kidnapping and Hostage-Taking: A Review of Effects, Coping and Resilience*, 102 J. ROY. SOC. MED. 16 (2009).  Among these effects, Al-Imam reports, are impaired memory and concentration, confusion, hyperarousal, and fear and anxiety.  Mot. Suppress at 4.  Al-Imam contends he was suffering from these symptoms, and that the "government did not wait for these symptoms to subside, but exploited them by having Al-Imam quickly sign an 'Advice of Rights' form and then interrogating him in the middle of the night[.]"  As evidence that he must have been mentally reeling from his abduction when he twice waived his <u>Miranda</u> rights, Al-Imam emphasizes that "[a]s soon as he had *one day* to process the brain effects of his sudden abduction from his home, homeland, and pregnant wife," he regained his wits and asked for a lawyer.  Mot. Suppress at 4-5; Day 2 Hr'g Tr. at 5:18-6:3 (arguing it was significant that Al-Imam invoked his right to counsel "finally, after getting some sleep, getting oriented").  The Court is unpersuaded.

As an initial matter, even if the Court were to credit the new research on which Al-Imam relies, it concerns, as the title suggests, victims of kidnappings and hostage-takings, not individuals who have been captured and detained by law enforcement.  The prospect of extreme violence, torture, and even death goes hand-in-hand with the former but not with the latter, at least not in this case.  Al-Imam knew early on that this was not a run-of-the-mill kidnapping or

hostage-taking; the capture team almost immediately informed Al-Imam that he was being taken into United States custody.  Furthermore, the government elicited testimony that Al-Imam appeared to relax once he learned that fact.  Goad Testimony, Hr'g Tr. at 14:14-17.  That would suggest, notwithstanding whatever cruelty Al-Imam may have perpetrated on captives or endured as a captive himself, that he understood he would be treated more humanely in U.S. hands.

Moreover, the government's detailed and credible account of the capture does not paint a picture of a traumatic abduction that would necessarily render Al-Imam's subsequent waivers invalid.  Without minimizing the stress one must experience at being forcibly whisked away in the dark of night, it is hard to imagine a capture being conducted in a calmer or more humane manner.  The American forces effectuated the capture without the use or show of weapons; they identified themselves; and they narrated their movements and the steps they were taking to keep Al-Imam safe.  See, e.g., Goad Testimony, Hr'g Tr. at 11:24-12:10; Kath Testimony, Hr'g Tr. at 36:4-13.  From the time he was captured to his arrival on the large naval vessel, Al-Imam apparently offered no resistance; he suffered no significant injuries during the arrest; and he was cooperative and communicative.  See Doctor Testimony, Hr'g Tr. at 72:21-25.  The fact that Al-Imam suffered seasickness does not significantly alter the calculus.  According to uncontradicted evidence introduced at the hearing, it did not seem to be all that debilitating: Al-Imam was given motion-sickness medication when it flared up, he was able to eat meals in between interrogations, and he repeatedly told the Doctor (who examined him frequently) and the agents that he was feeling fine.  See, e.g., Doctor Testimony, Hr'g Tr. at 81:3-6.  Besides, Al-Imam's last bout of vomiting happened several hours before he executed a Miranda waiver a second

time—after he had eaten, prayed, and told the Doctor and the agents that he was no longer nauseated and feeling much better.[10]

Finally, according to extensive testimony at the evidentiary hearing, almost all outward signs indicated that Al-Imam was not laboring under debilitating psychological trauma.  The Doctor testified that he had experience providing medical care "following traumatic situations," id. at 91:3-5, but denied observing any symptoms of Al-Imam "shutting down" as a result of his abduction, id. at 93:9-21.  When pressed on this issue, the Doctor testified that Al-Imam "was appropriate and cooperative," id. at 93:21, and that he never showed "signs of agitation," except for when he expressed discomfort with the genital-rectal examination, id. at 94:23-95:14. Special Agent Larkin and Babisha testified similarly.  They testified that, far from seeming distressed or agitated, Al-Imam was calm enough to engage in idle chatter about his family and soccer, Babisha Testimony, Hr'g Tr. at 150:11-151:2, and venture requests for his preferred foods, Larkin Testimony, Hr'g Tr. at 202:9-12 (discussing Al-Imam's request for coffee and olives).  These are not the signs of a man suffering from the sort of trauma that would preclude him from validly waiving his Miranda rights.  See Yunis, 859 F.2d at 963 (stating that "an assessment of external behavior is the best way of evaluating the effect of" claimed injuries or illnesses affecting voluntariness).  It is instructive that courts considering comparatively more traumatizing captures and detentions have nevertheless rejected voluntariness challenges.  Abu

---

[10] Al-Imam nevertheless says the eight-hour break he was given between the first and second interrogations did little to lessen his disorientation, because he was only allowed to sleep for three of those hours. Day 2 Hr'g Tr. at 7:4-8.  But Al-Imam told the Doctor that he had slept well, and that he "was feeling much better."  Doctor Testimony, Hr'g Tr. at 84:10-14.  The Doctor's record of his visit also indicates that Al-Imam had "increased water and food intake." Ex. 22.

