```
 1                IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
       - - - - - - - - - - - - - - - - x
 3     THE UNITED STATES OF AMERICA,
                                           Criminal Action No.
 4                    Plaintiff,           1:17-cr-00213-CRC-1
                                           Tuesday, March 19, 2019
 5     vs.                                 10:11 a.m.

 6     MUSTAFA MUHAMMAD MUFTAH AL-IMAM,

 7                    Defendant.
       - - - - - - - - - - - - - - - - x
 8     _____

 9          TRANSCRIPT OF EVIDENTIARY HEARING ~ DAY ONE
          HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
10                    UNITED STATES DISTRICT JUDGE
       _____
11     APPEARANCES:

12     For the United States:    JOHN M. CUMMINGS, JR., ESQ.
                                 KAREN P. SEIFERT, ESQ.
13                               MICHAEL C. DiLORENZO, ESQ.
                                 U.S. ATTORNEY'S OFFICE
14                               Judiciary Center Building
                                 555 Fourth Street, NW
15                               Washington, DC 20530
                                 (202) 353-9424
16                               john.cummings@usdoj.gov

17
       For the Defendant:        MATTHEW J. PEED, ESQ.
18                               CLINTON & PEED
                                 777 6th Street, NW, 11th Floor
19                               Washington, DC 20001
                                 (202) 621-1828
20                               matt@clintonpeed.com

21     Court Reporter:               Lisa A. Moreira, RDR, CRR
                                     Official Court Reporter
22                                   U.S. Courthouse, Room 6718
                                     333 Constitution Avenue, NW
23                                   Washington, DC  20001
                                     202-354-3187
24
       Proceedings recorded by mechanical stenography; transcript
25     produced by computer-aided transcription
```

```
 1                          I N D E X

 2
        WITNESS                                              PAGE
 3
        SPECIAL AGENT BRANDON GOAD
 4           (By Mr. Cummings)...................................   7
             (By Mr. Peed).....................................  23
 5
        SPECIAL AGENT JONATHAN KATH
 6           (By Mr. Cummings)..................................  25
             (By Mr. Peed).....................................  37
 7           (By Mr. Cummings)..................................  39

 8      SPECIAL AGENT JOSHUA KOLARCIK
             (By Mr. Cummings)..................................  39
 9           (By Mr. Peed).....................................  54
             (By Mr. Cummings)..................................  58
10
        DOCTOR
11           (By Mr. Cummings)..................................  60
             (By Mr. Peed).....................................  88
12           (By Mr. Cummings)..................................  94

13      CAPTAIN
             (By Mr. Cummings)..................................  96
14           (By Mr. Peed).................................... 116

15      SAMUEL BABISHA
             (By Ms. Seifert)................................. 119
16           (By Mr. Peed).................................... 159
             (By Ms. Seifert)................................. 172
17           (By Mr. Peed).................................... 176

18      SPECIAL AGENT RYAN LARKIN
             (By Ms. Seifert)................................. 176
19           (By Mr. Peed).................................... 206
             (By Ms. Seifert)................................. 213
20

21

22

23

24

25
```

```
1                      P R O C E E D I N G S
2              THE COURTROOM DEPUTY:  Your Honor, we're on the
3    record for Criminal Case 17-213, United States of America
4    vs. Mustafa Muhammad Muftah Al-Imam.  Let the record reflect
5    that the interpreter has been sworn.
6              Counsel, if you could please approach the lectern
7    and identify yourselves for the record.
8              MR. CUMMINGS:  Good morning, Your Honor; John
9    Cummings on behalf of the United States.  With me is
10   Mr. Michael DiLorenzo and Ms. Karen Seifert.
11             THE COURT:  Mr. Cummings.  How's everyone?
12             MR. PEED:  Good morning, Your Honor; Matthew Peed
13   on behalf of Mustafa Al-Imam.
14             THE COURT:  Mr. Peed.
15             Mr. Al-Imam, can you hear me?
16             THE DEFENDANT:  Yes.
17             THE COURT:  All right.  Mr. Cummings, we're here
18   on the defendant's motion to suppress statements.  Are your
19   witnesses ready?
20             MR. CUMMINGS:  We are, Your Honor.
21             THE COURT:  Okay.
22             MR. CUMMINGS:  Just a couple of preliminary
23   matters for the Court's information.
24             I've provided a copy of the exhibits to the
25   defense.  The Court should also have a copy in front of it.
```

1    Mr. Peed has no objection to the admission of those exhibits

2    for purposes of this motions hearing so we've also provided

3    a numbered binder for the witnesses to follow along, and we

4    will just have the witnesses comment on those exhibits as

5    appropriate.

6              THE COURT:  Okay.  Will you be covering all of the

7    exhibits?

8              MR. CUMMINGS:  I'll be covering Exhibits 1 through

9    28.

10             THE COURT:  All right.  So why don't we go ahead

11   and preadmit 1 through 28 so that you don't have to move

12   them in.

13             MR. CUMMINGS:  Thank you, Your Honor.

14             THE COURT:  Okay.  No objection, Mr. Peed?

15             MR. PEED:  No objection.

16             THE COURT:  All right.  So we are obviously not in

17   a classified setting today.  You do not, I understand,

18   intend to present any classified evidence.

19             MR. CUMMINGS:  That's correct, Your Honor.

20             THE COURT:  Okay.

21             Now, Mr. Peed, you filed a CIPA Section 5 notice

22   only recently.

23             MR. PEED:  Yes, Your Honor.  I received an

24   unclassified extraction of that summary of the document that

25   I noticed.  I haven't had a chance to compare it to the

1    whole document.  I can do that during a break because the

2    original document is in the secure room here.

3              THE COURT:  Okay.  Do you plan on using that with

4    a witness who is scheduled to testify this morning?

5              MR. PEED:  No, Your Honor.

6              THE COURT:  Okay.  So we'll work that out over the

7    break.

8              MR. PEED:  Yes, Your Honor.

9              THE COURT:  And we're not going to have to

10   reconvene for you to use a piece of classified evidence,

11   correct?

12             MR. PEED:  No, Your Honor.

13             THE COURT:  Okay.  All right.

14             MR. CUMMINGS:  Thank you, Your Honor.  Just one

15   other preliminary matter just to give the Court a little bit

16   of a road map of how we're going to proceed.

17             THE COURT:  Yes.

18             MR. CUMMINGS:  We're going to try to reduce the

19   duplication as much as possible.  There will be some

20   overlap, but we'll try to reduce it.

21             We'll begin with Special Agent Brandon Goad, who

22   will testify about the defendant's capture and his transport

23   to a naval vessel.

24             That will be followed by the testimony of Special

25   Agent Jonathan Kath, who is an Arabic-speaking FBI agent who

1    will testify about his communications following the capture

2    and during the transfer to the naval vessel.

3              We will then call Special Agent Joshua Kolarcik,

4    who will testify about the physical set-up on the naval

5    vessel as well as describe the initial processing of the

6    defendant on that vessel.

7              We will then call a doctor with the Department of

8    Defense who will testify about his medical examinations and

9    treatment of the defendant, and we'll follow that by calling

10   a captain in the Air Force, who will testify about the role

11   of the guard force in the defendant's detention.

12             And the final two witnesses regarding the

13   statements themselves, that will be Special Agent Ryan

14   Larkin and the interpreter, Samuel Babisha.

15             And I will try to avoid doing it as much as

16   possible, but particularly with relation to the capture

17   witnesses, I expect I may lead a little bit at the beginning

18   just to make sure I stay within the parameters that have

19   been set for me by the various stakeholders.

20             THE COURT:  All right.  So I intend to proceed

21   with the evidentiary portion of the hearing.  We'll,

22   depending on timing, allow for, you know, closings or

23   summations, and then, if we have time tomorrow, we'll take

24   up the 404(b) motion by the -- the government's 404(b)

25   motion.  Okay?

```
 1              MR. CUMMINGS:  Thank you.

 2              Your Honor, at this time the government will call

 3    Brandon Goad.

 4              THE COURT:  Very well.

 5              Good morning, sir.  Please stand and raise your

 6    right hand.

 7              (Witness sworn)

 8              THE COURT:  All right.  Special Agent Goad, feel

 9    free to pour yourself a cup of water there, if you'd like.

10              THE WITNESS:  Thank you, sir.

11              SPECIAL AGENT BRANDON GOAD, Sworn

12                      DIRECT EXAMINATION

13    BY MR. CUMMINGS:

14    Q.  Special Agent, if you would just take a moment to

15    introduce yourself, and spell both your first and last name

16    for the benefit of the court reporter.

17    A.  Special Agent Brandon Goad, B-R-A-N-D-O-N, G-O-A-D.

18    Q.  And Special Agent Goad, are you currently employed?

19    A.  Yes.

20    Q.  By whom?

21    A.  The FBI.

22    Q.  And what is your current position with the FBI?

23    A.  Special agent.

24    Q.  Where are you currently assigned?

25    A.  The hostage rescue team.
```

1    Q.  And can you just take a moment to briefly explain what

2    the hostage rescue team is.

3    A.  It's a full-time tactical unit for the FBI, kind of like

4    a SWAT team.

5    Q.  And how long have you been a member of the hostage

6    response team?

7    A.  Approximately six years.

8    Q.  And prior to joining the hostage response team, can you

9    briefly describe your career with the FBI.

10   A.  It was in the Albany division, Syracuse RA, for

11   approximately three years prior to coming on the team.

12   Q.  And prior to joining the FBI, did you have any military

13   service?

14   A.  Yes.  I was with the United States Marine Corps for

15   almost six years.

16   Q.  And what's the highest rank you received as a member of

17   the United States Marine Corps?

18   A.  Captain.

19   Q.  Now, I want to turn your attention to October of 2017.

20   Did you have occasion to become involved in a capture

21   operation involving an individual now known to you as

22   Mustafa Al-Imam?

23   A.  Yes.

24   Q.  And did that operation bring you to Misurata, Libya?

25   A.  Yes.

1    Q.  Prior to going -- let me ask you this, Special Agent

2    Goad.  Do you speak Arabic?

3    A.  I do not.

4    Q.  As part of your preparation for this operation, did you

5    learn any Arabic?

6    A.  I learned some -- a handful of phrases, yes.

7    Q.  And what was the purpose of learning this handful of

8    phrases?

9    A.  To be able to communicate with the subject after he was

10   captured.

11   Q.  And Agent Goad, if I could ask you -- there's a binder

12   in front of you.  If you could turn to what's Tab No. 1,

13   and pointing out what's been marked as Government's Exhibit

14   No. M1, do you recognize that particular exhibit?

15   A.  Yes.

16   Q.  And what is that exhibit?

17   A.  These are the phrases that I wrote down based on what

18   the translator gave me from the unit that I was with.

19   Q.  And what did you do to acquaint yourself in terms of how

20   to pronounce these particular phrases?

21   A.  I wrote them down, and then I said them back and forth

22   multiple times with the translator to try and attempt to

23   make sure I was pronouncing them correctly.  And then I just

24   kept this with me and tried to commit them to memory.

25   Q.  And what was your purpose in remembering these

1   particular phrases?

2   A.  Just to be able to very briefly communicate with the

3   subject after capture.

4   Q.  Now, on October 29, 2017, did you, in fact, capture

5   Mustafa Al-Imam?

6   A.  Yes.

7   Q.  And as part of your planning for this capture, were

8   there any personnel present to attend to Mr. Al-Imam's

9   medical needs?

10  A.  Yes.

11  Q.  And who was that, without naming them?

12  A.  It was a member of the DOD.

13  Q.  And do they have any specialized training, to the best

14  of your knowledge?

15  A.  Yes.

16  Q.  What type of training?

17  A.  I'm not sure what specific type, but trained to act as a

18  medic.

19  Q.  And prior to the capture of Mustafa Al-Imam, were you

20  located in a vehicle?

21  A.  Yes.

22  Q.  And can you describe for the Court what happened next

23  while you were in that vehicle.

24  A.  That vehicle contained myself and a number of

25  individuals to be able to effect the arrest of the subject.

1    Q.  And did there come a time on October 29, 2017, when you

2    initiated the arrest of Mustafa Al-Imam?

3    A.  Yes.

4    Q.  And do you recall what time that was?

5    A.  Approximately 11:15 p.m. local time.

6    Q.  And what would that be in terms of the Zulu Time?

7    A.  Around 915 Zulu.

8    Q.  And if you can, describe for the Court what happened at

9    that point in time.

10   A.  The vehicle was located at the subject's apartment

11   building.  The subject was taken into custody after he got

12   out of his car and was approaching the entrance to his

13   apartment building.

14   Q.  And what methods were used to take him into custody?

15   Describe those a little further.

16   A.  The individuals exited the vehicle we were in.  The

17   individuals grabbed his arms.  Another individual covered

18   his mouth.  They brought him back to the vehicle we were in.

19   I assisted them into the vehicle.  All the doors of the

20   vehicle were closed, and we departed the area.

21   Q.  And just focusing on an initial section of moving

22   Mr. Al-Imam into the vehicle, approximately how long did

23   that take?

24   A.  Probably ten seconds, if that.

25   Q.  And during the time that Mr. Al-Imam -- that ten-second

1    window when Mr. Al-Imam was being brought into the vehicle,

2    did any of the members of the team point any weapons at

3    Mr. Al-Imam?

4    A.  No, not that I recall.

5    Q.  And were any members of the team displaying any weapons

6    when they first initiated the capture of Mustafa Al-Imam?

7    A.  Not that I recall.

8    Q.  Again just focusing on this initial period of time, did

9    the defendant offer any resistance?

10   A.  No, not that I recall.

11   Q.  And the individual who you seized that day on October

12   29, 2017, do you see him in the courtroom here today?

13   A.  Yes.

14   Q.  And can you identify him by his position in the

15   courtroom and an article of clothing.

16   A.  Yes.  He's wearing -- I can't see the full -- he's

17   wearing the orange top there seated just to the back of you

18   to the right.

19           MR. CUMMINGS:  If the record could reflect an in-

20   court identification of the defendant?

21           THE COURT:  It may.

22   Q.  Now, Agent Goad, after the defendant was first brought

23   into the vehicle, can you describe what happened next.

24   A.  A couple of the individuals, the ones that had his arms,

25   presented his arms to me.  I put handcuffs on him.  Then I

 1    proceeded to put eye covering on him as well as ear

 2    protection.

 3              A riggers belt was placed around his waist; and

 4    there was a carabiner clip in a buckle that was on the belt,

 5    and the chain of the handcuffs was clipped into the

 6    carabiner, and he was handcuffed to the front of his body.

 7    Q.  And was there any object placed inside Mr. Al-Imam's

 8    mouth?

 9    A.  Yes, there was.  It was a verbal restraint.

10    Q.  And you just described the steps you just described that

11    you took.  Can you describe why you took those particular

12    steps in securing Mr. Al-Imam.

13    A.  For safety of both him and the individuals inside the

14    van because we were still basically in the middle of the

15    city at that point after departing his apartment building.

16    Q.  And was this of some concern to you, given your

17    location?

18    A.  Yes.

19    Q.  And what was your concern?

20    A.  Various groups in the city with varying opinions of --

21    people that may or may not want us there; may or may not

22    want him there.  It could have been a security concern so we

23    didn't want him to make any noise.

24    Q.  And was it your understanding that some of those groups

25    were also armed?

1    A.  Yes.

2    Q.  Did you view that there was a risk of an armed conflict

3    if you were discovered?

4    A.  Yes.

5    Q.  If such a conflict had occurred, whose safety would be

6    jeopardized?

7    A.  Everybody's.

8    Q.  Now, I'd like you again to just focus on this immediate

9    period of time when you first brought the defendant into the

10   vehicle and secured him.  During that first initial window

11   of time, how would you describe his demeanor immediately

12   after capture?

13   A.  Immediately after capture he seemed excited.  He was

14   breathing heavy.

15           And then after that, I spoke a few of the phrases

16   that I identified earlier, and his demeanor seemed to

17   completely calm down, and he appeared relaxed from that

18   point on.

19   Q.  What specific phrases did you say to him in Arabic?

20   A.  Specifically it was the "You are detained by American

21   government."  He seemed to calm down after that one.

22   Q.  And when you say "he seemed to calm down," what

23   physically did you notice about him after you said that to

24   him?

25   A.  It seemed like his breathing had relaxed.  He wasn't

1    breathing as heavy, and he just seemed to -- his body seemed

2    to relax.  He didn't seem as tense.

3    Q.  And I want to show you, if you can turn to Tab 2, what's

4    been marked as Government's Exhibit No. 2 -- M2, I

5    apologize -- and ask if you recognize what's depicted in

6    Government's Exhibit No. M2?

7    A.  Yes.

8    Q.  And what is Government's Exhibit No. M2?

9    A.  That was the eye and ear protection that was placed on

10   him along with the handcuffs.

11   Q.  And what's the purpose of the eye and ear protection?

12   A.  For his safety and for ours; for him to not be able to

13   identify exactly what's around or hear some of the

14   communications that were taking place inside the vehicle.

15   Q.  And why was that important to you?

16   A.  Again, just for safety for the transit.

17   Q.  And during the, as you described, period of transit,

18   what was the medic doing?

19   A.  The medic continued to monitor pulse and blood pressure.

20   Q.  And basically did you have any conversations with the

21   medic regarding the defendant's condition?

22   A.  No, not -- I witnessed the medic doing the checks, but I

23   didn't have any concern, again, because it seemed like he

24   had calmed down, and he was compliant.

25   Q.  And during this first phase when you had him in the

1  vehicle and were transporting him, was he compliant the

2  entire time?

3  A.  Yes.

4  Q.  And did you have occasion to transport him to a second

5  location?

6  A.  Yes.

7  Q.  And at that second location were there any other FBI

8  agents present?

9  A.  Yes.

10  Q.  And did any of those agents speak Arabic?

11  A.  Yes.

12  Q.  Which agent was that?

13  A.  Special Agent Jon Kath.

14  Q.  And can you describe what occurred at the second

15  location.

16  A.  At the second location his ear and eye protection were

17  briefly removed.  His ear protection was removed along with

18  the riggers belt.  We placed a fleece pullover on him, and

19  then we placed a trench coat, an all-weather trench coat, a

20  life jacket, and then we basically put the riggers belt back

21  on, and I rehandcuffed his hands in the front.  I did not

22  clip him into the belt at that point.  And then his eye and

23  ear protection was replaced.

24  Q.  And what happened to the gag that you had previously

25  placed in his mouth?

1    A.  It was not utilized from this point on.

2    Q.  So in terms of the kind of reduction in security

3    procedures, not handcuffing him to the riggers belt and not

4    using the gag, why did you do that at the second location?

5    A.  I didn't feel there was a need to.  Again, he was being

6    compliant, and he was following all the instructions and

7    seemed calm.

8    Q.  And when you said following instructions, who was

9    delivering the instructions to the defendant?

10   A.  Special Agent Kath.

11   Q.  And did it appear to you that the defendant would comply

12   with all instructions?

13   A.  Yes.

14   Q.  For example, did he put on the life vest and the

15   clothing you provided him?

16   A.  Yes.  And we assisted in getting him dressed as well.

17   Q.  And what was the purpose of supplying him with the

18   jacket, the coat, and the life preserver?

19   A.  Just environmental protection.  We were going to be

20   going onto a watercraft in the ocean, so it was just further

21   protection for warmth and from the environment.

22   Q.  And at the second location did you notice any injuries

23   on the defendant?

24   A.  I did not.

25   Q.  And did you have occasion to transport the defendant to

1    a third location?

2    A.  Yes.

3    Q.  And what was your role at this third location?

4    A.  The third location was to -- basically we were in a

5    staging area to get him on the craft that was coming in.

6    Q.  And how was the defendant secured at this third

7    location?

8    A.  He was just sitting in a vehicle, and I was just

9    standing next to him.

10   Q.  And what role did you play in the movement of the

11   defendant to a watercraft?

12   A.  Myself and Special Agent Kath basically hooked

13   underneath both of his arms and took him to the craft when

14   it arrived.

15   Q.  What way was he facing?

16   A.  As we were walking forward, his back was going forward,

17   so we were basically hooked under his arms.

18   Q.  So in terms of the watercraft, who was facing the

19   watercraft?

20   A.  His back was facing the watercraft.  We were facing it.

21   Q.  And why did you bring him into the water using that

22   particular method?

23   A.  It just made it easier to carry him.  By hooking him

24   under the arms, it made it easier for us to both walk with

25   him and then lift him up to try to get him in the craft.

1   Q.  And did anything unusual happen while you were trying to

2   get him into the watercraft?

3   A.  It was a rough sea state.  As we were lifting him up --

4   after we got out into the water, which was about waist deep,

5   as we were lifting him up, a wave knocked the craft back

6   into all of us, and the back of the craft impacted his back.

7   Q.  And did you see at that time -- well, let me ask you

8   this.  How did you respond to the watercraft hitting you?

9   A.  We were pushed off the back of it.  Special Agent Kath

10  and I maintained control of him; went back towards the boat.

11  At that point other individuals inside the craft assisted

12  him in getting on, and then we followed.

13  Q.  And when you say "him," you mean the defendant?

14  A.  Yes.

15  Q.  And at the time you were knocked back by this

16  watercraft, did you notice whether or not the defendant was

17  ever submerged?

18  A.  I don't recall.  I don't believe he was.

19  Q.  Do you recall any time when he was gasping for air or

20  spitting as though he had consumed some water?

21  A.  No.

22  Q.  And to the best of your knowledge, did he appear to lose

23  consciousness at any time as a result of being struck by the

24  watercraft?

25  A.  No.

1   Q.  And once you were on this watercraft, did anybody

2   communicate with the defendant?

3   A.  Yes.

4   Q.  Who was that?

5   A.  Special Agent Kath asked if he was okay and then

6   responded that he was.

7   Q.  And while on that first watercraft -- did anything

8   unusual happen on that first watercraft other than being

9   struck?

10  A.  No.

11  Q.  Did the defendant appear to remain alert and compliant

12  while you were on the first watercraft?

13  A.  Yes.

14  Q.  And did there come a time when you transferred him to a

15  second watercraft?

16  A.  Yes.

17  Q.  And can you describe that to the Court.

18  A.  Special Agent Kath and I, again, assisted him in going

19  from the first craft to the second craft.  Everybody was

20  standing.  Special Agent Kath and I were on either side of

21  the defendant.

22  Q.  And did you enter the second watercraft along with the

23  defendant?

24  A.  Yes.

25  Q.  And how was he secured on that second watercraft?

1    A.  Everybody was standing so he was -- Special Agent Kath

2    and I just tried to hook under his arms and maintain control

3    of him as we were transiting.

4    Q.  Was he still handcuffed at that point in time?

5    A.  Yes, to the front of his body.

6    Q.  And what about the eye and ear protection?  Was he still

7    wearing that?

8    A.  For most of the ride, yes.

9    Q.  And was there a time when you took off his eye

10   protection?

11   A.  Yes.

12   Q.  And can you describe to the Court why you did that.

13   A.  It appeared like the defendant may have been getting

14   sick.  We thought that might be because he had the eye and

15   ear pro in, so we removed it.

16   Q.  And what happened to the defendant while he was on this

17   second vessel?

18   A.  At some point he got sick.

19   Q.  And did that appear to you to be a result of

20   seasickness?

21   A.  Yes.

22   Q.  After on that second watercraft, was the defendant

23   transferred to a naval vessel?

24   A.  Yes.

25   Q.  And can you describe that process to the Court.

1    A.  He was placed inside of a basket, a metal basket, and

2    secured, and he was raised onto the naval vessel by a line

3    controlled by the crew that was on the naval vessel.

4    Q.  And did there appear to be any issues with his being

5    loaded onto that naval vessel?

6    A.  No.

7    Q.  And approximately what time was he located onto the

8    naval vessel?

9    A.  Approximately 1:15 to 1:30 a.m. local time.

10   Q.  And on that first -- on that naval vessel that the

11   defendant was loaded onto, did you have any further contact

12   with the defendant on that vessel?

13   A.  No.

14   Q.  And I want to kind of refer to the entire time frame

15   that you were with the defendant from the moment of capture

16   until he was located on that naval vessel.  At any time did

17   you see anybody physically abuse the defendant?

18   A.  No.

19   Q.  At any time, to the best of your knowledge, did the

20   defendant make any claim that he was abused?

21   A.  No.

22   Q.  How did you and other members of the capture team treat

23   the defendant during his capture and transfer to that naval

24   vessel?

25   A.  The defendant was, like I said, calm and compliant for

1    the entire transit.  We didn't really have to do anything

2    with him other than prep him for the movements.

3    Q.  And when you say "prep him for the movements," what do

4    you mean by that?

5    A.  That was just putting the extra clothing and

6    environmental protection on him to get aboard each one of

7    the crafts.  Other than that, he was compliant.

8    Q.  And during the process of moving him, were there various

9    points when the defendant would acknowledge -- appear to

10   acknowledge he understood instructions he was given?

11   A.  Yes.

12   Q.  How so?

13   A.  Special Agent Kath would explain to him what we were

14   doing, and Special Agent Kath told me that he said okay.

15              MR. CUMMINGS:  The Court's indulgence.

16              (Pause)

17              MR. CUMMINGS:  Nothing further.  Thank you, Your

18   Honor.

19              THE COURT: Mr. Peed.

20                        CROSS-EXAMINATION

21   BY MR. PEED:

22   Q.  Good morning.

23   A.  Good morning.

24   Q.  At any time when you were with Mr. Al-Imam, did you give

25   him -- did you or any member of your team give him

1    instructions about obeying orders?

2    A.  During which portion?

3    Q.  At any time while you were with him?

4    A.  He wasn't given instructions until we were at the second

5    location.  Special Agent Kath would tell him at each step,

6    when we were either transferring craft or getting onto the

7    naval vessel, what was happening.

8           Prior to that, the only phrases were the ones I

9    identified in the beginning there.

10   Q.  When he was given instructions, was he told to comply

11   with the instructions?

12   A.  No.  It was just explained that he had been detained by

13   the American government.

14   Q.  At the time of his capture, how many people were

15   physically involved with the grabbing of him?

16   A.  There were three people that initially grabbed him.

17   Q.  And you said one person put their hand on his mouth and

18   other people grabbed his arms.  Is that how it happened?

19   A.  Yes.

20           MR. PEED:  No further questions, Your Honor.

21           THE COURT:  What time was he captured?  Nighttime?

22           THE WITNESS:  It was approximately 11:15 p.m.  915

23   Zulu Time.

24           MR. CUMMINGS:  Nothing further, Your Honor.

25           THE COURT:  Okay.  Thank you very much for your

```
 1    testimony.  You're excused.

 2              THE WITNESS:  Thank you, sir.

 3              MR. PEED:  Your Honor, may I have an interpreter

 4    sit with me?

 5              THE COURT:  Sure.

 6              Good morning, sir.

 7              THE WITNESS:  Good morning, sir.

 8              THE COURT:  Please raise your right hand.  Stand

 9    up.

10              SPECIAL AGENT JONATHAN KATH, Sworn

11                    DIRECT EXAMINATION

12    BY MR. CUMMINGS:

13    Q.  Thank you, Agent.  If you could, just take a moment to

14    introduce yourself to the Court and spell both your first

15    and last name for the benefit of the court reporter.

16    A.  Yes, sure.  My name is Jon Kath.  That's J-O-N-A-T-

17    H-A-N, Jonathan; last name Kath, K-A-T-H.

18    Q.  And are you currently employed?

19    A.  Yes.

20    Q.  By whom?

21    A.  FBI.

22    Q.  And what is your current position with the Federal

23    Bureau of Investigation?

24    A.  I'm a special agent.  Currently I work out of the

25    Indianapolis field office.
```

```
 1    Q.  And prior to joining the Indianapolis field office, were

 2    you a member of what's called the Fly Team?

 3    A.  Yes.

 4    Q.  And can you please describe to the Court what the Fly

 5    Team is and any specialized training you may have received.

 6    A.  Sure.  The Fly Team is the FBI's outside-the-

 7    continental-United-States terrorism team, in essence,

 8    which means they respond to terrorism attacks, and then they

 9    also -- they work to further terrorism investigations for

10    the FBI outside the United States and inside the United

11    States.

12    Q.  And prior to joining the FBI, did you also serve in the

13    military?

14    A.  Yes.

15    Q.  And what branch of the service did you serve in?

16    A.  I was in the Marine Corps.

17    Q.  How long were you in the Marine Corps?

18    A.  Four years active, and three in the Reserves.

19    Q.  And what's the highest ranking you received within the

20    United States Marine Corps?

21    A.  Staff sergeant.

22    Q.  And Agent Kath, are you a native-born Arabic speaker?

23    A.  I am not a native-born Arabic speaker.

24    Q.  And have you learned any Arabic?

25    A.  Yes.
```

1    Q.  And can you please describe for the Court your training

2    in Arabic and your level of proficiency in Arabic.

3    A.  Sure.  I started Arabic in college.  I took two years of

4    Modern Standard Arabic.  From that, when I joined the

5    Bureau, then I've continued to take Arabic courses to the

6    extent of being what's considered a limited working

7    proficiency in Modern Standard Arabic.

8            I've taken, prior to this arrest operation, I

9    believe it was two, potentially three, different Arabic

10   courses that ranged from four weeks to eight weeks.

11   Q.  And when you say "limited working proficiency," can you

12   tell the Court what exactly that means.

13   A.  Sure.  That means that I'm able to give commands and

14   understand the responses back; engage in basic conversation.

15   It certainly doesn't mean entirely fluent, but it does mean

16   that I can understand basic conversation.

17   Q.  So in terms of the types of sentence structure or

18   vocabulary you would use, how would you describe that in

19   terms of complexity?

20   A.  I'd probably put it at elementary proficiency, slightly

21   more in the sense of I understand how to construct Arabic

22   sentences and to understand the responses.  Largely I

23   probably have 1,000 to maybe 1,500 words of Arabic

24   vocabulary.

25   Q.  And Agent Kath, did there come an occasion when you

1    became involved in the capture mission involving Mustafa

2    Al-Imam?

3    A.  Yes.

4    Q.  And were you actually present at the time Mr. Al-Imam

5    was initially seized in Misurata, Libya?

6    A.  I was in the vicinity.

7    Q.  So did you have direct contact with the defendant at the

8    capture site?

9    A.  No.

10   Q.  When was the first time you had direct contact with the

11   defendant?

12   A.  At the second location.

13   Q.  And can you please describe for the Court what your role

14   was at the second location.

15   A.  Sure.  Upon arrival at the second location, I got out of

16   my vehicle, went to the vehicle that Mustafa Al-Imam was in,

17   and my purpose was to further positively identify that it

18   was Mustafa Al-Imam and to engage in conversing and

19   ensuring, assessing, what his status was at the time.  As

20   well, I was there to kind of give him the next steps of kind

21   of what to expect in the arrest process.

22   Q.  So in terms of identifying himself, how did the

23   defendant identify himself to you?

24   A.  He initially identified himself as Mustafa.

25   Q.  And did you ask him any follow-up questions?

1    A.   Yes.  I asked him for his family name.

2    Q.   And what did he say his family name was?

3    A.   Al-Imam.

4    Q.   And do you see the individual that you identified and

5    saw that day as Mustafa Al-Imam in the court today?

6    A.   Yes.

7    Q.   And can you describe him by his position in the

8    courtroom and an article of clothing he's wearing.

9    A.   Yes.  He's directly in front of me to the left of the

10   courtroom wearing orange clothing.

11           MR. CUMMINGS:  If the Court could reflect an in-

12   court identification of the defendant?

13           THE COURT:  It may.

14   Q.   And I kind of want to follow up with a couple of things

15   you said.

16           In terms of your conversations with Mustafa

17   Al-Imam, were you providing him with information at the

18   second location?

19   A.   Yes.  I provided him with the extent of what was to come

20   as far as, like, we were going to move from one location to

21   another location.

22   Q.   And did you tell him what type of location you were

23   going to move him to?

24   A.   I believe I did.  I believe I said that we were going to

25   move from this location to the beach.

1    Q.  And is there a particular reason why you told him --

2    described to him you were going to move to different

3    locations?

4    A.  Yes.  I primarily did that to kind of keep him a little

5    more at ease, which was more for safety of the operation

6    side of things.  The more that the defendant -- that Mustafa

7    Al-Imam knew, the hopes would be that that would ensure the

8    ease of the operation and handling of him.

9    Q.  And during your conversations with Mr. Mustafa Al-Imam,

10   did you ever give him any instructions on things to do?

11   A.  Yes.

12   Q.  And what types of instructions would those be?

13   A.  I asked that he remain quiet for the operation.  I would

14   ask him to stand up or, you know, to begin moving.  Things

15   of that nature.

16   Q.  And when you would provide him instruction like that,

17   would he comply?

18   A.  Yes.

19   Q.  Did he appear to understand all of your instructions?

20   A.  Yes.

21   Q.  And at any time did Mr. Mustafa Al-Imam resist any of

22   your instructions?

23   A.  No.

24   Q.  At any time did you explain to Mustafa Al-Imam why you

25   were asking him to do some of these things?

1   A.   No.

2   Q.   And did you offer Mustafa Al-Imam any food or water?

3   A.   Yes.

4   Q.   And could you describe that to the Court.

5   A.   Sure.  That was my first interaction with Mustafa Al-

6   Imam at the second location.  I had asked him if he was

7   thirsty and how he felt generally, if he was fine, his

8   welfare.  He said he was fine.

9        I asked him if he was thirsty.  He identified he

10   was thirsty, so I gave him some water from a water bottle

11   that was close by.

12   Q.   And during the course of your conversations with Mustafa

13   Al-Imam that day, would he acknowledge that he understood

14   the instructions that he was providing to you?

15   A.   Yes.

16   Q.   And how would he do that?

17   A.   He would do that by verbally saying in Arabic, "Yes, I

18   understand," following my question to him of, "Do you

19   understand me?"

20   Q.   And did there come a time when Mustafa Al-Imam was

21   transported to a third location?

22   A.   Yes.

23   Q.   And what was your role at that third location?

24   A.   The third location it was to kind of, again, continue to

25   inform him of what the next steps were to come to kind of

 1    remove that fear of the unknown and usher him from that

 2    location to the first watercraft.

 3    Q.  And, again, you touched on this a little bit earlier,

 4    but at the third location, again, why were you informing him

 5    of what was going to happen in terms of putting him at ease?

 6    Why was that important to you?

 7    A.  Sure.  It's my belief and our belief that kind of

 8    removing part of that unknown, specifically in a potentially

 9    very dangerous environment, could be -- allows the defendant

10    to be more amenable to kind of moving and less resistant,

11    which then brings, in that specific environment, more safety

12    to not only the defendant but also to the team.

13    Q.  And did you play a role at that third location in moving

14    the defendant into a watercraft?

15    A.  Yes.

16    Q.  And can you describe what your role was in moving him

17    into that watercraft.

18    A.  Yes.  I was -- the defendant was on my left side, and I

19    moved him from the third location through the surf into the

20    first watercraft.

21    Q.  And which way was the defendant facing as you moved

22    toward the watercraft?

23    A.  He was facing to the rear.

24    Q.  And did anything happen while you were trying to load

25    him onto the watercraft?

1    A.   Yes.

2    Q.   What happened?

3    A.   The sea state at the time was fairly high, as in there

4    were decently large waves.  One of the waves, as it was

5    breaking, it had hit the watercraft and knocked all three of

6    us -- the wave knocked the boat or the watercraft into the

7    three of us.  It struck the back of the defendant, and it

8    struck the chest and -- the chest of my partner as well.

9         But we maintained contact with Mustafa at the time

10   and were able to kind of lift him up into the first

11   watercraft after that.

12   Q.   And after he was struck by the watercraft, did it

13   appear to you that Mustafa Al-Imam had been submerged at any

14   point?

15   A.   I don't believe so.

16   Q.   And at the time did it appear to you that he had

17   lost consciousness as a result of being struck by the

18   watercraft?

19   A.   No.

20   Q.   And were you able to get him into the watercraft?

21   A.   Yes.

22   Q.   And immediately upon getting him into the watercraft,

23   did you have any communications with Mustafa Al-Imam?

24   A.   Yes.

25   Q.   Describe those to the Court, please.

1    A.   Sure.  Upon entrance into the watercraft, I asked

2    Mustafa Al-Imam how he felt, how he was at the time.  He had

3    stated that his back had hurt.

4            I said, "Are you fine otherwise?"

5            He said, "Yes."

6            He appeared entirely fine.

7    Q.   And did you subsequently transfer Mustafa Al-Imam to a

8    second watercraft?

9    A.   Yes, we did.

10   Q.   And did you communicate with Mustafa Al-Imam before

11   transferring him to that other watercraft?

12   A.   Yes.

13   Q.   And, again, what was the purpose of that

14   communication?

15   A.   Again, the purpose is to keep him more informed in order

16   to help the safety of the operation so that he would be

17   amenable to following the directions that we were giving,

18   removing that unknown.

19   Q.   And while on the second watercraft, did anything unusual

20   happen with Mustafa Al-Imam?

21   A.   Yes.  On the second watercraft -- he vomited once or

22   twice while on the watercraft.

23   Q.   And were you communicating with him while on that second

24   watercraft?

25   A.   I was.

```
1    Q.  And, again, what was the nature of those
2    communications?
3    A.  It was the same, assessing his welfare.  At some point,
4    when he started vomiting, I removed the -- his -- the eye
5    covering, which was there for his safety to begin with
6    because there was a lot of splash that was coming from the
7    watercraft.
8         So upon removal of that -- I was assuming that he
9    might be vomiting because of the sea state, which would make
10   sense.  I had told him to look straight, assessing that, you
11   know, it was better to have his eyes open, and potentially
12   that would help, if he were able to look straight, to stop
13   him from vomiting on the second watercraft.
14   Q.  And did there come a time when you were present when he
15   was transferred onto a naval vessel?
16   A.  Yes.
17   Q.  And during the course of -- let me ask you this.  After
18   he was loaded onto that naval vessel, did you have any
19   further contact with Mustafa Al-Imam?
20   A.  After he was loaded on the vessel?  The third?
21   Q.  Yes.
22   A.  No.
23   Q.  And throughout the time that you spent with Mustafa Al-
24   Imam, how would you describe his demeanor overall?
25   A.  Very pleasant, to the extent where he would use the
```

1    equivalent of "yes, sir" answers in Arabic, and at no point

2    did he appear to be confrontational at all.

3    Q.  Did you ever have to raise your voice?

4    A.  No.

5    Q.  During the time that you were with the defendant, did

6    you see anybody physically abuse the defendant?

7    A.  No.

8    Q.  And during all of your conversations that you had with

9    Mustafa Al-Imam that evening, did he ever complain that he

10   had been abused in any way?

11   A.  No.

12   Q.  And did you notice any injuries to the defendant other

13   than the back injury that he reported?

14   A.  No.

15   Q.  And during the course of your conversations with him,

16   you indicated you had done welfare checks.  What do you mean

17   by that?

18   A.  Sure.  Just generally asking him how you feel, if you're

19   fine.  At some point when he -- when his back was hurt or he

20   stated that his back was hurt on the second watercraft, I

21   told him that he would be seeing a doctor in the near term

22   future.

23   Q.  And when you described earlier you were giving certain

24   instructions to Mustafa Al-Imam --

25   A.  Sure.

1    Q.  -- what was the tone you were speaking in when you would

2    give him these instructions?

3    A.  This tone.  Just, you know, nothing aggressive.  Just a

4    conversational tone.

5    Q.  And as a former member of the United States Marine

6    Corps, have you had people give you orders?

7    A.  Yes.

8    Q.  And what tone would you describe orders are usually

9    given in relative to how you were talking to Mustafa Al-

10   Imam?

11   A.  If you're referencing like drill-instructor-style

12   orders, more aggressive.  That's not my personality, and I

13   certainly did not use that intonation.

14           MR. CUMMINGS:  The Court's indulgence.

15           (Pause)

16           MR. CUMMINGS:  Thank you, Agent.

17           THE COURT:  Mr. Peed.

18                        CROSS-EXAMINATION

19   BY MR. PEED:

20   Q.  Good morning.

21   A.  Hi.  Good morning.

22   Q.  Could you describe what you were wearing at the time of

23   your interactions with Mr. Al-Imam.

24   A.  Sure.  I was wearing, like, 5.11-style pants, khaki, and

25   a shirt that I had borrowed, just a button-down shirt, from

1    someone.

2              THE COURT:  Would you tell me what 5.11-style

3    pants are.

4              THE WITNESS:  Yes, sir.  They are like khaki-style

5    pants with, you know, a couple of pockets on the sides.

6    Cargo style.

7              THE COURT:  Cargo pants.

8              THE WITNESS:  Yes, sir.

9    Q.  And could you describe what the other agents with you

10   were wearing?

11   A.  Not that I recall, sir.  I would assume something

12   similar.

13   Q.  And did you have any weapons showing?

14   A.  No.  No, I did not.

15   Q.  Did you have an occasion, when you were giving

16   Mr. Al-Imam instructions, to tell him what would happen if

17   he didn't follow the instructions?

18   A.  No.

19   Q.  And were there ever any instructions that he didn't

20   follow?

21   A.  No.

22   Q.  What was the last time that you were with Mr. Al-Imam,

23   if you recall?

24   A.  It would have been on the second watercraft.

25   Q.  Do you remember the time of day?

```
 1    A.  No.  Late.  Late evening, potentially early morning.

 2              MR. PEED:  Thank you.  No further questions.

 3              MR. CUMMINGS:  Just very briefly.

 4                        REDIRECT EXAMINATION

 5    BY MR. CUMMINGS:

 6    Q.  Agent Kath, was there any time when you had to use a

 7    threatening tone in order to gain the defendant's compliance

 8    with your instructions?

 9    A.  No.

10              MR. CUMMINGS:  That's all I have, Your Honor.

11              THE COURT:  Okay.  Agent Kath, thank you very much

12    for your testimony.

13              THE WITNESS:  Yes, sir.

14              THE COURT:  You're dismissed.

15              THE WITNESS:  Thank you, sir.

16              THE COURT:  Good morning, sir.  Please raise your

17    right hand.

18            SPECIAL AGENT JOSHUA KOLARCIK, Sworn

19                        DIRECT EXAMINATION

20    BY MR. CUMMINGS:

21    Q.  If you could please take a moment to introduce yourself

22    to the Court and spell both your first and last name for the

23    benefit of the court reporter.

24    A.  Sure.  My name is Special Agent Joshua Kolarcik, J-O-S-

25    H-U-A, K-O-L-A-R-C-I-K.
```

1    Q.   And Agent Kolarcik, are you currently employed?

2    A.   I am.

3    Q.   By whom?

4    A.   The FBI.

5    Q.   And what is your current position with the FBI?

6    A.   Currently I am an agent in the counterterrorism

7    division.

8    Q.   And how long have you been an agent in the

9    counterterrorism division?

10   A.   About three years.

11   Q.   And how long have you been with the Federal Bureau of

12   Investigation?

13   A.   11 years.

14   Q.   And if you can just briefly describe your career with

15   the FBI.

16   A.   Sure.   I went through new agents training at Quantico

17   starting in March 2008.   Upon finishing that, I was assigned

18   to the New Orleans division, where I served in a violent

19   crime squad capacity as an agent for about eight years

20   before transferring to the counterterrorism division, where

21   I've been working the last three years.

22   Q.   And Special Agent Kolarcik, did there come an occasion

23   in the fall of 2017 when you became involved in the capture

24   operation of an individual known to you as Mustafa Al-Imam?

25   A.   Yes.

1   Q.  And how did you become involved in that investigation?

2   A.  I was notified that there would be what we call an FTOC,

3   foreign transfer of custody, in which I was put in charge of

4   coordinating our piece for the counterterrorism division to

5   help facilitate between the Department of Defense.

6   Q.  And as part of your role, did you have a role in the

7   detention of Mustafa Al-Imam?

8   A.  I did.  Primarily my role was to document the

9   environment of his detention.

10  Q.  And was the environment you're describing located on a

11  naval vessel?

12  A.  Yes.

13  Q.  And how did you document the conditions on that naval

14  vessel?

15  A.  So prior to the capture operation occurring, we -- I

16  took pictures of the detention facility, took measurements

17  of the living quarters, the interview room that would be

18  used as well as the locations on board the vessel, what

19  would be involved in getting Mr. Imam on board, which in

20  this case was a hoist, documenting where that was,

21  sketching, and that was about it.

22  Q.  And in terms of preparations, in addition to documenting

23  the kind of physical space on the vessel, what steps did you

24  take to prepare for Mr. Al-Imam's arrival on that vessel?

25  A.  So one of the things we did was a lot of dry rehearsals,

1    both day and night.  We wanted to ensure getting Mr. Imam on

2    the vessel occurred in the most safe manner possible, which

3    involved using a litter basket, similar to the one that he

4    would be in, and practicing raising that up and down from

5    the vessel to ensure that it wouldn't hit the side of the

6    ship and that we'd be able to do it safely at night.

7    Q.  And was there anything else you practiced in preparation

8    for Mustafa Al-Imam's arrival?

9    A.  I mean, we went all the way through, then moving to his

10   detention facilities, detaining pod, going through the steps

11   of the inprocessing.

12   Q.  All right.  And you have a book in front of you.  I'd

13   ask that you turn to Tab No. 4.  Let me ask if you recognize

14   the photograph from what is depicted in Government's Exhibit

15   No. M4?

16   A.  I do.  What's depicted is the detention pod that was

17   used surrounded by a camouflage curtain that would be used

18   for privacy.

19   Q.  And showing you what's been marked as Government's

20   Exhibit No. M5, can you please describe what's depicted in

21   Government's Exhibit No. M5?

22   A.  So that is the inside of the detention pod.  Posted on

23   the inside of the detention pod were the rules provided by

24   the DOD guard force governing Mr. Imam's detention as well

25   as the Geneva Convention, I believe, in both English and

1    Arabic.

2    Q.  Showing you Government's Exhibit No. M6, I'll ask if you

3    recognize what is depicted in Government's Exhibit No. M6?

4    A.  I do.  Again, that's the DOD guard force rules of

5    detention.

6    Q.  And what was the purpose of posting these rules on the

7    wall of the pod?

8    A.  The primary purpose, my understanding -- again, this is

9    the Department of Defense guard force that's instituting

10   these rules.  This is part of their procedures.

11          But my understanding is that they are readily

12   available to be read and understood to help make sure that

13   the detainee knows kind of how things are going to go,

14   what's expected of him.

15   Q.  And showing you what's been marked as Government's

16   Exhibit No. M7, do you recognize what's depicted in

17   Government's Exhibit No. M7?

18   A.  Yes.  Again, the DOD rules, and then in English and

19   Arabic.

20   Q.  And then showing you what's been marked as Government's

21   Exhibit No. M8, I'll ask if you recognize what is depicted

22   in Government's Exhibit No. M8?

23   A.  I believe that is the appropriate Geneva Convention

24   guidelines in Arabic.

25   Q.  And, Agent Kolarcik, you had mentioned that there was a

1    pod.  What is a pod?

2    A.  A pod is just what we call the container used both to

3    house a detainee, and there are also latrine pods that

4    include a shower, a facility to use the bathroom, et cetera.

5            But a pod is basically just a container.

6    Q.  And on the first naval vessel where the defendant was

7    first brought, was there actually a latrine pod?

8    A.  There was not.

9    Q.  And what did you have to use for a latrine on this first

10   naval vessel?

11   A.  So on the first naval vessel, because there was no

12   latrine pod, we had to come up with a way for Mr. Imam to

13   use the bathroom when needed, and the solution that was

14   worked out was to transport him up onto the first deck of

15   the ship to use the latrine.

16            In order to do that, to minimize the impact to the

17   crew of the ship and to limit the visibility of the

18   operation, we would have to post door guards along the way

19   and kind of make sure the route was clear of any

20   interference from the crew.

21   Q.  And that was part of your preplanning?

22   A.  Correct.

23   Q.  I'll ask you to turn to Tab No. 3 and ask if you

24   recognize what's depicted in Government's Exhibit No. M3?

25   A.  I do.  That is a sketch I made of the first vessel we

1    were on.

2    Q.  And does your sketch include measurements?

3    A.  It does.  Some are approximate.  For instance, from the

4    hoist point to the detention pod, the detention pod to the

5    interview room, and then the measurements of the detention

6    pod itself and the interview room where I actually used an

7    actual tape measure.

8    Q.  And so the dimensions -- just so it's clear for the

9    record and the Court, what are the dimensions of the

10   detention pod?

11   A.  According to the sketch, 2.22 meters by 1.95 meters.

12   Q.  And how large was the interview room used in this case?

13   A.  The interview room was 4.58 meters by 5.75 meters.

14   Q.  And were both the detention pod and the interview room

15   air conditioned?

16   A.  Yes.

17   Q.  Now I'll show you what's been marked as Government's

18   Exhibit No. M9 for identification purposes and ask if you

19   recognize what is depicted in Government's Exhibit No. M9?

20   A.  I do.  That is the container we used for the interview

21   room.

22   Q.  And the table and chairs located there, were those in

23   the room when you first photographed them?

24   A.  Yes.

25   Q.  And was that the basic condition of the room when the

1    interviews were conducted, to the best of your knowledge?

2    A.  It was.

3    Q.  Now, I want to turn your attention to the events

4    following Mustafa Al-Imam's capture.  Were you present when

5    Mustafa Al-Imam was first brought onto the vessel?

6    A.  I was.

7    Q.  And could you please describe that process to the Court.

8    A.  So we were notified that the capture was successful and

9    that the team was proceeding with Mr. Imam to our vessel, so

10   we staged on the stern of the boat ready to receive him, got

11   the hoist crew ready that had practiced doing the recovery,

12   and basically stood by to receive him.  The guard force was

13   ready to transport him, once onboard, to the detention pod

14   where we would begin his inprocessing.

15   Q.  And can you describe how did the hoist go in terms of

16   how you trained for it?

17   A.  The hoist went great.  It was smooth.  There was no risk

18   of hitting up against the ship.  I mean, it couldn't have

19   gone any better.  He got onboard without any incident

20   safely.

21   Q.  And you mentioned that he came onboard in a type of

22   basket.  How was he secured in that basket?

23   A.  Correct.  So he was strapped down to what's called a

24   Stokes litter or Stokes basket, and he basically had eye and

25   ear protection on and was also covered in a rescue blanket

1    to try and help protect him from the elements, you know,

2    waves and cold.

3    Q.  And as you recall, who else was present when he was

4    first hoisted onto the vessel?

5    A.  To the best of my memory, we had the crew that was made

6    up of a few individuals from the boat itself that were

7    familiar with the hoist, and they were used to bring him

8    onboard.

9             The DOD guard force was present as well as the

10   translator.

11   Q.  And did you have any communication through the

12   interpreter with Mustafa Al-Imam when he was first brought

13   onto the vessel?

14   A.  Not when he was first brought on because he still had

15   hearing protection on, so he wouldn't have been able to

16   hear.

17   Q.  And you mentioned that there was a hoist.  Can you just

18   describe what the hoist is and how that brought him onto the

19   vessel?

20   A.  Sure.  If you're familiar with kind of a tackle that's

21   used with a pulley system, basically lowering down an

22   attachment to the crew on the small vessel that was bringing

23   Mr. Imam from the beach.  And once it was attached, he had a

24   four- to five-man crew that was pulling the rope to hoist

25   him up mainly because the mechanical crane would not give

1    the level of control that we needed to ensure his safety.

2    Q.  Any issues with his being brought onto the vessel?

3    A.  No, sir.

4    Q.  And what happened next?

5    A.  Once he was brought onboard, he was placed on the deck.

6    The attachment was removed from the basket, and then the

7    guard force picked him up and transported him to the

8    detention pod.

9    Q.  And what happened once you were in the detention pod?

10   Actually, let me step back.

11        When you say "detention pod," is that the same pod

12   you identified earlier as Government's Exhibit No. M5?

13   A.  Yes, sir.

14        So once at the detention pod, again, the process

15   began to get him out of the basket to start the

16   inprocessing, which began with documenting what he was

17   currently wearing in his current state prior to entering the

18   detention pod.

19   Q.  And who was present at the time that this initial

20   processing was going on?

21   A.  So it was myself, the DOD guard force, and the

22   translator.

23   Q.  And to the best of your knowledge, were any of those DOD

24   guard force members armed?

25   A.  No, not that I was aware of.

1    Q.  I'm showing you -- if you turn to Tab 10, I'm showing

2    you what's been marked as Government's Exhibit No. M10, and

3    I'll ask you to describe what's depicted in Government's

4    Exhibit No. M10.

5    A.  So that's Mr. Imam post-capture at the beginning of the

6    inprocessing inside the detention cell and the clothes he

7    was wearing.

8    Q.  And there appear to be some white flecks on his shoes

9    and pants.  Were you aware of what that was?

10   A.  I was.  That was -- Mr. Imam had gotten sick, I believe,

11   during the transport due to rough water and just being kind

12   of subjected to the bouncing up and down of the boat.

13   Q.  And what happened next in the inprocessing after you

14   identified him and photographed him?

15   A.  So after he was identified and photographed, the DOD

16   guard force began their initial inprocessing, which

17   primarily involved getting him out of the clothes he was in,

18   conducting a medical screening, getting him weighed, height

19   measured, and allowing the doctor to conduct an examination.

20   Q.  And were there any steps taken to protect the

21   defendant's privacy when he was being asked to change?

22   A.  There was.  So initially I believe they had him strip

23   down to his underwear.  But when he was provided dry clothes

24   to change into, everyone stepped out of the detention pod to

25   allow him to change in privacy.

1    Q.  So was he ever asked to remove all of his clothing in

2    the presence of either you or the guard force?

3    A.  Not in the presence of me.  I don't remember whether the

4    doctor had him remove anything, but I wouldn't have been in

5    there during that point.

6    Q.  And during this initial processing of the defendant, did

7    you take any other photographs of the defendant?

8    A.  I did.  We wanted to document any types of injuries or

9    abrasions he had that may have resulted from the transport,

10   so along the way, as things were identified, I took pictures

11   of them as well.

12   Q.  I want to have you look at Tab 11, what's marked as

13   Government's Exhibit No. M11, and ask you if you recognize

14   what is depicted in Government's Exhibit No. M11?

15   A.  I do.  So there were some abrasions on Mr. Imam's face

16   that were noted during the initial screening.

17   Q.  And showing you what's been marked as Government's

18   Exhibit No. M12, again, I'll ask you to describe what's

19   depicted in Government's Exhibit No. M12.

20   A.  Again, just some red marks on his face that we wanted to

21   capture with a photograph.

22   Q.  Government's Exhibit No. M13, same question.

23   A.  Again, just some red marks, a possible abrasion on the

24   top of his shoulder.

25   Q.  And Government's Exhibit No. M14?

1    A.  Same thing, just a slight abrasion, red mark, on his

2    left shoulder.

3    Q.  Government's Exhibit No. M15?

4    A.  15 was a more significant bruise on the inside of his

5    biceps.

6    Q.  And Government's Exhibit No. M16?

7    A.  16, again, was another mark that we noted.

8    Q.  And where was that mark?

9    A.  I don't remember exactly.  I think it was on his other

10   arm.

11   Q.  Is there anything that would refresh your memory as to

12   where that particular injury was located?

13   A.  Yes, if I could see my photo log.

14           MR. CUMMINGS:  Your Honor, I've provided counsel a

15   copy of what will be marked as Government's Exhibit No. M33.

16           May I approach, Your Honor?

17           THE COURT:  You may.

18   Q.  Agent, if you'll just take a moment to look at

19   Government's Exhibit No. M33 just to yourself, and look up

20   to me after you've had an opportunity to review that

21   document.

22   A.  (Witness reviews document) Okay.

23   Q.  And having been given the opportunity to review that

24   document, does it refresh your memory as to where the injury

25   depicted in Government's Exhibit No. M16 was located?

1    A.  It does.

2    Q.  Where is that injury located?

3    A.  It's a small bruise on the subject's left biceps.

4    Q.  Okay.  Now, during the processing, was there an

5    interpreter present?

6    A.  There was.

7    Q.  And did you provide any instructions to the defendant

8    through the interpreter?

9    A.  The only instruction I provided to him was when I was

10   taking his fingerprints, just to let him know what I was

11   doing.

12   Q.  And did you give him any instructions as part of that

13   process?

14   A.  I didn't.

15   Q.  And did you ever ask him to do anything as part of that

16   process?

17   A.  Not beyond probably basic "turn left," "turn right."

18   That's it.

19   Q.  And when you would provide instructions to the defendant

20   through the interpreter, would he comply with those

21   instructions?

22   A.  He would.

23   Q.  Did he appear to understand all of those instructions?

24   A.  He did.

25   Q.  During the time that you spent -- well, let me ask you

1     this.  You had mentioned that the guard force had originally

2     had him remove his clothing down to his underwear and then

3     was provided new clothing.  What other steps were taken as

4     part of this initial processing?

5     A.  So the big part of it was the medical screening by the

6     DOD doctor to check out what his current status was, whether

7     there were any health concerns.  That was the primary

8     objective of the inprocessing, to make sure there were no

9     immediate healthcare concerns that needed to be taken care

10    of.

11             Following that, we fingerprinted him and took

12    buccal swabs of the inside of his mouth for DNA samples.

13    There were pictures taken.  And then following that, the

14    rules of his detention and the Geneva Convention were

15    explained to him by the guard force.

16    Q.  And so were you present when the rules of detention were

17    explained to him?

18    A.  I was not.

19    Q.  And were you present with the medical doctor who was

20    conducting the examination of the defendant?

21    A.  For a portion of it, yes.

22    Q.  And were there any new injuries pointed out to you other

23    than those that you'd already photographed?

24    A.  Not that I recall.

25    Q.  During the time that you were with Mustafa Al-Imam, the

 1   defendant, did you notice any signs of physical abuse?

 2   A.  No.

 3   Q.  During the time that you were with Mustafa Al-Imam, did

 4   you overhear him through the translator claim that he had

 5   been physically abused in any way?

 6   A.  No.

 7   Q.  Based on your observations, how was the defendant

 8   treated by yourself, the doctor, and members of the guard

 9   force?

10   A.  I think he was treated very gently and humanely.  There

11   was no force ever required.  Everything was explained to him

12   through the translator.  He always acknowledged that he

13   understood.  No one used raised voices.  It was very calm

14   and organized and orderly.

15   Q.  And did you participate in any way in the subsequent

16   interviews of Mustafa Al-Imam?

17   A.  I did not.

18           MR. CUMMINGS:  The Court's indulgence.

19           (Pause)

20           MR. CUMMINGS:  That's all I have, Your Honor.

21   Thank you.

22           THE COURT:  Mr. Peed.

23                      CROSS-EXAMINATION

24   BY MR. PEED:

25   Q.  Good morning.

1    A.   Good morning.

2    Q.   Could you describe what you were wearing during your

3    interactions with Mr. Al-Imam?

4    A.   I don't recall what I was wearing.  I'm guessing it was

5    probably a collared shirt and a pair of pants.

6    Q.   Just so I understand, the detention pod, did it have

7    four walls to it?

8    A.   It did.

9    Q.   And so would this -- looking at M4, this was like for

10   privacy around the four walls?

11   A.   That's right.

12   Q.   Did the walls have windows?  Is that why there was a

13   privacy --

14   A.   There was one window in the door so the guard force

15   could look in and make sure the detainee's okay.

16   Q.   If you want to turn to Exhibit M6 in the binder, on the

17   right side, the rules on the right side, could you read the

18   English portion at the bottom, the last rule there.

19   A.   I don't have the best copy, but I believe -- is it the

20   "Do not attempt to escape"?

21   Q.   Yes.  I was trying to read it.  I was wondering if you

22   could.

23   A.   "Do not attempt to escape.  We will yell 'Halt, Stop'

24   three times and use deadly force."

25   Q.   Would you describe Mr. Al-Imam's demeanor during his

1    processing with you.

2    A.  He was very calm.  I think he was slightly emotionally

3    distraught, as could be understood given his situation and

4    following capture and being transported to a Navy vessel,

5    but we did our best to ensure that he was comfortable and

6    warm and to try and limit any emotional stress he may

7    experience during the inprocessing.

8    Q.  Did he seem docile?  Is that a fair characterization?

9    A.  Docile is fair.

10   Q.  Did he seem able to focus, or did he seem detached?  How

11   would you describe his affect?

12   A.  I believe he was focused enough to answer our questions

13   and to respond to instructions.

14   Q.  Do you recall any questions in particular that were

15   presented to him?

16   A.  Mainly just the ones the doctor was asking of him during

17   the initial screening.

18   Q.  On your photographic log you documented some ship

19   security cameras.  One near the detention area and one near

20   the interview room.  Did any of these cameras see in the

21   detention pod?

22   A.  No, sir.

23   Q.  Do you know if these cameras recorded video?

24   A.  So my understanding is -- because this was a concern

25   prior to the capture operation, one, for the Navy.  They

1    wanted to limit the exposure of their forces and limit the

2    exposure to the ship's crew, so they were concerned about

3    the video cameras.

4          So initially we attempted to find out whether we

5    could get copies of the video because we knew that they

6    would be something that would be discoverable.  Our attempts

7    to get a copy of those videos proved to be next to

8    impossible due to the system, and the person who was running

9    it was basically limited in their capability.

10         So I believe one of the DOD liaison officers that

11   was on board attempted to get a copy just to do a test to

12   see what it would -- how long it would take, and it took

13   like an hour just to download, like, three minutes of video.

14         The video wasn't very good.  The ship basically

15   used it just as, like, a security measure.

16         And so the decision was made, because it was so

17   difficult to get a copy of it, that we would document where

18   the cameras were, and then during the actual post-capture

19   operation we would have the ship turn those cameras off.

20   Q.  So the cameras were off while Mr. Al-Imam was being

21   processed?  Did I understand that right?

22   A.  I believe so.  We were in a darkened state due to

23   the security of the ship, so it was pretty dark down

24   there.  There was some red light.  There's obviously white

25   light inside the detention pod during the screening; but

```
 1    yes, sir.

 2              MR. PEED:  No further questions.

 3                      REDIRECT EXAMINATION

 4    BY MR. CUMMINGS:

 5    Q.  Agent Kolarcik, to the best of your knowledge, did

 6    anybody ever have to use any deadly force or any other type

 7    of force with the defendant?

 8    A.  No, sir.

 9    Q.  And if you could turn to Page -- Document No. 7, M7, of

10    the rules, I'd ask, do you recognize what's stated in

11    English as the first rule?

12    A.  Yes, sir.  That is the "If you are abused, notify

13    staff."

14    Q.  And to the best of your knowledge, did the defendant

15    ever notify staff that he had been abused in any way?

16    A.  Not to my knowledge.

17    Q.  And you had mentioned there was a camera near the

18    detention pod.  Were there any cameras inside the pod

19    itself?

20    A.  No, sir.

21    Q.  And the processing that you described earlier by the

22    guard force and the medical examination, did those take

23    place outside the detention pod or within the four walls of

24    the detention pod?

25    A.  It was inside the detention pod.
```

1    Q.  And was there any camera inside of that detention pod?

2    A.  There were the cameras we were using to take photos of

3    Mr. Imam and the marks and stuff that were noted during the

4    medical screening.  But beyond that, no, sir.

5    Q.  All right.  And just to be clear, because that was a

6    terrible question I just asked you, were there any security

7    cameras located inside?

8    A.  There were no security cameras.

9            MR. CUMMINGS:  That's all I have, Your Honor.

10   Thank you.

11           THE COURT:  All right, Agent.  Thank you very much

12   for your testimony.

13           THE WITNESS:  Yes, sir.

14           THE COURT:  You're excused.  Have a good day.

15           MR. CUMMINGS:  Your Honor, I'd actually request --

16   we're moving at a fairly quick pace.  I do have the other

17   two witnesses that were on their way.  They did not come

18   with us this morning due to some special arrangements.  I

19   believe they should be in the courthouse, if not now, maybe

20   momentarily.  Perhaps we could just take a ten-minute break

21   to make sure they're ready to go?

22           THE COURT:  We'll stand in recess for ten minutes.

23           (Recess taken)

24           THE COURTROOM DEPUTY:  Your Honor, we're back on

25   the record for Criminal Case 17-213, *United States of*

1    *America vs. Mustafa Muhammad Muftah Al-Imam.*

2              MR. CUMMINGS:  Good morning, Your Honor.  We're

3    ready to proceed.  The court reporter is aware that this

4    witness will just be testifying -- we'll refer to him simply

5    as "Doctor."

6              THE COURT:  Doctor, okay.

7              Good morning, sir.

8              THE WITNESS:  Good morning, sir.

9              THE COURT:  Please raise your right hand.

10                      DOCTOR, Sworn

11                   DIRECT EXAMINATION

12   BY MR. CUMMINGS:

13   Q.  Good morning, Doctor.

14   A.  Good morning.

15   Q.  Are you currently an active member of the United States

16   military?

17   A.  Yes.

18   Q.  And what branch of the service are you with?

19   A.  The United States Air Force.

20   Q.  And what is your current rank in the United States Air

21   Force?

22   A.  Major.

23   Q.  And do you have any specialization within the Air Force?

24   A.  Yes.  I'm an emergency medicine physician.

25   Q.  And can you please describe your duties as an emergency

1    medical physician?

2    A.   Yes.   I work as a primary provider in the emergency

3    department as well as the primary doctor in a group of folks

4    that take care of a broad spectrum of folks.

5    Q.   And let me just ask you to keep your voice -- pull the

6    mic closer to you a little bit, if you need to, and keep

7    your voice up.

8    A.   Yes, sir.

9    Q.   And so are you a medical doctor?

10   A.   I'm a DO, doctor of osteopathy.

11   Q.   And do you hold any board certifications?

12   A.   Yes, in emergency medicine.

13            MR. CUMMINGS:   And if I could, just, again -- and

14   I apologize to the Court.   I don't believe we had moved in

15   when we talked, Government's Exhibit No. 32, which is a copy

16   of the doctor's curriculum vitae.

17            THE COURT:   Any objection?

18            MR. PEED:   No objection.

19            THE COURT:   So moved.

20   Q.   And, Doctor, I don't need you to go through your entire

21   CV, but if you could just please provide the Court with a

22   brief overview of your training and schooling in medicine.

23   A.   Yes.   I enlisted in the United States Navy in 1994 as a

24   hospital corpsman.   I was trained there.

25            In 1999 I went through the ROTC program for

1    undergraduate training, and then into HPSP program for

2    medical school graduating in 2003.  Then I went -- or 2007

3    rather, and then I did an emergency medicine residency from

4    2007 to 2010.

5    Q.  And in the course of your duties as a doctor with the

6    Air Force, did you become involved in the case involving

7    Mustafa Al-Imam?

8    A.  Yes.

9    Q.  And how did you become involved in this particular case?

10   A.  I was directed to report to a vessel to provide medical

11   care.

12   Q.  And did you arrive on that vessel before the defendant

13   arrived on the vessel?

14   A.  Yes.

15   Q.  And did you engage in certain preparations to prepare

16   for the defendant's arrival?

17   A.  Yes.

18   Q.  And could you please tell the Court about some of those

19   preparations.

20   A.  Absolutely.  I reviewed current protocols.  I discussed

21   procedures with the subject matter expert.  I evaluated the

22   area where the patient would be held for any safety

23   concerns.

24   Q.  And what, particularly, were you looking for in kind of

25   the area where the defendant was going to be held?

1    A.  Trip hazards, temperature, environmental concerns.

2    Q.  And did you have to bring any concerns to members of the

3    guard force who were in charge of that area?

4    A.  Those were identified before I did.

5    Q.  And did you have any concerns about the safety

6    conditions, from a medical standpoint, of where the

7    defendant was going to be held and how he would be moved

8    about that vessel?

9    A.  No, sir.

10   Q.  Now, did you have an opportunity to meet with a -- let

11   me ask you this.  Do you yourself speak Arabic?

12   A.  No, sir.

13   Q.  And did you have an opportunity to meet with an FBI

14   linguist before the defendant arrived on the vessel?

15   A.  Yes, sir.

16   Q.  And what was your purpose of meeting with that linguist?

17   A.  To go over the medical terminology and make sure he was

18   familiar with it and could translate it effectively.

19   Q.  And based on your interactions with that linguist, did

20   he understand the terminology, and was he able to

21   communicate it effectively?

22   A.  Yes.

23   Q.  And did you generate any forms that you were going to

24   use as part of this operation?

25   A.  Yes.

1    Q.  And if I could turn your attention to the Tab 17 in

2    front of you, and I'd just ask if you could take a moment to

3    review those four pages of documentation, and let me know if

4    you've looked over those briefly.

5    A.  (Witness reviews document)

6    Q.  And are you familiar with what is in Government's

7    Exhibit No. M17?

8    A.  Yes.

9    Q.  And can you describe to the Court what that is.

10   A.  These are the forms that I've created both for the

11   initial intake exam and continuing exams.

12   Q.  And just so it's clear for the record, so the first two

13   pages of Government's Exhibit No. M17 are the form that you

14   created for the initial intake, and then the third and

15   fourth pages of that exhibit are the form that you created

16   for subsequent periodic evaluations?

17   A.  That's correct.

18   Q.  And what was your purpose in generating these particular

19   forms?

20   A.  To make sure I, one, didn't forget anything during the

21   exam and, two, to be able to effectively document my

22   findings.

23   Q.  And what process were you going to use in terms of using

24   these forms as part of your evaluation?

25   A.  I use kind of a four-step process, the first being the

1    subjective part.  And if you look at the intake form,

2    everything above the line above "Physical Exam," that's the

3    subjective part.

4              Below is the objective part.  And then the third

5    step is assessment and diagnoses, so to speak; and then the

6    plan is the fourth.

7    Q.  And so just to kind of go back over -- and, again, we

8    can use Government's Exhibit No. M17 as a guide.  You

9    indicated that above the line running through the middle of

10   the page is the subjective portion of the exam.  How many

11   parts are there to your subjective examination?

12   A.  Basically two parts.  The HPI, or history of present

13   illness, is the reason for the encounter, so to speak, and

14   then specific questioning as far as the review of systems

15   below.  So two parts.

16   Q.  And the review of systems is the area that follows below

17   "HPI" and above "Physical Exam" on Government's Exhibit No.

18   M17?

19   A.  That's correct, the section after "ROS."

20   Q.  And when you say that's the subjective part of the exam,

21   explain to the Court what you mean by that.

22   A.  So I'd ask specifically, for example, under "ROS,

23   General," do you have any fever, fatigue, lightheadedness,

24   so on and so forth.

25   Q.  And so for the subjective portion of the examination,

1    what is the source of information that's documented in the

2    subjective portion of the examination?

3    A.   The patient.

4    Q.   And you mentioned below that where there's "Physical

5    Exam," that that is the objective part of the examination.

6    A.   That's correct.

7    Q.   And can you explain that to the Court, what the

8    objective part of the examination is.

9    A.   So those are findings that I find from the patient.

10   Q.   And what is the source of information you used for the

11   objective portion of the examination?

12   A.   Again, the source is just what I find during my

13   examination --

14   Q.   So --

15   A.   -- of the patient.

16   Q.   When you say "examination," is that your physical

17   examination of the patient?

18   A.   Yes, sir.

19   Q.   And is that necessarily going to return the same results

20   as what the patient himself has reported, or is that an

21   independent review?

22   A.   The two should align, so to speak.  For example, if

23   somebody says they had surgery and they have scars, I should

24   be able to see those scars.

25   Q.   But, again, in the objective portion of the examination

1    you are conducting a physical exam and making your own

2    determinations?

3    A.   That's correct.

4    Q.   And turning to the second page of the initial intake

5    form, the form intake assessment and plan, what is that for?

6    A.   So the assessment is basically my diagnosis or

7    diagnoses, and the plan is what I will do about those

8    diagnoses.

9    Q.   And I want to turn your attention to Government's

10   Exhibit -- well, let me ask you this.  Did there come a time

11   when you conducted an examination of an individual who later

12   became known to you as Mustafa Al-Imam?

13   A.   Yes.

14   Q.   And where did that examination take place?

15   A.   On the vessel.

16   Q.   And do you recall the date of that examination?

17   A.   I do not.  I can find it in my notes.

18   Q.   And I ask that you turn to Government's Exhibit No. M18.

19   I'd just ask you to review that to yourself, and then look

20   up when it's refreshed your memory, if it has.

21   A.   (Witness reviews document)

22   Q.   And so when did you initially conduct an examination of

23   defendant Mustafa Al-Imam?

24   A.   29 October 2017 at 2351 Zulu.

25   Q.   And can you describe the process that you went through

1   in conducting your initial examination of Mustafa Al-Imam?

2   A.  Yes.  I basically followed the template.  So initially

3   it was just the subjective questioning part followed by the

4   physical exam part.

5   Q.  And you mentioned that you don't speak Arabic.  Did you

6   use an interpreter when you conducted the subjective part of

7   the examination?

8   A.  Yes, sir.

9   Q.  And I want to talk to you a little bit about your

10  initial interview with the defendant.  During that period of

11  time, did you ask him a series of questions that you have

12  outlined here?

13  A.  Yes, sir.

14  Q.  And referring, again, just to the subjective part of the

15  evaluation, did you ask him about each of the items listed

16  in the subjective portion of that examination?

17  A.  Yes.

18  Q.  And did the interpreter interpret for you?

19  A.  Yes.

20  Q.  Did the defendant offer any responses to you?

21  A.  Yes.

22  Q.  And did those responses seem logical in terms of the

23  question you were asking?

24  A.  Yes.

25  Q.  And if I could refer you to, first of all, the

1      subjective portion -- I'm sorry, let me begin with the

2      history of present illness.

3                Did the defendant report anything to you regarding

4      the history of present illness?

5      A.   Yes.

6      Q.   And what did he report to you?

7      A.   That he vomited prior to arrival on the vessel.

8      Q.   And did he indicate anything else to you, any other

9      medical conditions he had as part of his initial statement?

10     A.   That he was cold, and he had a productive cough with a

11     sore throat and nasal congestion for the past ten days.

12     Q.   And was that all information provided to you by the

13     defendant?

14     A.   Yes.

15     Q.   And if I could ask you to step through and highlight,

16     where you feel it's appropriate, the other parts of the

17     subjective review that you did with him, what other

18     information he provided to you.

19     A.   So following along on my note, medications, he reported

20     that he was taking Divido once every few months for the past

21     one and a half years for rheumatism.  He last ate

22     approximately four hours before our encounter.

23     Q.   And -- proceed.  I'm sorry.

24     A.   His rheumatism was diagnosed ten years ago, and with

25     that diagnosis he reported occasional headaches, muscle

1    spasm, bilateral shoulder and chest and right neck pain.

2               THE COURT:  Counsel, the document's in evidence.

3               MR. CUMMINGS:  Very well, Your Honor.

4               THE COURT:  Okay.

5    Q.  But just to be very clear, was the defendant able to

6    give you a complete medical history for himself?

7    A.  Yes.

8    Q.  And when he was giving you that history, were his

9    answers coherent and logical?

10   A.  Yes.

11   Q.  Did he appear to understand each question that was asked

12   of him?

13   A.  Yes.

14   Q.  Now, turning to your physical examination of the

15   defendant, did you have to give the defendant any

16   instructions during your physical examination?

17   A.  Yes.

18   Q.  And what would be an example of an instruction you would

19   have given to the defendant?

20   A.  For example, to take a deep breath when I'm listening to

21   the lungs.

22   Q.  And did the defendant appear to understand those

23   instructions?

24   A.  Yes.

25   Q.  And did he comply with each of those instructions?

1    A.  Yes.

2    Q.  Did the defendant indicate to you whether or not he had

3    any vision issues?

4    A.  Let me refer to my notes just to make sure.

5         (Pause)

6         He did admit to wearing glasses a long time ago

7    and that he had trouble reading up close.

8    Q.  And did he complain of any other visual issues?

9    A.  No, sir.

10   Q.  Did he complain of any loss of consciousness or head

11   trauma?

12   A.  No, sir.

13   Q.  Did you ask him whether or not he had any previous

14   mental health issues?

15   A.  Yes.

16   Q.  And did he report any previous mental health issues?

17   A.  No, sir.

18   Q.  Based on your observation of him, did he engage in any

19   abnormal behavior, hallucinations or thought disorders?

20   A.  No, sir.

21   Q.  Now, as part of your physical examination, would you

22   normally do a genital examination and rectal examination?

23   A.  Yes, sir.

24   Q.  Did you do that with respect to the defendant?

25   A.  No, sir.

1    Q.  And could you explain to the Court why you didn't

2    conduct that examination.

3    A.  When I asked the patient to take down his underwear so I

4    could do the examination, he became visibly upset, tearful,

5    and kind of backed up a little bit from me; so at that time

6    I stopped and did not further pursue that exam.

7    Q.  Did you ever conduct that exam during your time with

8    him?

9    A.  No, sir.

10   Q.  Did you observe any injuries to the defendant?

11   A.  I observed some minor abrasions and what appeared to be

12   some well-healed scars, yes.

13   Q.  I want to refer you first to Government's Exhibits Nos.

14   M11 and M12.  If you could take a moment to look at each of

15   those.

16   A.  (Witness reviews documents)

17   Q.  And can you describe what is depicted in Government's

18   Exhibits Nos. M11 and M12.

19   A.  There appear to be superficial abrasions of the face.

20   Q.  And in both M11 and M12?

21   A.  That's correct.

22   Q.  And do those require any medical treatment?

23   A.  No, sir.

24   Q.  As part of your discussion with the defendant, did you

25   ask him whether or not he had been abused at any time?

1    A.   Yes, sir.

2    Q.   And did he complain of any physical abuse?

3    A.   No, sir.

4    Q.   And you had indicated earlier that he mentioned that he

5    had motion sickness; is that correct?

6    A.   That's correct.

7    Q.   When you have somebody who has complained of motion

8    sickness, what are your concerns as a physician?

9    A.   First and foremost to prevent the motion sickness, so

10   it's ideal to treat ahead of time.  If that's not possible,

11   then you want to prevent vomiting, which could lead to

12   dehydration and further problems.

13   Q.   And when you say "lead to dehydration," what kind of

14   problems could dehydration cause?

15   A.   They could -- dehydration could cause numerous issues.

16   It could even be critical in this.

17   Q.   And we'll talk about kind of your visits with him going

18   on, but at any time did you ever -- did it ever appear to

19   you, during your examinations of the defendant, that he was

20   suffering from dehydration?

21   A.   No, sir.

22   Q.   In terms of the motion sickness the defendant had, how

23   did that manifest itself?

24   A.   Can you clarify?

25   Q.   When the defendant -- so the defendant complained of

1    motion sickness, correct?

2    A.  A history of, yes.

3    Q.  All right.  And did you observe any complications aside

4    from his complaint of motion sickness?

5    A.  He did have the single episode of vomiting prior to

6    arrival, and then one subsequent episode of vomiting.

7    Q.  And aside from those two instances of vomiting you're

8    aware of, were there any other complications that were

9    attributable to motion sickness?

10   A.  No, sir.

11   Q.  Now, what steps, if any, did you take to treat the

12   defendant's motion sickness following your initial

13   examination of him on October 29th?

14   A.  After my initial exam, I reviewed the potential adverse

15   effects of a medicine, meclizine, with the patient up to and

16   including death and offered that medication to him.

17   Q.  And for the benefit of the court reporter, can you spell

18   "meclizine"?

19   A.  M-E-C-L-I-Z-I-N-E.

20   Q.  And is meclizine an over-the-counter medication?

21   A.  It is.

22   Q.  And what is it used for?

23   A.  Motion sickness.

24   Q.  And after you reviewed the potential side effects of

25   that medication, did you give the defendant an opportunity

1    to take that medication?

2    A.   Yes.

3    Q.   And what did he say?

4    A.   He wanted to take the medication.

5    Q.   At any time did you force the defendant to take any

6    medication?

7    A.   No, sir.

8    Q.   Whose choice was it whether or not to take that

9    medication?

10   A.   The patient's.

11   Q.   And what was your plan moving forward after you

12   conducted your initial review -- initial examination of the

13   defendant?

14   A.   To conduct medical examinations at least every 12 hours

15   or as needed before that.  If desired, to continue the

16   meclizine every 12 hours as well.

17   Q.   And after you completed your initial examination of the

18   defendant, did you clear him for detention?

19   A.   Yes.

20   Q.   And what does that mean?

21   A.   That means there are no acute medical issues that would

22   preclude him from being detained.

23   Q.   And when you were conducting your examination of the

24   defendant, how did you note on your form what information

25   you obtained from the defendant?

1          Do you want me to restate that?

2     A.  Yes, please.

3     Q.  Okay.  In terms -- you had indicated earlier you created

4     basically a checklist of issues and questions that you would

5     ask the defendant.  How did you record information on those

6     sheets, and what did you do with those sheets?

7     A.  So I took a template, the template that is Exhibit M17.

8     I would make notes on that during the examination insofar as

9     vital signs and any pertinent findings.

10          After the exam, I went and directly transcribed

11     those onto a computer and then shredded the note sheet.

12     Q.  And so the initial sheet that you shredded, had anybody

13     told you that you needed to retain those documents?

14     A.  No, sir.

15     Q.  Now, you had indicated earlier -- and I apologize.  Let

16     me just ask you also, just for the record, that you look at

17     Government's Exhibits Nos. M13, M14, M15, and M16, and let

18     me know after you've had an opportunity to review each of

19     those.

20     A.  (Witness reviews documents)

21     Q.  Let me ask you to begin with what's depicted in

22     Government's Exhibits Nos. M13 and M14.  Could you describe

23     those for the Court.

24     A.  You said M13 and 14?

25     Q.  Yes, sir.

1    A.   Those appear to be superficial abrasions with small

2    areas of ecchymosis or bruising.

3    Q.   And when you say "ecchymosis," can you also spell that

4    for the court reporter?

5    A.   I think so.   E-C-C-H-Y-M-O-S-I-S.

6    Q.   And what is ecchymosis?

7    A.   Bruising.

8    Q.   And showing you Government's Exhibit No. M14, what is

9    that?

10   A.   It appears to be superficial abrasions.

11   Q.   And what's the difference between ecchymosis and

12   abrasions?

13   A.   Ecchymosis is bruising of deeper tissue.   Abrasions are

14   very superficial, the outermost layers.

15   Q.   And Government's Exhibit No. M15?

16   A.   Appears to be ecchymosis.

17   Q.   And on what body part, if you can tell?

18   A.   I can't tell from the picture.

19   Q.   Did you record anywhere, during your initial examination

20   of the defendant, where certain injuries were located?

21   A.   I did.

22   Q.   And if I could direct your attention to Government's

23   Exhibit No. M18, could you please explain, on Page 2 of

24   Government's Exhibit No. M18, the notations you've made on

25   that diagram.

1    A.  Yes.  So using the legend, I documented abrasions, areas

2    of ecchymosis, and scars.

3    Q.  And the areas of abrasions, where are those located

4    based on your diagram?

5    A.  So on the upper shoulders and then on the face.

6    Q.  And where did you note ecchymosis?

7    A.  The inside of both arms.

8    Q.  And what part of the arm?

9    A.  The biceps.

10   Q.  And is that consistent with the injuries that you see

11   depicted in Government's Exhibits Nos. I believe it's 15 and

12   16?

13   A.  Yes.

14   Q.  And you also have noted in your diagram some scars.

15   Those appear to be from new or older injuries?

16   A.  Old.

17   Q.  And did the defendant provide you with any information

18   regarding the source of those injuries?

19   A.  Yes.

20   Q.  And what did he tell you the source of those injuries

21   was?

22   A.  He said he had open reduction internal fixation, but not

23   in those -- he had surgery for fracture two years prior.

24   Q.  And did the scars you observed appear to be consistent

25   with the medical condition he had described?

```
1    A.  Yes.
2    Q.  Now, you had mentioned earlier that your plan was to see
3    him at least twice a day.  Was there a time later on, on
4    October 30th of 2017, when you had an unexpected encounter
5    with -- I'm sorry, an unscheduled encounter with the
6    defendant?
7    A.  Yes.
8    Q.  And what was the nature of that encounter?
9    A.  There was a report that he had vomited.
10   Q.  And after you had received that report, what did you do?
11   A.  Went immediately to evaluate the patient.
12   Q.  And what occurred during that evaluation?
13   A.  So I repeated the subjective nature, asked what
14   happened, then continued on with my exam.
15   Q.  And what did your exam reveal?
16   A.  That the patient wasn't in any acute distress.  There
17   was a small amount of vomitus in a trash can.
18   Q.  And did he show any signs of dehydration?
19   A.  No, sir.
20   Q.  Any other serious side effects as a result of this issue
21   of vomiting?
22   A.  No, sir.
23   Q.  And how did you treat that incident of vomiting?
24   A.  After discussing the risks and benefits of a medication
25   called Zofran, the side effects up to and including death, I
```

1    offered that medication to the patient, and he requested it.

2    Q.  And so he also requested the Zofran?

3    A.  Yes.

4    Q.  And did you provide it to him?

5    A.  Yes.

6    Q.  And the two medications that you provided to him, the

7    meclizine and the Zofran, do those drugs have any impact on

8    mental status or awareness?

9    A.  They can cause drowsiness; but not on mental status, no.

10   Q.  And did the defendant ever appear to you to have any

11   side effects as a result of taking either one of those

12   medications?

13   A.  No, sir.

14   Q.  Did he ever appear to be disoriented by taking either

15   one of those medications?

16   A.  No, sir.

17   Q.  Did he ever appear to be confused as a result of taking

18   either one of those medications?

19   A.  No, sir.

20   Q.  And to the best of your knowledge, was that the last

21   time the defendant vomited while he was in custody aboard

22   that vessel?

23   A.  Yes, sir.

24   Q.  And I want to refer to your examination that occurred on

25   October 30, 2017, at approximately 1000 Zulu hours or 10:00

1    Zulu hours.  Government's Exhibit No. M20.

2              During that examination did you notice any

3    significant differences between the defendant's physical

4    condition than what you had observed in your initial intake?

5    A.  No significant differences.

6    Q.  And did the defendant indicate to you how he was feeling

7    during that examination?

8    A.  He reported that he was no longer nauseated and that he

9    felt much better since the last exam.

10   Q.  And any other changes of note?

11   A.  No, sir.

12   Q.  Did you treat him for motion sickness following that

13   examination?

14   A.  I did.

15   Q.  And what did you provide to him?

16   A.  Meclizine.

17   Q.  And, again, same process.  Did you advise him of the

18   side effects?

19   A.  Yes, sir.

20   Q.  And did he request that medication?

21   A.  Yes, sir.

22   Q.  And turn your attention to M21 related to it.  Again,

23   was that a scheduled periodic examination of the defendant?

24   A.  It was.

25   Q.  And let me just focus on physically.  Did you notice any

```
 1    significant physical changes in his medical condition?

 2    A.  No, sir.

 3    Q.  And did the defendant report any change in mood?

 4    A.  He did report feeling sad because he didn't know what

 5    time to pray.

 6    Q.  And did you provide any information to him at that time?

 7    A.  In relation to that question?

 8    Q.  Yes, sir.

 9    A.  No.  It was the guard force.

10    Q.  And to the best of your knowledge, what information did

11    the guard force provide to the defendant at that time?

12    A.  That he could pray whenever he desired.

13    Q.  Now, in examining your report that is Government's

14    Exhibit No. M21, your periodic examination, did you identify

15    any error that you made on that report?

16    A.  I did.

17    Q.  And can you please point out to the Court the nature of

18    that error.

19    A.  Yes.  In history of present illness, he did report being

20    sad, but under the "Review of Systems" I noted that he

21    denied sadness.

22    Q.  So was that an error on your part?

23    A.  It is.

24    Q.  Now, when the defendant told you that he was sad, did

25    you ask any follow-up questions?
```

1   A.  Yes.

2   Q.  And could you please describe to the Court the nature of

3   those questions.

4   A.  I asked specifically about any suicidal ideation or want

5   to hurt himself.

6   Q.  And why did you ask those questions?

7   A.  As a follow-on to anyone that reports being sad, you

8   want to make sure that the condition isn't more serious.

9   Q.  And did he indicate to you that he had any more serious

10  mental condition?

11  A.  No, sir.

12  Q.  Did you provide him any medication at that point in

13  time?

14  A.  I didn't hear the question, I'm sorry.

15  Q.  Did you provide him any medication for his motion

16  sickness during that examination?

17  A.  I did.

18  Q.  And what did you provide to him?

19  A.  Meclizine.

20  Q.  And, again, same process as before?

21  A.  Yes, sir.

22  Q.  And turning your attention to what's been marked as

23  Government's Exhibit No. M22 --

24          THE COURT:  Sorry, Counsel, before you go on.

25          M21 indicates that you also prescribed Zofran; is

1    that correct?

2            THE WITNESS:  No, sir.  What I noted on that

3    document was that he last had the medication Zofran on 30

4    October 2017 at 0232 Zulu.

5            THE COURT:  Understood, thank you.

6            THE WITNESS:  Yes, sir.

7    Q.  And turning your attention to M22 and the examination on

8    October 31, 2017, at 0700 hours, again, did you conduct the

9    same type of examination there?

10   A.  Yes.

11   Q.  And did he indicate how he was feeling at that time?

12   A.  He did.

13   Q.  And what did he tell you?

14   A.  He reported that his hips were a little sore, that he

15   slept well.

16   Q.  And did he indicate to you how he was feeling?

17   A.  He reported he was feeling much better.

18   Q.  And did he request any medication during that

19   examination?

20   A.  He did.

21   Q.  And what did he report?

22   A.  What did he request?

23   Q.  What did he report to you?

24   A.  I'm sorry, can you go back?

25   Q.  I'm sorry, let me go back.

1          What did you report about how he was feeling?

2     A.  He reported that he was feeling much better.

3     Q.  And any other significant differences in his physical

4     condition during that examination?

5     A.  No, sir.

6     Q.  And the final examination I wanted to ask you about is

7     captured in M23, October 31, 2017, at 1930 hours Zulu -- I'm

8     sorry, 1903 hours Zulu.  Did you conduct the same type of

9     examination as you previously described?

10    A.  Yes, sir.

11    Q.  And did he indicate to you how he was feeling at that

12    point in time?

13    A.  Yes.

14    Q.  And what did he tell you?

15    A.  He reported being sad by his current condition.

16    Q.  And did you ask him any follow-up questions as a result

17    of that?

18    A.  Yes.

19    Q.  And what did you ask him?

20    A.  I asked if he had any suicidal ideations or thoughts of

21    hurting himself.

22    Q.  And what did he indicate?

23    A.  He indicated that he did not.

24    Q.  And did you realize any error on that report,

25    Government's Exhibit No. M23?

1    A.  Yes.

2    Q.  And can you please describe that to the Court.

3    A.  Yes.  In the HPI he reported being sad, but in the

4    "Review of Systems" in the subjective part, again, I put

5    "Denies sadness."

6    Q.  Now, I want you to focus on kind of the course of the

7    time you spent with the defendant.

8           And first of all, would you recognize the

9    defendant if you saw him again?

10   A.  Yes.

11   Q.  And do you see him in the courtroom here today?

12   A.  Yes.

13   Q.  Would you please identify him by an article of clothing

14   and his position in the courtroom.

15   A.  Yes, orange shirt and about 12:00 from my direction.

16           MR. CUMMINGS:  If the Court could reflect an in-

17   court identification of the defendant?

18           THE COURT:  The record will reflect a positive

19   identification.

20   Q.  And, Doctor, I just want to refer to the time you spent

21   speaking with the defendant through the interpreter.  Was

22   there any time when you were concerned about the defendant's

23   ability to understand you?

24   A.  Yes.

25   Q.  Okay.  And can you explain that to the Court.

```
 1    A.  On the initial intake there seemed to be some confusion

 2    about terms.  The only one that I remember offhand is

 3    dizziness, so I had to work with the interpreter to further

 4    explain what I meant by that.

 5    Q.  And so did the defendant make it clear to you that he

 6    didn't understand what you meant?

 7    A.  Yes.

 8    Q.  And after you had worked with the interpreter to clarify

 9    that, did he appear to understand?

10    A.  Yes.

11    Q.  And would you follow that same process if the defendant

12    didn't understand anything else?

13    A.  Yes.

14    Q.  Aside from terminology, did the defendant appear to

15    understand you and the nature of what you were doing?

16    A.  Yes.

17    Q.  Were his responses to you appropriate?

18    A.  Yes.

19    Q.  During your course of work as a medical -- as an

20    emergency medical physician, have you had to deal with

21    people who are in acute medical distress?

22    A.  Yes.

23    Q.  At any time did you observe the defendant show any signs

24    of any type of acute medical dis -- mental distress?  I'm

25    sorry.
```

1    A.  No, sir.

2    Q.  At any time did he appear confused?

3    A.  No, sir.

4    Q.  At any time did he appear disoriented?

5    A.  No.

6              MR. CUMMINGS:  The Court's indulgence.

7              (Pause)

8              MR. CUMMINGS:  That's all I have.  Thank you, Your

9    Honor.

10             THE COURT:  Okay.  Mr. Peed.

11                         CROSS-EXAMINATION

12   BY MR. PEED:

13   Q.  Good afternoon, Doctor.

14   A.  Good afternoon.

15   Q.  How many medical -- how many times have you -- not in

16   particular instances, but how many individuals have you

17   conducted detention screenings for in your career?

18   A.  This is -- on the military side, this is the only case.

19   Q.  This is the only case.  When you order --

20   A.  I just want to clarify that.  I've done numerous

21   clearances for detention in the civilian sector.

22   Q.  Okay.  Do you have an estimate of how many times?

23   A.  I'd say over 400 times.

24   Q.  While you were evaluating Mr. Al-Imam, did he follow

25   your directions?

1   A.  He did.

2   Q.  And did he provide any resistance or give you any reason

3   to use any kind of force with him?

4   A.  No.

5   Q.  Would you say he was docile or obedient during his

6   examination?

7   A.  I would say he was cooperative.  I wouldn't use those

8   terms you used.

9   Q.  How would you describe his affect?  Let's start with the

10  beginning when he first came.

11  A.  When I -- you mean when I first started my questioning

12  with him?

13  Q.  Your first examination of him.

14  A.  His affect was appropriate.

15  Q.  Could you turn to M21.  This is the evaluation that

16  you did October 30th at 1932 Zulu Time.  You reported that

17  Mr. Al-Imam felt sad, correct?

18  A.  That's correct.

19  Q.  But you didn't include any mention of sadness in the

20  psych portion of the report.

21  A.  That's correct.

22  Q.  That's correct.

23          If you'll turn to M23, this is your medical

24  examination on October 31st at 1903 Zulu.  In this

25  examination Mr. Al-Imam also expressed sadness, correct?

1   A.  That's correct.

2   Q.  But you didn't include that in the psych portion of this

3   evaluation, right?

4   A.  That's correct.

5   Q.  Were those errors?

6   A.  Yes.

7   Q.  How would you compare Mr. -- or contrast Mr. Al-Imam's

8   demeanor over the course of your evaluations compared to the

9   other ones, the other 400 or so that you've done?  Anything

10  from him seem different than other evaluations that you've

11  done from a psychological perspective?

12  A.  It's hard to compare the two because they were vastly

13  different scenarios.

14  Q.  Have you ever not cleared someone for detention for

15  psychological reasons?

16  A.  Yes.

17  Q.  What kinds of symptoms would make you not clear someone

18  for detention for psychological reasons?

19  A.  If there were evidence of active hallucinations or

20  obvious intoxication, things along those lines.

21  Q.  Do you have any psychiatric training?

22  A.  As an emergency medicine physician, I'm trained to

23  perform mental health examinations.  I did rotate through

24  with a psychiatrist during residency in medical school.

25  Q.  Were there any psychiatrists available on the ship with

1    you?

2    A.  If needed, we had psychiatrists available via TCON --

3    Q.  Is that a --

4    A.  -- or videoconference.

5    Q.  Videoconference.

6           Have you ever provided medical care following

7    traumatic situations to individuals?

8    A.  Yes.

9    Q.  What are the psychological effects of a traumatic

10   experience of an individual generally?

11   A.  I think each individual is different so it's hard to

12   summarize or put specific symptoms on a traumatic event.

13   Q.  Are there certain symptoms that can occur following a

14   traumatic event?

15   A.  Absolutely.

16   Q.  Let's talk about events that are not physically

17   traumatic, like a physical injury, but psychologically

18   traumatic.  What sort of symptoms would you expect to see in

19   the acute sense as a first responder, as an emergency

20   medical provider?

21   A.  You can have symptoms ranging from completely shutting

22   down or being nonresponsive all the way up to completely

23   agitated, argumentative, combative.

24   Q.  So some individuals respond to a traumatic situation by

25   shutting down?

1    A.  Yes, sir.

2    Q.  Would you describe what that looks like from a medical

3    perspective.

4    A.  Yes.  You ask questions; they don't respond.  They avoid

5    eye contact.  Things along those --

6    Q.  And the spectrum of responses from that all the way to

7    agitation, right?

8    A.  Yes.

9    Q.  In your experience with people who have suffered

10   traumatic situations that didn't involve medical trauma or

11   physical injury, would you say that you've witnessed

12   individuals having an impaired ability to function in a

13   professional environment immediately afterwards?

14   A.  Can you just expand the question so I better understand

15   what you're asking?

16   Q.  Sure.  In your experience in treating or evaluating

17   people who have just experienced a traumatic situation, for

18   those types that are more on the shutting down end of the

19   spectrum, have you observed traits that would impair their

20   ability to perform professionally immediately after the

21   event?

22         MR. CUMMINGS:  Object to the facts not in evidence

23   based on this witness's testimony today.

24         THE COURT:  I'm not sure he understands the

25   question.  Why don't you try one more time at rephrasing it.

1    Q.  Can a traumatic event, in your experience, that's not

2    physically traumatic but psychologically traumatic impair

3    someone's ability to perform professionally immediately

4    afterwards or --

5    A.  It would depend on what their professional job was or

6    what we're expecting them to do.

7    Q.  Can such psychological traumatic events impair

8    somebody's ability to remember?

9    A.  I don't know.

10   Q.  What about their ability to answer your questions about

11   events generally?

12            I guess I'm trying to understand what you mean by

13   shutting down.  For someone who is maybe able to speak, what

14   does it mean to psychologically shut down?

15   A.  What I meant by psychologically shutting down are the

16   folks that -- are the patients that refuse to answer my

17   questions, avoid eye contact.  And, again, I've witnessed

18   folks in that scenario all the way up to the combative

19   scenario.  Does that help?

20   Q.  Yes, it does.

21            Did you observe anything in your evaluation of

22   Mr. Al-Imam that made you think maybe he was on that

23   spectrum?

24   A.  No, sir.  He was appropriate and cooperative with me,

25   answering questions appropriately.

1    Q.  Did he look down at the floor when he wasn't speaking

2    with you?

3    A.  I don't recall.

4    Q.  You described him being tearful at a certain point in

5    your evaluation.  Was that the initial evaluation?

6    A.  It was during the initial evaluation, yes.

7    Q.  Did he seem fearful?

8    A.  As I mentioned, he became tearful.  I don't know if I

9    can say that that's fearful or not.

10   Q.  Did his body tense up?

11   A.  He did.

12   Q.  Did he make any movements to back away from you?

13   A.  He did.  He seemed to go back a little bit, yes.

14            MR. PEED:  Thank you.

15            No further questions, Your Honor.

16            THE COURT:  Mr. Cummings.

17            MR. CUMMINGS:  Very briefly, Your Honor.

18                       REDIRECT EXAMINATION

19   BY MR. CUMMINGS:

20   Q.  In terms of what you described as the adverse effects of

21   trauma on mental health, I just want to follow up with that.

22   At any time did the defendant appear to be unresponsive?

23   A.  No, sir.

24   Q.  At any time did he appear to lack any memory?

25   A.  No, sir.

1    Q.  At any time did he appear agitated in any way?

2    A.  Slightly agitated during the time around the -- when I

3    requested to perform the genital/urinary exam.

4    Q.  And when you decided not to perform that portion of the

5    exam, did you convey to the defendant that you were not

6    going to perform that examination?

7    A.  Immediately.

8    Q.  And how did he respond to that?

9    A.  Appropriately.  He sat down, and I took a pulse before

10   asking him any further questions or directing him to do

11   anything for the exam.

12   Q.  Were there any signs of agitation that occurred after

13   the issue with that particular exam?

14   A.  No, sir.

15   Q.  At any other time, during the time you spent with him,

16   did he show any signs of agitation?

17   A.  No, sir.

18          MR. CUMMINGS:  That's all I have.  Thank you.

19          THE COURT:  Okay, Doctor, thank you very much for

20   your testimony.  You're excused.  Have a good day.

21          THE WITNESS:  Yes, sir.  Thanks.

22          THE COURT:  All right.  Mr. Cummings, it's 12:30.

23   How long do you anticipate for the next witness?

24          MR. CUMMINGS:  I would say at least a half hour.

25          THE COURT:  What's your preference?  Break for

1      lunch or go forward?

2                   MR. CUMMINGS:  I'm happy to proceed, Your Honor.

3                   THE COURT:  Let's go forward.

4                   Good afternoon, ma'am.

5                   THE WITNESS:  Hello.

6                   THE COURT:  Please remain standing and raise your

7      right hand.

8                              CAPTAIN, Sworn

9                            DIRECT EXAMINATION

10     BY MR. CUMMINGS:

11     Q.  Good afternoon.  At your request we've agreed to refer

12     to you as "Captain."  Is that acceptable?

13     A.  It is.

14     Q.  And are you currently an active member of the United

15     States military?

16     A.  I am.

17     Q.  And what branch of the Service are you with?

18     A.  Air Force.

19     Q.  And what is your current rank in the Air Force?

20     A.  I'm a captain.

21     Q.  And to the extent -- how long have you been with the Air

22     Force?

23     A.  Approximately ten years.

24     Q.  And do you have any prior experience with the military

25     service?

1   A.  Nothing before that.

2   Q.  And to the extent that you're able to do so, can you

3   briefly describe for us your career with the Air Force.

4   A.  Sure.  I was an officer.  I fell into a variety of

5   leadership positions.  I've worked with flying units and

6   small teams as well as the local population working plans

7   and training in those types of things.

8   Q.  And in relation to -- did you become involved in the

9   fall of 2017 with a capture operation involving an

10  individual known to you as Mustafa Al-Imam?

11  A.  I was involved.  I was the team lead for the guard

12  force.

13  Q.  And can you please describe the role of the guard force

14  in an operation such as this.

15  A.  Sure.  The guard force oversees the detention, and I

16  oversee the care, humane treatment of the detainee, and then

17  the interaction with the law enforcement.

18          But the guard force is the one that conducts the

19  hands-on care for the detainee.

20  Q.  And for this particular mission, how many members of the

21  guard force were there?

22  A.  There were seven.

23  Q.  And in October of 2017, were you onboard a naval vessel

24  in the Mediterranean?

25  A.  I was.

1    Q.  And did you engage in certain preparations for the

2    capture of Mustafa Al-Imam during that time?

3    A.  We had conducted a number of dry rehearsals to ensure

4    that we were prepared to receive and that the inprocessing

5    of the detainee and then the steps during that inprocessing

6    were smooth ahead of the event.

7    Q.  And did you create any documentation regarding your

8    planning to make sure that the capture and detention of

9    Mr. Al-Imam went smoothly?

10   A.  I did.  I created a document I called the "Scheme of

11   Maneuver," and that way each individual who was involved

12   with the inprocessing knew at what steps we were going to

13   conduct certain things.  Given that the size of the pod is

14   quite small, I wanted to ensure we were efficiently moving

15   into and out of it throughout the processing.

16   Q.  And when you say "the pod," what are you referring to?

17   A.  We leveraged a detainee pod for the housing of the

18   medical inprocessing of the detainee.

19   Q.  And when you say -- just for those of us who aren't in

20   the military, when you say "leverage," what do you mean by

21   that?

22   A.  We utilized it.  We have a living pod, and it served as

23   the location of where we conducted his inprocessing, his

24   medical checks, and it's where he resided throughout the day

25   when he wasn't involved with the law enforcement interviews.

1    Q.  And, Captain, if I could ask if you could turn to Tab 24

2    in the binder in front of you and ask that you review the

3    document.

4    A.  (Witness reviews document)

5    Q.  And, Captain, do you recognize the document identified

6    as Government's Exhibit No. M24?

7    A.  I do.

8    Q.  And can you please describe to the Court what that

9    document is.

10   A.  This is the referenced "Scheme of Maneuver" that I

11   produced ahead of the date of the event and then

12   inprocessing, as well as my handwritten notes denoting the

13   time at which each of those items occurred.  And then I had

14   also made a note at the very end which was some medication

15   that the doc had provided.

16   Q.  And so the times that you have listed on there, those

17   are all times that you observed when these events actually

18   occurred?

19   A.  Correct.

20   Q.  Now, were you present when the defendant was --

21   actually, before I get to that.

22          As part of your planning, were members of the

23   guard force equipped with any weapons while they were in

24   proximity with the defendant?

25   A.  No.

1    Q.  And did they have any markings on their uniforms?

2    A.  No.  All members of the guard force had sanitized

3    uniforms; no names, no service recognition, no watches, and

4    certainly no weapons.

5    Q.  And were members of the guard force or, to the best of

6    your knowledge, anybody else on the naval vessel or the

7    military advised of the nature of the allegations against

8    the defendant?

9    A.  No member of the guard force was brought up to speed or

10   advised on the nature of the accusation against the

11   detainee.

12   Q.  And did anybody, other than members of the FBI and

13   members of the guard force and the physician and linguist,

14   have contact with the defendant while onboard the naval

15   vessel you were on?

16   A.  In addition to myself and the members that you just

17   referenced, nobody else had contact with the detainee.

18   Q.  And is that by design?

19   A.  It is.

20   Q.  Now, Captain, I want to turn your attention to when the

21   defendant was actually seized.  Were you present when he was

22   first brought onboard the naval vessel?

23   A.  I was present throughout his entire inprocessing to

24   include when he first came on the vessel.

25   Q.  And how was he brought onto the vessel?

1    A.  He was brought on through a pulley system where he was

2    strapped to a litter and then hoisted up to the mission bay

3    where we retrieved the litter and then brought him fully

4    onboard the vessel.

5    Q.  And as you described the litter, is that kind of like a

6    basket?

7    A.  A basket of sorts.  It has some curved edges, but it is

8    not fully encompassed at the top.

9    Q.  And what happened after he was brought onboard the

10   vessel?

11   A.  Once he was hoisted up and the guard force had custody,

12   we walked through the scheme of maneuver where we maneuvered

13   him from that location on the litter to our detention

14   location.  Then we lowered the litter and, through the

15   interpreter, who was there with us as we had precoordinated,

16   we instructed him that we were going to take him out of the

17   litter and then waited for him to acknowledge through a head

18   nod.

19   Q.  And did he, in fact, acknowledge when you gave him that

20   initial instruction?

21   A.  He did.  The instruction was given by the sergeant of

22   the guards and relayed by the interpreter.

23   Q.  And what tone were you using in providing these

24   instructions to the defendant?

25   A.  The sergeant of the guards and any other guard member

1    constructs their guidance of the detainee in a very

2    conversational, but firm, tone of voice.

3    Q.  And why is that?

4    A.  Just to ensure that we are efficient and our guidance is

5    clear, and so that we don't come off, also, as being

6    threatening throughout his detention.

7    Q.  And did he appear to understand the instructions you

8    provided him initially to get out of the litter?

9    A.  He did provide that head nod, and we had instructed the

10   guard force to pause after every issuing of guidance for the

11   interpreter to catch up and for us to receive that positive

12   confirmation through the head nod.

13   Q.  And can you describe to the Court what happened next.

14   A.  Once the guard force relayed what was going to happen,

15   they unstrapped him from the litter, they helped him up from

16   his litter, and then we moved him into the detention pod

17   where we initiated his inprocessing as articulated here in

18   the scheme of maneuver.

19   Q.  And can you just describe the inprocessing, what steps

20   you, as the guard force, took as part of that inprocessing?

21   A.  Certainly.  So when he was -- when he came in, he was

22   already -- he already had eyes and ears and was already

23   handcuffed to the front.  The guard force brought him into

24   the detention pod.  They removed the handcuffs.  They

25   removed the eyes and ears.  They searched his body, and we

1    also took some inprocessing photos at the time of him in his

2    original clothing.

3    Q.  And when you say you had to remove his clothing, how far

4    along did you go in having him remove his clothing?

5    A.  Once we finished conducting the initial intake photos,

6    we had him disrobe down to his underwear.

7    Q.  And what did you do next?

8    A.  At that time we had brought -- we brought the doc in,

9    and then the doctor initiated his medical inprocessing,

10   which included a line of questions, getting his vitals, as

11   well as bringing in a scale so we could get his weight.

12   Q.  And during this inprocessing did the defendant appear to

13   understand all instructions that you provided to him?

14   A.  I was not physically in the pod but looking in from the

15   window; however, I did observe the head nod periodically

16   throughout his inprocessing and again had instructed the

17   guard force to not proceed unless we received that positive

18   confirmation.  So I do believe he understood the steps that

19   we were taking throughout the inprocessing.

20   Q.  And after you had had him strip down to his underwear,

21   was there any time where he was forced to remove all of his

22   clothing in front of the guard force members?

23   A.  Not to my knowledge.

24   Q.  And why is that?

25   A.  I don't believe that it was a requirement levied by the

1    doctor, so he retained his stance in his personal

2    undergarments throughout the inprocessing until he changed

3    into the detainee uniform.

4    Q.  And when he was given the opportunity to change into the

5    detainee uniform, were there any steps taken to protect his

6    privacy?

7    A.  When he disrobed first, as well as changed at that last

8    step, everybody moved out of the detention pod while he

9    changed.  We do keep a guard posted at the door; however,

10   that's the level of privacy we were able to afford him.

11   Q.  And following the medical exam, were you notified about

12   whether or not the defendant was cleared for detention?

13   A.  Yes.  I discussed it with the doctor when he came out of

14   the pod and asked him directly if the detainee was medically

15   cleared for detention.  That's the verbiage that I needed,

16   and he gave that to me once he came out.

17   Q.  And did he tell you whether or not he was cleared for

18   detention or not?

19   A.  He did.

20   Q.  Did he express any reservations about clearing him for

21   detention?

22   A.  He did not.

23   Q.  And did you have any concerns about the defendant being

24   fit for detention, based on your observations?

25   A.  Not after the conclusion of the medical discussion.  We

1    thought at first he might have some hypothermic symptoms;

2    however, he -- that proved to not be the case after the

3    medical provider conducted his line of questions.

4    Q.  And did you have a contingency in place if he was

5    hypothermic?

6    A.  We did.  We had a follow-on doctor on standby.  And had

7    he have been hypothermic, we would have halted the

8    inprocessing and moved him to a medical bay for care.

9    Q.  So after he was cleared for detention, was he advised of

10   any rights or rules?

11   A.  He was.  The guard force, through the interpreter,

12   conveyed the instructions of the rules of the detention as

13   far as the position that he needs to take should the guard

14   force look to make entry to the pod, how the guard force

15   would make entry -- that's through two knocks on the door --

16   and then, if he needed something, how he could communicate

17   with the guard force and then take that position so the

18   guard force could make entrance.

19          Once we relayed the rules, we also walked

20   through -- the guard force walked through Article 3 of the

21   Geneva Convention.

22   Q.  And if you'll just briefly -- I'd like to refer you

23   back, if you could look again at the tabs in your binder.

24   And if you could look at Tabs Nos. 5, 6, and 7, and 8 as

25   well.

1    A.   (Witness reviews documents)

2    Q.   And do you recognize what those are photographs of?

3    A.   Yes.   We posted the rules in writing after inprocessing

4    was done.

5    Q.   And the rules that you just described, are those

6    depicted accurately on the documents you just reviewed?

7    A.   That's correct.

8    Q.   In addition to the rules that were provided to the

9    defendant, did you provide him any additional guidance

10   regarding his protections?

11   A.   We walked through the rules, as I mentioned, and then we

12   walked through Article 3, which speaks to protection against

13   mistreatment, inhumane care, as well as any humiliation.

14   Q.   And I want to talk to you a little bit about the process

15   that you used.   As the defendant was being advised of the

16   rules and also of the Article -- the Geneva Convention

17   Article 3 warnings, how does that process unfold?   How is

18   that done with the interpreter?

19   A.   We do one line of rule, one rule, and the interpreter

20   would relay what that rule was.   And we do that until we get

21   to the completion of the rules.   We receive an understanding

22   that the detainee understood or if he has any questions, and

23   then we moved onto the Article 3.

24   Q.   And to your recollection, did the defendant have any

25   questions regarding the rules that were provided to him?

1    A.  I do not recall.  I don't recall him ever having any

2    questions throughout inprocessing.

3    Q.  And I want to have you look at -- turn to Tab No. 25 and

4    ask you to take a moment to review Government's Exhibit No.

5    M25.

6    A.  (Witness reviews document)

7    Q.  Are you familiar with that document or documents similar

8    to it?

9    A.  I am.

10   Q.  And what is that document?

11   A.  It is the genesis of Article 3 that we convey to the

12   detainees.

13   Q.  And were these the Article 3 warnings that were conveyed

14   to the defendant as part of the inprocessing?

15   A.  I believe that they were, but I'm not entirely certain

16   if this specific one was translated and posted inside of his

17   pod.

18   Q.  Are these the warnings that the Department of Defense

19   was using at the time?

20   A.  Correct.  These are the standard ones that we would

21   leverage.

22   Q.  And who do you rely on to translate these for the

23   benefit of the defendant?

24   A.  On this specific vessel, we leveraged the interpreter

25   provided by FBI to translate and ensure the accuracy of the

1  translation.

2  Q.  And, again, was that done orally with the defendant as

3  part of inprocessing?

4  A.  It's done orally with the defendant, and then it's

5  posted, and then upon his final return from the law

6  enforcement interview, they went through it one more time.

7  Q.  So I want to turn your attention -- after the

8  inprocessing, after he was advised of the Article 3

9  warnings, what happened next for the defendant in terms of

10  the guard force?

11  A.  The guard force exited the pod.  I notified the law

12  enforcement representatives who were nearby that we were

13  prepared to move him to a designated location for the law

14  enforcement interviews.

15          Once we communicated that we were ready to go and

16  they were ready to receive, we then went back to the pod and

17  initiated the transfer, which is the two knocks at the door.

18  He moves to the wall, and the guard force make entry, and

19  then they move him to his location.

20  Q.  And after you moved him to a location where the law

21  enforcement interviews would take place, what did members of

22  the guard force do?

23  A.  I had one member of the guard force remain in close

24  proximity, and then the remainder of the guard force went

25  back to the pod to sanitize it, clean it, post the rules,

1      post the Geneva Convention, as well as put a sleeping mat, a

2      blanket, a water bottle, and then we placed a *Quran* and a

3      prayer rug on top of an MRE box.

4      Q.  And why did you place the *Quran* and prayer rug on top of

5      an MRE box?

6      A.  Just out of respect for the religious material.

7      Q.  And did members of the guard force remain in the

8      interview room during law enforcement interviews?

9      A.  No.

10     Q.  Did any member of the guard force participate in those

11     law enforcement interviews?

12     A.  No.

13     Q.  Would they have been permitted to do so?

14     A.  We had discussed with the law enforcement if they

15     desired to have the guard force inside of the room or posted

16     outside.  The law enforcement said that they were

17     comfortable with us being by the door so that the guard

18     force only made entry in order to conduct movement; so to

19     put eyes and ears, handcuffs, and then in that reverse.

20     Q.  And just to be clear, any time that you would move the

21     defendant, what are the steps you took to secure the

22     defendant?

23     A.  Handcuffs behind the back as well as eyes -- he's got a

24     layer of coverage over the eyes -- and then ears.

25     Q.  And why did you have those conditions any time the

1    defendant was moved in the vessel?

2    A.   We do it as a level of safety for the individuals who

3    are not participating in the actual detention, to prevent

4    any sort of observation of those individuals, and then as

5    well as your standard protocol as far as movement.

6    Q.   And in terms of the guard force and its interactions

7    with the defendant, were those documented in any type of

8    log?

9    A.   Yes.  We retain two logs that the guard force leverage

10   for any interaction with the detainee or the detainee pod.

11   Q.   And I'll ask that you turn your attention to --

12   actually, before I do that, do you see the defendant in the

13   courtroom today?

14   A.   I do.

15   Q.   And can you identify him by an article of clothing and

16   his position in the courtroom?

17   A.   It's the gentleman in the orange top sitting behind your

18   right shoulder.

19        MR. CUMMINGS:  Your Honor, if the record could

20   reflect an in-court identification of the defendant?

21        THE COURT:  It may.

22   Q.   And, Captain, if you could just turn your attention to

23   M26, please.  And can you please describe for the Court what

24   it's looking at in M26.

25   A.   Yes.  This is the more-extensive narrative that the

1    guard force would leverage as far as a log to denote any

2    sort of interaction with the detainee.

3    Q.  And, for example, turn your attention to -- I'm not

4    going to go through all of them, just a couple of items --

5    Line No. 12.  Can you explain what's documented in Line No.

6    12 of Government's Exhibit No. M26.

7    A.  During the law enforcement, the first law enforcement

8    interview, the detainee had requested some reading glasses,

9    and we were able to acquire some reading glasses for him to

10   leverage.

11   Q.  And do you know whether they were his reading glasses or

12   you were just able to find a pair, if you recall?

13   A.  I don't believe they were his glasses.

14   Q.  But did you try to accommodate that request?

15   A.  We did.

16   Q.  And looking, for example, at Line No. 16, there's a

17   notation about degrees on the end.  Can you explain why you

18   monitored that for the Court.

19   A.  As part of our practice, we keep the detention pod

20   between 72 and 75 degrees.  In order to ensure the accuracy

21   of the temperature, we leverage a temperature gauge gun that

22   we would leverage to move into the pod from an entrance on

23   the door.  And any reading of that, that was articulated

24   here.

25   Q.  And in terms of the document itself, in the upper right-

1   hand corner of the document are there certain date and time

2   notations?

3   A.   Yes.

4   Q.   And what does that cover, just so that the Court's

5   aware?

6   A.   It's just the span of which the log is covering.

7   Q.   And a final question about this page of the logs.  The

8   term "head count" appears throughout the log.  Can you

9   explain to the Court what the head count involves.

10  A.   We didn't have any cameras inside the detention pod so

11  "head count" is a nomenclature that we leverage for eyes on

12  the detainee.

13  Q.   And why do you want to put eyes on the detainee?

14  A.   Just to ensure that he is still doing well and is not

15  conducting any harm to himself or is in any sort of, you

16  know, bad position.

17  Q.   And during the course of your interactions with the

18  defendant on this vessel, were you made aware of any

19  injuries the defendant may have suffered?

20  A.   He had some slight nicks, I believe, from his original

21  detention before he arrived to the vessel.  Throughout his

22  detention with us and post the medical inprocessing, we

23  noticed that he had some slight bleeding from a cut on his

24  nose.  We later documented that in a memorandum for record

25  as well as additional photos, and I had the medical provider

1   come in another time --

2   Q.  And let me just stop you there.  Did that appear to be a

3   new injury or reinjury of one of those initial abrasions?

4   A.  We believe it was a reinjury.  It's just something that

5   hadn't been noted but was agitated by the practice of him

6   putting his head against the wall when he's assuming the

7   position before the guard force make entry.

8   Q.  And if you'd just explain that, when you say he's

9   assuming the position.  Describe that to the Court and why

10  you do that.

11  A.  Just to ensure that we are in agreement on the level of

12  compliance.  We communicate with the detainee that if we are

13  to make entry, the detainee needs to be against a designated

14  wall with his forehead against it and then hands to each

15  side.  It shows that he's not being combative, and it allows

16  us to maintain a low level of posture when we're entering

17  that cell.

18  Q.  And did you or other members of the guard force note any

19  other injuries after he had been detained and held on the

20  ship for some time?

21  A.  The guard force alerted me later on that he appeared to

22  have some slight bleeding from a cut on his wrist.  Same

23  procedures.  We had the doc come back in and speak to him

24  about it as well as talk to him about the level of care and

25  level of treatment from the guard force.  We gave him Band-

1    Aids, and then we documented it by that MFR as well as

2    through additional photos.

3    Q.  And did you make an assessment regarding the cause of

4    those injuries to his wrist?

5    A.  Yes.  It's based on the handcuffs; the placement and the

6    general not necessarily tightness, but just the weight of

7    his body against the cuffs.

8    Q.  And I want to direct your attention to two documents.

9    If you could, turn to Tab No. 27, and I'll ask if you

10   recognize what is contained in Document No. 27?

11   A.  (Witness reviews document) Yes.

12   Q.  And what is Document No. M27?

13   A.  This is the event that I registered where he had the red

14   spots on his wrist from the cuffs.

15   Q.  And is this the report you generated as a result of

16   being notified of that injury?

17   A.  It is.

18   Q.  And if you could also turn your attention to

19   Government's Exhibit No. M28.

20   A.  (Witness complies)

21   Q.  And what is Government's Exhibit No. M28?

22   A.  Those are the abrasions on his nose when the guard force

23   first observed some blood spots on the wall and then what

24   followed after that.  This is the document I articulated.

25   Q.  And I just want to be clear.  In Government's Exhibit

1    No. M27, if you can turn back to that, what was the injury

2    that you were documenting in M27?

3    A.   Yes.  M27 would be the handcuffs.

4    Q.   Okay.  Thank you.

5         During the time that you interacted with the

6    defendant, did he follow all commands?

7    A.   He did.

8    Q.   At any time did you or any member of the guard force

9    have any reason to raise their voice with the defendant?

10   A.   No.  Nobody raised their voice, nor did we have reason

11   to.

12   Q.   Did anybody have to use any type of deadly or aggressive

13   force with the defendant?

14   A.   No.

15   Q.   Did he appear to be compliant during his detention?

16   A.   He did.

17   Q.   In terms of the commands that were given to him

18   throughout, was he given commands throughout his detention

19   and movement on the vessel?

20   A.   He was.

21   Q.   And in what tone were those commands delivered?

22   A.   They're delivered assertively, but in a conversational

23   tone and just straight and to the point.

24        The first 24 hours we leveraged the interpreter to

25   help us convey the rules as we walked through them again,

1    but shortly, within the first 24 hours, we did not have the

2    need for the interpreter as he continued to be compliant

3    with the rules that we had established.

4    Q.  And at any time did you or any member of the guard force

5    develop any concerns about his mental ability or ability to

6    understand your commands?

7    A.  No.

8              MR. CUMMINGS:  The Court's indulgence.

9              (Pause)

10             MR. CUMMINGS:  Nothing further, Your Honor.

11             THE COURT:  Okay.  Mr. Peed.

12                         CROSS-EXAMINATION

13   BY MR. PEED:

14   Q.  Good afternoon.  When the Article 3 was read to

15   Mr. Al-Imam, was he informed that the Geneva Convention

16   applied to him?

17   A.  I don't believe that we expressed that in those specific

18   terms, though we relayed to him, as it's included in the

19   Article 3, that it's inclusive.

20   Q.  So he was informed that this -- that he fell under

21   Common Article 3?

22   A.  As we have it written here, that we make it inclusive,

23   but I don't believe we used a specific term or additional

24   discussion of him being afforded those protections.

25   Q.  Do you remember what you and the other members of

1    the guard force were wearing when they interacted with

2    Mr. Al-Imam?

3    A.  I was in civilian attire, as was the doctor, as was the

4    interpreter; and then the guard force, they leverage a

5    sanitized uniform.

6    Q.  You said a sanitized uniform?

7    A.  Yes.

8    Q.  What does that mean?

9    A.  The lower part of their body is in the standard fatigues

10   that we would call them.  They had T-shirts, they had their

11   boots, and then they had a belt with their T-shirt tucked

12   into it.

13   Q.  Was Mr. Al-Imam informed of any consequences that would

14   befall him if he did not follow the instructions?

15   A.  I don't recall any consequences being relayed to him

16   should he not follow the instructions.

17   Q.  Did you personally conduct any of the head counts?

18   A.  No.

19   Q.  Do you know who did conduct the head counts without

20   saying their name?

21   A.  Yes.  All of the annotations were done by one of the

22   seven members of the guard force based on their shifts.

23   Q.  In any of your interactions with Mr. Al-Imam, did he

24   appear to become tearful?

25   A.  He did not.

1          MR. PEED:  No questions, Your Honor.

2          THE COURT:  Okay.  Mr. Cummings.

3          MR. CUMMINGS:  No questions, Your Honor.  Thank

4    you.

5          THE COURT:  All right.  Thank you, ma'am, for your

6    testimony.  You're excused.  Have a good day.

7          MR. CUMMINGS:  Your Honor, this would be a good

8    time to take a lunch break before we call our next witness.

9          THE COURT:  Okay.  We'll take an hour for lunch.

10   We'll see you back here at 2:00.

11          (Lunch recess taken)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            A F T E R N O O N   S E S S I O N

2            THE COURTROOM DEPUTY:  Your Honor, we're back on

3    the record for Criminal Case 17-213, *United States of*

4    *America vs. Mustafa Muhammad Muftah Al-Imam.*

5            MS. SEIFERT:  Good afternoon, Your Honor; Karen

6    Seifert for the United States again.

7            THE COURT:  Ms. Seifert.

8            MS. SEIFERT:  With me is Mr. DiLorenzo and

9    Mr. Cummings.  If we may proceed?

10           THE COURT:  We're all set.

11           Mr. Al-Imam, can you hear us?

12           You may proceed.

13           MS. SEIFERT:  Your Honor, at this time the

14   government calls FBI linguist Samuel Babisha.

15           THE COURT:  Step right up, sir.  Please remain

16   standing and raise your right hand.

17                      SAMUEL BABISHA, Sworn

18                      DIRECT EXAMINATION

19   BY MS. SEIFERT:

20   Q.  Good afternoon, Mr. Babisha.

21   A.  Good afternoon.

22   Q.  Could you please introduce yourself to the Court and

23   spell your name.

24   A.  I am Sam Babisha; last name is B-A-B-I-S-H-A.

25   Q.  Mr. Babisha, where were you born?

1    A.  I was born in Jerusalem.

2    Q.  And what language did you speak from birth?

3    A.  Arabic.

4    Q.  When did you come to the United States?

5    A.  1986.

6    Q.  And for what purpose?

7    A.  I came for my education.

8    Q.  What degree did you obtain?

9    A.  I got a bachelor of science in accounting.

10   Q.  And how long did you work as an accountant?

11   A.  I'd say maybe 18 years or so.

12   Q.  And during that time were you located in the United

13   States?

14   A.  Yes, I was.

15   Q.  Did you become a U.S. citizen?

16   A.  Yes, I did.

17   Q.  And at some point did you end your career as an

18   accountant?

19   A.  Yes, I did.

20   Q.  Tell me about how you became a linguist.

21   A.  It was at 9/11, and I vividly recall people such as

22   Mr. Bob Miller and people such as Mr. John Ashcroft who were

23   on television saying, "If you know Arabic, please come

24   forward," and, of course, I wanted to come forward.

25   Q.  And when you did apply to be a linguist?  With what part

1    of the government did you first start working?

2    A.  I initially started with the U.S. State Department.

3    Q.  What did you do for the State Department?

4    A.  I interpreted for State Department.

5    Q.  How many years did you serve as an interpreter at the

6    State Department?

7    A.  All together, I would say five years.

8    Q.  And following your employment with the State Department,

9    did you start working for another agency?

10   A.  Yes, I did.

11   Q.  Which was that?

12   A.  For the U.S. Justice Department for the FBI.

13   Q.  And you've been with the FBI for how many years?

14   A.  As an employee, ten.  And I have another year of

15   contractor before that.

16   Q.  And so was it 2008/2009 when you became an FBI full-time

17   employee?

18   A.  Yes, 2008.

19   Q.  Now, what is your title at the FBI?

20   A.  Language analyst.

21   Q.  And where are you stationed?

22   A.  In Charlotte, North Carolina.

23   Q.  What does a language analyst do for the Bureau?

24   A.  We translate, we interpret, and we analyze also.

25   Q.  When you say "translate," are you referring to document

```
1    translations?

2    A.  Yes.

3    Q.  And interpretation, that's in reference to

4    conversational interpretation?

5    A.  Yes.

6    Q.  What language do you interpret between?

7    A.  Arabic.

8    Q.  And English?

9    A.  Yes, and English, of course.

10   Q.  And as part of your role -- let's talk first about being

11   a translator for written documents and works.  How many

12   documents could you estimate that in your 10 years at FBI or

13   11 years at FBI you've managed to translate for the Bureau?

14   A.  Thousands.

15   Q.  And what about in your job as an interpreter?  Do you

16   conduct interviews?

17   A.  Yes, I do.

18   Q.  And by that I mean are you conducting both interviews of

19   witnesses and also of subjects of FBI investigations?

20   A.  Both, and including victims as well.

21   Q.  Now, how many interviews in Arabic would you estimate

22   that you've provided interpretation services for?

23   A.  Several hundred.

24   Q.  And specifically let's talk about individuals who were

25   the defendants -- they were the charged defendants or they
```

1    were subjects of investigations.  Have you provided

2    interpretation to those individuals?

3    A.  Yes, I have.

4    Q.  And about, if you could estimate, how many of those

5    types of interviews have you been involved in?

6    A.  Over a hundred.

7    Q.  Now, in your interviews with defendants, have you been

8    asked to provide translation for *Miranda* warnings?

9    A.  Yes.

10   Q.  And can you -- specifically when you provide *Miranda*

11   warning translations, have you also familiarized yourself

12   with Arabic documents that provide those warnings?

13   A.  Yes, I have.

14   Q.  Is there a standard document that you use when you're

15   assisting in the Arabic interviews and when you're providing

16   *Miranda* warnings?

17   A.  Yes, we do have a standard *Miranda* rights document in

18   Arabic.

19   Q.  I'd like to talk a little bit about your entry into

20   employment with the FBI.

21   A.  Yes.

22   Q.  When you applied for the FBI, did you have to take any

23   tests to verify your language skills?

24   A.  Yes, I did.

25   Q.  Tell me about the tests that you took.

1    A.   There's a translation test that's based on documents,

2    and that's one part of it; and then there's another part of

3    it that's dependent on listening.  So there's almost two

4    tests within one.  And then later on, when you progress

5    through the hiring process, they have what I would call a

6    telephone interview of the testers on the other side of the

7    telephone who are conducting a test of your language skills.

8    Q.   So let's talk about the first tests, the translations

9    tests.  Were you asked to do any reading -- comprehension of

10   the information that you've translated?

11   A.   Yes.

12   Q.   And what about in that telephone interview process?  Are

13   you speaking in Arabic with the person on the other end, or

14   is that person speaking in English?

15   A.   It is in Arabic, conducted.

16   Q.   Did you pass all of those tests?

17   A.   Yes, I did.

18   Q.   And in addition to the -- are those the only tests that

19   you took for entry into the program?

20   A.   For entry, yes.

21   Q.   Subsequent to being hired as a language analyst, have

22   you had any type of other tests that you've had to take over

23   time to make sure your skills are up to par?

24   A.   Yes, I have.

25   Q.   Tell me about that.

1    A.  Well, we are subjected to what we call a quality review

2    process -- and more so in the first year, but it continues

3    up until this very moment -- that our documents and

4    translations are randomly selected, and they're sent to

5    appropriate departments who review our work to make sure

6    that we're still, on the operating level, demanded.

7    Q.  Now, that's with respect to the translation of

8    documents?

9    A.  Yes.

10   Q.  The individuals who are reviewing your translations, are

11   they also Arabic speakers?

12   A.  They have to be.

13   Q.  What's the grading system by which that test is done?

14   A.  Its satisfactory or unsatisfactory.

15   Q.  Have you ever received an unsatisfactory on any of your

16   reviews?

17   A.  No, I have never.

18   Q.  Are there any other types of proficiency tests that you

19   have participated in when you've been at FBI?

20   A.  Yes.  Once in a while, when the stars are right, as they

21   mention -- Congress agreeing to give us the money, and it's

22   there -- we are offered a language skills exam.  Both us

23   language analysts and agents, actually, who use that

24   language in their profession, we're examined to see if we

25   are functioning at a certain level.  Then, as a little

1    incentive, I think it's all equivalent to a two-week

2    paycheck they give us.  They will give us a little incentive

3    to encourage us to keep our language levels good.

4    Q.  So if you take the test and you do well, you get a

5    monetary payment?

6    A.  Yes.  Yes, we do.

7    Q.  And have you done -- have you taken those tests in the

8    past?

9    A.  Yes, I have.

10   Q.  And have you passed them and received the monetary --

11   A.  Yes, I have, and I have received the monetary award,

12   yes.

13   Q.  Now, at the Federal Bureau of Investigation, is there

14   specifically a testing done for the interpretation side?

15   A.  I'm not aware personally at the FBI that they have

16   interpretation tests until now.

17   Q.  So let me ask you.  You said before you were at the

18   State Department.  When you were at the State Department and

19   you served as an interpreter there, were you subject to

20   interpretation testing for your job there?

21   A.  Yes, I was.

22   Q.  And tell me about the testing that happened at the State

23   Department.

24   A.  The State Department, U.S. State Department, has three

25   levels of interpretation tests.  They have one they call the

1    consecutive; and then when you graduate from that and you

2    serve with that, you go to something called the

3    simultaneous; and then when you graduate with that, then you

4    have work experience with that, then you go to something

5    called conference-level interpretation.

6    Q.  So consecutive interpretation, fair to say that means

7    someone's talking and then you interpret after they're done

8    talking?

9    A.  Exactly.

10    Q.  And what was the second level?

11    A.  Simultaneous.

12    Q.  So simultaneous is when everyone's talking at the same

13    time?

14    A.  Yes.

15    Q.  Sort of like what's going on in court today?

16    A.  Exactly.

17    Q.  And what's the conference level?

18    A.  The conference level is simultaneous, but it's more

19    technical; so it could be something on the subject matter of

20    law, for example, so you're expected to know a certain depth

21    in the matter also.

22    Q.  And a certain vocabulary, potentially?

23    A.  Yes, of course.

24    Q.  Now, which level did you achieve when you were at the

25    State Department?

```
1    A.   I became a conference-level interpreter.

2    Q.   How many years did you serve as a conference-level

3    interpreter while you were at the State Department?

4    A.   Say two years.

5    Q.   And when you were serving as a conference-level

6    interpreter, did you have the opportunity to serve any high-

7    ranking officials at the State Department?

8    A.   Yes, I did.

9    Q.   Tell me about that.

10   A.   I've interpreted for Dr. Rice, Secretary -- U.S.

11   Secretary; not on a personal level, on a conference level.

12   And other dignitaries also.

13   Q.   And what about at the FBI?  Have you served in that

14   conference-level -- I know it's not called that at FBI, but

15   in that capacity at the FBI?

16   A.   Specifically with conference-level interpretation, yes,

17   we have them at the FBI, and I have been fortunate to have

18   served in that capacity, but more so with high-level

19   dignitaries.  Yes, I have accompanied Director Bob Mueller

20   across to other countries, and I have interpreted for him

21   and other very high-ranking officials.

22   Q.   Let me ask you about your trip with Director Mueller.

23   When you were accompanying him, where were you going?

24   A.   We went and met with the Middle Eastern president.

25   Q.   So the individuals that Director Mueller was speaking
```

 1    with were native speakers themselves?

 2    A.  Yes, of course.

 3    Q.  Beyond the training and the testing that we've been

 4    discussing, do you personally do any training in your own

 5    time to keep up with your language skills?

 6    A.  Yes, I do.

 7    Q.  Describe that for me.

 8    A.  Well, very early on, while working for the FBI, I

 9    realized that there's a tremendous amount of vocabulary

10    daily coming into the language, specifically with the

11    specialties that I work on, so I decided to hone my skills

12    and improve myself by starting what I call my own glossary,

13    which I have developed and I share with my fellow linguists.

14    Q.  What type of information do you put in the glossary?

15    A.  Technical high-level vocabulary, which I try to explain

16    to myself and to my colleagues what those terms mean.

17    Q.  Do any subject matters go into the glossary?

18    A.  Yes; military, law enforcement, security, explosives, on

19    and on.

20    Q.  How long is the glossary?

21    A.  Last I looked, it was over 1,500 pages.

22    Q.  Now, what about any other more casual ways that you keep

23    up with your language skills?

24    A.  Well, my wife is an Arabic speaker so, you know, at home

25    we speak Arabic.  We watch Arabic movies.  We listen to

1    music.  We go to places of worship that are completely

2    Arabic, and our friends are all Arabic speakers, many of

3    them.

4    Q.  Do you read any books or newspapers in Arabic?

5    A.  Yes, I do.

6    Q.  Let me specifically ask you about where the content is

7    coming from.  What countries in the Middle East or otherwise

8    does that content come from?

9    A.  I read from Arabic-speaking countries, from -- really

10   from Far East all the way to Far West, from Iraq to Morocco.

11   I read it all really, as much as I have time for it.

12   Q.  And you said your wife is Arabic -- speaks Arabic,

13   excuse me.  What is her native country?

14   A.  Egypt.

15   Q.  Now, if you could tell the Court a little bit about the

16   dialects of spoken Arabic.

17   A.  Well, overall they say that Arabic can be divided in the

18   Middle East into four categories.  You've got from east to

19   west what they call the Gulf Arabic, which would include

20   Iraq, Kuwait, and those Gulf countries, UAE and Qatar, et

21   cetera, and maybe a little bit of Yemen.

22          And then you've got what they call the Levant

23   part, which would include the Palestinian, Jordanian,

24   Syrian, and Lebanese.

25          And then you've got another group, which is the

1      Egyptian one that's the major one; and then the fourth

2      group, which we refer to as the Maghreb or the North African

3      group, which goes from Libya onward to Morocco.

4      Q.  I'd like to specifically ask you about the Maghreb

5      dialect.

6      A.  Sure.

7      Q.  In your time working at FBI, have you taken part in

8      cases in which the individuals you were interviewing were

9      using the Maghreb dialect?

10     A.  Yes, I have.

11     Q.  Can you tell me about some of those cases.

12     A.  One specific case I remember is when the regime was

13     brought down in Libya and a directive came from FBI

14     headquarters to FBI offices all across the U.S. that they

15     wanted to know what's going on with Libyan background

16     citizens or visitors here in the U.S., so I was in my area

17     in the Carolinas, and we went out and conducted interviews

18     with Libyan people, for example.

19     Q.  And how many interviews during this investigation did

20     you conduct of individuals from Libya?

21     A.  It was tens of them.

22     Q.  Were you involved in any other cases arising out of

23     Libya or with people who were of Libyan descent?

24     A.  Yes, I was.

25     Q.  Can you tell the Court about that.

1    A.  I've had cases where we had the Libyan subjects that

2    were of interest to the federal government conducting things

3    that they shouldn't be that we would basically -- I would

4    provide services to the investigators in the form of

5    translation and interpretation also.

6    Q.  Were you privy to any more conversational Libyan

7    dialects or conversational Libyan -- Libyans speaking in a

8    conversational manner?

9    A.  Yes, I was.

10   Q.  And explain that to the Court.  How did you become privy

11   to that?

12   A.  Well, we collect information in all sorts of formats,

13   and we -- and I would provide to the agents, the field

14   agents, conversation and analysis of what's being in those

15   documents.

16   Q.  And were these things posted online?  Were they text

17   messages?  Were they phone calls that were being listened

18   to?

19          Without revealing anything about the case, just

20   what's the context for when those communications occurred?

21   A.  All of the above, including private conversations.

22   Q.  Now, based on your interpretation or based on your work

23   as an interpreter, how different is the Libyan or the

24   Maghreb dialect to you?  Is that something that you have a

25   challenge understanding?

1    A.  I wouldn't call it a challenge, but it is different, but

2    it's -- I wouldn't call it a challenge to my work.

3    Q.  In what ways is the dialect different from your native

4    dialect?

5    A.  It is a little bit different, but not very much, I

6    wouldn't say.

7    Q.  Well, let me give you an example.  Obviously, in the

8    United States regionally, people from New York sound

9    different from people who live in Georgia, and they might

10   use different terms; and then alternatively people in the

11   United States versus people in Great Britain sound

12   differently, and they use different terms.  How would you

13   compare the dialects that we've been talking about and the

14   differences between them given those contexts?

15   A.  That's -- I would say that the analogy you gave is a

16   good one; that is, you know, to be the difference sometimes

17   between an area to another versus sometimes country to

18   another.  But very quickly they -- the speakers can assess

19   that he's not from where I am, so we adjust our

20   conversations to that effect.  It always is the case, I

21   would say.

22   Q.  When you've specifically been serving as an interpreter,

23   if you run into a situation where maybe the speaker is not

24   from the same place you are, and you're having a hard time

25   understanding them, what types of things do you do to deal

1    with that situation?

2    A.  I would ask the speaker in interpretation setting if

3    there's a word I wasn't sure I understood him correctly.  I

4    would use another word, for example, to say, "Did you mean

5    this word?"  And he would tell me yes.

6    Q.  And we've been talking about spoken dialect.  I'd like

7    to ask you a couple of questions about the written word.

8    A.  Yes.

9    Q.  Is Arabic writing the same --

10               THE COURT:  Excuse me.  Just for the record, could

11   you pronounce the Libyan dialect that you referred to?

12               THE WITNESS:  The answer is it's part of what we

13   would call the Maghreb, M-A --

14               THE COURT:  Maghreb, okay.

15               THE WITNESS:  Yes, sir.  -- group, we would call

16   each other.

17               THE COURT:  Got it.

18   Q.  Within the Maghreb dialect, or any of these dialects,

19   what type of written word in Arabic -- are they all the

20   same, or is it different based on dialect?

21   A.  When we write in Arabic east to west, Iraq to Morocco,

22   north to south, it's what we call Standard Arabic.  It's the

23   same Arabic taught at every single school from Grade 1 all

24   the way to graduation.

25   Q.  Now, what about newspapers or books?  Are they all

1    written in that standard language?

2    A.  Yes, they are.

3    Q.  What about the *Quran*?

4    A.  That's what I would call the highest level of Classical

5    Arabic.

6    Q.  Are there versions of the *Quran* that are in more of a,

7    you know, easy-to-read level, if you will?

8    A.  In Arabic?

9    Q.  Yes.

10   A.  No.  That would not be acceptable.

11   Q.  Now, in your work as an FBI linguist, are you assigned

12   only to work within the dialect that you grew up with?

13   A.  No.  That would not be practical for the FBI.  For

14   example, at this very moment I am the only Arabic linguist

15   serving all of North Carolina, so it's impractical of me to

16   tell my superiors I can only do this accent.

17   Q.  And of the four dialects that you told the Court about,

18   have you worked within all of those in your time as an FBI

19   linguist?

20   A.  Yes, I have.  I continue to do so.

21   Q.  And what about in your time at the State Department?

22   A.  I also worked with most dialects there as well.

23   Q.  Now --

24   A.  All of them.

25   Q.  -- turning to the facts of the case that bring you here

1     today, in October of 2017 were you part of an investigation

2     in which you were asked to take part in an interview of an

3     individual named Mustafa Al-Imam?

4     A.  Yes, I was.

5     Q.  And did you, in fact, take part in interviews with

6     Mustafa Al-Imam on October 30th to 31st of 2017?

7     A.  Yes, I did.

8     Q.  Do you see Mr. Al-Imam present in the courtroom today?

9     A.  Yes, I do.

10    Q.  Could you point him out to the Court and tell the Court

11    a piece of clothing he's wearing.

12    A.  He's sitting in front of me, and he's wearing orange.

13         MS. SEIFERT:  Your Honor, may the record reflect

14    an in-court identification of the defendant, Mr. Al-Imam?

15         THE COURT:  It may.

16    Q.  Now, before the defendant, did you yourself travel to

17    the naval vessel in the Mediterranean for this interview?

18    A.  Yes, I did.

19    Q.  Before the defendant came aboard, did you conduct any

20    preparatory, you know, meetings?  Did you have any

21    preparatory meetings with any members of the military or FBI

22    agents?

23    A.  Yes, I did have preparation.

24    Q.  I'd like to talk to you about some of those preparatory

25    steps.  Let's start first with your preparation with the

1    military.  What types of things did you do with the military

2    to prepare for Mr. Al-Imam to come onboard?

3    A.   The military prepared -- I would even use the word

4    "rehearsed" -- literally step by step what was going to

5    happen, and I would be involved in all of that with the

6    military.

7    Q.   Were you the only translator onboard?

8    A.   I was the only translator onboard, yes.

9    Q.   And when they said that they were prepping step by step,

10   what was your role supposed to be?

11   A.   I would provide interpretation for the intended

12   individuals.

13   Q.   What type of practice did they do with you?

14   A.   Well, for example, the medical doctor, for example, he

15   would literally practice with me the medical examination;

16   for example, the questions, the medical nature questions he

17   would want to ask.

18   Q.   Did the doctor go over any terms that were medical terms

19   that he might need to ask about?

20   A.   Yes, he did.

21   Q.   And were you familiar with those terms?

22   A.   Yes.  I had no problem with the language.

23   Q.   And with the other members of the guard force, the

24   individuals who were actually watching over and moving the

25   defendant about, did you practice the movements of the

```
1    defendant from places on the ship?

2    A.  Yes, we did.

3    Q.  And what was in general your role?

4    A.  To interpret for him where he needed to be, you know,

5    told things, instructed things, et cetera.

6    Q.  So if he were to be moved to the latrine, for instance?

7    A.  Yes.

8    Q.  You would tell him that's where he was going?

9    A.  Yes.  Even if it was literally step by step as we were

10   walking, I would tell him to watch his steps, et cetera.

11   Q.  Okay.  Now, did you have an opportunity to see the

12   sleeping area where the defendant was going to be sleeping

13   while he was aboard the vessel?

14   A.  Yes, I did.

15   Q.  And before you -- did you see it before the defendant

16   came onboard?

17   A.  Yes, of course I did.

18   Q.  Okay.  I'd like you to turn in your -- in the notebook

19   in front of you to the exhibit marked M5.  Do you recognize

20   what's in Exhibit M5?

21   A.  Yes, I do.

22   Q.  What is it?

23   A.  These were the rules that were posted on the wall where

24   the defendant was kept.

25   Q.  And I'd like to have you look at M6.  Is this a close-up
```

```
 1    version of one of those pieces of paper that was on the
 2    wall?
 3    A.  Yes, it is.
 4    Q.  Now, with respect to the rules that are on the wall,
 5    they were all written in both English and Arabic?
 6    A.  Yes, they were.
 7    Q.  Did you have a chance, before the defendant came
 8    onboard, to make sure that the translation between English
 9    and Arabic of these rules was accurate?
10    A.  Yes.  I had reviewed them.
11    Q.  And was it accurate?
12    A.  Yes, it was.
13    Q.  Now, in the bottom right-hand corner of the square that
14    is on M5 is a document that looked -- has a little bit of a
15    different font.
16    A.  Yes.
17    Q.  I'm showing you what's been marked as Government's
18    Exhibit M8.
19    A.  Yes.
20    Q.  Do you recognize that document?
21    A.  Yes, I do.
22    Q.  And what does the document that you can see in M8, what
23    does that document discuss?
24    A.  It's Article 3 of the Geneva Convention.
25              MS. SEIFERT:  Now, Your Honor, I believe in your
```

1    notebook this has not been admitted, but I would refer us

2    all to Government's Exhibit 31, which is not yet in

3    evidence.

4    Q.  And if the witness could turn to Government's Exhibit

5    31.

6    A.  31?

7    Q.  31.  Mr. Babisha, do you recognize Government's Exhibit

8    31?

9    A.  Yes, I do.

10   Q.  Is this -- what do you recognize it as?

11   A.  This is Article 3 of the Geneva Convention.

12   Q.  Is this a clearer copy of that same document that was on

13   the wall that we've just been talking about that's in

14   Government's M8?

15   A.  Yes, it is.

16          MS. SEIFERT:  Your Honor, move to admit

17   Government's 31.

18          THE COURT:  Any objection?

19          MR. PEED:  No objection.

20          THE COURT:  So moved.

21   Q.  So with respect to Government's Exhibit 31, the Geneva

22   Article 3 warning, did you also have an opportunity to

23   review this document before the defendant came aboard?

24   A.  Yes, I did.

25   Q.  And did you practice how the defendant was going to be

1    given the warnings that are in M31, the Article 3 warnings?

2    A.   Yes.  We practiced, yes.

3    Q.   And when you say "we," who are you referring to?

4    A.   The guards, the military personnel, and I.

5    Q.   Now, when you say you practiced, what were the guards

6    going to do, and then what were you supposed to do?

7    A.   So the way we agreed to do it was that they would read

8    an English section, and I would translate it point by point

9    and then consecutive.  Then I would -- then they would go

10   back and speak, and I would go back and interpret.

11   Q.   And if you could turn to M25, which has already been

12   admitted into evidence, Mr. Babisha.  In preparation for

13   your testimony today, did you review M25?

14   A.   Yes, I did.

15   Q.   And did you have an opportunity to compare the contents

16   of M25 with the document we were just looking at, the Arabic

17   version of the Article 3 warning?

18   A.   Yes, I did.

19   Q.   And when you compared them, did the two line up to each

20   other?

21   A.   Yes, they do.

22   Q.   Let's talk about a little further what your preparation

23   was with the FBI agents before the defendant came aboard the

24   ship.

25            What type of discussion did you have with FBI

1    Special Agent Larkin and FBI TFO Marcano about how the

2    interviews of the defendant were going to take place?

3    A.  Well, they shared with me first a background about the

4    case, people involved, places involved, and they told me the

5    way they would want to conduct their strategy of the

6    interview.

7    Q.  And did you discuss how *Miranda* warnings would be given

8    to the defendant?

9    A.  Yes, we did.

10   Q.  And I'd like to show you -- if you could turn to

11   Document M29, which has not yet been admitted into evidence.

12   A.  Yes.

13   Q.  Mr. Babisha, do you recognize Government's M29?

14   A.  Yes, I do.

15   Q.  What do you recognize it as?

16   A.  This is the *Miranda* rights document.

17   Q.  Is this the same document that was shown to the

18   defendant when he was aboard the naval vessel?

19   A.  Yes.

20   Q.  Do you notice any signatures on it that are familiar to

21   you?

22   A.  Yes, I do.

23   Q.  And could you point that out to the Court?

24   A.  I see my signature, and I see the defendant's signature.

25   Q.  Okay.

1            MS. SEIFERT:  I move to admit, Your Honor,

2     Government's M29.

3            MR. PEED:  No objection.

4            THE COURT:  So moved.

5     Q.  You said you saw the defendant's signature.  I'm going

6     to ask you to go -- there's a heading in the middle of the

7     page that's underlined.

8     A.  Yes.

9     Q.  And then there appears to be one, two, three, four

10    sentences.

11    A.  Yes.

12    Q.  And the next line down there appears to be a long

13    writing in Arabic.

14    A.  Yes.

15    Q.  What is that writing?

16    A.  It is the four-part Arabic name of the defendant, four

17    being his, his father, his grandfather, and family.

18    Q.  And who told the defendant to sign with all the parts of

19    his name?

20    A.  I specifically did.

21    Q.  And you personally witnessed him signing?

22    A.  Yes, I did.  Yes.

23    Q.  And then I'd also ask you -- I'm going to talk a little

24    bit about how you gave those rights in a minute, but first

25    I'd ask you to turn to M30, which, again, has not been

1    admitted into evidence yet.  Do you recognize Government's

2    M30?

3    A.  Yes, I do.

4    Q.  And what do you recognize it as?

5    A.  It is also a *Miranda* rights advice.

6    Q.  And is this one of the *Miranda* warnings that was given

7    to the defendant when he was aboard the naval vessel?

8    A.  Yes, it was.

9    Q.  And do you recognize any signatures on this page?

10   A.  Also I see the defendant's handwritten name and his

11   signature, and my signature underneath that.

12          MS. SEIFERT:  Your Honor, move to admit

13   Government's M30.

14          MR. PEED:  No objection.

15          THE COURT:  So moved.

16   Q.  And, again, just looking at Government's M30, pointing

17   your direction to the same spot we were looking at, the last

18   part where there's -- the middle of the page where there's a

19   heading and then four lines down --

20   A.  Yes.

21   Q.  -- and then a long set of words in Arabic.  Whose

22   signature is that that I'm pointing to?

23   A.  That is the handwritten name of the defendant.

24   Q.  And below that there appears to be something else.  What

25   am I pointing to?

1    A.   That is the defendant's signature.

2    Q.   Now, let's talk about what happened when the defendant

3    came onboard and what you did with the guard force upon his

4    arrival.

5    A.   Yes.

6    Q.   Okay.  So once the defendant was aboard the naval

7    vessel, what was your role?  How did it go?

8    A.   My role was from the very first moment to make sure that

9    the communication from and to the guards, from the defendant

10   to them, were very clear and done well.

11   Q.   When you came onboard, was the guard force giving him

12   any instructions?

13   A.   Yes.  From the very first instructions was to

14   acknowledge verbally that he understood what was being said

15   to him.

16   Q.   And when you translated what the guard force was saying,

17   how did the defendant respond?

18   A.   After that, he would audibly -- verbally he would say

19   yes, he understood, and then shake his head also.

20   Q.   Now, with the guard force, fair to say you moved the

21   defendant -- with the defendant from where he entered the

22   vessel into this sleeping area?

23   A.   Yes, I did.

24   Q.   And you were with the defendant the entire time?

25   A.   I was.

1    Q.  At any point in time during this period did the

2    defendant have any issues understanding you?

3    A.  No, he did not.

4    Q.  Did he ask you any questions?

5    A.  No, he did not.

6    Q.  Now, you met with the defendant and the doctor; is that

7    fair?

8    A.  Yes, I did.

9    Q.  Okay.  Tell me about the interview the defendant had

10   with the doctor.  Were you present for the entire interview?

11   A.  Yes, I was for the entirety.

12   Q.  Did you have any issues communicating with the defendant

13   during the interview with the doctor?

14   A.  No, I did not.

15   Q.  When the defendant was in the pod, at some point,

16   turning back to the rules that were on the wall, did those

17   rules get read to the defendant, or was he left to read them

18   on his own?

19   A.  No.  We read them to him word by word and line by line,

20   all of them.

21   Q.  Was the defendant asked to provide any response as to

22   acknowledging these rules?

23   A.  Yes.  He was asked if he understood.

24   Q.  And what were his responses?

25   A.  Yes, he did.  He replied that he understood.

1    Q.  And likewise, the Geneva Convention Article 3 warning

2    that was on the wall, was that also read to the defendant?

3    A.  Yes, verbatim, word for word.

4    Q.  And what was the defendant doing when the Geneva Article

5    3 warning was read to him?

6    A.  He was following with his eyes the words.

7    Q.  And when you say "he was following with his eyes," how

8    do you read in Arabic?  Left to right or right to left?

9    A.  We read top to bottom, right to left.

10   Q.  Were there any movements that you could see of the

11   defendant's head or his eyes that led you to believe he was

12   reading?

13   A.  Yes.  Initially when we -- he was speaking to us.  Once

14   we told him we were going to read, he turned his body

15   towards it, because the writing was on his right, and then

16   he -- I could see him following.

17   Q.  You could see his eyes following?

18   A.  Yes, I could see his eyes following the text.

19   Q.  All right.  And generally how would you describe -- in

20   this time period where the defendant is with the guard force

21   and the doctor, how would you describe his affect?

22   A.  I would say he was nervous.

23   Q.  Was he responsive to the questions that were being

24   asked?

25   A.  Yes, he was.

1   Q.  At any point in time were you concerned the defendant

2   wasn't understanding what you were saying?

3   A.  No, I was not.

4   Q.  And let's talk about the guard force.  When they were

5   providing commands or orders to the defendant, what type of

6   tone of voice were they using?

7   A.  It was professional and kind, I would call it.  They

8   were kind to him.

9   Q.  But they were orders nonetheless?

10  A.  They were orders, yes, but they were not demeaning in

11  any way.  They were just orders; but they were kind-spoken.

12  Q.  What about your tone of voice?  What tone of voice were

13  you using?

14  A.  I was mirroring what they were -- in my language and in

15  my tone of voice also what was being said to him.

16  Q.  What about with the doctor?  What tone of voice was the

17  doctor using with the defendant?

18  A.  It was a very normal doctor examination asking questions

19  and very normal tone of voice.

20  Q.  Now, let's go and talk about the interviews that you

21  conducted with Agent Larkin and TFO Marcano.  Did you take

22  notes of every single interview and what was said in every

23  single interview?

24  A.  No, I did not.

25  Q.  And whose job was it to take the notes?

```
1    A.   That is the agent, the agent on-site.  It's his job to

2    take the notes.

3    Q.   Okay.  So I'm going to ask you more general questions

4    about what happened during the interview and not specifics

5    about what was said in each interview.

6              When you first started -- when the defendant first

7    came in for his interview, where was everyone -- where was

8    everyone seated?

9    A.   There was a table, and defendant was across from us,

10   from me.  And another agent was to my side, and there was

11   another agent who was sitting on the other side of the

12   table.

13   Q.   Could you flip in your book to Exhibit No. 9.

14   A.   (Witness complies) Yes.

15   Q.   Do you recognize what's depicted in Exhibit 9?

16   A.   Yes.  This is what I refer to as the interview room.

17   Q.   Now, when you were sitting in the interview room at the

18   table with the defendant, you said you were across the table

19   from him at some points.

20   A.   Yes.

21   Q.   Did you have any trouble hearing him?

22   A.   No.

23   Q.   Did he appear to have trouble hearing you?

24   A.   No, he did not.

25   Q.   This initial time when you sat down with the defendant
```

1   and the agents, what type of discussion -- let me just first

2   ask, what was the defendant's affect when he first sat down

3   with the agents?

4   A.   From the -- in the very beginning -- he was also, I

5   would say, nervous in the beginning.

6   Q.   And did that change over time as the interviews went on?

7   A.   Yes, it did.

8   Q.   How so?

9   A.   I could observe that he became relaxed, if I could say,

10  in his interaction with us.   I physically saw it.

11  Q.   Was there any time during the interview that the agents

12  and/or you discussed with the defendant things unrelated to

13  the case, so more social topics?

14  A.   Yes, we did.

15  Q.   Tell the Court about that.

16  A.   We spoke with him about life in general.   We spoke about

17  soccer.   We spoke about his family.   He told us that he had

18  an unborn child that his wife was expecting.

19  Q.   Did the defendant, during any of these more social

20  conversations, display any emotions to you?

21  A.   It helped relax him, I believe.

22  Q.   Did he ever appear to smile or to joke with the agents?

23  A.   Yes.

24  Q.   When was that?

25  A.   For example, I remember when we spoke about soccer, and

1    he became a little bit engaged in the conversation.  He

2    liked that a little bit.

3    Q.  Now, let's talk about that -- again, back to that first

4    interview.  After the initial discussion, was the defendant

5    given his *Miranda* rights?

6    A.  Yes.  We read the *Miranda* rights to him.

7    Q.  And I'm asking you to open your book to page Exhibit No.

8    29, the one we've previously discussed.  How did you and the

9    agents go about giving the defendant the *Miranda* rights that

10   are shown in Exhibit 29?

11   A.  I personally read it to him verbatim, word for word.

12   Q.  And when you did that, what was the defendant doing?

13   A.  He was following.  He had a copy, and he was following

14   with his fingers and with his eyes also.

15   Q.  When you say he had a copy, he had a copy of what's in

16   Exhibit 29?

17   A.  Yes, he did.

18   Q.  And just to be clear, because the exhibit's two pages,

19   did he have an Arabic copy or an English copy?

20   A.  He had the Arabic one.

21   Q.  When you got to the end of the first paragraph of the

22   *Miranda* rights, I believe there's a question that says, "Do

23   you have any questions about what I have just explained to

24   you?"  When you read that to the defendant, did he have any

25   questions?

1    A.  No, he did not.

2    Q.  Now, in the second part of the document there are

3    several statements that start after acknowledgement of

4    rights and waiver of rights to an attorney and to remain

5    silent, and it says -- the first is, "I'm willing to make a

6    statement.  I do not want a lawyer.  I do understand the

7    rights."  And the fourth one is, "No promises have been made

8    to me."

9            After each of those on Exhibit 29 there -- it

10   looks like there's initials.  Whose initials are those?

11   A.  The defendant's.

12   Q.  Did he have any questions before he initialled next to

13   each of those statements?

14   A.  No, he did not.

15   Q.  When you were reading the defendant the *Miranda* rights

16   the first time, did he say anything about his ability to

17   read?

18   A.  No, he did not.

19   Q.  Did he describe needing any assistance in reading from

20   any eyeglasses or otherwise?

21   A.  Yes.  He asked for his eyeglasses.

22   Q.  When he asked for his glasses, what happened?

23   A.  I believe we found them and gave them to him.

24   Q.  Did he appear to have a hard time reading without the

25   glasses?

1   A.  I don't recall, to be precise, if he started reading

2   before the glasses or after.  I don't remember that.

3   Q.  Okay.

4         THE COURT:  Counsel, just for the record, I got a

5   replacement M29, which is one page.

6         MS. SEIFERT:  Yes, yes, and the witness has that,

7   defense has that, and that's the copy that I've admitted,

8   Your Honor.  I apologize.

9         THE COURT:  So it doesn't have the second page.

10         MS. SEIFERT:  Oh, I apologize.

11         THE COURT:  So we're all in the same song book.

12         MS. SEIFERT:  Thank you for your -- thank you,

13   Your Honor.

14   Q.  Mr. Babisha?

15   A.  Yes.

16   Q.  Let's talk just generally about that first interview.

17   Throughout the interview, when you asked the defendant the

18   questions the agents had, how were his responses?

19   A.  He understood, and he answered exactly what was being

20   asked of him.

21   Q.  How did the interpretation go?  Did you need to make any

22   corrections to the interpretation for the defendant to

23   understand you?

24   A.  Rarely.  There were a few words that he might have said

25   that I wanted to be absolutely sure that I understood that

1    word, even though I would have understood it from context.

2    But just to clarify, I would tell him, "You said this word.

3    Did you mean this?"  And I would, of course, tell my

4    agent -- that's always been my practice to tell them -- "I

5    asked him for clarification on this point."

6    Q.  And beyond those few instances, did you sense that the

7    responses that the defendant gave were aligned with the

8    questions so that he could understand the interpretation?

9    A.  Oh, he understood very well.

10   Q.  Do you know anything about the defendant's educational

11   background?

12   A.  No, I don't.

13   Q.  During the course of your conversation with the

14   defendant, were you concerned that he maybe wasn't educated

15   enough to understand either the rights or the conversation

16   that was going on?

17   A.  No, that was not the case.  I was not ever concerned

18   about his understanding, that it wasn't adequate.

19   Q.  Now, let's move to the second interview.

20   A.  I was concerned with the points where he had a little

21   bit of deception.  I would say, you know, "We have to bring

22   him back," but always understanding.

23   Q.  You're saying during the interview?

24   A.  Yes.

25   Q.  You interpreted his answers to be deceptive?

1    A.  At a few points, yes.

2    Q.  And did the agents confront him about that deception?

3    A.  Yes.

4    Q.  And how did he respond?

5    A.  He realized that, you know, what he's giving us is

6    contrary to what we knew, for example.

7    Q.  And so in his response, how did he respond then?  Did he

8    change his answer?

9    A.  Yes.  There were times where he changed an answer, yes.

10   Q.  Now, moving on to the second interview of the defendant

11   and turning to Government's Exhibit M30.  When the second

12   interview began, was the defendant, again, given this

13   version of the *Miranda* rights that is M30?

14   A.  Yes, he was.

15   Q.  Just to sort of save a little bit of time, the way that

16   you gave the defendant the *Miranda* rights the second time

17   and, in fact, the third time, was it the same way that you

18   did it the first time?

19   A.  Yes, it was.

20   Q.  And by that I mean you read it to the defendant, and he

21   read along with you?

22   A.  Yes, verbatim, word for word, each time.

23   Q.  And let's -- with respect to that second interview and

24   the second day of interviews, really, any changes in the

25   defendant's demeanor during that point in time?

1    A.   Yes, even from the end -- the middle or the ending part

2    of the first interview, throughout the second and then

3    following interview, his demeanor became more relaxed.

4    Q.   Now, let's, if you can, just go with me to the last day

5    that you interviewed him, so this is on October 31st.   Was

6    the defendant given a *Miranda* warning on that day as well?

7    A.   Yes, he was.

8    Q.   And when you were providing -- and when you were

9    providing that *Miranda* warning to the defendant, did he

10   respond that he did not want to continue with the

11   questioning by the agents?

12   A.   Yes.   That's exactly what happened.

13   Q.   Tell the Court about how that played out.

14   A.   He pointed to the part that talks that he want -- that

15   he said, "You told us I have the right for an attorney," and

16   he said, "I would like that."

17   Q.   And what did the agents do in response?

18   A.   They clarified.   "You said you wanted an attorney?"

19   Clarified to rephrase -- to repeat what he said.

20   Q.   And after the defendant -- what did the defendant say?

21   A.   He asserted yes, that he -- that's what he said and

22   meant.

23   Q.   And then what happened?

24   A.   The interview in the form of an interview ended

25   immediately.

1    Q.   Around this point in time did the defendant raise any

2    concerns about being abused or beaten by the agents?

3    A.   No, he did not.

4    Q.   Did he say anything about going back to his cell?

5    A.   Yes, he asked -- he asked that he -- could he go back to

6    his cell.

7    Q.   Do you recall the defendant saying words to the effect

8    of, "If you aren't going to beat me now, I'd like to go back

9    to my cell"?

10   A.   Yes, he did.

11   Q.   Tell me about that statement.  When he made that

12   statement, how did the agents react to that statement?

13   A.   The agents were smiling and almost surprised and said,

14   "No, we would never do something like that, and we have

15   never done anything like that.  We don't do that."

16   Q.   Did you observe, at any point in time when you were with

17   the defendant on the vessel, any signs of any abuse?

18   A.   No, I never did.

19   Q.   So after the defendant was assured that he wasn't going

20   to be beaten, was there any further conversation?

21   A.   Yes.  The agents told him, "You don't have to go back to

22   your cell.  You know, you could sit and finish."  I believe

23   he was drinking some drink we've offered him, and he had a

24   little snack we'd offered him.  We told him, "Go ahead.

25   Finish.  You don't have to rush back there."

1    Q.  And did the defendant choose to stay and finish the

2    drink?

3    A.  Yes, he did.  He stayed for a little bit.  Yes, he

4    stayed.

5    Q.  And what was everyone talking about, if anything?

6    A.  It was a social conversation.

7    Q.  Was this the same as the soccer conversation, or a

8    different one?

9    A.  I don't recall, to be honest with you, what was spoken

10   about that particular time, but it was a social

11   conversation.

12   Q.  Did the defendant express to you any emotions that he

13   was having?

14   A.  He expressed relief that, you know, we were at our word

15   when we told him you don't have to speak, you know, if he

16   doesn't choose to.  Yes, he expressed relief of that.

17   Q.  Did the defendant talk to you about his wife at all?

18   A.  Yes, he mentioned his wife.

19   Q.  Did he express any emotions about being away from his

20   wife?

21   A.  Yes.  He mentioned that he missed his family.

22   Q.  And just a couple of final questions.

23          Throughout the interpretation services that you

24   provided to the defendant during his time on the vessel, did

25   you have any sense that he was not able to understand the

1    questions that were being asked to him by either the agents

2    or the guard force or the doctor, for that matter?

3    A.  No, I never noticed that.

4    Q.  And how would you characterize his responses and his

5    behavior in response to the agents?

6    A.  He answered what they asked.  He was with the

7    conversation.  He understood, and we understood each other.

8    Q.  And after the defendant stated that he wanted an

9    attorney, did Agent Marcano or Agent Larkin attempt to speak

10   with the defendant again?

11   A.  No, never again.

12        MS. SEIFERT:  One second, Your Honor.

13        (Pause)

14   Q.  Mr. Babisha, one other final question.  At any point in

15   time, since you were the only Arab speaker on the ship, did

16   the defendant tell you that he had been abused or

17   maltreated?

18   A.  No, he never did.

19        MS. SEIFERT:  Thank you.

20                    CROSS-EXAMINATION

21   BY MR. PEED:

22   Q.  Good afternoon.

23   A.  Good afternoon.

24   Q.  How long have you worked with the FBI as an interpreter?

25   A.  11 years.

```
 1    Q.  Do you have any other employment that you do other than
 2    the FBI?
 3    A.  At the present time?
 4    Q.  Present time.
 5    A.  No, I do not.
 6    Q.  So 100 percent of your work is with the FBI?
 7    A.  Yes.
 8    Q.  How long had you prepared with the teams for this
 9    mission of interpreting on this case?
10    A.  You mean before we went?
11    Q.  Yes.
12    A.  We prepared while we were on the vessel.  We prepared.
13    Q.  How long -- how many days was your preparation?
14    A.  There were several days that we had to -- that we were
15    preparing for the mission.
16    Q.  Let's start when Mr. Al-Imam was raised onto the ship
17    and your interpretation began.  Did you ever interpret for
18    him any consequences of -- I'm sorry, let me step back.
19            You explained to him procedures he had to follow,
20    right?
21    A.  Yes, I did.
22    Q.  And did you tell him what the consequences would be if
23    he didn't follow those procedures?
24    A.  We did not discuss consequences.
25    Q.  There is no point where it came up that he would have to
```

1    obey or something would happen to him?

2    A.  No.  We never talked like that with him.

3    Q.  Did you ever read to him anything that said a

4    consequence on it?

5    A.  No.  We read the documents that were displayed.  You

6    know, that's -- that was the extent and the limit of the

7    conversations.

8    Q.  Do you recall any signs with consequences on them that

9    you read for Mr. Al-Imam?

10   A.  The rules that the military displayed and the Article 3

11   of the Geneva Convention were the only thing that we went

12   over.

13   Q.  Okay.  So those rules, did they have any consequences

14   with them, or they were just rules without any consequences?

15   A.  I believe there's one consequence if you attempt to

16   escape.  I believe there's -- it says that there's a

17   consequences for attempting to escape.

18   Q.  Do you recall what the consequence was?

19   A.  I believe it says that you will be shot if you attempt

20   to escape.

21   Q.  And no other form of consequences were explained orally

22   other than that one sign?

23   A.  No.  We did not.  We stuck only to the consequences

24   posted.

25   Q.  How many times did you meet with the prosecutors to

1   prepare for this afternoon's testimony?

2   A.  Twice.

3   Q.  Twice.  Did you send any emails or notes in preparation

4   for this testimony?

5   A.  No, just "I'm coming."  That's it.

6   Q.  When you were doing the interpretation for the

7   interrogation of Mr. Al-Imam, did you take notes?

8   A.  No, I did not.

9   Q.  Did you participate in the translation of the Advice of

10  Rights form?

11  A.  I did not translate that document.  I read it to him.

12  It's a standard FBI document we use, so I just used it.

13  Q.  So have you seen this form before?

14  A.  Yes, I have.

15  Q.  Have you used it before?

16  A.  Yes, I have.

17  Q.  When you've used it before, have you ever seen a form

18  that has yes or no questions at the bottom?

19  A.  I do not recall such a form.

20  Q.  Let's go to -- the first interrogation session began, I

21  believe, at 125 Zulu Time; is that correct?

22  A.  I do not recall the -- I didn't keep a record of what

23  time we started.

24  Q.  What's the first thing that happened in the

25  investigation -- I mean, in the interrogation?

1    A.   We introduced ourselves and told him who we were.

2    Q.   And how did you -- what did you say?

3    A.   We said, "We are from the Federal Bureau of

4    Investigation, and we're here to speak with you."

5    Q.   Then what was said?

6    A.   The agents explained a little background, and we

7    proceeded, I mean, with the questioning.

8    Q.   What background was explained?

9    A.   What brought us there, a little background about the

10   case that was...

11   Q.   And can you tell me what that background was.

12   A.   There was an attack against our Mission in Libya.

13   Q.   That was explained to Mr. Al-Imam?

14   A.   A little bit later on, yes, sir.

15   Q.   I'm trying to start from the beginning.

16            So you introduce yourself, and then you explained

17   some background at the beginning.  Is that what you were --

18   are we still there at the beginning of the interrogation?

19   A.   I don't have -- like I said, I didn't take notes so I'm

20   just giving from you my memory how it proceeded.  I couldn't

21   give you step by step how it went, but we introduced

22   ourselves, and I remember a little bit later we mentioned

23   what was the nature of the questioning that was going on.

24   Q.   And then what happened, after you introduced the nature

25   of the questioning?

1   A.  We started asking him about where he was and what he was

2   doing and asking what his involvement was.

3   Q.  What his involvement was on the day of the attack?

4   A.  Yes.

5   Q.  And did he provide you answers to that question?

6   A.  Yes, he did.

7   Q.  How long did those -- did the introductory remarks take

8   before you started asking about the day of the attack?

9   A.  I do not recall.

10  Q.  Could you give us just a ballpark.  A half hour?  15

11  minutes?  Five minutes?

12          MS. SEIFERT:  Objection; calls for speculation.

13          THE COURT:  Overruled.

14  A.  I do not recall how soon it took us to get to that

15  discussion.

16  Q.  So you did your introductions, and you mentioned the

17  nature of the questioning, and then you started asking him

18  about the attack.  Is that the timeline?  Is that correct?

19  A.  Later, when the questioning started.  I'm not saying it

20  was during the introduction.  Later we got to that part

21  where we started asking about it.

22  Q.  During the introduction part, did the agents mention

23  anything about themselves, their backgrounds?

24  A.  Yes.  They mentioned their names, and that they were

25  from the Federal Bureau of Investigation.

1   Q.  Did Mr. Al-Imam talk about his family during that

2   portion?

3   A.  Mr. Who?

4   Q.  Did Mr. Al-Imam talk about his family or his wife during

5   that portion?

6   A.  I do not recall if it was during the introduction that

7   he spoke about his family, but he did.  But I don't recall

8   if it was during the introduction.

9   Q.  At what point in the interview did you begin talking

10  about the rights?

11  A.  It was early on that we read him his -- the document,

12  the Advice of Rights.  Very early on.

13  Q.  Was it, would you say, about a half hour after your

14  beginning?

15  A.  I really cannot remember at what point.

16  Q.  I want to talk about the process of going through those

17  rights.  You've done this before many times, right?

18  A.  Yes, sir, I have.

19  Q.  How long did it take you to go through these rights with

20  Mr. Al-Imam?

21  A.  We read them, I mean, just at a normal pace of reading.

22  Q.  Was it read in English and then you read it in Arabic,

23  or was it just read in Arabic?

24  A.  No, the Advice of Rights was done in Arabic.

25  Q.  But did an agent read it in English while you read it in

1   Arabic?

2   A.  No, he did not read it in English.

3   Q.  Did Mr. Al-Imam have the form in front of him while his

4   rights were being read to him?

5   A.  Yes, he did.

6   Q.  And did he have his glasses on while he was reading the

7   form?

8   A.  I believe so.

9   Q.  Did you tell -- did you point to the form for

10  Mr. Al-Imam to show him where to sign?

11  A.  Yes.  I asked him to sign in the appropriate places.

12  Yes, I showed him where.

13  Q.  And what did you say while you were pointing to them?

14  A.  At the signature and writing of name, I asked him to

15  write the full name as I explained earlier, the four-part

16  name.

17  Q.  And for the other parts, what did you say to him?

18  A.  To initial his signature next to the other four parts.

19  Q.  So was your finger pointing to the form so he could see

20  where to initial it?

21  A.  I mean, generally speaking I was pointing to it.

22  Q.  So when -- I just want to make sure I understand your

23  answer.  Generally you were saying, "This is where you

24  should initial"; "This is where you should sign your full

25  name"?

1    A.  So we would read, for example, "I'm prepared to give

2    testimony, to answer questions," and I would ask him, "Would

3    you please initial next to that," and he would.  And I would

4    go to the next one, and so on, so forth.

5    Q.  And did I understand you right, it was the second

6    interrogation session where he mentioned that it says here I

7    have a right to an attorney?

8    A.  It was at the last interview we did with him.  I cannot

9    recall, to be honest with you, if it was two or three.  I

10   think it might have been three.  It was at the last one.

11   Q.  Okay.  And is that the way he phrased it?  "It says here

12   I have a right to an attorney"?

13   A.  The way he phrased it was, "You said something about I

14   have a right to an attorney.  I would like to have an

15   attorney."

16   Q.  How well do you remember those precise words, or is that

17   very close to -- are you fairly confident the way you just

18   said it is the way it was said?

19   A.  Pretty close.

20   Q.  So when he said, "You said I had a right to an

21   attorney," he wasn't reading something when he said that,

22   was he?

23   A.  He had just read it.  He had just read it, and I had --

24   he had read it with his eye, and I had read it with my

25   voice, so he heard me reading it.

1   Q.   Okay.  So when he said "you said," he was referring to

2   what was just read?

3   A.   Yes.

4   Q.   And he had his glasses on when he was reading it?

5   A.   I do not recall the glasses.  We -- I remember he early

6   on asked for the glasses.  I just don't remember the glasses

7   after that.

8   Q.   Were there any other documents shown to him other than

9   the Advice of Rights forms?

10  A.   Evidence was shown to him.

11  Q.   What kind of evidence?

12  A.   We have our -- you know, the FBI has evidence, pictures

13  we had, you know.

14  Q.   And was he using his reading glasses when he was looking

15  at the pictures?

16  A.   I do not recall the glasses part.  I just -- for some

17  reason, I just am not remembering the glasses part.

18  Q.   You stated on your direct examination you determined

19  that he was being deceptive at certain points, and that he

20  changed his answer.  What were those answers about?

21  A.   I do not remember the specifics of what was being

22  discussed, but the general example or analogy I would give

23  is we would tell him a certain fact, which we knew

24  absolutely what was going on, and he would tell us something

25  to contradict what we knew, and we would call him on that.

1   We would tell him, "We know that that's not the case."

2   Q.  And do you remember any specific instances where that

3   occurred?

4   A.  I do not remember specific instances that we called him

5   on it.

6   Q.  And when you say "we called him on it," it was the

7   agents that were doing the questioning, right?

8   A.  Yes.

9   Q.  Did you ever say things at any point to Mr. Al-Imam that

10  was not a direct translation of what the interviewing agents

11  were asking?

12  A.  I gave an example earlier when at some times I would

13  myself need clarification.  "You said this word.  Is that

14  what you meant?"  But I would turn to the agents and I would

15  tell them, "He said, and I asked him to clarify on that

16  word."

17  Q.  The warnings, they were provided at every session,

18  right?

19  A.  Which warning?

20  Q.  The *Miranda* warnings.

21  A.  The *Miranda* advice, yes.  Every time we started the

22  interviewing, we always read -- that was the instruction

23  given to us from FBI headquarters.  They wanted every time

24  to do it.

25  Q.  So that you didn't miss it at any of the sessions?

1    A.  No, we did not.

2    Q.  Have you ever -- in your interpretation services for the

3    FBI, have you ever seen an agent violate *Miranda* during an

4    interview?

5    A.  No, I have never.

6    Q.  Have you ever made any reports to anyone about the

7    conduct of an agent that you were interpreting for?

8    A.  I have never reported an agent.

9    Q.  Have you ever seen any mistakes or misconduct by an

10   agent you were interpreting for?

11   A.  Never.

12   Q.  Do you remember the order of the signature?

13           Let's start with the first one, which is M29.  Did

14   Mr. Al-Imam sign before you and Agent Larkin?

15   A.  I believe I was the last to sign.

16   Q.  So the order was Mr. Al-Imam and then Agent Larkin and

17   then you?

18   A.  I believe so.

19   Q.  And it's written 140 Zulu.  Was that the time that you

20   signed?

21   A.  That's -- I believe that's the agent's handwriting.  I

22   believe.  If it says so, yes.

23   Q.  Was there a clock on the wall or some other way to tell

24   the time in the room?

25   A.  We had our watches on.

1   Q.  Did you check to see if that was the time?

2   A.  No, I did not.

3   Q.  Do you recall if that time was written on there when you

4   signed?

5   A.  I do not recall looking for the time.

6   Q.  If there was a session that had begun before warnings

7   were given, would you have raised that to the attention of

8   the agents?

9   A.  Yes.  This was -- the instructions were given us from

10  headquarters very clearly.  We had to read them the Advice

11  of Rights every session before we start.

12  Q.  And there was never a time when that happened?

13  A.  Could you please rephrase that.

14  Q.  There was never a time where they began without Advice

15  of Rights?

16  A.  That's right.  That's correct.

17  Q.  Was there any time during the interrogation sessions

18  where Mr. Al-Imam seemed to get teary?

19  A.  There was one time, yes.

20  Q.  Could you describe that to me.

21  A.  He became emotional.  Sad, I would say.

22  Q.  When was that?

23  A.  I believe it was towards the end, the last session,

24  where he was going to assert his right to an attorney, and

25  he said what you said, "You guys aren't going to beat me

1    up," and we told him, "Of course we're not."  I believe it

2    was at that point.

3              MR. PEED:  That's all I've got, Your Honor.

4              THE COURT:  Ms. Seifert.

5                       REDIRECT EXAMINATION

6    BY MS. SEIFERT:

7    Q.  Mr. Babisha, whose job is it to decide what gets talked

8    about in the interview?

9    A.  The agents'.

10   Q.  And whose job is it to decide when the *Miranda* rights

11   are given in the course of the interview?

12   A.  It's the agents'.

13   Q.  Now, you said you didn't take notes.

14   A.  That's correct.

15   Q.  Is it your practice not to take notes?

16   A.  Yes, it is my practice not to take notes.

17   Q.  And why is that?

18   A.  I don't need it.  I really don't need it.  It's not my

19   job to keep up with what's being -- in that sense in the

20   interview.  It's not my job.

21   Q.  Your job is to stay up in the conversation between the

22   person being interviewed and the interviewer?

23   A.  Yes.

24   Q.  So fair to say that this happened over a year and a half

25   ago?

1    A.  Yes.

2    Q.  Have you had any opportunity to refresh your

3    recollection about the content of this interview between

4    October 2017 and today?

5    A.  I have not.

6    Q.  And have you conducted other interviews in Arabic with

7    other individuals who were detained or otherwise as part of

8    your job as an FBI linguist between October 2017 and today?

9    A.  Yes, I have.

10   Q.  And so as you sit here today, how certain are you about

11   your recollections about the content of what was talked

12   about with Mr. Al-Imam and in what order those things were

13   discussed?

14   A.  I really am not certain about those -- yes, the timing,

15   et cetera.

16   Q.  And specifically about -- you were asked about the

17   *Miranda* rights and how they were given.  Who talked with the

18   headquarters at the FBI about how to give the *Miranda*

19   rights?

20   A.  It was the agents.  I was merely present really.  The

21   agents are speaking with headquarters.  I was just present

22   listening.

23   Q.  And were you present with the agents before they came

24   onto the ship when they had any conversations with their

25   management about when to give *Miranda* rights?

1    A.  No.  I traveled with them, but we never discussed these

2    things during travel.

3    Q.  So you aren't -- you yourself aren't privy to the prior

4    conversations the agents may have had about when to give

5    *Miranda* rights?

6    A.  No, which is the case in all cases really.  The agent,

7    as you stated, always decides these things.

8    Q.  You were asked about the *Miranda* warning.  Let's just

9    look at Exhibit No. 29, if you could turn to that page.

10   A.  Yes.

11   Q.  And after you read the top portion of the warning where

12   you talked about the defendant's rights under *Miranda*, was

13   the defendant asked whether he wanted to speak with the FBI?

14   A.  Yes, he was.

15   Q.  Okay.  So before the defendant answered the questions

16   and initialled, had the defendant already told you that he

17   was willing to speak with you?

18   A.  Yes.  We specifically asked him, "Would you like to

19   speak with us?" after the reading of it, and he said, "Yes,

20   I do."

21   Q.  And was that in the three times that you were present --

22   let's talk about the two times the *Miranda* warnings were

23   given, the first two times.  In both of those first two

24   occasions did the defendant say he wanted to speak with you?

25   A.  Yes, he did.  He said, "I would like to speak with you,

1   yes."

2   Q.  And was that before he initialed any of the sentences

3   on the page?

4   A.  Yes, it was before.

5   Q.  Okay.  And the third time the *Miranda* warning was given,

6   that's when he said he did not want to speak with the

7   agents?

8   A.  The way he said it was, "You said that I have the right

9   to an attorney.  I would like to have the right to an

10  attorney."  That's how he said it.

11  Q.  And then just briefly, if you could turn to Page 6 in

12  the binder, Exhibit No. 6.  I'm sorry, Exhibit 7.

13          I know that this copy is not of the best quality,

14  but what's the first -- if you can read for us, what's the

15  first sentence on the page of the rules that's displayed on

16  the left-hand side of this -- of Exhibit No. 7?

17  A.  In Arabic it's the exact translation of the English.

18  "If you are abused, notify officials."

19  Q.  And that was verbally read to the defendant in addition

20  to being on this sign?

21  A.  Yes.  Several times that was repeated to him.

22          MS. SEIFERT:  Okay.  No questions, Your Honor.

23          MR. PEED:  Can I just have one question?

24          THE COURT:  Sure.

25          MR. PEED:  Just one more question.

```
 1                      RECROSS-EXAMINATION
 2    BY MR. PEED:
 3    Q.  Did Mr. Al-Imam ever ask why he had to sign the form?
 4    A.  No, he did not.
 5              MR. PEED:  Thanks.  I have no further questions.
 6              THE COURT:  Okay.  Sir, thank you very much for
 7    your testimony.  You're excused.  Have a good day.
 8              Why don't we take a ten-minute break.
 9              MS. SEIFERT:  Yes, Your Honor.
10              (Recess taken)
11              THE COURT:  Ms. Seifert, you're up.
12              MS. SEIFERT:  Thank you, Your Honor.  The
13    government calls Special Agent Ryan Larkin.
14              THE COURT:  Good afternoon.
15              THE WITNESS:  Good afternoon.  How are you doing?
16              THE COURT:  Please stand and raise your right
17    hand.
18                 SPECIAL AGENT RYAN LARKIN, Sworn
19                      DIRECT EXAMINATION
20    BY MS. SEIFERT:
21    Q.  Good afternoon, Agent Larkin.
22    A.  Good afternoon.
23    Q.  Please introduce yourself to the Court.
24    A.  My name's Ryan Larkin.  I'm a special agent with the
25    FBI.
```

1   Q.  And could you spell your last name.

2   A.  L-A-R-K-I-N.

3   Q.  Agent Larkin, how long have you worked for the FBI?

4   A.  Approximately seven and a half years.

5   Q.  Where are you currently stationed?

6   A.  New York office.

7   Q.  What squad are you assigned to?

8   A.  I'm assigned to CT3.  It's actually a territorial squad.

9   Q.  And "CT," does that stand for counterterrorism?

10  A.  It does.

11  Q.  So as part of your responsibilities as a special agent,

12  are you focusing on counterterrorism cases?

13  A.  Yes.

14  Q.  Okay.  And have you conducted law enforcement interviews

15  before?

16  A.  Yes.

17  Q.  How many have you done?

18  A.  I've probably done 40 to 50.

19  Q.  And are those specifically interviews of subjects or

20  defendants?

21  A.  Witnesses, subjects, and defendants, too.

22  Q.  Have you received training from the Federal Bureau of

23  Investigation about how to conduct a law enforcement

24  interview?

25  A.  Yes.

1    Q.  And in those 40 or 50 interviews, have you also

2    interviewed subjects or defendants?

3    A.  Yes.

4    Q.  And in the course of those interviews, have you provided

5    *Miranda* rights or *Miranda* warnings to the subjects?

6    A.  Yes.

7    Q.  Now, when did you become assigned to work on this case

8    that brings you to the courtroom today?

9    A.  I was assigned around September 2017.

10   Q.  And as part of your assignment onto the case, did you

11   take part in the mission to capture and interview the

12   defendant, Mustafa Al-Imam, on or about October 29th of

13   2017?

14   A.  Yes.

15   Q.  And do you see the defendant, Mr. Al-Imam, present in

16   the courtroom today?

17   A.  I do.  He's sitting right behind you in the orange

18   shirt.

19           MS. SEIFERT:  Your Honor, may the record reflect

20   an in-court identification of the defendant?

21           THE COURT:  It may.

22   Q.  Now, when you were first assigned to the team that was

23   going to be part of the interviews of Mr. Al-Imam, who was

24   assigned to that team with you?

25   A.  So there was Detective Anthony Marcano, who would be

1    part of the interview team.

2    Q.  And is he an FBI agent?

3    A.  He's a task force officer, so he's assigned to the FBI

4    as a task force officer.

5    Q.  So Agent Task Force Officer Marcano and yourself.

6    Anyone else?

7    A.  We also had a linguist, Sammy Babisha, Samuel Babisha.

8    Q.  And is he an FBI linguist?

9    A.  He is.

10   Q.  Now, before you went to actually conduct the interviews,

11   did you have an opportunity to discuss, internally with your

12   team at the FBI, how the interviews would be conducted?

13   A.  Yes.  We met on a couple of different occasions with FBI

14   lawyers, my supervisor, and other agents that also worked on

15   the same case to discuss our plan.

16   Q.  And when you say "we," who are you referring to?

17   A.  Detective Marcano and myself.

18   Q.  Was Mr. Babisha a part of those conversations?

19   A.  He was not a part of the conversations prior to going on

20   the boat.  He was a part of the conversations once we got on

21   the boat.

22   Q.  Let's just talk about the discussions you had internally

23   before you left for the naval vessel.

24           THE COURT:  I'm sorry, Ms. Seifert, what's

25   Detective Marcano's home assignment?  Where was he?

```
1              THE WITNESS:  Like what agency?
2              THE COURT:  Yes.
3              THE WITNESS:  He's NYPD.  He's part of the --
4              THE COURT:  He's NYPD?
5              THE WITNESS:  NYPD, yes.
6    Q.   In this discussion with Agent Marcano, your supervisors,
7    and the lawyers, what did you decide amongst yourselves what
8    was going to be the strategy for interviewing Mr. Al-Imam?
9    A.   We talked about a few things, but one of the main things
10   that we talked about was the Advice of Rights and how we're
11   going to do that; and in those discussions we decided that
12   we would do a daily Advice of Rights to Mr. Al-Imam.
13   Q.   And when you say "daily," at what point during the day
14   were you intending to give the Advice of Rights?
15   A.   In the first interview of the day.
16   Q.   Okay.  So if you had one interview or three interviews
17   that day, your plan was just to give it at the very first
18   interview of the day?
19   A.   Yes.
20   Q.   And did you and Agent Marcano talk about how you were
21   going to record the meetings, whether by taking notes or
22   otherwise?
23   A.   We did.  We did with the whole group.  There's -- there
24   is an FBI policy that we -- for a custodial interview, you
25   videotape the interview domestically.
```

1            When overseas it does not apply, so we decided

2       that we would not be videotaping the interviews.

3       Q.  Were there practical considerations that went into

4       deciding why you were not going to tape these interviews?

5       A.  Yes, definitely.  It would have added -- it would have

6       changed the dynamic of the interview because potentially we

7       would have had to figure out how to get a video recorder or

8       videotape in the actual room.  We would have probably had to

9       have somebody, like, rig it up or someone actually sitting

10      there videotaping, so we just decided against it.

11      Q.  When you videotape -- in your practice as an FBI agent,

12      when you videotape people in your offices, are the cameras

13      hand-held, or are they installed somewhere in the interview

14      room?

15      A.  Usually they're installed somewhere in the interview

16      room already.

17      Q.  And are they obvious to the interviewee?

18      A.  Usually they're not.

19      Q.  Did you have an idea, though, when you were planning

20      this interview, whether you would be able to have a camera

21      in the interview room with Mr. Al-Imam that was in a not

22      obvious place?

23      A.  Did we -- can you repeat that?

24      Q.  When you were discussing whether or not a camera was an

25      option in this context with Mr. Al-Imam, did you have any

1    anticipation about whether or not you were going to be able

2    to have a camera that wasn't obtrusive?

3    A.  We didn't know either way.

4    Q.  Did you discuss about how you were going to record the

5    interviews since you didn't have access -- where you were

6    not going to have access to video recording?

7    A.  Yes, just our standard process of taking notes and doing

8    a 302.

9    Q.  And tell the Court about what that process is.

10   A.  So usually you preassign someone in the interview -- one

11   of the two interviewers -- to take notes, and that person

12   takes notes and records what's said in the interview; and

13   then, when you get back to a place where you can type it up,

14   you can type up, based on using your notes, what was said

15   during the interview.

16   Q.  And does someone, a supervisor or someone else, review

17   the typed-up version of your notes?

18   A.  Yes, definitely.  Before you can memorialize it, the

19   supervisor has to sign off on it.

20   Q.  Now, in this particular instance, how many times did you

21   end up speaking with Mr. Al-Imam?

22   A.  So we ended up talking to Mr. Al-Imam four times.

23   Q.  And can you -- do you recall who was responsible for

24   taking the notes at each of those sessions?

25   A.  Tony took the notes at three out of the four sessions --

1    sorry, Detective Marcano took the notes at three out of the

2    four sessions, and then I took the notes for one session.

3    Q.  Now, I'll get more in detail about each session, but

4    let's go to discuss your arrival on the naval vessel.  When

5    you arrived on the vessel, what did you and Agent Marcano do

6    in order to set up the interview room where you would be

7    interviewing Mr. Al-Imam?

8    A.  So once we identified what the room would be, there

9    was -- it was previously a part of the gym, so in order to

10   kind of turn it into an interview room, we moved all the gym

11   equipment, a lot of treadmills, out of the room.  And once

12   we got all the treadmills out, we then put in a table and

13   chairs, I think garbage.

14   Q.  And when you were inside the room, did it have four

15   walls to it and a door?

16   A.  Yes.  I think it had two doors, but yes.

17   Q.  So -- but it wasn't -- only the people in the room knew

18   what was going on in the room; is that fair to say?

19   A.  Yes.

20   Q.  Okay.  Was there a window on the door?

21   A.  No.

22   Q.  Now, after you did the initial set-up for the room, did

23   you meet with your team to discuss the course of how the

24   interviews were going to proceed?

25   A.  Yes.

1    Q.  Tell me about those conversations.

2    A.  So we would -- we would -- we had some time on the boat,

3    so we met and kind of discussed what our strategy was in

4    terms of the interview and talked to the linguist a little

5    bit about when we planned on giving the Advice of Rights and

6    how we would do that.

7    Q.  And what did you settle on with the linguist about the

8    manner in which you intended to give the Advice of Rights to

9    the defendant?

10   A.  That we would read -- we would get an English version

11   that would be in front of us, and that he would sit next to

12   the defendant with the Arabic version.  And we would read

13   the English version, and he would translate as we read so

14   the defendant could have the opportunity to follow along on

15   the paper as well.

16   Q.  And I just want to clarify the pronoun.  So when you say

17   "we," you're referring to yourself and Detective Marcano?

18   A.  Yes.

19   Q.  And the interpreter is the individual you're saying

20   would have the Arabic version with the defendant?

21   A.  Yes.

22   Q.  Okay.  Now, in general did you have an idea of how long

23   these interviews were going to go on for?

24   A.  We had a rough idea that it would be a couple of hours,

25   hour or two.

1    Q.  And did you discuss how you would deal with taking

2    breaks or allowing the defendant to use the bathroom?

3    A.  Yes, which is kind of standard in all of our interviews.

4    We make sure that the defendant or the interviewee knows

5    that he can take a break at any time if he has to use the

6    bathroom or, in this case, if he had to pray or if there was

7    any reason at all.  He could let us know, and we could take

8    a break.

9           So we, at the beginning of -- we discussed that

10   that would be the plan, to tell him that at the beginning of

11   each interview.

12   Q.  And did you, in fact, once the interview started, convey

13   to Mr. Al-Imam that he could take a break at his preference;

14   that he could go to the bathroom at his preference?

15   A.  Yes.

16   Q.  And between you and Detective Marcano, did you have an

17   approach to how you wanted to go through the interview in

18   terms of the attitude that you wanted to show Mr. Al-Imam?

19   A.  Yes.  We were kind of like co-interviewers.  We were

20   both equal parts in the interview, and we both -- and this

21   is kind of standard for all the interviews I do, but we talk

22   in a conversational tone, and it's just like a conversation

23   we're having.

24           So that was kind of our strategy, or that's just

25   the way we were going to -- our technique.

1    Q.  And did Detective Marcano agree with that strategy?

2    A.  Yes.

3    Q.  And throughout the interviews, the four interviews that

4    you had with the defendant, did you abide by -- did you each

5    abide by that strategy?

6    A.  Yes.

7    Q.  When you say "conversational tone," how does that

8    compare with the voice you're using in court today?

9    A.  Very similar.

10   Q.  Now, before the defendant came aboard the boat, how were

11   you feeling?

12   A.  I was suffering from a little bit of motion sickness.

13   Q.  And did you see the ship's -- a doctor aboard the ship

14   to discuss your symptoms?

15   A.  I did.

16   Q.  And what happened?

17   A.  I saw multiple -- like multiple medics would come over

18   and check, but they would just issue me different types of

19   medication to try to ease the effects of the motion

20   sickness.

21   Q.  Do you recall what types of medication you used?

22   A.  So I had my own Dramamine, but I used that up pretty

23   quick.

24           I also had patches.  I don't remember exactly what

25   they were called.  It was one of those patches that you can

1    put behind your ear.

2              And then I also got -- a couple of times I got

3    Zofran for the upset stomach and the queasiness in the

4    stomach, and some pills from the doc as well that were

5    similar to Dramamine.  I forget the name though.

6    Q.  Did any of the medications that you were prescribed and

7    that you took while you were aboard the ship affect your

8    ability to engage with the defendant?

9    A.  No.  They enhanced it, if anything.

10   Q.  Did they make you drowsy to the point where you weren't

11   able to carry on a conversation?

12   A.  No.

13   Q.  And did they affect your ability to perceive or remember

14   the events as they happened?

15   A.  No.

16   Q.  Now, were you yourself present when the defendant came

17   aboard the naval vessel on the evening hours of October 29,

18   2017?

19   A.  Yes.

20   Q.  And did you see the defendant come aboard?

21   A.  Yes.

22   Q.  Now, were you generally aware of what was happening with

23   the defendant, where he was moving about the ship?

24   A.  Yes.

25   Q.  At what point did you actually get to meet with the

1    defendant?

2    A.  We first met with the defendant at 125 Zulu the night of

3    the 30th of October 2017.  Or the morning of the 30th,

4    sorry.

5    Q.  All right.  So just so I'm clear, it sounds like we

6    spanned midnight at this point.  The defendant came aboard

7    the evening of the 29th.

8    A.  Yes.

9    Q.  And by the time he came to the interview room, it was

10   the morning hours of the 30th?

11   A.  Yes, exactly.  So that same night that he got aboard, we

12   talked to him a few hours later.

13   Q.  Okay.  So in the early morning hours of October 30th you

14   said it was 125 Zulu?

15   A.  Yes.

16   Q.  When the defendant came into the room for the first

17   time, who was present -- the interview room, who was present

18   in the room with you?

19   A.  So the defendant came in with the guard force.  I think

20   there were three guard force members that brought him in the

21   room.  And then already in the room before the guard force

22   members brought him in were myself, Detective Marcano, and

23   the linguist, Samuel Babisha.

24   Q.  And when the defendant entered the room, what was he

25   wearing?

1    A.  I don't recall exactly what he was wearing.

2    Q.  And was he wearing or was he restrained in any way?

3    A.  Yes.  So he had hearing protection, eye protection, and

4    he had -- his hands were handcuffed in the back, behind his

5    back.

6    Q.  And did that protection stay on him while he was in the

7    room?

8    A.  So as soon as the guard force brought him in, they put

9    his -- they brought him up against one of the walls, had him

10   face the wall and removed his handcuffs and removed his

11   hearing protection and his eye protection, and then sat him

12   in one of the seats across from us.  And then they left the

13   room.

14   Q.  And just for the Court's ease, the other times that you

15   interviewed the defendant, did the guard force follow that

16   same procedure?

17   A.  Exactly the same.

18   Q.  Now, you were first sitting down with the defendant in

19   the early morning hours of October 30th.  What's the first

20   conversation you have with him?

21   A.  When we first sat down with him, we just asked about how

22   he was feeling, just his general, like, physical health and

23   how he was doing.  We introduced ourselves, told him who we

24   were.

25   Q.  What did you tell him about who you were?

1    A.  I told him we were -- I was a special agent with the

2    FBI.

3    Q.  Did you say you were from the United States government?

4    A.  Yes.

5    Q.  Did you tell the defendant where he was located?

6    A.  I don't recall.  I believe we did, but I don't recall.

7    Q.  Did you tell him he was on a ship?

8    A.  Yes.

9    Q.  All right.  You mentioned before that you talked about

10   that he could take a break and go to the bathroom, if he

11   needed to, or pray.  In the first meeting, where did that

12   conversation occur?  Was it at the beginning or sometime

13   later?

14   A.  It was in the beginning.

15   Q.  And, again, what tone of voice were you using during

16   this initial conversation with the defendant?

17   A.  The same that we're using now, conversational.

18   Q.  What was the defendant's affect like when he came in and

19   sat down with you?

20   A.  He was attentive.  I think -- he had mentioned that he

21   was feeling a little bit nauseous, but overall felt okay

22   physically.

23   Q.  And generally did his demeanor change at all throughout

24   that first interview?

25   A.  Not that I can remember.

1    Q.  Did you offer the defendant any food or water?

2    A.  We did.  At the beginning of every session we offered

3    him -- I think in the first meeting we offered him tea, or

4    we could get him water, too, if he wanted it.  And we had, I

5    think, Pop-Tarts.  We offered hip Pop-Tarts.  It was limited

6    as to what we could get, but...

7    Q.  Now, how long was it in this first interview before you

8    began to advise the defendant of his rights under *Miranda*?

9    A.  After we did all the things that we just discussed, we

10   then went into the *Miranda* rights.

11   Q.  Beyond the pleasantries that we've sort of just been

12   talking about, was there any substantive discussion that

13   occurred before you advised the defendant of his *Miranda*

14   rights?

15   A.  No.

16   Q.  Did you talk to him about why he was there, what the

17   case was about?

18   A.  No.

19   Q.  Okay.  Now, I'd ask you to turn to Exhibit 29 in your

20   book.  And this is already admitted into evidence.  Do you

21   recognize any of the signatures on Exhibit 29?

22   A.  Yes.

23   Q.  And what signatures do you recognize?

24   A.  Well, I recognize my own to start, then my name printed

25   above it; Sam Babisha, the linguist, is above that; and then

1    the defendant's signature is above that.

2    Q.  And on the bottom of the sheet there's a date and a time

3    written, and who wrote that?

4    A.  I did.

5    Q.  And Exhibit 29, is this the *Miranda* form from that first

6    interview you had with the defendant?

7    A.  Yes.

8    Q.  Tell the Court -- you know, you talked about the plan

9    for how you were going to go through the *Miranda* warning.

10   Did everything go to plan in this first interview?

11   A.  Yes, it did.

12   Q.  And so describe after you -- so the first part of this

13   *Miranda* warning -- and you can turn to the second page of

14   Exhibit 29, which is the English version.  It might be

15   easier for you to follow along.

16          The first part of the *Miranda* form discusses the

17   Advice of Rights.  Was that read to the defendant in its

18   entirety?

19   A.  Yes.

20   Q.  At the conclusion of reading that first part of the

21   form, what did you ask the defendant?

22   A.  We asked if he understood.

23   Q.  And what did he -- how did he respond?

24   A.  He said he did.

25   Q.  And then did you have any other questions for him?

1    A.  We asked if he understood and he wanted to keep talking

2    to us.

3    Q.  And when you asked the defendant if he wanted to keep

4    talking, how did the defendant respond?

5    A.  He said yes.

6    Q.  Okay.

7    A.  Or he nodded his head affirmatively.

8    Q.  And then after that happened, did you go on to the

9    second part of the form?

10   A.  Yes.

11   Q.  Okay.  And who directed -- did you read the entirety of

12   the second part of the form as well?

13   A.  Yes.

14   Q.  And who directed the defendant where to sign, or did the

15   defendant know on his own from reading the paper?

16   A.  I think Sammy -- I think Sammy might have directed him

17   where to sign.  I can't recall exactly how, but Sammy was

18   there to help him with, like, translations.

19   Q.  Now, when you say he was there to help him, did the

20   defendant have the first page, the Arabic page, in front of

21   him?

22   A.  Yes.

23   Q.  Could you tell from what you were looking at with the

24   defendant whether he appeared to be reading the page?

25   A.  He did.

1    Q.  How could you tell?

2    A.  He was just -- he was going -- like his eyes were moving

3    from right to left.  He's looking at it, acknowledging what

4    he was reading, what he was hearing.

5    Q.  At any point in time during this first review of the

6    *Miranda* warning did the defendant explain that he needed

7    glasses to read?

8    A.  He did.

9    Q.  And what did he say to you?

10   A.  I can't remember exactly, but something to the extent of

11   that he uses reading glasses.

12   Q.  And did you stop at that point and go get the glasses?

13   A.  I believe we stopped at that point and talked to the

14   guard force, who was usually waiting outside in case we

15   needed anything, and directed them to see if they could find

16   glasses for him.

17   Q.  Did you continue with the waiver without the glasses?

18   A.  Yes.

19   Q.  And why was that?

20   A.  Because he was acknowledging that he was understanding

21   what we were reading.

22   Q.  And by "he," you mean the defendant was acknowledging?

23   A.  Yes.

24   Q.  Did the defendant say he could read without the glasses,

25   or did you not inquire?

1    A.  He said it was tougher for him to read without the

2    glasses, but he could still, you know, generally see what

3    was on there.

4    Q.  And at some point were glasses obtained?

5    A.  Yes.

6    Q.  And from then on did the -- when you were with the

7    defendant, did he have his glasses with him, if you recall?

8    A.  Yes.

9    Q.  And by that I mean what about for the subsequent

10   interviews?  Did he also have glasses?

11   A.  Yes.

12   Q.  Now, this first interview you had with the defendant,

13   you spoke with him for some time, and then you took a break.

14   And what happened after the break?

15   A.  So after the first interview it was pretty late, so

16   after the -- oh, sorry, after the break he came back into

17   the -- using the same procedure with the guard force as had

18   been done before, and we sat down and talked to him again.

19   And then pretty soon after that he got physically ill and

20   threw up in the garbage can a little bit.

21   Q.  And what did you do after the defendant vomited?

22   A.  We contacted the guard force and asked him to get the

23   doctor.

24   Q.  What happened with the interview?

25   A.  So once the doctor came in and gave him an assessment

1    and gave him some medication, we decided to terminate the

2    interview just because of his feeling sick.

3    Q.  And where did everyone go?

4    A.  He, with the guard force, returned back to his sleeping

5    pod, and then we went up to -- we went to bed.

6    Q.  Let's talk about what happened on the second day you

7    were on the boat, so this is the morning of October 30th.

8    Did you have another interview with the defendant that

9    morning?

10   A.  We did.

11   Q.  And do you recall approximately what time that took

12   place?

13   A.  Yes.  Approximately 1045 Zulu.

14   Q.  Was the interview conducted in the same pod, the same

15   room?

16   A.  Yes, same procedure, same pod, same room.

17   Q.  Same people there:  you, Detective Marcano, and

18   Mr. Babisha?

19   A.  Yes.

20   Q.  And the same procedure with the guard force getting the

21   defendant in the room?

22   A.  Yes.

23   Q.  Okay.  Now, at the beginning of this second interview,

24   did you discuss, again, any pleasantries or any

25   introductions with the defendant?

1  A.  We did.  At the start of every interview we kind of just

2  talked to him about -- we talked to him about a variety of

3  different things, including soccer and just kind of small

4  talk.

5  Q.  Did you inquire about the defendant's health given that

6  he'd previously been ill?

7  A.  We did.  We went through the same kind of procedures

8  that we did in the first interview where we asked him how he

9  was.  We asked him if he needed anything.  We offered him

10  some, I think, water, tea, and asked how he was feeling.

11          He said he was feeling significantly better the

12  second morning.

13  Q.  How was his affect or his demeanor in this second

14  interview?

15  A.  It was definitely better than the first one.  He just

16  seemed a little bit like -- had a little bit more -- he was

17  feeling better.

18  Q.  And after the initial pleasantries and discussion, did

19  you have an opportunity to advise the defendant of his

20  rights?

21  A.  Yes.

22  Q.  And before you advised the defendant of his rights, what

23  substance was discussed?

24  A.  Before we advised him of his rights?

25  Q.  Right, correct.  Let me ask it differently.

1    A.  Okay.

2    Q.  Did you discuss substance with the defendant before you

3    advised him of his rights?

4    A.  No.

5    Q.  All right.  I'd like to direct your attention to

6    Government's Exhibit 30, which is already admitted.  Do you

7    recognize any of the signatures on Government's Exhibit 30?

8    A.  Yes.

9    Q.  And what signatures do you recognize?

10   A.  I recognize my own towards the bottom plus my name.  I

11   also recognize the linguist's name; Samuel Babisha is right

12   above that.  And above that is the defendant's.

13   Q.  And is this the *Miranda* page and the warning that was

14   given to defendant at this second interview?

15   A.  Yes.

16   Q.  Now, when you provided the second *Miranda* warning, how

17   did that differ from your first advisement that you'd given

18   the night before?

19   A.  In terms of how we -- in terms of how we discussed it

20   with him, it was exactly the same.

21   Q.  And, again, after you kind of did that first paragraph

22   of the *Miranda* warning where you talk about the defendant's

23   rights, did you ask the defendant any questions?

24   A.  Yes.  We just asked if he understood what he was

25   reading, and he just nodded that -- I can't remember if he

1    nodded or said yes, but he just nodded saying that he

2    understood.

3    Q.  And did you ask him any other questions?

4    A.  If he wanted to continue, and he said yes.

5    Q.  Continue talking, or was it just, "Do you want to

6    continue?"  Do you recall?

7    A.  I can't recall.

8    Q.  Okay.  Now, did the defendant end up having any

9    questions about the rights at any point during this second

10   interview?

11   A.  Not that I can remember.

12   Q.  And was he wearing his glasses?

13   A.  Yes.

14   Q.  Okay.  Now, within the second interview, just -- without

15   talking about substance, generally you discussed things.

16   For how long, would you say, did that -- did this interview

17   go on before you took a break?

18   A.  I can't recall the exact time, but it was probably about

19   an hour.

20   Q.  And then the defendant was given a break?

21   A.  Yes.

22   Q.  And did you continue thereafter?

23   A.  It was more like when the defendant wanted to take a

24   break, he would just come and ask us.

25              We didn't have, like, a set break time.  It was

1    whenever he felt like he wanted to use the restroom, and he

2    would go and use the restroom, and that was the time when he

3    decided he wanted to use the restroom so...

4    Q.  And, again, not talking about substance, but just

5    generally, during your conversation with the defendant in

6    either the first or the second interview, did you sense you

7    were having a hard time understanding each other through the

8    interpreter?

9    A.  No, not at all.

10   Q.  Now, that second interview ended at approximately 1255

11   Zulu; is that right?

12   A.  Yes.

13   Q.  And then what happened?

14   A.  Same process.  The guard force came in at the end, and

15   they brought him back to his cell.  We went upstairs and,

16   you know, had lunch or had some meetings and then --

17   Q.  And was there a second interview on the second day?

18   A.  Yes, and then we came back down for the second interview

19   around 2048 on the same day.

20   Q.  Okay.  So the second interview on Day 2, did that occur

21   in the same place?

22   A.  Yes.

23   Q.  And the same people were there?

24   A.  Yes.

25   Q.  And the guard force used all the same procedures?

1   A.  Yes.

2   Q.  Now, at the beginning of this second interview on Day 2,

3   did you have an opportunity to talk to the defendant again

4   about how he was feeling?

5   A.  Yes, we did.  We asked him all the same questions about

6   how he was feeling.

7          He said he was feeling -- he was feeling good.  He

8   wasn't feeling nauseous.  He was feeling better.

9   Q.  Did he express any emotions to you that he was upset or

10  sad?

11  A.  No.

12  Q.  Scared?

13  A.  No.

14  Q.  Did defendant talk to you about whether or not he'd had

15  the opportunity to pray?

16  A.  I believe he did say he had the opportunity to pray.

17  One of the questions we asked him was did he have time to

18  pray, and he said yes.  Because if he said no, we would have

19  made sure he had gotten time.

20  Q.  And what was defendant's demeanor like during this

21  second interview on Day 2?

22  A.  Very similar to the interview earlier that day.  I mean,

23  he was very conversational.  He was attentive, answering our

24  questions appropriately, and so on.

25  Q.  Now, did you provide defendant another *Miranda* warning,

1    another one of the sheets of paper like Government's 30 on

2    the second day, second interview?

3    A.   No, we didn't because back before we went on the boat

4    we -- in our discussions with the lawyers back at the FBI

5    and the team, we decided that it would just be every day,

6    one per day.  And that was the same day as the first

7    interview so we decided not to.

8    Q.   And during the second interview, did the defendant ask

9    you for anything?  Excuse me, the second interview on Day 2.

10   A.   Yes, the third interview.  At some point during the

11   interview he had asked us if it was possible if we could get

12   him some different types of food, like olives and rice and

13   coffee.

14   Q.   And approximately how long did the Interview 3 take

15   place?  How long did it go on for?

16   A.   Approximately two hours.

17   Q.   And at the close of the interview, what did you all do?

18   A.   So same process.  The guard force came in.  They took

19   him out, and they -- we exchanged pleasantries, and they

20   took him out, and then we went up and went to bed.

21   Q.   Now, let's talk about the next morning, October 31st.

22   Did you have an opportunity to interview the defendant on

23   the morning of the 31st?

24   A.   We did, at approximately 910 Zulu.

25   Q.   And same room?

1    A.  Same room.

2    Q.  Same people?

3    A.  Same people, same procedure.

4    Q.  Okay.  So when you get into the room with defendant on

5    the morning of October 31st, what does he say about how he's

6    been?

7    A.  So we exchanged our normal pleasantries, offered him

8    some things and asked him how he -- if he had slept well, if

9    he was feeling okay.  And he said he hadn't slept well, and

10   that he had been thinking about his family, and that they

11   would be worried about him.

12   Q.  How was his affect compared with -- or his demeanor

13   compared to how it was prior days?

14   A.  He seemed a little bit more down that day.

15   Q.  And were you addressing him in the same manner and tone?

16   A.  Yes, same.

17   Q.  Did you provide him a *Miranda* warning on the morning of

18   October 31st?

19   A.  Yes, we did.

20   Q.  And tell me what happened when you provided that

21   warning.

22   A.  So we did the standard practice that we had done every

23   other time, reading it and having him follow along while it

24   was being translated by Sam.  And this time, while we were

25   giving the warnings, he said something to the effect of "I

1    think I might want to have a lawyer here with me."

2    Q.  And how did you respond when he talked about a lawyer?

3    A.  We told him that that was his right and that, you know,

4    we couldn't provide him a lawyer on the boat so that we

5    wouldn't continue to talk to him until he had the

6    opportunity to have a lawyer.

7    Q.  And after you told him that would be the end of the

8    questioning, did the defendant say anything else to you?

9    A.  He did.  He said something to the effect of, "If you

10   guys aren't going to beat me, I would like to just go back

11   to my cell and sleep a little bit."

12   Q.  How did you respond when the defendant said that?

13   A.  I think both Tony and I were kind of taken aback that he

14   thought anybody was going to beat him, and so we were

15   surprised and immediately told him, like, "That's never

16   going to happen while you're in the custody of the U.S."

17   And "You won't be harmed in any way."

18   Q.  Did you ask him whether he had been harmed?

19   A.  I don't think we did, no.

20   Q.  Did you personally observe any signs on him, like

21   bruising or any other kind of abrasion, that might be

22   related to this comment?

23   A.  No.

24   Q.  Okay.  So did the defendant immediately go back to his

25   pod after he made that statement?

1    A.   After he made the initial statement about wanting to

2    have a lawyer, we actually talked to him for a little while.

3    He had just gotten -- we had just given him his coffee, and

4    we got him olives from the cafeteria, so we didn't want to,

5    like -- he would have not been able to finish that if he had

6    to leave right then, so we just gave him some time to finish

7    it, and we just talked about -- we just had some small talk

8    with him about soccer and other things.

9    Q.   Approximately how long did that small talk go on for?

10   A.   It seemed like 20 minutes.

11   Q.   And when he was having this small talk with you at the

12   end of the fourth interview, what was his affect like?

13   A.   It was definitely -- every time we talked about soccer

14   he would kind of -- he'd be happier and just like generally,

15   you know, smile a little bit.

16   Q.   And so following the social conversation about soccer,

17   what happened to the defendant?

18   A.   So after we did that, he finished his coffee, or the

19   majority of it.  The guard force came in the same way they

20   always have, and they took him out and brought him back to

21   his cell, and we went up -- we left the room.

22   Q.   Did you attempt to have any further interviews with the

23   defendant while he was on the vessel?

24   A.   No.

25   Q.   Now, just generally, about these four interviews that

 1    you had with the defendant, overall did you perceive there

 2    to be a problem with the translation between yourself and

 3    the defendant in terms of understanding each other?

 4    A.   No.   If we had perceived that there was a problem, we

 5    would have addressed it and done something about it.   But

 6    he -- based on his responses to our questions, he was

 7    understanding everything that we were saying, and there were

 8    no issues.

 9    Q.   In your mind were his answers to your questions

10    appropriate or conversationally responsive to the questions

11    you asked?

12    A.   Yes.   They were definitely appropriate and responsive to

13    the questions we were asking.

14              MS. SEIFERT:   Okay.   No other questions.

15                        CROSS-EXAMINATION

16    BY MR. PEED:

17    Q.   Good afternoon, Agent Larkin.

18    A.   How are you doing?

19    Q.   When you were preparing -- when you were in these

20    meetings preparing for your strategy for interrogating

21    Mr. Al-Imam, did it come up -- did the issue of sleep come

22    up in the hour that these interrogations would be happening?

23    A.   No, not in those -- you mean the ones back in New York?

24    Q.   Yes.

25    A.   No.

1    Q.  Your first interrogation of Mr. Al-Imam began around 120

2    Zulu Time, right?

3    A.  Yes.

4    Q.  And that was about 3:20 his local time, right?

5    A.  I don't know.  That sounds right though.

6    Q.  And it lasted until about 300 Zulu Time?

7    A.  Yes.

8    Q.  So 5:00 a.m. -- if there's a two-hour difference, 5:00

9    a.m. his time?

10   A.  Okay.

11   Q.  Let's go over when you first sat down and started having

12   your initial pleasantries with him.  How long did the

13   pleasantries last?

14   A.  In that first interview?

15   Q.  Yes.

16   A.  Probably like 15, 20 minutes.

17   Q.  Okay.

18   A.  I don't recall exactly though.

19   Q.  What did you discuss in that period?

20   A.  I don't know exactly.

21   Q.  Was there any discussion in your strategy meetings about

22   having a period of time for Mr. Al-Imam to adjust to his

23   situation before you started interrogating him?

24   A.  No.

25   Q.  Was it your strategy to begin interrogating him as soon

1    as he's been medically cleared and processed, basically your

2    first opportunity?

3    A.  I think we wanted to make sure we had an opportunity to

4    tell him why he was here -- why he was on the boat and to

5    talk to him a little bit that first night, so yes.

6    Q.  But you didn't just do that and then let him go get some

7    sleep.  You interrogated him.

8    A.  We did an interview with him, yes.

9    Q.  When he was first presented with the Advice of Rights

10   form, was it read to him -- was someone reading the rights

11   in English while it was translated for him?

12   A.  Yes.

13   Q.  And then when it was shown to him, did he -- did someone

14   need to show him where to sign?

15   A.  I can't recall exactly.  I can't recall.

16   Q.  Did he know what to do with it?  I mean, did someone

17   have to say, you know, "Take a pen and write your name"?

18   A.  Yes.  We told him that there were some portions on there

19   for a signature, yes.

20   Q.  What was said in that interchange?

21   A.  I can't remember exactly.

22   Q.  When you were talking to Mr. Al-Imam, did he ever -- did

23   you ever have a problem getting his answers to stay on

24   topic?

25   A.  Not that I can remember.

1   Q.  What was your sense of his level of mental ability after

2   talking to him?

3   A.  Level of mental ability?

4   Q.  Yes.  Did you have any -- did you notice anything about

5   your conversations that raised any concerns about his

6   intellect?

7   A.  No.  He seemed to understand all the questions that we

8   were asking, and he seemed to answer them appropriately.

9   Q.  Did he ever get emotional?

10   A.  In the last interview, I believe, when he was talking

11   about his family, I think he began to cry.

12   Q.  When he was answering you before that last interview --

13   let's start with the first interview.  Where would his eyes

14   go when he was answering you?

15   A.  So as I can recall, he was looking -- he would look back

16   and forth between the linguist and us; because we would say

17   it in English, and then the linguist would say it to him, so

18   he would look us in the eyes or look Sammy in the eyes.

19   Q.  When you were reading -- make sure I understand.  Did

20   you read the rights in English and then have it be

21   translated?

22   A.  Yes.

23   Q.  Did you stop during those rights and explain at all

24   about the American judicial system, what it meant to have

25   something used against him in court?

1    A.  We read exactly what's on the Advice of Rights form.

2    Q.  So the first interview was in his time about 3:00 a.m.

3    to 5:00 a.m., right?

4    A.  125 Zulu.

5    Q.  Right.  And then he slept -- he was given the

6    opportunity to sleep about three hours; is that right?

7    A.  I'm not sure how much he slept.

8    Q.  You don't know how much he slept before your interviews?

9    A.  No.

10   Q.  The second interview, you did the *Miranda* again,

11   correct?

12   A.  Yes.

13   Q.  How long did that interview last?

14   A.  I believe it was approximately two hours.

15   Q.  And then the next interview began at approximately 1000

16   Zulu Time p.m.; is that right?

17   A.  2048 Zulu.

18   Q.  2048.  8:00.  10:00 his time, right?

19   A.  Yes.  I don't know the conversion, but it was definitely

20   at 2048 Zulu.

21   Q.  Why, in your strategy discussions, did you decide not to

22   administer *Miranda* each time you interviewed him?

23   A.  It was really a discussion between the lawyers and our

24   team back -- I think we're obligated to read the *Miranda*

25   rights before the first interview, but we wanted to make

1   sure he understood everything and read it once a day.  So

2   that's why we decided to read it, but it was really the

3   advice of FBI lawyers.

4   Q.  Were you present for those discussions?

5   A.  For many of them, yes.

6   Q.  Was the goal of the strategy to get Mr. Al-Imam to speak

7   with the FBI?

8   A.  That's the goal of every interview, yes.

9   Q.  So the policy of once a day was to implement that goal,

10   to get him to speak with you?

11   A.  While also affording him the rights, yes.

12   Q.  Did he have reading glasses during any of the times that

13   he was reading his rights?

14   A.  Yes.

15   Q.  And when were those?

16   A.  As far as I can remember, he had reading glasses for all

17   of the interviews except for the first one.

18   Q.  So when he read the rights the first time, he didn't

19   have his reading glasses?

20   A.  That's correct.

21   Q.  At the last interview, when he talked about a lawyer,

22   can you describe in your own words what he said, as best you

23   recall.

24   A.  In my words or in his words?

25   Q.  Well, his words as best you recall.

1    A.  He said something to the effect of "I think I might want

2    to have a lawyer here with me."

3    Q.  And that's what the interpreter would have said to you.

4    You couldn't understand what he actually said?

5    A.  Yes.  I don't speak Arabic.

6    Q.  So what the interpreter said would be -- if the

7    interpreter testified of what he recalled from that, do you

8    think that would be more accurate?

9           MS. SEIFERT:  Objection.

10          THE COURT:  Overruled.

11    A.  I don't know which one would be more accurate.

12    Q.  You don't know what he actually said.

13    A.  In Arabic?

14    Q.  In Arabic.

15    A.  Yes, I don't -- I couldn't translate it, no.

16    Q.  When he said that -- this is calling for you to form an

17    opinion based on what you observed -- did it strike you that

18    he was having a mental realization at that moment?

19    A.  I couldn't say.

20    Q.  In other words, I guess did he seem to understand

21    something about what he was reading that was novel to him?

22    A.  I don't know if it was novel or not, but he definitely

23    understood that he had the right to have a lawyer with him,

24    yes.

25    Q.  At that moment he seemed to understand he had a right to

1    have a lawyer with him?

2    A.  Based on the statement that he made, yes.

3    Q.  Did Mr. Al-Imam ever change his answers to any questions

4    that you gave him?

5    A.  Not that I can recall.

6    Q.  And how were you dressed during these interviews?

7    A.  In civilian attire, so like probably khaki pants and a

8    Polo shirt.

9              MR. PEED:  No further questions, Your Honor.

10                  REDIRECT EXAMINATION

11   BY MS. SEIFERT:

12   Q.  Agent Larkin, I just want to first try to get the

13   timeline down correct so we're all on the same page.  It's

14   fair that the defendant came on the boat on the 29th of

15   October in the evening hours.

16   A.  Yes.

17   Q.  Okay.  But you didn't see him to interview him right

18   away.

19   A.  Right, yes.

20   Q.  And so when did you first interview him?

21   A.  We first interviewed him at 0125.

22   Q.  So it was the next day but still within the evening

23   hours of that night?

24   A.  Yes.  Technically it was the next day, but it was the

25   same time that he -- the same night that he arrived.

1   Q.   Okay.  So then everybody goes to bed, and now everyone

2   wakes up, and you have the second interview on October 30th

3   of 2017.  And what time did the second interview start?

4   A.   The second interview started at 1045.

5   Q.   Okay.  And then you take a break and come back.  And the

6   third interview, same day, October 30th, what time does that

7   interview start?

8   A.   2048.

9   Q.   Okay.  And then again everyone goes to bed, wakes up the

10  next day.  Now we're on to October 31st, and what time in

11  the morning on October 31st does the fourth interview begin?

12  A.   At 910.

13  Q.   And all those are Zulu hour?

14  A.   Yes.

15  Q.   Okay.  Now, defense counsel asked you some questions

16  about the Advice of Rights form, and we had looked at that.

17  That was Government's 29 and 30.

18          When the defendant was being told about his

19  *Miranda* rights, was the form in front of him at that time,

20  or was it shown to him after?

21  A.   No, it was in front of him the whole time.

22  Q.   Okay.  So just so I'm clear, when you're talking, does

23  he have the piece of paper in front of him?

24  A.   Yes.

25  Q.   And the piece of paper is in Arabic?

1    A.  Yes.

2    Q.  Okay.  And just briefly, you mentioned that one agent

3    was sort of in charge of the questioning, and the other

4    agent was in charge of the note-taking typically.  That was

5    your strategy.

6    A.  Yes, but the other -- the agent that was doing the note-

7    taking was also able to ask any questions.  It was like a

8    team approach.

9    Q.  Okay.  So the agent that's note-taking, who is the

10   scribe for that interview, are they taking down what the

11   interpreter is saying?

12   A.  No.

13   Q.  I mean, the translation?

14   A.  Oh, yes.

15   Q.  Okay.  So let's talk about the fourth interview because

16   I think defense counsel had some questions for you about

17   exactly how the invocation of counsel occurred.  You stated

18   that you recalled the defendant saying something along the

19   lines of "I think I might want to have a lawyer with me."

20   A.  Yes.

21   Q.  Who was writing when that statement was taken down?

22   A.  Detective Marcano.

23   Q.  And did you -- who actually wrote up the 302?

24   A.  So we both looked at it and reviewed it, each one of

25   them, but I can't recall.  I think it was Detective Marcano

1    that wrote it.

2    Q.  But prior to your testimony today did you have an

3    opportunity to review the 302 from the fourth interview?

4    A.  Yes.

5    Q.  That statement that you referred to, the one where the

6    defendant said "I think I might want to have a lawyer," did

7    that -- was that in the 302 that you reviewed?

8    A.  Yes.

9    Q.  And then finally, defense counsel had some questions for

10   you about whether, in the course of the interviews, the

11   defendant ever changed his answers, and your answer was no.

12   A.  Right.

13   Q.  Along those lines, did defendant ever -- was he evasive

14   with you or minimizing with you in his answers such that

15   sort of he maybe equivocated on the answer at some point?

16   A.  There were a few times where we assessed, based on our

17   knowledge of the investigation and the attack, that he was

18   minimizing his role, specifically on the day and the night

19   of the attack, yes.

20   Q.  And did you challenge the defendant on any of those

21   answers?

22   A.  Not that I can recall, no.

23   Q.  Did you, like, follow up with him about the questions or

24   the things that you thought he was minimizing on?

25   A.  Yes.

1    Q.  Okay.  And did he respond at all to your questioning?

2    A.  Yes.

3              MS. SEIFERT:  No other questions.

4              THE COURT:  Okay.

5              All right, Agent.  Thank you very much for your

6    testimony.  You're excused.  Have a good day.

7              MR. CUMMINGS:  Those are all the witnesses for the

8    government, Your Honor.

9              THE COURT:  All right.  Why don't we knock off for

10   the day and come back at 10:00, and I'm happy to hear

11   argument on this motion beginning with resolution of any

12   disputed facts and then application of the applicable law to

13   the facts, and then let's proceed to the 404(b) motion.

14             And then I'll take both under advisement, and

15   we'll do them each in writing, okay?  Does that make sense?

16             MR. CUMMINGS:  Your Honor, I just want to confirm

17   whether counsel intends to call any witnesses.

18             THE COURT:  Mr. Peed?

19             MR. PEED:  Does counsel what?

20             THE COURT:  Any witnesses?

21             MR. PEED:  At this time, Your Honor, I don't

22   intend to call any witnesses.  I was having a few further

23   follow-up discussions with one witness during our session

24   today, but so final answer I'd want to give first thing in

25   the morning, but I -- I would say I'm 90 percent sure no

1    witnesses, if the government can be satisfied with that.

2              And I would say if I were to call a witness --

3    I've had some discussion with the government about an

4    expert, and so we would need to put off that portion anyway,

5    so he wouldn't be being called tomorrow.  But I will give

6    the government a report and come back for that portion.

7              THE COURT:  Well, let me know that in the morning

8    because I want to decide it --

9              MR. PEED:  Yes, Your Honor.

10              THE COURT:  -- okay?

11              MR. PEED:  I would have, as a defense exhibit, the

12    unclassified summary that was provided to me yesterday.

13              THE COURT:  What is the summary of?  What does it

14    pertain to.

15              MS. SEIFERT:  Your Honor, if I might address this

16    issue.

17              (To Mr. Peed) Last week was it; or is it two weeks

18    ago now?

19              The government, two weeks ago now, disclosed a

20    classified summary to defense.  That summary is still

21    classified.  Defense asked if some version of that could be

22    provided to his doctor, so we worked with the agency that

23    owns the information --

24              THE COURT:  I'm sorry, a summary of what?

25              MS. SEIFERT:  Of some classified information.

1          THE COURT:  Pertaining to what, to the extent you

2     can say?

3          MS. SEIFERT:  Pertaining to information about the

4     defendant when he was living in Libya before his capture but

5     after the attack.  Counsel asked the government to provide a

6     version of that that his expert, the doctor, could review,

7     and we worked with the agency to provide a pared-down and

8     less-specific version of the summary solely for the purpose

9     of the doctor because that's what was asked for.

10          The government's position is that to the extent

11     that we've received counsel's notice of his intent under

12     CIPA to provide the Court and to discuss with the Court the

13     classified summary, that the government doesn't object to

14     discussing the classified summary in a classified setting

15     with Your Honor and Your Honor taking that classified

16     summary into account.  We would object --

17          THE COURT:  For purposes of this motion?

18          MS. SEIFERT:  Yes, that's correct, Your Honor.

19          We would object to using the declassified

20     sanitized version of the summary as it's not specific.  It

21     doesn't allow the Court to fully take in the context of the

22     classified information; and moreover, it's not -- the agency

23     did not present it for that purpose.  It is merely kind of

24     desanitized and brought down to a different level so that it

25     could be given to the doctor, and solely for that purpose.

1              THE COURT:  Okay.

2              MR. PEED:  I would rather use the full version,

3      Your Honor, with the Court; so that's fine.

4              THE COURT:  All right.  So why don't you submit it

5      in camera, and, without objection, I will consider it, and

6      we'll include it as a classified exhibit to this hearing.

7              MR. PEED:  That's great, Your Honor.  Thank you.

8              MS. SEIFERT:  Does Your Honor think that there'll

9      need to be argument tomorrow or discussion of the classified

10     document so I can inform the CISO whether -- I mean, we've

11     already told her that may happen, but I just want to inform

12     her whether that's necessary.

13             THE COURT:  Mr. Peed?

14             MR. PEED:  Well, the Court will have that

15     information from the document.

16             THE COURT:  Is it something that you need to -- is

17     it something that you would need to elucidate in an

18     argument, or does it speak for itself?  And if the former,

19     we have to schedule a time for a classified proceeding with

20     all the bells and whistles.

21             MR. PEED:  I think I can refer to it, Your Honor,

22     without -- certainly I could refer to the information that's

23     been declassified, but I understand that the purpose of that

24     was not to be used in argument.

25             THE COURT:  But as long as I have the full

1     document, I will be able to place the unclassified

2     references in some context.

3                MR. PEED:  I believe, Your Honor, that should be

4     okay.

5                THE COURT:  Okay.

6                MR. PEED:  And I'll just go ahead and represent at

7     this time, Your Honor, that we won't call any more

8     witnesses.

9                THE COURT:  Okay.  Very well.

10               So when can you -- can you get me the classified

11    document tomorrow morning?

12               MS. SEIFERT:  Yes.  I apologize, Your Honor.  It's

13    defense's motion so I thought they'd already provided it to

14    you, but I can certainly work with Ms. Peterson or defense

15    counsel can work with Ms. Peterson to give it to you.

16               THE COURT:  Can you get it to me in the morning?

17               MR. PEED:  I can bring it, Your Honor.

18               THE COURT:  Okay.

19               MR. PEED:  It's downstairs.  Thank you.

20               THE COURT:  Very well.  On the 404(b), if all or

21    part of the testimony is deemed admissible, would the

22    government -- the government anticipates calling V1 as a

23    live witness, correct?

24               MS. SEIFERT:  That's correct, Your Honor.

25               THE COURT:  Okay.

 1          MS. SEIFERT:  And the government's position with

 2     respect to the motion is that the motion is ripe to be

 3     decided just on the relevance and admissibility grounds.  To

 4     the extent that defense has raised questions about the

 5     veracity, the government would propose a later hearing,

 6     before the witness testifies, at which Your Honor could hear

 7     the testimony first before it was presented to the jury.

 8          THE COURT:  Very well.  I was going to suggest

 9     that.

10          MS. SEIFERT:  Thank you, Your Honor.

11          THE COURT:  All right.  Anything else?

12          MR. CUMMINGS:  Not from the government, Your

13     Honor.

14          THE COURT:  All right.  We're adjourned.  We'll

15     see you at 10:00, and hopefully I'll get the exhibit

16     beforehand.

17          MR. PEED:  I can just bring it up right now, Your

18     Honor.

19          THE COURT:  That's fine.  Thanks.

20                    (Whereupon the hearing was

21                     adjourned at 4:38 p.m.)

22

23

24

25

1

2                    **CERTIFICATE OF OFFICIAL COURT REPORTER**

3

4                    I, LISA A. MOREIRA, RDR, CRR, do hereby

5       certify that the above and foregoing constitutes a true and

6       accurate transcript of my stenographic notes and is a full,

7       true and complete transcript of the proceedings to the best

8       of my ability.

9            Dated this 10th day of May, 2019.

10

11
                                    /s/Lisa A. Moreira, RDR, CRR
12                                  Official Court Reporter
                                    United States Courthouse
13                                  Room 6718
                                    333 Constitution Avenue, NW
14                                  Washington, DC 20001

15

16

17

18

19

20

21

22

23

24

25

**'**

**'Halt** [1] - 55:23

**/**

**/s/Lisa** - 223:11

**0**

**0125** [1] - 213:21
**0232** [1] - 84:4
**0700** [1] - 84:8

**1**

**1** [4] - 4:8, 4:11, 9:12,
134:23
**1,000** [1] - 27:23
**1,500** [2] - 27:23,
129:21
**1.95** [1] - 45:11
**10** [2] - 49:1, 122:12
**100** [1] - 160:6
**1000** [2] - 80:25,
210:15
**1045** [2] - 196:13,
214:4
**10:00** [4] - 80:25,
210:18, 217:10,
222:15
**10:11** [1] - 1:5
**10th** [1] - 223:9
**11** [4] - 40:13, 50:12,
122:13, 159:25
**116** [1] - 2:14
**119** [1] - 2:15
**11:15** [2] - 11:5, 24:22
**11th** [1] - 1:18
**12** [4] - 75:14, 75:16,
111:5, 111:6
**120** [1] - 207:1
**125** [4] - 162:21,
188:2, 188:14, 210:4
**1255** [1] - 200:10
**12:00** [1] - 86:15
**12:30** [1] - 95:22
**14** [1] - 76:24
**140** [1] - 170:19
**15** [4] - 51:4, 78:11,
164:10, 207:16
**159** [1] - 2:16
**16** [3] - 51:7, 78:12,
111:16
**17** [1] - 64:1
**17-213** [3] - 3:3, 59:25,
119:3
**172** [1] - 2:16
**176** [2] - 2:17, 2:18
**18** [1] - 120:11
**19** [1] - 1:4

**1903** [2] - 85:8, 89:24
**1930** [1] - 85:7
**1932** [1] - 89:16
**1986** [1] - 120:5
**1994** [1] - 61:23
**1999** [1] - 61:25
**1:15** [1] - 22:9
**1:17-cr-00213-CRC-1**
[1] - 1:4
**1:30** [1] - 22:9

**2**

**2** [7] - 15:3, 15:4,
77:23, 200:20,
201:2, 201:21, 202:9
**2.22** [1] - 45:11
**20** [2] - 205:10, 207:16
**20001** [3] - 1:19, 1:23,
223:14
**2003** [1] - 62:2
**2007** [2] - 62:2, 62:4
**2008** [2] - 40:17,
121:18
**2008/2009** [1] - 121:16
**2010** [1] - 62:4
**2017** [22] - 8:19, 10:4,
11:1, 12:12, 40:23,
67:24, 79:4, 80:25,
84:4, 84:8, 85:7,
97:9, 97:23, 136:1,
136:6, 173:4, 173:8,
178:9, 178:13,
187:18, 188:3, 214:3
**2019** [2] - 1:4, 223:9
**202** [2] - 1:15, 1:19
**202-354-3187** [1] -
1:23
**2048** [5] - 200:19,
210:17, 210:18,
210:20, 214:8
**20530** [1] - 1:15
**206** [1] - 2:19
**213** [1] - 2:19
**23** [1] - 2:4
**2351** [1] - 67:24
**24** [3] - 99:1, 115:24,
116:1
**25** [2] - 2:6, 107:3
**27** [2] - 114:9, 114:10
**28** [2] - 4:9, 4:11
**29** [15] - 10:4, 11:1,
12:12, 67:24, 151:8,
151:10, 151:16,
152:9, 174:9,
187:17, 191:19,
191:21, 192:5,
192:14, 214:17
**29th** [4] - 74:13,
178:12, 188:7,

**213**:14
**2:00** [1] - 118:10

**3**

**3** [20] - 44:23, 105:20,
106:12, 106:17,
106:23, 107:11,
107:13, 108:8,
116:14, 116:19,
116:21, 139:24,
140:11, 140:22,
141:1, 141:17,
147:1, 147:5,
161:10, 202:14
**30** [6] - 80:25, 84:3,
198:6, 198:7, 202:1,
214:17
**300** [1] - 207:6
**302** [4] - 182:8,
215:23, 216:3, 216:7
**30th** [11] - 79:4, 89:16,
136:6, 188:3,
188:10, 188:13,
189:19, 196:7,
214:2, 214:6
**31** [9] - 84:8, 85:7,
140:2, 140:5, 140:6,
140:7, 140:8,
140:17, 140:21
**31st** [9] - 89:24, 136:6,
156:5, 202:21,
202:23, 203:5,
203:18, 214:10,
214:11
**32** [1] - 61:15
**333** [2] - 1:22, 223:13
**353-9424** [1] - 1:15
**37** [1] - 2:6
**39** [2] - 2:7, 2:8
**3:00** [1] - 210:2
**3:20** [1] - 207:4

**4**

**4** [1] - 42:13
**4.58** [1] - 45:13
**40** [2] - 177:18, 178:1
**400** [2] - 88:23, 90:9
**404(b** [4] - 6:24,
217:13, 221:20
**4:38** [1] - 222:21

**5**

**5** [2] - 4:21, 105:24
**5.11-style** [2] - 37:24,
38:2
**5.75** [1] - 45:13
**50** [2] - 177:18, 178:1
**54** [1] - 2:9

**555** [1] - 1:14
**58** [1] - 2:9
**5:00** [3] - 207:8, 210:3

**6**

**6** [3] - 105:24, 175:11,
175:12
**60** [1] - 2:11
**621-1828** [1] - 1:19
**6718** [2] - 1:22, 223:13
**6th** [1] - 1:18

**7**

**7** [5] - 2:4, 58:9,
105:24, 175:12,
175:16
**72** [1] - 111:20
**75** [1] - 111:20
**777** [1] - 1:18

**8**

**8** [1] - 105:24
**88** [1] - 2:11
**8:00** [1] - 210:18

**9**

**9** [2] - 149:13, 149:15
**9/11** [1] - 120:21
**90** [1] - 217:25
**910** [2] - 202:24,
214:12
**915** [2] - 11:7, 24:22
**94** [1] - 2:12
**96** [1] - 2:13

**A**

**a.m** [1] - 1:5, 22:9,
207:8, 207:9, 210:2,
210:3
**aback** [1] - 204:13
**abide** [2] - 186:4,
186:5
**ability** [14] - 86:23,
92:12, 92:20, 93:3,
93:8, 93:10, 116:5,
152:16, 187:8,
187:13, 209:1,
209:3, 223:8
**able** [27] - 9:9, 10:2,
10:25, 15:12, 27:13,
33:10, 33:20, 35:12,
42:6, 47:15, 56:10,
63:20, 64:21, 66:24,
70:5, 93:13, 97:2,
104:10, 111:9,
111:12, 158:25,
181:20, 182:1,

187:11, 205:5,
215:7, 221:1
**abnormal** [1] - 71:19
**aboard** [16] - 23:6,
80:21, 136:19,
138:13, 140:23,
141:23, 142:18,
144:7, 145:6,
186:10, 186:13,
187:7, 187:17,
187:20, 188:6,
188:11
**abrasion** [3] - 50:23,
51:1, 204:21
**abrasions** [12] - 50:9,
50:15, 72:11, 72:19,
77:1, 77:10, 77:12,
77:13, 78:1, 78:3,
113:3, 114:22
**absolutely** [4] - 62:20,
91:15, 153:25,
168:24
**abuse** [5] - 22:17,
36:6, 54:1, 73:2,
157:17
**abused** [9] - 22:20,
36:10, 54:5, 58:12,
58:15, 72:25, 157:2,
159:16, 175:18
**accent** [1] - 135:16
**acceptable** [2] - 96:12,
135:10
**access** [2] - 182:5,
182:6
**accommodate** [1] -
111:14
**accompanied** [1] -
128:19
**accompanying** [1] -
128:23
**according** [1] - 45:11
**account** [1] - 219:16
**accountant** [2] -
120:10, 120:18
**accounting** [1] - 120:9
**accuracy** [2] - 107:25,
111:20
**accurate** [5] - 139:9,
139:11, 212:8,
212:11, 223:6
**accurately** [1] - 106:6
**accusation** [1] -
100:10
**achieve** [1] - 127:24
**acknowledge** [6] -
23:9, 23:10, 31:13,
101:17, 101:19,
145:14
**acknowledged** [1] -
54:12

**acknowledgement** [1] - 152:3
**acknowledging** [4] - 146:22, 194:3, 194:20, 194:22
**acquaint** [1] - 9:19
**acquire** [1] - 111:9
**act** [1] - 10:17
**Action** [1] - 1:3
**active** [4] - 26:18, 60:15, 90:19, 96:14
**actual** [4] - 45:7, 57:18, 110:3, 181:8
**acute** [5] - 75:21, 79:16, 87:21, 87:24, 91:19
**added** [1] - 181:5
**addition** [5] - 41:22, 100:16, 106:8, 124:18, 175:19
**additional** [4] - 106:9, 112:25, 114:2, 116:23
**address** [1] - 218:15
**addressed** [1] - 206:5
**addressing** [1] - 203:15
**adequate** [1] - 154:18
**adjourned** [2] - 222:14, 222:21
**adjust** [2] - 133:19, 207:22
**administer** [1] - 210:22
**admissibility** [1] - 222:3
**admissible** [1] - 221:21
**admission** [1] - 4:1
**admit** [4] - 71:6, 140:16, 143:1, 144:12
**admitted** [7] - 140:1, 141:12, 142:11, 144:1, 153:7, 191:20, 198:6
**adverse** [2] - 74:14, 94:20
**Advice** [15] - 162:9, 165:12, 165:24, 168:9, 171:10, 171:14, 180:10, 180:12, 180:14, 184:5, 184:8, 192:17, 208:9, 210:1, 214:16
**advice** [3] - 144:5, 169:21, 211:3
**advise** [3] - 81:17, 191:8, 197:19

**advised** [9] - 100:7, 100:10, 105:9, 106:15, 108:8, 191:13, 197:22, 197:24, 198:3
**advisement** [2] - 198:17, 217:14
**affect** [1] - 56:11, 89:9, 89:14, 147:21, 150:2, 187:7, 187:13, 190:18, 197:13, 203:12, 205:12
**affirmatively** [1] - 193:7
**afford** [1] - 104:10
**afforded** [1] - 116:24
**affording** [1] - 211:11
**African** [1] - 131:2
**afternoon** [15] - 88:13, 88:14, 96:4, 96:11, 116:14, 119:5, 119:20, 119:21, 159:22, 159:23, 176:14, 176:15, 176:21, 176:22, 206:17
**afternoon's** [1] - 162:1
**afterwards** [2] - 92:13, 93:4
**agency** [5] - 121:9, 180:1, 218:22, 219:7, 219:22
**AGENT** [8] - 2:3, 2:5, 2:8, 2:18, 7:11, 25:10, 39:18, 176:18
**agent** [28] - 5:25, 7:23, 16:12, 25:24, 40:6, 40:8, 40:19, 51:18, 149:1, 149:10, 149:11, 154:4, 165:25, 170:3, 170:7, 170:8, 170:10, 174:6, 176:24, 177:11, 179:2, 181:11, 190:1, 215:2, 215:4, 215:6, 215:9
**Agent** [50] - 5:21, 5:25, 6:3, 6:13, 7:8, 7:14, 7:17, 7:18, 9:1, 9:11, 12:22, 16:13, 17:10, 18:12, 19:9, 20:5, 20:18, 20:20, 21:1, 23:13, 23:14, 24:5, 25:13, 26:22, 27:25, 37:16, 39:6, 39:11, 39:24, 40:1, 40:22, 43:25, 58:5, 59:11, 142:1, 148:21,

159:9, 170:14, 170:16, 176:13, 176:21, 177:3, 179:5, 180:6, 180:20, 183:5, 206:17, 213:12, 217:5
**agent's** [1] - 170:21
**agents** [36] - 16:8, 16:10, 38:9, 40:16, 125:23, 132:13, 132:14, 136:22, 141:23, 150:1, 150:3, 150:11, 150:22, 151:9, 153:18, 155:2, 156:11, 156:17, 157:2, 157:12, 157:13, 157:21, 159:1, 159:5, 163:6, 164:22, 169:7, 169:10, 169:14, 171:8, 173:20, 173:21, 173:23, 174:4, 175:7, 179:14
**agents'** [2] - 172:9, 172:12
**aggressive** [3] - 37:3, 37:12, 115:12
**agitated** [4] - 91:23, 95:1, 95:2, 113:5
**agitation** [3] - 92:7, 95:12, 95:16
**ago** [5] - 69:24, 71:6, 172:25, 218:18, 218:19
**agree** [1] - 186:1
**agreed** [2] - 96:11, 141:7
**agreeing** [1] - 125:21
**agreement** [1] - 113:11
**ahead** [6] - 4:10, 73:10, 98:6, 99:11, 157:24, 221:6
**aided** [1] - 1:25
**Aids** [1] - 114:1
**air** [2] - 19:19, 45:15
**Air** [9] - 6:10, 60:19, 60:20, 60:23, 62:6, 96:18, 96:19, 96:21, 97:3
**Al** [115] - 3:4, 3:13, 3:15, 8:22, 10:5, 10:8, 10:19, 11:2, 11:22, 11:25, 12:1, 12:3, 12:6, 13:7, 13:12, 23:24, 28:2, 28:4, 28:16, 28:18, 29:3, 29:5, 29:17,

30:7, 30:9, 30:21, 30:24, 31:2, 31:5, 31:13, 31:20, 33:13, 33:23, 34:2, 34:7, 34:10, 34:20, 35:19, 35:23, 36:9, 36:24, 37:9, 37:23, 38:16, 38:22, 40:24, 41:7, 41:24, 42:8, 46:4, 46:5, 47:12, 53:25, 54:3, 54:16, 55:3, 55:25, 57:20, 60:1, 62:7, 67:12, 67:23, 68:1, 88:24, 89:17, 89:25, 90:7, 93:22, 97:10, 98:2, 98:9, 116:15, 117:2, 117:13, 117:23, 119:4, 119:11, 136:3, 136:6, 136:8, 136:14, 137:2, 160:16, 161:9, 162:7, 163:13, 165:1, 165:4, 165:20, 166:3, 166:10, 169:9, 170:14, 170:16, 171:18, 173:12, 176:3, 178:12, 178:15, 178:23, 180:8, 180:12, 181:21, 181:25, 182:21, 182:22, 183:7, 185:13, 185:18, 206:21, 207:1, 207:22, 208:22, 211:6, 213:3
**AL** [1] - 1:6
**Al-Imam** [105] - 3:4, 3:13, 3:15, 8:22, 10:5, 10:19, 11:2, 11:22, 11:25, 12:1, 12:3, 12:6, 13:12, 23:24, 28:2, 28:4, 28:16, 28:18, 29:3, 29:5, 29:17, 30:7, 30:9, 30:21, 30:24, 31:2, 31:13, 31:20, 33:13, 33:23, 34:2, 34:7, 34:10, 34:20, 35:19, 36:9, 36:24, 37:23, 38:16, 38:22, 40:24, 41:7, 46:5, 47:12, 53:25, 54:3, 54:16, 55:3, 57:20, 60:1, 62:7, 67:12, 67:23, 68:1, 88:24, 89:17, 89:25, 93:22, 97:10, 98:2, 98:9, 116:15, 117:2, 117:13, 117:23,

119:4, 119:11, 136:3, 136:6, 136:8, 136:14, 137:2, 160:16, 161:9, 162:7, 163:13, 165:1, 165:4, 165:20, 166:3, 166:10, 169:9, 170:14, 170:16, 171:18, 173:12, 176:3, 178:12, 178:15, 178:23, 180:8, 180:12, 181:21, 181:25, 182:21, 182:22, 183:7, 185:13, 185:18, 206:21, 207:1, 207:22, 208:22, 211:6, 213:3
**AL-IMAM** [1] - 1:6
**Al-Imam's** [7] - 10:8, 13:7, 41:24, 42:8, 46:4, 55:25, 90:7
**Albany** [1] - 8:10
**alert** [1] - 20:11
**alerted** [1] - 113:21
**align** [1] - 66:22
**aligned** [1] - 154:7
**all-weather** [1] - 16:19
**allegations** [1] - 100:7
**allow** [3] - 6:22, 49:25, 219:21
**allowing** [1] - 49:19, 185:2
**allows** [2] - 32:9, 113:15
**almost** [3] - 8:15, 124:3, 157:13
**alternatively** [1] - 133:10
**amenable** [2] - 32:10, 34:17
**America** [3] - 3:3, 60:1, 119:4
**AMERICA** [1] - 1:3
**American** [4] - 14:20, 24:13, 209:24
**amount** [2] - 79:17, 129:9
**analogy** [2] - 133:15, 168:22
**analysis** [1] - 132:14
**analyst** [3] - 121:20, 121:23, 124:21
**analysts** [1] - 125:23
**analyze** [1] - 121:24
**annotations** [1] - 117:21
**answer** [13] - 56:12, 93:10, 93:16,

134:12, 155:8, 155:9, 166:23, 167:2, 168:20, 209:8, 216:11, 216:15, 217:24
**answered** [3] - 153:19, 159:6, 174:15
**answering** [4] - 93:25, 201:23, 209:12, 209:14
**answers** [11] - 36:1, 70:9, 154:25, 164:5, 168:20, 206:9, 208:23, 213:3, 216:11, 216:14, 216:21
**Anthony** [1] - 178:25
**anticipate** [1] - 95:23
**anticipates** [1] - 221:22
**anticipation** [1] - 182:1
**anyway** [1] - 218:4
**apartment** [3] - 11:10, 11:13, 13:15
**apologize** [6] - 15:5, 61:14, 76:15, 153:8, 153:10, 221:12
**appear** [37] - 17:11, 19:22, 20:11, 21:19, 22:4, 23:9, 30:19, 33:13, 33:16, 36:2, 49:8, 52:23, 70:11, 70:22, 72:19, 73:18, 77:1, 78:15, 78:24, 80:10, 80:14, 80:17, 87:9, 87:14, 88:2, 88:4, 94:22, 94:24, 95:1, 102:7, 103:12, 113:2, 115:15, 117:24, 149:23, 150:22, 152:24
**APPEARANCES** [1] - 1:11
**appeared** [6] - 14:17, 21:13, 34:6, 72:11, 113:21, 193:24
**applicable** [1] - 217:12
**application** [1] - 217:12
**applied** [2] - 116:16, 123:22
**apply** [2] - 120:25, 181:1
**approach** [4] - 3:6, 51:16, 185:17, 215:8
**approaching** [1] - 11:12
**appropriate** [10] - 4:5, 43:23, 69:16, 87:17,

89:14, 93:24, 125:5, 166:11, 206:10, 206:12
**appropriately** [4] - 93:25, 95:9, 201:24, 209:8
**approximate** [1] - 45:3
**Arab** [1] - 159:15
**Arabic** [76] - 5:25, 9:2, 9:5, 14:19, 16:10, 26:22, 26:23, 26:24, 27:2, 27:3, 27:4, 27:5, 27:7, 27:9, 27:21, 27:23, 31:17, 36:1, 43:1, 43:19, 43:24, 63:11, 68:5, 120:3, 120:23, 122:7, 122:21, 123:12, 123:15, 123:18, 124:13, 124:15, 125:11, 129:24, 129:25, 130:2, 130:4, 130:9, 130:12, 130:16, 130:17, 130:19, 134:9, 134:19, 134:21, 134:22, 134:23, 135:5, 135:8, 135:14, 139:5, 139:9, 141:16, 143:13, 143:16, 144:21, 147:8, 151:19, 151:20, 165:22, 165:23, 165:24, 166:1, 173:6, 175:17, 184:12, 184:20, 193:20, 212:5, 212:13, 212:14, 214:25
**Arabic-speaking** [2] - 5:25, 130:9
**area** [11] - 11:20, 18:5, 56:19, 62:22, 62:25, 63:3, 65:16, 131:16, 133:17, 138:12, 145:22
**areas** [3] - 77:2, 78:1, 78:3
**argument** [4] - 217:11, 220:9, 220:18, 220:24
**argumentative** [1] - 91:23
**arising** [1] - 131:22
**arm** [2] - 51:10, 78:8
**armed** [3] - 13:25, 14:2, 48:24
**arms** [9] - 11:17, 12:24, 12:25, 18:13,

18:17, 18:24, 21:2, 24:18, 78:7
**arrangements** [1] - 59:18
**arrest** [4] - 10:25, 11:2, 27:8, 28:21
**arrival** [8] - 28:15, 41:24, 42:8, 62:16, 69:7, 74:6, 145:4, 183:4
**arrive** [1] - 62:12
**arrived** [6] - 18:14, 62:13, 63:14, 112:21, 183:5, 213:25
**Article** [19] - 105:20, 106:12, 106:16, 106:17, 106:23, 107:11, 107:13, 108:8, 116:14, 116:19, 116:21, 139:24, 140:11, 140:22, 141:1, 141:17, 147:1, 147:4, 161:10
**article** [4] - 12:15, 29:8, 86:13, 110:15
**articulated** [3] - 102:17, 111:23, 114:24
**Ashcroft** [1] - 120:22
**aside** [3] - 74:3, 74:7, 87:14
**assert** [1] - 171:24
**asserted** [1] - 156:21
**assertively** [1] - 115:22
**assess** [1] - 133:18
**assessed** [1] - 216:16
**assessing** [3] - 28:19, 35:3, 35:10
**assessment** [5] - 65:5, 67:5, 67:6, 114:3, 195:25
**assigned** [10] - 7:24, 40:17, 135:11, 177:7, 177:8, 178:7, 178:9, 178:22, 178:24, 179:3
**assignment** [2] - 178:10, 179:25
**assistance** [1] - 152:19
**assisted** [4] - 11:19, 17:16, 19:11, 20:18
**assisting** [1] - 123:15
**assume** [1] - 38:11
**assuming** [3] - 35:8, 113:6, 113:9
**assured** [1] - 157:19

**ate** [1] - 69:21
**attached** [1] - 47:23
**attachment** [2] - 47:22, 48:6
**attack** [7] - 163:12, 164:3, 164:8, 164:18, 216:17, 216:19, 219:5
**attacks** [1] - 26:8
**attempt** [7] - 9:22, 55:20, 55:23, 159:9, 161:15, 161:19, 205:22
**attempted** [2] - 57:4, 57:11
**attempting** [1] - 161:17
**attempts** [1] - 57:6
**attend** [1] - 10:8
**attention** [17] - 8:19, 46:3, 64:1, 67:9, 77:22, 81:22, 83:22, 84:7, 100:20, 108:7, 110:11, 110:22, 111:3, 114:8, 114:18, 171:7, 198:5
**attentive** [2] - 190:20, 201:23
**attire** [2] - 117:3, 213:7
**attitude** [1] - 185:18
**attorney** [12] - 152:4, 156:15, 156:18, 159:9, 167:7, 167:12, 167:14, 167:15, 167:21, 171:24, 175:9, 175:10
**ATTORNEY'S** [1] - 1:13
**attributable** [1] - 74:9
**audibly** [1] - 145:18
**available** [3] - 43:12, 90:25, 91:2
**Avenue** [1] - 1:22, 223:13
**avoid** [3] - 6:15, 92:4, 93:17
**award** [1] - 126:11
**aware** [8] - 48:25, 49:9, 60:3, 74:8, 112:5, 112:18, 126:15, 187:22
**awareness** [1] - 80:8

## B

**B-A-B-I-S-H-A** [1] - 119:24
**BABISHA** [2] - 2:15, 119:17

**Babisha** [18] - 6:14, 119:14, 119:20, 119:24, 119:25, 140:7, 141:12, 142:13, 153:14, 159:14, 172:7, 179:7, 179:18, 188:23, 191:25, 196:18, 198:11
**bachelor** [1] - 120:9
**backed** [1] - 72:5
**background** [8] - 131:15, 142:3, 154:11, 163:6, 163:8, 163:9, 163:11, 163:17
**backgrounds** [1] - 164:23
**bad** [1] - 112:16
**ballpark** [1] - 164:10
**Band** [1] - 113:25
**based** [18] - 9:17, 54:7, 63:19, 71:18, 78:4, 92:23, 104:24, 114:5, 117:22, 124:1, 132:22, 134:20, 182:14, 206:6, 212:17, 213:2, 216:16
**basic** [4] - 27:14, 27:16, 45:25, 52:17
**basket** [10] - 22:1, 42:3, 46:22, 46:24, 48:6, 48:15, 101:6, 101:7
**bathroom** [6] - 44:4, 44:13, 185:2, 185:6, 185:14, 190:10
**bay** [2] - 101:2, 105:8
**beach** [2] - 29:25, 47:23
**beat** [4] - 157:8, 171:25, 204:10, 204:14
**beaten** [2] - 157:2, 157:20
**became** [12] - 28:1, 40:23, 67:12, 72:4, 94:8, 120:20, 121:16, 128:1, 150:9, 151:1, 156:3, 171:21
**become** [9] - 8:20, 41:1, 62:6, 62:9, 97:8, 117:24, 120:15, 132:10, 178:7
**bed** [4] - 196:5, 202:20, 214:1, 214:9
**befall** [1] - 117:14

**BEFORE** [1] - 1:9
**beforehand** [1] - 222:16
**began** [11] - 48:15, 48:16, 49:16, 155:12, 160:17, 162:20, 171:14, 191:8, 207:1, 209:11, 210:15
**begin** [9] - 5:21, 30:14, 35:5, 46:14, 69:1, 76:21, 165:9, 207:25, 214:11
**beginning** [18] - 6:17, 24:9, 49:5, 89:10, 150:4, 150:5, 163:15, 163:17, 163:18, 165:14, 185:9, 185:10, 190:12, 190:14, 191:2, 196:23, 201:2, 217:11
**begun** [1] - 171:6
**behalf** [2] - 3:9, 3:13
**behavior** [2] - 71:19, 159:5
**behind** [5] - 109:23, 110:17, 178:17, 187:1, 189:4
**belief** [2] - 32:7
**bells** [1] - 220:20
**below** [5] - 65:4, 65:15, 65:16, 66:4, 144:24
**belt** [7] - 13:3, 13:4, 16:18, 16:20, 16:22, 17:3, 117:11
**benefit** [5] - 7:16, 25:15, 39:23, 74:17, 107:23
**benefits** [1] - 79:24
**best** [17] - 10:13, 19:22, 22:19, 46:1, 47:5, 48:23, 55:19, 56:5, 58:5, 58:14, 80:20, 82:10, 100:5, 175:13, 211:22, 211:25, 223:7
**better** [10] - 35:11, 46:19, 81:9, 84:17, 85:2, 92:14, 197:11, 197:15, 197:17, 201:8
**between** [15] - 41:5, 77:11, 81:3, 111:20, 122:6, 133:14, 133:17, 139:8, 172:21, 173:3, 173:8, 185:16, 206:2, 209:16,

210:23
**beyond** [5] - 52:17, 59:4, 129:3, 154:6, 191:11
**biceps** [3] - 51:5, 52:3, 78:9
**big** [1] - 53:5
**bilateral** [1] - 70:1
**binder** [6] - 4:3, 9:11, 55:16, 99:2, 105:23, 175:12
**birth** [1] - 120:2
**bit** [31] - 5:15, 6:17, 32:3, 61:6, 68:9, 72:5, 94:13, 106:14, 123:19, 130:15, 130:21, 133:5, 139:14, 143:24, 151:1, 151:2, 154:21, 155:15, 158:3, 163:14, 163:22, 184:5, 186:12, 190:21, 195:20, 197:16, 203:14, 204:11, 205:15, 208:5
**blanket** [2] - 46:25, 109:2
**bleeding** [2] - 112:23, 113:22
**blood** [2] - 15:19, 114:23
**board** [4] - 41:18, 41:19, 57:11, 61:11
**boat** [14] - 19:10, 33:6, 46:10, 47:6, 49:12, 179:20, 179:21, 184:2, 186:10, 196:7, 202:3, 204:4, 208:4, 213:14
**Bob** [2] - 120:22, 128:19
**body** [9] - 13:6, 15:1, 21:5, 77:17, 94:10, 102:25, 114:7, 117:9, 147:14
**book** [5] - 42:12, 149:13, 151:7, 153:11, 191:20
**books** [2] - 130:4, 134:25
**boots** [1] - 117:11
**born** [4] - 26:22, 26:23, 119:25, 120:1
**borrowed** [1] - 37:25
**bottle** [2] - 31:10, 109:2
**bottom** [6] - 55:18, 139:13, 147:9, 162:18, 192:2,

198:10
**bouncing** [1] - 49:12
**box** [2] - 109:3, 109:5
**branch** [3] - 26:15, 60:18, 96:17
**BRANDON** [3] - 2:3, 7:11, 7:17
**Brandon** [3] - 5:21, 7:3, 7:17
**break** [18] - 5:1, 5:7, 59:20, 95:25, 118:8, 176:8, 185:5, 185:8, 185:13, 190:10, 195:13, 195:14, 195:16, 199:17, 199:20, 199:24, 199:25, 214:5
**breaking** [1] - 33:5
**breaks** [1] - 185:2
**breath** [1] - 70:20
**breathing** [3] - 14:14, 14:25, 15:1
**brief** [1] - 61:22
**briefly** [12] - 8:1, 8:9, 10:2, 16:17, 39:3, 40:14, 64:4, 94:17, 97:3, 105:22, 175:11, 215:2
**bring** [8] - 8:24, 18:21, 47:7, 63:2, 135:25, 154:21, 221:17, 222:17
**bringing** [2] - 47:22, 103:11
**brings** [2] - 32:11, 178:8
**Britain** [1] - 133:11
**broad** [1] - 61:4
**brought** [29] - 11:18, 12:1, 12:22, 14:9, 44:7, 46:5, 47:12, 47:14, 47:18, 48:2, 48:5, 100:9, 100:22, 100:25, 101:1, 101:3, 101:9, 102:23, 103:8, 131:13, 163:9, 188:20, 188:22, 189:8, 189:9, 200:15, 205:20, 219:24
**bruise** [2] - 51:4, 52:3
**bruising** [4] - 77:2, 77:7, 77:13, 204:21
**buccal** [1] - 53:12
**buckle** [1] - 13:4
**Building** [1] - 1:14
**building** [3] - 11:11, 11:13, 13:15
**Bureau** [9] - 25:23,

27:5, 40:11, 121:23, 122:13, 126:13, 163:3, 164:25, 177:22
**but..** [1] - 191:6
**button** [1] - 37:25
**button-down** [1] - 37:25
**BY** [20] - 7:13, 23:21, 25:12, 37:19, 39:5, 39:20, 54:24, 58:4, 60:12, 88:12, 94:19, 96:10, 116:13, 119:19, 159:21, 172:6, 176:2, 176:20, 206:16, 213:11

## C

**cafeteria** [1] - 205:4
**calm** [7] - 14:17, 14:21, 14:22, 17:7, 22:25, 54:13, 56:2
**calmed** [1] - 15:24
**camera** [6] - 58:17, 59:1, 181:20, 181:24, 182:2, 220:5
**cameras** [13] - 56:19, 56:20, 56:23, 57:3, 57:18, 57:19, 57:20, 58:18, 59:2, 59:7, 59:8, 112:10, 181:12
**camouflage** [1] - 42:17
**cannot** [2] - 165:15, 167:8
**capability** [1] - 57:9
**capacity** [3] - 40:19, 128:15, 128:18
**captain** [2] - 6:10, 96:20
**CAPTAIN** [2] - 2:13, 96:8
**Captain** [6] - 8:18, 96:12, 99:1, 99:5, 100:20, 110:22
**capture** [31] - 5:22, 6:1, 6:16, 8:20, 10:3, 10:4, 10:7, 10:19, 12:6, 14:12, 14:13, 22:15, 22:22, 22:23, 24:14, 28:1, 28:8, 40:23, 41:15, 46:4, 46:8, 49:5, 50:21, 56:4, 56:25, 57:18, 97:9, 98:2, 98:8, 178:11, 219:4
**captured** [3] - 9:10, 24:21, 85:7

**car** [1] - 11:12
**carabiner** [2] - 13:4, 13:6
**care** [9] - 53:9, 61:4, 62:11, 91:6, 97:16, 97:19, 105:8, 106:13, 113:24
**career** [5] - 8:9, 40:14, 88:17, 97:3, 120:17
**cargo** [2] - 38:6, 38:7
**Carolina** [2] - 121:22, 135:15
**Carolinas** [1] - 131:17
**carry** [2] - 18:23, 187:11
**Case** [3] - 3:3, 59:25, 119:3
**case** [24] - 41:20, 45:12, 62:6, 62:9, 88:18, 88:19, 105:2, 131:12, 132:19, 133:20, 135:25, 142:4, 150:13, 154:17, 160:9, 163:10, 169:1, 174:6, 178:7, 178:10, 179:15, 185:6, 191:17, 194:14
**cases** [6] - 131:8, 131:11, 131:22, 132:1, 174:6, 177:12
**casual** [1] - 129:22
**catch** [1] - 102:11
**categories** [1] - 130:18
**cell** [9] - 49:6, 113:17, 157:4, 157:6, 157:9, 157:22, 200:15, 204:11, 205:21
**Center** [1] - 1:14
**certain** [16] - 36:23, 62:15, 77:20, 91:13, 94:4, 98:1, 98:13, 107:15, 112:1, 125:25, 127:20, 127:22, 168:19, 168:23, 173:10, 173:14
**certainly** [6] - 27:15, 37:13, 100:4, 102:21, 220:22, 221:14
**CERTIFICATE** [1] - 223:2
**certifications** [1] - 61:11
**certify** [1] - 223:5
**cetera** [5] - 44:4, 130:21, 138:5,

138:10, 173:15
**chain** [1] - 13:5
**chairs** [2] - 45:22,
183:13
**challenge** [4] - 132:25,
133:1, 133:2, 216:20
**chance** [2] - 4:25,
139:7
**change** [9] - 49:21,
49:24, 49:25, 82:3,
104:4, 150:6, 155:8,
190:23, 213:3
**changed** [7] - 104:2,
104:7, 104:9, 155:9,
168:20, 181:6,
216:11
**changes** [3] - 81:10,
82:1, 155:24
**characterization** [1] -
56:8
**characterize** [1] -
159:4
**charge** [4] - 41:3, 63:3,
215:3, 215:4
**charged** [1] - 122:25
**Charlotte** [1] - 121:22
**check** [5] - 53:6,
171:1, 186:18
**checklist** [1] - 76:4
**checks** [3] - 15:22,
36:16, 98:24
**chest** [3] - 33:8, 70:1
**child** [1] - 150:18
**choice** [1] - 75:8
**choose** [2] - 158:1,
158:16
**CHRISTOPHER** [1] -
1:9
**CIPA** [2] - 4:21, 219:12
**CISO** [1] - 220:10
**citizen** [1] - 120:15
**citizens** [1] - 131:16
**city** [2] - 13:15, 13:20
**civilian** [3] - 88:21,
117:3, 213:7
**claim** [2] - 22:20, 54:4
**clarification** [2] -
154:5, 169:13
**clarified** [2] - 156:18,
156:19
**clarify** [6] - 73:24,
87:8, 88:20, 154:2,
169:15, 184:16
**Classical** [1] - 135:4
**classified** [15] - 4:17,
4:18, 5:10, 218:20,
218:21, 218:25,
219:13, 219:14,
219:15, 219:22,
220:6, 220:9,

220:19, 221:10
**clean** [1] - 108:25
**clear** [15] - 44:19, 45:8,
59:5, 64:12, 70:5,
75:18, 87:5, 90:17,
102:5, 109:20,
114:25, 145:10,
151:18, 188:5,
214:22
**clearances** [1] - 88:21
**cleared** [6] - 90:14,
104:12, 104:15,
104:17, 105:9, 208:1
**clearer** [1] - 140:12
**clearing** [1] - 104:20
**clearly** [1] - 171:10
**CLINTON** [1] - 1:18
**clip** [2] - 13:4, 16:22
**clipped** [1] - 13:5
**clock** [1] - 170:23
**close** [7] - 31:11, 71:7,
108:23, 138:25,
167:17, 167:19,
202:17
**close-up** [1] - 138:25
**closed** [1] - 11:20
**closer** [1] - 61:6
**closings** [1] - 6:22
**clothes** [3] - 49:6,
49:17, 49:23
**clothing** [5] - 12:15,
17:15, 23:5, 29:8,
29:10, 50:1, 53:2,
53:3, 86:13, 103:2,
103:3, 103:4,
103:22, 110:15,
136:11
**co** [1] - 185:19
**co-interviewers** [1] -
185:19
**coat** [3] - 16:19, 17:18
**coffee** [3] - 202:13,
205:3, 205:18
**coherent** [1] - 70:9
**cold** [2] - 47:2, 69:10
**collared** [1] - 55:5
**colleagues** [1] -
129:16
**collect** [1] - 132:12
**college** [1] - 27:3
**COLUMBIA** [1] - 1:1
**combative** [3] - 91:23,
93:18, 113:15
**comfortable** [2] - 56:5,
109:17
**coming** [6] - 8:11,
18:5, 35:6, 129:10,
130:7, 162:5
**commands** [7] -
27:13, 115:6,

115:17, 115:18,
115:21, 116:6, 148:5
**comment** [2] - 4:4,
204:22
**commit** [1] - 9:24
**Common** [1] - 116:21
**communicate** [7] -
9:9, 10:2, 20:2,
34:10, 63:21,
105:16, 113:12
**communicated** [1] -
108:15
**communicating** [2] -
34:23, 146:12
**communication** [3] -
34:14, 47:11, 145:9
**communications** [5] -
6:1, 15:14, 33:23,
35:2, 132:20
**compare** [6] - 4:25,
90:7, 90:12, 133:13,
141:15, 186:8
**compared** [4] - 90:8,
141:19, 203:12,
203:13
**complain** [4] - 36:9,
71:8, 71:10, 73:2
**complained** [2] - 73:7,
73:25
**complaint** [1] - 74:4
**complete** [2] - 70:6,
223:7
**completed** [1] - 75:17
**completely** [4] - 14:17,
91:21, 91:22, 130:1
**completion** [1] -
106:21
**complexity** [1] - 27:19
**compliance** [2] - 39:7,
113:12
**compliant** [8] - 15:24,
16:1, 17:6, 20:11,
22:25, 23:7, 115:15,
116:2
**complications** [2] -
74:3, 74:8
**complies** [2] - 114:20,
149:14
**comply** [5] - 17:11,
24:10, 30:17, 52:20,
70:25
**comprehension** [1] -
124:9
**computer** [2] - 1:25,
76:11
**computer-aided** [1] -
1:25
**concern** [5] - 13:16,
13:19, 13:22, 15:23,
56:24

**concerned** [6] - 57:2,
86:22, 148:1,
154:14, 154:17,
154:20
**concerns** [11] - 53:7,
53:9, 62:23, 63:1,
63:2, 63:5, 73:8,
104:23, 116:5,
157:2, 209:5
**conclusion** [2] -
104:25, 192:20
**condition** [9] - 15:21,
45:25, 78:25, 81:4,
82:1, 83:8, 83:10,
85:4, 85:15
**conditioned** [1] -
45:15
**conditions** [4] - 41:13,
63:6, 69:9, 109:25
**conduct** [18] - 49:19,
67:22, 72:2, 72:7,
75:14, 84:8, 85:8,
98:13, 109:18,
117:17, 117:19,
122:16, 131:20,
136:19, 142:5,
170:7, 177:23,
179:10
**conducted** [15] - 46:1,
67:11, 68:6, 75:12,
88:17, 98:3, 98:23,
105:3, 124:15,
131:17, 148:21,
173:6, 177:14,
179:12, 196:14
**conducting** [10] -
49:18, 53:20, 67:1,
68:1, 75:23, 103:5,
112:15, 122:18,
124:7, 132:2
**conducts** [1] - 97:18
**conference** [9] -
127:5, 127:17,
127:18, 128:1,
128:2, 128:5,
128:11, 128:14,
128:16
**conference-level** [6] -
127:5, 128:1, 128:2,
128:5, 128:14,
128:16
**confident** [1] - 167:17
**confirm** [1] - 217:16
**confirmation** [2] -
102:12, 103:18
**conflict** [2] - 14:2, 14:5
**confront** [1] - 155:2
**confrontational** [1] -
36:2
**confused** [2] - 80:17,

88:2
**confusion** [1] - 87:1
**congestion** [1] - 69:11
**Congress** [1] - 125:21
**consciousness** [3] -
19:23, 33:17, 71:10
**consecutive** [3] -
127:1, 127:6, 141:9
**consequence** [3] -
161:4, 161:15,
161:18
**consequences** [11] -
117:13, 117:15,
160:18, 160:22,
160:24, 161:8,
161:13, 161:14,
161:17, 161:21,
161:23
**consider** [1] - 220:5
**considerations** [1] -
181:3
**considered** [1] - 27:6
**consistent** [2] - 78:10,
78:24
**constitutes** [1] - 223:5
**Constitution** [2] -
1:22, 223:13
**construct** [1] - 27:21
**constructs** [1] - 102:1
**consumed** [1] - 19:20
**contact** [9] - 22:11,
28:7, 28:10, 33:9,
35:19, 92:5, 93:17,
100:14, 100:17
**contacted** [1] - 195:22
**contained** [2] - 10:24,
114:10
**container** [3] - 44:2,
44:5, 45:20
**content** [4] - 130:6,
130:8, 173:3, 173:11
**contents** [1] - 141:15
**context** [5] - 132:20,
154:1, 181:25,
219:21, 221:2
**contexts** [1] - 133:14
**continental** [1] - 26:7
**continental-United-**
**States** [1] - 26:7
**contingency** [1] -
105:4
**continue** [10] - 31:24,
75:15, 135:20,
156:10, 194:17,
199:4, 199:5, 199:6,
199:22, 204:5
**continued** [4] - 15:19,
27:5, 79:14, 116:2
**continues** [1] - 125:2
**continuing** [1] - 64:11

**contractor** [1] - 121:15
**contradict** [1] - 168:25
**contrary** [1] - 155:6
**contrast** [1] - 90:7
**control** [3] - 19:10,
21:2, 48:1
**controlled** [1] - 22:3
**Convention** [11] -
42:25, 43:23, 53:14,
105:21, 106:16,
109:1, 116:15,
139:24, 140:11,
147:1, 161:11
**conversation** [19] -
27:14, 27:16,
132:14, 151:1,
154:13, 154:15,
157:20, 158:6,
158:7, 158:11,
159:7, 172:21,
185:22, 187:11,
189:20, 190:12,
190:16, 200:5,
205:16
**conversational** [11] -
37:4, 102:2, 115:22,
122:4, 132:6, 132:7,
132:8, 185:22,
186:7, 190:17,
201:23
**conversationally** [1] -
206:10
**conversations** [17] -
15:20, 29:16, 30:9,
31:12, 36:8, 36:15,
132:21, 133:20,
150:20, 161:7,
173:24, 174:4,
179:18, 179:19,
179:20, 184:1, 209:5
**conversing** [1] - 28:18
**conversion** [1] -
210:19
**convey** [4] - 95:5,
107:11, 115:25,
185:12
**conveyed** [2] - 105:12,
107:13
**COOPER** [1] - 1:9
**cooperative** [2] - 89:7,
93:24
**coordinating** [1] - 41:4
**copies** [1] - 57:5
**copy** [16] - 3:24, 3:25,
51:15, 55:19, 57:7,
57:11, 57:17, 61:15,
140:12, 151:13,
151:15, 151:19,
153:7, 175:13
**corner** [2] - 112:1,

139:13
**Corps** [6] - 8:14, 8:17,
26:16, 26:17, 26:20,
37:6
**corpsman** [1] - 61:24
**correct** [34] - 4:19,
5:11, 44:22, 46:23,
64:17, 65:19, 66:6,
67:3, 72:21, 73:5,
73:6, 74:1, 84:1,
89:17, 89:18, 89:21,
89:22, 89:25, 90:1,
90:4, 99:19, 106:7,
107:20, 162:21,
164:18, 171:16,
172:14, 197:25,
210:11, 211:20,
213:13, 219:18,
221:23, 221:24
**corrections** [1] -
153:22
**correctly** [2] - 9:23,
134:3
**cough** [1] - 69:10
**counsel** [12] - 3:6,
51:14, 70:2, 153:4,
214:15, 215:16,
215:17, 216:9,
217:17, 217:19,
219:5, 221:15
**Counsel** [1] - 83:24
**counsel's** [1] - 219:11
**count** [3] - 112:8,
112:9, 112:11
**counter** [1] - 74:20
**counterterrorism** [6] -
40:6, 40:9, 40:20,
41:4, 177:9, 177:12
**countries** [4] - 128:20,
130:7, 130:9, 130:20
**country** [2] - 130:13,
133:17
**counts** [2] - 117:17,
117:19
**couple** [10] - 3:22,
12:24, 29:14, 38:5,
111:4, 134:7,
158:22, 179:13,
184:24, 187:2
**course** [20] - 31:12,
35:17, 36:15, 62:5,
86:6, 87:19, 90:8,
112:17, 120:24,
122:9, 127:23,
129:2, 138:17,
154:3, 154:13,
172:1, 172:11,
178:4, 183:23,
216:10
**courses** [2] - 27:5,

27:10
**COURT** [110] - 1:1,
3:11, 3:14, 3:17,
3:21, 4:6, 4:10, 4:14,
4:16, 4:20, 5:3, 5:6,
5:9, 5:13, 5:17, 6:20,
7:4, 7:8, 12:21,
23:19, 24:21, 24:25,
25:5, 25:8, 29:13,
37:17, 38:2, 38:7,
39:11, 39:14, 39:16,
51:17, 54:22, 59:11,
59:14, 59:22, 60:6,
60:9, 61:17, 61:19,
70:2, 70:4, 83:24,
84:5, 86:18, 88:10,
92:24, 94:16, 95:19,
95:22, 95:25, 96:3,
96:6, 110:21,
116:11, 118:2,
118:5, 118:9, 119:7,
119:10, 119:15,
134:10, 134:14,
134:17, 136:15,
140:18, 140:20,
143:4, 144:15,
153:4, 153:9,
153:11, 164:13,
172:4, 175:24,
176:6, 176:11,
176:14, 176:16,
178:21, 179:24,
180:2, 180:4,
212:10, 217:4,
217:9, 217:18,
217:20, 218:7,
218:10, 218:13,
218:24, 219:1,
219:17, 220:1,
220:4, 220:13,
220:16, 220:25,
221:5, 221:9,
221:16, 221:18,
221:20, 221:25,
222:8, 222:11,
222:14, 222:19,
223:2
**Court** [58] - 1:21, 1:21,
3:25, 5:15, 10:22,
11:8, 20:17, 21:12,
21:25, 25:14, 26:4,
27:1, 27:12, 28:13,
29:11, 31:4, 33:25,
39:22, 45:9, 46:7,
61:14, 61:21, 62:18,
64:9, 65:21, 66:7,
72:1, 76:23, 82:17,
83:2, 86:2, 86:16,
86:25, 99:8, 102:13,
110:23, 111:18,
112:9, 113:9,

119:22, 130:15,
131:25, 132:10,
135:17, 136:10,
142:23, 150:15,
156:13, 176:23,
182:9, 192:8,
219:12, 219:21,
220:3, 220:14,
223:12
**court** [16] - 7:16,
12:20, 25:15, 29:5,
29:12, 39:23, 60:3,
74:17, 77:4, 86:17,
110:20, 127:15,
136:14, 178:20,
186:8, 209:25
**Court's** [8] - 3:23,
23:15, 37:14, 54:18,
88:6, 112:4, 116:8,
189:14
**courthouse** [1] - 59:19
**Courthouse** [2] - 1:22,
223:12
**COURTROOM** [3] -
3:2, 59:24, 119:2
**courtroom** [11] -
12:12, 12:15, 29:8,
29:10, 86:11, 86:14,
110:13, 110:16,
136:8, 178:8, 178:16
**cover** [1] - 112:4
**coverage** [1] - 109:24
**covered** [2] - 11:17,
46:25
**covering** [5] - 4:6, 4:8,
13:1, 35:5, 112:6
**craft** [9] - 18:5, 18:13,
18:25, 19:5, 19:6,
19:11, 20:19, 24:6
**crafts** [1] - 23:7
**crane** [1] - 47:25
**create** [1] - 98:7
**created** [5] - 64:10,
64:14, 64:15, 76:3,
98:10
**crew** [8] - 22:3, 44:17,
44:20, 46:11, 47:5,
47:22, 47:24, 57:2
**crime** [1] - 40:19
**Criminal** [4] - 1:3, 3:3,
59:25, 119:3
**critical** [1] - 73:16
**CROSS** [7] - 23:20,
37:18, 54:23, 88:11,
116:12, 159:20,
206:15

**CROSS-
EXAMINATION** [7] -
23:20, 37:18, 54:23,
88:11, 116:12,

159:20, 206:15
**CRR** [3] - 1:21, 223:4,
223:11
**cry** [1] - 209:11
**CT** [1] - 177:9
**CT3** [1] - 177:8
**cuffs** [2] - 114:7,
114:14
**CUMMINGS** [51] -
1:12, 3:8, 3:20, 3:22,
4:8, 4:13, 4:19, 5:14,
5:18, 7:1, 7:13,
12:19, 23:15, 23:17,
24:24, 25:12, 29:11,
37:14, 37:16, 39:3,
39:5, 39:10, 39:20,
51:14, 54:18, 54:20,
58:4, 59:9, 59:15,
60:2, 60:12, 61:13,
70:3, 86:16, 88:6,
88:8, 92:22, 94:17,
94:19, 95:18, 95:24,
96:2, 96:10, 110:19,
116:8, 116:10,
118:3, 118:7, 217:7,
217:16, 222:12
**Cummings** [7] - 3:9,
3:11, 3:17, 94:16,
95:22, 118:2, 119:9
**Cummings)..............
................** [8] - 2:4,
2:6, 2:7, 2:8, 2:9,
2:11, 2:12, 2:13
**cup** [1] - 7:9
**current** [9] - 7:22,
25:22, 40:5, 48:17,
53:6, 60:20, 62:20,
85:15, 96:19
**curriculum** [1] - 61:16
**curtain** [1] - 42:17
**curved** [1] - 101:7
**custodial** [1] - 180:24
**custody** [6] - 11:11,
11:14, 41:3, 80:21,
101:11, 204:16
**cut** [2] - 112:23,
113:22
**CV** [1] - 61:21

# D

**daily** [3] - 129:10,
180:12, 180:13
**dangerous** [1] - 32:9
**dark** [1] - 57:23
**darkened** [1] - 57:22
**date** [4] - 67:16, 99:11,
112:1, 192:2
**Dated** [1] - 223:9
**DAY** [1] - 1:9

**days** [4] - 69:11, 160:13, 160:14, 203:13
**DC** [4] - 1:15, 1:19, 1:23, 223:14
**deadly** [3] - 55:24, 58:6, 115:12
**deal** [3] - 87:20, 133:25, 185:1
**death** [2] - 74:16, 79:25
**decently** [1] - 33:4
**deception** [2] - 154:21, 155:2
**deceptive** [2] - 154:25, 168:19
**decide** [5] - 172:7, 172:10, 180:7, 210:21, 218:8
**decided** [11] - 95:4, 129:11, 180:11, 181:1, 181:10, 196:1, 200:3, 202:5, 202:7, 211:2, 222:3
**decides** [1] - 174:7
**deciding** [1] - 181:4
**decision** [1] - 57:16
**deck** [2] - 44:14, 48:5
**declassified** [2] - 219:19, 220:23
**deemed** [1] - 221:21
**deep** [2] - 19:4, 70:20
**deeper** [1] - 77:13
**defendant** [284] - 6:6, 6:9, 12:9, 12:20, 12:22, 14:9, 17:9, 17:11, 17:23, 17:25, 18:6, 18:11, 19:13, 19:16, 20:2, 20:11, 20:21, 20:23, 21:13, 21:16, 21:22, 22:11, 22:12, 22:15, 22:17, 22:20, 22:23, 22:25, 23:9, 28:7, 28:11, 28:23, 29:12, 30:6, 32:9, 32:12, 32:14, 32:18, 32:21, 33:7, 36:5, 36:6, 36:12, 44:6, 50:6, 50:7, 52:7, 52:19, 53:20, 54:1, 54:7, 58:7, 58:14, 62:12, 62:25, 63:7, 63:14, 67:23, 68:10, 68:20, 69:3, 69:13, 70:5, 70:15, 70:19, 70:22, 71:2, 71:24, 72:10, 72:24, 73:19, 73:22, 73:25, 74:25, 75:5, 75:13, 75:18, 75:24, 75:25,

76:5, 77:20, 78:17, 79:6, 80:10, 80:21, 81:6, 81:23, 82:3, 82:11, 82:24, 86:7, 86:9, 86:17, 86:21, 87:5, 87:11, 87:14, 87:23, 94:22, 95:5, 99:20, 99:24, 100:8, 100:14, 100:21, 101:24, 103:12, 104:12, 104:23, 106:9, 106:15, 106:24, 107:14, 107:23, 108:2, 108:4, 108:9, 109:21, 109:22, 110:1, 110:7, 110:12, 110:20, 112:18, 112:19, 115:6, 115:9, 115:13, 136:14, 136:16, 136:19, 137:25, 138:1, 138:12, 138:15, 138:24, 139:7, 140:23, 140:25, 141:23, 142:2, 142:8, 142:18, 143:16, 143:18, 144:7, 144:23, 145:2, 145:6, 145:9, 145:17, 145:21, 145:24, 146:2, 146:6, 146:9, 146:12, 146:15, 146:17, 146:21, 147:2, 147:4, 147:20, 148:1, 148:5, 148:17, 149:6, 149:9, 149:18, 149:25, 150:12, 150:19, 151:4, 151:9, 151:12, 151:24, 152:15, 153:17, 153:22, 154:7, 154:14, 155:10, 155:12, 155:16, 155:20, 156:6, 156:9, 156:20, 157:1, 157:7, 157:17, 157:19, 158:1, 158:12, 158:17, 158:24, 159:8, 159:10, 159:16, 174:13, 174:15, 174:16, 174:24, 175:19, 178:12, 178:15, 178:20, 184:9, 184:12, 184:14,

184:20, 185:2, 185:4, 186:4, 186:10, 187:8, 187:16, 187:20, 187:23, 188:1, 188:2, 188:6, 188:16, 188:19, 188:24, 189:15, 189:18, 190:5, 190:16, 191:1, 191:8, 191:13, 192:6, 192:17, 192:21, 193:3, 193:4, 193:14, 193:15, 193:20, 193:24, 194:6, 194:22, 194:24, 195:7, 195:12, 195:21, 196:8, 196:21, 196:25, 197:19, 197:22, 198:2, 198:14, 198:23, 199:8, 199:20, 199:23, 200:5, 201:3, 201:14, 201:25, 202:8, 202:22, 203:4, 204:8, 204:12, 204:24, 205:17, 205:23, 206:1, 206:3, 213:14, 214:18, 215:18, 216:6, 216:11, 216:13, 216:20, 219:4
**DEFENDANT** [1] - 3:16
**Defendant** [2] - 1:7, 1:17
**defendant's** [26] - 3:18, 5:22, 6:11, 15:21, 39:7, 49:21, 62:16, 74:12, 81:3, 86:22, 142:24, 143:5, 144:10, 145:1, 147:11, 150:2, 152:11, 154:10, 155:25, 174:12, 190:18, 192:1, 197:5, 198:12, 198:22, 201:20
**defendants** [6] - 122:25, 123:7, 177:20, 177:21, 178:2
**Defense** [4] - 6:8, 41:5, 43:9, 107:18
**defense** [10] - 3:25, 153:7, 214:15,

215:16, 216:9, 218:11, 218:20, 218:21, 221:14, 222:4
**defense's** [1] - 221:13
**definitely** [7] - 181:5, 182:18, 197:15, 205:13, 206:12, 210:19, 212:22
**degree** [1] - 120:8
**degrees** [2] - 111:17, 111:20
**dehydration** [6] - 73:12, 73:13, 73:14, 73:15, 73:20, 79:18
**delivered** [2] - 115:21, 115:22
**delivering** [1] - 17:9
**demanded** [1] - 125:6
**demeaning** [1] - 148:10
**demeanor** [11] - 14:11, 14:16, 35:24, 55:25, 90:8, 155:25, 156:3, 190:23, 197:13, 201:20, 203:12
**denied** [1] - 82:21
**Denies** [1] - 86:5
**denote** [1] - 111:1
**denoting** [1] - 99:12
**departed** [1] - 11:20
**departing** [1] - 13:15
**department** [1] - 61:3
**Department** [19] - 6:7, 41:5, 43:9, 107:18, 121:2, 121:3, 121:4, 121:6, 121:8, 121:12, 126:18, 126:23, 126:24, 127:25, 128:3, 128:7, 135:21
**departments** [1] - 125:5
**dependent** [1] - 124:3
**depicted** [18] - 15:5, 42:14, 42:16, 42:20, 43:3, 43:16, 43:21, 44:24, 45:19, 49:3, 50:14, 50:19, 51:25, 72:17, 76:21, 78:11, 106:6, 149:15
**depth** [1] - 127:20
**DEPUTY** [3] - 3:2, 59:24, 119:2
**desanitized** [1] - 219:24
**descent** [1] - 131:23
**describe** [57] - 6:5, 8:9, 10:22, 11:8, 11:15, 12:23, 13:11,

14:11, 16:14, 20:17, 21:12, 21:25, 26:4, 27:1, 27:18, 28:13, 29:7, 31:4, 32:16, 33:25, 35:24, 37:8, 37:22, 38:9, 40:14, 42:20, 46:7, 46:15, 47:18, 49:3, 50:18, 55:2, 55:25, 56:11, 60:25, 64:9, 67:25, 72:17, 76:22, 83:2, 86:2, 89:9, 92:2, 97:3, 97:13, 99:8, 102:13, 102:19, 110:23, 113:9, 129:7, 147:19, 147:21, 152:19, 171:20, 192:12, 211:22
**described** [12] - 13:10, 15:17, 30:2, 36:23, 58:21, 78:25, 85:9, 94:4, 94:20, 101:5, 106:5
**describing** [1] - 41:10
**design** [1] - 100:18
**designated** [2] - 108:13, 113:13
**desired** [3] - 75:15, 82:12, 109:15
**detached** [1] - 56:10
**detail** [1] - 183:3
**detained** [5] - 14:20, 24:12, 75:22, 113:19, 173:7
**detainee** [22] - 43:13, 44:3, 97:16, 97:19, 98:5, 98:17, 98:18, 100:11, 100:17, 102:1, 104:3, 104:5, 104:14, 106:22, 110:10, 111:2, 111:8, 112:12, 112:13, 113:12, 113:13
**detainee's** [1] - 55:15
**detainees** [1] - 107:12
**detaining** [1] - 42:10
**Detective** [10] - 178:25, 179:25, 183:1, 184:17, 185:16, 186:1, 188:22, 196:17, 215:22, 215:25
**detective** [1] - 179:17
**detention** [60] - 6:11, 41:7, 41:9, 41:16, 42:10, 42:16, 42:22, 42:23, 42:24, 43:5, 45:4, 45:5, 45:10,

45:14, 46:13, 48:8,
48:9, 48:11, 48:14,
48:18, 49:6, 49:24,
53:14, 53:16, 55:6,
56:19, 56:21, 57:25,
58:18, 58:23, 58:24,
58:25, 59:1, 75:18,
88:17, 88:21, 90:14,
90:18, 97:15, 98:8,
101:13, 102:6,
102:16, 102:24,
104:8, 104:12,
104:15, 104:18,
104:21, 104:24,
105:9, 105:12,
110:3, 111:19,
112:10, 112:21,
112:22, 115:15,
115:18
**determinations** [1] -
67:2
**determined** [1] -
168:18
**develop** [1] - 116:5
**developed** [1] - 129:13
**diagnosed** [1] - 69:24
**diagnoses** [3] - 65:5,
67:7, 67:8
**diagnosis** [2] - 67:6,
69:25
**diagram** [3] - 77:25,
78:4, 78:14
**dialect** [12] - 131:5,
131:9, 132:24,
133:3, 133:4, 134:6,
134:11, 134:18,
134:20, 135:12
**dialects** [6] - 130:16,
132:7, 133:13,
134:18, 135:17,
135:22
**differ** [1] - 198:17
**difference** [3] - 77:11,
133:16, 207:8
**differences** [4] - 81:3,
81:5, 85:3, 133:14
**different** [20] - 27:9,
30:2, 90:10, 90:13,
91:11, 132:23,
133:1, 133:3, 133:5,
133:9, 133:10,
133:12, 134:20,
139:15, 158:8,
179:13, 186:18,
197:3, 202:12,
219:24
**differently** [2] -
133:12, 197:25
**difficult** [1] - 57:17
**dignitaries** [2] -

128:12, 128:19
**DiLorenzo** [3] - 1:13,
3:10, 119:8
**dimensions** [2] - 45:8,
45:9
**direct** [7] - 28:7, 28:10,
77:22, 114:8,
168:18, 169:10,
198:5
**DIRECT** [7] - 7:12,
25:11, 39:19, 60:11,
96:9, 119:18, 176:19
**directed** [5] - 62:10,
193:11, 193:14,
193:16, 194:15
**directing** [1] - 95:10
**direction** [2] - 86:15,
144:17
**directions** [2] - 34:17,
88:25
**directive** [1] - 131:13
**directly** [3] - 29:9,
76:10, 104:14
**Director** [3] - 128:19,
128:22, 128:25
**dis** [1] - 87:24
**disclosed** [1] - 218:19
**discoverable** [1] -
57:6
**discovered** [1] - 14:3
**discuss** [14] - 139:23,
142:7, 160:24,
179:11, 179:15,
182:4, 183:4,
183:23, 185:1,
186:14, 196:24,
198:2, 207:19,
219:12
**discussed** [14] -
62:20, 104:13,
109:14, 150:12,
151:8, 168:22,
173:13, 174:1,
184:3, 185:9, 191:9,
197:23, 198:19,
199:15
**discusses** [1] - 192:16
**discussing** [4] - 79:24,
129:4, 181:24,
219:14
**discussion** [14] -
72:24, 104:25,
116:24, 141:25,
150:1, 151:4,
164:15, 180:6,
191:12, 197:18,
207:21, 210:23,
218:3, 220:9
**discussions** [6] -
179:22, 180:11,

202:4, 210:21,
211:4, 217:23
**dismissed** [1] - 39:14
**disorders** [1] - 71:19
**disoriented** [2] -
80:14, 88:4
**display** [1] - 150:20
**displayed** [3] - 161:5,
161:10, 175:15
**displaying** [1] - 12:5
**disputed** [1] - 217:12
**disrobe** [1] - 103:6
**disrobed** [1] - 104:7
**distraught** [1] - 56:3
**distress** [3] - 79:16,
87:21, 87:24
**DISTRICT** [3] - 1:1,
1:1, 1:10
**divided** [1] - 130:17
**Divido** [1] - 69:20
**division** [6] - 8:10,
40:7, 40:9, 40:18,
40:20, 41:4
**dizziness** [1] - 87:3
**DNA** [1] - 53:12
**DO** [1] - 61:10
**doc** [4] - 99:15, 103:8,
113:23, 187:4
**docile** [3] - 56:8, 56:9,
89:5
**DOCTOR** [2] - 2:10,
60:10
**Doctor** [6] - 60:5,
60:13, 61:20, 86:20,
88:13, 95:19
**doctor** [35] - 6:7,
36:21, 49:19, 50:4,
53:6, 53:19, 54:8,
56:16, 60:6, 61:3,
61:9, 61:10, 62:5,
103:9, 104:1,
104:13, 105:6,
117:3, 137:14,
137:18, 146:6,
146:10, 146:13,
147:21, 148:16,
148:17, 148:18,
159:2, 186:13,
195:23, 195:25,
218:22, 219:6,
219:9, 219:25
**doctor's** [1] - 61:16
**document** [46] - 4:24,
5:1, 5:2, 41:8, 41:13,
50:8, 51:21, 51:22,
51:24, 57:17, 64:5,
64:21, 67:21, 84:3,
98:10, 99:3, 99:4,
99:5, 99:9, 107:6,
107:7, 107:10,

111:25, 112:1,
114:11, 114:24,
121:25, 123:14,
123:17, 139:14,
139:20, 139:22,
139:23, 140:12,
140:23, 141:16,
142:16, 142:17,
152:2, 162:11,
162:12, 165:11,
220:10, 220:15,
221:1, 221:11
**Document** [4] - 58:9,
114:10, 114:12,
142:11
**document's** [1] - 70:2
**documentation** [2] -
64:3, 98:7
**documented** [7] -
56:18, 66:1, 78:1,
110:7, 111:5,
112:24, 114:1
**documenting** [4] -
41:20, 41:22, 48:16,
115:2
**documents** [16] -
72:16, 76:13, 76:20,
106:1, 106:6, 107:7,
114:8, 122:11,
122:12, 123:12,
124:1, 125:3, 125:8,
132:15, 161:5, 168:8
**DOD** [10] - 10:12,
42:24, 43:4, 43:18,
47:9, 48:21, 48:23,
49:15, 53:6, 57:10
**domestically** [1] -
180:25
**done** [22] - 36:16,
88:20, 90:9, 90:11,
106:4, 106:18,
108:2, 108:4,
117:21, 125:13,
126:7, 126:14,
127:7, 145:10,
157:15, 165:17,
165:24, 177:17,
177:18, 195:18,
203:22, 206:5
**door** [9] - 44:18,
55:14, 104:9,
105:15, 108:17,
109:17, 111:23,
183:15, 183:20
**doors** [2] - 11:19,
183:16
**down** [42] - 9:17, 9:21,
14:17, 14:21, 14:22,
15:24, 37:25, 42:4,
46:23, 47:21, 49:12,

49:23, 53:2, 57:23,
72:3, 91:22, 91:25,
92:18, 93:13, 93:14,
93:15, 94:1, 95:9,
103:6, 103:20,
131:13, 143:12,
144:19, 149:25,
150:2, 189:18,
189:21, 190:19,
195:18, 200:18,
203:14, 207:11,
213:13, 215:10,
215:21, 219:7,
219:24
**download** [1] - 57:13
**downstairs** [1] -
221:19
**Dr** [1] - 128:10
**Dramamine** [2] -
186:22, 187:5
**dressed** [2] - 17:16,
213:6
**drill** [1] - 37:11
**drill-instructor-style**
[1] - 37:11
**drink** [2] - 157:23,
158:2
**drinking** [1] - 157:23
**drowsiness** [1] - 80:9
**drowsy** [1] - 187:10
**drugs** [1] - 80:7
**dry** [3] - 41:25, 49:23,
98:3
**due** [4] - 49:11, 57:8,
57:22, 59:18
**duplication** [1] - 5:19
**during** [91] - 5:1, 6:2,
11:25, 14:10, 15:17,
15:25, 22:23, 23:8,
24:2, 30:9, 31:12,
35:17, 36:5, 36:8,
36:15, 49:11, 50:5,
50:6, 50:16, 52:4,
52:25, 53:25, 54:3,
55:2, 55:25, 56:7,
56:16, 57:18, 57:25,
59:3, 64:20, 66:12,
68:10, 70:16, 72:7,
73:19, 76:8, 77:19,
79:12, 81:2, 81:7,
83:16, 84:18, 85:4,
87:19, 89:5, 90:24,
94:6, 95:2, 95:15,
98:2, 98:5, 103:12,
109:8, 111:7,
112:17, 115:5,
115:15, 120:12,
131:19, 146:1,
146:13, 149:4,
150:11, 150:19,

154:13, 154:23,
155:25, 158:24,
164:20, 164:22,
165:1, 165:4, 165:6,
165:8, 170:3,
171:17, 174:2,
180:13, 182:15,
190:15, 194:5,
199:9, 200:5,
201:20, 202:8,
202:10, 209:23,
211:12, 213:6,
217:23
**duties** [2] - 60:25, 62:5
**dynamic** [1] - 181:6

## E

**E-C-C-H-Y-M-O-S-I-S**
[1] - 77:5
**ear** [10] - 13:1, 15:9,
15:11, 16:16, 16:17,
16:23, 21:6, 21:15,
46:25, 187:1
**early** [7] - 39:1, 129:8,
165:11, 165:12,
168:5, 188:13,
189:19
**ears** [4] - 102:22,
102:25, 109:19,
109:24
**ease** [5] - 30:5, 30:8,
32:5, 186:19, 189:14
**easier** [3] - 18:23,
18:24, 192:15
**East** [3] - 130:7,
130:10, 130:18
**east** [2] - 130:18,
134:21
**Eastern** [1] - 128:24
**easy** [1] - 135:7
**easy-to-read** [1] -
135:7
**ecchymosis** [8] - 77:2,
77:3, 77:6, 77:11,
77:13, 77:16, 78:2,
78:6
**edges** [1] - 101:7
**educated** [1] - 154:14
**education** [1] - 120:7
**educational** [1] -
154:10
**effect** [6] - 10:25,
133:20, 157:7,
203:25, 204:9, 212:1
**effectively** [3] - 63:18,
63:21, 64:21
**effects** [6] - 74:15,
74:24, 79:20, 79:25,
80:11, 81:18, 91:9,

94:20, 186:19
**efficient** [1] - 102:4
**efficiently** [1] - 98:14
**Egypt** [1] - 130:14
**Egyptian** [1] - 131:1
**eight** [2] - 27:10, 40:19
**either** [10] - 20:20,
24:6, 50:2, 80:11,
80:14, 80:18,
154:15, 159:1,
182:3, 200:6
**elementary** [1] - 27:20
**elements** [1] - 47:1
**elucidate** [1] - 220:17
**emails** [1] - 162:3
**emergency** [8] - 60:24,
60:25, 61:2, 61:12,
62:3, 87:20, 90:22,
91:19
**emotional** [3] - 56:6,
171:21, 209:9
**emotionally** [1] - 56:2
**emotions** [4] - 150:20,
158:12, 158:19,
201:9
**employed** [3] - 7:18,
25:18, 40:1
**employee** [2] - 121:14,
121:17
**employment** [3] -
121:8, 123:20, 160:1
**encompassed** [1] -
101:8
**encounter** [5] - 65:13,
69:22, 79:4, 79:5,
79:8
**encourage** [1] - 126:3
**end** [13] - 92:18,
99:14, 111:17,
120:17, 124:13,
151:21, 156:1,
171:23, 182:21,
199:8, 200:14,
204:7, 205:12
**ended** [3] - 156:24,
182:22, 200:10
**ending** [1] - 156:1
**enforcement** [15] -
97:17, 98:25, 108:6,
108:12, 108:14,
108:21, 109:8,
109:11, 109:14,
109:16, 111:7,
129:18, 177:14,
177:23
**engage** [6] - 27:14,
28:18, 62:15, 71:18,
98:1, 187:8
**engaged** [1] - 151:1
**English** [21] - 42:25,

43:18, 55:18, 58:11,
122:8, 122:9,
124:14, 139:5,
139:8, 141:8,
151:19, 165:22,
165:25, 166:2,
175:17, 184:10,
184:13, 192:14,
208:11, 209:17,
209:20
**enhanced** [1] - 187:9
**enlisted** [1] - 61:23
**ensure** [12] - 30:7,
42:1, 42:5, 48:1,
56:5, 98:3, 98:14,
102:4, 107:25,
111:20, 112:14,
113:11
**ensuring** [1] - 28:19
**enter** [1] - 20:22
**entered** [2] - 145:21,
188:24
**entering** [2] - 48:17,
113:16
**entire** [7] - 16:2, 22:14,
23:1, 61:20, 100:23,
145:24, 146:10
**entirely** [3] - 27:15,
34:6, 107:15
**entirety** [3] - 146:11,
192:18, 193:11
**entrance** [4] - 11:12,
34:1, 105:18, 111:22
**entry** [9] - 105:14,
105:15, 108:18,
109:18, 113:7,
113:13, 123:19,
124:19, 124:20
**environment** [6] -
17:21, 32:9, 32:11,
41:9, 41:10, 92:13
**environmental** [3] -
17:19, 23:6, 63:1
**episode** [2] - 74:5,
74:6
**equal** [1] - 185:20
**equipment** [1] -
183:11
**equipped** [1] - 99:23
**equivalent** [2] - 36:1,
126:1
**equivocated** [1] -
216:15
**error** [4] - 82:15,
82:18, 82:22, 85:24
**errors** [1] - 90:5
**escape** [5] - 55:20,
55:23, 161:16,
161:17, 161:20
**ESQ** [4] - 1:12, 1:12,

1:13, 1:17
**essence** [1] - 26:7
**established** [1] - 116:3
**estimate** [4] - 88:22,
122:12, 122:21,
123:4
**et** [5] - 44:4, 130:20,
138:5, 138:10,
173:15
**evaluate** [1] - 79:11
**evaluated** [1] - 62:21
**evaluating** [2] - 88:24,
92:16
**evaluation** [9] - 64:24,
68:15, 79:12, 89:15,
90:3, 93:21, 94:5,
94:6
**evaluations** [3] -
64:16, 90:8, 90:10
**evasive** [1] - 216:13
**evening** [6] - 36:9,
39:1, 187:17, 188:7,
213:15, 213:22
**event** [7] - 91:12,
91:14, 92:21, 93:1,
98:6, 99:11, 114:13
**events** [6] - 46:3,
91:16, 93:7, 93:11,
99:17, 187:14
**evidence** [13] - 4:18,
5:10, 70:2, 90:19,
92:22, 140:3,
141:12, 142:11,
144:1, 168:10,
168:11, 168:12,
191:20
**EVIDENTIARY** [1] -
1:9
**evidentiary** [1] - 6:21
**exact** [2] - 175:17,
199:18
**exactly** [20] - 15:13,
27:12, 51:9, 127:9,
127:16, 153:19,
156:12, 186:24,
188:11, 189:1,
189:17, 193:17,
194:10, 198:20,
207:18, 207:20,
208:15, 208:21,
210:1, 215:17
**exam** [19] - 64:11,
64:21, 65:10, 65:20,
67:1, 68:4, 72:6,
72:7, 74:14, 76:10,
79:14, 79:15, 81:9,
95:3, 95:5, 95:11,
95:13, 104:11,
125:22
**Exam** [3] - 65:2, 65:17,

66:5
**examination** [54] -
49:19, 53:20, 58:22,
65:11, 65:25, 66:2,
66:5, 66:8, 66:11,
66:13, 66:16, 66:17,
66:25, 67:11, 67:14,
67:16, 67:22, 68:1,
68:7, 68:16, 70:14,
70:16, 71:21, 71:22,
72:2, 72:4, 74:13,
75:12, 75:17, 75:23,
76:8, 77:19, 80:24,
81:2, 81:7, 81:13,
81:23, 82:14, 83:16,
84:7, 84:9, 84:19,
85:4, 85:6, 85:9,
89:6, 89:13, 89:24,
89:25, 95:6, 137:15,
148:18, 168:18
**EXAMINATION** [20] -
7:12, 23:20, 25:11,
37:18, 39:4, 39:19,
54:23, 58:3, 60:11,
88:11, 94:18, 96:9,
116:12, 119:18,
159:20, 172:5,
176:1, 176:19,
206:15, 213:10
**examinations** [4] -
6:8, 73:19, 75:14,
90:23
**examined** [1] - 125:24
**examining** [1] - 82:13
**example** [20] - 17:14,
65:22, 66:22, 70:18,
70:20, 111:3,
111:16, 127:20,
131:18, 133:7,
134:4, 135:14,
137:14, 137:16,
150:25, 155:6,
167:1, 168:22,
169:12
**exams** [1] - 64:11
**except** [1] - 211:17
**exchanged** [2] -
202:19, 203:7
**excited** [1] - 14:13
**excuse** [3] - 130:13,
134:10, 202:9
**excused** [6] - 25:1,
59:14, 95:20, 118:6,
176:7, 217:6
**Exhibit** [76] - 9:13,
15:4, 15:6, 15:8,
42:14, 42:20, 42:21,
43:2, 43:3, 43:16,
43:17, 43:21, 43:22,
44:24, 45:18, 45:19,

48:12, 49:2, 49:4,
50:13, 50:14, 50:18,
50:19, 50:22, 50:25,
51:3, 51:6, 51:15,
51:19, 51:25, 55:16,
61:15, 64:7, 64:13,
65:8, 65:17, 67:10,
67:18, 76:7, 77:8,
77:15, 77:23, 77:24,
81:1, 82:14, 83:23,
85:25, 99:6, 107:4,
111:6, 114:19,
114:21, 114:25,
138:20, 139:18,
140:2, 140:4, 140:7,
140:21, 149:13,
149:15, 151:7,
151:10, 151:16,
152:9, 155:11,
174:9, 175:12,
175:16, 191:19,
191:21, 192:5,
192:14, 198:6, 198:7
**exhibit** [7] - 9:14, 9:16,
64:15, 138:19,
218:11, 220:6,
222:15
**exhibit's** [1] - 151:18
**Exhibits** [6] - 4:8,
72:13, 72:18, 76:17,
76:22, 78:11
**exhibits** [4] - 3:24, 4:1,
4:4, 4:7
**exited** [2] - 11:16,
108:11
**expand** [1] - 92:14
**expect** [3] - 6:17,
28:21, 91:18
**expected** [2] - 43:14,
127:20
**expecting** [2] - 93:6,
150:18
**experience** [7] - 56:7,
91:10, 92:9, 92:16,
93:1, 96:24, 127:4
**experienced** [1] -
92:17
**expert** [3] - 62:21,
218:4, 219:6
**explain** [7] - 8:1,
23:13, 30:24, 65:21,
66:7, 72:1, 77:23,
86:25, 87:4, 111:5,
111:17, 112:9,
113:8, 129:15,
132:10, 194:6,
209:23
**explained** [12] - 24:12,
53:15, 53:17, 54:11,
151:23, 160:19,

161:21, 163:6,
163:8, 163:13,
163:16, 166:15
**explosives** [1] -
129:18
**exposure** [2] - 57:1,
57:2
**express** [4] - 104:20,
158:12, 158:19,
201:9
**expressed** [4] - 89:25,
116:17, 158:14,
158:16
**extensive** [1] - 110:25
**extent** [10] - 27:6,
29:19, 35:25, 96:21,
97:2, 161:6, 194:10,
219:1, 219:10, 222:4
**extra** [1] - 23:5
**extraction** [1] - 4:24
**eye** [15] - 13:1, 15:9,
15:11, 16:16, 16:22,
21:6, 21:9, 21:14,
35:4, 46:24, 92:5,
93:17, 167:24,
189:3, 189:11
**eyeglasses** [2] -
152:20, 152:21
**eyes** [18] - 35:11,
102:22, 102:25,
109:19, 109:23,
109:24, 112:11,
112:13, 147:6,
147:7, 147:11,
147:17, 147:18,
151:14, 194:2,
209:13, 209:18

**F**

**face** [5] - 50:15, 50:20,
72:19, 78:5, 189:10
**facilitate** [1] - 41:5
**facilities** [1] - 42:10
**facility** [2] - 41:16,
44:4
**facing** [6] - 18:15,
18:18, 18:20, 32:21,
32:23
**fact** [6] - 10:4, 101:19,
136:5, 155:17,
168:23, 185:12
**facts** [4] - 92:22,
135:25, 217:12,
217:13
**fair** [8] - 56:8, 56:9,
127:6, 145:20,
146:7, 172:24,
183:18, 213:14
**fairly** [3] - 33:3, 59:16,

167:17
**fall** [2] - 40:23, 97:9
**familiar** [7] - 47:7,
47:20, 63:18, 64:6,
107:7, 137:21,
142:20
**familiarized** [1] -
123:11
**family** [10] - 29:1, 29:2,
143:17, 150:17,
158:21, 165:1,
165:4, 165:7,
203:10, 209:11
**far** [7] - 29:20, 65:14,
103:3, 105:13,
110:5, 111:1, 211:16
**Far** [2] - 130:10
**father** [1] - 143:17
**fatigue** [1] - 65:23
**fatigues** [1] - 117:9
**FBI** [66] - 5:25, 7:21,
7:22, 8:3, 8:9, 8:12,
16:7, 25:21, 26:10,
26:12, 40:4, 40:5,
40:15, 63:13,
100:12, 107:25,
119:14, 121:12,
121:13, 121:16,
121:19, 122:12,
122:13, 122:19,
123:20, 123:22,
125:19, 126:15,
128:13, 128:14,
128:15, 128:17,
129:8, 131:7,
131:13, 131:14,
135:11, 135:13,
135:18, 136:21,
141:23, 141:25,
142:1, 159:24,
160:2, 160:6,
162:12, 168:12,
169:23, 170:3,
173:8, 173:18,
174:13, 176:25,
177:3, 179:2, 179:3,
179:8, 179:12,
179:13, 180:24,
181:11, 190:2,
202:4, 211:3, 211:7
**FBI's** [1] - 26:6
**fear** [1] - 32:1
**fearful** [2] - 94:7, 94:9
**federal** [1] - 132:2
**Federal** [6] - 25:22,
40:11, 126:13,
163:3, 164:25,
177:22
**fell** [2] - 97:4, 116:20
**fellow** [1] - 129:13

**felt** [6] - 31:7, 34:2,
81:9, 89:17, 190:21,
200:1
**fever** [1] - 65:23
**few** [10] - 14:15, 47:6,
69:20, 153:24,
154:6, 155:1, 180:9,
188:12, 216:16,
217:22
**field** [3] - 25:25, 26:1,
132:13
**figure** [1] - 181:7
**filed** [1] - 4:21
**final** [6] - 6:12, 85:6,
108:5, 112:7,
158:22, 159:14,
217:24
**finally** [1] - 216:9
**findings** [3] - 64:22,
66:9, 76:9
**fine** [7] - 31:7, 31:8,
34:4, 34:6, 36:19,
220:3, 222:19
**finger** [1] - 166:19
**fingerprinted** [1] -
53:11
**fingerprints** [1] -
52:10
**fingers** [1] - 151:14
**finish** [5] - 157:22,
157:25, 158:1,
205:5, 205:6
**finished** [2] - 103:5,
205:18
**finishing** [1] - 40:17
**firm** [1] - 102:2
**first** [118] - 7:15, 12:6,
12:22, 14:9, 14:10,
15:25, 20:7, 20:8,
20:12, 20:19, 22:10,
25:14, 28:10, 31:5,
32:2, 32:20, 33:10,
39:22, 44:6, 44:7,
44:9, 44:11, 44:14,
44:25, 45:23, 46:5,
47:4, 47:12, 47:14,
58:11, 64:12, 64:25,
68:25, 72:13, 73:9,
86:8, 89:10, 89:11,
89:13, 91:19,
100:22, 100:24,
104:7, 105:1, 111:7,
114:23, 115:24,
116:1, 121:1,
122:10, 124:8,
125:2, 136:25,
142:3, 143:24,
145:8, 145:13,
149:6, 150:1, 150:2,
151:3, 151:21,

152:5, 152:16,
153:16, 155:18,
156:2, 162:20,
162:24, 170:13,
174:23, 175:14,
175:15, 178:22,
180:15, 180:17,
188:2, 188:16,
189:18, 189:19,
189:21, 190:11,
190:24, 191:3,
191:7, 192:5,
192:10, 192:12,
192:16, 192:20,
193:20, 194:5,
195:12, 195:15,
197:8, 197:15,
198:17, 198:21,
200:6, 202:6, 207:1,
207:11, 207:14,
208:2, 208:5, 208:9,
209:13, 210:2,
210:25, 211:17,
211:18, 213:12,
213:20, 213:21,
217:24, 222:7
**fit** [1] - 104:24
**five** [3] - 47:24, 121:7,
164:11
**five-man** [1] - 47:24
**fixation** [1] - 78:22
**flecks** [1] - 49:8
**fleece** [1] - 16:18
**flip** [1] - 149:13
**Floor** [1] - 1:18
**floor** [1] - 94:1
**fluent** [1] - 27:15
**Fly** [3] - 26:2, 26:4,
26:6
**flying** [1] - 97:5
**focus** [4] - 14:8, 56:10,
81:25, 86:6
**focused** [1] - 56:12
**focusing** [3] - 11:21,
12:8, 177:12
**folks** [4] - 61:3, 61:4,
93:16, 93:18
**follow** [24] - 4:3, 6:9,
28:25, 29:14, 38:17,
38:20, 82:25, 83:7,
85:16, 87:11, 88:24,
94:21, 105:6, 115:6,
117:14, 117:16,
160:19, 160:23,
184:14, 189:15,
192:15, 203:23,
216:23, 217:23
**follow-on** [2] - 83:7,
105:6
**follow-up** [4] - 28:25,

82:25, 85:16, 217:23
**followed** [5] - 5:24,
19:12, 68:2, 68:3,
114:24
**following** [25] - 6:1,
17:6, 17:8, 31:18,
34:17, 46:4, 53:11,
53:13, 56:4, 69:19,
74:12, 81:12, 91:6,
91:13, 104:11,
121:8, 147:6, 147:7,
147:16, 147:17,
147:18, 151:13,
156:3, 205:16
**follows** [1] - 65:16
**font** [1] - 139:15
**food** [3] - 31:2, 191:1,
202:12
**FOR** [1] - 1:1
**Force** [10] - 6:10,
60:19, 60:21, 60:23,
62:6, 96:18, 96:19,
96:22, 97:3, 179:5
**force** [96] - 6:11,
42:24, 43:4, 43:9,
46:12, 47:9, 48:7,
48:21, 48:24, 49:16,
50:2, 53:1, 53:15,
54:9, 54:11, 55:14,
55:24, 58:6, 58:7,
58:22, 63:3, 75:5,
82:9, 82:11, 89:3,
97:12, 97:13, 97:15,
97:18, 97:21, 99:23,
100:2, 100:5, 100:9,
100:13, 101:11,
102:10, 102:14,
102:20, 102:23,
103:17, 103:22,
105:11, 105:14,
105:17, 105:18,
105:20, 108:10,
108:11, 108:18,
108:22, 108:23,
108:24, 109:7,
109:10, 109:15,
109:18, 110:6,
110:9, 111:1, 113:7,
113:18, 113:21,
113:25, 114:22,
115:8, 115:13,
116:4, 117:1, 117:4,
117:22, 137:23,
145:3, 145:11,
145:16, 145:20,
147:20, 148:4,
159:2, 179:3, 179:4,
188:19, 188:20,
188:21, 189:8,
189:15, 194:14,

195:17, 195:22,
196:4, 196:20,
200:14, 200:25,
202:18, 205:19
**forced** [1] - 103:21
**forces** [1] - 57:1
**foregoing** [1] - 223:5
**forehead** [1] - 113:14
**foreign** [1] - 41:3
**foremost** [1] - 73:9
**forget** [2] - 64:20,
187:5
**form** [28] - 64:13,
64:15, 65:1, 67:5,
75:24, 132:4,
156:24, 161:21,
162:10, 162:13,
162:17, 162:19,
166:3, 166:7, 166:9,
166:19, 176:3,
192:5, 192:16,
192:21, 193:9,
193:12, 208:10,
210:1, 212:16,
214:16, 214:19
**formats** [1] - 132:12
**former** [2] - 37:5,
220:18
**forms** [5] - 63:23,
64:10, 64:19, 64:24,
168:9
**forth** [4] - 9:21, 65:24,
167:4, 209:16
**fortunate** [1] - 128:17
**forward** [7] - 18:16,
75:11, 96:1, 96:3,
120:24
**four** [23] - 26:18,
27:10, 47:24, 55:7,
55:10, 58:23, 64:3,
64:25, 69:22,
130:18, 135:17,
143:9, 143:16,
144:19, 166:15,
166:18, 182:22,
182:25, 183:2,
183:14, 186:3,
205:25
**four-part** [2] - 143:16,
166:15
**four-step** [1] - 64:25
**Fourth** [1] - 1:14
**fourth** [8] - 64:15,
65:6, 131:1, 152:7,
205:12, 214:11,
215:15, 216:3
**fracture** [1] - 78:23
**frame** [1] - 22:14
**free** [1] - 7:9
**friends** [1] - 130:2

**front** [19] - 3:25, 9:12,
13:6, 16:21, 21:5,
29:9, 42:12, 64:2,
99:2, 102:23,
103:22, 136:12,
138:19, 166:3,
184:11, 193:20,
214:19, 214:21,
214:23
**FTOC** [1] - 41:2
**full** [8] - 8:3, 12:16,
121:16, 166:15,
166:24, 220:2,
220:25, 223:6
**full-time** [2] - 8:3,
121:16
**fully** [3] - 101:3, 101:8,
219:21
**function** [1] - 92:12
**functioning** [1] -
125:25
**future** [1] - 36:22

## G

**G-O-A-D** [1] - 7:17
**gag** [2] - 16:24, 17:4
**gain** [1] - 39:7
**garbage** [2] - 183:13,
195:20
**gasping** [1] - 19:19
**gauge** [1] - 111:21
**General** [1] - 65:23
**general** [7] - 114:6,
138:3, 149:3,
150:16, 168:22,
184:22, 189:22
**generally** [15] - 31:7,
36:18, 91:10, 93:11,
147:19, 153:16,
166:21, 166:23,
187:22, 190:23,
195:2, 199:15,
200:5, 205:14,
205:25
**generate** [1] - 63:23
**generated** [1] - 114:15
**generating** [1] - 64:18
**genesis** [1] - 107:11
**Geneva** [13] - 42:25,
43:23, 53:14,
105:21, 106:16,
109:1, 116:15,
139:24, 140:11,
140:21, 147:1,
147:4, 161:11
**genital** [1] - 71:22
**genital/urinary** [1] -
95:3
**gentleman** [1] -

110:17
**gently** [1] - 54:10
**Georgia** [1] - 133:9
**given** [34] - 13:16,
23:10, 24:4, 24:10,
37:9, 51:23, 56:3,
70:19, 98:13,
101:21, 104:4,
115:17, 115:18,
133:14, 141:1,
142:7, 144:6, 151:5,
155:12, 156:6,
169:23, 171:7,
171:9, 172:11,
173:17, 174:23,
175:5, 197:5,
198:14, 198:17,
199:20, 205:3,
210:5, 219:25
**glasses** [30] - 71:6,
111:8, 111:9,
111:11, 111:13,
152:22, 152:25,
153:2, 166:6, 168:4,
168:5, 168:6,
168:14, 168:16,
168:17, 194:7,
194:11, 194:12,
194:16, 194:17,
194:24, 195:2,
195:4, 195:7,
195:10, 199:12,
211:12, 211:16,
211:19
**glossary** [4] - 129:12,
129:14, 129:17,
129:20
**Goad** [8] - 5:21, 7:3,
7:8, 7:17, 7:18, 9:2,
9:11, 12:22
**GOAD** [2] - 2:3, 7:11
**goal** [3] - 211:6, 211:8,
211:9
**governing** [1] - 42:24
**government** [19] - 7:2,
14:21, 24:13,
119:14, 121:1,
132:2, 176:13,
190:3, 217:8, 218:1,
218:3, 218:6,
218:19, 219:5,
219:13, 221:22,
222:5, 222:12
**Government's** [71] -
9:13, 15:4, 15:6,
15:8, 42:14, 42:19,
42:21, 43:2, 43:3,
43:15, 43:17, 43:20,
43:22, 44:24, 45:17,
45:19, 48:12, 49:2,

49:3, 50:13, 50:14,
50:17, 50:19, 50:25,
51:6, 51:15, 51:19,
51:25, 61:15, 64:6,
64:13, 65:8, 65:17,
67:9, 67:18, 72:13,
72:17, 76:17, 76:22,
77:8, 77:15, 77:22,
77:24, 78:11, 81:1,
82:13, 83:23, 85:25,
99:6, 107:4, 111:6,
114:19, 114:21,
114:25, 139:17,
140:2, 140:4, 140:7,
140:14, 140:17,
140:21, 142:13,
143:2, 144:1,
144:13, 144:16,
155:11, 198:6,
198:7, 202:1, 214:17
**government's** [5] -
6:24, 50:22, 51:3,
219:10, 222:1
**grabbed** [3] - 11:17,
24:16, 24:18
**grabbing** [1] - 24:15
**Grade** [1] - 134:23
**grading** [1] - 125:13
**graduate** [2] - 127:1,
127:3
**graduating** [1] - 62:2
**graduation** [1] -
134:24
**grandfather** [1] -
143:17
**great** [2] - 46:17, 220:7
**Great** [1] - 133:11
**grew** [1] - 135:12
**grounds** [1] - 222:3
**group** [6] - 61:3,
130:25, 131:2,
131:3, 134:15,
180:23
**groups** [2] - 13:20,
13:24
**guard** [89] - 6:11,
42:24, 43:4, 43:9,
46:12, 47:9, 48:7,
48:21, 48:24, 49:16,
50:2, 53:1, 53:15,
54:8, 55:14, 58:22,
63:3, 82:9, 82:11,
97:11, 97:13, 97:15,
97:18, 97:21, 99:23,
100:2, 100:5, 100:9,
100:13, 101:11,
101:25, 102:10,
102:14, 102:20,
102:23, 103:17,
103:22, 104:9,

105:11, 105:13,
105:14, 105:17,
105:18, 105:20,
108:10, 108:11,
108:18, 108:22,
108:23, 108:24,
109:7, 109:10,
109:15, 109:17,
110:6, 110:9, 111:1,
113:7, 113:18,
113:21, 113:25,
114:22, 115:8,
116:4, 117:1, 117:4,
117:22, 137:23,
145:3, 145:11,
145:16, 145:20,
147:20, 148:4,
159:2, 188:19,
188:20, 188:21,
189:8, 189:15,
194:14, 195:17,
195:22, 196:4,
196:20, 200:14,
200:25, 202:18,
205:19
**guards** [6] - 44:18,
101:22, 101:25,
141:4, 141:5, 145:9
**guess** [2] - 93:12,
212:20
**guessing** [1] - 55:4
**guidance** [4] - 102:1,
102:4, 102:10, 106:9
**guide** [1] - 65:8
**guidelines** [1] - 43:24
**Gulf** [2] - 130:19,
130:20
**gun** [1] - 111:21
**guys** [2] - 171:25,
204:10
**gym** [2] - 183:9,
183:10

## H

**half** [6] - 69:21, 95:24,
164:10, 165:13,
172:24, 177:4
**hallucinations** [2] -
71:19, 90:19
**halted** [1] - 105:7
**HAN** [1] - 25:17
**hand** [12] - 7:6, 24:17,
25:8, 39:17, 60:9,
96:7, 112:1, 119:16,
139:13, 175:16,
176:17, 181:13
**hand-held** [1] - 181:13
**handcuffed** [4] - 13:6,
21:4, 102:23, 189:4

**handcuffing** [1] - 17:3
**handcuffs** [9] - 12:25,
13:5, 15:10, 102:24,
109:19, 109:23,
114:5, 115:3, 189:10
**handful** [2] - 9:6, 9:7
**handling** [1] - 30:8
**hands** [4] - 16:21,
97:19, 113:14, 189:4
**hands-on** [1] - 97:19
**handwriting** [1] -
170:21
**handwritten** [3] -
99:12, 144:10,
144:23
**happier** [1] - 205:14
**happy** [2] - 96:2,
217:10
**hard** [5] - 90:12, 91:11,
133:24, 152:24,
200:7
**harm** [1] - 112:15
**harmed** [2] - 204:17,
204:18
**hazards** [1] - 63:1
**head** [14] - 71:10,
101:17, 102:9,
102:12, 103:15,
112:8, 112:9,
112:11, 113:6,
117:17, 117:19,
145:19, 147:11,
193:7
**headaches** [1] - 69:25
**heading** [2] - 143:6,
144:19
**headquarters** [5] -
131:14, 169:23,
171:10, 173:18,
173:21
**healed** [1] - 72:12
**health** [7] - 53:7,
71:14, 71:16, 90:23,
94:21, 189:22, 197:5
**healthcare** [1] - 53:9
**hear** [7] - 3:15, 15:13,
47:16, 83:14,
119:11, 217:10,
222:6
**heard** [1] - 167:25
**HEARING** [1] - 1:9
**hearing** [11] - 4:2,
6:21, 47:15, 149:21,
149:23, 189:3,
189:11, 194:4,
220:6, 222:5, 222:20
**heavy** [2] - 14:14, 15:1
**height** [1] - 49:18
**held** [5] - 62:22, 62:25,
63:7, 113:19, 181:13

**HELD** [1] - 1:9
**hello** [1] - 96:5
**help** [9] - 34:16, 35:12,
41:5, 43:12, 47:1,
93:19, 115:25,
193:18, 193:19
**helped** [2] - 102:15,
150:21
**hereby** [1] - 223:4
**hi** [1] - 37:21
**high** [5] - 33:3, 128:6,
128:18, 128:21,
129:15
**high-level** [2] - 128:18,
129:15
**high-ranking** [1] -
128:21
**highest** [3] - 8:16,
26:19, 135:4
**highlight** [1] - 69:15
**himself** [8] - 28:22,
28:23, 28:24, 66:20,
70:6, 83:5, 85:21,
112:15
**hip** [1] - 191:5
**hips** [1] - 84:14
**hired** [1] - 124:21
**hiring** [1] - 124:5
**history** [7] - 65:12,
69:2, 69:4, 70:6,
70:8, 74:2, 82:19
**hit** [2] - 33:5, 42:5
**hitting** [2] - 19:8,
46:18
**hoist** [9] - 41:20, 45:4,
46:11, 46:15, 46:17,
47:7, 47:17, 47:18,
47:24
**hoisted** [3] - 47:4,
101:2, 101:11
**hold** [1] - 61:11
**home** [2] - 129:24,
179:25
**hone** [1] - 129:11
**honest** [2] - 158:9,
167:9
**Honor** [72] - 3:2, 3:8,
3:12, 3:20, 4:13,
4:19, 4:23, 5:5, 5:8,
5:12, 5:14, 7:2,
23:18, 24:20, 24:24,
25:3, 39:10, 51:14,
51:16, 54:20, 59:9,
59:15, 59:24, 60:2,
70:3, 88:9, 94:15,
94:17, 96:2, 110:19,
116:10, 118:1,
118:3, 118:7, 119:2,
119:5, 119:13,
136:13, 139:25,

140:16, 143:1,
144:12, 153:8,
153:13, 159:12,
172:3, 175:22,
176:9, 176:12,
178:19, 213:9,
217:8, 217:16,
217:21, 218:9,
218:15, 219:15,
219:18, 220:3,
220:7, 220:8,
220:21, 221:3,
221:7, 221:12,
221:17, 221:24,
222:6, 222:10,
222:13, 222:18
**HONORABLE** [1] - 1:9
**hook** [1] - 21:2
**hooked** [2] - 18:12,
18:17
**hooking** [1] - 18:23
**hopefully** [1] - 222:15
**hopes** [1] - 30:7
**hospital** [1] - 61:24
**hostage** [4] - 7:25, 8:2,
8:5, 8:8
**hour** [10] - 57:13,
95:24, 118:9,
164:10, 165:13,
184:25, 199:19,
206:22, 207:8,
214:13
**hours** [21] - 69:22,
75:14, 75:16, 80:25,
81:1, 84:8, 85:7,
85:8, 115:24, 116:1,
184:24, 187:17,
188:10, 188:12,
188:13, 189:19,
202:16, 210:6,
210:14, 213:15,
213:23
**house** [1] - 44:3
**housing** [1] - 98:17
**HPI** [3] - 65:12, 65:17,
86:3
**HPSP** [1] - 62:1
**HUA** [1] - 39:25
**humane** [1] - 97:16
**humanely** [1] - 54:10
**humiliation** [1] -
106:13
**hundred** [2] - 122:23,
123:6
**hurt** [4] - 34:3, 36:19,
36:20, 83:5
**hurting** [1] - 85:21
**hypothermic** [3] -
105:1, 105:5, 105:7

## I

**idea** [3] - 181:19,
184:22, 184:24
**ideal** [1] - 73:10
**ideation** [1] - 83:4
**ideations** [1] - 85:20
**identification** [8] -
12:20, 29:12, 45:18,
86:17, 86:19,
110:20, 136:14,
178:20
**identified** [12] - 14:16,
24:9, 28:24, 29:4,
31:9, 48:12, 49:14,
49:15, 50:10, 63:4,
99:5, 183:8
**identify** [8] - 3:7,
12:14, 15:13, 28:17,
28:23, 82:14, 86:13,
110:15
**identifying** [1] - 28:22
**ill** [2] - 195:19, 197:6
**illness** [4] - 65:13,
69:2, 69:4, 82:19
**imam** [7] - 41:19, 42:1,
44:12, 46:9, 49:5,
49:10, 59:3
**Imam** [109] - 3:4, 3:13,
3:15, 8:22, 10:5,
10:19, 11:2, 11:22,
11:25, 12:1, 12:3,
12:6, 13:12, 23:24,
28:2, 28:4, 28:16,
28:18, 29:3, 29:5,
29:17, 30:7, 30:9,
30:21, 30:24, 31:2,
31:6, 31:13, 31:20,
33:13, 33:23, 34:2,
34:7, 34:10, 34:20,
35:19, 35:24, 36:9,
36:24, 37:10, 37:23,
38:16, 38:22, 40:24,
41:7, 46:5, 47:12,
47:23, 53:25, 54:3,
54:16, 55:3, 57:20,
60:1, 62:7, 67:12,
67:23, 68:1, 88:24,
89:17, 89:25, 93:22,
97:10, 98:2, 98:9,
116:15, 117:2,
117:13, 117:23,
119:4, 119:11,
136:3, 136:6, 136:8,
136:14, 137:2,
160:16, 161:9,
162:7, 163:13,
165:1, 165:4,
165:20, 166:3,
166:10, 169:9,

170:14, 170:16,
171:18, 173:12,
176:3, 178:12,
178:15, 178:23,
180:8, 180:12,
181:21, 181:25,
182:21, 182:22,
183:7, 185:13,
185:18, 206:21,
207:1, 207:22,
208:22, 211:6, 213:3
**IMAM** [1] - 1:6
**imam's** [2] - 42:24,
50:15
**Imam's** [7] - 10:8,
13:7, 41:24, 42:8,
46:4, 55:25, 90:7
**immediate** [2] - 14:8,
53:9
**immediately** [11] -
14:11, 14:13, 33:22,
79:11, 92:13, 92:20,
93:3, 95:7, 156:25,
204:15, 204:24
**impact** [2] - 44:16,
80:7
**impacted** [1] - 19:6
**impair** [3] - 92:19,
93:2, 93:7
**impaired** [1] - 92:12
**implement** [1] - 211:9
**important** [2] - 15:15,
32:6
**impossible** [1] - 57:8
**impractical** [1] -
135:15
**improve** [1] - 129:12
**IN** [1] - 1:1
**in-court** [3] - 110:20,
136:14, 178:20
**incentive** [2] - 126:1,
126:2
**incident** [2] - 46:19,
79:23
**include** [8] - 44:4,
45:2, 89:19, 90:2,
100:24, 130:19,
130:23, 220:6
**included** [2] - 103:10,
116:18
**including** [5] - 74:16,
79:25, 122:20,
132:21, 197:3
**inclusive** [2] - 116:19,
116:22
**independent** [1] -
66:21
**Indianapolis** [2] -
25:25, 26:1
**indicate** [8] - 69:8,

71:2, 81:6, 83:9,
84:11, 84:16, 85:11,
85:22
**indicated** [6] - 36:16,
65:9, 73:4, 76:3,
76:15, 85:23
**indicates** [1] - 83:25
**individual** [12] - 8:21,
11:17, 12:11, 29:4,
40:24, 67:11, 91:10,
91:11, 97:10, 98:11,
136:3, 184:19
**individuals** [22] -
10:25, 11:16, 11:17,
12:24, 13:13, 19:11,
47:6, 88:16, 91:7,
91:24, 92:12, 110:2,
110:4, 122:24,
123:2, 125:10,
128:25, 131:8,
131:20, 137:12,
137:24, 173:7
**indulgence** [5] -
23:15, 37:14, 54:18,
88:6, 116:8
**inform** [3] - 31:25,
220:10, 220:11
**information** [20] -
3:23, 29:17, 66:1,
66:10, 69:12, 69:18,
75:24, 76:5, 78:17,
82:6, 82:10, 124:10,
129:14, 132:12,
218:23, 218:25,
219:3, 219:22,
220:15, 220:22
**informed** [4] - 34:15,
116:15, 116:20,
117:13
**informing** [1] - 32:4
**inhumane** [1] - 106:13
**initial** [41] - 6:5, 11:21,
12:8, 14:10, 48:19,
49:16, 50:6, 50:16,
53:4, 56:17, 64:11,
64:14, 67:4, 68:1,
68:10, 69:9, 74:12,
74:14, 75:12, 75:17,
76:12, 77:19, 81:4,
87:1, 94:5, 94:6,
101:20, 103:5,
113:3, 149:25,
151:4, 166:18,
166:20, 166:24,
167:3, 183:22,
190:16, 197:18,
205:1, 207:12
**initialled** [3] - 152:12,
174:16, 175:2
**initials** [2] - 152:10

**initiated** [5] - 11:2,
12:6, 102:17, 103:9,
108:17
**injuries** [13] - 17:22,
36:12, 50:8, 53:22,
72:10, 77:20, 78:10,
78:15, 78:18, 78:20,
112:19, 113:19,
114:4
**injury** [9] - 36:13,
51:12, 51:24, 52:2,
91:17, 92:11, 113:3,
114:16, 115:1
**inprocessing** [31] -
42:11, 46:14, 48:16,
49:6, 49:13, 49:16,
53:8, 56:7, 98:4,
98:5, 98:12, 98:18,
98:23, 99:12,
100:23, 102:17,
102:19, 102:20,
103:1, 103:9,
103:12, 103:16,
103:19, 104:2,
105:8, 106:3, 107:2,
107:14, 108:3,
108:8, 112:22
**inquire** [2] - 194:25,
197:5
**inside** [21] - 13:7,
13:13, 15:14, 19:11,
22:1, 26:10, 42:22,
42:23, 49:6, 51:4,
53:12, 57:25, 58:18,
58:25, 59:1, 59:7,
78:7, 107:16,
109:15, 112:10,
183:14
**insofar** [1] - 76:8
**installed** [2] - 181:13,
181:15
**instance** [3] - 45:3,
138:6, 182:20
**instances** [5] - 74:7,
88:16, 154:6, 169:2,
169:4
**instituting** [1] - 43:9
**instructed** [4] -
101:16, 102:9,
103:16, 138:5
**instruction** [6] - 30:16,
52:9, 70:18, 101:20,
101:21, 169:22
**instructions** [38] -
17:6, 17:8, 17:9,
17:12, 23:10, 24:1,
24:4, 24:10, 24:11,
30:10, 30:12, 30:19,
30:22, 31:14, 36:24,
37:2, 38:16, 38:17,

38:19, 39:8, 52:7,
52:12, 52:19, 52:21,
52:23, 56:13, 70:16,
70:23, 70:25,
101:24, 102:7,
103:13, 105:12,
117:14, 117:16,
145:12, 145:13,
171:9
**instructor** [1] - 37:11
**intake** [8] - 64:11,
64:14, 65:1, 67:4,
67:5, 81:4, 87:1,
103:5
**intellect** [1] - 209:6
**intend** [3] - 4:18, 6:20,
217:22
**intended** [2] - 137:11,
184:8
**intending** [1] - 180:14
**intends** [1] - 217:17
**intent** [1] - 219:11
**interacted** [2] - 115:5,
117:1
**interaction** [5] - 31:5,
97:17, 110:10,
111:2, 150:10
**interactions** [6] -
37:23, 55:3, 63:19,
110:6, 112:17,
117:23
**interchange** [1] -
208:20
**interest** [1] - 132:2
**interference** [1] -
44:20
**internal** [1] - 78:22
**internally** [2] - 179:11,
179:22
**interpret** [7] - 68:18,
121:24, 122:6,
127:7, 138:4,
141:10, 160:17
**interpretation** [22] -
122:3, 122:4,
122:22, 123:2,
126:14, 126:16,
126:20, 126:25,
127:5, 127:6,
128:16, 132:5,
132:22, 134:2,
137:11, 153:21,
153:22, 154:8,
158:23, 160:17,
162:6, 170:2
**interpreted** [4] - 121:4,
128:10, 128:20,
154:25

52:5, 52:8, 52:20,
68:6, 68:18, 86:21,
87:3, 87:8, 101:15,
101:22, 102:11,
105:11, 106:18,
106:19, 107:24,
115:24, 116:2,
117:4, 121:5,
122:15, 126:19,
128:1, 128:3, 128:6,
132:23, 133:22,
159:24, 184:19,
200:8, 212:3, 212:6,
212:7, 215:11
**interpreting** [3] -
160:9, 170:7, 170:10
**interrogated** [1] -
208:7
**interrogating** [3] -
206:20, 207:23,
207:25
**interrogation** [7] -
162:7, 162:20,
162:25, 163:18,
167:6, 171:17, 207:1
**interrogations** [1] -
206:22
**interview** [130] - 41:17,
45:5, 45:6, 45:12,
45:13, 45:14, 45:20,
56:20, 68:10, 108:6,
109:8, 111:8, 124:6,
124:12, 136:2,
136:17, 142:6,
146:9, 146:10,
146:13, 148:22,
148:23, 149:4,
149:5, 149:7,
149:16, 149:17,
150:11, 151:4,
153:16, 153:17,
154:19, 154:23,
155:10, 155:12,
155:23, 156:2,
156:3, 156:24,
165:9, 167:8, 170:4,
172:8, 172:11,
172:20, 173:3,
177:24, 178:11,
179:1, 180:15,
180:16, 180:18,
180:24, 180:25,
181:6, 181:13,
181:15, 181:20,
181:21, 182:10,
182:12, 182:15,
183:6, 183:10,
184:4, 185:11,
185:12, 185:17,
185:20, 188:9,

188:17, 190:24,
191:7, 192:6,
192:10, 195:12,
195:15, 195:24,
196:2, 196:8,
196:14, 196:23,
197:1, 197:8,
197:14, 198:14,
199:10, 199:14,
199:16, 200:6,
200:10, 200:17,
200:18, 200:20,
201:2, 201:21,
201:22, 202:2,
202:7, 202:8, 202:9,
202:10, 202:11,
202:17, 202:22,
205:12, 207:14,
208:8, 209:10,
209:12, 209:13,
210:2, 210:10,
210:13, 210:15,
210:25, 211:8,
211:21, 213:17,
213:20, 214:2,
214:3, 214:4, 214:6,
214:7, 214:11,
215:10, 215:15,
216:3
**Interview** [1] - 202:14
**interviewed** [6] -
156:5, 172:22,
178:2, 189:15,
210:22, 213:21
**interviewee** [2] -
181:17, 185:4
**interviewer** [1] -
172:22
**interviewers** [2] -
182:11, 185:19
**interviewing** [5] -
131:8, 169:10,
169:22, 180:8, 183:7
**interviews** [45] - 46:1,
54:16, 98:25,
108:14, 108:21,
109:8, 109:11,
122:16, 122:18,
122:21, 123:5,
123:7, 123:15,
131:17, 131:19,
136:5, 142:2,
148:20, 150:6,
155:24, 173:6,
177:14, 177:19,
178:1, 178:4,
178:23, 179:10,
179:12, 180:16,
181:2, 181:4, 182:5,
183:24, 184:23,

185:3, 185:21,
186:3, 195:10,
205:22, 205:25,
210:8, 211:17,
213:6, 216:10
**intonation** [1] - 37:13
**intoxication** [1] -
90:20
**introduce** [6] - 7:15,
25:14, 39:21,
119:22, 163:16,
176:23
**introduced** [4] - 163:1,
163:21, 163:24,
189:23
**introduction** [4] -
164:20, 164:22,
165:6, 165:8
**introductions** [2] -
164:16, 196:25
**introductory** [1] -
164:7
**investigation** [5] -
41:1, 131:19, 136:1,
162:25, 216:17
**Investigation** [6] -
25:23, 40:12,
126:13, 163:4,
164:25, 177:23
**investigations** [3] -
26:9, 122:19, 123:1
**investigators** [1] -
132:4
**invocation** [1] -
215:17
**involve** [1] - 92:10
**involved** [19] - 8:20,
24:15, 28:1, 40:23,
41:1, 41:19, 42:3,
49:17, 62:6, 62:9,
97:8, 97:11, 98:11,
98:25, 123:5,
131:22, 137:5, 142:4
**involvement** [2] -
164:2, 164:3
**involves** [1] - 112:9
**involving** [4] - 8:21,
28:1, 62:6, 97:9
**Iraq** [3] - 130:10,
130:20, 134:21
**issue** [5] - 79:20,
95:13, 186:18,
206:21, 218:16
**issues** [12] - 22:4,
48:2, 71:3, 71:8,
71:14, 71:16, 73:15,
75:21, 76:4, 146:2,
146:12, 206:8
**issuing** [1] - 102:10
**items** [3] - 68:15,

99:13, 111:4
**itself** [6] - 45:6, 47:6,
58:19, 73:23,
111:25, 220:18

## J

**jacket** [2] - 16:20,
17:18
**jeopardized** [1] - 14:6
**Jerusalem** [1] - 120:1
**job** [11] - 93:5, 122:15,
126:20, 148:25,
149:1, 172:7,
172:10, 172:19,
172:20, 172:21,
173:8
**John** [2] - 3:8, 120:22
**JOHN** [1] - 1:12
**john.cummings@
  usdoj.gov** [1] - 1:16
**joined** [1] - 27:4
**joining** [4] - 8:8, 8:12,
26:1, 26:12
**joke** [1] - 150:22
**Jon** [2] - 16:13, 25:16
**JONAT** [1] - 25:16
**Jonathan** [2] - 5:25,
25:17
**JONATHAN** [2] - 2:5,
25:10
**Jordanian** [1] - 130:23
**JOS** [1] - 39:24
**JOSHUA** [2] - 2:8,
39:18
**Joshua** [2] - 6:3, 39:24
**JR** [1] - 1:12
**JUDGE** [1] - 1:10
**judicial** [1] - 209:24
**Judiciary** [1] - 1:14
**jury** [1] - 222:7
**Justice** [1] - 121:12

## K

**K-A-T-H** [1] - 25:17
**K-O-L-A-R-C-I-K** [1] -
39:25
**KAREN** [1] - 1:12
**Karen** [2] - 3:10, 119:5
**Kath** [18] - 5:25, 16:13,
17:10, 18:12, 19:9,
20:5, 20:18, 20:20,
21:1, 23:13, 23:14,
24:5, 25:16, 25:17,
26:22, 27:25, 39:6,
39:11
**KATH** [2] - 2:5, 25:10
**keep** [13] - 30:4, 34:15,
61:5, 61:6, 104:9,

111:19, 126:3,
129:5, 129:22,
162:22, 172:19,
193:1, 193:3
**kept** [2] - 9:24, 138:24
**khaki** [3] - 37:24, 38:4,
213:7
**khaki-style** [1] - 38:4
**kind** [44] - 8:3, 17:2,
22:14, 28:20, 29:14,
30:4, 31:24, 31:25,
32:7, 32:10, 33:10,
41:23, 43:13, 44:19,
47:20, 49:11, 62:24,
64:25, 65:7, 72:5,
73:13, 73:17, 86:6,
89:3, 101:5, 148:7,
148:8, 148:11,
168:11, 183:10,
184:3, 185:3,
185:19, 185:21,
185:24, 197:1,
197:3, 197:7,
198:21, 204:13,
204:21, 205:14,
219:23
**kind-spoken** [1] -
148:11
**kinds** [1] - 90:17
**knock** [1] - 217:9
**knocked** [4] - 19:5,
19:15, 33:5, 33:6
**knocks** [2] - 105:15,
108:17
**knowledge** [13] -
10:14, 19:22, 22:19,
46:1, 48:23, 58:5,
58:14, 58:16, 80:20,
82:10, 100:6,
103:23, 216:17
**known** [4] - 8:21,
40:24, 67:12, 97:10
**knows** [2] - 43:13,
185:4
**KOLARCIK** [2] - 2:8,
39:18
**Kolarcik** [6] - 6:3,
39:24, 40:1, 40:22,
43:25, 58:5
**Kuwait** [1] - 130:20

## L

**L-A-R-K-I-N** [1] - 177:2
**lack** [1] - 94:24
**language** [17] - 120:2,
121:20, 121:23,
122:6, 123:23,
124:7, 124:21,
125:22, 125:23,

125:24, 126:3,
129:5, 129:10,
129:23, 135:1,
137:22, 148:14
**large** [2] - 33:4, 45:12
**largely** [1] - 27:22
**LARKIN** [2] - 2:18,
176:18
**Larkin** [12] - 6:14,
142:1, 148:21,
159:9, 170:14,
170:16, 176:13,
176:21, 176:24,
177:3, 206:17,
213:12
**last** [26] - 7:15, 25:15,
25:17, 38:22, 39:22,
40:21, 55:18, 69:21,
80:20, 81:9, 84:3,
104:7, 119:24,
129:21, 144:17,
156:4, 167:8,
167:10, 170:15,
171:23, 177:1,
207:13, 209:10,
209:12, 210:13,
211:21
**Last** [1] - 218:17
**lasted** [1] - 207:6
**late** [3] - 39:1, 195:15
**latrine** [6] - 44:3, 44:7,
44:9, 44:12, 44:15,
138:6
**law** [17] - 97:17, 98:25,
108:5, 108:11,
108:13, 108:20,
109:8, 109:11,
109:14, 109:16,
111:7, 127:20,
129:18, 177:14,
177:23, 217:12
**lawyer** [12] - 152:6,
204:1, 204:2, 204:4,
204:6, 205:2,
211:21, 212:2,
212:23, 213:1,
215:19, 216:6
**lawyers** [2] - 179:14,
180:7, 202:4,
210:23, 211:3
**layer** [1] - 109:24
**layers** [1] - 77:14
**lead** [4] - 6:17, 73:11,
73:13, 97:11
**leadership** [1] - 97:5
**learn** [1] - 9:5
**learned** [2] - 9:6, 26:24
**learning** [1] - 9:7
**least** [3] - 75:14, 79:3,
95:24

leave [1] - 205:6
Lebanese [1] - 130:24
lectern [1] - 3:6
led [1] - 147:11
left [14] - 29:9, 32:18,
51:2, 52:3, 52:17,
146:17, 147:8,
147:9, 175:16,
179:23, 189:12,
194:3, 205:21
left-hand [1] - 175:16
legend [1] - 78:1
less [2] - 32:10, 219:8
less-specific [1] -
219:8
Levant [1] - 130:22
level [29] - 27:2, 48:1,
104:10, 110:2,
113:11, 113:16,
113:24, 113:25,
125:6, 125:25,
127:5, 127:10,
127:17, 127:18,
127:24, 128:1,
128:2, 128:5,
128:11, 128:14,
128:16, 128:18,
129:15, 135:4,
135:7, 209:1, 209:3,
219:24
levels [2] - 126:3,
126:25
leverage [9] - 98:20,
107:21, 110:9,
111:1, 111:10,
111:21, 111:22,
112:11, 117:4
leveraged [3] - 98:17,
107:24, 115:24
levied [1] - 103:25
liaison [1] - 57:10
Libya [8] - 8:24, 28:5,
131:3, 131:13,
131:20, 131:23,
163:12, 219:4
Libyan [8] - 131:15,
131:18, 131:23,
132:1, 132:6, 132:7,
132:23, 134:11
Libyans [1] - 132:7
life [4] - 16:20, 17:14,
17:18, 150:16
lift [2] - 18:25, 33:10
lifting [2] - 19:3, 19:5
light [2] - 57:24, 57:25
lightheadedness [1] -
65:23
likewise [1] - 147:1
limit [5] - 44:17, 56:6,
57:1, 161:6

limited [4] - 27:6,
27:11, 57:9, 191:5
Line [3] - 111:5,
111:16
line [10] - 22:2, 65:2,
65:9, 103:10, 105:3,
106:19, 141:19,
143:12, 146:19
lines [4] - 90:20,
144:19, 215:19,
216:13
linguist [19] - 63:14,
63:16, 63:19,
100:13, 119:14,
120:20, 120:25,
135:11, 135:14,
135:19, 173:8,
179:7, 179:8, 184:4,
184:7, 188:23,
191:25, 209:16,
209:17
linguist's [1] - 198:11
linguists [1] - 129:13
LISA [1] - 223:4
Lisa [1] - 1:21
listed [2] - 68:15,
99:16
listen [1] - 129:25
listened [1] - 132:17
listening [3] - 70:20,
124:3, 173:22
literally [3] - 137:4,
137:15, 138:9
litter [11] - 42:3, 46:24,
101:2, 101:3, 101:5,
101:13, 101:14,
101:17, 102:8,
102:15, 102:16
live [2] - 133:9, 221:23
living [3] - 41:17,
98:22, 219:4
load [1] - 32:24
loaded [4] - 22:5,
22:11, 35:18, 35:20
local [4] - 11:5, 22:9,
97:6, 207:4
located [14] - 10:20,
11:10, 22:7, 22:16,
41:10, 45:22, 51:12,
51:25, 52:2, 59:7,
77:20, 78:3, 120:12,
190:5
location [34] - 13:17,
16:5, 16:7, 16:15,
16:16, 17:4, 17:22,
18:1, 18:3, 18:4,
18:7, 24:5, 28:12,
28:14, 28:15, 29:18,
29:20, 29:21, 29:22,
29:25, 31:6, 31:21,

31:23, 31:24, 32:2,
32:4, 32:13, 32:19,
98:23, 101:13,
101:14, 108:13,
108:19, 108:20
locations [2] - 30:3,
41:18
log [6] - 51:13, 56:18,
110:8, 111:1, 112:6,
112:8
logical [2] - 68:22,
70:9
logs [2] - 110:9, 112:7
look [20] - 35:10,
35:12, 50:12, 51:18,
51:19, 55:15, 65:1,
67:19, 72:14, 76:16,
94:1, 105:14,
105:23, 105:24,
107:3, 138:25,
174:9, 209:15,
209:18
looked [5] - 64:4,
129:21, 139:14,
214:16, 215:24
looking [13] - 55:9,
62:24, 103:14,
110:24, 111:16,
141:16, 144:16,
144:17, 168:14,
171:5, 193:23,
194:3, 209:15
looks [2] - 92:2,
152:10
lose [1] - 19:22
loss [1] - 71:10
lost [1] - 33:17
low [1] - 113:16
lower [1] - 117:9
lowered [1] - 101:14
lowering [1] - 47:21
lunch [4] - 96:1, 118:8,
118:9, 200:16
Lunch [1] - 118:11
lungs [1] - 70:21

**M**

M-E-C-L-I-Z-I-N-E [1] -
74:19
M1 [1] - 9:14
M10 [2] - 49:2, 49:4
M11 [5] - 50:13, 50:14,
72:14, 72:18, 72:20
M12 [5] - 50:18, 50:19,
72:14, 72:18, 72:20
M13 [4] - 50:22, 76:17,
76:22, 76:24
M14 [5] - 50:25, 76:17,
76:22, 77:8

M15 [3] - 51:3, 76:17,
77:15
M16 [3] - 51:6, 51:25,
76:17
M17 [5] - 64:7, 64:13,
65:8, 65:18, 76:7
M18 [3] - 67:18, 77:23,
77:24
M2 [3] - 15:4, 15:6,
15:8
M20 [1] - 81:1
M21 [4] - 81:22, 82:14,
83:25, 89:15
M22 [2] - 83:23, 84:7
M23 [3] - 85:7, 85:25,
89:23
M24 [1] - 99:6
M25 [4] - 107:5,
141:11, 141:13,
141:16
M26 [3] - 110:23,
110:24, 111:6
M27 [4] - 114:12,
115:1, 115:2, 115:3
M28 [2] - 114:19,
114:21
M29 [5] - 142:11,
142:13, 143:2,
153:5, 170:13
M3 [1] - 44:24
M30 [6] - 143:25,
144:2, 144:13,
144:16, 155:11,
155:13
M31 [1] - 141:1
M33 [2] - 51:15, 51:19
M4 [2] - 42:15, 55:9
M5 [6] - 42:20, 42:21,
48:12, 138:19,
138:20, 139:14
M6 [4] - 43:2, 43:3,
55:16, 138:25
M7 [3] - 43:16, 43:17,
58:9
M8 [5] - 43:21, 43:22,
139:18, 139:22,
140:14
M9 [2] - 45:18, 45:19
MA [1] - 134:13
ma'am [2] - 96:4,
118:5
Maghreb [7] - 131:2,
131:4, 131:9,
132:24, 134:13,
134:14, 134:18
main [1] - 180:9
maintain [2] - 21:2,
113:16
maintained [2] -
19:10, 33:9

major [2] - 60:22,
131:1
majority [1] - 205:19
maltreated [1] -
159:17
man [1] - 47:24
managed [1] - 122:13
management [1] -
173:25
maneuver [2] -
101:12, 102:18
Maneuver [2] - 98:11,
99:10
maneuvered [1] -
101:12
manifest [1] - 73:23
manner [4] - 42:2,
132:8, 184:8, 203:15
map [1] - 5:16
Marcano [17] - 142:1,
148:21, 159:9,
178:25, 179:5,
179:17, 180:6,
180:20, 183:1,
183:5, 184:17,
185:16, 186:1,
188:22, 196:17,
215:22, 215:25
Marcano's [1] - 179:25
March [2] - 1:4, 40:17
Marine [6] - 8:14, 8:17,
26:16, 26:17, 26:20,
37:5
mark [3] - 51:1, 51:7,
51:8
marked [13] - 9:13,
15:4, 42:19, 43:15,
43:20, 45:17, 49:2,
50:12, 50:17, 51:15,
83:22, 138:19,
139:17
markings [1] - 100:1
marks [3] - 50:20,
50:23, 59:3
mat [1] - 109:1
material [1] - 109:6
matt@clintonpeed.
com [1] - 1:20
matter [5] - 5:15,
62:21, 127:19,
127:21, 159:2
matters [2] - 3:23,
129:17
MATTHEW [1] - 1:17
Matthew [1] - 3:12
mean [3] - 19:13,
23:4, 27:15, 36:16,
42:9, 46:18, 65:21,
75:20, 89:11, 93:12,
93:14, 98:20, 117:8,

122:18, 129:16,
134:4, 154:3,
155:20, 160:10,
162:25, 163:7,
165:21, 166:21,
194:22, 195:9,
201:22, 206:23,
208:16, 215:13,
220:10
**means** [5] - 26:8,
27:12, 27:13, 75:21,
127:6
**meant** [6] - 87:4, 87:6,
93:15, 156:22,
169:14, 209:24
**measure** [2] - 45:7,
57:15
**measured** [1] - 49:19
**measurements** [3] -
41:16, 45:2, 45:5
**mechanical** [2] - 1:24,
47:25
**meclizine** [7] - 74:15,
74:18, 74:20, 75:16,
80:7, 81:16, 83:19
**medic** [5] - 10:18,
15:18, 15:19, 15:21,
15:22
**medical** [44] - 6:8,
10:9, 49:18, 53:5,
53:19, 58:22, 59:4,
61:1, 61:9, 62:2,
62:10, 63:6, 63:17,
69:9, 70:6, 72:22,
75:14, 75:21, 78:25,
82:1, 87:19, 87:20,
87:21, 87:24, 88:15,
89:23, 90:24, 91:6,
91:20, 92:2, 92:10,
98:18, 98:24, 103:9,
104:11, 104:25,
105:3, 105:8,
112:22, 112:25,
137:14, 137:15,
137:16, 137:18
**medically** [2] - 104:14,
208:1
**medication** [18] -
74:16, 74:20, 74:25,
75:1, 75:4, 75:6,
75:9, 79:24, 80:1,
81:20, 83:12, 83:15,
84:3, 84:18, 99:14,
186:19, 186:21,
196:1
**medications** [6] -
69:19, 80:6, 80:12,
80:15, 80:18, 187:6
**medicine** [6] - 60:24,
61:12, 61:22, 62:3,

74:15, 90:22
**medics** [1] - 186:17
**Mediterranean** [2] -
97:24, 136:17
**meet** [5] - 63:10,
63:13, 161:25,
183:23, 187:25
**meeting** [3] - 63:16,
190:11, 191:3
**meetings** [6] - 136:20,
136:21, 180:21,
200:16, 206:20,
207:21
**member** [14] - 8:5,
8:16, 10:12, 23:25,
26:2, 37:5, 60:15,
96:14, 100:9,
101:25, 108:23,
109:10, 115:8, 116:4
**members** [23] - 12:2,
12:5, 22:22, 48:24,
54:8, 63:2, 97:20,
99:22, 100:2, 100:5,
100:12, 100:13,
100:16, 103:22,
108:21, 109:7,
113:18, 116:25,
117:22, 136:21,
137:23, 188:20,
188:22
**memorandum** [1] -
112:24
**memorialize** [1] -
182:18
**memory** [7] - 9:24,
47:5, 51:11, 51:24,
67:20, 94:24, 163:20
**mental** [12] - 71:14,
71:16, 80:8, 80:9,
83:10, 87:24, 90:23,
94:21, 116:5, 209:1,
209:3, 212:18
**mention** [3] - 89:19,
125:21, 164:22
**mentioned** [20] -
43:25, 46:21, 47:17,
53:1, 58:17, 66:4,
68:5, 73:4, 79:2,
94:8, 106:11,
158:18, 158:21,
163:22, 164:16,
164:24, 167:6,
190:9, 190:20, 215:2
**merely** [2] - 173:20,
219:23
**messages** [1] - 132:17
**met** [5] - 128:24,
146:6, 179:13,
184:3, 188:2
**metal** [1] - 22:1

**meters** [4] - 45:11,
45:13
**method** [1] - 18:22
**methods** [1] - 11:14
**MFR** [1] - 114:1
**mic** [1] - 61:6
**Michael** [1] - 3:10
**MICHAEL** [1] - 1:13
**middle** [5] - 13:14,
65:9, 143:6, 144:18,
156:1
**Middle** [3] - 128:24,
130:7, 130:18
**midnight** [1] - 188:6
**might** [15] - 21:14,
35:9, 105:1, 133:9,
137:19, 153:24,
167:10, 192:14,
193:16, 204:1,
204:21, 212:1,
215:19, 216:6,
218:15
**military** [16] - 8:12,
26:13, 60:16, 88:18,
96:15, 96:24, 98:20,
100:7, 129:18,
136:21, 137:1,
137:3, 137:6, 141:4,
161:10
**Miller** [1] - 120:22
**mind** [1] - 206:9
**minimize** [1] - 44:16
**minimizing** [3] -
216:14, 216:18,
216:24
**minor** [1] - 72:11
**minute** [3] - 59:20,
143:24, 176:8
**minutes** [6] - 57:13,
59:22, 164:11,
205:10, 207:16
**Miranda** [48] - 123:8,
123:10, 123:16,
123:17, 142:7,
142:16, 144:5,
144:6, 151:5, 151:6,
151:9, 151:22,
152:15, 155:13,
155:16, 156:6,
156:9, 169:20,
169:21, 170:3,
172:10, 173:17,
173:18, 173:25,
174:5, 174:8,
174:12, 174:22,
175:5, 178:5, 191:8,
191:10, 191:13,
192:5, 192:9,
192:13, 192:16,
194:6, 198:13,

198:16, 198:22,
201:25, 203:17,
210:10, 210:22,
210:24, 214:19
**mirroring** [1] - 148:14
**misconduct** [1] -
170:9
**miss** [1] - 169:25
**missed** [1] - 158:21
**mission** [6] - 28:1,
97:20, 101:2, 160:9,
160:15, 178:11
**Mission** [1] - 163:12
**mistakes** [1] - 170:9
**mistreatment** [1] -
106:13
**Misurata** [2] - 8:24,
28:5
**Modern** [2] - 27:4,
27:7
**moment** [14] - 7:14,
8:1, 22:15, 25:13,
39:21, 51:18, 64:2,
72:14, 107:4, 125:3,
135:14, 145:8,
212:18, 212:25
**momentarily** [1] -
59:20
**monetary** [3] - 126:5,
126:10, 126:11
**money** [1] - 125:21
**monitor** [1] - 15:19
**monitored** [1] - 111:18
**months** [1] - 69:20
**mood** [1] - 82:3
**more-extensive** [1] -
110:25
**Moreira** [2] - 1:21,
223:11
**MOREIRA** [1] - 223:4
**moreover** [1] - 219:22
**morning** [36] - 3:8,
3:12, 5:4, 7:5, 23:22,
23:23, 25:6, 25:7,
37:20, 37:21, 39:1,
39:16, 54:25, 55:1,
59:18, 60:2, 60:7,
60:8, 60:13, 60:14,
188:3, 188:10,
188:13, 189:19,
196:7, 196:9,
197:12, 202:21,
202:23, 203:5,
203:17, 214:11,
217:25, 218:7,
221:11, 221:16
**Morocco** [3] - 130:10,
131:3, 134:21
**most** [3] - 21:8, 42:2,
135:22

**motion** [22] - 3:18,
6:24, 6:25, 73:5,
73:7, 73:9, 73:22,
74:1, 74:4, 74:9,
74:12, 74:23, 81:12,
83:15, 186:12,
186:19, 217:11,
217:13, 219:17,
221:13, 222:2
**motions** [1] - 4:2
**mouth** [5] - 11:18,
13:8, 16:25, 24:17,
53:12
**move** [13] - 4:11,
29:20, 29:23, 29:25,
30:2, 108:13,
108:19, 109:20,
111:22, 140:16,
143:1, 144:12,
154:19
**moved** [17] - 32:19,
32:21, 61:14, 61:19,
63:7, 102:16, 104:8,
105:8, 106:23,
108:20, 110:1,
138:6, 140:20,
143:4, 144:15,
145:20, 183:10
**movement** [4] - 18:10,
109:18, 110:5,
115:19
**movements** [5] - 23:2,
23:3, 94:12, 137:25,
147:10
**moves** [1] - 108:18
**movies** [1] - 129:25
**moving** [14] - 11:21,
23:8, 30:14, 32:10,
32:13, 32:16, 42:9,
59:16, 75:11, 98:14,
137:24, 155:10,
187:23, 194:2
**MR** [92] - 3:8, 3:12,
3:20, 3:22, 4:8, 4:13,
4:15, 4:19, 4:23, 5:5,
5:8, 5:12, 5:14, 5:18,
7:1, 7:13, 12:19,
23:15, 23:17, 23:21,
24:20, 24:24, 25:3,
25:12, 29:11, 37:14,
37:16, 37:19, 39:2,
39:3, 39:5, 39:10,
39:20, 51:14, 54:18,
54:20, 54:24, 58:2,
58:4, 59:9, 59:15,
60:2, 60:12, 61:13,
61:18, 70:3, 86:16,
88:6, 88:8, 88:12,
92:22, 94:14, 94:17,
94:19, 95:18, 95:24,

96:2, 96:10, 110:19, 116:8, 116:10, 116:13, 118:1, 118:3, 118:7, 140:19, 143:3, 144:14, 159:21, 172:3, 175:23, 175:25, 176:2, 176:5, 206:16, 213:9, 217:7, 217:16, 217:19, 217:21, 218:9, 218:11, 220:2, 220:7, 220:14, 220:21, 221:3, 221:6, 221:17, 221:19, 222:12, 222:17

MRE [2] - 109:3, 109:5
MS [34] - 119:5, 119:8, 119:13, 119:19, 136:13, 139:25, 140:16, 143:1, 144:12, 153:6, 153:10, 153:12, 159:12, 159:19, 164:12, 172:6, 175:22, 176:9, 176:12, 176:20, 178:19, 206:14, 212:9, 213:11, 217:3, 218:15, 218:25, 219:3, 219:18, 220:8, 221:12, 221:24, 222:1, 222:10
Mueller [3] - 128:19, 128:22, 128:25
MUFTAH [1] - 1:6
Muftah [3] - 3:4, 60:1, 119:4
MUHAMMAD [1] - 1:6
Muhammad [3] - 3:4, 60:1, 119:4
multiple [3] - 9:22, 186:17
muscle [1] - 69:25
music [1] - 130:1
MUSTAFA [1] - 1:6
Mustafa [53] - 3:4, 3:13, 8:22, 10:5, 10:19, 11:2, 12:6, 28:1, 28:16, 28:18, 28:24, 29:5, 29:16, 30:6, 30:9, 30:21, 30:24, 31:2, 31:5, 31:12, 31:20, 33:9, 33:13, 33:23, 34:2, 34:7, 34:10, 34:20, 35:19, 35:23, 36:9,

36:24, 37:9, 40:24, 41:7, 42:8, 46:4, 46:5, 47:12, 53:25, 54:3, 54:16, 60:1, 62:7, 67:12, 67:23, 68:1, 97:10, 98:2, 119:4, 136:3, 136:6, 178:12

## N

name [25] - 7:15, 25:15, 25:16, 25:17, 29:1, 29:2, 39:22, 39:24, 117:20, 119:23, 119:24, 143:16, 143:19, 144:10, 144:23, 166:14, 166:15, 166:16, 166:25, 177:1, 187:5, 191:24, 198:10, 198:11, 208:17
name's [1] - 176:24
named [1] - 136:3
names [2] - 100:3, 164:24
naming [1] - 10:11
narrative [1] - 110:25
nasal [1] - 69:11
native [5] - 26:22, 26:23, 129:1, 130:13, 133:3
native-born [2] - 26:22, 26:23
nature [13] - 30:15, 35:1, 79:8, 79:13, 82:17, 83:2, 87:15, 100:7, 100:10, 137:16, 163:23, 163:24, 164:17
nauseated [1] - 81:8
nauseous [2] - 190:21, 201:8
naval [30] - 5:23, 6:2, 6:4, 21:23, 22:2, 22:3, 22:5, 22:8, 22:10, 22:16, 22:23, 24:7, 35:15, 35:18, 41:11, 41:13, 44:6, 44:10, 44:11, 97:23, 100:6, 100:14, 100:22, 136:17, 142:18, 144:7, 145:6, 179:23, 183:4, 187:17
Navy [3] - 56:4, 56:25, 61:23
near [4] - 36:21, 56:19, 58:17
nearby [1] - 108:12

necessarily [2] - 66:19, 114:6
necessary [1] - 220:12
neck [1] - 70:1
need [14] - 17:5, 61:6, 61:20, 116:2, 137:19, 153:21, 169:13, 172:18, 208:14, 218:4, 220:9, 220:16, 220:17
needed [13] - 44:13, 48:1, 53:9, 75:15, 76:13, 91:2, 104:15, 105:16, 138:4, 190:11, 194:6, 194:15, 197:9
needing [1] - 152:19
needs [3] - 10:9, 105:13, 113:13
nervous [2] - 147:22, 150:5
never [15] - 125:17, 157:14, 157:15, 157:18, 159:3, 159:11, 159:18, 161:2, 170:5, 170:8, 170:11, 171:12, 171:14, 174:1, 204:15
new [5] - 40:16, 53:3, 53:22, 78:15, 113:3
New [4] - 40:18, 133:8, 177:6, 206:23
newspapers [2] - 130:4, 134:25
next [24] - 10:22, 12:23, 18:9, 28:20, 31:25, 48:4, 49:13, 57:7, 95:23, 102:13, 103:7, 108:9, 118:8, 143:12, 152:12, 166:18, 167:3, 167:4, 184:11, 202:21, 210:15, 213:22, 213:24, 214:10
nicks [1] - 112:20
night [9] - 42:1, 42:6, 188:2, 188:11, 198:18, 208:5, 213:23, 213:25, 216:18
nighttime [1] - 24:21
nobody [2] - 100:17, 115:10
noise [1] - 13:23
nomenclature [1] - 112:11
nonetheless [1] -

148:9
nonresponsive [1] - 91:22
normal [4] - 148:18, 148:19, 165:21, 203:7
normally [1] - 71:22
North [3] - 121:22, 131:2, 135:15
north [1] - 134:22
Nos [6] - 72:13, 72:18, 76:17, 76:22, 78:11, 105:24
nose [2] - 112:24, 114:22
notation [1] - 111:17
notations [2] - 77:24, 112:2
note [10] - 69:19, 75:24, 76:11, 78:6, 81:10, 99:14, 113:18, 215:4, 215:6, 215:9
note-taking [2] - 215:4, 215:9
notebook [2] - 138:18, 140:1
noted [7] - 50:16, 51:7, 59:3, 78:14, 82:20, 84:2, 113:5
notes [24] - 67:17, 71:4, 76:8, 99:12, 148:22, 148:25, 149:2, 162:3, 162:7, 163:19, 172:13, 172:15, 172:16, 180:21, 182:7, 182:11, 182:12, 182:14, 182:17, 182:24, 182:25, 183:1, 183:2, 223:6
nothing [5] - 23:17, 24:24, 37:3, 97:1, 116:10
notice [11] - 4:21, 14:23, 17:22, 19:16, 36:12, 54:1, 81:2, 81:25, 142:20, 209:4, 219:11
noticed [3] - 4:25, 112:23, 159:3
notified [5] - 41:2, 46:8, 104:11, 108:11, 114:16
notify [5] - 58:12, 58:15, 175:18
novel [2] - 212:21, 212:22
number [2] - 10:24, 98:3

numbered [1] - 4:3
numerous [2] - 73:15, 88:20
NW [4] - 1:14, 1:18, 1:22, 223:13
NYPD [3] - 180:3, 180:4, 180:5

## O

obedient [1] - 89:5
obey [1] - 161:1
obeying [1] - 24:1
object [5] - 13:7, 92:22, 219:13, 219:16, 219:19
objection [12] - 4:1, 4:14, 4:15, 61:17, 61:18, 140:18, 140:19, 143:3, 144:14, 164:12, 212:9, 220:5
objective [8] - 53:8, 65:4, 66:5, 66:8, 66:11, 66:25
obligated [1] - 210:24
observation [2] - 71:18, 110:4
observations [2] - 54:7, 104:24
observe [8] - 72:10, 74:3, 87:23, 93:21, 103:15, 150:9, 157:16, 204:20
observed [7] - 72:11, 78:24, 81:4, 92:19, 99:17, 114:23, 212:17
obtain [1] - 120:8
obtained [2] - 75:25, 195:4
obtrusive [1] - 182:2
obvious [3] - 90:20, 181:17, 181:22
obviously [4] - 4:16, 57:24, 133:7
occasion [6] - 8:20, 16:4, 17:25, 27:25, 38:15, 40:22
occasional [7] - 69:25
occasions [2] - 174:24, 179:13
occur [3] - 91:13, 190:12, 200:20
occurred [12] - 14:5, 16:14, 42:2, 79:12, 80:24, 95:12, 99:13, 99:18, 132:20, 169:3, 191:13, 215:17

occurring [1] - 41:15
ocean [1] - 17:20
October [33] - 8:19,
10:4, 11:1, 12:11,
67:24, 74:13, 79:4,
80:25, 84:4, 84:8,
85:7, 89:16, 89:24,
97:23, 136:1, 136:6,
156:5, 173:4, 173:8,
178:12, 187:17,
188:3, 188:13,
189:19, 196:7,
202:21, 203:5,
203:18, 213:15,
214:2, 214:6,
214:10, 214:11
OF [4] - 1:1, 1:3, 1:9,
223:2
offer [4] - 12:9, 31:2,
68:20, 191:1
offered [10] - 74:16,
80:1, 125:22,
157:23, 157:24,
191:2, 191:3, 191:5,
197:9, 203:7
offhand [1] - 87:2
office [3] - 25:25, 26:1,
177:6
OFFICE [1] - 1:13
officer [3] - 97:4,
179:3, 179:4
Officer [1] - 179:5
officers [1] - 57:10
offices [2] - 131:14,
181:12
Official [1] - 1:21
OFFICIAL [1] - 223:2
official [1] - 223:12
officials [3] - 128:7,
128:21, 175:18
old [1] - 78:16
older [1] - 78:15
olives [2] - 202:12,
205:4
on-site [1] - 149:1
onboard [17] - 46:13,
46:19, 46:21, 47:8,
48:5, 97:23, 100:14,
100:22, 101:4,
101:9, 137:2, 137:7,
137:8, 138:16,
139:8, 145:3, 145:11
once [24] - 20:1,
34:21, 46:13, 47:23,
48:5, 48:9, 48:14,
69:20, 101:11,
102:14, 103:5,
104:16, 105:19,
108:15, 125:20,
145:6, 147:13,

179:20, 183:8,
183:11, 185:12,
195:25, 211:1, 211:9
ONE [1] - 1:9
one [72] - 5:14, 14:21,
23:6, 24:17, 29:20,
33:4, 41:25, 42:3,
54:13, 55:14, 56:19,
56:25, 57:10, 64:20,
69:21, 74:6, 80:11,
80:15, 80:18, 87:2,
92:25, 97:18,
106:19, 107:16,
108:6, 108:23,
113:3, 117:21,
124:2, 124:4,
126:25, 131:1,
131:12, 133:16,
139:1, 143:9, 144:6,
151:8, 151:20,
152:7, 153:5, 158:8,
159:12, 159:14,
161:15, 161:22,
167:4, 167:10,
170:13, 171:19,
175:23, 175:25,
180:9, 180:16,
182:10, 183:2,
186:25, 189:9,
189:12, 197:15,
201:17, 202:1,
202:6, 211:17,
212:11, 215:2,
215:24, 216:5,
217:23
ones [6] - 12:24, 24:8,
56:16, 90:9, 107:20,
206:23
online [1] - 132:16
onward [1] - 131:3
open [3] - 35:11,
78:22, 151:7
operating [1] - 125:6
operation [16] - 8:21,
8:24, 9:4, 27:8, 30:5,
30:8, 30:13, 34:16,
40:24, 41:15, 44:18,
56:25, 57:19, 63:24,
97:9, 97:14
opinion [1] - 212:17
opinions [1] - 13:20
opportunity [24] -
51:20, 51:23, 63:10,
63:13, 74:25, 76:18,
104:4, 128:6,
138:11, 140:22,
141:15, 173:2,
179:11, 184:14,
197:19, 201:3,
201:15, 201:16,

202:22, 204:6,
208:2, 208:3, 210:6,
216:3
option [1] - 181:25
orally [3] - 108:2,
108:4, 161:21
orange [6] - 12:17,
29:10, 86:15,
110:17, 136:12,
178:17
order [11] - 34:15,
39:7, 44:16, 88:19,
109:18, 111:20,
170:12, 170:16,
173:12, 183:6, 183:9
orderly [1] - 54:14
orders [8] - 24:1, 37:6,
37:8, 37:12, 148:5,
148:9, 148:10,
148:11
organized [1] - 54:14
original [3] - 5:2,
103:2, 112:20
originally [1] - 53:1
Orleans [1] - 40:18
osteopathy [1] - 61:10
otherwise [5] - 34:4,
130:7, 152:20,
173:7, 180:22
ourselves [3] - 163:1,
163:22, 189:23
outermost [1] - 77:14
outlined [1] - 68:12
outside [5] - 26:6,
26:10, 58:23,
109:16, 194:14
outside-the [1] - 26:6
over-the-counter [1] -
74:20
overall [4] - 35:24,
130:17, 190:21,
206:1
overhear [1] - 54:4
overlap [1] - 5:20
overruled [2] - 164:13,
212:10
overseas [1] - 181:1
oversee [1] - 97:16
oversees [1] - 97:15
overview [1] - 61:22
own [9] - 67:1, 129:4,
129:12, 146:18,
186:22, 191:24,
193:15, 198:10,
211:22
owns [1] - 218:23

P

p.m [4] - 11:5, 24:22,

210:16, 222:21
pace [2] - 59:16,
165:21
PAGE [1] - 2:2
page [18] - 65:10,
67:4, 112:7, 143:7,
144:9, 144:18,
151:7, 153:5, 153:9,
174:9, 175:3,
175:15, 192:13,
193:20, 193:24,
198:13, 213:13
Page [3] - 58:9, 77:23,
175:11
pages [5] - 64:3,
64:13, 64:15,
129:21, 151:18
pain [1] - 70:1
pair [2] - 55:5, 111:12
Palestinian [1] -
130:23
pants [7] - 37:24, 38:3,
38:5, 38:7, 49:9,
55:5, 213:7
paper [6] - 139:1,
184:15, 193:15,
202:1, 214:23,
214:25
par [1] - 124:23
paragraph [2] -
151:21, 198:21
parameters [1] - 6:18
pared [1] - 219:7
pared-down [1] -
219:7
part [72] - 9:4, 10:7,
32:8, 41:6, 43:10,
44:21, 52:12, 52:15,
53:4, 53:5, 63:24,
64:24, 65:1, 65:3,
65:4, 65:20, 66:5,
66:8, 68:3, 68:4,
68:6, 68:14, 69:9,
71:21, 72:24, 77:17,
78:8, 82:22, 86:4,
99:22, 102:20,
107:14, 108:3,
111:19, 117:9,
120:25, 122:10,
124:2, 130:23,
131:7, 134:12,
136:1, 136:2, 136:5,
143:16, 144:18,
152:2, 156:1,
156:14, 164:20,
164:22, 166:15,
168:16, 168:17,
173:7, 177:11,
178:10, 178:11,
178:23, 179:1,

179:18, 179:19,
179:20, 180:3,
183:9, 192:12,
192:16, 192:20,
193:9, 193:12,
221:21
participate [3] - 54:15,
109:10, 162:9
participated [1] -
125:19
participating [1] -
110:3
particular [15] - 9:14,
9:20, 10:1, 13:11,
18:22, 30:1, 51:12,
56:14, 62:9, 64:18,
88:16, 95:13, 97:20,
158:10, 182:20
particularly [2] - 6:16,
62:24
partner [1] - 33:8
parts [8] - 65:11,
65:12, 65:15, 69:16,
143:18, 166:17,
166:18, 185:20
pass [1] - 124:16
passed [1] - 126:10
past [3] - 69:11, 69:20,
126:8
patches [2] - 186:24,
186:25
patient [1] - 62:22,
66:3, 66:9, 66:15,
66:17, 66:20, 72:3,
74:15, 79:11, 79:16,
80:1
patient's [1] - 75:10
patients [1] - 93:16
Pause [7] - 23:16,
37:15, 54:19, 71:5,
88:7, 116:9, 159:13
pause [1] - 102:10
paycheck [1] - 126:2
payment [1] - 126:5
Peed [13] - 3:12, 3:14,
4:1, 4:14, 4:21,
23:19, 37:17, 54:22,
88:10, 116:11,
217:18, 218:17,
220:13
PEED [44] - 1:17, 1:18,
3:12, 4:15, 4:23, 5:5,
5:8, 5:12, 23:21,
24:20, 25:3, 37:19,
39:2, 54:24, 58:2,
61:18, 88:12, 94:14,
116:13, 118:1,
140:19, 143:3,
144:14, 159:21,
172:3, 175:23,

175:25, 176:2,
176:5, 206:16,
213:9, 217:19,
217:21, 218:9,
218:11, 220:2,
220:7, 220:14,
220:21, 221:3,
221:6, 221:17,
221:19, 222:17
**Peed).........................
...........** [8] - 2:4, 2:6,
2:9, 2:11, 2:14, 2:16,
2:17, 2:19
**pen** [1] - 208:17
**people** [23] - 13:21,
24:14, 24:16, 24:18,
37:6, 87:21, 92:9,
92:17, 120:21,
120:22, 131:18,
131:23, 133:8,
133:9, 133:10,
133:11, 142:4,
181:12, 183:17,
196:17, 200:23,
203:2, 203:3
**per** [1] - 202:6
**perceive** [2] - 187:13,
206:1
**perceived** [1] - 206:4
**percent** [2] - 160:6,
217:25
**perform** [6] - 90:23,
92:20, 93:3, 95:3,
95:4, 95:6
**perhaps** [1] - 59:20
**period** [8] - 12:8, 14:9,
15:17, 68:10, 146:1,
147:20, 207:19,
207:22
**periodic** [3] - 64:16,
81:23, 82:14
**periodically** [1] -
103:15
**permitted** [1] - 109:13
**person** [6] - 24:17,
57:8, 124:13,
124:14, 172:22,
182:11
**personal** [2] - 104:1,
128:11
**personality** [1] - 37:12
**personally** [6] -
117:17, 126:15,
129:4, 143:21,
151:11, 204:20
**personnel** [2] - 10:8,
141:4
**perspective** [2] -
90:11, 92:3
**pertain** [1] - 218:14

**pertaining** [2] - 219:1,
219:3
**pertinent** [1] - 76:9
**Peterson** [2] - 221:14,
221:15
**phase** [1] - 15:25
**phone** [1] - 132:17
**photo** [1] - 51:13
**photograph** [2] -
42:14, 50:21
**photographed** [4] -
45:23, 49:14, 49:15,
53:23
**photographic** [1] -
56:18
**photographs** [2] -
50:7, 106:2
**photos** [5] - 59:2,
103:1, 103:5,
112:25, 114:2
**phrased** [2] - 167:11,
167:13
**phrases** [8] - 9:6, 9:8,
9:17, 9:20, 10:1,
14:15, 14:19, 24:8
**physical** [16] - 6:4,
41:23, 54:1, 66:16,
67:1, 68:4, 70:14,
70:16, 71:21, 73:2,
81:3, 82:1, 85:3,
91:17, 92:11, 189:22
**Physical** [3] - 65:2,
65:17, 66:4
**physically** [12] - 14:23,
22:17, 24:15, 36:6,
54:5, 81:25, 91:16,
93:2, 103:14,
150:10, 190:22,
195:19
**physician** [6] - 60:24,
61:1, 73:8, 87:20,
90:22, 100:13
**picked** [1] - 48:7
**picture** [1] - 77:18
**pictures** [5] - 41:16,
50:10, 53:13,
168:12, 168:15
**piece** [5] - 5:10, 41:4,
136:11, 214:23,
214:25
**pieces** [1] - 139:1
**pills** [1] - 187:4
**place** [14] - 15:14,
58:23, 67:14, 105:4,
108:21, 109:4,
133:24, 142:2,
181:22, 182:13,
196:12, 200:21,
202:15, 221:1
**placed** [9] - 13:3, 13:7,

15:9, 16:18, 16:19,
16:25, 22:1, 48:5,
109:2
**placement** [1] - 114:5
**places** [4] - 130:1,
138:1, 142:4, 166:11
**Plaintiff** [1] - 1:4
**plan** [11] - 5:3, 65:6,
67:5, 67:7, 75:11,
79:2, 179:15,
180:17, 185:10,
192:8, 192:10
**planned** [1] - 184:5
**planning** [4] - 10:7,
98:8, 99:22, 181:19
**plans** [1] - 97:6
**play** [2] - 18:10, 32:13
**played** [1] - 156:13
**pleasant** [1] - 35:25
**pleasantries** [7] -
191:11, 196:24,
197:18, 202:19,
203:7, 207:12,
207:13
**plus** [1] - 198:10
**pockets** [1] - 38:5
**pod** [56] - 42:10,
42:16, 42:22, 42:23,
43:7, 44:1, 44:2,
44:5, 44:7, 44:12,
45:4, 45:6, 45:10,
45:14, 46:13, 48:8,
48:9, 48:11, 48:14,
48:18, 49:24, 55:6,
56:21, 57:25, 58:18,
58:23, 58:24, 58:25,
59:1, 98:13, 98:16,
98:17, 98:22,
102:16, 102:24,
103:14, 104:8,
104:14, 105:14,
107:17, 108:11,
108:16, 108:25,
110:10, 111:19,
111:22, 112:10,
146:15, 196:5,
196:14, 196:16,
204:25
**pods** [1] - 44:3
**point** [50] - 11:9, 12:2,
13:15, 14:18, 16:22,
17:1, 19:11, 21:4,
21:18, 33:14, 35:3,
36:1, 36:19, 45:4,
50:5, 82:17, 83:12,
85:12, 94:4, 115:23,
120:17, 136:10,
141:8, 142:23,
146:1, 146:15,
148:1, 154:5,

155:25, 157:1,
157:16, 159:14,
160:25, 165:9,
165:15, 166:9,
169:9, 172:2,
180:13, 187:10,
187:25, 188:6,
194:5, 194:12,
194:13, 195:4,
199:9, 202:10,
216:15
**pointed** [2] - 53:22,
156:14
**pointing** [7] - 9:13,
144:16, 144:22,
144:25, 166:13,
166:19, 166:21
**points** [5] - 23:9,
149:19, 154:20,
155:1, 168:19
**policy** [2] - 180:24,
211:9
**Polo** [1] - 213:8
**Pop** [2] - 191:5
**Pop-Tarts** [2] - 191:5
**population** [1] - 97:6
**portion** [19] - 6:21,
24:2, 53:21, 55:18,
65:10, 65:25, 66:2,
66:11, 66:25, 68:16,
69:1, 89:20, 90:2,
95:4, 165:2, 165:5,
174:11, 218:4, 218:6
**portions** [1] - 208:18
**position** [14] - 7:22,
12:14, 25:22, 29:7,
40:5, 86:14, 105:13,
105:17, 110:16,
112:16, 113:7,
113:9, 219:10, 222:1
**positions** [1] - 97:5
**positive** [3] - 86:18,
102:11, 103:17
**positively** [2] - 28:17
**possible** [6] - 5:19,
6:16, 42:2, 50:23,
73:10, 202:11
**post** [6] - 44:18, 49:5,
57:18, 108:25,
109:1, 112:22
**post-capture** [2] -
49:5, 57:18
**posted** [9] - 42:22,
104:9, 106:3,
107:16, 108:5,
109:15, 132:16,
138:23, 161:24
**posting** [1] - 113:16
**posture** [1] - 113:16
**potential** [2] - 74:14,

74:24
**potentially** [6] - 27:9,
32:8, 35:11, 39:1,
127:22, 181:6
**pour** [1] - 7:9
**practical** [2] - 135:13,
181:3
**practice** [11] - 111:19,
113:5, 137:13,
137:15, 137:25,
140:25, 154:4,
172:15, 172:16,
181:11, 203:22
**practiced** [4] - 42:7,
46:11, 141:2, 141:5
**practicing** [1] - 42:4
**pray** [7] - 82:5, 82:12,
185:6, 190:11,
201:15, 201:16,
201:18
**prayer** [2] - 109:3,
109:4
**preadmit** [1] - 4:11
**preassign** [1] - 182:10
**precise** [2] - 153:1,
167:16
**preclude** [1] - 75:22
**precoordinated** [1] -
101:15
**preference** [3] - 95:25,
185:13, 185:14
**preliminary** [2] - 3:22,
5:15
**prep** [2] - 23:2, 23:3
**preparation** [8] - 9:4,
42:7, 136:23,
136:25, 141:12,
141:22, 160:13,
162:3
**preparations** [4] -
41:22, 62:15, 62:19,
98:1
**preparatory** [3] -
136:20, 136:21,
136:24
**prepare** [4] - 41:24,
62:15, 137:2, 162:1
**prepared** [7] - 98:4,
108:13, 137:3,
160:8, 160:12, 167:1
**preparing** [3] - 160:15,
206:19, 206:20
**preplanning** [1] -
44:21
**prepping** [1] - 137:9
**prescribed** [2] - 83:25,
187:6
**presence** [2] - 50:2,
50:3
**present** [33] - 4:18,

10:8, 16:8, 28:4, 35:14, 46:4, 47:3, 47:9, 48:19, 52:5, 53:16, 53:19, 65:12, 69:2, 69:4, 82:19, 99:20, 100:21, 100:23, 136:8, 146:10, 160:3, 160:4, 173:20, 173:21, 173:23, 174:21, 178:15, 187:16, 188:17, 211:4, 219:23
**presented** [4] - 12:25, 56:15, 208:9, 222:7
**preserver** [1] - 17:18
**president** [1] - 128:24
**pressure** [1] - 15:19
**pretty** [5] - 57:23, 167:19, 186:22, 195:15, 195:19
**prevent** [3] - 73:9, 73:11, 110:3
**previous** [2] - 71:13, 71:16
**previously** [5] - 16:24, 85:9, 151:8, 183:9, 197:6
**primarily** [3] - 30:4, 41:8, 49:17
**primary** [4] - 43:8, 53:7, 61:2, 61:3
**printed** [1] - 191:24
**privacy** [7] - 42:18, 49:21, 49:25, 55:10, 55:13, 104:6, 104:10
**private** [1] - 132:21
**privy** [3] - 132:6, 132:10, 174:3
**pro** [1] - 21:15
**problem** [4] - 137:22, 206:2, 206:4, 208:23
**problems** [2] - 73:12, 73:14
**procedure** [5] - 189:16, 195:17, 196:16, 196:20, 203:3
**procedures** [8] - 17:3, 43:10, 62:21, 113:23, 160:19, 160:23, 197:7, 200:25
**proceed** [10] - 5:16, 6:20, 60:3, 69:23, 96:2, 103:17, 119:9, 119:12, 183:24, 217:13
**proceeded** [3] - 13:1, 163:7, 163:20

**proceeding** [2] - 46:9, 220:19
**proceedings** [1] - 223:7
**Proceedings** [1] - 1:24
**process** [23] - 21:25, 23:8, 28:21, 46:7, 48:14, 52:13, 52:16, 64:23, 64:25, 67:25, 81:17, 83:20, 87:11, 106:14, 106:17, 124:5, 124:12, 125:2, 165:16, 182:7, 182:9, 200:14, 202:18
**processed** [2] - 57:21, 208:1
**processing** [8] - 6:5, 48:20, 50:6, 52:4, 53:4, 56:1, 58:21, 98:15
**produced** [2] - 1:25, 99:11
**productive** [1] - 69:10
**profession** [1] - 125:24
**professional** [3] - 92:13, 93:5, 148:7
**professionally** [2] - 92:20, 93:3
**proficiency** [5] - 27:2, 27:7, 27:11, 27:20, 125:18
**program** [3] - 61:25, 62:1, 124:19
**progress** [1] - 124:4
**promises** [1] - 152:7
**pronoun** [1] - 184:16
**pronounce** [2] - 9:20, 134:11
**pronouncing** [1] - 9:23
**propose** [1] - 222:5
**prosecutors** [1] - 161:25
**protect** [3] - 47:1, 49:20, 104:5
**protection** [19] - 13:2, 15:9, 15:11, 16:16, 16:17, 16:23, 17:19, 17:21, 21:6, 21:10, 23:6, 46:25, 47:15, 106:12, 189:3, 189:6, 189:11
**protections** [2] - 106:10, 116:24
**protocol** [1] - 110:5
**protocols** [1] - 62:20
**proved** [2] - 57:7, 105:2

**provide** [30] - 30:16, 52:7, 52:19, 61:21, 62:10, 78:17, 80:4, 81:15, 82:6, 82:11, 83:12, 83:15, 83:18, 89:2, 102:9, 106:9, 123:8, 123:10, 123:12, 132:4, 132:13, 137:11, 146:21, 164:5, 201:25, 203:17, 204:4, 219:5, 219:7, 219:12
**provided** [29] - 3:24, 4:2, 17:15, 29:19, 42:23, 49:23, 51:14, 52:9, 53:3, 69:12, 69:18, 80:6, 91:6, 99:15, 102:8, 103:13, 106:8, 106:25, 107:25, 122:22, 123:1, 158:24, 169:17, 178:4, 198:16, 203:20, 218:12, 218:22, 221:13
**provider** [4] - 61:2, 91:20, 105:3, 112:25
**providing** [7] - 29:17, 31:14, 101:23, 123:15, 148:5, 156:8, 156:9
**proximity** [2] - 99:24, 108:24
**psych** [2] - 89:20, 90:2
**psychiatric** [1] - 90:21
**psychiatrist** [1] - 90:24
**psychiatrists** [2] - 90:25, 91:2
**psychological** [5] - 90:11, 90:15, 90:18, 91:9, 93:7
**psychologically** [4] - 91:17, 93:2, 93:14, 93:15
**pull** [1] - 61:5
**pulley** [2] - 47:21, 101:1
**pulling** [1] - 47:24
**pullover** [1] - 16:18
**pulse** [2] - 15:19, 95:9
**purpose** [16] - 9:7, 9:25, 15:11, 17:17, 28:17, 34:13, 34:15, 43:6, 43:8, 63:16, 64:18, 120:6, 219:8, 219:23, 219:25, 220:23
**purposes** [3] - 4:2,

45:18, 219:17
**pursue** [1] - 72:6
**pushed** [1] - 19:9
**put** [17] - 12:25, 13:1, 16:20, 17:14, 24:17, 27:20, 41:3, 86:4, 91:12, 109:1, 109:19, 112:13, 129:14, 183:12, 187:1, 189:8, 218:4
**putting** [3] - 23:5, 32:5, 113:6

## Q

**Qatar** [1] - 130:20
**quality** [2] - 125:1, 175:13
**Quantico** [1] - 40:16
**quarters** [1] - 41:17
**queasiness** [1] - 187:3
**questioning** [13] - 65:14, 68:3, 89:11, 156:11, 163:7, 163:23, 163:25, 164:17, 164:19, 169:7, 204:8, 215:3, 217:1
**questions** [66] - 24:20, 28:25, 39:2, 56:12, 56:14, 58:2, 68:11, 76:4, 82:25, 83:3, 83:6, 85:16, 92:4, 93:10, 93:17, 93:25, 94:15, 95:10, 103:10, 105:3, 106:22, 106:25, 107:2, 118:1, 118:3, 134:7, 137:16, 146:4, 147:23, 148:18, 149:3, 151:23, 151:25, 152:12, 153:18, 154:8, 158:22, 159:1, 162:18, 167:2, 174:15, 175:22, 176:5, 192:25, 198:23, 199:3, 199:9, 201:5, 201:17, 201:24, 206:6, 206:9, 206:10, 206:13, 206:14, 209:7, 213:3, 213:9, 214:15, 215:7, 215:16, 216:9, 216:23, 217:3, 222:4
**quick** [2] - 59:16, 186:23
**quickly** [1] - 133:18
**quiet** [1] - 30:13

**quite** [1] - 98:14
**Quran** [4] - 109:2, 109:4, 135:3, 135:6

## R

**RA** [1] - 8:10
**raise** [10] - 7:5, 25:8, 36:3, 39:16, 60:9, 96:6, 115:9, 119:16, 157:1, 176:16
**raised** [7] - 22:2, 54:13, 115:10, 160:16, 171:7, 209:5, 222:4
**raising** [1] - 42:4
**randomly** [1] - 125:4
**ranged** [1] - 27:10
**ranging** [1] - 91:21
**rank** [3] - 8:16, 60:20, 96:19
**ranking** [3] - 26:19, 128:7, 128:21
**rarely** [1] - 153:24
**rather** [2] - 62:3, 220:2
**RDR** [3] - 1:21, 223:4, 223:11
**react** [1] - 157:12
**read** [62] - 43:12, 55:17, 55:21, 116:14, 130:4, 130:9, 130:11, 135:7, 141:7, 146:17, 146:19, 147:2, 147:5, 147:8, 147:9, 147:14, 151:6, 151:11, 151:24, 152:17, 155:20, 155:21, 161:3, 161:5, 161:9, 162:11, 165:11, 165:21, 165:22, 165:23, 165:25, 166:2, 166:4, 167:1, 167:23, 167:24, 168:2, 169:22, 171:10, 174:11, 175:14, 175:19, 184:10, 184:12, 184:13, 192:17, 193:11, 194:7, 194:24, 195:1, 208:10, 209:20, 210:1, 210:24, 211:1, 211:2, 211:18
**readily** [1] - 43:11
**reading** [3] - 71:7, 111:8, 111:9, 111:11, 111:23, 124:9, 147:12,

152:15, 152:19,
152:24, 153:1,
165:21, 166:6,
167:21, 167:25,
168:4, 168:14,
174:19, 192:20,
193:15, 193:24,
194:4, 194:11,
194:21, 198:25,
203:23, 208:10,
209:19, 211:12,
211:13, 211:16,
211:19, 212:21
**ready** [8] - 3:19, 46:10,
46:11, 46:13, 59:21,
60:3, 108:15, 108:16
**realization** [1] - 212:18
**realize** [1] - 85:24
**realized** [2] - 129:9,
155:5
**really** [11] - 23:1,
130:9, 130:11,
155:24, 165:15,
172:18, 173:14,
173:20, 174:6,
210:23, 211:2
**rear** [1] - 32:23
**reason** [7] - 30:1,
65:13, 89:2, 115:9,
115:10, 168:17,
185:7
**reasons** [2] - 90:15,
90:18
**recalled** [2] - 212:7,
215:18
**receive** [6] - 46:10,
46:12, 98:4, 102:11,
106:21, 108:16
**received** [11] - 4:23,
8:16, 26:5, 26:19,
79:10, 103:17,
125:15, 126:10,
126:11, 177:22,
219:11
**recently** [1] - 4:22
**recess** [2] - 59:22,
118:11
**Recess** [2] - 59:23,
176:10
**recognition** [1] - 100:3
**recognize** [31] - 9:14,
15:5, 42:13, 43:3,
43:16, 43:21, 44:24,
45:19, 50:13, 58:10,
86:8, 99:5, 106:2,
114:10, 138:19,
139:20, 140:7,
140:10, 142:13,
142:15, 144:1,
144:4, 144:9,

149:15, 191:21,
191:23, 191:24,
198:7, 198:9,
198:10, 198:11
**recollection** [2] -
106:24, 173:3
**recollections** [1] -
173:11
**reconvene** [1] - 5:10
**record** [21] - 3:3, 3:4,
3:7, 12:19, 45:9,
59:25, 64:12, 76:5,
76:16, 77:19, 86:18,
110:19, 112:24,
119:3, 134:10,
136:13, 153:4,
162:22, 178:19,
180:21, 182:4
**recorded** [2] - 1:24,
56:23
**recorder** [1] - 181:7
**recording** [1] - 182:6
**records** [1] - 182:12
**recovery** [1] - 46:11
**RECROSS** [1] - 176:1
**RECROSS-
EXAMINATION** [1] -
176:1
**rectal** [1] - 71:22
**red** [5] - 50:20, 50:23,
51:1, 57:24, 114:13
**REDIRECT** [5] - 39:4,
58:3, 94:18, 172:5,
213:10
**reduce** [2] - 5:18, 5:20
**reduction** [2] - 17:2,
78:22
**refer** [14] - 22:14, 60:4,
68:25, 71:4, 72:13,
80:24, 86:20, 96:11,
105:22, 131:2,
140:1, 149:16,
220:21, 220:22
**reference** [1] - 122:3
**referenced** [2] - 99:10,
100:17
**references** [1] - 221:2
**referencing** [1] - 37:11
**referred** [2] - 134:11,
216:5
**referring** [7] - 68:14,
98:16, 121:25,
141:3, 168:1,
179:16, 184:17
**reflect** [8] - 3:4, 12:19,
29:11, 86:16, 86:18,
110:20, 136:13,
178:19
**refresh** [3] - 51:11,
51:24, 173:2

**refreshed** [1] - 67:20
**refuse** [1] - 93:16
**regarding** [8] - 6:12,
15:21, 69:3, 78:18,
98:7, 106:10,
106:25, 114:3
**regime** [1] - 131:12
**regionally** [1] - 133:8
**registered** [1] - 114:13
**rehandcuffed** [1] -
16:21
**rehearsals** [2] - 41:25,
98:3
**rehearsed** [1] - 137:4
**reinjury** [2] - 113:3,
113:4
**related** [2] - 81:22,
204:22
**relation** [3] - 6:16,
82:7, 97:8
**relative** [1] - 37:9
**relax** [2] - 15:2, 150:21
**relaxed** [4] - 14:17,
14:25, 150:9, 156:3
**relay** [1] - 106:20
**relayed** [5] - 101:22,
102:14, 105:19,
116:18, 117:15
**relevance** [1] - 222:3
**relief** [2] - 158:14,
158:16
**religious** [1] - 109:6
**rely** [1] - 107:22
**remain** [7] - 20:11,
30:13, 96:6, 108:23,
109:7, 119:15, 152:4
**remainder** [1] - 108:24
**remarks** [1] - 164:7
**remember** [27] - 38:25,
50:3, 51:9, 87:2,
93:8, 116:25,
131:12, 150:25,
153:2, 163:22,
165:15, 167:16,
168:5, 168:6,
168:21, 169:2,
169:4, 170:12,
186:24, 187:13,
190:25, 194:10,
198:25, 199:11,
208:21, 208:25,
211:16
**remembering** [2] -
9:25, 168:17
**removal** [1] - 35:8
**remove** [7] - 32:1,
50:1, 50:4, 53:2,
103:3, 103:4, 103:21
**removed** [9] - 16:17,
21:15, 35:4, 48:6,

102:24, 102:25,
189:10
**removing** [2] - 32:8,
34:18
**repeat** [2] - 156:19,
181:23
**repeated** [2] - 79:13,
175:21
**rephrase** [2] - 156:19,
171:13
**rephrasing** [1] - 92:25
**replaced** [1] - 16:23
**replacement** [1] -
153:5
**replied** [1] - 146:25
**report** [18] - 62:10,
69:3, 69:6, 71:16,
79:9, 79:10, 82:3,
82:4, 82:13, 82:15,
82:19, 84:21, 84:23,
85:1, 85:24, 89:20,
114:15, 218:6
**reported** [12] - 36:13,
66:20, 69:19, 69:25,
81:8, 84:14, 84:17,
85:2, 85:15, 86:3,
89:16, 170:8
**Reporter** [3] - 1:21,
1:21, 223:12
**reporter** [6] - 7:16,
25:15, 39:23, 60:3,
74:17, 77:4
**REPORTER** [1] -
223:2
**reports** [2] - 83:7,
170:6
**represent** [1] - 221:6
**representatives** [1] -
108:12
**request** [6] - 59:15,
81:20, 84:18, 84:22,
96:11, 111:14
**requested** [4] - 80:1,
80:2, 95:3, 111:8
**require** [1] - 72:22
**required** [1] - 54:11
**requirement** [1] -
103:25
**rescue** [3] - 7:25, 8:2,
46:25
**reservations** [1] -
104:20
**Reserves** [1] - 26:18
**resided** [1] - 98:24
**residency** [2] - 62:3,
90:24
**resist** [1] - 30:21
**resistance** [2] - 12:9,
89:2
**resistant** [1] - 32:10

**resolution** [1] - 217:11
**respect** [7] - 71:24,
109:6, 125:7, 139:4,
140:21, 155:23,
222:2
**respond** [15] - 19:8,
26:8, 56:13, 91:24,
92:4, 95:8, 145:17,
155:4, 155:7,
156:10, 192:23,
193:4, 204:2,
204:12, 217:1
**responded** [1] - 20:6
**responder** [1] - 91:19
**response** [6] - 8:6,
8:8, 146:21, 155:7,
156:17, 159:5
**responses** [11] -
27:14, 27:22, 68:20,
68:22, 87:17, 92:6,
146:24, 153:18,
154:7, 159:4, 206:6
**responsibilities** [1] -
177:11
**responsible** [1] -
182:23
**responsive** [3] -
147:23, 206:10,
206:12
**restate** [1] - 76:1
**restrained** [1] - 189:2
**restraint** [1] - 13:9
**restroom** [3] - 200:1,
200:2, 200:3
**result** [8] - 19:23,
21:19, 33:17, 79:20,
80:11, 80:17, 85:16,
114:15
**resulted** [1] - 50:9
**results** [1] - 66:19
**retain** [2] - 76:13,
110:9
**retained** [1] - 104:1
**retrieved** [1] - 101:3
**return** [2] - 66:19,
108:5
**returned** [1] - 196:4
**reveal** [1] - 79:15
**revealing** [1] - 132:19
**reverse** [1] - 109:19
**Review** [2] - 82:20,
86:4
**review** [20] - 51:20,
51:23, 64:3, 65:14,
65:16, 66:21, 67:19,
69:17, 75:12, 76:18,
99:2, 107:4, 125:1,
125:5, 140:23,
141:13, 182:16,
194:5, 216:3, 219:6

reviewed [7] - 62:20, 74:14, 74:24, 106:6, 139:10, 215:24, 216:7
reviewing [1] - 125:10
reviews [10] - 51:22, 64:5, 67:21, 72:16, 76:20, 99:4, 106:1, 107:6, 114:11, 125:16
rheumatism [2] - 69:21, 69:24
rice [2] - 128:10, 202:12
ride [1] - 21:8
rig [1] - 181:9
riggers [4] - 13:3, 16:18, 16:20, 17:3
right-hand [1] - 139:13
Rights [15] - 162:10, 165:12, 165:24, 168:9, 171:11, 171:15, 180:10, 180:12, 180:14, 184:5, 184:8, 192:17, 208:9, 210:1, 214:16
rights [44] - 105:10, 123:17, 142:16, 143:24, 144:5, 151:5, 151:6, 151:9, 151:22, 152:4, 152:7, 152:15, 154:15, 155:13, 155:16, 165:10, 165:17, 165:19, 166:4, 172:10, 173:17, 173:19, 173:25, 174:5, 174:12, 178:5, 191:8, 191:10, 191:14, 197:20, 197:22, 197:24, 198:3, 198:23, 199:9, 208:10, 209:20, 209:23, 210:25, 211:11, 211:13, 211:18, 214:19
ripe [1] - 222:2
risk [2] - 14:2, 46:17
risks [1] - 79:24
road [1] - 5:16
role [17] - 6:10, 18:3, 18:10, 28:13, 31:23, 32:13, 32:16, 41:6, 41:8, 97:13, 122:10, 137:10, 138:3, 145:7, 145:8, 216:18
room [44] - 5:2, 41:17,

45:5, 45:6, 45:12, 45:13, 45:14, 45:21, 45:23, 45:25, 56:20, 109:8, 109:15, 149:16, 149:17, 170:24, 181:8, 181:14, 181:16, 181:21, 183:6, 183:8, 183:10, 183:11, 183:14, 183:17, 183:18, 183:22, 188:9, 188:16, 188:17, 188:18, 188:21, 188:24, 189:7, 189:13, 196:15, 196:16, 196:21, 202:25, 203:1, 203:4, 205:21
Room [2] - 1:22, 223:13
rope [1] - 47:24
ROS [2] - 65:19, 65:22
rotate [1] - 90:23
ROTC [1] - 61:25
rough [3] - 19:3, 49:11, 184:24
route [1] - 44:19
rug [1] - 109:3, 109:4
rule [5] - 55:18, 58:11, 106:19, 106:20
rules [32] - 42:23, 43:4, 43:6, 43:10, 43:18, 53:14, 53:16, 55:17, 58:10, 105:10, 105:12, 105:19, 106:3, 106:5, 106:8, 106:11, 106:16, 106:21, 106:25, 108:25, 115:25, 116:3, 138:23, 139:4, 139:9, 146:16, 146:17, 146:22, 161:10, 161:13, 161:14, 175:15
run [1] - 133:23
running [2] - 57:8, 65:9
rush [1] - 157:25
Ryan [3] - 6:13, 176:13, 176:24
RYAN [2] - 2:18, 176:18

**S**

sad [9] - 82:4, 82:20, 82:24, 83:7, 85:15, 86:3, 89:17, 171:21,

201:10
sadness [4] - 82:21, 86:5, 89:19, 89:25
safe [1] - 42:2
safely [2] - 42:6, 46:20
safety [12] - 13:13, 14:5, 15:12, 15:16, 30:5, 32:11, 34:16, 35:5, 48:1, 62:22, 63:5, 110:2
Sam [3] - 119:24, 191:25, 203:24
Sammy [5] - 179:7, 193:16, 193:17, 209:18
samples [1] - 53:12
SAMUEL [2] - 2:15, 119:17
Samuel [5] - 6:14, 119:14, 179:7, 188:23, 198:11
sanitize [1] - 108:25
sanitized [4] - 100:2, 117:5, 117:6, 219:20
sat [8] - 95:9, 149:25, 150:2, 189:11, 189:21, 190:19, 195:18, 207:11
satisfactory [1] - 125:14
satisfied [1] - 218:1
save [1] - 155:15
saw [5] - 29:5, 86:9, 143:5, 150:10, 186:17
scale [1] - 103:11
scared [1] - 201:12
scars [6] - 66:23, 66:24, 72:12, 78:2, 78:14, 78:24
scenario [2] - 93:18, 93:19
scenarios [1] - 90:13
schedule [1] - 220:19
scheduled [2] - 5:4, 81:23
Scheme [2] - 98:10, 99:10
scheme [2] - 101:12, 102:18
school [3] - 62:2, 90:24, 134:23
schooling [1] - 61:22
science [1] - 120:9
screening [6] - 49:18, 50:16, 53:5, 56:17, 57:25, 59:4
screenings [1] - 88:17
scribe [1] - 215:10
sea [3] - 19:3, 33:3,

35:9
searched [1] - 102:25
seasickness [1] - 21:20
seated [2] - 12:17, 149:8
seats [1] - 189:12
second [66] - 11:25, 16:4, 16:7, 16:14, 16:16, 17:4, 17:22, 20:15, 20:19, 20:22, 20:25, 21:17, 21:22, 24:4, 28:12, 28:14, 28:15, 29:18, 31:6, 34:8, 34:19, 34:21, 34:23, 35:13, 36:20, 38:24, 67:4, 127:10, 152:2, 153:9, 154:19, 155:10, 155:11, 155:16, 155:23, 155:24, 156:2, 159:12, 167:5, 192:13, 193:9, 193:12, 196:6, 196:23, 197:12, 197:13, 198:14, 198:16, 199:9, 199:14, 200:6, 200:10, 200:17, 200:18, 200:20, 201:2, 201:21, 202:2, 202:8, 202:9, 210:10, 214:2, 214:3, 214:4
seconds [1] - 11:24
Secretary [2] - 128:10, 128:11
Section [1] - 4:21
section [3] - 11:21, 65:19, 141:8
sector [1] - 88:21
secure [2] - 5:2, 109:21
secured [5] - 14:10, 18:6, 20:25, 22:2, 46:22
securing [1] - 13:12
security [8] - 13:22, 17:2, 56:19, 57:15, 57:23, 59:6, 59:8, 129:18
see [37] - 12:12, 12:16, 19:7, 22:17, 29:4, 36:6, 51:13, 56:20, 57:12, 66:24, 78:10, 79:2, 86:11, 91:18, 110:12, 118:10, 125:24, 136:8, 138:11, 138:15,

139:22, 142:24, 144:10, 147:10, 147:16, 147:17, 147:18, 166:19, 171:1, 178:15, 186:13, 187:20, 194:15, 195:2, 213:17, 222:15
seeing [1] - 36:21
seem [8] - 15:2, 56:8, 56:10, 68:22, 90:10, 94:7, 212:20
SEIFERT [35] - 1:12, 119:5, 119:8, 119:13, 119:19, 136:13, 139:25, 140:16, 143:1, 144:12, 153:6, 153:10, 153:12, 159:12, 159:19, 164:12, 172:6, 175:22, 176:9, 176:12, 176:20, 178:19, 206:14, 212:9, 213:11, 217:3, 218:15, 218:25, 219:3, 219:18, 220:8, 221:12, 221:24, 222:1, 222:10
Seifert [6] - 3:10, 119:6, 119:7, 172:4, 176:11, 179:24
Seifert)........................ .......... [4] - 2:15, 2:16, 2:18, 2:19
seized [3] - 12:11, 28:5, 100:21
selected [1] - 125:4
send [1] - 162:3
sense [9] - 27:21, 35:10, 91:19, 154:6, 158:25, 172:19, 200:6, 209:1, 217:15
sent [1] - 125:4
sentence [2] - 27:17, 175:15
sentences [3] - 27:22, 143:10, 175:2
September [1] - 178:9
sergeant [3] - 26:21, 101:21, 101:25
series [1] - 68:11
serious [3] - 79:20, 83:8, 83:9
serve [6] - 26:12, 26:15, 121:5, 127:2, 128:2, 128:6
served [5] - 40:18, 98:22, 126:19,

128:13, 128:18
**service** [5] - 8:13, 26:15, 60:18, 96:25, 100:3
**Service** [1] - 96:17
**services** [4] - 122:22, 132:4, 158:23, 170:2
**serving** [3] - 128:5, 133:22, 135:15
**session** [10] - 162:20, 167:6, 169:17, 171:6, 171:11, 171:23, 183:2, 183:3, 191:2, 217:23
**sessions** [5] - 169:25, 171:17, 182:24, 182:25, 183:2
**set** [7] - 6:4, 6:19, 119:10, 144:21, 183:6, 183:22, 199:25
**set-up** [2] - 6:4, 183:22
**setting** [4] - 4:17, 134:2, 219:14
**settle** [1] - 184:7
**seven** [3] - 97:22, 117:22, 177:4
**several** [4] - 122:23, 152:3, 160:14, 175:21
**shake** [1] - 145:19
**share** [1] - 129:13
**shared** [1] - 142:3
**sheet** [3] - 76:11, 76:12, 192:2
**sheets** [3] - 76:6, 202:1
**shifts** [1] - 117:22
**ship** [19] - 42:6, 44:15, 44:17, 46:18, 56:18, 57:14, 57:19, 57:23, 90:25, 113:20, 138:1, 141:24, 159:15, 160:16, 173:24, 186:13, 187:7, 187:23, 190:7
**ship's** [2] - 57:2, 186:13
**shirt** [7] - 37:25, 55:5, 86:15, 117:11, 178:18, 213:8
**shirts** [1] - 117:10
**shoes** [1] - 49:8
**shortly** [1] - 116:1
**shot** [1] - 161:19
**shoulder** [4] - 50:24, 51:2, 70:1, 110:18
**shoulders** [1] - 78:5
**show** [9] - 15:3, 45:17, 79:18, 87:23, 95:16,

142:10, 166:10, 185:18, 208:14
**showed** [1] - 166:12
**shower** [1] - 44:4
**showing** [10] - 38:13, 42:19, 43:2, 43:15, 43:20, 49:1, 50:17, 77:8, 139:17
**shown** [6] - 142:17, 151:10, 168:8, 168:10, 208:13, 214:20
**shows** [1] - 113:15
**shredded** [2] - 76:11, 76:12
**shut** [1] - 93:14
**shutting** [5] - 91:21, 91:25, 92:18, 93:13, 93:15
**sick** [4] - 21:14, 21:18, 49:10, 196:2
**sickness** [13] - 73:5, 73:8, 73:9, 73:22, 74:1, 74:4, 74:9, 74:12, 74:23, 81:12, 83:16, 186:12, 186:20
**side** [18] - 20:20, 30:6, 32:18, 42:5, 55:17, 74:24, 79:20, 79:25, 80:11, 81:18, 88:18, 113:15, 124:6, 126:14, 149:10, 149:11, 175:16
**sides** [1] - 38:5
**sign** [13] - 143:18, 161:22, 166:10, 166:11, 166:24, 170:14, 170:15, 175:20, 176:3, 182:19, 193:14, 193:17, 208:14
**signature** [12] - 142:24, 143:5, 144:11, 144:22, 145:1, 166:14, 166:18, 170:12, 192:1, 208:19
**signatures** [6] - 142:20, 144:9, 191:21, 191:23, 198:7, 198:9
**signed** [2] - 170:20, 171:4
**significant** [5] - 51:4, 81:3, 81:5, 82:1, 85:3
**significantly** [1] - 197:11
**signing** [1] - 143:21

**signs** [9] - 54:1, 76:9, 79:18, 87:23, 95:12, 95:16, 157:17, 161:8, 204:20
**silent** [1] - 152:5
**similar** [6] - 38:12, 42:3, 107:7, 186:9, 187:5, 201:22
**simply** [1] - 60:4
**simultaneous** [4] - 127:3, 127:11, 127:12, 127:18
**single** [4] - 74:5, 134:23, 148:22, 148:23
**sit** [4] - 25:4, 157:22, 173:10, 184:11
**site** [2] - 28:8, 149:1
**sitting** [8] - 18:8, 110:17, 136:12, 149:11, 149:17, 178:17, 181:9, 189:18
**situation** [6] - 56:3, 91:24, 92:17, 133:23, 134:1, 207:23
**situations** [2] - 91:7, 92:10
**six** [2] - 8:7, 8:15
**size** [1] - 98:13
**sketch** [3] - 44:25, 45:2, 45:11
**sketching** [1] - 41:21
**skills** [7] - 123:23, 124:7, 124:23, 125:22, 129:5, 129:11, 129:23
**sleep** [4] - 204:11, 206:21, 208:7, 210:6
**sleeping** [5] - 109:1, 138:12, 145:22, 196:4
**slept** [6] - 84:15, 203:8, 203:9, 210:5, 210:7, 210:8
**slight** [4] - 51:1, 112:20, 112:23, 113:22
**slightly** [3] - 27:20, 56:2, 95:2
**small** [10] - 47:22, 52:3, 77:1, 79:17, 97:6, 98:14, 197:3, 205:7, 205:9, 205:11
**smile** [2] - 150:22, 205:15
**smiling** [1] - 157:13
**smooth** [2] - 46:17, 98:6

**smoothly** [1] - 98:9
**snack** [1] - 157:24
**so..** [1] - 200:3
**soccer** [7] - 150:17, 150:25, 158:7, 197:3, 205:8, 205:13, 205:16
**social** [5] - 150:13, 150:19, 158:6, 158:10, 205:16
**solely** [2] - 219:8, 219:25
**solution** [1] - 44:13
**someone** [11] - 38:1, 90:14, 90:17, 93:13, 181:9, 182:10, 182:16, 208:10, 208:13, 208:16
**sometime** [1] - 190:12
**sometimes** [2] - 133:16, 133:17
**somewhere** [2] - 181:13, 181:15
**song** [1] - 153:11
**soon** [4] - 164:14, 189:8, 195:19, 207:25
**sore** [2] - 69:11, 84:14
**sorry** [16] - 69:1, 69:23, 79:5, 83:14, 83:24, 84:24, 84:25, 85:8, 87:25, 160:18, 175:12, 179:24, 183:1, 188:4, 195:16, 218:24
**sort** [9] - 91:18, 110:4, 111:2, 112:15, 127:15, 155:15, 191:11, 215:3, 216:15
**sorts** [2] - 101:7, 132:12
**sound** [2] - 133:8, 133:11
**sounds** [2] - 188:5, 207:5
**source** [5] - 66:1, 66:10, 66:12, 78:18, 78:20
**south** [1] - 134:22
**space** [1] - 41:23
**span** [1] - 112:6
**spanned** [1] - 188:6
**spasm** [1] - 70:1
**speaker** [6] - 26:22, 26:23, 129:24, 133:23, 134:2, 159:15
**speakers** [4] - 125:11, 129:1, 130:2, 133:18

**speaking** [13] - 5:25, 37:1, 86:21, 94:1, 124:13, 124:14, 128:25, 130:9, 132:7, 147:13, 166:21, 173:21, 182:21
**speaks** [2] - 106:12, 130:12
**special** [9] - 7:14, 7:17, 7:23, 20:20, 25:24, 59:18, 176:24, 177:11, 190:1
**Special** [21] - 5:21, 5:24, 6:3, 6:13, 7:8, 7:18, 9:1, 16:13, 17:10, 18:12, 19:9, 20:5, 20:18, 21:1, 23:13, 23:14, 24:5, 39:24, 40:22, 142:1, 176:13
**SPECIAL** [8] - 2:3, 2:5, 2:8, 2:18, 7:11, 25:10, 39:18, 176:18
**specialization** [1] - 60:23
**specialized** [2] - 10:13, 26:5
**specialties** [1] - 129:11
**specific** [14] - 10:17, 14:19, 32:11, 65:14, 91:12, 107:16, 107:24, 116:17, 116:23, 131:12, 169:2, 169:4, 219:8, 219:20
**specifically** [17] - 14:20, 32:8, 65:22, 83:4, 122:24, 123:10, 126:14, 128:16, 129:10, 130:6, 131:4, 133:22, 143:20, 173:16, 174:18, 177:19, 216:18
**specifics** [2] - 149:4, 168:21
**spectrum** [4] - 61:4, 92:6, 92:19, 93:23
**speculation** [1] - 164:12
**speed** [1] - 100:9
**spell** [7] - 7:15, 25:14, 39:22, 74:17, 77:3, 119:23, 177:1
**spent** [5] - 35:23, 52:25, 86:7, 86:20, 95:15

**spitting** [1] - 19:20
**splash** [1] - 35:6
**spoken** [2] - 130:16, 134:6, 148:11, 158:9
**spot** [1] - 144:17
**spots** [2] - 114:14, 114:23
**squad** [3] - 40:19, 177:7, 177:8
**square** [1] - 139:13
**staff** [3] - 26:21, 58:13, 58:15
**staged** [1] - 46:10
**staging** [1] - 18:5
**stakeholders** [1] - 6:19
**stance** [1] - 104:1
**stand** [6] - 7:5, 25:8, 30:14, 59:22, 176:16, 177:9
**standard** [11] - 107:20, 110:5, 117:9, 123:14, 123:17, 135:1, 162:12, 182:7, 185:3, 185:21, 203:22
**Standard** [3] - 27:4, 27:7, 134:22
**standby** [1] - 105:6
**standing** [5] - 18:9, 20:20, 21:1, 96:6, 119:16
**standpoint** [1] - 63:6
**stars** [1] - 125:20
**start** [15] - 48:15, 89:9, 121:1, 121:9, 136:25, 152:3, 160:16, 163:15, 170:13, 171:11, 191:24, 197:1, 209:13, 214:3, 214:7
**started** [17] - 27:3, 35:4, 89:11, 121:2, 149:6, 153:1, 162:23, 164:1, 164:8, 164:17, 164:19, 164:21, 169:21, 185:12, 207:11, 207:23, 214:4
**starting** [2] - 40:17, 129:12
**state** [5] - 19:3, 33:3, 35:9, 48:17, 57:22
**State** [14] - 121:2, 121:3, 121:4, 121:6, 121:8, 126:18, 126:22, 126:24, 127:25, 128:3, 128:7, 135:21

**statement** [10] - 69:9, 152:6, 157:11, 157:12, 204:25, 205:1, 213:2, 215:21, 216:5
**statements** [4] - 3:18, 6:13, 152:3, 152:13
**STATES** [3] - 1:1, 1:3, 1:10
**States** [24] - 1:12, 3:3, 3:9, 8:14, 8:17, 26:7, 26:10, 26:11, 26:20, 37:5, 59:25, 60:15, 60:19, 60:20, 61:23, 96:15, 119:3, 119:6, 120:4, 120:13, 133:8, 133:11, 190:3, 223:12
**stationed** [2] - 121:21, 177:5
**status** [4] - 28:19, 53:6, 80:8, 80:9
**stay** [5] - 6:18, 158:1, 172:21, 189:6, 208:23
**stayed** [2] - 158:3, 158:4
**stenographic** [1] - 223:6
**stenography** [1] - 1:24
**step** [16] - 24:5, 48:10, 64:25, 65:5, 69:15, 104:8, 119:15, 137:4, 137:9, 138:9, 160:18, 163:21
**stepped** [1] - 49:24
**steps** [17] - 13:10, 13:12, 28:20, 31:25, 41:23, 42:10, 49:20, 53:3, 74:11, 98:5, 98:12, 102:19, 103:18, 104:5, 109:21, 136:25, 138:10
**stern** [1] - 46:10
**still** [10] - 13:14, 21:4, 21:6, 47:14, 112:14, 125:6, 163:18, 195:2, 213:22, 218:20
**Stokes** [1] - 46:24
**stomach** [2] - 187:3, 187:4
**stood** [1] - 46:12
**stop** [4] - 35:12, 113:2, 194:12, 209:23
**Stop'** [1] - 55:23
**stopped** [2] - 72:6, 194:13
**straight** [3] - 35:10,

35:12, 115:23
**strapped** [2] - 46:23, 101:2
**strategy** [12] - 142:5, 180:8, 184:3, 185:24, 186:1, 186:5, 206:20, 207:21, 207:25, 210:21, 211:6, 215:5
**Street** [2] - 1:14, 1:18
**stress** [1] - 56:6
**strike** [1] - 212:17
**strip** [2] - 49:22, 103:20
**struck** [6] - 19:23, 20:9, 33:7, 33:8, 33:12, 33:17
**structure** [1] - 27:17
**stuck** [1] - 161:23
**stuff** [1] - 59:3
**style** [3] - 37:11, 38:4, 38:6
**subject** [8] - 9:9, 10:3, 10:25, 11:11, 62:21, 126:19, 127:19, 129:17
**subject's** [2] - 11:10, 52:3
**subjected** [2] - 49:12, 125:1
**subjective** [15] - 65:1, 65:3, 65:10, 65:11, 65:20, 65:25, 66:2, 68:3, 68:6, 68:14, 68:16, 69:1, 69:17, 79:13, 86:4
**subjects** [7] - 122:19, 123:1, 132:1, 177:19, 177:21, 178:2, 178:5
**submerged** [2] - 19:17, 33:13
**submit** [1] - 220:4
**subsequent** [5] - 54:15, 64:16, 74:6, 124:21, 195:9
**subsequently** [1] - 34:7
**substance** [4] - 197:23, 198:2, 199:15, 200:4
**substantive** [1] - 191:12
**successful** [1] - 46:8
**suffered** [1] - 92:9, 112:19
**suffering** [1] - 73:20, 186:12
**suggest** [1] - 222:8
**suicidal** [2] - 83:4,

85:20
**summarize** [1] - 91:12
**summary** [11] - 4:24, 218:12, 218:13, 218:20, 218:24, 219:8, 219:13, 219:14, 219:16, 219:20
**summations** [1] - 6:23
**superficial** [4] - 72:19, 77:1, 77:10, 77:14
**superiors** [1] - 135:16
**supervisor** [3] - 179:14, 182:16, 182:19
**supervisors** [1] - 180:6
**supplying** [1] - 17:17
**supposed** [2] - 137:10, 141:6
**suppress** [1] - 3:18
**surf** [1] - 32:19
**surgery** [2] - 66:23, 78:23
**surprised** [2] - 157:13, 204:15
**surrounded** [1] - 42:17
**swabs** [1] - 53:12
**SWAT** [1] - 8:4
**sworn** [2] - 3:5, 7:7
**Sworn** [7] - 7:11, 25:10, 39:18, 60:10, 96:8, 119:17, 176:18
**symptoms** [7] - 90:17, 91:12, 91:13, 91:18, 91:21, 105:1, 186:14
**Syracuse** [1] - 8:10
**Syrian** [1] - 130:24
**system** [5] - 47:21, 57:8, 101:1, 125:13, 209:24
**systems** [2] - 65:14, 65:16
**Systems** [2] - 82:20, 86:4

## T

**T-shirt** [1] - 117:11
**T-shirts** [1] - 117:10
**Tab** [10] - 9:12, 15:3, 42:13, 44:23, 49:1, 50:12, 64:1, 99:1, 107:3, 114:9
**table** [6] - 45:22, 149:9, 149:12, 149:18, 183:12
**tabs** [1] - 105:23
**Tabs** [1] - 105:24

**tackle** [1] - 47:20
**tactical** [1] - 8:3
**talks** [1] - 156:14
**tape** [2] - 45:7, 181:4
**Tarts** [1] - 191:5
**task** [2] - 179:3, 179:4
**Task** [1] - 179:5
**taught** [1] - 134:23
**TCON** [1] - 91:2
**tea** [1] - 191:3, 197:10
**Team** [3] - 26:2, 26:5, 26:6
**team** [22] - 7:25, 8:2, 8:4, 8:6, 8:8, 8:11, 12:2, 12:5, 22:22, 23:25, 26:7, 32:12, 46:9, 97:11, 178:22, 178:24, 179:1, 179:12, 183:23, 202:5, 210:24, 215:8
**teams** [2] - 97:6, 160:8
**tearful** [4] - 72:4, 94:4, 94:8, 117:24
**teary** [1] - 171:18
**technical** [2] - 127:19, 129:15
**technically** [1] - 213:24
**technique** [1] - 185:25
**telephone** [3] - 124:6, 124:7, 124:12
**television** [1] - 120:23
**temperature** [3] - 63:1, 111:21
**template** [3] - 68:2, 76:7
**ten** [9] - 11:24, 11:25, 59:20, 59:22, 69:11, 69:24, 96:23, 121:14, 176:8
**ten-minute** [2] - 59:20, 176:8
**ten-second** [1] - 11:25
**tens** [1] - 131:21
**tense** [2] - 15:2, 94:10
**term** [3] - 36:21, 112:8, 116:23
**terminate** [1] - 196:1
**terminology** [3] - 63:17, 63:20, 87:14
**terms** [34] - 9:19, 11:6, 17:2, 18:18, 27:17, 27:19, 28:22, 29:16, 32:5, 41:22, 46:15, 64:23, 68:22, 73:22, 76:3, 87:2, 89:8, 94:20, 108:9, 110:6, 111:25, 115:17, 116:18, 129:16, 133:10, 133:12,

137:18, 137:21,
184:4, 185:18,
198:19, 206:3
**terrible** [1] - 59:6
**territorial** [1] - 177:8
**terrorism** [3] - 26:7,
26:8, 26:9
**test** [5] - 57:11, 124:1,
124:7, 125:13, 126:4
**testers** [1] - 124:6
**testified** [1] - 212:7
**testifies** [1] - 222:6
**testify** [6] - 5:4, 5:22,
6:1, 6:4, 6:8, 6:10
**testifying** [1] - 60:4
**testimony** [16] - 5:24,
25:1, 39:12, 59:12,
92:23, 95:20, 118:6,
141:13, 162:1,
162:4, 167:2, 176:7,
216:2, 217:6,
221:21, 222:7
**testing** [4] - 126:14,
126:20, 126:22,
129:3
**tests** [12] - 123:23,
123:25, 124:4,
124:8, 124:9,
124:16, 124:18,
124:22, 125:18,
126:7, 126:16,
126:25
**text** [2] - 132:16,
147:18
**TFO** [2] - 142:1,
148:21
**THE** [135] - 1:1, 1:1,
1:9, 3:2, 3:11, 3:14,
3:16, 3:17, 3:21, 4:6,
4:10, 4:14, 4:16,
4:20, 5:3, 5:6, 5:9,
5:13, 5:17, 6:20, 7:4,
7:8, 7:10, 12:21,
23:19, 24:21, 24:22,
24:25, 25:2, 25:5,
25:7, 25:8, 29:13,
37:17, 38:2, 38:4,
38:7, 38:8, 39:11,
39:13, 39:14, 39:15,
39:16, 51:17, 54:22,
59:11, 59:13, 59:14,
59:22, 59:24, 60:6,
60:8, 60:9, 61:17,
61:19, 70:2, 70:4,
83:24, 84:2, 84:5,
84:6, 86:18, 88:10,
92:24, 94:16, 95:19,
95:21, 95:22, 95:25,
96:3, 96:5, 96:6,
110:21, 116:11,

118:2, 118:5, 118:9,
119:2, 119:7,
119:10, 119:15,
134:10, 134:12,
134:14, 134:15,
134:17, 136:15,
140:18, 140:20,
143:4, 144:15,
153:4, 153:9,
153:11, 164:13,
172:4, 175:24,
176:6, 176:11,
176:14, 176:15,
176:16, 178:21,
179:24, 180:1,
180:2, 180:3, 180:4,
180:5, 212:10,
217:4, 217:9,
217:18, 217:20,
218:7, 218:10,
218:13, 218:24,
219:1, 219:17,
220:1, 220:4,
220:13, 220:16,
220:25, 221:5,
221:9, 221:16,
221:18, 221:20,
221:25, 222:8,
222:11, 222:14,
222:19
**themselves** [3] - 6:13,
129:1, 164:23
**there'll** [1] - 220:8
**thereafter** [1] - 199:22
**thinking** [1] - 203:10
**third** [17] - 18:1, 18:3,
18:4, 18:6, 31:21,
31:23, 31:24, 32:4,
32:13, 32:19, 35:20,
64:14, 65:4, 155:17,
175:5, 202:10, 214:6
**thirsty** [3] - 31:7, 31:9,
31:10
**thoughts** [1] - 85:20
**thousands** [1] -
122:14
**threatening** [2] - 39:7,
102:6
**three** [20] - 8:11,
24:16, 26:18, 27:9,
33:5, 33:7, 40:10,
40:21, 55:24, 57:13,
126:24, 143:9,
167:9, 167:10,
174:21, 180:16,
182:25, 183:1,
188:20, 210:6
**threw** [1] - 195:20
**throat** [1] - 69:11
**throughout** [18] -

35:23, 98:15, 98:24,
100:23, 102:6,
103:16, 103:19,
104:2, 107:2, 112:8,
112:21, 115:18,
153:17, 156:2,
158:23, 186:3,
190:23
**tightness** [1] - 114:6
**timeline** [2] - 164:18,
213:13
**timing** [2] - 6:22,
173:14
**tissue** [1] - 77:13
**title** [1] - 121:19
**today** [18] - 4:17,
12:12, 29:5, 86:11,
92:23, 110:13,
127:15, 136:1,
136:8, 141:13,
173:4, 173:8,
173:10, 178:8,
178:16, 186:8,
216:2, 217:24
**together** [1] - 121:7
**tomorrow** [4] - 6:23,
218:5, 220:9, 221:11
**tone** [19] - 37:1, 37:3,
37:4, 37:8, 39:7,
101:23, 102:2,
115:21, 115:23,
148:6, 148:12,
148:15, 148:16,
148:19, 185:22,
186:7, 190:15,
203:15
**Tony** [2] - 182:25,
204:13
**took** [28] - 13:11,
18:13, 21:9, 27:3,
41:16, 50:10, 53:11,
57:12, 76:7, 95:9,
102:20, 103:1,
109:21, 123:25,
124:19, 164:14,
182:25, 183:1,
183:2, 187:7,
195:13, 196:11,
199:17, 202:18,
202:20, 205:20
**top** [8] - 12:17, 50:24,
101:8, 109:3, 109:4,
110:17, 147:9,
174:11
**topic** [1] - 208:24
**topics** [1] - 150:13
**touched** [1] - 32:3
**tougher** [1] - 195:1
**toward** [1] - 32:22
**towards** [4] - 19:10,

147:15, 171:23,
198:10
**trained** [4] - 10:17,
46:16, 61:24, 90:22
**training** [12] - 10:13,
10:16, 26:5, 27:1,
40:16, 61:22, 62:1,
90:21, 97:7, 129:3,
129:4, 177:22
**traits** [1] - 92:19
**transcribed** [1] - 76:10
**transcript** [3] - 1:24,
223:6, 223:7
**TRANSCRIPT** [1] - 1:9
**transcription** [1] -
1:25
**transfer** [5] - 6:2,
22:23, 34:7, 41:3,
108:17
**transferred** [3] -
20:14, 21:23, 35:15
**transferring** [3] - 24:6,
34:11, 40:20
**transit** [3] - 15:16,
15:17, 23:1
**transiting** [1] - 21:3
**translate** [10] - 63:18,
107:22, 107:25,
121:24, 121:25,
122:13, 141:8,
162:11, 184:13,
212:15
**translated** [6] -
107:16, 124:10,
145:16, 203:24,
208:11, 209:21
**translation** [11] -
108:1, 123:8, 124:1,
125:7, 132:5, 139:8,
162:9, 169:10,
175:17, 206:2,
215:13
**translations** [6] -
122:1, 123:11,
124:8, 125:4,
125:10, 193:18
**translator** [9] - 9:18,
9:22, 47:10, 48:22,
54:4, 54:12, 122:11,
137:7, 137:8
**transport** [7] - 5:22,
16:4, 17:25, 44:14,
46:13, 49:11, 50:9
**transported** [3] -
31:21, 48:7, 56:4
**transporting** [1] - 16:1
**trash** [1] - 79:17
**trauma** [3] - 71:11,
92:10, 94:21
**traumatic** [13] - 91:7,

91:9, 91:12, 91:14,
91:17, 91:18, 91:24,
92:10, 92:17, 93:1,
93:2, 93:7
**travel** [2] - 136:16,
174:2
**traveled** [1] - 174:1
**treadmills** [2] -
183:11, 183:12
**treat** [5] - 22:22, 73:10,
74:11, 79:23, 81:12
**treated** [2] - 54:8,
54:10
**treating** [1] - 92:16
**treatment** [4] - 6:9,
72:22, 97:16, 113:25
**tremendous** [1] -
129:9
**trench** [1] - 16:19
**tried** [2] - 9:24, 21:2
**trip** [2] - 63:1, 128:22
**trouble** [3] - 71:7,
149:21, 149:23
**true** [2] - 223:5, 223:7
**try** [12] - 5:18, 5:20,
6:15, 9:22, 18:25,
47:1, 56:6, 92:25,
111:14, 129:15,
186:19, 213:12
**trying** [5] - 19:1,
32:24, 55:21, 93:12,
163:15
**tucked** [1] - 117:11
**Tuesday** [1] - 1:4
**turn** [39] - 8:19, 9:12,
15:3, 42:13, 44:23,
46:3, 49:1, 52:17,
55:16, 57:19, 58:9,
64:1, 67:9, 67:18,
81:22, 89:15, 89:23,
99:1, 100:20, 107:3,
108:7, 110:11,
110:22, 111:3,
114:9, 114:18,
115:1, 138:18,
140:4, 141:11,
142:10, 143:25,
169:14, 174:9,
175:11, 183:10,
191:19, 192:13
**turned** [1] - 147:14
**turning** [7] - 67:4,
70:14, 83:22, 84:7,
135:25, 146:16,
155:11
**twice** [4] - 34:22, 79:3,
162:2, 162:3
**two** [35] - 6:12, 27:3,
27:9, 59:17, 64:12,
64:21, 65:12, 65:15,

66:22, 74:7, 78:23,
80:6, 90:12, 105:15,
108:17, 110:9,
114:8, 124:3, 126:1,
128:4, 141:19,
143:9, 151:18,
167:9, 174:22,
174:23, 182:11,
183:16, 184:25,
202:16, 207:8,
210:14, 218:17,
218:19
**two-hour** [1] - 207:8
**two-week** [1] - 126:1
**type** [19] - 10:16,
10:17, 29:22, 46:21,
58:6, 84:9, 85:8,
87:24, 110:7,
115:12, 124:22,
129:14, 134:19,
137:13, 141:25,
148:5, 150:1,
182:13, 182:14
**typed** [1] - 182:17
**typed-up** [1] - 182:17
**types** [12] - 27:17,
30:12, 50:8, 92:18,
97:7, 123:5, 125:18,
133:25, 137:1,
186:18, 186:21,
202:12
**typically** [1] - 215:4

## U

**U.S** [10] - 1:13, 1:22,
120:15, 121:2,
121:12, 126:24,
128:10, 131:14,
134:16, 204:16
**UAE** [1] - 130:20
**unborn** [1] - 150:18
**unclassified** [3] - 4:24,
218:12, 221:1
**under** [10] - 18:17,
18:24, 21:2, 65:22,
82:20, 116:20,
174:12, 191:8,
217:14, 219:11
**undergarments** [1] -
104:2
**undergraduate** [1] -
62:1
**underlined** [1] - 143:7
**underneath** [2] -
18:13, 144:11
**understood** [25] -
23:10, 31:13, 43:12,
54:13, 56:3, 84:5,
103:18, 106:22,
134:3, 145:14,

145:19, 146:23,
146:25, 153:19,
153:25, 154:1,
154:9, 159:7,
192:22, 193:1,
198:24, 199:2,
211:1, 212:23
**underwear** [5] - 49:23,
53:2, 72:3, 103:6,
103:20
**unexpected** [1] - 79:4
**unfold** [1] - 106:17
**uniform** [4] - 104:3,
104:5, 117:5, 117:6
**uniforms** [2] - 100:1,
100:3
**unit** [2] - 8:3, 9:18
**UNITED** [3] - 1:1, 1:3,
1:10
**United** [24] - 1:12, 3:3,
3:9, 8:14, 8:17, 26:7,
26:10, 26:20, 37:5,
59:25, 60:15, 60:19,
60:20, 61:23, 96:14,
119:3, 119:6, 120:4,
120:12, 133:8,
133:11, 190:3,
223:12
**units** [1] - 97:5
**unknown** [3] - 32:1,
32:8, 34:18
**unless** [1] - 103:17
**unrelated** [1] - 150:12
**unresponsive** [1] -
94:22
**unsatisfactory** [2] -
125:14, 125:15
**unscheduled** [1] -
79:5
**unstrapped** [1] -
102:15
**unusual** [3] - 19:1,
20:8, 34:19
**up** [72] - 6:4, 6:24,
18:25, 19:3, 19:5,
25:9, 28:25, 29:14,
30:14, 33:10, 42:4,
44:12, 44:14, 46:18,
47:6, 47:25, 48:7,
49:12, 51:19, 61:7,
67:20, 71:7, 72:5,
74:15, 79:25, 82:25,
85:16, 91:22, 93:18,
94:10, 94:21, 100:9,
101:2, 101:11,
102:11, 102:15,
119:15, 124:23,
125:3, 129:5,
129:23, 135:12,
138:25, 141:19,

160:25, 172:1,
172:19, 172:21,
176:11, 181:9,
182:13, 182:14,
182:17, 182:21,
182:22, 183:6,
183:22, 186:22,
189:9, 195:20,
196:5, 199:8,
202:20, 205:21,
206:21, 206:22,
214:2, 214:9,
215:23, 216:23,
217:23, 222:17
**upper** [2] - 78:5,
111:25
**upset** [3] - 72:4, 187:3,
201:9
**upstairs** [1] - 200:15
**uses** [1] - 194:11
**usher** [1] - 32:1
**utilized** [2] - 17:1,
98:22

## V

**V1** [1] - 221:22
**van** [1] - 13:14
**variety** [2] - 97:4,
197:2
**various** [3] - 6:19,
13:20, 23:8
**varying** [1] - 13:20
**vastly** [1] - 90:12
**vehicle** [17] - 10:20,
10:23, 10:24, 11:10,
11:16, 11:18, 11:19,
11:20, 11:22, 12:1,
12:23, 14:10, 15:14,
16:1, 18:8, 28:16
**veracity** [1] - 222:5
**verbal** [1] - 13:9
**verbally** [4] - 31:17,
145:14, 145:18,
175:19
**verbatim** [3] - 147:3,
151:11, 155:22
**verbiage** [1] - 104:15
**verify** [1] - 123:23
**version** [14] - 139:1,
141:17, 155:13,
182:17, 184:10,
184:12, 184:13,
184:20, 192:14,
218:21, 219:6,
219:8, 219:20, 220:2
**versions** [1] - 135:6
**versus** [2] - 133:11,
133:17
**vessel** [72] - 5:23, 6:2,

6:5, 6:6, 21:17,
21:23, 22:2, 22:3,
22:5, 22:8, 22:10,
22:12, 22:16, 22:24,
24:7, 35:15, 35:18,
35:20, 41:11, 41:14,
41:18, 41:23, 41:24,
42:2, 42:5, 44:6,
44:10, 44:11, 44:25,
46:5, 46:9, 47:4,
47:13, 47:19, 47:22,
48:2, 56:4, 62:10,
62:12, 62:13, 63:8,
63:14, 67:15, 69:7,
80:22, 97:23, 100:6,
100:15, 100:22,
100:24, 100:25,
101:4, 101:10,
107:24, 110:1,
112:18, 112:21,
115:19, 136:17,
138:13, 142:18,
144:7, 145:7,
145:22, 157:17,
158:24, 160:12,
179:23, 183:4,
183:5, 187:17,
205:23
**vest** [1] - 17:14
**via** [1] - 91:2
**vicinity** [1] - 28:6
**victims** [1] - 122:20
**video** [7] - 56:23, 57:3,
57:5, 57:13, 57:14,
181:7, 182:6
**videoconference** [2] -
91:4, 91:5
**videos** [1] - 57:7
**videotape** [4] - 180:25,
181:8, 181:11,
181:12
**videotaping** [2] -
181:2, 181:10
**view** [1] - 14:2
**violate** [1] - 170:3
**violent** [1] - 40:18
**visibility** [1] - 44:17
**visibly** [1] - 72:4
**vision** [1] - 71:3
**visitors** [1] - 131:16
**visits** [1] - 73:17
**visual** [1] - 71:8
**vitae** [1] - 61:16
**vital** [1] - 76:9
**vitals** [1] - 103:10
**vividly** [1] - 120:21
**vocabulary** [5] - 27:18,
27:24, 127:22,
129:9, 129:15
**voice** [16] - 36:3, 61:5,

61:7, 102:2, 115:9,
115:10, 148:6,
148:12, 148:15,
148:16, 148:19,
167:25, 186:8,
190:15
**voices** [1] - 54:13
**vomited** [5] - 34:21,
69:7, 79:9, 80:21,
195:21
**vomiting** [9] - 35:4,
35:9, 35:13, 73:11,
74:5, 74:6, 74:7,
79:21, 79:23
**vomitus** [1] - 79:17
**vs** [4] - 1:5, 3:4, 60:1,
119:4

## W

**waist** [2] - 13:3, 19:4
**waited** [1] - 101:17
**waiting** [1] - 194:14
**waiver** [2] - 152:4,
194:17
**wakes** [2] - 214:2,
214:9
**walk** [1] - 18:24
**walked** [6] - 101:12,
105:19, 105:20,
106:11, 106:12,
115:25
**walking** [2] - 18:16,
138:10
**wall** [13] - 43:7,
108:18, 113:6,
113:14, 114:23,
138:23, 139:2,
139:4, 140:13,
146:16, 147:2,
170:23, 189:10
**walls** [6] - 55:7, 55:10,
55:12, 58:23,
183:15, 189:9
**warm** [1] - 56:6
**warmth** [1] - 17:21
**warning** [20] - 123:11,
140:22, 141:17,
147:1, 147:5, 156:6,
156:9, 169:19,
174:8, 174:11,
175:5, 192:9,
192:13, 194:6,
198:13, 198:16,
198:22, 201:25,
203:17, 203:21
**warnings** [17] -
106:17, 107:13,
107:18, 108:9,
123:8, 123:12,

123:16, 141:1,
142:7, 144:6,
169:17, 169:20,
171:6, 174:22,
178:5, 203:25
**was..** [1] - 163:10
**Washington** [4] - 1:15,
1:19, 1:23, 223:14
**watch** [2] - 129:25,
138:10
**watches** [2] - 100:3,
170:25
**watching** [1] - 137:24
**water** [12] - 7:9, 18:21,
19:4, 19:20, 31:2,
31:10, 49:11, 109:2,
191:1, 191:4, 197:10
**watercraft** [41] - 17:20,
18:11, 18:18, 18:19,
18:20, 19:2, 19:8,
19:16, 19:24, 20:1,
20:7, 20:8, 20:12,
20:15, 20:22, 20:25,
21:22, 32:2, 32:14,
32:17, 32:20, 32:22,
32:25, 33:5, 33:6,
33:11, 33:12, 33:18,
33:20, 33:22, 34:1,
34:8, 34:11, 34:19,
34:21, 34:22, 34:24,
35:7, 35:13, 36:20,
38:24
**wave** [2] - 19:5, 33:6
**waves** [3] - 33:4, 47:2
**ways** [2] - 129:22,
133:3
**weapons** [5] - 12:2,
12:5, 38:13, 99:23,
100:4
**wearing** [20] - 12:16,
12:17, 21:7, 29:8,
29:10, 37:22, 37:24,
38:10, 48:17, 49:7,
55:2, 55:4, 71:6,
117:1, 136:11,
136:12, 188:25,
189:1, 189:2, 199:12
**weather** [1] - 16:19
**week** [2] - 126:1,
218:17
**weeks** [4] - 27:10,
218:17, 218:19
**weighed** [1] - 49:18
**weight** [2] - 103:11,
114:6
**welfare** [3] - 31:8,
35:3, 36:16
**well-healed** [1] - 72:12
**West** [1] - 130:10
**west** [2] - 130:19,

134:21
**whistles** [1] - 220:20
**white** [2] - 49:8, 57:24
**whole** [3] - 5:1,
180:23, 214:21
**wife** [7] - 129:24,
130:12, 150:18,
158:17, 158:18,
158:20, 165:4
**willing** [2] - 152:5,
174:17
**window** [5] - 12:1,
14:10, 55:14,
103:15, 183:20
**windows** [1] - 55:12
**witness** [11] - 5:4, 7:7,
60:4, 95:23, 118:8,
140:4, 153:6,
217:23, 218:2,
221:23, 222:6
**WITNESS** [21] - 2:2,
7:10, 24:22, 25:2,
25:7, 38:4, 38:8,
39:13, 39:15, 59:13,
60:8, 84:2, 84:6,
95:21, 96:5, 134:12,
134:15, 176:15,
180:1, 180:3, 180:5
**Witness** [11] - 51:22,
64:5, 67:21, 72:16,
76:20, 99:4, 106:1,
107:6, 114:11,
114:20, 149:14
**witness's** [1] - 92:23
**witnessed** [4] - 15:22,
92:11, 93:17, 143:21
**witnesses** [14] - 3:19,
4:3, 4:4, 6:12, 6:17,
59:17, 122:19,
177:21, 217:7,
217:17, 217:20,
217:22, 218:1, 221:8
**wondering** [1] - 55:21
**word** [19] - 134:3,
134:4, 134:5, 134:7,
134:19, 137:3,
146:19, 147:3,
151:11, 154:1,
154:2, 155:22,
158:14, 169:13,
169:16
**words** [11] - 27:23,
144:21, 147:6,
153:24, 157:7,
167:16, 211:22,
211:24, 211:25,
212:20
**works** [1] - 122:11
**worried** [1] - 203:11
**worship** [1] - 130:1

**wrist** [3] - 113:22,
114:4, 114:14
**write** [3] - 134:21,
166:15, 208:17
**writing** [8] - 106:3,
134:9, 143:13,
143:15, 147:15,
166:14, 215:21,
217:15
**written** [9] - 116:22,
122:11, 134:7,
134:19, 135:1,
139:5, 170:19,
171:3, 192:3
**wrote** [5] - 9:17, 9:21,
192:3, 215:23, 216:1

## Y

**year** [3] - 121:14,
125:2, 172:24
**years** [23] - 8:7, 8:11,
8:15, 26:18, 27:3,
40:10, 40:13, 40:19,
40:21, 69:21, 69:24,
78:23, 96:23,
120:11, 121:5,
121:7, 121:13,
122:12, 122:13,
128:2, 128:4,
159:25, 177:4
**yell** [1] - 55:23
**Yemen** [1] - 130:21
**yesterday** [1] - 218:12
**York** [3] - 133:8,
177:6, 206:23
**yourself** [19] - 7:9,
7:15, 9:19, 25:14,
39:21, 51:19, 54:8,
63:11, 67:19,
119:22, 123:11,
136:16, 163:16,
174:3, 176:23,
179:5, 184:17,
187:16, 206:2
**yourselves** [2] - 3:7,
180:7

## Z

**Zofran** [6] - 79:25,
80:2, 80:7, 83:25,
84:3, 187:3
**Zulu** [25] - 11:6, 11:7,
24:23, 67:24, 80:25,
81:1, 84:4, 85:7,
85:8, 89:16, 89:24,
162:21, 170:19,
188:2, 188:14,
196:13, 200:11,
202:24, 207:2,

207:6, 210:4,
210:16, 210:17,
210:20, 214:13