REDACTED / CLEARED FOR PUBLIC RELEASE

Filed with Classified
Information Security Officer
CISO M Ceder 2
Date 5/16/2019

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

MUSTAFA MUHAMMAD MUFTAH AL-
IMAM

Defendant.

Case No. 17-cr-00213 (CRC)

## MEMORANDUM OPINION AND ORDER

Mustafa Al-Imam is charged in a seventeen-count criminal indictment stemming from his alleged role in the September 2012 attack on U.S. diplomatic and intelligence facilities in Benghazi, Libya. The Government moves to admit into evidence at trial telephone records that it alleges are associated with a phone number used by the Defendant's alleged co-conspirator, Ahmed Abu Khatallah, who was tried in this Court on virtually identical charges in 2017. The Government seeks admission of the records under Federal Rule of Evidence 803(6), the business-records exception to the prohibition on hearsay evidence. It also moves to admit certification from Mohamed Ben Ayad, the CEO of the cell-phone carrier Libyana Telecommunications, attesting to the authenticity of the records based on the factors set forth in 18 U.S.C. § 3505. Al-Imam opposes both requests.

The Government moved to admit these same phone records into evidence in advance of Abu Khatallah's trial. At that time, the Court held a hearing regarding the Government's acquisition of the records and Mr. Ayad's certification. Based on its factual findings, the Court concluded that the Government had met its burden to show by a preponderance of the evidence that the records were admissible. Here, Al-Imam renews objections to the introduction of the records made by Abu Khatallah and identifies perceived flaws in the Court's prior assessment.

REDACTED / CLEARED FOR PUBLIC RELEASE

For the reasons that follow, the Court will grant the Government's motion. Both the telephone records and Ayad's § 3505 certification are admissible at trial.

### I.   Factual Background

The Court draws the following factual background from its <u>Abu Khatallah</u> decision, based on the hearing it held on September 14, 2017. <u>See</u> <u>United States v. Abu Khatallah</u>, 278 F. Supp. 3d 1 (D.D.C. 2017).[1] Al-Imam has not contested or otherwise sought to revisit these factual findings.

The telephone records at issue were first obtained ███████████████████ ██████ in October 2012. Hr'g Tr. 19:20–24 (Sept. 14, 2017); Gov. Ex. 1101.[2] ███████ 



████████████████████████████████████████████████████████

_____

[2] In the prior proceedings, the Court admitted Government Exhibit 1101, ██████████ ████████████████████████████ for purposes of the hearing only. Hr'g Tr. 23:12 (Sept. 14, 2017).

███████████████████████████████████████████
███████████████████████

_____

[4] In the prior proceedings, Abu Khatallah pointed to some evidence suggesting the telephone number was not his, such as the fact that someone else is listed as the number's subscriber. <u>See, e.g.</u>, Hr'g Tr. 119:4–7 (Sept. 14, 2017). The Court concluded that sufficient evidence existed to infer the phone number was used by Abu Khatallah during the relevant time period, including that the listed subscriber was his brother, the testimony that Libyan law did not

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



prevent phones from being subscribed in another's name, and statements allegedly made to FBI Agent Justin O'Donnell indicating Abu Khatallah used this number at the time in question. See id. 20:20–24, 25:20–26:14, 45:8–16, 81:15–20, 86:22–87:1, 88:7–12, 88:24–25 (Sept. 14, 2017). Al-Imam has not renewed Abu Khatallah's arguments in this regard.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



4

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE



The Federal Bureau of Investigation ("FBI"), which was investigating the Benghazi attacks, obtained a copy of these telephone records in October 2012. Hr'g Tr. 70:13–15, 91:14–18 (Sept. 14, 2017). In January 2017, FBI Agent Justin O'Donnell contacted Mohamed Ben Ayad, the CEO and co-founder of Libyana, seeking to authenticate the records. Id. 71:16–20, 72:5, 73:21–23. Prior to meeting with him, Agent O'Donnell and other agents confirmed Ayad's identity as the Libyana CEO through open sources and publicly available information. Id. 72:10–17, 98:17–22. Agent O'Donnell and FBI Agent Mike Clarke met with Ayad outside the United States on January 21, 2017. Id. 72:2–5. At the meeting, O'Donnell and Clarke introduced themselves as FBI agents investigating the September 2012 attack on the U.S. Mission and Annex in Benghazi. Id. 72:20–24, 73:14–16. Ayad agreed to assist the two agents in their investigation with respect to the telephone records. Id. 73:18.

