## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | :    **Criminal No. 17-CR-213 (CRC)** |
| | : |
| MUSTAFA MUHAMMAD MUFTAH | :    **Sentencing: January 23, 2020** |
| AL-IMAM, | : |
| | : |
| Defendant. | : |

### UNITED STATES' MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing. The attack on the United States Mission and Annex in Benghazi, Libya, on September 11-12, 2012, was a coordinated attack with one singular purpose—to drive out, by any means, the Americans who were present in Benghazi. In the ensuing attack, four Americans lost their lives in the service of their country. The defendant, Mustafa Muhammad Muftah Al-Imam, who voluntarily joined the conspiracy to violently drive the Americans out of Benghazi, faces a maximum sentence of 35 years of imprisonment. The government asks this Court to impose the maximum sentence.

## I.    INTRODUCTION

On June 13, 2019, the jury in this case found the defendant guilty of Conspiracy to Provide Material Support and Resources to Terrorists, in violation of 18 U.S.C. § 2339A, and the underlying substantive offense of Maliciously Destroying and Injuring Dwellings and Property and Placing Lives in Jeopardy within the Special Maritime and Territorial Jurisdiction of the United States, in violation of 18 U.S.C. §§ 7, 1363. The defendant's convictions stem from a series of coordinated and continuous attacks on September 11-12, 2012, that first targeted the United States Special Mission located in Benghazi, Libya, and later targeted a nearby CIA Annex where

the survivors of the Mission attack sought refuge. The continuous attacks, launched by the defendant and his coconspirators, resulted in the deaths of four Americans—Ambassador J. Christopher Stevens, Department of State ("DOS") Information Officer Sean Patrick Smith, and Global Response Staff ("GRS") members Tyrone Snowden Woods and Glen Anthony Doherty. The attackers also inflicted horrific, life-threating injuries to GRS member Mark Geist and Diplomatic Security Service ("DSS") Special Agents Scott Wickland and David Ubben.

While there is no evidence that the defendant directly caused the deaths or injuries described above, the defendant had aligned himself with a Benghazi-based extremist—Ahmed Abu Khatallah—and traveled to the Mission on the evening of September 11, 2012, with Khatallah and other extremists, including Khatallah's body guard and an individual armed with an AK-47. Information derived from call data records from the Libyana telephone company (hereinafter "telephone records," admitted at trial as Ex. 1100) establish that Khatallah and the defendant were in the vicinity of the Mission beginning at approximately 9:54 p.m., before the first fires were set by the defendant's coconspirators and after gunfire and explosions could clearly be heard in the vicinity of the Mission. Those same telephone records, in combination with surveillance video from the Mission, establish that Khatallah and the defendant remained in the area until shortly after midnight. At the height of the battle for the Mission, the defendant, acting as Khatallah's eyes and ears, called Khatallah at 10:44 p.m. and remained on the phone with him for over 18 minutes. Any claim that the defendant did not share Khatallah's views or voluntarily participate in the conspiracy to attack the Mission and Annex is directly refuted by, among other things, the defendant's own admissions that he knew Khatallah was the leader of an extremist militia—Ubayda Bin Jurah ("UBJ"); that he knew Khatallah believed there was a spy base at the Mission; and that he and other coconspirators assaulted and kidnapped a bystander ("W-61") when they saw W-61 taking

their picture as they exited the compound. Further, the defendant's actions against V-1 in August of 2012, days before the attack, and voluntary statements to the FBI further demonstrate the defendant's own anti-American bias.

Witnesses including Scott Wickland, David Ubben, Alec Henderson, Renaldo Burt, and John Tiegen all described the extreme violence and wide array of firepower that the defendant and his coconspirators directed at the Mission and Annex, making the deaths of the Americans inside of the Mission and Annex entirely foreseeable to anyone in the area of the Mission at the time of the attacks. Once the attack on the Mission was under way, the defendant never withdrew from the conspiracy to violently attack the Americans. Instead, after leaving the burning shell of the Mission compound and assaulting and kidnapping W-61, the defendant travelled with Khatallah to the base camp of another extremist group, Ansar Al Sharia ("AAS"). It appears that it was from that AAS base camp, according to information provided by W-61, that the attack on the Annex was planned and launched. It is noteworthy that as the first shots were fired at the Annex, Khatallah received a call from coconspirator Zakaria Bil Qasim Harroun Al-Bargathi ("Jutuf"). Jutuf is one of several UBJ members who were in direct contact with Khatallah in the hour before the initial assault on the Mission, during the assault, and who were identified on video surveillance as part of the first wave of attackers to enter the compound.

Finally, as the testimony of Ali Majrisi made clear, after the attack on the Mission and Annex, the deaths of four Americans, injuries to several other Americans, and the evacuation of American personnel from Benghazi, the defendant remained a loyal member of Khatallah's close-knit circle, following his directions and taking up arms to defend Khatallah.

Because the defendant entered into a conspiracy to provide material support to terrorists, that conspiracy was designed to intimidate, coerce or retaliate against the government of the United

States, and the conspiracy resulted in the foreseeable deaths of four Americans, the defendant's applicable guideline range is 50 (capped at 43). The government agrees with the United States Probation Office's calculation of the applicable guideline range, with the exception of a two-point reduction for a minor role pursuant to U.S.S.G. § 3B1.2(b). This disagreement is inconsequential, as the maximum offense level is 43, resulting in an applicable guideline range sentence of life.[1] The maximum statutory sentence the defendant faces is 15 years for violating 18 U.S.C § 2339A and 20 years for violating 18 U.S.C. § 1363. Because the guideline sentence exceeds the statutory maximum, pursuant to U.S.S.G. 5G1.1(a), the applicable guideline sentence becomes the statutory maximum: 15 years for violating §2339A and 20 years for violating §1363. While generally sentences run concurrently, here a concurrent sentence would result in a sentence that falls short of the total punishment provided for by the Guidelines—life. Accordingly, pursuant to U.S.S.G. § 5G1.2(d), this Court should run these sentences consecutively, resulting in a guideline-compliant sentence of 35 years.

Analysis of the Guidelines along with the sentencing factors enumerated in 18 U.S.C. § 3553(a) demonstrate that the imposition of the maximum sentence permissible under the law is warranted in this case.

## II.    PROCEDURAL BACKGROUND

The defendant, a Libyan national, was charged by federal indictment for his participation in the September 11, 2012, terrorist attack on the Mission and Annex, which as described above

---

[1] The reduction for playing a mitigating role in an offense applies only to "a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2(b) Comm. 3(A). As a member of a broad conspiracy, the "average participant" was not limited to those who actually set fire to the buildings or used weapons to fire at the Mission and Annex. The defendant's role described in detail throughout this memorandum is thus not fairly characterized as "substantially less culpable."

resulted in the deaths of four Americans and significant injuries to three others. The defendant was captured in Libya on or about October 29, 2017, during an operation conducted by U.S. personnel. The defendant was transported to the United States and was presented in U.S. District Court for the District of Columbia to stand trial on charges arising from his involvement in the attack.

On November 8, 2017, a federal grand jury in this district returned a one-count Indictment charging the defendant with Conspiracy to Provide Material Support and Resources to Terrorists Resulting in Death, in violation of 18 U.S.C. § 2339A. The grand jury subsequently returned a superseding indictment charging the defendant with the following offenses: *Count One*—Conspiracy to Provide Material Support and Resources to Terrorists Resulting in Death, in violation of 18 U.S.C. § 2339A; *Count Two*—Providing Material Support and Resources to Terrorists Resulting in Death, in violation of 18 U.S.C. §§ 2339A and 2; *Count Three*—Killing of an Internationally Protected Person (Ambassador Christopher Stevens), in violation of 18 U.S.C. §§ 1116, 1111, and 2; *Counts Four Through Six*—three counts of Killing Officers and Employees of the United States (IMO Sean Smith, GRS member Tyrone Woods, GRS member Glen Doherty), in violation of 18 U.S.C. §§ 1114, 1111, and 2; *Counts Seven Through Nine*—two counts of Attempting to Kill Officers and Employees of the United States (DSS Special Agents Scott Wickland and David Ubben, and GRS member Mark Geist), in violation of 18 U.S.C. §§ 1114, 1113, and 2; Counts *Ten through Thirteen*—four counts (one for each victim) of Killing a Person in the Course of an Attack on a Federal Facility Involving the Use of a Firearm or a Dangerous Weapon, in violation of 18 U.S.C. §§ 930(c), 1111, and 2; *Counts Fourteen and Fifteen*—two counts (one for each facility attacked) of Maliciously Damaging and Destroying U.S. Property by Means of Fire and an Explosive Causing Death, in violation of 18 U.S.C. §§ 844(f)(1) & (3) and 2; and *Counts Sixteen and Seventeen*—two counts (one  for  each

facility attacked) of Willfully and Maliciously Destroying Property within the Special Maritime and Territorial Jurisdiction of the United States and Placing Lives in Jeopardy, in violation of 18 U.S.C. §§ 1363, 7, and 2.

