**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 17-CR-213 (CRC) |
| MUSTAFA AL-IMAM, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

Mustafa Al-Imam is a frail, uneducated, and simple man.  He is not a fighter, an ideologue, or a terrorist.  He is a former convenience store clerk whose main loves in life are soccer and family.



Mr. Al-Imam made a tremendous mistake seven years ago when he agreed to help his friend, Ahmed Abu Khatallah, damage and loot U.S. property in the aftermath of the attack on the U.S. Special Mission in Benghazi, Libya.  Despite the overwhelming resources of the government, however, there is no evidence that Mr. Al-Imam intended to harm any Americans,

nor was he convicted of any crime resulting in death. The guidelines for his conduct point to a sentence of 41-51 months (at most). Having failed to convict him of any crimes involving death, *and passed on its right to retry him*, the government now attempts to convince the Court what it could not convince a jury—that Al-Imam knew about and agreed with the violent attack at the U.S. Special Mission. He did not. The defense respectfully requests the Court sentence Mr. Al-Imam to 41 months, with a *Smith* departure, knowing that every month of that sentence will be spent in an incredibly harsh environment without speakers of his language or the comfort of family in the United States.

## **BACKGROUND**

Mustafa Al-Imam was born in Benghazi, Libya in 1974. His father was a construction worker and his mother was a homemaker. He has ten brothers and sisters. When he was eight, Mustafa was hit by a car while riding his bicycle and sustained a brain injury. He reports having problems with memory from that date.



*Mustafa Al-Imam as a young boy*

Mustafa attended school up through the 8th grade.  After leaving school, he worked for the Libyan government.  In 1992, Mustafa started working as a shopkeeper.  He was a good employee and was well-liked by his customers.  He and his brothers would eventually open their own shop, where Mustafa would go after his day shift.



*Mustafa in his shop*

As the Court knows well, prior to 2011, Libya was ruled with an iron fist by Muammar Gaddafi.  One in every five households had a family member who disappeared under the Gaddafi regime. *See* Ian Black, *Human rights abuses "leave a third of Libyans with mental health problems": Research reveals human consequences of violence and lawlessness in north African country since fall of Gaddafi*, Guardian, Nov. 26, 2014, http://www.theguardian.com/world/2014/nov/26/human-rights-abuses-libyans-mental-health-problems-report.  Among those abuses, as reported by Amnesty International, were arbitrary arrests of regime opponents.  Amnesty International, *Libya: Gross Human Rights Violations Amid Secrecy and Isolation*, 1-7, (1997), *available at* http://www.amnesty.org/en/documents/mde19/008/1997/en/.  Mustafa was one such casualty.  He was imprisoned without trial after letting a friend stay at his home.  He was later

released and promised a $100,000 dinar payment for false arrest by the government, but was never paid anything.

Mustafa returned to work at his shop after his release. He remained there during the revolution of 2011, when numerous citizens took up arms against the Gaddafi regime, ultimately overthrowing him. Although Mustafa was abused by the Gaddafi regime, he did not like fighting and kept his head down during the revolution. He was extremely small and suffered from rheumatism, and did not concern himself with political issues.

During his imprisonment, Mustafa became friends with Ahmed Abu Khatallah, a fellow resident of Benghazi who lived near Mustafa's uncle. Al-Imam kept in touch with Khatallah after their release and would hang out with him on a social basis. Mustafa was aware that Khatallah had a militia, but he did not join it or any of the other many militias vying for control of Benghazi following the fall of Gaddafi. Khatallah seemed important however, and Mustafa hoped that his friendship could help him obtain medical treatment and stay safe in the post-war chaos. For his part, Khatallah described Mustafa as "a friend he sees socially" and a "weak person."

On the night of September 11, 2012, Mustafa was hanging out at a radio station run by Khatallah when Khatallah received a call about a disturbance at the U.S. Special Mission. This appears to be one of several calls where Khatallah feigned ignorance about the attack, including a call in front of a U.S. resident witness and a call with government witness Bilal al-Ubaydi, as reported to the New York Times.

As best Mustafa could recall five years later, Ashraf Al Fazini, Salah Al Amari, and Al-Imam got into Al Fazini's car and followed Khatallah to the Mission after Khatallah received this call. When they arrived at the Mission, Mustafa saw some February 17 Brigade members postured at a roadblock in the street with weapons. Mustafa heard shooting but did not see any Americans on the compound. Al Fazini stayed outside of the Mission compound with an AK-47

in a security posture, while Al Amari and Mustafa entered one of the office buildings inside the Mission.

The building was messy and chaotic. Mr. Al-Imam saw broken furniture and things all over the floor. Inside the building, Khatallah pointed at a phone that was on a desk and told Mr. Al-Imam to take the phone. Mr. Al-Imam took the phone, as well as a map of Libya that was hanging on the wall in the building.  Mr. Al-Imam did not want to be known as a thief, so he handed the phone and the map to Khalid Al Sagisley.  Mr. Al-Imam never saw the map or phone again after giving them to Sagisley.

