**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** : | |
| : | |
| v. : | Criminal No. 17-CR-213 (CRC) |
| : | |
| **MUSTAFA MUHAMMAD MUFTAH** : | Sentencing: January 23, 2020 |
| **AL-IMAM,** : | |
| : | |
| **Defendant.** : | |

**UNITED STATES' SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this supplemental memorandum in aid of sentencing. The United States presented evidence at evidentiary hearings related to the cell tower records previously admitted at trial in this matter (Ex. 1100). The purpose of this presentation was to assist the Court in determining when Ahmed Abu Khatallah and defendant Mustafa Al Imam arrived on scene at the U.S. Special Mission in Benghazi, an additional fact that will allow the Court to evaluate the defendant's liability at sentencing for the actions of his coconspirators. *See* U.S.S.G. § 1B1.3(a)(1)(B) (relevant conduct "in the case of a jointly undertaken criminal activity"). A preponderance of the evidence presented at trial, as well as the additional evidence submitted during the pre-sentencing evidentiary hearings, show that the defendant arrived in the vicinity of the Mission at approximately 9:54 p.m. on September 11, 2012, and remained there until approximately 12:10 a.m. on September 12, 2012. Given the state of the attack on the Mission during that timeframe, to include the visibly raging fires and the sounds of automatic weapons, RPGs, and gellatina bombs, it was reasonably foreseeable to the defendant while he was in the vicinity of the U.S. Mission that the conspiracy he had joined could result in death.

**ARGUMENT**

**I. The Evidence Establishes That Defendant Was at the Mission Starting at 9:54 p.m.**

Several pieces of evidence admitted at trial in this case and in Khatallah's case confirm that on September 11, 2012, the defendant and Khatallah were in the vicinity of the U.S. Special Mission beginning at approximately 9:54 p.m.

**A. Defendant's Statement**

The defendant stated that on September 11, 2012, Khatallah "received a phone call about 5:00 p.m." and that "once Khatallah received the call," the defendant and several others got into a car and "followed Khatallah to the U.S. Embassy." Ex. A (10/30/17 AM Stmt.) at 3. The defendant later clarified that he "did not remember" the exact time, but that "it may have been around 5:00 p.m. when they left to go" to the Mission. Ex. B (10/30/17 PM Stmt.) at 2. The defendant provided no details of when he arrived at the Mission, although he stated that Khatallah arrived "about five minutes before" the defendant did. Ex. A at 3. The defendant did state that, at the time he "entered the compound," "he heard shooting but did not see any Americans on the compound." Ex. A at 3.[1] The defendant further described being at the Mission with Khatallah until "he left the compound with Khatallah and they drove to AAS headquarters." Ex. A at 4.

---

[1] In the 10/30/17 AM statement, the defendant described stopping at a gas station on the way to the Mission. Ex. A at 3. In the 10/30/17 PM statement, the defendant stated that Khatallah stopped to pick up someone on the way. Ex. B at 2. Neither statement gives a definitive timeline of what stops were made on the way to the Mission or when the defendant arrived.
By contrast, in his statement, Khatallah described making stops on the way to the Mission, how long it took to travel to the Mission, and the direction by which he arrived at the Mission. Ex. C (Khatallah Interview #2) at 9-10. During a later interview, Khatallah changed his timeline and stated that he picked up Al Imam after approximately 8:30 p.m. Ex. D (Khatallah Interview #6) at 4.

### B. Khatallah's Statement

Khatallah stated that he arrived at the Mission before "approximately 9:30 p.m.," at which time he observed Ayman Al-Dijawi at the Mission. Ex. D at 2. Khatallah stated that following his arrival at the Mission, he parked his car on the south side of Venezia Street (Fourth Ring Road), "approximately fifty to one hundred meters west" of the Mission's back gate.[2] Ex. C at 9.

### C. Call Data Records for Khatallah's Phone

The call data records for Khatallah's cellular phone show that Khatallah, and by extension the defendant, was in the same general geographic area between 9:54 p.m. and 11:24 p.m. on September 11, 2012. Specifically, during this time period Khatallah made or received twenty-four calls. *See* Ex. 1100.D. These calls primarily utilized the same cell phone site to connect to the cell network—LAC 9380 / CELL ID 19583. For six of the calls, Khatallah's cell phone utilized a site with LAC 9380 / CELL ID 27633, and for one call, Khatallah's cell phone utilized a site with LAC 9380 / CELL ID 27632.  The records show that Khatallah's phone switched back and forth between these three sites, but ultimately returned to using the site with LAC 9380 / CELL ID 19583.

