**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | )   Crim. No. 17-CR-213 (CRC) |
| MUSTAFA AL-IMAM, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S SUPPLEMENTAL MEMORANDUM IN AID OF SENTENCING**

The government's supplemental memorandum argues that the phone of Ahmed Abu Khatallah was at the U.S. Special Mission at approximately 9:54pm based on cell towers IDs in Gov't Ex. 1100. The government's evidence is unreliable. But even if it weren't, it does not establish the location of Mustafa Al-Imam, much less what was in his mind. Like the government's other claims, this location argument ultimately amounts to a "just so" story rather than proof of a conspiratorial agreement to attack the Special Mission. The Court should reject it.

**I.   THE CELL PHONE LOCATION CLAIMS ARE UNRELIABLE AND IRRELEVANT**

    **A.   The Court cannot reliably draw conclusions from a single, anonymous cell sector "hit" in December 2016**

The government's evidence concerning the location of the cell towers that connected with Khatallah's phone between 9:54pm and 11:24pm comes from OpenCelliD and UnwiredLabs.com. OpenCelliD has a single measurement from December 2016 supporting its estimate of the location of cell sector 19583. Ex. 1. Cell sectors 27632 and 27633 are not found in OpenCelliD, but estimates are provided by the proprietary algorithm of UnwiredLabs.com. Ex. 2. However, their location is based on the same measurement of cell sector 19583. Ex. 3. Thus, if the antenna structure for these sectors was moved—whether laterally or vertically—in the four years after 2012, OpenCelliD's location estimate would be the wrong location for all three

1

sectors. And as the government's expert acknowledged, antennas are frequently placed on buildings, which would necessitate moving if the building received structural damage or if new buildings arose that blocked the existing signal.

Similarly, if the GPS data underlying this single measurement were inaccurate, spoofed, or corrupted, OpenCelliD's estimate would be affected. The UnwiredLabs website discusses the problems with GPS, stating:

> Signals aren't strong enough:
>
> Every satellite based navigation system share a fundamental weakness as they rely on signals from satellites transmitting from an altitude of around 12 thousand miles, the signals are very weak, making them vulnerable to accidental or deliberate interference.
>
> It's too easy to spoof:
>
> Simple apps available on the Google AppStore give people the ability to trick any app into thinking that they're in a location they actually aren't. Software spoofing is as simple as clicking a button. There is no need to root the device or learn programming.

Ex. 4, available at https://unwiredlabs.com/blog/trustedgps-when-gps-isnt-good-enough. Thus, anyone with access to Khatallah's records, which were part of an ongoing public prosecution as of December 2016, could have "spoofed" the anonymous measurement on OpenCelliD.

Taking OpenCelliD/UnwiredLab's estimates at face value, the evidence established that its margin of error, at least in some reports, covered almost half of Benghazi:



2

Ex. 5.  And since the blue circle only reflects the estimated center of the cell sector, the coverage area of the cell towers could extend even further away if the sector center were in the outer part of the margin of error.

Although UnwiredLabs does not explain the margin of error in its proprietary algorithm, its competitor, CellMapper.net, provides a Frequently Asked Questions website explaining some of the issues involved in algorithm-based estimates.  Ex. 6.  These include:

- "Low accuracy towers"

    "Low accuracy towers are towers whose location cannot be accurately predicted given the uploaded data. Therefore, they revert to a more simple algorithm of placing the tower closest to the location of the best signal strength. This will usually be significantly less accurate than the triangulation method normally used. Some towers that only have 1 or two cells, such as omnidirectional towers, will always be low accuracy. Likewise, any towers which were detected with weaker signals will also be low accuracy until stronger signal samples are uploaded."

- Water interference and phone errors

    "Tower locations are based purely on calculations. The reason that towers will show up over water is due to the fact that water usually doesn't contain any object that can block signals. So, to the algorithm, sitting in a building right beside a cell phone tower will appear to be the same as being 5 km away with direct line of sight. Hence, it will calculate an average of the two spots and display a marker there. The most ideal terrain to calculate a towers is a completely flat ground with tower spaced wide apart. That being said, even that will not guarantee the location is correct if the measurements provided by the phone were not correct. For a tower to be calculated properly, you will need to travel around the tower in at least 1/2 to 3/4 of a circle near the actual location in order to determine the exact location."