Khatallah, 275 F. Supp. 3d at 42 (waiver was valid even though defendant was thrown to the ground and resisted arrest for "three to four minutes" by "punching, biting, and kicking his captors"); Yunis, 859 F.2d at 955-56 (waiver was valid when "take down" during capture broke defendant's wrists and where defendant suffered much worse seasickness).  The Court likewise rejects this one.

Next, Al-Imam argues that the form stating his rights and asking whether he would waive those rights was "psychologically coercive" because it did not contain an "option to sign in a way to indicate his objection to questioning."  Mot. Suppress. at 5.  This defect on the face of the form was compounded, according to Al-Imam, by the fact that the agents "undoubtedly instructed [him] to 'sign here.'"  Id.  This argument also fails.

Although the form, as Al-Imam says, does not contain a statement (next to which the defendant could initial) that the defendant objects to further questioning, other features of the form undermine any notion that it is "psychologically coercive."  See Ex. 29.  For one thing, the "Advice of Rights" portion of the form—which in clear and simple sentences, separated by a line-break, explained why he was being held and set forth his right to remain silent and to have a lawyer present during questioning—is separated from the "waiver" portion.  Id.  As the government argues, "the structure and language of the form clearly separated the announcement of the defendant's rights, from any decision to waive those rights."  Opp. at 25.  For another thing, the form requires the defendant to waive each right individually; for instance, he must initial next to the phrase "I am willing to make a statement and answer questions" and next to the phrase "I do not want a lawyer at this time."  Id.  The interpreter Babisha clarified at the hearing that he walked through this portion of the form one right at a time.  Babisha Testimony, Hr'g Tr. at 166:21-167:4 ("And I would go to the next one, and so on, so forth.").  This allowed Al-Imam

to carefully consider each discrete right before indicating his intent to relinquish it.  And that is not all: the form also asks the defendant (in the advice of rights portion) if he has "any questions about what I have just explained to you," and contains a statement (in the waiver portion) that he must initial attesting that he understands his rights and that he is voluntarily giving them up.  Id. These are not the hallmarks of a coercive form, even if it lacks an option for the defendant to affirmatively assert his rights.

At the hearing, counsel for Al-Imam seized on Special Agent Larkin's testimony that Babisha "might have directed [Al-Imam] where to sign," Larkin Testimony, Hr'g Tr. at 193:15-16, and Babisha's testimony that he "asked [Al-Imam] to sign in the appropriate places," Babisha Testimony, Hr'g Tr. at 166:11-12.  Yet a fuller picture of the testimony at the hearing suggests Babisha's assistance with the form was more reactive than directive: he indicated where Al-Imam was to initial and sign the form *after* Al-Imam indicated he wished to continue speaking with the agents.  See supra at 14-15; see also Babisha Testimony, Hr'g Tr. at 174:11-20.  In any event, it seems unlikely that Al-Imam understood Babisha or the agents to be ordering him to sign the form, or that he had no choice but to do so, given that just hours later he would invoke his right to counsel and refuse to sign the waiver.

That leaves only Al-Imam's argument that he waived his rights, at least in part, because he feared physical retribution if he did not.  Al-Imam's sole support for this contention is his statement, after he invoked his right to counsel, that he would like to return to his living quarters so long as he would not be beaten.  Granted, this exchange provides at least some indication that Al-Imam feared that he might be physically abused if he chose not to participate in the interrogations.  This fact, however, does not significantly alter the voluntariness calculus.  "[T]he voluntariness of a [Miranda] waiver . . . has always depended on the absence of police

overreaching[.]"  Colorado v. Connelly, 479 U.S. 157, 170 (1986).  The Supreme Court has

roundly rejected the argument that an attempted waiver is "invalid whenever the defendant feels

compelled to waive his rights by reason of any compulsion, even if the compulsion does not flow

from the police."  Id.; see also id. ("Miranda protects defendants against *government* coercion

leading them to surrender rights protected by the Fifth Amendment; it goes no further than that."

(emphasis added)).  Thus, even though a court must take into account a defendant's particular

circumstances, Bradshaw, 462 U.S. at 1046, those circumstances alone—especially when they

amount to a privately-held fear that would not be obvious to the interrogators—are ordinarily not

enough to find a Miranda waiver involuntary.  Instead, the interrogators must also perpetrate

some abuse of power.

Al-Imam can point to no such abuse here.  Again, his counsel conceded at the evidentiary

hearing that the agents treated Al-Imam fairly and humanely throughout the interviews, and he

has made no argument that other actors involved in his detention were abusive in any way.  Day

2 Hr'g Tr. at 3:22-25 (stating that the "politeness of the officers is clear" and that he is "not

accusing them of mistreatment of Al-Imam in this motion").  His only pertinent argument is one

the Court already rejected: that the interviews started too soon after his abduction, without an

ample opportunity to rest and recuperate.  Id. at 7:24-8:1 ("[T]he strategy shows they're trying to

accomplish getting information without actually having him provide them a valid waiver.").  As

evidence of this larger "strategy"—which was purportedly to prey on Al-Imam's disorientation

and fatigue—Al-Imam's counsel highlighted the fact that the agents did not administer Miranda

warnings during the third interview, after Al-Imam had "the psychological benefit of resting."