During the meeting, Agent O'Donnell and Agent Clarke showed Ayad a hard copy of the telephone records. Id. 74:6–10. Ayad told the agents that Libyana maintains call data records as a matter of general practice for reasons such as accountability and billing and that he was

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

familiar with Libyana's business records practices. Id. 73:24–74:3, 85:17–86:1, 102:4–5. He

then reviewed the records that the agents brought with them for several minutes. Id. 74:12–13.

After his review, he told the agents that the records were call data records from Libyana,

explaining that the format of the records and the "profile page" that listed the information about

the subscriber were unique to Libyana. Id. 74:17–19. Ayad explained that he had helped design

the format for the profile page with the subscriber information and recognized it. Id. 76:1–3. In

addition, Ayad told the agents that two particular telephone number prefixes—092 and 094—

were used solely for numbers serviced by Libyana and the number here had a 092 prefix. Id.

75:2–17. The agents then asked Ayad to sign a certification form attesting to the authenticity of

the records and walked him through the form line-by-line to confirm his understanding before he

signed it. Id. 76:7–11, 77:4–78:2. They thanked Ayad for his assistance and asked if he might

also be able to reproduce the telephone records from the Libyana databases. Id. 79:7–9.

     Following the meeting, Ayad emailed Agent O'Donnell additional phone records for the

same telephone number, this time covering February 21, 2014 through April 28, 2014. Id. 80:3–

9, 82:1–11.[5] Agent O'Donnell replied to Ayad via email, thanking him for the records but

clarifying that the Government was interested in telephone records for July to December 2012,

not February to April 2014. Id. 82:16–23. Ayad responded that he could not access those

records presently because Libyana's electronic records from 2012 had been corrupted, though

technicians were working on recovering the data. Id. 83:1–3, 105:1–2, 107:4–6, 126:7–19.

---

    [5] In the prior proceedings, defense counsel argued that these later records were suspect
because they reflect calls made after Abu Khatallah was in custody. Hr'g Tr. 153:16–154:2
(Sept. 14, 2017). However, the additional records produced for the specific number associated
with Abu Khatallah covered February 21, 2014 through April 28, 2014, before Abu Khatallah
was captured in June 2014. Id. 82:6–11. Ayad also provided records that included calls in 2016
for *other* numbers that had the same subscriber—Abu Khatallah's brother—listed. Id. 80:10–17.
As such, the record before the Court does not suggest there were calls made from the number
associated with Abu Khatallah after his capture.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Agent O'Donnell and Ayad spoke again by phone in July 2017, and Ayad confirmed that he was still unable to access the requested data from 2012. Id. 107:7–10, 112:3–10.

On July 12, 2017, Agent O'Donnell sent an electronic version of the telephone records to Ayad and asked him to analyze them once more and compare them to existing phone records in the Libyana databases. Id. 83:6–13, 108:10–14, 109:23–110:4, 110:18–19. Ayad did so, and confirmed once again that the telephone records were Libyana call data records. Id. 83:15, 84:10–17, 84:25–85:1. He also provided another certification as to the authenticity of the records, signed on July 18, 2017. Id. 83:16, 84:4. This certification, which was made under penalty of perjury of the laws of Libya, attested that the records "were made at or near the time of the occurrence of the matters set forth therein by (or from information transmitted by) a person with knowledge of those matters," "were kept in the course of regularly conducted business activity," "were made by the said business activity as a regular practice," and "if not original records, are duplicates of original records." Mot. in Limine to Introduce Phone Records ("MIL") Ex. E, ECF No. 78-5.

Agent O'Donnell also attempted to confirm the authenticity of the records by verifying that they included calls that other evidence indicated had occurred in that time period. Hr'g Tr. 86:2–6 (Sept. 14, 2017). For instance, during interviews with Abu Khatallah following his capture in June 2014, Abu Khatallah apparently told Agent O'Donnell that he had a phone call with a number ending in 8891 on the evening of the attacks, September 11, 2012, around 8:30 p.m. Id. 86:9–87:1. Agent O'Donnell examined the records and found an entry documenting a call with a number ending in 8891 on September 11, 2012 at 8:39 p.m. Id. 87:2–6. In addition, Abu Khatallah apparently told Agent O'Donnell about another specific call that he made to a phone number ending in 1530 on September 11, 2012—which the recipient of the call also

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

verified to Agent O'Donnell occurred. Id. 88:7–89:4. Agent O'Donnell found an entry in the telephone records documenting this call too. Id. 89:7–9. During the hearing, Agent O'Donnell testified that there were other examples of telephone calls that he knew occurred and had verified appeared on the records, though he could not recall any specific calls during the hearing. Id. 89:18–22, 122:8–22, 126:20–127:4.