Trial in this matter commenced on May 8, 2019. The jury began their deliberations on June 5, 2019, and on June 13, 2019, the jury returned guilty verdicts against the defendant on Counts One and Sixteen. While the jury unanimously found the defendant guilty of Count One, the jury did not return a verdict on the special finding of whether Count One resulted in death. The jury continued to deliberate on the remaining counts, however, the jury was unable to reach a unanimous verdict on the remaining counts, or the special finding contained in Count One, and this Court declared a mistrial on those counts on June 17, 2019.

On October 9, 2019, pursuant to the Court's Order, the United States Probation Office ("USPO") submitted to the parties a draft Presentence Investigation Report ("PSR") to aid the Court in the sentencing of this matter. In addition to several factual errors noted by the government, the government also objected to the PSR writer's omission of a twelve-point victim-related adjustment pursuant to U.S.S.G. § 3A1.4(a) for a felony that involved, or was intended to promote, a federal crime of terrorism. The government also argued that the draft PSR relied on the incorrect underlying substantive offense, a violation of § 2339A, instead of the defendant's offense of conviction, § 1363. These errors were properly corrected in the final PSR. However, the final PSR also left "unresolved" several objections by the defense, including arguments that: there is no evidence that the defendant was a trusted aide of Khatallah; there is no evidence UBJ existed at the time of the attack or that UBJ acted in concert with AAS; the defendant did not place any lives in danger and he was not convicted of any offense resulting in death; and the correct guideline sentence should be based on U.S.S.G. § 2B1.1, which is applicable to offenses

involving the destruction of property. As discussed below, these objections lack merit, and this Court should adopt the guideline calculation set forth in the PSR.[2]

## III.    ARGUMENT

### A.    Issues Related to Guidelines Calculations

At the outset, it is important to note that the jury did not acquit the defendant of any charges, demonstrating that some members of the jury found beyond a reasonable doubt that the defendant was legally responsible *inter alia* for the murders that occurred at the Mission *as well as* the attack and murders that occurred at the Annex. Even though the jury did not reach a unanimous verdict on the counts related to the murders of Ambassador Stevens, Sean Smith, Tyrone Woods and Glen Doherty, this Court may nonetheless find that the murders constitute relevant conduct if this Court finds by a preponderance of the evidence that the defendant's actions, or the reasonably foreseeable acts of his coconspirators that were within the scope of the conspiracy and in furtherance of the conspiracy, resulted in the deaths of the four Americans killed during the attack. *United States v. Watts,* 519 U.S. 148, 154-55 (1997); *Pinkerton v. United States,* 328 U.S. 640, 647 (1946); *United States v. Bell*, 795 F.3d 88, 103 (D.C. Cir. 2015) (stating that the preponderance standard applies at sentencing; *see also* U.S.S.G. § 1B1.3(a)(1)(B) (relevant conduct "in the case of a jointly undertaken criminal activity"); U.S.S.G. § 6A1.3 Application Note (evidentiary standard at sentencing).

This Court conducted a similar analysis in *United States v. Khatallah,* No 14-CR-00141 (CRC), ECF No. 529 (June 20, 2018). In *Khatallah*, the defendant was *acquitted* of all counts related to the murders of the four Americans at the Mission and Annex. Nonetheless, this Court

---

[2] The government notes that even if this Court were to start its guideline calculation using U.S.S.G. § 2B1.1, pursuant § 2B1.1(c)(2), if the offense involved arson, as it did here, the Court is to apply U.S.S.G. § 2K1.4 (arson).

found that the deaths of Ambassador Stevens and Sean Smith constituted relevant conduct and that the PSR in *Khatallah* properly relied on the guideline for second-degree murder in calculating Khatallah's applicable guideline range. *Id.* at 15-25. The central questions that the Court discussed in *Khatallah* remain applicable here: what was the scope of conspiracy that the defendant joined and were the deaths of the Americans at the Mission and/or the Annex reasonably foreseeable? In answering the latter question, the defendant did not have to foresee the precise manner in which the deaths occurred. *United States v. Molina,* 106 F.3d 1118, 1124-25 (2nd Cir. 1997). Further, in light of the evidence produced at trial, and the fact that some members of the jury concluded beyond a reasonable doubt that the defendant was criminally responsible for the murders and injuries at both the Mission and the Annex, this Court should also examine whether the defendant withdrew from the conspiracy before the attack on the Annex. The record evidence in this case establishes that he failed to do so, and, as such, the defendant's relevant conduct also includes the deaths at the Annex.

As discussed below, the preponderance of the evidence supports the following:

1. The defendant shared Khatallah's anti-American views;

2. The defendant's anti-American bias was evident in his treatment of, and statements to, V-1;

3. The defendant's anti-American bias was also demonstrated during his statements to the FBI;

4. The defendant knew Khatallah was the leader of UBJ, an extremist militia;

5. The defendant knew that members of AAS also followed Khatallah's orders;

6. The defendant shared Khatallah's view that the Mission was a spy base;

7.  The defendant travelled with Khatallah to the Mission on September 11, 2012, leaving as early as 5:00 p.m.;

8.  The defendant and Khatallah arrived at the Mission during the early stages of the attack on the Mission and before fires were set by fellow coconspirators;

9.  The attack involved multiple groups working in conjunction with each other including UBJ, AAS, and militants from other parts of Libya;

10. Upon arriving at the Mission, the gunfire and explosions from rocket propelled grenades ("RPG") and gelatina bombs made plain that the attack on the Mission was violent and would place lives at risk;

11. The defendant and Khatallah remained near the Mission as coconspirators set fire to buildings located within the Mission, including Villa C;

12. These fires were clearly visible to anyone near the Mission, including the defendant, and anyone seeing the fires would clearly understand that the fires would place lives in danger;

13. The defendant separated from Khatallah during the attack, and reported back to Khatallah during critical stages of the attack;

14. The defendant admitted that he heard gunfire when he first entered the Mission grounds, and thus he entered the Mission while the attack was ongoing;

15. Ambassador Stevens and Sean Smith died of smoke inhalation while Khatallah and the defendant were in the vicinity of the Mission and Khatallah and other coconspirators were actively preventing aid from reaching the Mission;

16. As the Americans withdrew from the Mission and traveled to the Annex, they were fired upon by the defendant's coconspirators;

17. The defendant participated in the site exploitation of the Office by removing maps and electronic equipment, the latter at the express direction of Khatallah;

18. The defendant provided these materials to an armed member of UBJ's "hit squad";

19. The defendant participated in the assault and kidnapping of W-61 after W-61 was observed taking a picture of Khatallah and his men;

20. The defendant traveled with Khatallah to a nearby AAS camp after leaving the mission grounds sometime around midnight;

21. While at the AAS camp, W-61 heard militants planning to launch another attack;

22. At approximately 12:34 a.m. on September 12, 2012, the Annex was attacked using similar tactics to those used at the Mission—RPG fire and gelatina bombs, in combination with automatic weapons fire;

23. Between approximately 2:00 a.m. and 2:30 a.m., the Annex was attacked again using similar weapons and tactics;

24. At 5:15 a.m., after the defendant's coconspirators launched a mortar attack on the Annex, directly resulting in the deaths of Glen Doherty and Tyrone Woods, and severe injuries to David Ubben and Mark Geist;

25. The attacks on the Mission and the Annex were part of a continuous series of attacks that did not end until the Americans withdrew from Benghazi;

26. At no time did the defendant take any affirmative action to withdraw from the conspiracy that he joined;

27. The defendant's actions following the attack corroborate his allegiance to Khatallah and his willing participation in the conspiracy, including:

    a.   The defendant smiled when in his presence Khatallah referred to the defendant as a "trust [sic] person and close person to" Khatallah;

    b.   The defendant agreed with Khatallah's statement that the Americans had been using the Mission as a spy base;

    c.   The defendant took up arms to defend Khatallah after the assassination of Colonel Al-Bargathi;

    d.   The defendant moved weapons for Khatallah at Khatallah's direction;

    e.   The defendant made several post-capture admissions regarding his relationship with Khatallah.