While Mustafa was in the vicinity of the Mission, he remembers a young man using his phone to take a picture of him and members of Khatallah's crew.  Not knowing his motives, Mustafa confronted the man and pushed him.  Other people grabbed his phone.  Khatallah gave an order to Abdel Salaam Al Bashashi to grab the man, put him in the vehicle, and bring him to an AAS camp in Benghazi.

Al-Imam left with Khatallah and went with him to the AAS camp, near his home.  At the AAS camp, Mustafa saw Khatallah talking to the man who had taken the pictures. Al-Imam stayed at the AAS camp for approximately 30 minutes.  He then travelled to his residence from the camp and did not talk to Khatallah again that night.  Mustafa told the FBI about the young man and about what he witnessed Khatallah and his men doing to him that night.

Mustafa continued working at his shop in the months and years after September 11, 2012. During this period, Benghazi became increasingly fractured. There were assassinations and retaliations on an almost daily basis.  Also during this period, Ali al-Majrisi was contacted by the U.S. government and tasked with infiltrating Khatallah's group.  He spent several months with Khatallah, gaining his trust to the point of orchestrating his capture in 2014.  Majrisi had next to nothing to say about Mustafa during this period:  Mustafa's name did not appear in *any* cables

sent to his handlers—including Majrisi's cable about the transfer of weapons from a garage owned by Khatallah.  In later testimony, Majrisi would state that Mustafa and Khatallah were close "like a family, like a father to a son," Dep. Tr. 42; that Mustafa was a "regular individual," unlike Khatallah's fighters, 5/20/19 Tr. 2218; and that Mustafa was "quiet" and never discussed politics with Majrisi, 5/20/19 Tr. 2216.  And, in poignant testimony, Majrisi recounted Mustafa's internal struggle over maintaining a relationship with Khatallah:

> His family [was] like upset for him to hang out with Ahmed because he's following from Americans and he's a bad dude, stuff like this, and [Al-Imam]'s upset. And he's confusing between the family and hang out with Ahmed, you know? He trying to choose family or best friend like Ahmed. Yeah, he was confusing.  He opened his heart to me to talk about this."

5/20/19 Tr. 1966.

In February 2014, a general named Khalid Haftar announced that the General National Congress had been dissolved, a move described as a coup attempt by observers.  *See, e.g.*, Ramzy Baroud, *The Libyan Bedlam: General Hifter, the CIA and the Unfinished Coup*, London, UK: Middle East Online (20 February 2014), available at https://middle-east-online.com/en/libyan-bedlam-general-hifter-cia-and-unfinished-coup.  Two months later, General Haftar launched Operation Dignity, a campaign against groups he described as pro-Islamic militias.  This included groups such as February 17th Brigade and Libya Shield, which had helped defend the U.S. Special Mission and evacuate U.S. personnel, as well as individuals like Wissam bin Hamid and Fathi al-Obeidi, who provided assistance to the U.S. on September 11, 2012.  *See* Frederic Wehrey, *'We Helped You and Now You Abandoned Us'*, N.Y. Times (April 16, 2018), available at https://www.nytimes.com/2018/04/16/opinion/libya-america-cia.html (quoting, as its title, the plea of Fathi al-Obeidi for assistance in his struggle against General Haftar).

Gen. Haftar's campaign involved mass arbitrary detention and human rights abuses, and Mustafa was forced to flee his home in Benghazi.  He took refuge at a camp run by the February

17th Brigade, where he worked as a buyer of supplies in exchange for room and board. Mustafa spent a few months at the camp before getting injured by shrapnel. A senior member of the militia during this period had this to say about Mustafa:

(i)      Mustafa never expressed any extremist ideology;

(ii)     Although he was close to Abu Khatallah, Mustafa was not associated with Ansar al-Sharia or Al Qaʾida at the time;

(iii)    Mustafa could not use a weapon;

(iv)     Mustafa insisted on sleeping with the lights on because he was terrified of the dark;

(v)      Mustafa was regarded by most members of the militia to be mentally handicapped; and

(vi)     due to this mental handicap and his inability to use a weapon, he was primarily used by the militia group during this time frame to bring the other members food and drink.

Def. Trial Ex. 27.

In 2015, after being injured by shrapnel, Mustafa left the camp and went to Tripoli for treatment. There he met his wife, Amina, and at the age of 40, Mustafa fulfilled a lifelong goal of becoming a husband.



*A picture of Mustafa provided by his wife, Amina*

After his marriage, Mustafa began supporting himself by selling cookies, birds and household supplies.



*Mustafa with one of his birds*

In June 2017, Amina and Mustafa began expecting their first child.  Four months later, Mustafa was captured in Libya, transported to the United States, and placed into solitary confinement under the Department of Justice's "special administrative measures."  Five months later, Mustafa became a father for the first time while awaiting trial in this case.