The government's expert, Federal Bureau of Investigation Special Agent ("SA") Benjamin Inman, opined that these records, on their face, were consistent with the user of Khatallah's cell phone being in the same general geographic area for the period of 9:54 p.m. to 11:24 p.m. SA Inman explained that cell phones work using line of sight technology and connect to the cleanest, strongest signal in order to make or receive a call. In general, where a phone utilizes a specific cell site to make or receive a call, the phone has to be located in the coverage area of the specific cell

---

[2] The government notes that Khatallah referred to the gate on Venezia Street as the "main gate" of the Mission. At trial, this was identified by the government's witnesses as the back gate of the Mission compound. See Ex. 103A (identifying Venezia Street as the street running immediately to the south of the Mission).

site. Here, SA Inman noted that Khatallah's phone repeatedly used the cell site with CELL ID 19583 and that the phone quickly switched between that CELL ID and the two other CELL IDs. SA Inman explained that these records were consistent with these cell sites either being co-located on the same cell phone tower or neighboring (adjacent) cells, further supporting the ultimate conclusion that the phone was in the same general geographic area between 9:54-11:24 p.m.

### D. 10:20 p.m. Call

At 10:20 p.m. on September 11, 2012, Khatallah made a call on his cell phone to Bilal Al Ubaydi, utilizing LAC 9380 / CELL ID 19583. *See* Exs. 1100 & 1100D (Line 1606). According to Al Ubaydi, Khatallah told him to "withdraw your men." 5/13/19 PM Tr. at 963. Khatallah described the men he was referring to, and Al Ubaydi understood that Khatallah was talking about two members of his Preventative Security Group, Hussein and Hamza. *Id.* at 965.

Al Ubaydi testified that Hussein and Hamza were picking up their dinner at a restaurant located at the southeast corner of Venezia and Shari Al Andulus Streets. *Id.* at 962. This corner is due west of the back gate of the Mission. *See* 103A. Hamza later called Al Ubaydi and told him that the two had been stopped by Khatallah on September 11, 2012. *Id.* at 965. As stated, Khatallah recalled being at this same intersection and stated that he parked his car nearby. Ex. C at 9.

SA Inman testified that, if the location of the cell phone was known for a specific call utilizing a specific cell site, then by deduction, it was possible to conclude that the cell phone was in the coverage area of the cell site when the call occurred. The cell phone would, therefore, be in the area of that same location during *all* the calls when it utilized that same cell site. Thus, by deduction, during the calls made or received by Khatallah between 9:54 p.m. and 11:24 p.m. on September 11, 2012, Khatallah was in the same general geographic area as he was at 10:20 p.m.— *i.e.*, the area to the west of the Mission's back gate.

4

### E. Surveillance Video

Khatallah's cell phone records for September 11-12, 2012, show a one-hour gap in usage between 11:24 p.m. and 12:23 a.m. This gap is significant given the volume and pattern of calls otherwise throughout that evening. Specifically, from 4:45 p.m. through 11:24 p.m., Khatallah made or received 71 calls, 24 of which occurred after 9:54 p.m. *See* Exs. 1100 & 1100.D. After 9:54 p.m., Khatallah's calls proceeded at a rapid pace, with calls occurring every few minutes. *Id.* As described at trial by FBI SA Jessica Krueger, a number of these calls were between Khatallah and members of UBJ (Jutuf and al-Dijawi) who were seen on camera inside the Mission during the attack and around the time they were communicating with Khatallah. *See* Ex. 234-16 (attached hereto). Three other calls were with the defendant between 10:28-10:44 p.m., the last of which lasted for 18 minutes, and these calls all took place during the period where GRS members had arrived on scene and were assisting in defending the Mission. *Id.* Then, at 11:24 p.m., the calls ceased for nearly an hour. *Id.*

This gap is significant given what else was occurring at the Mission during this period of time, according to the surveillance video and aerial drone footage. At 11:10 p.m., an explosive was thrown over the Mission's rear gate. Between 11:16-11:31 p.m., gunfire and RPGs were fired into the Mission from outside the rear gate. At 11:24 p.m., there was an explosion in the vicinity of Villa B. At 11:34 p.m., the GRS members withdrew from the Mission, thus ending the battle for control of the Mission. At 11:45 p.m., the drone footage shows individuals entering into the Mission from the rear gate. Starting at 11:46 p.m., known associates of Khatallah (including Khalid Sagluzi, Aymen Dijawi, and the defendant) and others are seen outside the TOC building on the surveillance video, and Khatallah is also caught on camera at 11:54 p.m., after which he enters into the TOC with Khalid Nayhum. All of this timing is consistent with the pattern for Khatallah's

calls. Once the attackers had secured the Mission and driven out the Americans, Khatallah and his subordinates, like the defendant, were together exploiting the Mission and thus there was no need for Khatallah to be on the phone with those subordinates.