- Phones getting "stuck" reporting a single cell ID

    "Most phones will report the same Cell ID when a call is in progress. Likewise, some phones will get "stuck" to reporting a single cell id for a certain length of time. Another possibility is that the GPS device is incorrectly reporting the position; and as a result the location may keep changing wildly before it settles down to the right location."

*Id*.  There is no reason to think that these problems do not apply to UnwiredLabs's estimates, which involve the same algorithm-based estimations as CellMapper.net.  Indeed, Agent Inman testified that he uses CellMapper.net, and the government informed the defense in a May 31, 2019 letter that the approximate location of Khatallah's cell IDs could be located using OpenCelliD *or* CellMapper.net.  Ex. 7 at 1, n.1.

In addition to not knowing where, within a margin of two miles, the centers of the call sectors were, the government does not know how broad the coverage areas for these sectors were in 2012.  "Cell towers can service phones at distances of up to 35 kilometers (approximately 21 miles) and may service several distinct sectors."  Ayers et al., *Guidelines on Mobile Device Forensics*, NIST Special Publication 800-101 Revision 1 at 54 (May 2014), available at https://nvlpubs.nist.gov/nistpubs/specialpublications/nist.sp.800-101r1.pdf.  "While plotting call record locations and information onto a map can sometimes be useful, it does not necessarily provide a complete and accurate picture."  *Id*.

Of course, the defense does not dispute that cell phones more typically connect to towers less than 21 miles away.  "Various factors, such as terrain, seasonal changes, antenna performance, and call loading, affect the coverage area of cells and the plausible locale to associate with a call record."  *Id*.  However, the city of Benghazi is less then ten miles across, and a coverage area of even two miles covers major portions of the city.  And CellMapper.net—which uses the same kind of user-generated, real-world sources as OpenCelliD and UnwiredLabs—estimates cell sector coverage areas in Benghazi stretching many miles, including near the Mission:



*CellMapper.net coverage estimate for Cell ID 10382 reflecting an over 5-mile range (Ex. 8 at 1)*



*CellMapper.net coverage estimate for Cell ID 27311 reflecting an over 11-mile range (Ex. 8 at 2)*

5

The government claims that the defense did not explain these coverage maps or support their reliability through any witness. On the contrary, as noted above, Agent Inman testified that he has used CellMapper.net, and the government itself admitted in its May 2018 letter that CellMapper.net is an alternative to OpenCelliD for the plotting of cell IDs. Ex. 7 at 1, n.1. Thus, its objection to the simple conclusion these exhibits illustrate—that real-world Benghazi towers sometimes connect to phones up to 11 miles away—reflects simple expediency over truth.

Moreover, the towers near the Mission are precisely the kind one would expect to have a large coverage area based on the NIST report and Agent Inman's testimony. As reflected in the government's Exhibit G, the towers near the mission are surrounded by vast areas of land without any cell sector noted:



*Except of Ex. G showing large areas without towers to the south and west of the Mission*

For all of these reasons—antenna movement, GPS errors, GPS spoofing, large reported margins of error, "low accuracy towers," "stuck" cell ID reporting, and long tower ranges—the Court simply cannot reliably determine the location of the cell towers used by Khatallah's phone between 9:54pm and 11:24pm, much less how far away from those towers his phone was. And

given the timing of the calls—during a widely-publicized incident likely to generate unusual call volume, and thus a need for load balancing—there may have been network-based reasons to route calls through these towers that are simply unknowable in 2020, eight years after the event.