Id. at 7:21-22; see also Larkin Testimony, Hr'g Tr. at 201:24-202:6 (explaining that the agents

did not Mirandize Al-Imam the night of October 30 because he had been Mirandized eight hours

earlier that same day).  The Court finds this conjecture unsupported by the record; the agents

Mirandized Al-Imam the first two times they met with him on October 30, and again on the

morning of October 31; that they failed to do so on the third October 30 interview does not

suggest some pernicious plan to elicit an involuntary waiver.

To be sure, Al-Imam may well have expected physical abuse to follow if he refused to

speak to the FBI interrogators.  But the Court finds nothing in the record that suggests the agents

should have detected this fear and understood Al-Imam's vulnerability the first three times they

spoke with him.  Nor does the Court find anything to suggest that whatever fear Al-Imam was

experiencing was inspired by the conduct of the U.S. personnel he encountered.  As Al-Imam's

counsel admitted during his argument, "there are two parts of voluntariness" and "[o]ne is the

government's misconduct."  Day 2 Hr'g Tr. at 4:18-20.  Because the record is "devoid of any

suggestion that [the government] resorted to physical or psychological pressure to elicit the

statements," Burbine, 475 U.S. at 421, Al-Imam's argument that his waiver was obtained

involuntarily fails.

Now, to the second question in Burbine: whether the waiver was "made with a full

awareness of both the nature of the right being abandoned and the consequences of the decision

to abandon it."  475 U.S. at 421.  Here, Al-Imam's principal argument is that his lack of

education and familiarity with American legal culture prevented him from fully understanding

his Miranda rights and the consequences of waiving them.  He complains, for instance, that while

the phrase "you have the right to remain silent" is familiar enough to American ears, that

language "encompasses notions of legal rights non-existent in Libya."  Mot. Suppress at 5.  But

even assuming that the import of the "right to remain silent" may have been lost on Al-Imam, the

rest of the form is less ambiguous.  Immediately after the right to remain silent, the form says

"*[i]f you decide* to speak with us today," Ex. 29 (emphasis added), which indicates Al-Imam had

the choice not to speak with them.  The next two lines provide that "[y]ou have the right to talk

to a lawyer for advice before we ask you any questions" and "[y]ou have the right to have a

lawyer with you during questioning."  Ex. 29.  All these statements clarify what the "right to

remain silent" means: that Al-Imam had a choice whether to speak with the agents, or at least

that he did not have to speak with them until a lawyer was present.  And if this still left matters

unclear for Al-Imam, the very last line of the "Advice of Rights" asks him whether he has any

questions regarding the rights just explained.  Id.

Even if the form could have been clearer, the Court would still reject his challenge.

Courts, including this one, have viewed skeptically arguments that a defendant's lack of

education and particular cultural background can render a waiver unknowing.  In Abu Khatallah,

the defendant raised an essentially identical argument.  275 F. Supp. 3d at 68.  Although this

Court said that Abu Khatallah's "status as a foreign national" is "one relevant factor in

evaluating" whether his waiver was knowing and intelligent, it declined to hold that it was

sufficient to render the waiver (which was made using a substantially similar process to that

employed in this case) unknowing.  Id.  In doing so, the Court noted the D.C. Circuit's rejection

of a similar argument in Yunis and similar decisions by courts across the country.  Id. (citing

United States v. Labrada-Bustamante, 428 F.3d 1252, 1259 (9th Cir. 2005) (valid waiver where

defendant "might not be familiar with the United States' form of justice") and United States v.

Hasan, 747 F. Supp. 2d 642, 669 (E.D. Va. 2010) (valid waiver by "non-English speaking and

illiterate Somali nationals without any connection to the United States")).  The Court doubts that

Al-Imam was any less equipped to comprehend his rights and the effect of waiving them than the

defendants in any of the cases just cited.  Testimony on this subject at the evidentiary hearing

suggested that Al-Imam had no difficulty comprehending his rights.  One example: Babisha was

asked whether he was "concerned that [Al-Imam] maybe wasn't educated enough to understand

either the rights or the conversation that was going on," and he responded: "[n]o, that was not the

case.  I was not ever concerned about his understanding, that it wasn't adequate."  Babisha

Testimony, Hr'g Tr. at 154: 13-18.  And again, Al-Imam *did* invoke his right to counsel during

the third Miranda administration, which suggests he understood his rights the first two times as

well but simply chose not to invoke them.  See supra 27 n.9.

*      *      *

For all these reasons, the Court concludes that Al-Imam's two Miranda waivers were

voluntary, knowing, and intelligent.  It therefore will deny his motion to suppress the statements

he offered during his interviews with the agents while aboard the naval vessel.  A separate Order

shall accompany this memorandum opinion.


_____
CHRISTOPHER R. COOPER
United States District Judge


Date: April 8, 2019