The Court adds the following to its Abu Khatallah findings: Al-Imam told FBI agents that he did not speak to Abu Khatallah after leaving an Ansar Al-Sharia camp on the evening of the attacks. See Reply Supp. MIL Ex. F, ECF No. 115-1, at 3. This corresponds with the records, which show several calls between the number Al-Imam used, see id. at 1, and Abu Khatallah's purported number, none of which occurred after 10:45 p.m. See MIL Ex. C at 3433–34.

## II.   Legal Standard

Under the Federal Rules of Evidence, the Court "must decide any preliminary question about whether . . . evidence is admissible." Fed. R. Evid. 104(a). In considering admissibility, the Court "is not bound by evidence rules, except those on privilege." Id. The proponent of evidence must show by a preponderance of the evidence that any necessary prerequisites for admission have been met. Bourjaily v. United States, 483 U.S. 175, 176 (1987).

The Federal Rules of Evidence permit admission of a "record of an act, event, condition, opinion or diagnosis" as a business record excepted from the prohibition on hearsay if:

(1) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(2) the record was kept in the course of a regularly conducted activity of a business; and

(3) making the record was a regular practice of that activity.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Fed. R. Evid. 803(6). These conditions must be shown "by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification." Id. Finally, the record is only admissible if the opponent to admission "does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness." Id.

Neither of the certification options in Rule 902(11) or (12) apply here because the Government is seeking to admit foreign records in a criminal case. See Fed. R. Evid. 902(11) (discussing admission of *domestic* records); id. 902(12) (discussing admission of foreign records in a *civil* case). Instead, the Government relies on 18 U.S.C. § 3505, which provides that "a foreign record of a regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule" in a criminal case if there is a "foreign certification" attesting that:

(1) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

(2) such record was kept in the course of a regularly conducted business activity;

(3) the business activity made such a record as a regular practice; and

(4) if such record is not the original, such record is a duplicate of the original.

18 U.S.C. § 3505(a)(1). A "foreign certification" is defined as "a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the laws of that country." Id. § 3505(c)(2). A foreign record is admissible with a valid foreign certification that attests to the relevant requirements "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Id. § 3505(a)(1).

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

The Government argues that the telephone records are admissible under Rule 803(6) because the foreign certification signed by Ayad meets the requirements of § 3505, see Fed. R. Evid. 803(6)(D) (permitting the requirements to be shown by a certification that complies with a statute permitting certification), and because the testimony of the witnesses at the September 14, 2017 hearing, along with the certification, show the requirements of the Rule are met. Hr'g Tr. 137:11–24 (Sept. 14, 2017). The Court agrees and will admit the records through an appropriate witness, along with Ayad's certification.

## III. Analysis

### A. The Records

The Court will first briefly recap its Abu Khatallah holding before considering Al-Imam's contentions that it erred. Abu Khatallah held that Ayad's certification—the same certification at issue here—met the requirements of § 3505(a)(1). 278 F. Supp. 3d at 7. That certification, signed under the penalty of perjury of the laws of Libya, see 18 U.S.C. § 3505(c), attests that: (1) the records were made at or near the time of the occurrence of the matters set forth; (2) they were kept in the course of a regularly conducted business activity; (3) the business activity made such records as a regular practice; and (4) if the records were not the original, they were a duplicate of the original. See MIL Ex. E, ECF No. 78-5.

After considering the certification and the full factual record, the Court concluded that the certification met the requirements of § 3505 and that the Government met its *prima facie* burden under Rule 803(6). Abu Khatallah, 278 F. Supp. 3d at 7. Then, the Court considered whether "the source or the method or circumstance of preparation" of the records "indicate[d] a lack of trustworthiness," 18 U.S.C. § 3505(a)(1), and concluded they did not. At this step of the analysis, the burden was on the defendant, and the Court explained that "the record is silent as to

REDACTED / CLEARED FOR PUBLIC RELEASE

any indication of the alteration of the records . . . and supports the conclusion that the records obtained were Libyana call records." Abu Khatallah, 278 F. Supp. 3d at 8.