Based in part on these facts, the PSR properly calculated the defendant's guideline range to include the 12-point terrorism enhancement and concluded that the defendant's actions resulted in death, leading to reliance on the applicable base offense level for second-degree murder.

        1.   <u>The PSR Properly Relied upon the Base Offense Level for Second-Degree Murder.</u>

           *a.    General Principles and the Jury's Verdict*

As discussed below, the correct base offense level for defendant Al-Imam is 38 based on the application of U.S.S.G. § 2X2.1, § 2K1.4 and § 2A1.2(a).

In *Khatallah*, this Court evaluated the applicable guideline range for a conviction for Conspiring to Provide Material Support to Terrorists pursuant to 18 U.S.C. § 2339A and Maliciously Destroying and Injuring Dwellings and Property and Placing Lives in Jeopardy within the Special Maritime and Territorial Jurisdiction of the United States, pursuant to 18 U.S.C.

§ 1363. These are the same two offenses that defendant Al-Imam was convicted of at trial in this case.[3]

In a detailed memorandum opinion addressing several sentencing issues in *Khatallah* (1:14-cr-00141 (CRC) ECF No. 529), this Court began by noting that it "was not confined to the jury's factual findings or even the trial record . . . the Court may consider all of a defendant's relevant conduct [which] need only be established by a preponderance of the evidence." *Id.* at 5 (citing *Bell*, 795 F.3d at 103). Thus, in calculating the defendant's base offense level, the PSR writer was not constrained by the fact that the jury did not reach a verdict on the specific finding of causing death. Indeed, while the jury in defendant Al-Imam's trial *failed to reach a verdict* on the specific finding of causing death, in *Khatallah* this Court found that the relevant conduct included causing death despite the fact that the jury found the defendant *not guilty* of causing death.

In *Khatallah*, the PSR correctly calculated the base offense level as 38. (*Khatallah* ECF No. 504). There, as here, the PSR reached that base level by starting with U.S.S.G. § 2X2.1, the general conspiracy guideline. That guideline instructs that the base offense level is the same as the base offense level of the underlying offense. For both Khatallah and defendant Al-Imam, the underlying offense that the jury found the defendant guilty of was Willfully and Maliciously Destroying Property within the Special Maritime and Territorial Jurisdiction of the United States and Placing Lives in Jeopardy, in violation of 18 U.S.C. §§ 2, 7, 1363. Accordingly, here, as in *Khatallah*, the PSR correctly applied guideline § 2K1.4 (Arson).

---

[3] While Khatallah was also convicted of providing material support to terrorists, that additional count of conviction is immaterial because all three offenses were grouped together pursuant to U.S.S.G. § 3D1.2. Khatallah was also convicted of a firearms offense that is not relevant to this discussion.

In *Khatallah*, the PSR writer, applying § 2K1.4(c)(1), found that because death resulted, or the offense was intended to cause death or serious bodily injury, it was appropriate to apply U.S.S.G. § 2A1.2(a) (Second Degree Murder), resulting in a base offense level of 38. There is no reason to reach a different result in the defendant's calculation. In this Court's memorandum opinion on sentencing issues in *Khatallah* (ECF No. 529), this Court rejected a defense challenge to the application of U.S.S.G. § 2A1.2(a) to Khatallah's conduct. In upholding the PSR's application of § 2A1.2(a), this Court focused on the "well-worn principle that defendants are liable for all foreseeable criminal acts taken by their co-conspirators in furtherance of the conspiracy" (*Khatallah* ECF No. 529 at 11). However, as this Court noted in *Khatallah,* this Court is required "to 'make explicit findings as to the scope of the [defendant's] conspiratorial agreement before holding him responsible for a co-conspirator's reasonably foreseeable acts.'" *Khatallah,* ECF 529 at 15 (quoting *United States v. Tabron,* 437 F.3d 63, 66 (D.C. Cir. 2006)).

Here, in order the find the defendant guilty, the jury necessarily found "that between on or about September 11, 2012, and September 12, 2012, there was an agreement to provide material support or resources with the knowledge or intent that they were to be used to prepare for, or to carry out, one of the crimes charged in Counts Three through Seventeen; and second, that the defendant intentionally joined in that agreement." (ECF No. 191 at 18). The Court's charge to the jury also defined the scope of the conspiracy that the defendant had joined:

> the objects and purposes of the conspiracy were to, among other things, remove the presence of the United States in Benghazi, Libya through the use of force and the threat of force; to violently attack the U.S. Special Mission and the Annex; to kill United States citizens at the Mission and the Annex; to destroy buildings and other property at the Mission and the Annex; to plunder property from the Mission and Annex, including documents, maps, and computers containing sensitive information; and to use documents, maps and computers containing sensitive information plundered from the Mission to identify and coordinate additional attacks against United States citizens, installations, and interests in Libya.

*Id.* at 15-16. The preponderance of the evidence supports a finding that at a minimum the defendant joined with Khatallah and other members of UBJ to launch a violent attack against the United States Mission, to destroy the Mission, and to kill or injure the Americans located within the Mission.

While there is limited evidence regarding the defendant's connection to UBJ before the attack, there is ample evidence of his connection to Khatallah and thereby UBJ. Although Al-Ubaydi and Ali Majrisi do not appear to have known the defendant during the civil war when they had contact with other members of UBJ, the defendant's own statement indicates that he had ties to the group through Khatallah. According to the defendant, he first met Khatallah when they were both in prison in 2007, before the revolution. The defendant kept in touch with Khatallah after they were released, and admitted that he knew that Khatallah was the leader of UBJ. According to the defendant, at Khatallah's request, the defendant would often go to Khatallah's base, which Khatallah shared with AAS. Although the defendant claimed that he never worked for Khatallah, the defendant knew other members of UBJ including Salah Al-Amari,[4] Khalid Saglusi,[5] and Al-Birnawi,[6] and knew that members of AAS also respected Khatallah and would follow Khatallah's orders. Similarly, the defendant also understood the motive for the attack on the Mission, admitting to the FBI that he knew that Khatallah believed the Mission was a spy base. Thus, while the defendant may not have been employed as a fighter for UBJ during the revolution, it is clear that

---

[4] Ali-Majrisi identified Al-Amari as Khatallah's body guard.

[5] Saglusi is the individual to whom the defendant passed the phone and the map after the defendant removed them from the Tactical Operations Center ("TOC").

[6] Al-Birnawi was identified as one of the initial attackers on the Mission who among other acts is visible on camera beating one of the Blue Mountain guards behind the Office building.

in the period leading up to the attack on the Mission he maintained a close relationship with UBJ's leader (Khatallah), and frequently had contact with UBJ and AAS members.

This pre-attack relationship makes it more likely than not that the defendant was aware that Khatallah and other members of UBJ were planning an attack on the Mission. As this Court noted in *Khatallah,* Khatallah and other coconspirators including Jutuf and Al-Dijawi, procured weapons shortly before the attack, indicating that "Khatallah understood the nature of the planned attack and that he participated well before he arrived at the scene on the night of the attack." ECF 529 at 17. Given the defendant's close relationship with Khatallah, his regular contact with UBJ and AAS members, it blinks reality to assume that the defendant was unaware of the attack that was being planned around him.

The defendant's own actions on the night of the attack further contradict any claim of ignorance or mere presence. According to the defendant, at approximately 5:00 p.m. he was with Khatallah at the clinic that was shared by UBJ and AAS. Khatallah left after he received a phone call about an alleged "demonstration" at the Mission. The defendant followed Khatallah to the Mission with Khatallah's personal body guard (Al-Amari) and a second individual who was armed with an AK-47. During the period from 8:08 to 8:52 p.m., Khatallah spoke by phone with coconspirators Al-Amari, Jutuf, and Al-Dijawi. As discussed in more detail below, the defendant and Khatallah arrived in the vicinity of the Mission at approximately 9:54 p.m. Once there, the defendant was one of several individuals, including Jutuf and Al-Dijawi, who were in regular communication with Khatallah during the attack.[7]

---

[7] Jutuf and Al-Dijawi were both identified as participants in the initial attack on the Mission through video identifications by Al-Ubaydi and Ali-Majrisi.