## LEGAL STANDARDS

The fundamental requirement of a federal sentence is to be "sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. § 3553(a).  Courts must consider ten factors when sentencing a defendant: (1) "the nature and circumstances of the offense";

(2) "the history and characteristics of the defendant"; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need to afford adequate deterrence to criminal conduct; (5) the need to protect the public from further crimes of the defendant; (6) the need to provide the defendant with needed correctional treatment; (7) the kinds of sentences available; (8) the Sentencing Guidelines and policies; (9) the need to avoid unwarranted sentencing disparities; and (10) the need to provide restitution to any victims of the offense. These requirements reflect the "uniform and constant federal judicial tradition of considering every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotation omitted).

## ANALYSIS

## I.     THE ADVISORY SENTENCING GUIDELINES SUPPORT THE REQUESTED SENTENCE

The guidelines analysis in this case begins with USSG §2B1.1, which expressly covers the crime of conviction (18 U.S.C. § 1363). From there, the Court must determine whether the crime involved "arson, or property damage by use of explosives," in which case the applicable guideline is USSG §2K1.4, as well whether death resulted from Al-Imam's conspiracy, in which case the applicable guideline is USSG §2A1.2(a) (Second Degree Murder). Separately, the Court must determine whether to apply the terrorism enhancement under §3A1.4(a).

### A.     Applicable Guidelines Section

Here, the evidence does not support a finding that Mr. Al-Imam conspired to use arson or explosives, or joined any conspiracy resulting in death. Mr. Al-Imam was not convicted of any count involving conspiring to commit arson (Counts Three, Four, Seven, Ten, and Eleven), and

arson or explosives were not used during the post-attack injuring of the office compound that Mr. Al-Imam and his co-conspirators ransacked and looted.  He was convicted of injuring property, which reflects his on-camera conduct of entering the Mission office and pulling a phone from the socket while others ransacked and trampled the facility.  Unlike Khatallah, for whom there was significant evidence of leadership, motive, planning, and coordination of the attacks, there is no basis for concluding that Al-Imam was a member of any conspiracy greater than the one for which he is on video: joining Khatallah and others in damaging the Mission office, including pulling phones from the wall.

The government's expert report of the attack supports this conclusion.  It states that the initial attack ended at 11:23, and that "*after the attack*, this group of individuals was observed looting burning buildings…at approximately 23:47 hours until 00:55 hours based on the surveillance video."  Report of Edward Knapp at 2 (June 6, 2017) (emphasis added).  Indeed, when Mr. Al-Imam entered the Mission office, there were dozens if not hundreds of individuals visible on surveillance footage milling around the grounds of the U.S. Mission, and numerous individuals went into the office, including civilians, since it was not on fire.  Thus, the fact that individuals went into the office building does not indicate that they shared any knowledge or purpose with the individuals responsible for launching the initial attack and arson of the U.S. Mission.

Since Al-Imam's property-damage conspiracy did not involve arson or explosives, the correct guideline for Mr. Al-Imam's offense is §2B1.1.  This would result in a base offense level of **14** after application of specific-offense characteristic §2B1.1(15) (use of a firearm).  This appropriately reflects the offense level for someone who damaged an abandoned U.S. facility without playing any role in the death and destruction that preceded his conduct.

There is an argument that since one or more individuals looting the Mission with Al-Imam were carrying rocket launchers with RPGs, that §2K1.4 could apply.  Likewise, the damage to the Mission office was arguably possible because other buildings were burning and thus undefended. If the Court determines that either of these facts qualify as "arson, or property damage by use of explosives," §2B1.1(c), then the correct application would be §2K1.4, resulting in a base offense level of **24**.  Applying §2K1.4 in this way makes some linguistic sense, since this guideline refers to destruction of a "dwelling" or "government facility," while the language of §2B1.1 is chiefly concerned with financial damages.

Regardless, the Court should not find that death resulted from the time period of Al-Imam's limited post-attack conspiracy to injure property as described in the government's expert report.  In its PSR objections, the government contends that the correct guideline for Mr. Al-Imam is § 2A1.2(a) (Second Degree Murder) based on the Court's finding in the *Khatallah* case that death resulted from the offense.  But the court's reasoning in *Khatallah* relied heavily on Khatallah's role as the leader of UBJ and the unlikelihood that such a leader would not have known about and directed the conduct of his subordinates.  *Khatallah*,1:14-cr-00141 (CRC), Dkt. 529 at at 21 (Khatallah's "commanding role before and after the attack makes it highly unlikely that they staged and carried out the attack without his knowledge").  That logic does not apply to Mr. Al-Imam.