The one hour gap in the cell phone records in combination with the known location of Khatallah and the activity at the Mission during this timeframe all support that Khatallah and the defendant were present in the vicinity of the Mission in the time period prior to their entry into the Mission.

Based on all the aforementioned evidence, the Court should find that a preponderance of the evidence shows that the defendant was in the vicinity of the Mission beginning at 9:54 p.m. on September 11, 2012.

## II. Additional Evidence About Cell Site Location Corroborates That the Defendant Was in the Vicinity of the Mission Beginning at 9:54 p.m.

At the evidentiary hearings in advance of sentencing, SA Inman also presented information about the location of relevant cell sites provided by a publicly available website, OpenCell ID. Specifically, OpenCell ID provides an estimate of the location of the center of the cell sectors for the three cell sites used by Khatallah on September 11, 2012 from 9:54 p.m. to 11:24 p.m.— CELL IDs 19583, 27632, 27633. OpenCell ID showed that the location of the center of the cell sector of each to be in the general geographic vicinity of the Mission. SA Inman opined that the OpenCell ID data was consistent with the fact that Khatallah's cell phone was in the general geographic area of the Mission between 9:54 p.m. to 11:24 p.m.

SA Inman testified that he tested some of the data provided in OpenCell ID to assist in assessing its reliability. OpenCell ID is a resource used by some members of the FBI Cellular Analysis Survey Team in the absence of cell tower lists from the service provider. OpenCell ID gathers cell site information from users who voluntarily release that information to OpenCell ID.

SA Inman reviewed certain OpenCell ID data by comparing the location for two cell sectors provided by OpenCell ID—one in Washington, D.C. and one in Poland—with known location information about the towers with which those cell sectors were associated, as identified by the relevant cell phone provider. For both of the comparisons, Open Cell ID's information was consistent with the known tower location information, and estimated that the center of the cell sector was located between 200-600 meters from the location of the tower.

Additionally, SA Inman conducted an additional comparison of OpenCell ID data in Libya that further assists in showing the reliability of the OpenCell ID data. First, SA Inman identified the "high use" cell sites for Khatallah's phone as LAC 9250 / CELL ID 25023 and LAC 9250 / CELL ID 18053. *See* Ex. E at 1 (table of cell sectors listed in Gov. Ex. 1100). SA Inman testified that "high use" cell sites are typically those located near the user's home. Second, SA Inman plotted the OpenCell ID data for these two sites against the known location for Khatallah's residence. *See* Ex. F. OpenCell ID data showed the center of the cell sectors for these cell sites as located within the vicinity of Khatallah's residence, just as one would expect to be the case for Khatallah's home towers. *Id.* Moreover, OpenCell ID's data regarding these cell sites is entirely consistent with the stipulation of Khatallah and the government about the same issue, Gov. Ex. 240. In Khatallah's case, Khatallah and the government stipulated that Khatallah's phone was in the vicinity of his residence between 2:17-10:23 a.m. on September 12, 2012, *id.*, during which time the call data records show that the cell phone was utilizing CELL ID 25023 and CELL ID 18053, *see* Ex. 1100.[3] Thus, as seen in Exhibit F, OpenCell ID's consistency has been verified for Khatallah's home towers, two data points in Libya.

---

[3]    The full stipulation states that "On September 12, 2012 between 2:17AM and 10:23 AM, the defendant's cell phone (0532) was location in the vicinity of his residence which was 3.15 miles away from the Mission and 3.08138 miles away from the Annex."

This additional evidence from OpenCell ID corroborates the other evidence previously discussed, *see supra* Section I, all of which supports a finding that the defendant was in the vicinity of the Mission beginning at 9:54 p.m.