      **B.**      **The government's connection between Khatallah's phone and Al-Imam's location is based on a 5-year-old memory retold under stressful conditions**

Even if the Court concludes that Khatallah's phone was in the vicinity of the Mission, that does not mean that Al-Imam was. The government's argument rests on statements made by Al-Imam to investigators. But Al-Imam's timeline—placing himself at the Mission at 5pm—is patently inaccurate, showing his memory is simply unreliable. And that is understandable, since he was being interviewed five years after the fact on a ship following his traumatic capture. He recalled leaving in a caravan with Khatallah, but perhaps he only caravanned back; he recalled Khatallah arriving five minutes before him, but perhaps it only felt like five minutes. Perhaps Al-Imam is confusing calls with Khatallah made after he left with in-person conversations, placing himself closer in time to Khatallah's departure than he actually was. Counsel would venture to guess that closing arguments in this case were exciting for government counsel, yet they probably do not remember all of the details of how or when they arrived to court or to whom they spoke. Undersigned counsel does not. Al-Imam's memory aside, the fact that there are calls between Al-Imam and Khatallah would indicate that they are *not* together, rather than that they are.

Moreover, even if Al-Imam did travel with Khatallah, he could have done so after 9:54pm without contradicting the call records. Taking the government's tower arguments at face value, it would appear that it only took a few minutes for Khatallah to travel to the area of the Mission: he had a five-minute call at 9:35 from LAC 9190, was in the coverage area of LAC 9380 six minutes after this call ended, and used Cell ID 19583 nine minutes after that. Gov't Ex. 1100. If the camp was this close, Khatallah could have left the Mission multiple times, including during the alleged

7

18-minute phone call or the twenty-four minutes between his last call and his video appearance. That is especially true since the coverage area of 19583 could have extended over his travel route, and since cell phones can get "stuck" reporting the same cell ID, Ex. 6. This would match the testimony of a civilian grand jury witness, who testified that he saw Khatallah arrive at the Mission with several men after the attack had ended.

        **C.**      **Presence at the scene does not equate to agreement with the attack**

Finally, even if Khatallah's phone *and* Al-Imam were both at the U.S. Mission starting at 9:54pm, that provides no insight into Al-Imam's *state of mind*. The point of the cell tower evidence is to show that "it was reasonably foreseeable to [Al-Imam] that death could result from the conspiracy he joined." Gov't Supp. Sent. Mem. at 10. But even if he were sitting right by Khatallah's side outside the Mission, that would not indicate that he joined the conspiracy to *attack* the mission. Wissam bin Hamid reported that he was also standing outside the Mission with Khatallah during the fighting, with no awareness that Khatallah was behind it. David Kirkpatrick, *A Deadly Mix in Benghazi*, N.Y. Times (Dec. 28, 2013), available at http://www.nytimes.com/projects/2013/benghazi/index.html#/?chapt=0. Al-Imam likewise could have been observing the chaos—as Wissam bin Hamid apparently was—without knowing that Khatallah was responsible.

The government cannot escape the fact that its evidence and argument described a two-phase event, with the second phase occurring after "the battle for the Mission is over" and the "facility has been lost." Tr. 3803 (government closing argument). The jury was unconvinced that Al-Imam joined the first phase, and his mere knowledge and presence is not sufficient (or even particularly strong) evidence that he agreed with it. As the jury heard, there were other individuals connected to Khatallah and Ansar al-Sharia who entered the office during the "site exploitation" phase and for which there was little basis to conclude they conspired in the initial attack. This

included AAS member Jalal Al-Sudani and the former UBJ member and friend of Ali Majrisi.[1] Tr. 1094; Ex. 9. This shows that being at the scene, going into the office, and being associated with Khatallah or AAS are not strong indications that someone knew about or agreed with the initial attack.

Supporting this conclusion is the evidence that Khatallah took pains to create a web of alibi witnesses who did not know his full involvement in the Mission attack, including Ahmed Salem, Bilal al-Ubeydi, and Wissam bin Hamid. Significantly, Khatallah called one these men during the attack itself (al-Ubeydi), and reportedly stood next to another outside the Mission (bin Hamid). Thus, Al-Imam's presence at the Mission is no indication that he knew Khatallah was responsible, much less that he *agreed* with what was going on.