In holding that Ayad's certification satisfied § 3505, the Court considered the requirement that the declaration be made by either a "custodian of a foreign record . . . or another qualified person." 18 U.S.C. § 3505(c)(2); see Abu Khatallah, 278 F. Supp. 3d at 6–7. The Court held that Ayad was "another qualified person" based on D.C. Circuit precedent interpreting the qualifications of witnesses testifying pursuant to Rule 803(6) and the certification requirements of Rule 902(11). Abu Khatallah, 278 F. Supp. 3d at 6–7. Specifically, the Court explained that a qualified witness "need not have personal knowledge of the actual creation of the document," id. at 6 (quoting United States v. Adefehinti, 510 F.3d 319, 325 (D.C. Cir. 2007)), but "need only be 'familiar with the record-keeping procedures of the organization," id. (quoting United States v. Baker, 458 F.3d 513, 518 (6th Cir. 2006)). Based on this precedent and the full factual record illuminating the process by which the certification was obtained, the Court concluded that Ayad was a qualified person under the statute, even though there was no way for him to conduct a line-by-line comparison of the records to Libyana's database or personally attest to the records' accuracy or how they were gathered. Id. at 7 (collecting cases).

Al-Imam spies a problem with this holding. He argues that the Court followed precedent regarding the first three elements of § 3505(a)(1)—that the records were kept in the regular course of business as part of the business's regular practice and were made at or near the time of the relevant event—and erroneously applied it to the fourth element: that the records, if not original, were a duplicate of the original. In other words, Al-Imam contends that, whatever qualifications Ayad had to certify Libyana's record-keeping practices, he had no way to know that these records were duplicates of actual Libyana records created by those practices. More

11

REDACTED / CLEARED FOR PUBLIC RELEASE

specifically, because Ayad did not have first-hand knowledge of how the records were acquired or whether they were doctored in the interim, he could not attest that they were duplicates.

Section 3505's requirement that a witness attest to a record being a duplicate was not designed to be as rigid a threshold as Al-Imam suggests. Congress enacted § 3505 as a "simple, inexpensive substitute for the cumbersome and expensive procedures" of live-witness testimony under Rule 803(6). H.R. Rep. 98-907, at 3 (1984); see also United States v. Ross, 33 F.3d 1507, 1515 (11th Cir. 1994); United States v. Strickland, 935 F.2d 822, 830 (7th Cir. 1991). Reflecting this purpose, several circuit courts have explained that § 3505 "was not intended to add technical roadblocks to the admission of foreign records, but, rather, to streamline the admission of such records." United States v. Jawara, 474 F.3d 565, 584 (9th Cir. 2007) (quoting Strickland, 935 F.2d at 831); see also United States v. Garcia Abrego, 141 F.3d 142, 178 (5th Cir. 1998). Consistent with this purpose, § 3505 does "not change the benchmark question in this and every situation involving the admission of documentary evidence: do the documents bear the indicia of reliability?" Jawara, 474 F.3d at 479 (quoting Strickland, 935 F.2d at 831). Here, the Court has already concluded that, based on the testimony it heard from ▮▮▮▮▮▮▮ O'Donnell, the records are sufficiently reliable to be admitted under Rule 803(6).

Al-Imam suggests that Rule 803(6) requires that a record be "known by the witness to be a direct product of [the] record-keeping system." Opp'n to MIL at 3. He implies that a witness must either directly print or copy the record from the business's files or compare it to the original to ensure authenticity. Id. at 6. At the Court's motion hearing, Al-Imam's counsel indicated that a certification would be insufficient if the president of a foreign company were handed a report from the company's accounting department and certified to its status as a duplicate based on his experience seeing similar reports. Hr'g Tr. 27:13–28:14 (April 15, 2019). Yet neither Rule

REDACTED / CLEARED FOR PUBLIC RELEASE

803(6) nor § 3505 demands such formalism.[6]   See, e.g., Wye Oak Technology, Inc. v. Republic

of Iraq, Case No. 1:10-cv-01182-RCL, 2019 WL 1746326, at *3 (D.D.C. Apr. 18, 2019)

("Although [the witness] . . . did not find the documents herself, this does not preclude her from

being a qualified person . . . . Such individuals do not have to be the ones to retrieve the

records."); United States v. Marcos, Case No. SSSS 87 CR. 598 (JFK), 1990 WL 37845, at *5

(S.D.N.Y. Mar. 27, 1990) ("Neither Section 3505 nor Fed R. Evid. 803(6) . . . require that the

business records custodian ushering documents into evidence personally locate or prepare all

business records in the files of the business in order to identify them as business records."). Cf.