Even if this Court were to assume that the defendant was unaware of the planned attack as he followed Khatallah to the Mission, as discussed in detail below regarding the issue of foreseeability, once the defendant was at the Mission, it was clear that Khatallah, the defendant, and his coconspirators were involved in a dangerous and life-threating assault on the Mission, and that American property and lives were at risk. Indeed, the use of automatic weapons, explosives, and fire conclusively demonstrate that the defendant and his coconspirators intended to kill the Americans inside of the Mission and to destroy the Mission. Thus, even if this Court found that the defendant did not join the conspiracy until he arrived at the Mission, or did not understand the nature of the conspiracy until his arrival, once the defendant was at the Mission he had joined a conspiracy that involved an armed attack on an American facility that placed lives and property at risk.

The remaining issue is whether under the preponderance of the evidence standard there was evidence that it was foreseeable that deaths could result from the conspiracy that the defendant joined. *See Khatallah* ECF No. 529 at 15 ("Abu Khatallah did not himself set the fires at the Mission that killed Ambassador Stevens and Sean Patrick Smith, but as the Court will explain, it is more likely than not that he agreed with several other participants to launch an armed attack on the Mission, and the attack foreseeably resulted in deaths that furthered the ends of the conspiracy.").

        b.      *The Deaths of the Americans at the Mission and Annex Were Foreseeable.*

The evidence developed at trial, the defendant's statements, telephone records, additional testimony about the telephone records from FBI Special Agent Benjamin Inman during the presentencing hearings, the pretrial testimony of V-1, and the testimony of FBI Special Agent Michael Clarke in the *Khatallah* case regarding the statements of W-61, all demonstrate that it was

more likely than not that the defendant entered into a conspiracy where causing the deaths of Americans was foreseeable. Specifically, the evidence shows that the defendant was a close associate of Khatallah who helped to lead the attack on the Mission; that the defendant was communicating with Khatallah during critical times during the attack; that Khatallah and the defendant were in the vicinity of the Mission in the minutes after the initial assault; that Khatallah and the defendant in the vicinity of the Mission when the fire that killed Ambassador Stevens and Sean Smith was first started and thereafter while that fire was visible for miles in all directions; that the Americans were fired upon as they withdrew from the Mission to the Annex; that the defendant never withdrew from the conspiracy; and that shortly after securing and exploiting the Mission, the Annex was attacked.

i.   <u>The Defendant's Admissions</u>

The defendant's voluntary statements to the FBI (Attachment A) establish that:

    a.   The defendant knew Khatallah was the leader of UBJ and that members of another militia, AAS, also viewed Khatallah as a commander and leader.

    b.   The defendant met Khatallah in 2007 when they were both in prison. Before the attack, Khatallah would often call the defendant and ask the defendant to come to Khatallah's camp.

    c.   The defendant knew that Khatallah believed that the U.S. Special Mission was a "spy base."

    d.   At the time he provided his statements to the FBI, the defendant still had an anti-American bias.

    e.   On the day of the attack, the defendant drove to a clinic that was occupied by UBJ and AAS, where he met with Khatallah. The defendant and Khatallah left

the clinic together at approximately 5:00 p.m., after Khatallah received a call about an alleged "demonstration" at the U.S. Mission. The defendant stated that he remained with Khatallah for the entire night.

f.  Khatallah drove to the Mission in a military-style vehicle, while the defendant and others (including Salah Al-Amari) followed Khatallah in another vehicle. One of the men the defendant was with was carrying an AK-47.

g.  When the defendant entered the Mission, he could hear gunshots. The defendant still elected to remain in the Mission complex.

h.  While inside the TOC, the defendant followed Khatallah's "order" to take a telephone. The defendant also took a large map of Benghazi off the wall on his own accord.

i.  After exiting the TOC, the defendant gave the stolen phone and map to Khalid Saglusi, a member of UBJ's "hit squad."

j.  While exiting the Mission grounds, the defendant and others attacked an individual described by the defendant as a "boy," who was taking pictures of the UBJ and AAS members. At Khatallah's direction, the boy was seized and brought back to the AAS camp.

k.  After the attack the defendant traveled to the AAS camp with Khatallah in Khatallah's military-style vehicle.

ii.  Information Derived from Khatallah's Phone Records

Information derived from Khatallah's phone records (Ex. 1100), particularly in combination with the testimony of Bilal Al-Ubaydi and Special Agent Inman, establish that Khatallah and the defendant were at the Mission well before they were captured on video at

approximately 11:45 p.m., and that the defendant played an active role during the attack on the Mission. The defendant used cell phone number 2180925315935, while Khatallah used cell phone number 21892390532.

*Cell Tower Information Confirming Location.* The cell phone records show that Khatallah, and by extension the defendant, were in the vicinity of the Mission during the attack. In addition to recording incoming and outgoing calls, Khatallah's telephone records also contained data regarding which cell sites Khatallah's cell phone was utilizing on September 11, 2012. Between 9:54 p.m. and 11:24 p.m., Khatallah's cell phone made or received 24 calls, all utilizing the same three cell sites. Specifically, Khatallah's cell phone primarily utilized a cell site with Cell ID No. 19583, and intermittently used the cell sites with Cell ID Nos. 27632 and 27633 (which Special Agent Inman opined were two different cell sites located on the same cell tower). As explained by Special Agent Inman, the repeated use of the same three cell sites for this 90-minute time period indicates that Khatallah was in the geographic vicinity of the three cell sites for this 90-minute period on September 11, 2012. This 90-minute period (9:54-11:24 p.m.) includes almost the entire offensive on the Mission, until U.S. personnel withdrew for the Annex, as shown on the surveillance footage at approximately 11:34 p.m. The 11:24 p.m. call is the last call in Khatallah's records before he is seen on camera with defendant Al-Imam inside of the Mission grounds, and is consistent with the timing of the end of the attack and the withdrawal of the Americans at approximately 11:34 p.m.

These records, when correlated with other evidence, confirm Khatallah's (and by extension the defendant's) presence in the vicinity of the Mission. At trial, Al-Ubaydi testified that he received a call from Khatallah at 10:20 p.m. and that, based on the content of the call and his later conversation with his own personnel who were in the area, Al-Ubaydi believed that Khatallah was

located at an intersection immediately southwest from the rear gate of the Mission. While the content of this call was heavily contested at trial, the existence of the call itself is corroborated by Khatallah's telephone records.  The 10:20 p.m. call from Khatallah to Al-Ubaydi used the cell site with Cell ID No. 19583. Thus, by extrapolation, Khatallah was in that same general geographic area for the entire time period in which his phone was utilizing the cell site with ID No. 19583, *i.e.*, between 9:54 p.m. and 11:24 p.m. This conclusion (and moreover, Al-Ubaydi's testimony) is corroborated by the testimony of Special Agent Inman regarding online public information about the location of the cell sites with ID Nos. 19583, 27632, and 27633. Special Agent Inman testified that an online database of cell tower locations used by the FBI in the course of their investigations shows that these three cell sites are located in the geographic area of the Mission.

Thus, based on the cell phone records themselves and the eyewitness testimony of Al-Ubaydi, as well as the corroborating public information about the cell site locations, a preponderance of the evidence shows that Khatallah was in the geographical area of the U.S. Special Mission no later than 9:54 p.m. and continuing until 12:10 a.m., when he was captured on surveillance footage leaving the Mission. By extension, the defendant, who stated that he and Khatallah were together the entire night starting at 5:00 p.m., was also in the geographic area of the U.S. Special Mission between 9:54 p.m. and 12:10 a.m.

*Call Records Confirming Location, Activity, and Relationship.* The cell phone call records also belie any claim that the defendant was elsewhere, or was merely a passive observer of the attack. As FBI Special Agent Jessica Krueger testified, the call records show that September 11-12, 2012 were two of the highest use call days for Khatallah during the period of time covered by his call records (2.5 months). Specifically, on September 11, 2012, Khatallah made or received 98 calls, and on September 12, 2012, Khatallah made or received 103 calls. These calls were most

frequent during the 8:00 pm to 2:00 a.m. time period, *i.e.* during the height of the attack, during which Khatallah exchanged approximately 81 calls. The defendant and Khatallah exchanged five calls on September 11, which was the third most frequent contact between them during the 2.5 month period covered by the records. The most significant of these calls occurred at 10:44 p.m. and lasted for over 18 minutes. The evidence at trial established that this was a critical point in time, occurring after UBJ, AAS, and other extremists had been forced out of the Mission, and ending shortly before the UBJ and AAS counterattack began. This was the longest call in Khatallah's records from the night of the attack. That call and several others between the Defendant and Khatallah were sandwiched between calls between Khatallah and other attackers seen on camera during the initial assault on the Mission (Jutuf and al-Dijawi) (Attachment B). As the government argued at trial, the frequency, duration, and volume of calls, both between the defendant and Khatallah and between Khatallah and other attackers, all support that the defendant was playing an active role in this conspiracy including during the height of the attack on the Mission.