On the contrary, numerous government witnesses testified about the military concept of "need-to-know," which dictates that lower-level members of an operational team should not be given more information about a mission than necessary to carry out their particular roles. Nothing proffered by the government, such as evidence that Mr. Al-Imam was present with Khatallah or spoke with him on the phone, overcomes this principle.  Even if Mr. Al-Imam were a full-fledged member of UBJ—which he was not—the government offered no evidence that he

was aware in advance that UBJ planned a violent attack on the Mission. Rather, evidence at trial established that Mr. Al Imam was a shopkeeper with no ideological bent, a tiny frame, and no fighting experience. It is highly improbable that Abu Khatallah would have trusted such a person with plans to attack a "spy base" of world superpower, but rather would have asked him to come with him without telling him of any plans to launch the initial attack.

This matches Mr. Al-Imam's account to U.S. authorities, which reflects candor and self-incrimination in numerous other respects, including in describing the items he took, his pushing of a young man taking pictures, and his travel to an AAS camp. In those interviews, Mr. Al-Imam reported that Khatallah received a phone call about a demonstration at the U.S. Mission prior to traveling to the site. Significantly, there are two other independent accounts of Khatallah acting surprised about the attack during phone calls that night. The first was from U.S. resident Ahmed Salem, who testified in Khatallah's trial that he was with him when he received a phone call about protests at the Mission that night. The second was from Bilal al-Ubaydi, the government's star witness. Al-Ubaydi told a reporter for the New York Times that he spoke with Khatallah that night and Khatallah sounded surprised to learn that an attack was going on. (Tr. 3527). These two accounts strongly suggest that Khatallah—if not genuinely surprised—was attempting to create a web of alibi witnesses who did not know his full involvement in the Mission attack. If so, the evidence suggests that Khatallah was similarly manipulating Mr. Al-Imam, and brought this non-ideological "friend" along to participate in the post-attack looting of sensitive Mission documents.

As a key government witnesses testified, Khatallah was a "secretive" individual who did not disclose all of his plans to even his most trusted associates. (Tr. 2220). And as the Court noted in its opinion, Khatallah's role as a leader indicates that "the many phone calls between Abu Khatallah and these men were top-down, with Abu Khatallah providing direction rather than

merely receiving updates." *Id*. at 32.  Thus, none of the government's arguments indicate that Khatallah would have told Mr. Al-Imam about the attack he planned with his "special forces," even if he spoke extensively with Mr. Al-Imam on the phone, as he did many people that night unrelated to the Mission attack.[1]

Likewise, the government's arguments about Mr. Al-Imam's presence at the scene do not indicate his awareness or agreement with the initial attacks.  The government asserts that Mr. Al-Imam was present at the Mission during the attack based on cell tower information.  There are numerous problems with that assertion, however.  First, it is based on a single dubious open-source measurement that cannot reliably establish the location of the relevant cell tower.  Second, a medical doctor testified to the grand jury that he observed Abu Khatallah arriving *after* the attack when the doctor and other civilians were already there exploring the Mission.  This corroborates Mr. Al-Imam's statement to U.S. authorities, and contradicts the government's arguments.  Third, the government's claims *match* and *corroborate* Khatallah's account of going to the Mission during the attack and waiting outside until the shooting died down—a claim corroborated by Wissam bin Hamid in an interview with the New York Times (another alibi witness Khatallah likely took pains to create).  Thus, all the cell tower evidence would show is that Al-Imam misremembered the timing of his arrival—or the interval between Khatallah's arrival and his—not that Khatallah discussed his plans to attack the Mission with Al-Imam.

Notably, there were other UBJ and AAS-related individuals present in the office with Mr. Al-Imam who also do not appear to have known about or participated in the initial attack.  For

---

[1] Notably, the government's key witness, Bilal al-Ubaydi, claimed that numerous contacts between himself and Abu Khatallah listed in the government's "phone records" never occurred. (Tr. 1086).  Thus, either the records are inaccurate, or the government's key inculpatory witness lied about the extent of his communications with Abu Khatallah.  In any event, FBI analyst Jessica Krueger testified that according to the records, Khatallah spoke significantly more with two individuals during the relevant timeframe than he did with Mr. Al-Imam, yet that frequency was not determined to reflect any indicia of conspiratorial activity.  (Tr. 3164–65).

example, key government witness Ali Majrisi testified that a friend and former member of UBJ was at the Mission that night, but he had no reason to believe the friend was involved in the attack. Likewise, Bilal al-Ubaydi testified that a member of AAS entered the office contemporaneously with Mr. Al-Imam and then went to his security headquarters and addressed the media. (Tr. 1098). This shows that being at the scene, going into the office, and being associated with AAS are not strong indications that someone knew about and agreed with the initial attack.