**III. The Defendant's Arguments to the Contrary Are Unpersuasive.**

The defendant's arguments to the contrary are not persuasive. First, the defendant seems to assert that it is irrelevant that the cell sites are in the vicinity of the Mission, because a cell tower can purportedly service a cell phone 21 miles away. There is little to no evidence for this assumption. The defendant stated he intended to submit a document in support, however the document in question provides no citation or calculation on this point, and SA Inman testified that the authors admitted to the FBI that they obtained this information from Wikipedia.[4] The document itself goes on to state that such a "service" area would not apply to "densely populated urban locations." Even the defendant's own "expert," who the Court did not qualify, explained that (i) at best this distance is merely how far away a phone might *recognize* a cell site, not make a call; (ii) it was a "theoretical" calculation and he had never done any tests to support the assumption; and (iii) such results would only be possible "out west," *i.e.*, in a wide-open rural area.

The notion that the cell sites near the Mission were being used by Khatallah while he was miles away is entirely inconsistent with the evidence. Libyana utilized *at least* 383 cell sites in Benghazi in 2012, because that is how many sites appear in Khatallah's phone records. *See* Ex. E at 13. After he testified, SA Inman mapped whatever of those 383 sites were found in OpenCell ID's downloadable data file, and the result shows that Khatallah utilized an array of cell sites geographically dispersed around Benghazi. Ex. G. Moreover, SA Inman also mapped the cell sites

---

[4] Ayers *et al.*, *Guidelines on Mobile Device Forensics*, NIST Special Publication 800-101 Revision 1 at 54 (May 2014), *available at* http://dx.doi.org/10.6028/NIST.SP.800-101r1.

used by Khatallah's phone on September 11-12, 2012, and the result shows Khatallah using a variety of cell sites throughout the city of Benghazi. Ex. H (submitted via DVD).[5] Finally, as discussed, Khatallah's phone was nearly three miles away from the Mission between 2:17-10:27 a.m. on September 12, 2012, at which time it was utilizing a different LAC (9250) than that at the Mission, and two different cell sites (CELL ID 25023 and CELL ID 18053) than those near the Mission. *See* Gov. Ex. 240; Ex. E; Ex. F. All of these data points show the improbability that Khatallah's phone was located miles away from the Mission when it utilized the three cell sites in the Mission's vicinity between 9:54-11:24 p.m.

Second, the fact that OpenCell ID did not record the location of the cell sites at issue (IDs 19583, 27622, and 27633) until 2016 does not diminish the data. As SA Inman explained, those three cell sites were in use in 2012 because they were recorded in the Libyana call data records. SA Inman opined that it was extremely unlikely that the location of the cell sites in 2012 was different than that which was recorded in OpenCell ID in 2016. SA Inman has never seen a cell provider move a cell site, explaining that it was more common for cell providers to build new sites than move existing ones. Further, SA Inman explained that the three cell sites at issue during the pertinent time frame utilized 2G technology, which was an older technology and further made it unlikely that Libyana would utilize its resources to move the cell site as opposed to building newer technology and decommissioning the outmoded cell sites. Moreover, if the cell site had moved any substantive distance, the code for the cell site would have been different because it was located

---

[5] SA Inman plotted the sector information for all of the cell sites used between September 11, 2012 at 9:09 a.m. and September 12, 2012 at 12:13 p.m. that were located within the downloadable data set provided by OpenCell ID. Approximately seven cell sites were not part of the downloadable data set and thus are not part of Exhibit H. Those cell sites, however, are in the online version of OpenCell ID; in other words, OpenCell ID has records for all of the cell sites used on September 11-12, 2012, though a few are not included in the downloadable data file.

in a different LAC. It is also dubious that *all three* of the towers utilized by Khatallah's phone between 9:54-11:24 p.m. on September 11 would have been, coincidentally, moved by Libyana to the vicinity of the Mission in the time period between 2012 to 2016.

Third, the defendant submitted into evidence numerous maps from other cell tower location websites, but without any substantive information about what those maps purport to show or how those websites collect their information. Def. Ex. 1; Def. Ex. 4. The defendant did not explain those maps or support their reliability through any witness, and the maps are not clear on their face as to any conclusion the Court should draw. They have no evidentiary value.

## CONCLUSION

For the foregoing reasons, the government requests the Court find that the defendant was present in the vicinity of the Mission starting at approximately 9:54 p.m., and that at that time and immediately thereafter, it was reasonably foreseeable to him that death could result from the conspiracy he joined.

Respectfully submitted,

JESSIE K. LIU
UNITED STATES ATTORNEY
D.C. Bar No. 472845

By:      /s/
John Cummings
D.C. Bar No. 986573
Karen P. W. Seifert
N.Y. Bar No. 4742342
Assistant United States Attorneys
National Security Section
United States Attorney's Office
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7527
Karen.Seifert@usdoj.gov