In sum, the government's tower-location evidence is inconclusive at best. But more fundamentally, it is irrelevant given the jury's verdict and the two-stage nature of the events at the Mission. The jury heard evidence about the type of man Al-Imam is and his friendship with Khatallah, and refused to convict him of any charge associated with arson or attacks resulting in death. They convicted him of property damage, consistent with joining a "site exploitation" conspiracy as charged in the Indictment. Dkt. 43, ¶ 21(e) (listing "to plunder property from the Mission and Annex, including documents, maps, and computers containing sensitive information," as one of the "objects and purposes of the conspiracy"). Whether he was at the Mission at 9:54pm or not, there is no evidence that Al-Imam joined a broader conspiracy to do anything more than what he has been convicted of.

---

[1] Majrisi himself admitted to being longtime "friends" with Zubayr Al-Bakoush and Ahmed Al-Fitori, two key leaders of the Mission attack. Tr. 2150–51.

## II.     THE GOVERNMENT'S OTHER ASSERTIONS ARE WITHOUT MERIT

In its sentencing submission, the government made several other allegations against Al-Imam in an effort to bolster its argument that Al-Imam would have joined in a conspiracy to attack the United States resulting in death.  Specifically, the government asserted that: (i) Al-Imam demonstrated anti-American bias in his FBI interviews; (ii) Al-Imam agreed with Khatallah's statement that the Americans had been using the Mission as a spy base; (iii) Al-Imam moved weapons for Khatallah at Khatallah's direction; (iv) Al-Imam took up arms to defend Khatallah after the assassination of Colonel Al-Bargathi; and (v) the call records demonstrate closeness between Al-Imam and Khatallah and Al-Imam's role in the attack.  These claims are easily answered.

First, there is nothing in Al-Imam's FBI interviews that reflect "anti-American bias."  In his statements about General Haftar, Al-Imam is quoted as describing what the *Libyan people* think of Haftar, not as providing his own personal opinions.  *See* Ex. 10 at 2 ("AL IMAM said the *Libyan people* were not confident in the current Libyan president HAFTAR and felt he was in line with the American government. AL IMAM said the *people* feel that HAFTAR was put in government by the Americans. AL IMAM said most *Libyans* felt HAFTAR was an American.") (emphasis added); *id*. at 3 ("AL IMAM continued to speak about the *Libyan people*, and how HAFTAR was believed to be an American.") (emphasis added).  Nor was this public opinion anti-American:  it is not anti-American to desire self-determination and oppose foreign meddling in domestic politics, any more than it is anti-Russian to oppose Russian interference in the 2016 U.S. presidential election.  Nor is fighting against Gen. Haftar evidence of anti-American bias.  Even Fathi al-Obeidi, who risked his life to rescue Americans and received a commendation from the U.S. government, joined the fight against Gen. Haftar.  *See* Frederic Wehrey, *'We Helped You and Now You Abandoned Us'*, N.Y. Times (April 16, 2018), available at

10

https://www.nytimes.com/2018/04/16/opinion/libya-america-cia.html (quoting, as its title, the plea of Fathi al-Obeidi for assistance in his struggle against General Haftar). Finally, when he did speak about his own opinions, Al-Imam *criticized* extremist groups fighting Gen. Haftar as "mainly thugs and hooligans" and "the worst people of Libya." Ex. 11 at. 2. There is thus no basis for the claim that Al-Imam's statements to the FBI reflect "anti-American bias."

Likewise, there is no substance to the government's insistence that Al-Imam "agreed with Khatallah's statement that the Americans had been using the Mission as a spy base." Gov't Sent. Mem. at 11. The statement referred to by Majrisi occurred many months or even years after the attack, after the existence of the CIA-run Annex and had become common knowledge. Moreover, in Majrisi's telling, Khatallah comes across like an agitated uncle going on about politics at Thanksgiving dinner, making everyone uncomfortable until they acknowledge token agreement:

> Q: At any of those meetings, did Mr. Abu Khatallah talk about the Americans spying on Libya or Libyans?
>
> A: He talk about this all the time, Ahmed Abu Khatallah….
>
> Q. Okay. And when Mr. Abu Khatallah would talk about the Americans spying, what types of things -- what did he say?
>
> A. Like they have a base. They spy on us. They don't use this as a consul.
>
> Q. Now, when Mr. Abu Khatallah made those statements, did the people in the group, including Mr. Mustafa Al-Imam, respond? Did they agree, or did they disagree?
>
> A. Yes, they agree.
>
> Q. Were you one of the people in the group?
>
> A. Yes.
>
> Q. Did you agree or disagree?
>
> A. Yes, definitely. I have to agree.