United States v. Chang An-Lo, 851 F.2d 547, 557 (2d Cir. 1988) (upholding admission of

business record duplicates where proponent witness testified that "[w]hile he had not compared

the specific page of the duplicate with the original, he did recognize the names and signatures of

the telephone operators and the handwriting, room numbers and printed format used on the

logs").

Further, Congress based § 3505 on Rule 803(6) and instructed courts to interpret "the

language in subsection (a)(1)(A), (B), (C), and (D) . . . in the same manner as the comparable

language in Rule 803(6) is interpreted." H.R. Rep. 98-907, at 3 (1984). While nothing in the

---

[6] Nor do the cases Al-Imam cites establish the proposition he advances. It is true that in
United States v. Estrella, 72 F.3d 920 (D.C. Cir. 1995) (tbl.), the D.C. Circuit explained that a
proponent of phone records is generally an employee who is knowledgeable about the process of
"printing the data that appears in the phone bill." Id. But the fact that a proponent witness will
generally know that the records came directly from a business's files is not tantamount to a
requirement that she watch it be printed. Nor does United States v. Baker, 458 F.3d 513 (6th Cir.
2006), require the proponent, as Al-Imam suggests, to compare the proffered records with
originals in the absence of such knowledge. First, while the Sixth Circuit in Baker noted that a
testifying postal inspector had "compared photocopies of the documents presented at trial with
actual Postal Office records to ensure that they were official records," id. at 519, the opinion
does not indicate that he compared the photocopies with the particular underlying records—as
opposed to other records to examine indicia of authenticity. And the postal inspector in Baker
testified to "his familiarity with the various details of the postal records," id., similar to Ayad's
examination of indicia of authenticity here.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

text of Rule 803(6) mirrors § 3505(a)(1)(D)'s requirement of certification that a document is an original or duplicate, the Rule does require a "qualified witness" to testify; this parallels § 3505's "qualified person" requirement. As the Court explained in Abu Khatallah, "qualified witness" is interpreted broadly. 278 F. Supp. 3d at 6–7. Thus, for example, a witness is qualified to testify that a record was made at or near the time of an occurrence based on general familiarity with a business's record-keeping procedures, even if the witness knows nothing about the creation of the particular record itself. See, e.g., United States v. Fahnbulleh, 752 F.3d 470, 478–79 (D.C. Cir. 2014); see also 30B Fed. Prac. & Proc. Evid. § 6863 (2018). Indeed, a person is qualified to offer such testimony even if the records were created by another entity. See, e.g., Adefehinti, 510 F.3d at 326. There is no reason to conclude that a similarly permissive principle does not obtain when assessing a person's qualifications to attest that a record is a duplicate of the original.

Ayad helped create the format of the Libyana database and was familiar with how it worked. Agent O'Donnell presented him with documents bearing several important indicia of Libyana phone records. And Ayad was able to pull records for the same phone number—albeit for a different time period. That intimate familiarity with the system, combined with indicia on the records themselves, led him to conclude that the records were indeed duplicates. Against the strong weight of authority that a person is "qualified" to attest to when a record was created based on general knowledge of a system and indicia on the documents themselves, the Court concludes that Ayad was qualified to certify that the records were duplicates of Libyana's original records.

True, a foundational witness under Rule 803(6) typically will have printed or copied the records from the business's files herself. But nothing in the Rule or in § 3505 requires such

14

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

near-metaphysical certainty. The circumstances of this case are no doubt unusual, if not extraordinary. But, at bottom, the question for the Court is straightforward: has the Government shown, by preponderance of the evidence, that these records are reliable and authentic business records? In Abu Khatallah, the Court held that, all told, the Government had met that burden, and Al-Imam provides no new reason to reverse course. As discussed, his argument that Ayad was not qualified to certify all of § 3505 requirements does not withstand scrutiny in light of the facts and the law governing business records. The Court therefore again concludes that the records are admissible.