Additionally, the cell records corroborate and confirm that the defendant was a close associate of Khatallah. The defendant was the third highest frequency contact of Khatallah's during the 2.5 month period of time covered by the cell records. The defendant and Khatallah exchanged 84 calls during that time period, including 5 calls on September 11, 2012. The defendant and Khatallah's call at 10:44 p.m. is the second-longest call that Khatallah had during those 2.5 months. The defendant was present in Khatallah's cell phone contact list and Khatallah's father was present in the defendant's cell phone contact list, despite the fact that Khatallah had been captured years earlier. These records corroborate the testimony of Ali Majrisi and the defendant's own statement about the nature of the relationship.

### iii.   The Nature of the Attack

The fact that the lives of the Americans within the Mission were at risk would have been reasonably foreseeable, if not obvious, to the defendant who was in the vicinity of the Mission. Eyewitnesses to the attack including Scott Wickland, David Ubben, Renaldo Burt, Alec Henderson, and John Tiegen all described the extreme and obvious violence that the attack involved. The witnesses described hearing loud bursts of automatic gunfire, seeing tracers from machine guns firing into the Mission, and hearing the explosions of RPGs and other explosives. This eyewitness testimony was corroborated by Special Agent Edward Knapp, who reviewed video evidence and physical evidence, and concluded that the attack on the Mission included the use of RPGs, automatic weapons, and grenades or similar explosive devices. The attack on the Mission involved a pattern—the use of an explosive followed by an assault using automatic weapons. The defendant himself admitted that he heard the sounds of gunfire when he entered the Mission, and thus it was reasonably foreseeable to him that lives were in danger.

### iv.   Evidence Regarding the Fires at the Mission

Likewise, testimony regarding the fires that the defendant's coconspirators set at the Mission demonstrate that the deaths of Americans were reasonably foreseeable to the defendant when he was in the vicinity of the Mission. The defendant's coconspirators set fires to the Mission's buildings beginning at approximately 9:57 p.m. With few exceptions, the fires were all captured on the Mission's surveillance footage, as was described at trial by Bureau of Alcohol, Tobacco, and Firearms Fire Examiner Chad Campanell.

The first group of fires at the Mission were set at approximately 9:57 and 10:06 p.m.

a.   *Fires near the QRF building.* At approximately 9:57 p.m., the coconspirators set fire to a vehicle (designated as Vehicle #3), which was located near the QRF

building. Shortly thereafter, at 10:01 p.m., the coconspirators set fire to another vehicle (designated as Vehicle #2), which was located in the same vicinity. An additional fire was set in this area, next to Vehicle #2, at 10:06 p.m.

b. *Fires at Villa C.* At approximately 10:02 p.m., the coconspirators set fire to the rooms inside Villa C, where Ambassador Stevens, Sean Smith, and Scott Wickland were sheltering inside the Villa C sanctuary. Fires were separately set in two of the Mission's living areas (designated as Rooms F and J). Although unclear from the surveillance footage, a separate fire was set in DSS SA Alec Henderson's room (designated as Room O) as early as 10:02 p.m. Ultimately, within minutes to hours of when the fires were set, Ambassador Stevens and Sean Smith succumbed to the effects of smoke inhalation and died.

The fires set near the QRF and at Villa C eventually raged to great heights. As visible on the surveillance cameras, both fires were at full blaze within minutes of being set. GRS member Mark Geist testified that he could see the blazes at the Mission from the rooftop of the CIA Annex. Thus, a preponderance of the evidence supports that coconspirators in the vicinity of the Mission, including the defendant, would have seen the fires raging at the Mission buildings shortly after they had been set. Although he may not have lit the match that set the first group of fires, it was reasonably foreseeable to the defendant and his coconspirators who were in the vicinity of the Mission compound that the conspiracy to attack the Mission had placed in jeopardy human life within the Mission's buildings.

It is also more likely than not that the destruction of the Mission buildings by the use of fire, and the resulting deaths of Ambassador Stevens and Sean Smith, were reasonably foreseeable from the outset of the attack. The attack was conducted with coordination between multiple groups,

most notably UBJ and AAS. While these groups came to the Mission equipped with automatic weapons, RPGs, explosives, and other weapons, it was entirely foreseeable that these irregular forces would use any destructive materials they opportunistically located in the Mission, including cans of diesel fuel, to accomplish their goal of destroying the Mission and driving the Americans from Benghazi.

v.   The Video Evidence

The video evidence introduced at trial showed the defendant entering the TOC at the Mission at the same time that Khatallah, at approximately 11:53-11:54 p.m. Numerous members of UBJ and AAS, and other identified extremists, were seen in the area and entering and exiting the TOC at the same time. Al-Dijawi, a member of the UBJ hit squad who participated in the initial assault on the Mission, was with Khatallah immediately before Khatallah entered the office. While the defendant was in the TOC, Khatallah, Kalid Nayhum, a leader of AAS, and Kahlid Sagluzi, a member of the UBJ hit squad, were all in the building as well. On the video, the defendant was seen carrying the phone and map out of the TOC at approximately 12:00 a.m., and the defendant appears to converse with other attackers, including Sagluzi, who were also removing items from the TOC. This video evidence, along with the defendant's own statements and the cell phone evidence, all support that the defendant participated in the conspiracy willingly as a part of a group of attackers with whom he was well acquainted and that he acted in concert with those attackers for the same goal.  The defendant's argument to the contrary, that he played a minimal role and was convicted only based on  his role in exploiting the TOC after the Americans had withdrawn from the Mission, is not supported by the record, in particular the information derived from the cell phone call records from Khatallah's cellular phone.

vi.   The Defendant's Relevant Conduct Includes the Deaths at the Annex in Light of the Defendant's Failure to Withdraw from the Conspiracy Combined with the Foreseeability of Additional Attacks

The defendant, who was present near the Mission while the attack unfolded, an attack involving the use of fire, explosives, automatic weapons, and RPGs, was faced with a simple choice—continue as a member of the deadly conspiracy, or withdraw from the conspiracy. The defendant's actions demonstrate that he chose the former course of action. Irrespective of what the defendant knew as he followed Khatallah to the Mission, by 9:54 p.m. it was at least reasonably foreseeable, if not obvious, that the defendant and his coconspirators were involved in a violent attack against the Mission, and that the attack was placing American lives in danger. The jury was instructed that:

> It is a defense to the charge of conspiracy that the defendant withdrew from the conspiracy before the commission of any overt act or substantive offense. In order to withdraw from the conspiracy the defendant must have taken some definite, decisive, and affirmative action to disavow himself from the conspiracy or to defeat the goal or purpose of the conspiracy. Merely stopping activities or cooperation with the conspiracy or merely being inactive for a period of time is not sufficient to constitute the defense of withdrawal. In deciding if the defendant took a step to disavow or defeat the conspiracy, you may consider several factors, including whether he intentionally alerted law enforcement to the conspiracy, whether he told others in the conspiracy that his participation had ended, whether the defendant took steps to correct prior assistance to the group, and whether he attempted to remedy any past act or attempted to prevent any further progress of the conspiracy.

ECF 191 at 18-19. The defense did not suggest at trial, and there is no evidence to support a claim, that the defendant withdrew from the conspiracy once the imminent danger to the Americans inside of the Mission became reasonably foreseeable. To the contrary, the defendant's actions as the attack unfolded confirmed his dedication to Khatallah and his desire to help Khatallah and his other coconspirators achieve the goals of the conspiracy. These actions included the 18-minute phone call that the defendant made to Khatallah during a pivotal moment in the

attack, following Khatallah's orders to seize a phone from the TOC, handing that phone and the

map the defendant took from the TOC to an armed member of UBJ (Saglusi), participating in the

assault and kidnapping of W-61, and then driving to the AAS camp with Khatallah and W-61.[8]

There is no evidence that the defendant was present at the Annex, however, the continuing

attacks on Americans in Benghazi were foreseeable. As the government argued at trial, materials

removed from the TOC, including maps and evacuation cards, could have helped the defendant

and his coconspirators to locate the Annex, a facility which until September 11, 2012, was a

covert American facility.[9] But even without this evidence, the attack on the Annex was

foreseeable. First, as described by Scott Wickland, David Ubben, Renaldo Burt, and Alec

Henderson, as they drove out of the Mission towards the Annex, the defendant's coconspirators

ambushed them near the northeast corner of the Mission, indicating that withdrawing from the

Mission was not going to stop the defendant's coconspirators from trying to kill the Americans.