The government's PSR objections also assert that "the jury already concluded, beyond a reasonable doubt, that it was reasonably foreseeable to defendant Mr. Al-Imam that the attack could place lives in jeopardy." That is not true: both § 1363 and the jury instructions only required the jury to find that the Mission was a *dwelling*; there was no requirement to find that lives were placed in jeopardy. In sum, there is no evidence indicating that Mr. Al-Imam knew about or agreed with the initial violent attack on the U.S. Mission. Rather, he was seen by a witness arriving at the Mission shortly before midnight to a chaotic scene and agreed to join others looting and injuring the Mission. The government has failed in its burden to prove by a preponderance of the evidence that death resulted from this offense by Mr. Al-Imam, which occurred after the evacuation of U.S. personnel from the Mission. Therefore, the proper guideline remains §2B1.1 (or §2K1.1).[2]

### B.   The Terrorism Enhancement Does Not Apply

The Court should not apply the twelve-point victim-related adjustment pursuant to U.S.S.G. § 3A1.4(a) for a felony that involved, or was intended to promote, a federal crime of

---

[2] For preservation purposes, Defendant additionally objects to the application of a significant sentencing enhancement based on a factor ("resulting in death") not found by the jury. *See United States v. Bell*, 808 F.3d 926, 927-28 (D.C. Cir. 2015) (Kavanaugh, J. concurring in denial of rehearing en banc).

terrorism.   Again, the proper perspective begins with the post-attack period identified by the government's own expert report.   *See* Report of Edward Knapp at 2 (June 6, 2017) ("*[A]fter the attack*, this group of individuals was observed looting burning buildings…at approximately 23:47 hours until 00:55 hours based on the surveillance video.") (emphasis added).   A federal crime of terrorism is a crime that is "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." 18 U.S.C. § 2332b.   In its prior opinion, the Court stated that "a U.S. diplomatic (or intelligence) facility is a physical manifestation of the U.S. government, and, in the absence of any plausible alternative motives (e.g., stealing items for economic reasons, hurting a particular individual, proving one's chutzpah), attacking it suggests a desire to retaliate against or influence that government." *Khatallah*,1:14-cr-00141 (CRC), Dkt. 529 at 29.   But here, the government argued extensively to the jury that there *was* an alternative motive for the specific post-attack conspiracy that Mr. Al-Imam joined: "site exploitation."   *See, e.g.*, Tr. 3803 ("And at this point the battle for the Mission *is over*. That facility has been *lost*.   It is now in the hands of these co-conspirators, these attackers. And the *next thing* that happens is that *site exploitation*.   Between 11:45 and 12:10 [when Mr. Al-Imam is on video] there is *site exploitation* of the Mission.") (emphases added); Tr. 3819 ("Mr. Al-Imam did several things on 9/11 that showed that he was providing himself as personnel for material support of terrorism….He *exploited* the TOC. He took that map. He worked with Saglusi, Al-Amari, and Khatallah…[H]e went to the AAS camp with Mr. Khatallah and with all of that *site exploitation* evidence.").

"Site exploitation," as defined by government witness David Ubben, means, "collecting whatever material, papers, equipment, electronics, asking questions, getting as much….information from that site for the purpose of fulfilling some sort of information request or to get information on additional targets." Tr. 2330–31.   While the fruit of a site exploitation

operation might result in future crimes of terrorism, it is not itself an act calculated to coerce, intimidate, or retaliate against a government.  It is just an information-gathering operation—one that by the government's own closing argument was the "*next thing*" that began *after* the "battle for the Mission is over." Tr. 3803.  Thus, by the government's own argument, the conspiracy Mr. Al-Imam joined was not a federal crime of terrorism, and the 12-point enhancement should not apply.[3,4]

### C.    Role Adjustment

The PSR applied a 2-point role adjustment under USSG §3B1.2, finding that Al-Imam is substantially less culpable than other members of the conspiracy.  That conclusion is correct:  Al-Imam did not carry a weapon, played no role in the initial attack, was not a member of UBJ, was not a fighter, showed no evidence of planning, was not an ideological person, felt remorse, and at all times was directed by Khatallah, according to the government. He thus qualifies for this adjustment.

### D.    Applicable Guidelines Range

Applying §2B1.1 (based on the lack of arson or explosives in the "site exploitation" conspiracy for which Mr. Al-Imam is convicted) would result in a final offense level of **12**, and a sentencing range of **10-16 months**.  Applying §2K1.4 (based on the continued role of fires or RPGs in the "site exploitation" stage) would result in a final offense level of **22**, and a sentencing

---

[3] If the Court does determine that the terrorism enhancement should apply, it would cause Mr. Al-Imam's criminal history to be overrepresented, and he should then benefit from a departure under USSG §4A1.3.  *See United States v. Benkahla*, 501 F.Supp.2d 748, 758 (E.D.V.A. 2007) (applying the Terrorism Enhancement and then a downward departure under §4A1.3 to drop the defendant's criminal history category from VI back down to I).

[4] For preservation purposes, Defendant additionally objects to the application of a significant sentencing enhancement based on a factor ("terrorism") not found by the jury.  *See United States v. Bell*, 808 F.3d 926, 927-28 (D.C. Cir. 2015) (Kavanaugh, J. concurring in denial of rehearing en banc).

range of **41–51 months**.  Based on these ranges, the defense submits that a sentence of **41 months** is "sufficient, but not more than necessary" to achieve the purposes of sentencing in § 3553(a).