Tr. 2064–65. On this telling, Al-Imam's "agreement" was no more incriminating than Majrisi's. Nor is there anything incriminating about this subject in his FBI interview: Al-Imam was asked in the abstract what he knew about the Mission, and said that Khatallah believed it was a U.S. spy

11

base. There is no connection between that statement and any motive for attacking the Mission. It is just an answer to a question based on what, according to Majrisi, Khatallah had been ranting about months after the Mission attack.

The government's reliance on the claim that Al-Imam moved weapons for Khatallah at Khatallah's direction is easily refuted: it didn't happen. Majrisi described this incident in detail in real time in his cables, listing everyone who participated by name. Ex. 12. Al-Imam was not among them. This claim arose for the first time shortly before Majrisi's deposition in this case—five years after the fact—and is simply not credible. Ex. 13.

Majrisi's claims about Al-Imam defending Khatallah after the assassination of Col. Barghathi are also late additions, and irrelevant. Majrisi testified that everyone who knew Khatallah came to defend him against an attacking mob, including Faraj Shaku—a defender of the Mission. Tr. 2192. Bilal al-Ubeydi, the government's star witness and a member of the Benghazi security apparatus, also intervened at Khatallah's request by getting his uncle to help mediate a peaceful resolution. Tr. 1102. There is thus nothing incriminating in this incident or evidence of any ideological bent by Al-Imam, other than a desire to avoid mob retaliation against a friend who also happened to be living adjacent to his own elderly uncle.

Finally, the government's reliance on the call records to argue that Al-Imam must have known about and agreed with Khatallah's plans to attack the Mission was rejected by the jury, for good reason. FBI analyst Jessica Krueger testified that according to the records, Khatallah spoke significantly more with two other individuals during the relevant timeframe than he did with Al-Imam, yet that frequency was not determined to reflect any indicia of conspiratorial activity. Tr. 3164–65. Agent Krueger also testified that there is no way to tell from the records if Khatallah switched over to another call after the call in the records began; it is thus impossible to determine whether the famed 18-minute call was even with Al-Imam. And even if Al-Imam was live-

reporting the attacks to Khatallah—as the government fancifully claims in its "just so" story—there is still no basis to conclude that Al-Imam agreed with what was going on. Again, Khatallah appears to have been using key "friends"—Ahmed Salem, Bilal al-Ubeydi, Wissam bin Hamid, and likely Al-Imam—to accomplish his purposes while maintaining plausible deniability.

In the usual case the government has *evidence* to disprove innocent presence: wiretaps, incriminating warrant returns, ideological writings, anti-American statements. Here, it asks the Court to impose a severe sentence for Al-Imam based on assumptions. The Court should reject the government's attempt to secure a sentence based on a conspiracy the jury rejected and the evidence fails to support. Instead, the Court should impose a guidelines sentence for the conspiracy the jury did find—the conspiracy charged in the indictment to injure U.S. property with the object "to plunder property from the Mission and Annex, including documents, maps, and computers containing sensitive information." Dkt. 43, ¶ 21(e).

## CONCLUSION

For the foregoing reasons, Defendant Mustafa al-Imam respectfully requests that the Court find that there is insufficient evidence to find that Al-Imam intentionally joined a conspiracy that could reasonably foreseeably result in death, and impose a guidelines sentence of no more than 41 months, with a standard departure under *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994).

January 22, 2020

Respectfully submitted,

/s/ Matthew J. Peed
Matthew J. Peed (D.C. Bar No. 503328)
CLINTON & PEED
777 Sixth St. N.W., 11th Floor
Washington, DC 20001
(202) 621-1828 (tel)
(202) 204-6320 (fax)

*Counsel for Defendant Mustafa Al-Imam*