### B. The Certification

The Government also seeks to introduce Ayad's certification. Al-Imam objects, contending that its admission would violate the Confrontation Clause of the Sixth Amendment to the Constitution.[7] Every court that has addressed this issue has concluded that admission of certifications provided pursuant to Rule 803(6)—including § 3505 and its analogs in Rules 902(11) and (12)—does not pose Confrontation Clause problems. See United States v. Anekwu, 695 F.3d 967, 976 (9th Cir. 2012); United States v. Johnson, 688 F.3d 494, 504 (8th Cir. 2012); United States v. Mallory, 461 F. App'x 352, 356–57 (4th Cir. 2012); United States v. Yeley-Davis, 632 F.3d 673, 679–80 (10th Cir. 2011); United States v. Ellis, 460 F.3d 920, 927 (7th Cir.

---

[7] To be clear, Al-Imam does not contend that the records themselves implicate the Confrontation Clause. With good reason: as the Court explained in Abu Khatallah, "[t]he Supreme Court has recognized that '[b]usiness and public records are generally admissible absent confrontation' because 'they are not testimonial.'" 278 F. Supp. 3d at 11 (second alteration in original) (quoting Melendez-Diaz v. Massachusetts, 557 U.S. 305, 324 (2009)).

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

2006); United States v. Edwards, Case No. 11-cr-129 (CKK), 2012 WL 5522157, at *3 (D.D.C.

Nov. 15, 2012); United States v. Qualls, 553 F. Supp. 2d 241, 246 (E.D.N.Y. 2008).[8]

This Court joins them. In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the

Supreme Court held that affidavits reporting a forensic analysis were testimonial and subject to

confrontation under the Sixth Amendment because they provided evidence against a criminal

defendant. In that case, the Court contrasted these affidavits with "a certificate authenticating an

official record—or a copy thereof," which are non-testimonial. Id. at 322. Ayad's attestations

do not go to any fact to be proven at trial; rather, they merely lay a foundation for the

introduction of the phone records themselves. It is the phone records, and not the certification,

that will be introduced as substantive evidence against Al-Imam. Ayad's certification "do[es]

not contain any information about [the] defendant[], the relative merits of the charges against

[the] defendant[], or any factual support for the charges." Qualls, 553 F. Supp. 2d at 246.

Al-Imam contends that these authorities are inapposite because their reasoning hinged on

the routine nature of the certifications at issue whereas the circumstances of this case compel a

different result. He analogizes Ayad's certification to a hypothetical discussed by the Supreme

Court in Melendez-Diaz in which a clerk attests to an unsuccessful search for a particular record,

see 557 U.S. at 323; this, he contends, is a more apt comparison than Melendez-Diaz's

conclusion that the Confrontation Clause was not implicated by a clerk's attestation that a

---

[8] In Abu Khatallah, the government did not seek to introduce the certification as
evidence, apparently out of a concern that because the certification was prepared for trial, the
Confrontation Clause was implicated. See Hr'g Tr. 2566:17–2567:4 (Oct. 18, 2017), ECF No.
420, United States v. Abu Khatallah, Case No. 14-141 (D.D.C.). Although Al-Imam does not
focus on the fact that the certification was prepared for litigation, it bears noting that courts have
consistently held that because certifications do not go to a fact to be proven at trial, but rather
admissibility of the records, they are not testimonial and thus the Confrontation Clause is not
implicated even though they are created for trial. See, e.g., Edwards, 2012 WL 5522157, at *2;
Qualls, 553 F. Supp. 2d at 246.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

document is a copy of a court record. Not so. In offering the hypothetical regarding a failed search for a record, the Supreme Court explained that the clerk's statement would be substantive evidence against a defendant whose guilt depended on the nonexistence of the record. Id. In other words, the certificate the Supreme Court discussed was testimonial inasmuch as it went to a fact to be proven at trial—an element of the offense. That characteristic is what likened it to the affidavits at issue in Melendez-Diaz: certifications of forensic analysis finding cocaine used in a drug case. By contrast, Ayad's certification does not "provid[e] evidence against a defendant," and parallels a clerk's affidavit authenticating or providing a copy of an otherwise admissible record. Id. at 322–23 ("A clerk could by affidavit *authenticate* or provide a copy of an otherwise admissible record, but could not . . . *create* a record for the sole purpose of providing evidence against a defendant.")

Thus, Al-Imam is incorrect that Ayad's certification, like a clerk's attestation of a failed search, includes "implicit[] assumptions and conclusions about the nature of the underlying record." Opp'n to MIL at 8. This is little more than a repurposing of his primary contentions that the certification is insufficient and the records are problematic. Any assumptions or conclusions go not to a fact to be proven at trial regarding Al-Imam's guilt, but to the authenticity of the records—a matter of their admissibility.