Second, as the jury was instructed, one of the alleged goals of the conspiracy that the defendant

joined was to drive the Americans out of Benghazi. This goal, combined with the defendant's

understanding and shared belief that the Mission was a spy base, made continuing attacks by the

defendant's coconspirators on anyone withdrawing from the Mission foreseeable. Indeed, this is

precisely what occurred.

---

[8]  While the government was unable to secure the testimony of W-61, during the sentencing proceedings for Khatallah, this Court heard testimony from FBI Special Agent Michael Clarke regarding W-61's statements to the FBI and credited those statements. [Attachment C]. Here, the defendant's own statements to the FBI corroborate the information that W-61 provided to the FBI regarding when and how he was attacked, and the fact that he was taken to an AAS camp after he was abducted by Khatallah and his men, including the defendant.

[9]  The testimony at trial established that the Mission was an overt American facility that had been subjected to a prior grenade attack and surveillance the day before the September 11, 2012, attack. In contrast, there was no evidence adduced at trial to suggest the Annex had been identified as an American facility before September 11, 2012.

As described by W-61, while he was present at the AAS camp, he heard militia members state that they were getting ready to launch another attack. The attack on the Annex started at approximately 12:34 a.m. on September 12, 2012. Like the attack on the Mission, the initial attacks on the Annex involved the use of explosives such as gelatina bombs and RPGs followed by automatic gunfire. The timing of the attack on the Annex, the similarity in initial tactics, the improbability that separate groups launched two separate attacks on two separate facilities on the same day in Benghazi, and the statements of W-61, demonstrate that the attack on the Annex was a continuation of the attack on the Mission. Finally, in both the Mission and Annex attacks, when the attackers were unsuccessful in achieving their goals using automatic weapons, grenades, and RPGs, they switched tactics to achieve their aims. For example, Agent Wickland described in detail how he was able to secure Ambassador Stevens and Sean Smith behind the locked gates of the sanctuary. When the defendant's coconspirators were unable to breach the gates of the sanctuary, they turned to setting Villa C on fire, and fired automatic weapons at Agent Wickland when he emerged from Villa C to seek relief from the intense heat, flames, and smoke. Similarly, when the defendant's coconspirators were unable to force their way into the Annex, they turned to using mortars.

In light of the foreseeability of the attack on the Annex by the defendant's coconspirators and the deaths of two Americans there, at least some members of the jury were prepared to find beyond a reasonable doubt that that the defendant was responsible for the deaths of Tyrone Woods and Glen Doherty at the Annex. Based on the preponderance of the evidence standard, the deaths at the Annex should be considered by this Court as part of the defendant's relevant conduct.

For the foregoing reasons, even if this Court were to limit itself to the deaths caused at the Mission, the PSR properly applied a base offense level of 38 pursuant to U.S.S.G. § 2A1.2(a).

### 2.   The PSR Properly Applied the 12-Point Terrorism Enhancement.

With respect to the terrorism enhancement, the jury found that the defendant was a member of a conspiracy to provide material support to terrorists. The Court's instructions for that offense provided that:

> It is against the law to agree with someone to commit the crime of providing material support or resources while knowing or intending that they are to be used in preparation for, or in carrying out, any of the crimes charged in Counts Three through Seventeen. Here, the objects and purposes of the conspiracy were to, among other things, remove the presence of the United States in Benghazi, Libya through the use of force and the threat of force; to violently attack the U.S. Special Mission and the Annex; to kill United States citizens at the Mission and the Annex; to destroy buildings and other property at the Mission and the Annex; to plunder property from the Mission and Annex, including documents, maps, and computers containing sensitive information; and to use documents, maps and computers containing sensitive information plundered from the Mission to identify and coordinate additional attacks against United States citizens, installations, and interests in Libya.

[ECF No. 191 at 15-16]. Each of the objects of the conspiracy listed in the jury instructions warrant the application of U.S.S.G. § 3A1.4(a). The twelve-point enhancement pursuant to § 3A1.4(a) applies to any felony that involved, or was intended to promote, a federal crime of terrorism. A federal crime of terrorism is an offense that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b(5). Each of the objects of the conspiracy in this case were clearly designed to "affect the conduct of [the United States] by intimidation or coercion, or to retaliate against government conduct [of the United States]" and are among the federal crimes of terrorism listed in § 2332b(g)(5)(B). It would ignore reality to suggest that the decision to attack the United States Mission and Annex in Benghazi, Libya, on the anniversary of the September 11 attacks, was mere

coincidence. Further, the attack on the Annex, a previously covert facility, makes plain that the defendant, Khatallah, and their coconspirators, were targeting Americans and American facilities. As this Court found in *Khatallah,*

> [T]he very choice of target for the attack suggests it was calculated to affect the United States' conduct or to retaliate against it for its presence in Libya. To state the obvious, a U.S. diplomatic (or intelligence) facility is a physical manifestation of the U.S. government, and, in the absence of any plausible alternative motives (e.g., stealing items for economic reasons, hurting a particular individual, proving one's chutzpah), attacking it suggests a desire to retaliate against or influence that government.

ECF No. 529 at 29.

As in *Khatallah,* the defendant's actions after the attack demonstrate that the defendant was motivated by anti-American animus. Libyan businessman Ali Majrisi, who infiltrated Khatallah's inner circle after the attacks, testified at the defendant's trial that he was present when the defendant and others agreed with Khatallah that the Mission was a "spy base" and that the Americans were using it to spy on Libyans. Further, this Court had the opportunity in a closed setting to hear the testimony of V-1, testimony that establishes by a preponderance of the evidence that prior to the attacks the defendant held anti-American views. The defendant's statements to the FBI following his capture, which are riddled with claims that the United States is still trying to control Libya through General Haftar, provide evidence of the defendant's suspicions about the United States.

Furthermore, far from distancing himself from Khatallah, after the deaths of the Americans at the Mission and Annex, the defendant remained a loyal follower of Khatallah. As Ali-Majrisi testified, when he first infiltrated Khatallah's inner circle in late 2012-2013, he would see Al-Imam with Khatallah "all the time" and Khatallah, in the defendant's presence, introduced the defendant as a "trust person [sic] and close person." Upon hearing this, the defendant began smiling. Ali

Majrisi described the defendant and Khatallah as having a "close relationship," a fact corroborated by the defendant's own statements to the FBI. And although Ali Majrisi testified that Khatallah never gave orders to the defendant, Ali Majrisi described an incident where Khatallah gave an "order to everybody, include Mustafa Al-Imam, to go to this garage to evacuate all the weapons," an order with which the defendant complied. Ali-Majrisi also described a separate incident where, after Khatallah was threatened following the assassination of a Libyan official, Colonel Al-Bargathi, the defendant armed himself with an AK-47 to try to protect Khatallah.

Thus, the defendant's own anti-American bias, suspicions about a spy base at the Mission, as well as his continuing loyalty to Khatallah, the leader of an extremist group that helped to lead the attack on the Mission, support the PSR's inclusion of the 12-point terrorism enhancement pursuant to U.S.S.G. § 3A1.4(a).[10]

B. Consideration of Sentencing Factors

"As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining the defendant's sentence. *Gall v. United States*, 522 U.S. 38, 49 (2007). While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 90 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity that courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise,'" *id.* at 574 (quoting *United States v. Pruitt,* 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme

---

[10]   Even in the absence of the terrorism enhancement, the defendant would still face a guideline range sentence of 235-295 months.

Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough,* 552 U.S. at 576 (quoting *Rita v. United States*, 551 U.S. 338, 351 (2007)). In the context of terrorism cases, "the Guidelines, while only advisory, appropriately reflect Congress's considered judgment that terrorism is different from other crimes. Terrorism represents a particularly grave threat because the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal." *United States v. Mumuni Saleh*, No. 18-1604-CR, 2019 WL 7196814, at *11 (2d Cir. Dec. 27, 2019) (quotations omitted).