## II.      THE § 3355 FACTORS SUPPORT A MITIGATED SENTENCE

### A.  The History and Characteristics of the Defendant Support a Mitigated Sentence

Mr. Al-Imam's history and characteristics support leniency in this case.  Mustafa is a simple, non-political man who has lived his whole life in Libya. He suffered a car accident as a child that impacted his memory the rest of his life.  He lost his father as a child, and watched his mother struggle to raise eleven children.  His education stopped in the eighth grade, and he lived in a toxic police state fueled by brutal oppression.  He was himself a victim of that oppression, having been imprisoned by Gaddafi without charge.  Yet this experience did not make him bitter, or turn him into a radical or revolutionary.  He remained joyful and focused on his twin loves of family and soccer, doing his best at his job everyday without getting involved in politics or the revolution.

This is Mustafa's first offense.  And there is nothing suggesting that his involvement in this case reflects an anti-American or terrorist ideology.  Rather, Al-Imam had a close, entirely personal connection with a "father"-like figure who led him astray against the advice of his family.  Knowing that he would be seen entering the Mission office, Khatallah likely used Al-Imam to enhance his alibi, as he had with Ahmed Salem, Wissam bin Hamid, and Bilal al-Ubaydi.  It is significant that Mustafa's connection with Khatallah was always one of friendship and was never described by anyone as ideological or terroristic.  Majrisi described Mustafa as torn up over loyalty to his friend, someone who had been with him in the darkest hours, or his family, who saw better than Mustafa that Khatallah was bad news.  There is very little chance that Mustafa will be a threat to anyone if he is allowed to return to his family, including his infant son,

to live a normal life as possible in wartorn Libya while Khattallah serves the remainder of his sentence.

Even Mustafa's brief stint in a militia support leniency.  When he had to find a safe place to go, he chose the February 17th Brigade—which guarded to the U.S. Special Mission—rather than UBJ, Ansar al-Sharia, ISIS, or other more extreme groups fighting Haftar.   And his experience in the group reflected his peaceful nature.   He "never expressed any extremist ideology," "was not associated with Ansar al-Sharia or Al Qa'ida," "could not use a weapon," and was "primarily used by the militia group…to bring other members food and drink."  Def. Trial Ex. 27.

Mustafa's aging, ailing mother and young son, whom he has never met, provide additional grounds for leniency.  His rheumatism—a painful condition made worse by cold cells—also means that any imprisonment will be physically harsh.  Even worse, however, will be the psychological burden under which he will serve any sentence.  The government has imposed "special administrative measures" (SAMs) on Mr. Al-Imam for the last two years, and these conditions are likely to continue through the remainder of any sentence the Court imposes.  He has been held in solitary confinement with no ability to speak with family members—or anyone who speaks his language—outside of a phone call every two to four weeks.  This supports both a more generous "credit" for the time he has already served, and leniency for any additional time imposed.  *See United States v. Warsame*, 651 F. Supp. 2d 978, 982 (D. Minn. 2009 (defendant's pretrial confinement under conditions significantly more onerous than conditions faced by ordinary pretrial detainees comparable to a longer period of time served in federal prison).

Mr. Al-Imam also will continue to face more punishing conditions of detention than most prisoners, not only due to the language barrier and the lack of contact with family, but also due to his status as a deportable alien, which likely would increase the severity of his confinement and the length

of his term of incarceration by eliminating the possibility of going to a halfway house or participating in many other programs. *See United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994) (non-guideline sentence may be appropriate because defendant's status as deportable alien would increase length and severity of sentence). Even if the SAMs restrictions are not continued, the BOP rules and regulations provide for differential treatment for aliens. The differences include, but are not limited to ineligibility for early placement into a halfway house or home confinement, resulting in service of his entire sentence, less good time credit; increased housing classification level; ineligibility for work in the Federal Prison Industries Program; and ineligibility for vocational training. In short, because he is a deportable alien, Mr. Al-Imam would not receive the same benefits of programs within the BOP as other prisoners. Mr. Al-Imam's status as a deportable alien, therefore, would increase both the severity and the length of his sentence.

Mr. Al-Imam's small physical stature (5'2", 108 lbs.) and frail physical condition will also make him extremely vulnerable to abuse in prison in the few times when he is not being held in solitary confinement.  This is a factor the Court can and should consider.

Finally, the fate that awaits Mr. Al-Imam in Libya is a factor that supports a mitigated sentence.  Mustafa's home country is in chaos, with civil war, slavery, ISIS, criminal kidnappings, and a ravaged economy making life perilous and miserable for the population. Given the high-profile nature of this case, Mr. Al-Imam will likely face trouble with forces aligned with General Haftar when he returns, and may face additional terms of imprisonment with or without due process.  And even if he is not re-prosecuted, or persecuted, the fact remains that he will be deported back to a failed state with constant insecurity.  This lessens the need for a long prison sentence to meet the purposes of § 3553(a).