Likewise misplaced is Al-Imam's invocation of the D.C. Circuit's discussion in United States v. Adefehinti, 510 F.3d 319 (D.C. Cir. 2007). At the outset, the Circuit embraced the logic underpinning the unanimous case law that certifications are admissible without implicating the Confrontation Clause. Id. at 328. In so doing, the court explained that procedural safeguards ensure that a party can challenge the trustworthiness of records introduced via certification. The

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

Circuit continued that, "[i]n an appropriate case the challenge could presumably take the form of calling a certificate's signatory to the stand." Id.

Al-Imam suggests that this portion of Adefehinti stands for the proposition that if the certificates themselves lack indicia of trustworthiness, then the Sixth Amendment is implicated; he insists that this is such a case and he must have the opportunity to cross-examine Ayad because the "the circumstances of Ayad's certification of the 'original or duplicate' requirement manifestly indicates a lack of trustworthiness."[9] Opp'n to MIL at 8. But Adefehinti discussed these procedural protections to highlight how the advance-notice requirement for certificate-based introduction of business records mirrors 803(6)'s exception for excluding business records that indicate lack of trustworthiness: by requiring advanced notice, the opposing party can contend that the records are untrustworthy, including by questioning the certificate's signatory. 510 F.3d at 328. The Circuit's emphasis on procedural protections designed to allow a party to challenge introduction of the records is not tantamount to a suggestion that the Sixth Amendment *requires* the Government to put the signatory on the stand. As discussed, the certification is not testimonial, and Al-Imam has not attempted to secure Ayad's presence to demonstrate purported untrustworthiness. See id. at 327 ("Adefehinti does not argue that the court ever *thwarted* any effort to call any of the certifying custodians[.]").

Moreover, the Supreme Court has clearly stated that the applicability of the Confrontation Clause does not turn on the reliability or trustworthiness of the testimony to be

---

[9] As explained, the Court disagrees with this premise: Ayad examined the records, identified several unique details indicative of Libyana records, and was able to find records for the relevant phone number in Libyana's database. Agent O'Donnell testified credibly that he and another agent reviewed each line of the certification with Ayad to confirm his understanding. Ayad later compared an electronic copy of the records with Libyana's database and once again concluded the records were Libyana records, providing a renewed certification. Based on those facts, the Court cannot conclude that Ayad's certification is untrustworthy—let alone manifestly so—in certifying that the records were duplicates.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

proffered. See, e.g., Bullcoming v. New Mexico, 564 U.S. 647, 661 (2011); Melendez-Diaz, 557
U.S. at 318; Crawford v. Washington, 541 U.S. 36, 62 (2004). Thus, Al-Imam cannot be correct
that Adefehinti stands for the proposition that he has the right to confront Ayad because of
perceived untrustworthiness in the certification. If that were the case, every defendant would
have a Confrontation Clause right to cross-examine a certification's signatory, and any
exceptions would swallow the rule. That cannot be squared with Adefehinti's embrace of the
unanimous case law holding that certifications of business records do not implicate the
Confrontation Clause.

Finally, Al-Imam contends that Ayad's certification should be excluded pursuant to
Federal Rule of Evidence 403, which allows the Court to "exclude relevant evidence if its
probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the
issues, [or] misleading the jury," among other things. The rule "tilts, as do the rules as a whole,
toward the admission of evidence in close cases." United States v. Cassell, 292 F.3d 788, 795
(D.C. Cir. 2002). Al-Imam explains that because "Ayad is not qualified to discuss" whether the
records were manipulated before or after they were provided to the Government, "admitting his
certification, which purports to answer that question . . . would be unfairly prejudicial." Opp'n at
9. Al-Imam's contention is premised on the notion that it would be unfairly prejudicial for a jury
to see a certification that the records are duplicates of Libyana records. Ayad's certification does
not attest to the accuracy of the records or conclude that they were not manipulated; it merely
lays a foundation for what they are and why they were admitted. Nothing unduly weighs in
favor of a conclusion that they are accurate or that they were not manipulated.

REDACTED / CLEARED FOR PUBLIC RELEASE

REDACTED / CLEARED FOR PUBLIC RELEASE

## IV.  Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that the Government's [78] Motion in Limine is GRANTED.

**SO ORDERED.**

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: <u>May 16, 2019</u>

REDACTED / CLEARED FOR PUBLIC RELEASE