Consideration of the factors enumerated in 18 U.S.C. § 3553(a) do not reveal a basis to depart from the guideline range sentence of 35 years of imprisonment. Several of those factors are central to determining the appropriate sentence in this case.

1. 18 U.S.C. §§ 3553 (a)(1) – Nature and Circumstances of the Offense and Characteristics of the Defendant

The Attack on the Mission and Annex were clear acts of terrorism designed to punish and intimidate the United States. Four Americans—Ambassador Stephens, Sean Smith, Tyrone Woods, and Glen Doherty—were murdered simply because they were Americans. This was not just an attack on the occupants of the Mission and Annex, but an attack on all Americans and their values. What is so abhorrent about this attack, and why it adversely affected so many Libyans, was that Americans like Ambassador Stevens were in Libya to help the Libyan people rebuild.

In 1969, Muammar Gaddafi seized power in Libya through a coup and remained Libya's leader until 2011, at which time a civil war broke out. The civil war began in the city of Benghazi, which was controlled by the rebels and served as the base of operations for the rebel-led Transitional National Council ("TNC"). On February 25, 2011, DOS suspended operations in Libya and evacuated American personnel. On April 5, 2011, then-Special Envoy to the TNC,

Ambassador Stevens, arrived in Benghazi to re-establish a U.S. presence in Libya. The U.S. officially recognized the TNC as Libya's legitimate governing authority on July 15, 2011. In August 2011, as a result of the civil war, Gaddafi was ousted from power. On May 26, 2012, Stevens arrived in Tripoli as the U.S Ambassador to Libya. Beginning in September 2011, Libya was governed by the TNC; however, it exhibited little control over eastern Libya, to include Benghazi.

In November 2011, the United States established the Mission in the city of Benghazi as a diplomatic outpost. The purpose of the Mission was to maintain a diplomatic relationship with those in eastern Libya and to support the people of Libya in rebuilding their war-torn country. The Mission was typically occupied by a small contingent of DOS personnel and members of a local guard force, who were employed by DOS. Ambassador Stevens had traveled on September 10, 2012, from Tripoli to Benghazi on official business along with his DSS security detail. Ambassador Stevens was beloved by many in Benghazi. Witnesses including Ali-Majrisi and Scott Wickland testified about the Ambassador's willingness to roll up his sleeves to help Libyans, while showing the same humility to the DOS personnel who were responsible for his safety.

The attack on the Mission was unrelenting, involving wave after wave of attackers. Their desire to kill Americans was so intense that when they could not reach their intended targets in Villa C, they set the building on fire, leaving Ambassador Stevens, Sean Smith, and Scott Wickland to suffocate in the thick smoke and heat of the resulting inferno. Even Wickland, who survived the fire, was not safe. Each time he emerged from the building to escape the smoke and heat, the defendant's coconspirators fired at him with automatic weapons.

Abandoning the Mission was not enough to quell the hatred the defendant and his coconspirators had for the Americans. As the DSS agents withdrew from the Mission, attackers

outside of the front gate tried to lure the DSS agents into an ambush before riddling their armored vehicle with gunfire, and throwing grenades underneath the fleeing car. As this Court knows, the attack did not stop there. Less than 30 minutes after Khatallah and the defendant left the Mission with the materials they had seized from the TOC, the Annex too came under attack.

Unlike the Mission, the Annex was a defensible position, equipped with firing towers and extra ammunition. Members of the GRS and DSS including John Tiegen, Mark Geist, David Ubben, and Renaldo Burt repelled multiple attacks on the Annex. When the attackers were unable to breach the Annex using the same tactics they had used at the Mission, and reinforcements from GRS in Tripoli arrived at the Annex, the attackers turned to using mortars. Within seconds, the precision mortar attack on the Annex resulted in the deaths of Tyrone Woods and Glen Doherty, and life threating injuries to Mark Geist and David Ubben.[11] Only after the Americans left the Annex and flew out of Benghazi did the attacks stop. This, as the Court knows, was the ultimate aim of Khatallah, the defendant, and their coconspirators. In sum, the nature and circumstances of the offense warrant the maximum sentence of 35 years.[12]

---

[11] When determining the appropriate sentence for the defendant, this Court should also consider the life-threatening injuries to Scott Wickland, David Ubben, and Mark Geist and the risk of death or injury to all of the Americans located at the Mission and Annex. As the Second Circuit recently observed in *Mumuni Saleh,* "when it comes to sentencing terrorism, Congress and the United States Sentencing Commission 'plainly intended for the punishment of crimes of terrorism to be significantly enhanced without regard to whether, due to events beyond the defendant's control, the defendant's conduct failed to achieve its intended deadly consequences.' Thus, in determining what constitutes a sufficient sentence for a terrorist defendant whose conduct did not result in death or physical injury, a sentence at the high end of the applicable range may plainly be reasonable if supported by the balance of § 3553(a) factors." *United States v. Mumuni Saleh*, No. 18-1604-CR, 2019 WL 7196814, at *11 (2d Cir. Dec. 27, 2019) (citing *United States v. Stewart,* 590 F.3d 93, 175 (2nd Cir. 2009)(Walker J., concurring in part and dissenting in part)).

[12] The government, with the consent of the defense, and with the permission of this Court, will file under seal victim impact statements detailing the personal impact that the attack had on the victims and their families.

The history and characteristics of the defendant are not mitigating. While the defendant has tried to portray himself as a simple man who simply happened onto the Mission that night, the defendant's actions that night, his treatment of V-1, his loyalty to Khatallah after the attack, his continuing anti-American views that were evident in his statements to the FBI, and his admission that he did join the February 17 Brigade are all inconsistent with this manufactured image. Further, the defendant's statements regarding his life in Libya are suspect in light of false statements he provided to the PSR writer. In particular, the defendant told the PSR writer that he was employed by the February 17 Brigade as a "buyer of supplies for room and board." PSR at ¶64. However, the defendant admitted to the FBI that, he had joined the February 17 Brigade, and that after he was wounded [in a mortar attack] members of the February 17 Brigade evacuated him to Tripoli. Further, images of the defendant at the February 17 camp depict him with what appears to be an AK-47, the same type of weapon he used to victimize V-1.

2.    18 U.S.C. §§ 3553 (a)(2)(B) – Adequate Deterrence to Criminal Conduct

The sentence should also afford an adequate deterrence to criminal conduct. 18 U.S.C. § 3553(a)(2)(B); *see also United States v. Ghailani,* 733 F.3d 29 (2d Cir. 2013), *cert. denied* 134 S.Ct. 1523 (2014) (sentence of life imprisonment reasonable in prosecution for conspiracy to destroy buildings and property of the United States, relating to terrorist bombings of U.S. embassies in Kenya and Tanzania, despite acquittals on 244 related murders, because, in part, "[a] sentence must be imposed that in addition to other things makes crystal clear that others who engage or contemplate engaging in deadly acts of terrorism risk *enormously serious consequences*") (emphasis added). *Cf. United States v. Rayyan*, 885 F.3d 436, 440-41, 443 (6th Cir. 2018) (the district court properly imposed an upward variance and sentenced an ISIS sympathizer on unlawful possession of a firearm and marijuana to 60 months, which was three

times the guideline range, in part "to deter others from following [the defendant's] path" upon recognition of the defendant's "affinity for terrorism"; appellate court held that "the judge reasonably thought a substantial sentence would deter like-minded sympathizers from taking even the first step toward transforming sympathy into action").

The United States has diplomatic posts and personnel throughout the world, whose goal it is to serve U.S. diplomatic efforts. Many of these individuals serve in dangerous places and are subject to the threat of harm from extremists, like the defendant. From Libya, to Tanzania and Kenya, to Iran, and most recently in Iraq, history has shown that American diplomatic posts abroad are targets for terrorists. In the current geopolitical environment, terrorists must understand that there are harsh consequences for attacking diplomatic posts and harming U.S. personnel—particularly a U.S. Ambassador.

The sentencing in this case should send a clear message to the world that if an individual commits such an act of terrorism anywhere in the world, the United States will take all steps necessary under the law to ensure that justice prevails—to include investigating a case in the four-corners of the world in order to obtain an indictment, capturing a suspect in a hostile environment, and trying the suspect in a federal courthouse. The sentence imposed in this matter should send a similar message of deterrence to the world—and this message is best conveyed through the imposition of the maximum sentence permissible under the law.