**B.**     **Nature and Circumstances of the Offense Support a Mitigated Sentence**

Although he was not convicted of any conduct resulting in death, Al-Imam was convicted of conspiring to injure U.S. property in a manner that assisted in the taking of sensitive materials from a U.S. facility.    That is undoubtedly a serious crime worthy of multiple years of imprisonment, as the defense has requested.

However, there is no evidence that Al-Imam agreed to or intended to harm any Americans.  The jury refused to convict Mr. Al-Imam of any charge related to murder, arson, or conduct resulting in death, and the government has elected not to retry him.   The logical implication of the jury's verdict is that Mr. Al-Imam joined a conspiracy to injure property after the attack ended, when no Americans were present and the property had been abandoned.  This late-formed agreement to damage an abandoned, foreign property in one's home country, itself a battleground of jockeying militias, is a far cry from the intentional targeting of an American facility or civilians for terrorist purposes—something Mr. Al-Imam would never support.

Moreover, the government's theory at trial was that Khatallah believed the Special Mission to be an illegal spy base violating the sovereignty of Libya, *not* a diplomatic facility. That is an extremely mitigating factor, especially since there was conflict over who was the established authority in Benghazi responsible for enforcing laws.  If an Iraqi citizen overran and gathered documents from what he believed to be an Iranian or Syrian spy base operating in a poorly-governed area of Iraqi territory, most Americans would view that as a patriotic act.  That is essentially the crime that, under the government's theory, Khatallah convinced Mr. Al-Imam to join.  Even if Al-Imam had agreed to join the initial attack resulting in deaths—which he did not—the fact that Khatallah (and by implication, Al-Imam) believed it to be a legitimate site to attack mitigates the need for significant sentence to reflect the seriousness of the offense.

**C.      The Need for Just Punishment Supports a Mitigated Sentence**

A just sentence is one that faithfully applies the jury's verdict rather than the government's allegations, and upholds the "uniform and constant federal judicial tradition of considering every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall*, 552 U.S. at 52. That is what the requested sentence does here. It is based on a guidelines calculation that appropriately imposes multiple years of imprisonment for conduct that damaged U.S. property, without artificially inflating the punishment based on conclusions the jury rejected. While the evidence supported additional findings against Khatallah, Al-Imam was not a leader of any militia group, was not in communication with militia fighters, and was subject to the principle of "need to know" testified at length by government witnesses. Thus, a just sentence reflects the jury's verdict, not more or less.

The Court should be additionally mindful of the fears that the current practice for sentencing individuals convicted of crimes of terrorism, including application of the Terrorism Enhancement, has unintended national security consequences. *See, e.g.,* Christina Parajon Skinner, *Punishing Crimes of Terror in Article III Courts*, 31 Yale L. & Pol'y Rev. 309, 381 (2013) (arguing that the current sentencing system has created a serious national security weakness–"the risk that it is 'hardening' terrorist defendants against America, and contributing to the development or entrenchment of terrorist networks."); James P. McLoughlin, Jr., *Deconstructing United States Sentencing Guidelines Section 3A1.4: Sentencing Failure in Cases of Financial Support for Foreign Terrorist Organizations*, 28 Law & Ineq. 51, 76 (2010) ("One must ask what U.S.S.G. [§] 3A1.4 adds to the equation that improves sentencing or anti-terrorism policy when it creates such draconian anomalies that (in the case of defendants who are foreign nationals) become newsworthy in the countries from which the defendants have come fostering a

belief that the U.S. justice system is biased and fundamentally unfair.").  These consequences are the product of sentences which are perceived as unfair to the human individuals upon which they are imposed, promoting disrespect for the law and increasing the risk of terrorism.

### D.    The Need for Deterrence Supports a Mitigated Sentence

A long sentence does not automatically equal deterrence:  injustices beget grievances that result in terrorism.  Treating Al-Imam appropriately and fairly will go a long way to showing the fairness of U.S. legal system and its ability to honor jury verdicts and treat foreign, Muslim defendants as individuals.

Many commentators warn against unnecessarily lengthy sentences for terrorism offenses. *See, e.g.*, Sameer Ahmed, *Is History Repeating Itself? Sentencing Young American Muslims in the War on Terror*, 126 Yale L.J. 1520, 1527-28 (2017) ("[N]ot only do lengthy sentences hinder rehabilitation, but they can also promote recidivism, especially in the terrorism context."); Parajon Skinner, supra, at 381 ("The risk that terrorists will harden in the U.S. prison system, or, in ordinary criminal language 'recidivate,' is at least in part a function of their experience in prison, inclusive of their perceptions of the process behind the punishment.").  One of the reasons behind those warnings is the possibility of further "radicalization" while in prison. "Prison systems throughout the world have been and continue to be breeding grounds for radicalism, recruiting grounds for extremist movements, and facilities for the planning and training of radical activities."  Office of the Inspector Gen., U.S. Dep't of Justice, A Review of the Federal Bureau of Prisons' Selection of Muslim Religious Services Providers 6 (2004), available at https://oig.justice.gov/special/0404/final.pdf.  These concerns support the requested sentence.