>    3.    18 U.S.C. §§ 3553 (a)(2)(C) – Protect the Public from Further Crimes of
>           the Defendant

A sentence should also be imposed to protect the public from further crimes of the defendant. 18 U.S.C. § 3553(a)(2)(C). This is particularly true in cases involving terrorism. Courts have recognized that "terrorists[,] [even those] with no prior criminal behavior, are unique among

criminals in the likelihood of recidivism, the difficulty of rehabilitation, and the need for incapacitation." *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (*quoting United States v. Meskini*, 319 F.3d 88, 92 (2d Cir. 2003)). The defendant's actions after the attack demonstrate that far from being driven away from a terrorist organization by the brutality of the attack on the Mission and Annex, the defendant remained loyal to Khatallah. The defendant's continuing anti-American views reflect the same animus that drove the defendant to join the conspiracy to forcibly remove the United States from Benghazi and to retaliate against the United States for its presence in Benghazi. There is no indication that these beliefs can be reversed or rehabilitated. If the defendant were released, even after a long sentence, he would likely be returned to Libya, where it would be impossible to supervise or rehabilitate him. Therefore, the maximum sentence permissible under the law is necessary to protect the public from the further crimes of the defendant.

    C. <u>The Court Should Not Depart or Vary from the Guidelines and Resulting Sentence of 35 Years of Imprisonment</u>

The government's sentencing recommendation in this case falls within the established guideline range and is consistent with the goals of the Sentencing Guidelines. The PSR itself does not identify any additional mitigating or aggravating circumstances that would affect the Guidelines or warrant a variance based on the factors enumerated in § 3553(a). *See* PSR at ¶95-96.[13] Consistent with 18 U.S.C. § 3553(a)(6), which instructs the sentencing court to consider ("the

---

[13] The PSR suggests that a downward departure may be warranted by the defendant's status as a deportable alien because he will not be permitted to participate in standard pretrial release programs. Such departures, based on language contained in *United States v. Smith*, 27 F.3d 649, 655 (D.C. Cir. 1994), are intended to be rare. As the court stated in Smith:

> [W]e do not mean to suggest that a departure is in order whenever a factor unrelated to a prisoner's just deserts may affect the severity of his confinement. For a departure on such a basis to be reasonable the difference in severity must be

need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct," this Court should sentence the defendant to the maximum sentence of 35 years. As discussed below, there are important differences in the verdicts between Khatallah and the defendant that weigh against a variance in the defendant's case.

In *Khatallah,* this Court varied significantly from the guideline recommendation of a sentence of life.[14] In doing so, this Court struggled with imposing a significant period of incarceration as the result of *acquitted* conduct. *See, e.g.*, Sentencing Transcript of June 27, 2018, at 56-61. In particular, this Court focused on the fact that the jury made a specific finding that Khatallah's conduct did not result in death. *Id.* at 60. In reaching its decision to vary downward from the recommended guideline range of life, this Court relied heavily on the concurring opinions of Judges Kavanaugh and Millett in *United States v. Bell*, 808 F.3d 926, 927 (D.C. Cir. 2015) (denying rehearing en banc). However, in *Bell* the concurring judges focused exclusively on the issue of judicial reliance on acquitted conduct at sentencing, not conduct where the jury had failed to reach a verdict. *Id.* at 928-930. Both concurring opinions acknowledged that the practice of increasing a defendant's sentence using acquitted conduct based on a preponderance standard was

---

substantial and the sentencing court must have a high degree of confidence that it will in fact apply for a substantial portion of the defendant's sentence. Finally, as the defendant's status as a deportable alien is by no means necessarily unrelated to his just deserts, even a court confident that the status will lead to worse conditions should depart only when persuaded that the greater severity is undeserved. Thus the court will fulfil the Guidelines' command that such departures will be "highly infrequent". U.S.S.G., Ch. 1, Pt. A, § 4(b).

*Smith*, 27 F.3d at 655. The defendant's participation in a conspiracy that resulted in the deaths of four Americans, and the lengthy period of incarceration that the defendant faces, a *Smith* departure is not warranted.

[14] This Court varied downward to impose a total sentencing package of 22 years on the four counts of conviction in *Khatallah*. The government has appealed this downward variance and plans to argue that the resulting sentence was substantively unreasonable.

consistent with controlling Supreme Court and Circuit precedent. *Id.* at 928-29. While both judges

suggested that the Supreme Court, Congress, or the Sentencing Commission ought to bring an end

to the use of acquitted conduct, there has been no shift in controlling precedent, indicating the

continuing intent to permit the practice notwithstanding objections to it. Indeed, while Judge

Millett stated that she was opposed to granting en banc review in part because it would "delay

affording the Supreme Court another opportunity to take up this important, frequently recurring,

and troubling contradiction in sentencing law," *id.* at 932, the Supreme Court declined the

invitation to review the issue. *Bell v. United States*, 137 S. Ct. 37 (2016) (denying petition for writ

of certiorari).

This Court is not faced with a similar dilemma here because the jury did not acquit the

defendant of causing death, but failed to reach a unanimous verdict on that issue. Courts have

relied upon conduct where the jury could not reach a verdict for sentencing purposes upon a finding

of preponderance. *See e.g., United States v. Brika,* 487 F.3d 450, 460 (6th Cir. 2007) ("We hold,

therefore, that the preponderance standard, supplied by *Watts* and unchanged by *Booker,* applies

regardless of whether the jury hung on a particular count); *United States v. Irving*, 593 F. Supp. 2d

140, 142 (D.D.C. 2009) ("[T]he Court will consider both uncharged conduct and conduct on which

the jury could not reach a verdict and therefore was hung in calculating the tax loss that establishes

the base offense level. This is because the Court has found by a preponderance of the evidence that

the defendant had the requisite state of mind with respect to Counts 3, 4, 7 and 8, as well as with

respect to the two acts of uncharged conduct . . . ."). In light of the defendant's relevant conduct,

including conduct where the jury could not reach a unanimous verdict, this Court should not vary

from the guideline range sentence of 35 years, as such a variance would undermine the clear will

of Congress and the Sentencing Commission to insure significant periods of incarceration in cases

involving acts of terrorism, particularly where such acts resulted in death. *See e.g., Mumuni Saleh*, 2019 WL 7196814, at *11 (finding a sentence of 17 years substantively unreasonable where the defendant faced a Guidelines Range of 85 years when he attempted, but did not succeed, in stabbing an officer who was executing a search warrant in Mumuni's home during a terrorism investigation); *see also id.* at n. 65 and 66 (describing congressional actions designed to stiffen statutory and guideline sentences in terrorism cases).

It is noteworthy that significant variances in terrorism cases have been overturned in the past, even where the lower court did impose a lengthy sentence in cases involving no death or injuries. *See United States v. Ressam*, 679 F.3d 1069, 1088 (9th Cir. 2012) (en banc) (finding in a conspiracy case where the terrorist attack was prevented, that a 264-month sentence was unreasonable, where Guidelines Range was 65 years to life); *United States v. Jayyousi*, 657 F.3d 1085, 1117 (11th Cir. 2011) (finding in a conspiracy case where the terrorist attack was prevented, that a 208-month sentence was unreasonable, where guidelines range was 360-life); *United States v. Abu Ali*, 528 F.3d 269 (4th Cir. 2008) (finding in a conspiracy case where the terrorist attack was prevented, that a 360-month sentence was unreasonable, where guidelines range was life). *But see United States v. Thavaraja*, 740 F.3d 253 (2d Cir. 2014) (rejecting government's challenge to reasonableness of 108-month sentence, where guidelines range was 240 months' to life imprisonment, but court found that defendant's intent was not malicious); *United States v. Amawi*, 695 F.3d 457, 485-49 (6th Cir. 2012) (rejecting government's challenge to reasonableness of defendants' sentences to 240, 144, and 100 months, respectively, where guidelines range was life); *United States v. Hammoud*, 483 Fed. Appx. 865 (4th Cir. 2012) (rejecting each party's challenge to reasonableness of 30-year sentence, where guidelines range was 155 years).

## IV.    CONCLUSION

For the foregoing reasons, and any additional evidence or argument presented at the sentencing hearing in this matter, the government strongly recommends that this Court impose the maximum, guideline-compliant, sentence of 35 years of incarceration.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar No. 472845

By:      _____/s/_____
John Cummings
D.C. Bar No. 986573
Karen P. W. Seifert
N.Y. Bar No. 4742342
Assistant United States Attorneys
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7271
John.Cummings@usdoj.gov
Karen.Seifert@usdoj.gov