As for individual deterrence, Mr. Al-Imam has no criminal history and there is no evidence that he harbors any negative view of America—despite the government's confiscation of

electronic devices from both Al-Imam and Khatallah.  A lengthy prison sentence is thus not necessary to protect the public from Al-Imam.

### E.       The Sentencing Guidelines Support a Mitigated Sentence

The guidelines range produced by the defense analysis (10–16 months or 41–51 months) are reasonable and should be applied by the Court.  The Court should reject any artificial, draconian increase in this reasonable sentence range based on the Terrorism Enhancement.  *See United States v. Jumaev*, No. 12-CR-00033-JLK, 2018 WL 3490886, at *10 (D. Colo. July 18, 2018) (explaining wholesale rejection of the Terrorism Enhancement as failing to differentiate between various levels of conduct, which is the among the purposes of the Sentencing Guidelines).

### F.       The Need to Avoid Unwarranted Sentencing Disparities Supports a Mitigated Sentence

All material-support cases are serious. Nonetheless, courts have shown great discretion in imposing mitigated sentences far below the advisory guideline range when warranted. In fact, mitigated sentences have been imposed where the conduct was much more committed, severe and threatening than this case. Following is a sampling of terrorism cases in which mitigated sentences or sentences substantially below the advisory guidelines were ordered:

| Case Name | Case Summary | Sentence |
|---|---|---|
| *United States v. Abdallah* Case No. 2:08-cr-0094-NVW | Defendant participated in fundraising for designated terrorist organization Holy Land Foundation for Relief & Development and lied about his participation to the FBI. | 18 months |

| | | |
|---|---|---|
| *United States v. Abdoulah*<br>Case No. 01CR3240-W | Defendant assisted the September 11, 2001, hijackers in arriving in San Diego. | Time Served<br>(after about a year in custody) |
| *United States v. Abdow*<br>Case No. 09-292 JMR/SRN | Defendant obstructed FBI investigation into the recruitment of young men in the United States to train and fight for extremist groups in Somalia. | 4 months incarceration,<br>4 months house arrest |
| *United States v. Akl, et al.*<br>Case No. 3:10CR251 | Husband and Wife co-defendants were involved in scheme to send hundreds of thousands of dollars to the terrorist group Hizballah over the course of almost a year. | Husband: 75 months;<br>Wife: 40 months |
| *United States v. Ali*<br>Case No. 02CR2912-L<br><br>*United States v. Durrani*<br>Case No. 02CR2912-L | Co-defendants conspired to distribute heroin and hashish for the purpose of providing material support to terrorist group Al-Qaeda, and travelled internationally in support of that conspiracy. | 57 months each |
| *United States v. Al-Arian*<br>Case No. 8:03-CR-77-T-30TBM | Defendant conspired to make or receive contribution of funds, goods or services to or for the benefit of the terrorist group Palestinian Islamic Jihad. | 57 months |
| *United States v. Al-Hanooti*<br>Case No. 08CR20083-1 | Defendant entered into an illegal business relationship for oil with Saddam Hussein's government. | 12 months and a day |
| *United States v. Christianson*<br>586 F.3d 532 (7th Cir. 2009) | Two co-defendants who were members of the domestic eco-terrorist organization Earth Liberation Front committed $424,361 worth of damage at a facility belonging to the U.S. Forest Service. | 24 months and 36 months |

24

| *United States v. Hupper*<br>Case No. 1:08-cr-20410-PCH | Defendant provided $20,000 to terrorist group Hamas and made a false passport application. | 46 months |
| *Hamdan v. United States*<br>696 F.3d 1238, 1240 (D.C. Cir. 2012) | Defendant was an Al Qaeda driver, who worked at Al Qaeda training camps, and eventually become the driver of and personal assistant to Osama Bin Laden. | 66 months |

In light of these precedents, a sentence of 41 months is a reasonable sentence for a non-ideological, non-violent defendant who shows no animosity toward the United States and whose involvement in this crime reflected a misguided friendship with a "father" figure after he lost a father of his own.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant Mustafa al-Imam respectfully requests that the Court impose a sentence of 41 months, with a *Smith* departure.

January 13, 2020

Respectfully submitted,

/s/ Matthew J. Peed
Matthew J. Peed (D.C. Bar No. 503328)
CLINTON & PEED
777 Sixth St. N.W., 11th Floor
Washington, DC 20001
(202) 621-1828 (tel)
(202) 204-6320 (fax)

*Counsel for Defendant Mustafa Al-Imam*